FILED
4:30 P.M.
JUN 5 1978

V. J. FURSTENAU, CLERK
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA
BY _____

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

FISHER, et al.,                          )
                                         )
              Plaintiffs,                )
                                         )
UNITED STATES OF AMERICA,                )   CIVIL NO. 74-90-TUC-WCF
                                         )
              Plaintiff-Intervenor,      )
                                         )
       vs.                               )
                                         )
LOHR, et al.,                            )
                                         )
              Defendants,                )
                                         )
and                                      )
                                         )
SIDNEY L. SUTTON, et al.,                )
                                         )
              Intervenors-Defendants.    )
——————————————————————                   )
                                         )
MENDOZA, et al.,                         )
                                         )
              Plaintiffs,                )   CIVIL NO. 74-204-TUC-WCF
                                         )
UNITED STATES OF AMERICA,                )
                                         )
              Plaintiff-Intervenor,      )   FINDINGS OF FACT AND
                                         )   CONCLUSIONS OF LAW
       vs.                               )
                                         )
TUCSON SCHOOL DISTRICT NUMBER 1,         )
et al.,                                  )
                                         )
              Defendants.                )
——————————————————————                   )

        These consolidated actions charge Tucson School District
Number 1 with intentionally segregating Black and Mexican-American
students from other students on the basis of race and national origin.
This matter was tried to the Court without a jury on the issue of
segregative intent.  The Court's Findings of Fact and Conclusions
of Law are as hereinafter set forth.  Each paragraph will be numbered
under the respective headings used herein in order to make it simpler
for reference purposes hereafter for the Courts and counsel.

                        <u>INTRODUCTION</u>

        1.  The plaintiffs in these cases have referred to themselves

as minority or minorities, Blacks and Mexican-Americans.  Defendants have responded accordingly.  In order to avoid confusion, this terminology will be utilized by the Court.  Also, the parties and witnesses have used the terms "District", "School District", "Board", "School Board" interchangeably as referring to defendant Tucson Elementary School District No. 1, its Board of Trustees and its administrators.  Again, the Court will conform so as to avoid con- fusion, but rather than using the terms interchangeably, will use "District" as reference to all.

A short historical sketch of this area, of the school district and of the proceedings in these cases is needed as back- ground to the detailed findings and conclusions of the Court.

2.  Tucson lies in southern Arizona 65 miles from Mexico. It is surrounded by mountains -- the Catalinas to the north, the Tucson Mountains to the west, the Rincons and Santa Ritas to the east and south respectively.  Generally speaking, it is approximately 15 miles from the base of the Tucsons to the base of the Rincons, and from the base of the Catalinas to the base of the Santa Ritas is quite a distance further.

The valley is drained by three streams, all of which are now intermittent.  The Santa Cruz River is the largest.  It flows north from Mexico through the extreme western portion of the valley and then runs out of the valley to the northwest.  The Rillito ("little river" in Spanish) flows west along the foot of the Catalinas to meet the Santa Cruz at the northern end of the valley.  The Pantano Wash flows from the southeastern corner of the valley to join the Rillito.  These streams have not presented major obstacles to school attendance, nor do they in any way affect the result in this suit.

3.  The first Europeans came to this area in the sixteenth century.  Coronado passed on the far side of the Rincons, Jesuit missionaries came later, then the military and the settlers.  Tucson has for many centuries been the site of Indian villages, but it is generally accepted that the original Spanish settlement was established

in 1775.  Tucson celebrated its bicentennial in 1975.  This area
became a part of Mexico when the Mexicans won their independence
from Spain, and it remained a part of Mexico after the war  between
the United States and Mexico.  It did not come under the American
flag until the Gadsden Purchase in 1853.  The area has a definite
Mexican heritage.

4.  The Gadsden Purchase brought the United States a
satisfactory southern route for the railroad; however, it was not
until 1880 that the railroad reached Tucson.  The Southern Pacific
main line now slants across the valley from southeast to northwest
through the geographic center of the School District which is now
24 miles from east to west and averages nine miles from north to
south.  The railroad tracks passing through the District have always
presented a major transportation barrier and problems for the School
District.

5.  Tucson's population has grown steadily through the
years with what can be termed a "staggering increase" occurring
between 1950 and 1960.  The following illustrates the growth pattern
for Tucson and Pima County:

| | TUCSON | PIMA COUNTY |
|---|---|---|
| 1870 | 3,000 | 5,700 |
| 1880 | 7,000 | 17,000 |
| 1890 | 5,000 | 11,000 |
| 1900 | 7,500 | 12,000 |
| 1910 | 13,000 | 22,000 |
| 1920 | 20,000 | 37,000 |
| 1930 | 32,500 | 57,000 |
| 1940 | 36,000 | 72,000 |
| 1950 | 45,500 | 141,000 |
| 1960 | 213,000 | 265,000 |
| 1970 | 263,000 | 351,000 |
| 1975 | 299,000 | 449,000 |

6.  Most of Tucson's population lives within District

-3-

No. 1, but there are other districts which contain substantial
parts of Tucson, notably Amphitheater and Flowing Wells on the
north and Sunnyside on the south. To the west, District No. 1
extends past the Tucson Mountains to cover a large area outside
the City of Tucson. The Tucson Mountains also constitute a
major transportation barrier or obstacle.

7. Tucson School District No. 1 was formed in 1867
with boundaries "one mile each way from the Plaza de la Mesilla".
The area where the Plaza formerly was is now known as "La Placita",
and is located on Broadway in the downtown area. The first school
of the District was opened by Augustus Brichta, a saloon keeper,
in 1868. It had a dirt floor, and the students were 55 Mexican
boys. The school operated for only six months, then closed. There
was no public school in Tucson until 1872.

8. The second school in Tucson was located at the corner
of Meyer and McCormick and was taught by John Spring. Maximum
enrollment was 138 and, again, few students spoke English natively.
In the next year of operation, there were two teachers, Maria
Wakefield and Harriet Bolton, but only 75 students. Finally, in
1875 the District built its own school building on Congress Street.
Enrollment grew to 350 by 1882.

9. As the town grew the School District expanded both
in area and enrollment. In 1887-88 there were 528 pupils; by 1910
there was an enrollment of over 2,300. The District expanded from
four square miles to 30 square miles. In 1910 there were six schools,
the high school (now Roskruge Elementary), Mansfeld (now Safford
Elementary), Safford, Davis, Drachman and the original Holladay
(torn down to build Tucson High).

10. Pursuant to state law and after a petition presented
by Negro parents, a segregated school (Dunbar) was opened in the
fall of 1913. Dunbar School (renamed Spring) was completed in 1917
and housed the Black students in grades K through 8 until steps were
taken to desegregate it in 1951. Black students attended high school

with all the other students at Tucson High.

11.  By May, 1920, two more schools had been built --
Menlo Park and University Heights.  Districtwide enrollment was
538 in the high school and 3,582 in the elementary schools.  The
new school superintendent was C. E. Rose, and with his tenure the
plaintiffs' witnesses begin their analysis of the District's actions
which they have alleged served to maintain a separate system for
Mexican-American students.  The findings and conclusions of the
Court cover the pertinent remainder of the District's history in
more detail.  Nevertheless, a few additional facts are worthy of
note as background.

12.  Although there have been a great many school board
members during the past 58 years, there have been only four super-
intendents:  C. E. Rose from 1920 to 1941, Robert Morrow from 1941
to 1967, Thomas Lee from 1967 to 1977 and Wilbur Lewis from 1977
to the present.

13.  In that period, school population has multiplied;
the District has grown to cover an area of close to 200 square
miles, and the number of schools has increased from eight to 98
(71 elementaries, 18 junior highs and nine high schools).  A chart
of school enrollment gives a general idea of the problems which
have confronted the District:

|         | GRADES K-8 | HIGH SCHOOL | TOTAL  |
|---------|-----------|-------------|--------|
| 1919-20 | 3,582     | 538         | 4,120  |
| 1929-30 | 7,001     | 1,481       | 8,482  |
| 1939-40 | 9,526     | 2,216       | 11,742 |
| 1950-51 | 13,997    | 2,174       | 16,171 |
| 1959-60 | 28,102    | 8,495       | 36,597 |
| 1969-70 | 37,114    | 16,497      | 53,611 |
| 1975-76 | 41,583    | 19,842      | 61,425 |

PLEADINGS

1. On May 24, 1974, individual Black parents and the
N.A.A.C.P. filed a lawsuit in this Court, CIV-74-90-TUC-WCF, on
behalf of themselves and of a class of similarly situated people
charging  Tucson School District No. 1, its Board of Education,
its superintendent and the Pima County School Superintendent with
violations of the United States Constitution and various statutes.
They asked that the defendants be permanently enjoined from racially
segregating and discriminating against Black children in elementary
and junior high schools.

2. In October of the same year, individual Mexican-
American parents and the Mexican-American Legal Defense Fund
(MALDEF) on behalf of themselves and of a class, filed a similar,
but more expanded lawsuit, CIV-74-204-TUC-WCF, against the same
defendants, charging illegal discrimination against Mexican-American
children on the basis of race, color and national origin.  They
also asked for permanent injunctive relief.  The Amended Complaint
contained eight counts alleging:  One, the creation and maintenance
of a triethnic segregated system; two, discriminatory tracking of
students; three, inferior curricula and facilities for minorities;
four, discrimination in the hot lunch program; five, discrimination
in the special education program; six, failure  to properly take
into account linguistic differences; seven, the lack of bilingual
notices; and eight, failure to employ and promote "Chicano" staff.
Before trial the plaintiffs and defendants stipulated to dismiss
Counts Three, Four and Seven and to sever and stay any further pro-
ceedings to Counts Two, Five and Six. Only the segregation and
employment counts remain, and since no plaintiff is alleging employ-
ment discrimination against himself, the issue is properly in the
case only insofar as it is relevant to segregative intent and racial
identification of schools.  There is no plaintiff in the case with
any proper standing to raise the employment issue per se.

3. In each case a hearing was held concerning the

-6-

certification of a class, and in each case a plaintiff class was
certified consisting of Black or Mexican-American children attending
grades K through 8 in the District and the parents of these children.
A class of Mexican-American students attending grades 9 through 12
and their parents, guardians or next friends was also certified.
The suit by the Black plaintiffs concerns only grades K through 8 and
does not concern the high schools.  At the same time that the plaintiff
classes were certified the N.A.A.C.P. and MALDEF were dismissed as
plaintiffs for lack of standing.

4.  In May of 1975, the two cases were consolidated for
pretrial and trial; however, the cases retain their separate
identities.

5.  During the pendency of these actions there have been
two attempts by individual parents to intervene, one on the side of
the defendants and one on the side of the plaintiffs.  Initially,
those on the side of the defendants were allowed to intervene, and
a class of non-Black, non-Mexican-American students and parents
was certified.  However, at hearings which were held concerning
such class, the diversity of interests of the class became apparent
and the certification of the class was withdrawn.  Permission to
intervene was not withdrawn.  As to those who later attempted to
intervene on the side of the plaintiffs, the Court held that their
interests were coextensive with those of the Black and Mexican-
American plaintiffs and their intervention would add nothing to
the case or to the just and speedy resolution of these actions.
They were not allowed to intervene, but they may renew their request
if the need for doing so should arise.

6.  In July of 1976, well over two years after filing,
the parties still had not been able to complete discovery procedures
and trial preparations.  In order to expedite these cases the Court
set deadlines for completing discovery and fashioned certain other
requirements not normally encountered in litigation.  Almost the
entire case of the plaintiffs is based on history, statistics and

expert analysis thereof.  The Court anticipated complicated and
voluminous testimony requiring trial time far in excess of that
which was currently available in the District of Arizona.  For
that reason, and also in order to have well-documented testimony
available after trial, it was ordered that all direct testimony
be submitted in the form of verified written statements along
with relevant or supporting data.  In addition, all designations
of deposition testimony, exhibits, rebuttal evidence and objections
to evidence were to be submitted well before the actual trial began.
At trial a very limited amount of direct examination, all cross
examination and all redirect were allowed.  Even with these
limitations, trial and oral argument lasted nine days.

        7.  After all written evidence was submitted, and only
two weeks before the final pretrial conference, the United States
moved to intervene pursuant to 42 U.S.C. §2000h-2.  Intervention
was allowed, but since it appeared unlikely that the Government
would have any additional or new evidence to offer, the United States
was not allowed to start the discovery and evidence-gathering
procedure all over again, nor to submit any separate evidence
of its own.

        8.  The actual trial was conducted January 11 through
January 21, 1977.  Final arguments occurred in April.

JURISDICTION, STANDING AND CLASS STATUS

1. Plaintiffs, Maria Mendoza, Alberto Sanchez and Theresa Trujillo are adult, Mexican-American citizens of the United States and the State of Arizona and residents within Tucson School District No. 1, Pima County, Arizona.

2. Plaintiff children, identified in paragraphs 3 through 10 hereunder, who sue by and through their parent and/or next friend, are minor children, citizens of the United States and the State of Arizona and residents within Tucson School District No. 1, Pima County, Arizona. They are Mexican-Americans.

3. Nancy Mendoza, a minor, sues by her parent and next friend, Maria Mendoza, but does not attend and has not attended a Tucson School District No. 1 elementary school.

4. Nadine Sanchez, a minor, sues by her parent and next friend, Alberto Sanchez, and was attending Manzo Elementary School.

5. Betty Sanchez, a minor, sues by her parent and next friend, Alberto Sanchez, and was attending Manzo Elementary School.

6. George Sanchez, a minor, sues by his parent and next friend, Alberto Sanchez, and was attending Manzo Elementary School.

7. Ernest Sanchez, a minor, sues by his parent and next friend, Alberto Sanchez, and was attending Spring Junior High School.

8. John Sanchez, a minor, sues by his parent and next friend, Alberto Sanchez, and was attending Tucson High School.

9. Albert Trujillo, a minor, sues by his parent and next friend, Theresa Trujillo, and was attending Cholla High School.

10. David Trujillo, a minor, sues by his parent and next friend, Theresa Trujillo, and was attending Cholla High School.

11. Plaintiffs bring this action in their own behalf and in behalf of others pursuant to Rule 23(b)(1)(B), 23(b)(2) and 23(b)(3), Federal Rules of Civil Procedure.

12. The class which the plaintiffs represent is so numerous that joinder of all members thereof is impracticable.

Said class consists of "all Mexican-American or Hispano-American
students or students with Spanish surnames who attend grades K
through 8 in Tucson School District No. 1 and grades 9 through 12
in Tucson High School District No. 1 and the parents, guardians
and/or next friends of those students."  (See December 29, 1975,
Order of this Court.)

      13.  There are some questions of fact and law common to
all members of the class represented by plaintiffs, namely:

          a.  Whether the members of said class, by
              virtue of the acts or omissions of the
              defendants, are attending de jure segre-
              gated schools in violation of their
              constitutional rights; and

          b.  Whether the members of said class, by
              virtue of the acts or omissions of the
              defendants, are being deprived of access
              to equal educational opportunities in
              violation of their constitutional rights.

      14.  The claims of the individual plaintiffs are not
representative and typical of all the members of the class.

      15.  Said individual plaintiffs could fairly and
adequately represent and protect the interests of the class,
but the plaintiffs and all the members of the class do not share
common objectives and purposes in presenting the issues framed
herein and in seeking a declaration of their constitutional rights.

      16.  However, the prosecution of separate actions by
individual members of the class would, as a practical matter,
be dispositive of the interests of other members not parties
to the adjudication and would substantially impair their ability
to protect their interests.

      17.  The parties opposing the class, i.e., the defendants
herein, have acted or have refused to act on grounds generally
applicable to the class.  Any final disposition with respect to

this case will necessarily apply to the class as a whole.

18.   The questions of law, but not fact, common to the members of the class predominate over any questions affecting or relating only to individual members of the class, and proceeding by way of this class action is superior to any other alternate means available for the fair and efficient adjudication of the controversy and of the granting of adequate relief.

19.   The evidence has failed to show that the interests, aims, complaints, past and present, economic and social backgrounds, residence, schools attended, neighborhoods in which the plaintiffs live, are similar or the same or typical of those of all the class which plaintiffs in Case No. 74-204 represent.

20.   Plaintiff Mendoza in Case No. 74-204 has no standing in this case, either in an individual or representative capacity.

21.   Defendant, Tucson School District No. 1, Pima County, Arizona, is a body corporate, organized and existing under the laws of the State of Arizona.

22.   Defendant, Board of Trustees of Tucson School District No. 1 (hereinafter referred to as the "Board"), is organized and exists under the laws of the State of Arizona.  A.R.S. §15-431, et seq. and §15-541, et seq.  The Board is composed of five School District Trustees, elected to such office by electors residing within the boundaries of the School District; said Board is vested with all powers delegated to a Board of Trustees or to a school district by law, and is required to perform all duties required by law.

23.   Defendants Laura Almquist, Raul Grijalva, Helen Hafley, Soleng Tom and Mitchell Vavich, are all residents of Pima County, Arizona, and are elected School District Trustees and members of said Board of Education.

24.   Defendant Thomas Lee is a resident of Pima County, Arizona, and was at times pertinent to this case, the appointed superintendent of schools of Tucson School District No. 1,

(hereinafter referred to as the "Superintendent").  He was the
executive officer of the Board of Education and was charged
with the responsibility of maintaining, managing and governing
the public schools in the School District in accordance with
the rules, regulations, resolutions, policies, directives,
customs, practices and usages established by defendant Board
of Education.

25.  Defendant Anita Lohr is a resident of Pima
County, Arizona, and is Superintendent of Schools for Pima
County, Arizona, and is chief administrative officer for
public education in Pima County.

26.  Each defendant in Case No. 74-204 is sued
individually and in his or her official capacity.  However,
the evidence fails to reveal any act or conduct of any defen-
dants in their individual capacity, as distinguished from
their official capacity which in any way supports any claim
or complaint of any plaintiff.

27.  Plaintiffs Boyd Lewis, Elizabeth Lewis, Reverend
Lloyd D. Hall, Jr. and Virginia Hall, Case No. 74-90, are adult,
Black citizens of the United States and the State of Arizona and
residents within Tucson School District No. 1, Pima County, Arizona.

28.  Plaintiff children, in Case No. 74-90, who sue
by their parents and/or next friend, are minor children, citizens
of the United States and the State of Arizona, and residents within
Tucson School District No. 1, Pima County, Arizona.  They are
Black.

29.  Ellen Lewis, a Black minor, sues by her parents and
next friends, Boyd Lewis and Elizabeth Lewis, and was at time of
trial attending Spring Junior High School.

30.  Keith and Kamille Hall, Black minors, sue by their
parents and next friends, Rev. Lloyd D. Hall, Jr. and Virginia
Hall, and were at the time of trial attending University Heights
Elementary School.

31. Lloyd Hall, a Black minor, sues by his parents and next friends, Rev. Lloyd D. Hall, Jr. and Virginia Hall, and was at time of trial attending Doolen Junior High School.

32. Plaintiffs bring this action (74-90) in their own behalf and in behalf of others pursuant to Rule 23(b)(1)(B), 23(b)(2) and 23(b)(3), Federal Rules of Civil Procedure.

33. The class which the plaintiffs represent is so numerous that joinder of all members thereof is impracticable. Said class consists of "all Black students who attend grades K through 8 in Tucson School District No. 1 and the parents, guardians and/or next friends of those students". (See November 26, 1974, Order of this Court).

34. These are questions of fact and law common to all members of the class represented by plaintiffs, namely:

     a. Whether the members of said class, by virtue of the acts or omissions of the defendants, are attending de jure segregated schools in grades K through 8 in Tucson School District No. 1, in violation of their constitutional rights; and

     b. Whether the members of said class, by virtue of the acts or omissions of the defendants, are being deprived of access to equal educational opportunities in violation of their constitutional rights.

35. The claims of the individual plaintiffs are not representative and typical of the class, each minor plaintiff does not reflect and illustrate the constitutional deprivations alleged in plaintiffs' complaint.

36. Said individual plaintiffs will fairly and adequately represent and protect the interests of the class, in that said plaintiffs and the class apparently share common objectives and

purposes in presenting the issues framed herein and in seeking a declaration of their constitutional rights.

37. The prosecution of separate actions by individual members of the class would, as a practical matter, be dispositive of the interests of other members not party to the adjudication and would substantially impair their ability to protect their interests.

38. The parties opposing the class, i.e., the defendants herein, have acted or have refused to act on grounds generally applicable to the class, and any final disposition of the case will apply to the class as a whole.

39. The evidence has failed to show that the interests, aims, complaints, past and present, economic and social backgrounds, residence, schools attended, neighborhoods in which the plaintiffs live, are similar or the same or typical of all those members of the class which plaintiffs in Case No. 74-90 represent.

40. The questions of law, but not fact, common to the members of the class predominate over any questions affecting or relating only to individual members of the class, and proceeding by way of this class action is superior to any other alternative means available for the fair and efficient adjudication of the controversy and of the granting of adequate relief.

41. Edward H. Levi, as Attorney General of the United States, certified that these consolidated cases were of general public importance within the meaning of 42 U.S.C. §2000h-2. By its untimely application to intervene, and as a condition to the granting of the application to intervene, the United States has waived the right to present evidence or to object to the form in which evidence has been received in these cases. The United States does have standing to argue the evidence presented by the other parties, to argue the law in these cases and to seek remedies on behalf of itself and of the plaintiffs.

-14-

## BACKGROUND

1.  The only major barriers within the District are the railroad tracks which, as pointed out above, bisect the District geographic area, entering from the southcentral and traversing the District area northwesterly, generally across the western one-third part thereof; an interstate highway (I-10) which enters the District area from the south, west of the railroad tracks and then parallels the railroad tracks to a point near the northern geographic boundary of the District where the railroad and I-10 merge, side by side; and Davis-Monthan Air Force Base which covers approximately six square miles in the southcentral portion of the District just east of the railroad tracks.

2.  For purposes of their own, plaintiffs and their expert witness Lamson, undertook to divide the District into four "activity areas" or "regions". Throughout the case, plaintiffs' counsel and their witnesses presented an analysis of the case using such four regions. This proved to be misleading, confusing and unrealistic.

There was no evidence to show any establishment of such areas, zones or regions by the District or to show any use by or reliance upon such zones, areas or regions by the District. These four regions were arbitrarily and artificially created and were purely the result of witnesses' theories and conclusions.

If it was the intent of the plaintiffs' witnesses to divide the School District into areas or regions based on Board decisions, practices or policies, development, historical data and/or racial or ethnic makeup of the District area, then only two basic areas are logical in light of the evidence. One would be logically termed the eastern half and the other the western half. The dividing line or boundary between the two areas appears to the Court to be North First Avenue starting at the northern boundary line of the District, thence going south

along North First Avenue to its merger with Euclid Avenue (at Grant Road), then continuing south along Euclid to the railroad tracks, thence along the railroad tracks to the southern edge of the District boundary.

3.   The District appears to have always shown great deference to the railroad tracks in setting attendance zones, student assignments, busing and school sites.  However, such barrier was not always respected in such matters, especially after the construction of overpasses allowing better passage over the tracks.

4.   There were, at the time of trial, 42 elementary schools in the eastern portion of the District and 27 in the western part.  (Spring was closed at time of trial and Borman, on Davis-Monthan Air Force Base, was not considered open.)

5.   There were, at the time of trial, 11 junior high schools in the eastern portion and six in the western part.

6.   There were, at the time of trial, six high schools in the eastern portion and two in the western part.

7.   There were two elementary schools, Roskruge and University Heights, which logically could be termed borderline schools.  These two schools had attendance areas spanning both sides of North First-Euclid Avenues.

8.   There was only one borderline junior high school, Roskruge, and it had an attendance area which included children living on both sides of First-Euclid Avenues.  This school was closed after the 1971-72 school year.

9.   There was only one borderline high school, Tucson High School, which had an attendance area on both sides of First-Euclid Avenues.

10.  As previously stated, the parties have classified the students within the District as minority, minorities or Black, Mexican-American and Anglo or White.  Such designations will be used by the Court for clarity and continuity.

11.   Tucson School District No. 1 consists of 228 square miles spanning four townships (24 lineal miles) at its widest point (E to W), and almost three townships (14 lineal miles) at its longest point (N to S).  The width of the District varies along its length from 24 miles maximum at 22nd Street to two miles minimum at Snyder Road.

12.   The extreme north and south schools, Collier and Lyons, while seven air miles apart, are separated by approximately 10.2 miles driving distance.  The extreme east and west schools, Vesey and Dunham, are 17 air miles apart and 20 miles driving distance apart.

13.   From Collier Elementary in the northeast portion of the District to Lawrence Elementary in the southwest is a driving distance of approximately 26.0 miles.  From Sabino Junior High to Pistor Junior High is a driving distance of approximately 24.2 miles.  From Sabino High School to Cholla High School is a driving distance of approximately 19.3 miles.

14.   In 1950, the School District consisted of a total of 34 schools:  27 elementary, six junior high and one high school. In 1976, there were 96 schools:  70 elementary, 17 junior high and nine high schools.

15.   Between 1950 and 1974 the student enrollment in Tucson School District No. 1 increased by over 450 percent; the total number of schools nearly tripled to house such increased student population.

16.   The racial composition of the School District's population in 1974 was 26.3 percent Spanish-surnamed, 5.2 percent Black and 68.5 percent Anglo.

17.   In numbers, there were at time of trial approximately 1,681 Black students in elementary school, 9,066 Mexican-Americans and 20,603 "Other" who were presumptively Anglo or White. Of these numbers, 1,016 Blacks, 6,342 Mexican-Americans and 3,350 "Others" (presumptively Anglo), for a total of 10,708 students,

were attending westside or border area elementary schools.  In
the eastside elementary schools, there were 665 Blacks, 2,724
Mexican-Americans and 17,253 "Others", for a total of 20,642.

18.  In the 1975-76 school year, there were 531 Blacks
then attending junior high school, 2,837 Mexican-Americans and
6,865 who were presumptively Angle or White.  The westside
schools had 309 of the total Black junior high school students,
the eastside schools had 222.  The westside schools had 1,923
of the total Mexican-American junior high school students and
the eastside schools had 914.

19.  In high school at the time of trial, there were
983 Blacks, 4,727 Mexican-Americans and 14,132 who were pre-
sumptively Anglo or White.

20.  The foregoing statistics are reflected in attached
schedules.

21.  Those whom the Court refers to as "Others" or
presumptively White or Anglo, include all students of every
race or nationality except the two classes of plaintiffs,
recognizing, of course, that they are not in fact all properly
so classified.

22.  The Black elementary students in the westside
elementary schools increased from 441 in 1950-51 to 1,016 in
1975-76.  In the eastside schools, they increased from two in
1950-51 to 665 in 1975-76.

23.  The Mexican-American students in all elementary
schools on the west side increased from 3,832 in 1950-51 to
6,342 in 1975-76.  In the eastside schools they increased from
292 in 1950-51 to 2,724 in 1975-76.

24.  All "Other" students (presumptively Anglo) in
the westside schools increased from 2,566 in 1950-51 to 10,708
in 1975-76.

25.  In the eastside elementary schools, such "Others"
increased from 6,556 in 1950-51 to 17,253 in 1975-76.

26.   In 1950-51, the presumptively Anglo population
of the westside elementary schools constituted 36.9% of the
total enrollment, but because of a more substantial increase
among the Blacks and Mexican-Americans combined, the total
percentage of such "Others" decreased to 31.3% by 1975-76.
However, these figures do not tell the whole story on the
west side.  For example, in 1954-55, the "Others" in the
westside and border elementary schools numbered 3,047 and
constituted 39.1% of the total elementary enrollment; by
1968-69, these figures were 2,389 students, constituting
24.7% of the total.  However, the peak westside elementary
school population, according to the evidence, was reached in
1974-75 with 11,342.  The Black elementary school population
peaked in the westside schools in 1972-73 when there were 1,300
enrolled.  The Mexican-American elementary school population
in the westside schools peaked in 1974-75 when there were
6,685 students enrolled; this was the same school year when
the presumptively Anglos or "Others" population peaked at
3,541.  There were various ups and downs recorded in the
intervening years and the evidence fails to reflect why.

27.   The figures simply fail to establish any clear
pattern of containment or discrimination in the westside ele-
mentary schools when considered as a whole.  A little different
story is apparent only when some of the westside schools are
considered separately.

28.   When the eastside elementary schools are analyzed
in this manner, the same conclusion is reached.  The District
elementary school population in general is fluid and fluctuating
with a total District peak enrollment of 33,753 students reached
in 1972-73.

29.   The Court has determined all the immediately
foregoing statistics from the evidence in this case, and they
are reflected in Schedules A, B and C attached hereto.

30.   Schedules D and E attached, contain summaries
of numbers of students and the race or ethnicity in the District
junior high schools between the school year 1950-51 and the
1975-76 school year.

31.   When the 1950-51 school year opened, there were
six junior high schools in the District, Safford, Spring, Wakefield,
Roskruge, Mansfeld and Doolen.

32.   In that school year, there were 2,871 junior high
school students enrolled in the District.   There were 117 Black
students, 773 Mexican-American students and 1,984 "Other" (pre-
sumptively Anglo).   The Anglos constituted 69%, the Mexican-
Americans 27% and the Blacks 4%.

33.   In the 1975-76 school year, there were 17 junior
high schools in the District with a total enrollment of 10,233
students.   There were 531 Black students (5.2%), 2,837 Mexican-
American students (27.7%) and 6,865 Anglos (67.1%).

34.   It is apparent that the numbers of Mexican-American
and Black students in the District as a whole are increasing
slightly more than the Anglos.   This caused a 1.9% decrease in
the percentage of Anglo students in the District junior high
schools.

35.   In considering the junior high schools on the west
side and east side, as the Court has delineated the east and west
sides of the District, the westside schools are Safford, Spring,
Wakefield, Utterback, Pistor and Maxwell.   The eastside schools
are Mansfeld, Doolen, Vail, Townsend, Fickett, Naylor, Magee,
Carson, Sabino, Secrist and Gridley.   There was one "border"
junior high school, Roskruge, which closed after the 1971-72 school
year.

By "border" school, we mean a school which has a
substantial attendance area on both sides of the Court's analytical
North First-Euclid dividing line between east and west.

36.   In the school year 1950-51, there was a total of

1,139 junior high school students in the westside schools.  There
was a total of 1,141 students in the eastside junior high schools
and 549 in Roskruge, the border school.  It is obvious there was
then an equal balance in numbers of junior high school students
between the east and west sides of the District.

    37.  In the 1950-51 school year, there were 117 Black
students, 650 Mexican-American students and 1,139 Anglo students
in the westside junior high schools.  The Anglo students constituted
32.7% of the total students enrolled in the westside junior high
schools.

    38.  In that same school year, there were no Black
students, 73 Mexican-American students and 1,068 Anglo students
enrolled in the eastside junior high schools.  The Anglo per-
centage in the eastside junior high schools was 93.6%.

    39.  In the 1975-76 school year, there were 309 Black
students, 1,923 Mexican-American students and 943 Anglo students
enrolled in the westside junior high schools, for an Anglo per-
centage of 29.7%.

    40.  It is apparent that through population shifts, not
any District action, the number of Anglo students declined in
that 25-year period by 186 in the westside junior high schools.
The Black students increased by 192 and the Mexican-American
students increased by 1,273.

    41.  In the eastside junior high schools in the 1975-76
school year, there was a total enrollment of 7,058 students.  Of
these, 222 were Black, 914 were Mexican-American and 5,922 were
Anglo, for an Anglo percentage of 83.9%.

    42.  It is apparent that the Anglo percentage in the
eastside junior high schools declined by 9.7% during the 25-year
period covered by the evidence.

    43.  It also is apparent from these figures that popu-
lation shifts and population growth, not District action, account
for where people are living and where they are moving to and from.

There are five times as many Anglo junior high school students living on the east side of the District now as there were in 1950-51.  There were 222 more Black students and more than 12 times as many Mexican-American students enrolled in the eastside schools in the 1975-76 school year than in the 1950-51 school year.

The Black students are more equally divided between the eastside and the westside junior high schools than are the Mexican-American and Anglo students.

44.  In the school year 1950-51 the Black junior high school students all attended Spring Junior High School.  The following school year (1951-52), they attended the junior high school serving the neighborhood where they lived, as did all other junior high school students.

In the 1951-52 school year, there was a total of 139 Black junior high school students enrolled in four out of the five District junior high schools, 56 in Safford, 57 in Spring (formerly all Black), 16 in Wakefield, six in Roskruge, four in Mansfeld and none in Doolen.

By the 1975-76 school year, there were only 27 Black junior high school students in Spring Junior High, only three in Wakefield, 15 in Mansfeld, 71 in Safford and the remainder scattered throughout all the junior high schools in the District.  There was a concentration of 139, however, in Utterback Junior High in the southcentral part of the District. Utterback opened with the 1958-59 school year with 45 Black students, increased to a high of 183 in 1970-71 and declined to 139 in 1975-76.

45.  As previously stated, there were nine high schools in the District at time of trial.  They were Tucson, Pueblo, Catalina, Rincon, Palo Verde, Sahuaro, Santa Rita, Cholla and Sabino.

46.  Starting with the school year 1950-51, there was a total of 2,174 high school students enrolled in the District.

They all attended Tucson High. There were 59 Black students
(2.7%), 370 Mexican-American students (17%) and 1,745 "Other".
We will presume them to be Anglo. The Anglos constituted 80.3%
of the total.

47. By the 1975-76 school year, there was a total of
19,842 high school students enrolled in the District. There
were 983 Black students (4%), 4,727 Mexican-American students
(23.8%) and 14,132 Anglo students (71.2%).

48. As is apparent, while the number of Anglo high
school students in the District increased slightly more than
eight times over within the past 25 years, the number of such
Black students increased 15 times over and the number of such
Mexican-American students increased a little less than 13 times
over.

The total of combined minority high school students
is increasing in greater proportion than Anglo students. Con-
sequently, the percentage of Anglo high school students in the
District has decreased over the past 25 years from a high of
85.8% in 1951-52 to a low of 71.2% in 1975-76.

49. The greatest increase in the minority student
population has been in the west and southwest parts of the
District. This is illustrated by the attendance figures for
Pueblo, Tucson and Cholla High Schools. Tucson High had a
combined minority attendance of 429 students in 1950-51 and
in 1975-76, it was 1,838. Pueblo High School the first year
it was open (1957-58), had a combined minority student enrollment
of 609; in 1975-76 the figure was 1,698. Cholla opened with
the 1969-70 school year and it had 694 combined minority students;
in 1975-76 this figure was 793.

50. Although Mexican-American high school students
attended Pueblo High School in 1975-76 in substantial numbers
(1,486), there were more than twice that many (3,241) attending
the other eight high schools in the District; they are simply

more diffused through the system.  However, Tucson High School
had 1,398.  This is also the situation with respect to Black
high school students; there are 202 in Pueblo, 709 scattered
throughout the other eight high schools, with Santa Rita High
School on the far east side of the District having 180; Tucson
High School had 229.

## HISTORY OF SCHOOL CONSTRUCTION

1.  As early as 1891, the District apparently sought
to build schools to serve areas where people lived.  There were
two schools then serving the entire District.  Congress Street
School and the Military Plaza School (Safford).  The students
from the developing eastside, 7th, 8th, 9th and 10th Streets
had to walk quite some distance to attend them.

2.  In 1891 a proposal for bonds to build a school at
the north end and another at the south end of the District was
rejected by the voters.

3.  In 1899, the Old Adobe School, which had formerly
been a separate district and which had been accepted into District
1 in 1887, was reopened to serve the eastside.  This school
apparently had been closed after it was annexed to District 1.
Apparently, it was closed again the next year (1900) and reopened
for the third time in 1906 as a high school.

4.  Records indicate that in 1890 there were 365
students enrolled in the District schools.  Of these, 43% were of
Mexican parents, 19% were of Mexican and Anglo parents and 38%
"Americans".

5.  Apparently a consideration for reopening the Old
Adobe School on the east side in 1899 was that the Legislature
had enacted a compulsory school attendance law in that year and
a school canvas had indicated 471 children of school age (eight
to 14) not attending.

6.  In 1901, the District Board adopted a resolution to
build three schools to be called Davis, Holladay and Drachman.
It appears at that time only two schools, Safford and Congress
Street, were in operation.  The new schools were to be located
in the southwest (Drachman), northwest (Davis) and east parts
of the city (Holladay).  These schools were located in a triangle
approximately equidistant from each other.

7.  Mansfeld school (Safford Elementary) was the next

school built and it was dedicated October 3, 1904.

8.   There were construction decisions involving
these early schools which are summarized in Schedule B attached
hereto.  However, the next new school constructed was a high school
in 1908.  This building, along with an elementary school built
on the same site in 1913-14, later became Roskruge Junior High
and Roskruge Elementary respectively when Tucson High School
was opened on the site of the old, original Holladay School.

9.   A new Safford School was built adjacent to the
then existing Mansfeld in 1918.  This building is now Safford
Junior High and Mansfeld is Safford Elementary.

10.   What appears to be a valid conclusion from these
early construction decisions is that Tucson was growing both
eastward and southwest between 1890 and 1920.  The District
was accommodating such growth by building schools to serve
the surrounding neighborhoods.

11.   What appears to be difficult for many of the
witnesses and attorneys involved in this case to grasp in
evaluating the growth of the District, is that Tucson was a
very different kind of community in that period, from what
they know and have observed.

12.   What these latter day witnesses and counsel seem
to fail to acknowledge is that there was a relatively small,
condensed business area generally located around Stone and
Congress, Meyer and Main Streets with the remainder of the
area, particularly north, south and east occupied by homes.

13.   The evolution of the "colored" school, Dunbar,
built in 1917-18 (later renamed Spring) is covered elsewhere.

14.   By 1917 parallel growth to the east and west
necessitated the building of Menlo Park (completed in 1919)
and University Heights (completed in 1918) schools.  They
were originally two-room schools and both were enlarged in
1921.  Two rooms were added to Menlo Park and eight to

-26-

University Heights, indicating a greater population growth
to the east.  The Menlo Park construction decision is
covered elsewhere in these findings.

15.   The growth of Tucson to the east was pre-
dominantly Anglo.  To the west, with the exception of the
Menlo Park and "snob hollow" areas, it was mainly Mexican-
American.  The "snob hollow" area was located in the general
area between Congress and Franklin Streets and along Main
and Granada Avenues.

16.   For the school year ending in 1920, student
enrollment in the District was 538 in high school and 3,582
in the nine elementary schools.

17.   The C. E. Rose (Superintendent) era started
in 1920 and Miles, Ochoa and Roosevelt Schools were being
built in 1921.  The location of these schools reflects a
growth pattern to the north (Roosevelt), to the east along
Broadway (Miles) and to the south along the east side of
the Santa Cruz River (Ochoa).  No doubt these schools reflected
the makeup of the neighborhoods or areas they were built to
serve, and no doubt when opened Ochoa was predominantly
Mexican-American and Miles and Roosevelt were predominantly
Anglo.

18.   The need for these schools was indicated by
the fact that 1,200 students out of a total enrollment of
4,120 in the spring of 1920 (this figure seems  somehow to
have increased from 3,582 at the close of the previous school
year) were on half-day sessions.

19.   Mission View School was completed in 1923.  It
was built on South 8th Avenue as the result of a petition in
1920 by parents in the area for a new school to serve their area.

20.   Richey School, which is discussed elsewhere, was
started by a Miss Thamar Richey to serve Yaqui Indians because
they did not want their children to attend Roosevelt School with

Anglos, but instead wanted their own school.

    21.   The school was originally called Pascua after the name of the settlement or village where the Yaquis lived. The Yaquis, mostly Spanish-surnamed, settled here as political refugees from oppression in Mexico.

    22.   The next two schools were built in 1927 and were Borton to the southeast and Hughes on the east side of Tucson.

    23.   In 1928, the District acquired Davidson School by annexing a small district to the northeast of Tucson. This was done at the request of the Davidson district electors; this district was basically a Mormon community.

    24.   Carrillo and Government Heights (Hollinger) were next built in 1930-31 along with Mansfeld Junior High School.

    25.   Again, these schools appear to have been built to serve expanding population growth in the areas to be served by them and not as a part of any scheme or plan or intent to operate a dual Mexican-American-Anglo school system. However, it was apparent that the city was dividing that way and the schools reflected the division. Later construction is discussed in various other findings where it is relevant.

MEXICAN-AMERICANS

1.  The southwestern states have much in common, including
a history of discrimination against Mexican-Americans.

2.  Both historically and currently, Mexican-Americans
generally, in Tucson, Arizona, have been perceived as a distinct
ethnic group by both the general community and the local school
district.

3.  Historically, many Mexican-Americans in the south-
western part of the United States and in Tucson, were relegated to
some extent to certain stores, movie theaters, swimming pools, bus
lines and even churches.  These facilities were generally of lesser
quality than the same type facilities used mainly by Anglos.

4.  Employment discrimination against Mexican-Americans
has existed in the Southwest and in Tucson, Arizona.  Mexicans
(citizens of Mexico) and Mexican-Americans in general, have been
relegated to lower paying jobs, along with other minority groups.

5.  There was a general kind of residential separation
of Blacks, Mexican-Americans and Anglos in Tucson prior to the
early 1940's.

6.  Historically, and speaking in generalities, a
dividing line between Mexican-American and the Anglo communities
in Tucson was the railroad tracks.  However, substantial numbers
of Anglos have always lived west of such tracks, and some historic
Barrios were located east of the tracks (Santa Rosa, San Antonio
and Tiburon).  Mexican-Americans have always enjoyed residential
mobility in Tucson, and neither restrictive covenants nor any type
of State action have been shown to have caused the residential
concentrations of Mexican-Americans and the general ethnic im-
balance in the south and westside schools.

There was no evidence from which it can reasonably
be concluded that but for State or District practices or policies,
Mexican-Americans would be living in areas other than where they

are now living and have been living within the District.

In this connection, the percentage of Anglo student enrollment in all elementary schools which the Court has determined to be the west side, i.e., all schools west of North First Avenue and southwest of the railroad tracks, is approximately 35% below the District average.  There was a total of 10,294 elementary students in the westside schools in the 1975-76 school year, 894 (8.7%) were Black, 6,238 (60.6%) were Mexican-American  and 3,162 (30.7%) were Anglo.  There was no reasonable way in which the District could have placed the schools in this area or have drawn attendance areas and had anything but ethnically imbalanced schools. The District did not cause or contribute to this situation, regardless of segregative or discriminatory acts committed therein by the District.

7.  The evidence reveals a study which shows that the natural decline of indigenous Mexican-Americans on the west and south sides of Tucson have been more than offset by entry of new people from Mexico.

8.  Other evidence indicates that 63% of the increase in the Spanish-surnamed population between 1950 and 1960 was largely due to in-migration.  It is reasonable to infer, when considering the increased dispersal during the past 25 years of Mexican-Americans throughout the District, while at the same time Mexican-American student population on the west and south sides of the District continue increasing in spite of such dispersal, that the in-migration of Mexican-Americans into the area, is a significant factor in the ethnic imbalance in the west and south side schools.

9.  Tucson School District No. 1 officials have always been aware of the areas in Tucson in which Mexican-Americans live.

10.  As early as 1890, Tucson School District No. 1 classified children as either "Mexican" or "American" (Anglo).

11.  However, Arizona has never, by statute, required

the segregation of Mexican-American children in any manner in
any school.

12.   The District established in its early history
educational programs designed to "Americanize" the Mexican-
American.  Generally, however, these educational programs were
designed to overcome language barriers, not cultural differences.

13.   In the 1940's and 1950's, principals at some
District schools utilized, and at times enforced, a policy of
not allowing Spanish to be spoken on school grounds.  This,
again, was an attempt to overcome language difficulties, but
it was discriminatory.

14.   In the early 1970's, investigators for HEW deter-
mined that Tucson School District No. 1 employed a disproportionately
small number of Mexican-American teachers and administrators.

15.   In the school year 1928-29, there was a total
District elementary enrollment of 6,119 students; there were
2,929 Mexican-Americans, 100 were Black and 2,989 were Anglo.
The District elementary schools prior to this time were pre-
dominantly Mexican-American in enrollment.  By 1950, the District
elementary school Mexican-American enrollment was 36.7%.  In the
1975-76 school year, there was a total of 16,630 Mexican-American
students in all District schools, constituting 27.1% of the total
District enrollment; there were 3,195 Black students (5.2%) and
41,600 "others" (67.7%).  As can be seen, the "Others" or Anglo
students were increasing proportionately faster than the Mexican-
Americans.  These Anglos were basically newcomers to the area and
were settling in newly developed areas, generally to the north
and east of the older "downtown" area.

16.   Certain schools in Tucson had a section of first
grade known as 1-C.  The stated purpose of 1-C was to teach English
to any children who were deficient in the language before they
could go on to the regular first grade.  Most of those 1-C classes
were Mexican-Americans.  Other than for this purpose, Mexican-Americans

were not segregated into separate classes at any school at
any time.

17.  The generally lower economic status of Mexican-
Americans was historically one of common knowledge in Tucson.
However, this is no longer prevalent.

18.  Poor Mexican-American parents, as with poor
generally, do not interact with the school to the same degree
or in the same manner as do the middle-class parents.

19.  Until September of 1974, Tucson School District
No. 1 had no written policy providing for bilingual notification
of school activities to Mexican-American parents.  District
announcements were solely in English prior to September, 1974.

20.  As a result of District announcements being
solely in English, many Mexican-American parents prior to
September, 1974, were inadequately, if at all, informed of
school activities.

21.  Until the 1950's, a majority of the Mexican-
American students in the District attended identifiably minority
schools, that is, schools which were predominantly Mexican-American
in student enrollment.

22.  Since the 1920's, there have been schools in
Tucson which were identifiably Mexican-American.  One school
was entirely Black until 1951, and others were identifiably
Anglo.

23.  Superintendents' reports issued annually in the
1920's and early 1930's, show that "Mexicans" were considered
to need separate education and were in some ways treated as a
separate part of the Tucson school system.  However, throughout
the District history, Mexican-Americans have always attended
schools with Anglos and vice versa.

24.  Because of residential patterns, almost all
"Mexican" students in the 1920's and 1930's were attending
schools in the western part of the District, Davis, Drachman,

Safford, Menlo Park, Ochoa, Mission View and Borton.  As pointed
out above, it is still true today that more than half of the
Mexican-American students live in the western part of the
District.  In the school year 1975-76, there were 6,238 Mexican-
American elementary students living on the west side of the
District and only 2,828 on the east side; there were 104 attending
elementary schools which had an attendance area on both sides
of the east-west boundary line (University Heights and Roskruge).
There are more Anglo elementary students attending westside
schools (3,162) than there are Mexican-American elementary
students attending eastside schools.

25.  For many years prior to 1940 and continuing in
some cases into the 1940's, there were elementary schools
generally considered by the residents of the District as Anglo,
located on the west side of the railroad tracks.  Some of these
schools were at times Anglo-dominated (more than 50% Anglo) and
others were not.  One of the schools which was Anglo-dominated
in its early history was Menlo Park Elementary School.  Mission
View and Safford, in their early history, had approximately
equal numbers of Anglos and Mexican-Americans.  Increasing
numbers of Mexican-American students caused all of these schools
to become predominantly Mexican-American in enrollment starting
before 1940.

26.  Menlo Park School has an early history of dis-
crimination; it is located less than one-half mile to the south
of El Rio (now Manzo) Elementary School.

27.  Historically, the El Rio neighborhood has been
economically inferior in comparison to the Menlo Park neighborhood.

28.  The District was aware of the racial/ethnic economic
and social differences between the Menlo Park and El Rio populations.

29.  In 1945-46, El Rio (Manzo) Elementary had a total
enrollment of 671 pupils, 1% of which were Anglos.  At the same
time, Menlo Park's total enrollment was 230 pupils, 35% of which

were Anglos.  By 1965-66, Menlo Park was only 13.3% Anglo and
in 1967-6%, it was down to 1.4%.  It had increased to 9% Anglo
in 1975-76.  After 1950, other westside schools such as Richey,
Carrillo, Davis, Safford, Tully, Drachman, Ochoa, Borton, had
similar numbers of Anglos.

30.  El Rio Elementary School (now Manzo Elementary)
has always been an almost exclusively Mexican school.  Although
in the years 1968-69 and 1969-70, both El Rio and Menlo Park
had approximately equal numbers of Anglo students, as did the
other westside schools.[1]

31.  During the 1940's, five elementary schools,
Carrillo, El Rio, Drachman, Ochoa and Davis were commonly
referred to by District residents as "Mexican schools".

32.  In 1945-46, the Mexican-American enrollment of
the "Mexican schools" and the Yaqui enrollment of the Pascua
Village School was as follows:

| Carrillo | 100% |
|----------|------|
| Ochoa | 100% |
| Pascua | 100% |
| El Rio | 99% |
| Drachman | 96% |
| Davis | 90% |

However, since 1950, all these schools have consistently enrolled
varying numbers of Anglo students.  Carrillo had as much as 13%
Anglo enrollment in 1953-54; Ochoa had a 24.3% Anglo enrollment
in 1971-72; Pascua (Richey) had a 45.2% Anglo enrollment in 1967-68
and a 70.7% Anglo enrollment in 1972-73; El Rio was 11.6% Anglo
in 1956-57; Drachman was 15% Anglo in 1950-51 and 14.5% Anglo
in 1966-67; Davis enrolled between 15.4% and 20.2% Anglo students
consistently every year between 1957-58 and 1965-66.

While these figures are not impressive as repre-
senting a good racial/ethnic balance, they do reflect neighborhood

--------------------

[1]See footnote next page.

[1]The actual numbers and percentage of Anglo students attending these and other nearby schools for the school years mentioned in Findings No. 29 and 30 above, were:

| School | Year | No. of Anglo Students | % of Anglo Students |
|---|---|---|---|
| Borton | 65-66 | 58 | 22.8 |
| | 67-68 | 9 | 3.8 |
| | 68-69 | 19 | 9.6 |
| | 69-70 | 18 | 9.4 |
| | 75-76 | 19 | 9.6 |
| Carrillo | 65-66 | 39 | 10.1 |
| | 67-68 | 29 | 7.9 |
| | 68-69 | 29 | 7.6 |
| | 69-70 | 34 | 9.3 |
| | 75-76 | 21 | 9.5 |
| Davis | 65-66 | 55 | 16.2 |
| | 67-68 | 16 | 5.0 |
| | 68-69 | 15 | 5.1 |
| | 69-70 | 12 | 4.0 |
| | 75-76 | 4 | 2.7 |
| Drachman | 65-66 | 40 | 10.2 |
| | 67-68 | 17 | 3.7 |
| | 68-69 | 19 | 4.4 |
| | 69-70 | 5 | 1.3 |
| | 75-76 | 22 | 8.3 |
| Manzo (El Rio) | 65-66 | 30 | 5.6 |
| | 67-68 | 3 | .6 |
| | 68-69 | 23 | 4.6 |
| | 69-70 | 29 | 5.8 |
| | 75-76 | 14 | 2.8 |
| Menlo Park | 65-66 | 47 | 13.3 |
| | 67-68 | 5 | 1.4 |
| | 68-69 | 28 | 8.3 |
| | 69-70 | 20 | 6.2 |
| | 75-76 | 32 | .9 |
| Ochoa | 65-66 | 1 | .2 |
| | 67-68 | 63 | 14.8 |
| | 68-69 | 66 | 15.5 |
| | 69-70 | 53 | 13.0 |
| | 75-76 | 79 | 20.0 |
| Richey (Pascua) | 65-66 | 11 | 3.8 |
| | 67-68 | 98 | 45.2 |
| | 68-69 | 3 | 1.4 |
| | 69-70 | 6 | 3.0 |
| | 75-76 | 39 | 18.4 |
| Safford | 65-66 | 65 | 20.8 |
| | 67-68 | 45 | 15.8 |
| | 68-69 | 24 | 13.2 |
| | 69-70 | 25 | 15.2 |
| | 75-76 | 19 | 11.5 |
| Tully | 65-66 | 111 | 21.6 |
| | 67-68 | 51 | 10.2 |
| | 68-69 | 46 | 10.0 |
| | 69-70 | 55 | 12.1 |
| | 75-76 | 124 | 26.5 |

(This footnote continued on next page)

The only rational and reasonable inference to be
drawn from these figures and the other evidence of attendance
history at these schools, is that the Anglo population on the
west side, while considerably below the District average, is
fairly well dispersed in the area served by these schools and
the Anglo students are attending their neighborhood schools
even though such schools are minority-dominated.  The same
rationale applies to all the other older westside schools,
such as Mission View, Holladay, Hollinger (Government Heights)
and Rose.  If people, such as the Mexican-Americans and Anglos
in this case, insist on living in concentrated areas, as they
have every right to do, and if schools, particularly elementary
schools, are conveniently located, as they should be, there
may well be imbalanced schools, but provided there is no State
action or artificial means used to create or maintain such
imbalance, this does not constitute unconstitutional or de
jure segregation.

makeup and a general adherence to a neighborhood school attendance
policy.

33.  Mexican-Americans have always been a political
force and influence in Tucson and in Pima County.  They have
served on the City Council, the County Board of Supervisors,
the School Board of the District, the school boards of other
districts in the City area, as State Senators and members of
the State House of Representatives, Superior Court Judges and
recently Ambassador Raul Castro, who served as an elected County
Attorney and Superior Court Judge, was Governor of the State.

34.  The evidence fails to support a finding of any
District-wide continuing pattern or practice of deliberate or
artificial separation of Mexican-American students by the
District, although with respect to certain schools at various
times, the District did engage in such practices on the west
side.

35.  The evidence did reveal also that during the
past 50 years there were many other acts of discrimination by
the District and even District policy, at times, was discriminatory.
For example, the District, as early as 1890, classified students
as "Mexican" or "American".  This practice stopped, however,
more than 40 years ago.  The "no Spanish" rule of some principals
forbidding Spanish to be spoken on school grounds, also terminated
25 or 30 years ago.  The student transfer policy allowing Anglos
to transfer out of "Mexican" schools was also discriminatory
but, again, this policy ended more than 25 years ago.  Other
instances of discriminatory acts have been set forth elsewhere
in these findings.  However, the issues in this case are not
only whether such discriminatory acts occurred, but whether
they are probative of existing discriminatory intent and whether
there are any existing effects of past discrimination which indi-
cate that at present the District is operating any segregated
(in the legal sense) schools and/or dual or segregated system.

36.   The evidence was notable by the absence of
District acts or policies which could reasonably or rationally
be termed discriminatory or reflective of racial or ethnic dis-
crimination or discriminatory intent occurring within the past
few years. While teacher hiring and assignment decisions and
non-teaching hiring and promotion practices of the District
support a reasonable and rational inference of discrimination
in these areas, all the evidence, taken as a whole, fails to
support a finding of a de jure segregated school system. However,
as previously stated and set forth in other findings, as to certain
schools on the west side, the District has engaged in discriminatory
practices and it appears there is some existing effect therefrom
as shown by other findings.

37.   Throughout its history, the District knew the
areas where Mexican-Americans were concentrated and the schools
where such students were concentrated.

38.   Schools were built by the District to serve
neighborhoods, however, it was apparent that certain schools
because of their location, would be totally or substantially
Mexican-American in the makeup of the students.   Throughout
the history of the District, these schools continued to be
predominantly Mexican-American.   Such schools are (from N to S):

                    Richey/Pascua

                    Manzo/El Rio

                    Davis

                    Carrillo

                    Drachman

                    Ochoa

39.   While it is recognized that the District was not
under any duty to achieve ethnic or racial balance, it has always
had an affirmative duty not to segregate or discriminate and
when such racial or ethnic imbalance is apparent and continuing,
an intent to discriminate may be inferred, unless other evidence

rebuts such permissible inference.

40.  In 1937, the District superintendent acknow-
ledged that four elementary schools (Davis, Drachman, Ochoa
and Carrillo) were 100% Mexican-American.  At that time, it
appears, there were 17 elementary schools in the District and
one of those (Dunbar) was Black and one (Pascua) was Yaqui
Indian.  The other schools (Menlo Park, Roskruge, Safford,
Government Heights, Roosevelt, University Heights, Miles,
Hughes, Davidson, Borton and Mission View) were presumably
mixed, probably with a predominance of Anglos in most of them.

41.  In 1948 when the Drachman Elementary School
burned, the District had an opportunity to build a school
in a different area or add to other schools so as to disperse
the heavy concentration of Mexican-American students.  This was
not done.  The school was rebuilt on the same site when it was
clearly foreseeable that the rebuilt school would have the same
heavy concentration of Mexican-American students it had previously.
Between 1936 and 1949, as a result of the rebuilding of Drachman
and additions to Davis, Drachman, Ochoa, Carrillo and Borton,
about 40 new classrooms were built which housed large concen-
trations of Mexican-American students.  These decisions had the
foreseeable effect of retaining Mexican-American students in
schools having a predominance of such students.  However, such
decisions did provide convenient neighborhood schools and,
further, at that time, the only schools with any substantial
numbers of Anglos within a reasonable distance were Safford
and Menlo Park and their sites were inadequate for sufficient
additions to house all the students involved.  We conclude,
however, that these reasons for such decisions offered by
the District are not persuasive to overcome an inference of
intent on the part of the District to have Mexican-American
elementary students in certain westside elementary schools
segregated or separated from schools housing more substantial

numbers of Anglos.  The segregative effects of these decisions
appear to have become so attenuated during the past 28 to 30
years as to have little present probative value, especially
if we consider the lack of reasonable alternatives then
available to the District and considering that the whole west
side of the District has always been greatly over-populated
with Mexican-Americans.  There was no evidence from which the
Court can now find that if the District  had not made these
segregative or questionable decisions, there would be less
minority impaction or imbalance today in these schools.  For
the most part, the imbalance existing today in these schools
does not appear to be the result of any State or District action,
but results from individual choice as to where people live.
And whatever factors may have dictated such individual choice
is not shown by the evidence.  The evidence fails to show that
existing conditions in all these particular schools is the result
of discriminatory decisions.  However, as set out in other
findings, there are a few schools within the western part of the
District with racial/ethnic imbalances resulting in part from
discriminatory practices of the District.

<u>SEGREGATION AND DESEGREGATION</u>

1.  Prior to 1951, the Tucson Public Schools complied
with a 1912 Arizona state law and segregated Black elementary
students in the District from all other students by placing
them in one school; after 1918, this was Dunbar.

2.  In response to the passage of the law requiring
segregation of Blacks, a one-room building was rented and became
known as the "colored" school.

3.  The Paul Lawrence Dunbar "colored" school was opened
in 1918 as a two-classroom school to replace the rented facility.
It was built in an area of Black population near the Southern
Pacific Railroad tracks.

4.  In 1921, Dunbar received a two-room addition, giving
it a total of four classrooms.

5.  In 1930, it received an additional two-classroom
unit, giving it a total of six classrooms.

6.  Although segregated into one school, Blacks resided
in substantial numbers in many of the precincts within the City
of Tucson as early as 1930.  Census data for 1930 indicates
there was, in some areas, an intermixing of Blacks and Mexican-
Americans.

7.  In 1936, because of the growing Black population,
another two-room addition was placed at Dunbar, giving it a
total of eight classrooms.  In 1940, another five classrooms
were added.  In 1948, the building was completely remodeled,
and another addition was constructed creating a modern combined
elementary and junior high school with 23 classrooms, as well
as offices and a cafeteria-auditorium combination.

8.  By 1949, Dunbar had become a seriously overcrowded
school and the construction of a second Negro school was recom-
mended to relieve Dunbar.

9.  Pursuant to the recommendation of the Superintendent,

a decision was made to build a second six-room Negro school
on the present site of the Holladay Elementary School.

10.  Prior to 1950-51, Black elementary students
from all areas of Tucson School District No. 1 were bused to
Dunbar School.

11.  Prior to 1950-51, all secondary school students
in the District, including Blacks, attended Tucson High School.

12.  The single high school, Tucson High, had segregated
homerooms prior to 1946.  In that year, Superintendent Morrow
eliminated this practice, along with other similar practices
in athletics, choir, band, orchestra and all other school
activities.

13.  Prior to the 1950-51 school year and all years
subsequent, Mexican-American students, both elementary and
secondary, generally attended neighborhood schools.

14.  Dr. Morrow and Tucson School District No. 1 officials
worked actively for several years prior to 1950 to eliminate the
racially dual elementary school system.

15.  Supported by the Tucson Council for Civic Unity,
the Arizona State Legislature amended the mandatory school segre-
gation statute so that separation of Black students from all others
was no longer compelled by law.

16.  When State legislation was passed in March, 1951,
no longer requiring segregation of Black elementary students,
Dr. Morrow and the District Board immediately moved to desegregate
Dunbar School.  By the next fall (1951-52 school year), Dunbar
was renamed Spring and was no longer an all-Black school; Black
students previously in attendance were reassigned to attend
schools in the neighborhood where they lived.

17.  It was foreseeable in 1950-51, that if Black ele-
mentary students were assigned to their neighborhood schools,
substantial numbers would be attending six schools which had
predominantly Mexican-American enrollment (Carrillo, Davis,

Borton, Drachman, Ochoa and Manzo).

18.  In 1950-51, Dunbar had an all-Black faculty and a Black principal.

19.  In March, 1951, when the mandatory segregation statute was repealed, it was replaced by a permissive statute. The permissive statute was never utilized by the District.  It was ruled unconstitutional by two judges of the Superior Court of Arizona in 1953.

20.  In 1951, three years prior to the Supreme Court decision in Brown v. Board of Education, the Tucson Public Schools attempted to desegregate their dual school system and, in 1950, established fairly firm boundary lines and a firm neighborhood school policy.

21.  The reactions to this move were varied, and resulted in numerous letters and positive publicity for the Tucson Public Schools.  These included national coverage in magazines such as "Time".

22.  On March 23, 1951, Mr. Jesse W. Johnson, President of the Urban League of Tucson, wrote Dr. Morrow expressing the League's appreciation for his "courageous advocacy of early desegregation in the lower grades of the Tucson schools".

23.  On April 17, 1951, the Maricopa County branch of the NAACP, voted to express to Dr. Morrow and the School Board their deep appreciation for this immediate and forthright action fully integrating the entire system.

24.  On April 19, 1951, R. B. Phillips, President of the Maricopa County branch of the NAACP, wrote to Dr. Morrow noting that the Tucson School system acting under H. B. 86, had fully integrated the entire system.

25.  On February 12, 1954, the executive secretary of the Columbus, Ohio branch of the NAACP, Barbie William Durham, addressed a letter to Dr. Morrow, having "learned through the American Friends Service Committee that (Tucson Public Schools)

-43-

have met considerable success in integrating the personnel
of your school system".

26.   On March 27, 1954, Alton W. Thomas, executive
secretary of the Phoenix Urban League, wrote to Dr. Morrow
praising him for having "added tremendous impetus to the
movement toward complete integration in Arizona".

27.   On November 4, 1954, Leland D. Case, Clerk of
the U. S. Senate, wrote to Dr. Morrow thanking him for material
sent on the Tucson experience with desegregation, stating that
it would prove useful to similar problems in the District of
Columbia.

28.   Absent the law requiring segregation of Black
elementary pupils before 1951, the following schools would have
had substantial Black enrollments:  Borton, Carrillo, Davis,
Drachman, Dunbar (Spring), Lynn, Manzo, Miles, Ochoa, Roosevelt
and University Heights.  Some of these schools were predominantly
Anglo:  Lynn, Miles, University Heights and Roosevelt.

29.   When Dunbar was converted to a neighborhood school,
its enrollment changed and reflected that of the surrounding
neighborhood; Dunbar was no longer a school with a majority of
Black students.

30.   The District determined in 1951 that its student
assignment decisions, with respect to Blacks being then relocated
into neighborhood schools, had effectively dismantled its former
dual system.  This reassignment might well have been sufficient
had it not been for the predominantly Mexican-American schools
to which 80.5% of such Black students were reassigned.  At that
time, of course, there were no Court decisions to guide the
District, and the District could not possibly have foreseen the
Court decisions which came much later and which now make the
reassignment questionable.  Hindsight is generally very clear
because actions are viewed in light of after events.  The evidence
fails to support a reasonable inference that when the Black students

were reassigned in 1951, that there was any intent to keep them from Anglos or to deliberately resegregate them with Mexican-Americans.  This reassignment can be considered appropriate dismantlement in 1951 for lack of clear guide-lines or judicial decisions involving Constitutional rights of minorities.  What is now pertinent, however, about such assignment, is whether segregative acts on the part of the District caused the retention of these racial and ethnic imbalances after 1954, and/or whether any effect of the former racially dual system remain.

31.  While the District was greatly concerned about desegregating its system with respect to Black students, no thought appears to have been given to the fact that part of its elementary school system was and had always been severely imbalanced as to Mexican-Americans.  The reasons, of course, appear obvious; neither Court decisions nor public sentiment seemed to require it.

32.  As previously stated herein, the assignment of Black students to neighborhood schools in 1951 resulted in the placement of 80.5% of all Black elementary and junior high school children in schools that were previously identified or designated as Black schools (Holladay and Spring) or schools that were predominantly Mexican-American in their 1950-51 enroll-ment.  Elementary schools then affected and the percentages of Mexican-American students were:  Borton (65.5%), Carrillo (97.1%), Davis (78.1%), Drachman (85%), Manzo (90%), Mission View (61.9%), Menlo Park (54.3%), Ochoa (78.2%), Richey (89.9%) and Safford (51.2%).

33.  By 1954-55, 75.4% of all Black students were enrolled in minority-identifiable schools.  By 1965-66, 79.3% of all Black elementary school children were enrolled in such schools.  By 1970-71, 72.9% of all Black elementary students were enrolled in predominantly minority schools; by the time

of the filing of this lawsuit in 1973-74, 62.9% of all Black
students were in such schools. In 1975-76, only 18.7% of all
Black elementary school students were in the elementary schools
mentioned above.  The numbers of Black elementary students
attending such elementary schools is revealing of a lack of
segregative intent.  They are:

| School | Number of Black Students | Total Enrollment |
|--------|--------------------------|------------------|
| Borton | 50 | 197 |
| Carrillo | 22 | 221 |
| Davis | 10 | 151 |
| Drachman | 50 | 267 |
| Manzo | 1 | 498 |
| Mission View | 14 | 508 |
| Menlo Park | 19 | 356 |
| Ochoa | 10 | 396 |
| Richey | 5 | 212 |
| Safford | 11 | 165 |
| Holladay | 123 | 349 |
| TOTALS | 315 | 3,320 |

34.  If we consider the same elementary and junior high
schools which in 1951-52 had 80.5% of all Black students, as
mentioned above, in 1975-76 they had a total of only 413 Black
students out of a total of 4,098 students in attendance at such
schools.  With a total of 2,212 Black elementary and junior high
school students in the District in 1975-76, only 18% were attending
the minority identifiable schools mentioned above.

The formerly all-Black Spring Junior High School
had only 27 Black students and Safford Junior High had 71 Black
students out of total student enrollments of 371 and 407, respectively.

35.  In the school year 1951-52, 19.5% of all Black
elementary and junior high school children were assigned to schools

that were less than 50% Mexican-American in their enrollments.
7.1% were assigned to schools that were less than one-quarter
Mexican-American.

36.   In 1951, the District determined that the 23-room
school formerly known as Dunbar, should be renamed Spring School
and the facility should be divided between an elementary and a
junior high school.

37.   The elementary school was allotted six rooms and
assigned a small, racially imbalanced attendance area resulting
in a minority enrollment of 84.2% (98 Blacks, 31 Mexican-Americans
and 24 "Other").

38.   The Spring reassignment decision resulted in a
17-room junior high school having an enrollment that was 91%
minority (57 Blacks, 215 Mexican-Americans and 26 "Other").

39.   Adjoining Spring Elementary School to the east
was Roskruge Junior High School -- a school that was, at that
time, over 90% Anglo in its enrollment.  Roskruge, like Spring,
was a combination elementary-junior high school.  Like Spring
in 1951, six of its rooms were devoted to the elementary school.

40.   Another decision the District was required to
make in 1951 was what to do with the concentration of Black
children in what is known as the South Park area of the City.
That was an area of predominantly Black population known to the
District.

41.   Prior to desegregation -- while the maintenance
of Black schools was required by law -- the District had decided
to build a six-room Black school on the Holladay site (1110 East
33rd Street, near South Park Avenue).

42.   That decision could have been amended to either
erect a larger school, or to erect a school on a different site,
or to place the Holladay enrollment in existing schools.  The
District, after its decision to dismantle the dual school system,
reaffirmed the decision to construct Holladay School.

-47-

43.  As a result of that decision, Holladay Elementary
School opened in the fall of 1951 with 113 Black students, while
the school immediately to the east (approximately one mile),
Pueblo Gardens, had no Black students.

44.  Holladay had an enrollment that was 91.6% minority,
which adjacent Pueblo Gardens had only a 2.2% minority (Mexican-
American) enrollment.

45.  Holladay was 53 students under capacity in 1951.
Pueblo Gardens, at the same time, was 64 over capacity.

46.  There were three Black teachers at Holladay School
and no Black teachers at Pueblo Gardens.

47.  Another significant contingent of Black elementary
school pupils in 1951 resided in what is known as Hiram Banks
Subdivision in the area of "A" Mountain.  This, again, was an
area well known to have a high Black population -- a population
that had resided there for many years prior to 1951.

48.  A small site was immediately acquired and the
decision made to erect a four-room elementary school in that
subdivision.  The site was acquired from a well-known Black
member of the Tucson community.  The school could only have been
designed to serve the Black population in that area.  However,
no elementary school was ever built on this site and the students
from this area were not sent to a minority-dominated school.

49.  In the 1951-52 school year, the only Black students
bused were those in the Hiram Banks Subdivision.  They were bused
to Lynn Elementary School, which was predominantly Anglo (73.2%).

50.  In the 1952-53 school year, Safford Junior High
had the greatest number of Black students (56), while the former
all-Black Spring Junior High School had only 35, out of a total
enrollment of 339.  The following year, there were 73 Black students
in Safford Junior High and 42 in Spring.  The evidence does not
show this increase to have resulted from District action.

51.  At the elementary level, Black students were attending

18 of 27 schools in the fall of 1951.

52. By 1955, Black students attended 19 of 35 elementary schools in District No. 1, with only Holladay School having more Black students than Lynn Elementary, which was a predominantly Anglo school.

53. By 1967, 11 of 13 junior high schools had Black students attending them. By 1976, all 17 junior high schools had Black students in attendance.

54. In 1961, the Arizona State Advisory Committee, in their report to the U. S. Commission on Civil Rights, praised the equality in the Tucson Public Schools and specifically mentioned the positive attitude of the Tucson Public Schools administration.

55. Since 1951, Black students in the Tucson Public Schools have integrated steadily and uninterruptedly, overcoming in the process resegregatory pressures of explosive growth in racially unbalanced housing.

56. Although there is now, and historically there has always been, a concentration of Mexican-Americans living along the Santa Cruz River, Mexican-Americans live throughout the City of Tucson and are enrolled in every school in the District.

57. Significant mixing or integration of Blacks, Mexican-Americans and Anglos has occurred and is occuring in Tucson. As an example, Keen and Robison Elementary Schools each had, at time of trial, approximately 300 Mexican-American students and 31 and 17 Black students, respectively. Both of these schools opened 90% Anglo in enrollment, with no Black students.

58. Corbett Elementary School near Wilmot Road on the far east side, has approximately the same number of Mexican-American students (148 in 1975-76) as Davis (137) or Borton (128) on the west side. It also has 37 Black students.

59. Beginning with the 1972-73 school year, Carson

Junior High on the far east side of Tucson, Naylor in the south-
east part of the City and Doolen on the north side, all have more
Black students (56, 75 and 60, respectively) than the formerly
all-Black Spring Junior High School (37). This, again, is a
fact tending to negative segregative intent with respect to
junior high schools in the District when considered in light
of all the other evidence in the case.

60.   Brichta Elementary School, which opened 96.1%
Anglo and no Blacks in 1960, had as many Black students as
Mission View School in the 1972-73/1973-74 school years.
Mission View shares a common boundary with Holladay School,
which has a substantial number of Black students.

61.   Pueblo Gardens School and Cavett School both
opened nearly 100% Anglo. At time of trial, Cavett was 46%
Black. However, Anglos are apparently moving back into that
area, tending to dilute the disproportionate percentage of
Black students.

62.   Pueblo Gardens School, adjacent to Cavett, is
now predominantly Mexican-American, with Anglo students comprising,
in 1973-74, only one-third of that school's enrollment. However,
it opened 96% Anglo. These changing patterns are not the result
of any District action or inaction, but simply reflect changing
neighborhoods resulting from the exercise of free choice by
the residents.

63.   The southwestern part of the District has recently
experienced a rapid increase in the numbers of Anglos and Mexican-
Americans, creating a series of well-balanced elementary schools:
Lynn, White, Vesey, Lawrence and Warren.

64.   At Erickson School, on the far east side, there
have been over 100 Mexican-American students enrolled since 1973.
In its seventh year of operation (1974-75 school year), the number
of Mexican-Americans at that school (110) nearly equalled some
of the older westside schools. (Borton - 128, Davis - 137, Safford -

135).

65.   Five eastside schools, Keen, Robison, Roberts,
Myers and Corbett, all opened with over 90% Anglo populations.
In the year 1975, these schools enrolled only 145 fewer Mexican-
American students than six westside schools, Borton, Ochoa,
Carrillo, Davis, Drachman and Safford.   Seven schools west of
the Santa Cruz (which, except for Tolson Elementary, have Anglos
as the majority in their enrollment), enrolled up to 80% of the
same number of Mexican-American students as were enrolled at the
six westside schools listed above.   This, again, reflects changing
neighborhoods and movement of both Mexican-Americans and Anglos
by choice.

66.   There is and always has been a concentration of
Mexican-Americans along the Santa Cruz River, largely as the
result of a steady in-migration of Mexican-Nationals who settle
in one of the established barrios where there are relatives,
friends and no language barriers.

67.   Tucson School District No. 1 assumes the responsi-
bility for the education of the children of several hundred new
non-English-speaking immigrants from Mexico each year.

68.   No school in School District No. 1 has been
without Mexican-American or Anglo students from 1951 to the
present.

69.   Only two elementary schools in the 1976-77
school year, Davidson and Booth, were without Black students,
although both have had Black students in the past.

70.   In the 1973-74 school year, the number of Black
students attending the four elementary schools with the largest
Anglo enrollment surpassed by a nine to one ratio the number of
Black students that attended the four elementary schools having
the largest Mexican-American enrollment.

71.   Beginning with the 1973-74 school year, Henry School,
which is in the far east side with approximately a 90% Anglo

enrollment, has had as many Black teachers as has Holladay, located in an area with substantial Black students; each has three.

72.  There are Indian students in all but 11 of 69 elementary schools in the District, and Oriental children in all but 15 schools.  This is indicative that the District policy provides that students attend their neighborhood school.

73.  The large size of many schools obscures the fact that there are substantial numbers of minority children in attendance at those schools.  Schools such as Cavett, Corbett, Pueblo Gardens, Myers, Robison and Keen, all opened overwhelmingly Anglo, but four (Cavett, Pueblo Gardens, Robison and Keen) changed to predominantly minority schools as minorities moved into their respective attendance areas.  Neighborhood changes, not attendance area changes, account  for these ethnic changes in enrollment.

74.  From 1950 to the present, there has been a notable dispersal of Black pupils within the District.  In 1950, all but four Black elementary and junior high school pupils attended school at Dunbar.  In 1954, Black elementary school pupils attended schools that were on the average 1.9 miles from the Dunbar/Spring School.  In 1959, that distance had increased to 2.0 miles, in 1964, the distance was 2.5 miles, in 1969, the distance was 3.4 miles, and by 1974, Black elementary school pupils attended schools that were on the average 4.3 miles from Dunbar/Spring School.

75.  A measure available in examining a school system is the proportion of students from one racial/ethnic group attending school with children of another racial/ethnic group.  This measure can be calculated for all pairs of racial/ethnic groups within a school system.  This measure was advanced by Dr. James Coleman, in Trends in School Segregation, published in 1975.  Using Dr. Coleman's methodology, the average Black elementary pupil in 1974 attended schools that were on the average 19.6% Black, 43.4% Anglo and 38.0% Mexican-American.  In 1974, Mexican-American students

attended schools that were on the average 38.0% Anglo, 55.2%
Mexican-American and 6.8% Black, while in 1954, they attended
schools that were on the average 31.5% Anglo, 63.5% Mexican-
American and 5.1% Black.

76.  In 1954, a Black elementary school pupil in
School District No. 1 attended a school that was on the average
35.9% Black.  By 1974, a Black elementary school pupil in
District No. 1 attended a school that was on the average
19.6% Black.

77.  In 1954, Mexican-American students attended
schools that were on the average 63.5% Mexican-American in
student enrollment, while in 1974, they attended schools that
were on the average 55.2% Mexican-American in student enrollment.

78.  Within Tucson School District No. 1, there has
been a trend toward dispersion of both Black and Mexican-American
pupils relative to Anglo pupils.  The trend indicates that Black
students are better integrated with Anglo students than are
Mexican-American students, however, the patterns of dispersal
are generally parallel.  In 1954, Black students attended schools
that were on the average 25.7% Anglo, while Mexican-American
students attended schools that were on the average 31.4% Anglo.
In 1974, Black students attended schools that were on the average
43.4% Anglo, and Mexican-American students attended schools that
were on the average 38.0% Anglo.

79.  In 1951, Black students were not integrated solely
with Mexican-American students, but considering the relatively few
numbers, (67 high school students, 139 junior high school students
and 506 elementary school students) were substantially integrated
with Anglo students.  In 1954, Black elementary pupils attended
schools that were on the average 38.3% Mexican-American.  In 1974,
Black elementary pupils attended schools that were on the average
37% Mexican-American.

80.  From 1954-59, a decrease in concentrations of Black

students occurred.  In 1954, Black pupils attended schools that
were on the average 35.9% Black, while in 1959, they attended
schools that were on the average 29.1% Black.  During the same
period of time, there was a 2.6% increase in separation of Black
students from Mexican-American  students.  During this period of
time, a 31.1% increase in the integration of Black students
and Anglo students occurred; by 1959, Black elementary pupils
attended schools that were on the average 33.7% Anglo.

81.  For the period 1969-74, while there was quite an
increase in integration of both Black pupils and Mexican-American
pupils with Anglo pupils in Tucson School District No. 1, there
was only a very slight amount of separation between Black pupils
and Mexican-American pupils.

For example, between 1969 and 1974, the integration
of Anglo pupils with Mexican-American pupils increased 24.2%.  In
1969, Mexican-American elementary pupils attended schools that
were on the average 30.6% Anglo, while in 1974, they attended
schools that were on the average 38% Anglo, a 7.4% increase in
integration of Mexican-Americans and Anglos.  During the same
time period, there was a 28.8% increase in the integration of Black
and Anglo pupils.  In 1969, Black elementary pupils attended
schools that were on the average 43.4% Anglo.  During that same
period, there was only a slight increase in the separation between
Black pupils and Mexican-American pupils.  In 1969, Black elementary
pupils attended schools that were on the average 37.5% Mexican-
American, while in 1974, they attended schools that were on the
average 37.0% Mexican-American.

82.  In 1974, 52% of the Mexican-American pupils in
the District attended schools with approximately nine percent
of the District's Black pupils.  Since 1951, both Black students
and Mexican-American students have integrated fairly well with
Anglo students.  Only Black pupils were segregated by law prior
to 1951 and in the District as a whole, Black pupils are now

approximately as well integrated with Anglo pupils as they
are with Mexican-American pupils. There are, of course, a
few schools which are glaring exceptions and which have been
heavily imbalanced (more than 80%) minority (Black and Mexican-
American) practically every year since 1951. They are: Carrillo,
Davis, Drachman, Holladay and Manzo.

83. Utilizing the same segregation indices suggested
by Dr. Karl Taeuber, (which theory appears highly questionable
as reliable evidence in this case) it is possible to compare the
integration of Black students with all other students in the
elementary, junior high and high schools within Tucson School
District No. 1 in the years 1967, 1970 and 1975.

Such indices indicate that Black pupils are being
integrated into the student bodies of Tucson School District No. 1
schools at all levels, despite significant surrounding residential
segregation.

84. The increase in the number of Blacks enrolled by
1955 at predominantly Anglo schools, was 19 more than the increase
of Blacks at predominantly minority schools. In 1955, only Holladay
School enrolled more Black students than Lynn School. A review
of Schedule B attached, shows this matter and the fluctuations
in each elementary school for the school years 1950-51 through
1975-76.

85. Of the ten schools enrolling the most number of
Blacks in 1955, four had Anglo majorities.

86. After 1951, Black students were attending the
school serving the neighborhood in which they happened to live
or move into. Since 1969, they could attend any school of
their choice in the District, provided their attendance would
improve the racial balance.

87. There was no evidence of any analysis done by
the District in 1950 to determine where Black children would
be attending school or whether they would be attending school

with Mexican-Americans.

       88.  Population in the mid-1950's was growing in Tucson at the rate of about 1,300 elementary students per year.

       89.  As compared to minority schools which received Black students in 1951, the Anglo schools receiving Blacks in 1951 had, by 1975, increased their Black enrollment 27 times that of minority schools.

RESIDENTIAL SEGREGATION

1.  There is a certain amount of segregation resulting
from housing patterns, i.e., where people either need or choose
to live.  This creates a higher concentration of Blacks and Mexican-
Americans in certain areas or neighborhoods within the District
than is reflected by the concentration of such minorities in
the schools serving those areas.

2.  The schools serving areas of minority concentration
are more integrated that the neighborhoods where people choose to
live.

3.  Many causes contribute to the development, persistence
and extension of patterns of ethnic and racial residential segre-
gation.  Scholars often group the causes into three main categories
-- economics, choice and discrimination.

4.  Blacks and Mexican-Americans generally have lower
incomes than do Anglos in the Tucson region and economic factors
clearly contribute to residential segregation.

5.  Census charts reveal that low rent minority house-
holds are not located in the same neighborhoods as are low rent
Anglo households, nor are the medium and high rent minority house-
holds generally dispersed among Anglo households of similar rent
levels.

6.  With respect to homeowners, economic factors do not
fully explain why minorities and Anglos are residentially segregated
even when comparison is confined to homeowners who have made the
same housing investment.

7.  As a generality, most minority householders, whatever
monthly rent or mortgage payments they make, choose to live among
other minority householders, and most Anglo householders, no
matter how low the rents and mortgage payments they make, choose
to live among other Anglo householders.

8.  While it may be reasonable to assume that in very

recent years, economic factors have become more important in
explaining the signs that residential segregation is beginning
to break down, the available historical evidence and scholarly
research confirms that economic factors alone cannot explain
the origins and intensification over time of residential segre-
gation.  Other factors have played a part in the historical
development of patterns of residential isolation in Tucson
and in this country's other urban centers.

9.  Choice is the second reason commonly asserted
to explain the existence of racial and residential segregation,
i.e., Blacks and Mexican-Americans have freely chosen to isolate
themselves or to concentrate in certain areas or neighborhoods.
Again, choice may account for some portion of residential separa-
tion, but it is not alone a full explanation.

10.  Those minorities with sufficient income to pay
higher rents or purchase more expensive homes  are, in comparison
with economically less well off families, able to exercise greater
choice of neighborhood and have chosen to live in mixed rather
than uniracial neighborhoods.

PUBLIC HOUSING

1.   The selection of sites for public housing projects
and the determination of tenant assignment policies are direct
governmental actions in the housing market.  In the early years
of federally assisted public housing programs -- in the 1930's,
1940's and 1950's, many projects were located within minority
areas and tenants were chosen primarily from designated minority
groups.

2.   In Tucson in 1941, two public housing projects
were planned specifically to serve minorities.  The Crispus Attucks
project, named for a Black patriot, was proposed or planned for
location near all-Black Dunbar School.  It was never built,
however.  The La Reforma project was built to serve low income
families, primarily Mexican-American families.  It continues
to be predominantly Mexican-American in occupancy.

3.   The Federal Government, FHA and VA, have had a large
impact on housing patterns throughout the country by means of
their mortgage insurance programs and through an array of other
programs to subsidize or encourage privately developed housing
construction and rehabilitation.

4.   The Underwriting Manuals published by the FHA set
forth many of these policies which were not only utilized by
the Federal Government, but were also used to guide the policies
and programs of other governmental and private agencies.

5.   The Government Underwriting Manuals stated that
the "infiltration of inharmonious racial or national origin" groups
should be identified as a detrimental influence to be taken into
account when making decisions on whether to approve mortgages.

6.   The Underwriting Manual -- in advising its appraisers
on rating the locations in which FHA or VA financing is being
sought -- address among other things the consideration of the
racial composition of schools.

"The social class of the parents of children
at the school will in many instances have a
vital bearing.  Thus, although physical sur-
roundings of a neighborhood area may be
favorable and conducive to enjoyable,
pleasant living in its locations, if the
children of the people living in such an
area are compelled to attend school where
the majority or a goodly number of the pupils
represent a far lower level of society or
incompatible racial element, the neighborhood
under consideration will prove far less stable
and desirable. . ."

7.  The National Association of Real Estate Boards incor-
porated language similar to that contained in the FHA Manuals in
its Code of Ethics.  The Arizona State Board of Realtors and the
Tucson Board of Realtors adopted and distributed this Code to
their members as part of a Real Estate Primer in use as late
as 1959.  Pursuant to Article 34 of that Code, realtors were
admonished to:

". . . never be instrumental in introducing
into a neighborhood a character of property
or occupancy, members of any race or nationality,
or any individual whose presence will be clearly
detrimental to property values in that neighbor-
hood."

8.  However, the evidence failed to show that these
policies resulted in minority concentrations or impaction in
the areas served by the minority-dominated schools in the
District.  The changing character of neighborhoods discussed
elsewhere in these findings, preclude an inference of such,
particularly when considered in light of all the other evidence
in this case.

9.   Tucson, in 1959, and Pima County, in 1960, adopted
a General Land Use Plan:  Tucson and Environs, prepared by the
City-County Planning and Zoning Commission.  This plan specifies
instruments or tools for carrying out a master plan:  zoning
and subdivision standards and controls, as well as restrictive
covenants.

10.   The Tucson Housing Assistance Plan, 1975, acknow-
ledges that the pattern of housing development in Tucson has
limited "the housing opportunities of low and moderate-income
households in Tucson" and that Blacks and Spanish-surnamed
persons are inadequately housed.  Goal number two of the Plan
states:  "Housing opportunities for. . .ethnic minority house-
holds should be increased outside the Inner City".

11.   The General Land Use Plan indicates  that it is
one of three key elements of a master plan, and that the other
key elements are a Major Thoroughfare Plan and a School and
Recreation Area location.  A central feature of the Land Use
Plan (and of the 1955 Tucson Public Schools:  A Plan for School
Location) is the neighborhood unit concept.

12.   The neighborhood unit is defined as that area
which can be served by one elementary school. The ideal unit
is one mile square with an elementary school in the interior.
Intensive residential uses such as multiple-housing units are
to be kept out of the interior and located along major streets.

## RESTRICTIVE COVENANTS

1.  Covenants against sale or rental of residential property to Blacks, Mexican-Americans, non-Caucasians, Jews and various other groups have been used in Tucson for many decades.

2.  Restrictive covenants are a form of residential segregation and an indication of prejudice and discrimination against minorities.

3.  There was no evidence, however, of any enforcement within the District of racially restrictive covenants running with the land, nor does it appear that there was widespread use of such. The evidence fails to show that these type of covenants affected housing patterns in the City.

4.  There was no evidence presented that the Courts in Arizona ever attempted to enforce such restrictive covenants.

DISCRIMINATION WITHIN THE REAL ESTATE INDUSTRY

1.   Discrimination existed within the real estate
industry in Tucson for many years; until recently, the Tucson
Board of Realtors would not admit Black realtors.

2.   This exclusion from the Tucson Board of Realtors
deprived Black real estate sales personnel not only of prestige
and informal access to the general real estate community, but
also denied them specific services.  In particular, only realtors
could (until recently) participate in and subscribe to the multiple
listing service, a service that greatly augments the ability of a
salesman to match buyers and sellers and hence to make a living.

3.   A Black salesman at a certain real estate agency
was restricted to serve all Black customers and sell to them in
areas already designated for minorities.

4.   The real estate industry utilized racial codes (LOC)
to identify vacancies open to "colored" persons.

5.   The evidence failed to reveal what, if any, effect
such discriminatory policies by the real estate industry had,
and failed to show any State action which promoted or enforced
such policy.



## PRIVATE DISCRIMINATION

1.  Discrimination by individuals is an aspect of
the various types of discrimination which caused racial and
ethnic residential segregation.

2.  Restrictions and biases mentioned herein are
far less important today than they were in the 1940's, 1950's
and into the 1960's.  As an experienced local Black realtor,
Mr. Yancy Gaston, testified at trial, "historically" discrimi-
nation against minorities pervaded the housing decision, but
in recent years -- after 1970 -- other less odious factors
such as choice, economics and quality of the neighborhood
have become more important.

3.  An examination of the census tracts with the
greatest number of Spanish-surnamed households (tracts 38, 24,
11, 9, 25, 35, 20, 7, 2), reveals that in 1970, 48% of the
people living within those tracts are Anglo, 40% are of
Spanish origin and three percent are Black.

4.  While there are pockets of concentration of
Blacks and Mexican-Americans within the District area, there
are no large, long-established ghetto-type concentrations.
The nearest thing to such in Tucson appears to be a fairly
narrow strip running parallel with the Santa Cruz River.

5.  There was no credible evidence presented from
which the Court can reasonably infer that School Board decisions
or policies caused or created concentrations of Blacks or
Mexican-Americans or aggravated such, except, perhaps, in the
area served by Spring School, as discussed elsewhere.  However,
some school construction or reconstruction decisions have tended
to have segregative effect in certain cases insofar as it concerns
racial or ethnic imbalance in certain elementary schools, which
matter is also discussed elsewhere in these findings.

6.  Evidence in the form of a study made by the School

District of 181 Spanish-surnamed families or households living east of Country Club Road (which is east-centrally located within the District boundaries) in 1954, showed that the families had lived at addresses all over the west and south sides of the City from 1946 to 1954. Approximately five percent of these families had arrived on the east side prior to 1946. They started moving into the area at the inception of its development.

7. Approximately 90% of these families were engaged in occupations similar to those of other Spanish-surnamed families living elsewhere in the City.

8. Less than five percent of these eastside Spanish-surnamed families returned to the west or south parts of the City.

9. Blacks and Mexican-Americans do not appear to be integrated in the same neighborhoods although concentrated in some of the same general areas of the City.

10. There was no evidence that the racial or ethnic composition of any subdivision or proposed subdivision was discussed or considered by the District in consultation with developers or real estate company representatives. However, it should have been apparent to the District that the El Rio development would result in a Mexican-American neighborhood and that construction of El Rio School (Manzo) would be heavily Mexican-American and would pull Mexican-Americans from Menlo Park School.

11. Tucson School District No. 1 has, to some degree, influenced where Blacks have chosen to live in Tucson by virtue of the location and treatment of Spring School. However, the cost of housing in a particular area seems to have had a far greater impace upon residential patterns than any other factor.

12. School District No. 1 never participated in the concept of redlining in the City of Tucson.

13.   The School District has been concerned with the tendency of minorities to overly concentrate in certain areas and has adamantly opposed the building of low income housing in minority impacted areas.

14.   Publically financed housing toward the end of the 1960's, brought to the School Board's attention the impact of such housing upon the schools.

15.   Since the people occupying publically financed housing were often members of minority groups, and the housing was placed in areas with existing concentrations of minorities, the Board felt that these activities by the City of Tucson and other governmental agencies, caused or aggravated racial/ ethnic imbalances in some schools.

16.   In February of 1970, the Board passed a resolution calling for the City of Tucson and other governmental agencies to refrain from locating public housing in areas of minority group concentrations.

17.   The District did not determine or participate in the placement of low-income housing projects.  Such projects in the Tucson area have attracted large numbers of minorities, public housing authorities have created problems for the School District that were counter-productive in its attempts to balance its schools.

18.   In May of 1975, the Board discussed and later unanimously approved a resolution announcing its opposition to I-10 since it would prevent future opportunities to change housing patterns, particularly in minority neighborhoods.

19.   The City of Tucson, particularly with respect to the racial and ethnic character of the population, has significantly expanded without any pattern of containment or concentration of minorities during the 1960's and into the 1970's.

20.   Persons of all racial and ethnic backgrounds have

dispersed themselves into virtually every census tract in the
county.

21.   The evidence fails to reveal any official policy
or practice of containment of either Blacks or Mexican-Americans
within any specific geographic area within Pima County or in
the City of Tucson, or any design or intent to do so.

22.   In the 1930's approximately 43.7% of the westside
population was Anglo.  Mexican-Americans were concentrated,
somewhat on the west side, particularly in "barrios" or neigh-
borhoods west of Sixth Avenue and south of Congress Street in
the vicinity of Drachman, Carrillo and Ochoa Schools.  Other
concentrations of Mexican-Americans on the west side were
located north of Congress Street generally along the Santa
Cruz River in the vicinity of Davis School and in the El Rio
district (Manzo School area).

23.   In the 1930's, Tucson had a relatively small
population (32,500), and the streets were relatively free of
traffic, particularly away from downtown.  Consequently, crossing
of even major thoroughfares, except for South Sixth Avenue, (which
was then part of U. S. Highway 80), was no particular hazard,
and such major thoroughfares did not constitute any major or
substantial barrier to school attendance.

24.   At the beginning of the decade of the 1950's,
Mexican-Americans were an identifiable minority group in the
Southwest generally, in the State of Arizona and in the City
of Tucson, and they, like Blacks, had suffered patterns of
discrimination within the community.

25.   There had been in existence within School District
No. 1 for a number of years, a written Board regulation or policy
allowing non-Mexican-Americans residing within the attendance 
areas of Mexican-American schools, to transfer out of those
schools and to attend adjoining schools.

26.   In the 1950-51 school year, that policy was omitted 

from the Handbook of Tucson Public Schools.

27.   This transfer policy appears to have been based
on language differences and allowed Mexican-American or Spanish-
speaking students to attend schools where programs to assist
them in learning English were available and for Anglo children
to transfer out of such schools.  However, as stated elsewhere
in these findings, such a policy allowed Anglos to transfer out
of schools which were predominantly Mexican-American and was
thus applied discriminatorily, with Davis School being primarily
affected.  No effect from such a policy presently remains.

28.   It was apparent, as previously stated herein,
that certain schools in the District were identified by the
community as "Mexican" schools and others as "White" or "Anglo"
schools.  Prejudices and aversions were showing in the community
and should have been apparent to the District, particularly with
respect to certain elementary schools.  Findings pertinent to
these matters are set out elsewhere.

29.   In 1937, the District Superintendent announced
that most of the District's Mexican-American pupils were attending
four elementary schools (Davis, Drachman, Ochoa and Carrillo),
which were 100% minority in their enrollments.

RICHEY SCHOOL

1.  Richey School, formerly known as the Pascua
School, opened as a one-room school in 1923 to serve the
Yaqui Indians.  These Yaqui Indians lived in what was known
as Pascua Village where they had settled after fleeing
oppression in Mexico during the 1920's.  They were basically
political refugees who were granted  asylum.  For many years,
Pascua had no established attendance area but was simply a
school located within the Yaqui Indian Village on the northern
end of the Davis attendance zone (west of Oracle Road and
south of Grant Road).  It was essentially a segregated school.
The Yaqui Indians had previously attended Roosevelt School.

2.  Pascua School was built after repeated entreaties
by the Yaqui Indians for their own school.  It was an adobe
school built near the village under the guidance of Miss Thamar
Richey.  In 1953, because of proposed industrial rezoning in
the area, District Board members visited the area before committing
themselves to any future action concerning the school.

3.  The federal government provided $225,000 for a new
school.  However, because the area might become industrial and
the people be forced to leave, the Board deferred action on the
new school, even though a site had been donated by the Marshall
Foundation.  A new school, Richey, was ultimately completed in
1955.  After five years of overcrowding, four additional rooms
were built in 1961.

4.  Richey School was treated the same as all other
schools in the District.  The attendance area included areas far
beyond Pascua Village.  There have been other students besides
Yaquis at Richey, including Mexican-American, Anglo and Black
children.

5.  A dedicated faculty and staff worked to encourage
many Yaqui children attending Richey School to seek higher education

and to make the school a part of community life.

6.  During the late 1960's, there was considerable
discussion concerning the relocation of the Yaquis to a 200-acre
site southwest of Mission and Valencia Roads.  The Yaqui children
who did move from the old Pascua Village to the new Pascua Village
during the 1960's, were transported to White Elementary School,
the school closest to the new village.  More recently, they
have been attending the newer Lawrence School.

7.  Richey School was constructed in an attendance
area needing a school.  In addition, it has served as a major
factor in causing the transition of the Yaquis into this country
after being hunted in Mexico and expelled from their homeland.
The District concluded that they were entitled, as were all
other members of the Tucson community, to an education facility
near their homes.  Segregative intent was not a motivating factor
in locating or constructing Richey School.

8.  The minority percentage of Richey School has declined
approximately 10% between 1950 and 1975.  Richey enrolled 48 more
children in 1975 than it did in 1950.  Data suggests that Anglo
students have caused the increase in Richey's enrollment.

9.  In summary of this section on segregation and desegre-
gation within and/or by the District, a reasonable conclusion to
be drawn is that the District is not operating a de jure segregated
system, notwithstanding some segregative intent and actions.  The
District made a commendable and valiant effort to desegregate the
dual or de jure system as to Blacks, at the time and under the
circumstances, including the state of the law then existing.
Viewed 25 years later under different circumstances, including
a whole new array of legal decisions, it was inadequate.  However,
most of the effect from the earlier segregation of Black students,
has attenuated during the past 25 years.  As stated elsewhere in
these findings, it appears that some effect may remain, as evidenced
by the relatively large number of Black students remaining in the
area of Spring, Roosevelt and University Heights.

SCHOOL SITE SELECTION, CONSTRUCTION
AND/OR CLOSING OF SCHOOLS, USE OF PORTABLES

1.   Tucson School District No. 1 has worked closely in
the past 22 years with the City-County Planning and Zoning Depart-
ment in establishing criteria for the selection of school sites.
Those criteria include the cost of acquisition, the general lay
of the land, whether it is state land, federal land or BLM land,
the surrounding area for access to the proposed site, which streets
and roads serve that area, and how far the children would probably
have to travel in order to reach the school.

2.   Selection of school sites is, and has been since
1955, a function of a cooperative effort between school officials
and the City-County Planning Departments.  Whenever it comes to
the attention of City or County planners that residential growth
is about to extend into a previously undeveloped area, advice is
given to Tucson School District No. 1 officials to purchase school
sites in the area.

3.   For example, in 1959 the City-County Planning and
Zoning Department recommended the purchase of a high school site
in the northeast corner of the School District.  This site, the
location of Sabino High School, is fairly centrally located in
the center of its attendance area.

4.   In 1955, most of the 43 District schools were
operating at or beyond capacity.  Predictions called for con-
struction of 26 new schools during the next five years.  Because
the School Board could not know with certainty which locations
would become most appropriate for future school sites, it was
necessary to buy more sites than actually utilized and investigate
even more sites than actually purchased.

5.   Tucson School District No. 1 never considered or
utilized racial  and ethnic criteria when contemplating the purchase
of sites for future school construction.

6.   The policy of Tucson School District No. 1 has been

to purchase school sites many years in advance of their actual
utilization in an attempt to anticipate where future growth would
be and where people would be locating and, therefore, to purchase
in advance of the inevitable increase in land prices.

7.  As a result of the cooperation between school
officials and City-County planning professionals, school sites
have been purchased as much as 20 years in advance of need at
a considerable savings to taxpayers.

8.  Each school building in the District, irrespective
of its age, geographic location or the racial/ethnic composition
of its student body or faculty, is adequate to offer each student
in attendance complete access to an equal educational opportunity.

9.  The decision to actually construct a school on a
site involves the joint cooperation of personnel from both the
Pima County Planning and Zoning Department and the District.
District officials are constantly reviewing trends in population
in areas where sites have been acquired with a view toward ultimate
construction if needed.

10.  There is a close correlation in the District
between site selection and residential development.  People have
gravitated toward school facilities.  People with children demand
and are entitled to have fairly conveniently located schools.

11.  In selecting school sites in advance of development,
the District and its decision-makers could not have known, nor
predicted the makeup of the neighborhood surrounding the school
with respect to race or ethnicity.  Many factors such as the
ownership of land, the nature or kind of subdivision to be
developed, the type or kind of developer, the value of the land,
the state of the area's economy, the nature of the subdivision
restrictions as to type, kind or value of improvement to be
allowed, must be considered to determine the potential makeup
of the neighborhood to be served by a particular school.  All

these factors could not possibly be known or predicted by the
District.  Such unknown factors are substantial in number and
kind and are completely outside the control of the District.

12.  In terms of the nexus between residential develop-
ment and school sites, it has long been apparent to anyone familiar
with the development of Tucson that a new school site is an important
factor for residential developers and may be counted on to increase
the rate of development.

However, new schools were seldom built in advance
of development.  For example, many schools were at capacity or
overcrowded when opened:  Brown, Bonillas, Cavett, Cragin, Duffy,
Erickson, Ford, Fruchthendler, Gale, Hudlow, Kellond, Lineweaver,
Marshall, Meyers, Rogers, Steele, Vesey and Whitmore.

13.  In approximately 1969, Mr. Cooper informally
requested two county planners, Richard Cantrell and Ron Asta, to
search for a potentially integrative high school site that would
draw from the attendance areas of several existing high schools
which were either predominantly Anglo or predominantly minority.

14.  Such an informal study was made and a site at
22nd and Alvernon was suggested.  Plaintiffs contend it was a
site that would have the potential to draw high school students
from the predominantly minority schools to the west of the SPRR
and at the same time could possibly have drawn Anglo children
from Rincon, Catalina and Palo Verde.  However, the site cost
was prohibitive, there was at the time great concern about its
proximity to Davis-Monthan Air Force Base flight pattern, and
there was a congested traffic intersection then developing because
of these two major thoroughfares.  Alvernon south of 22nd Street
is now the busiest strip in Tucson.  It leads to Hughes Aircraft,
Interstate Highway 10 and the Tucson International Airport, and
it is the only route across the railroad tracks within three miles.
The site was wisely and properly rejected for these reasons.  It
further appears questionable that the school would then or now be

-73-

better integrated than Pueblo or Tucson High.  It is likely
it would have drawn Mexican-American students out of Rincon
and Palo Verde.  It could not have reasonably included any
Catalina Anglos and would probably have drawn Anglos out of
Tucson High.

        15.  Site selection and construction of such schools
as Drachman (1904), Ochoa (1921), Safford (Mansfeld) (1904),
Mission View (1929), Government Heights (1931), Borton (1927),
Hughes (1927), Mansfeld Junior High (1930), Roosevelt Elementary
(1921), Roskruge Elementary and Junior High (first constructed
in 1908 as a high school) and University Heights (1918), are
of questionable proof of segregative intent.  The District
decision in each instance appears to have been made to provide
schools for neighborhoods then in existence or developing;
segregative intent does not appear to be a reasonable inference
therefrom.  There is no evidence in this case which shows that
these schools should have or could have been built on any other
available site and still have conveniently served the neighborhoods
or areas then needing to be served and have been better integrated
either then or now.  Early construction decisions which might
reasonably be questioned as to segregative intent are Menlo Park,
Richey and Carrillo.  Menlo Park and Richey are discussed else-
where.  Carrillo was built in 1930 only a short distance from
Drachman.  Such proximity lends itself to the inference that
this was designed to keep Mexican-American students out of Safford.
However, reasons other than segregation appear to account for this
decision.  The District acquired the site at little or no cost and
got a swimming pool in the bargain.  Also, at the time, Drachman
and Mansfeld/Safford Elementary, which served the area, were
crowded, and neither the Drachman nor the Mansfeld sites were
adequate for substantial enlargement.  Carrillo opened as a
rather large 12-room school.  Drachman at the time already had
14 rooms.  This shows considerable impaction of people in the area



served by these schools.  There was no evidence that the Carrillo
attendance area could have been served and the school have been
better integrated by locating it anywhere else within a mile
from where it was.  Further, even if Safford had been enlarged
or Carrillo located anywhere else within a mile or more of
where it is, it would still be a minority-dominated school today.
Every school but one, Roskruge, within a radius of two miles from
Carrillo, was predominantly minority at time of trial and had
been so for quite some time:

> Drachman, predominantly minority since
> opening in 1901.  91.7% minority in
> 1975-76.

> Safford (Mansfeld), predominantly minority
> every year since 1950-51 and for some
> time prior.  88.5% minority in 1975-76.

> Ochoa, predominantly minority since opening
> in 1922.  80% minority in 1975-76.

> Mission View, predominantly minority every
> year since before 1950-51.  83.3% minority
> in 1975-76.

> Holladay, predominantly minority since opening
> in 1951.  91.1% minority in 1975-76.

> Borton, predominantly minority since before
> 1950-51.  90.4% minority in 1975-76.

> Menlo Park, predominantly minority since before
> 1950-51.  81% minority in 1975-76.

> Manzo, predominantly minority since opening
> in 1939.  97.2% minority in 1975-76.

> Davis, predominantly minority since opening in
> 1901.  97.3% minority in 1975-76.

> Roosevelt, predominantly minority since 1963-64.
> 80.6% minority in 1975-76.

16.  As previously stated, schools as much as two or

even three miles away from Carrillo in any direction have always been minority-dominated or have been for some time:  Tully, Richey, Holladay, Pueblo Gardens, Cavett, Mission View, Hollinger (Government Heights), University Heights, Robison, Tolson, Rose, Van Buskirk.

17.  Roskruge, as previously stated, is the only school within a two or three mile radius of Carrillo which is not minority-dominated, and in the 1975-76 school year, it had a minority enrollment of 46.2%.  In 1971-72, it was slightly minority-dominated (50.2%).

18.  However, some site selection and construction decisions, particularly after 1951, appear questionable because they had a clearly foreseeable effect of creating, continuing or aggravating racially imbalanced schools.  The schools involved are Menlo Park, Manzo, Tully, Brichta, Richey, Holladay and Pueblo Gardens.  These decisions are discussed elsewhere.

19.  With respect to the decision in 1950 to rebuild Drachman next door to Carrillo after it had burned, the foregoing analysis or findings with respect to Carrillo applies.

PORTABLE CLASSROOMS

1.  The District utilized portable classrooms to
relieve overcrowding starting approximately in 1961.  The decisions
to use portable classrooms were necessary and, as a general rule,
appropriately motivated, i.e., they do not appear to have been
designed to "contain" or segregate either Anglos or minorities,
but simply to relieve temporary overcrowded conditions.  Their
effect on the racial or ethnic balance of the school was generally
neutral in that they neither increased nor decreased racial or
ethnic imbalance.  There are exceptions, however.  One exception
was with respect to Holladay and Pueblo Gardens.  In the case of
Holladay, since 1970, without the use of portables, some of the
minority students could have been bused to predominantly Anglo
schools.  The same could be said of Pueblo Gardens after 1967.

2.  A second exception is Brichta.  As set out elsewhere,
District policy and practice with respect to Brichta Elementary
School indicates segregative intent.  This segregative intent is
further demonstrated by the use of portable classrooms at Brichta
in 1972 instead of transporting students to Tully and/or Richey
or Davis, all of which then had space available.  Tully had
space for approximately 130 students.  Richey had space available
for approximately 125 students and Davis had space for over 200.
Tully is less than a mile from Brichta; Richey and Davis are just
over two miles away.  Many students within the Brichta area were
already being transported to Brichta and could have been sent on
just far enough to relieve the overcrowding.

3.  Borman Elementary School, under construction at time
of trial, was built to accommodate military families moving into
new housing at Davis-Monthan Air Force Base who formerly lived
off base.  Smith School, the only school previously on the base,
was 500 students over capacity in 1974.  Smith School was built in
1952 under an agreement with the federal government that it would
not be segregated.

4.   The District received assurances from the Air Force
that Borman would be a balanced school, but because the ethnic
and racial composition of the Air Force more nearly resembles
the nation as a whole rather than the Tucson area, Borman, as
Smith has, will probably have more Blacks than Mexican-Americans.
Borman will serve those people already living on Davis-Monthan
in the new housing.   There will be no students drawn from sur-
rounding areas.

5.   There has been no pattern of containment or
segregation in either the selection of future sites or the actual
construction of new schools shown by the evidence.   The District
does not appear to have established a pattern of building schools
to "contain" or separate ethnic or racial groups, but appears
to have followed a policy to build schools when and in areas
where the need therefor appeared.

6.   The evidence failed to show the District did any-
thing to prevent or encourage changing racial or ethnic makeup
in most transition schools.

7.   The only site selections which appear to have been
made with segregative intent were Hiram Banks and Holladay, both
discussed elsewhere.   No school was ever constructed on the Hiram
Banks site.

8.   As Tucson's population grew or expanded, new
schools were constructed in or near the growth areas to house
the student population.

9.   As new schools were built, generally their enrollment
would rise steadily for approximately the first seven years, peak
at about the seventh year and then decline for about five to seven
years; then it would more or less stabilize.   Construction of
additional classrooms and the use of portable classrooms appears
to have been undertaken within the past 15 years, in most instances,
in accordance with this experience factor so as not to over-build
classrooms to take care of the peak enrollment and then have empty

space in later years.

        10.  Proper long-range planning for elementary schools mandates that new schools not be built to accommodate the largest conceivable number of children in the neighborhood, only to stand empty in future years as the area changes and fewer school-age children are in residence.

CLOSING OF SCHOOLS

1.  The decision to close a particular school is based
upon several criteria.  Consideration is given to the quality of
the existing physical plant, the size of the school enrollment
and the neighborhood population which a school serves.  An important
criterion is the additional expense required for renovation and for
providing a full educational program to a small enrollment.

2.  An ancillary effect of the closing of a school may
be an improvement or change of racial and ethnic balance in other
schools in the District.

3.  Nowhere does the 1955 School Plan, nor any other
plan or District correspondence, recommend new schools downtown
to replace those considered for abandonment.

4.  The 1955 School Plan recommended the closing of
Spring Elementary School because of a decline in its neighborhood
population.  This recommendation was implemented after the 1960-61
school year when it became apparent that it was no longer economi-
cally feasible to maintain an elementary school at Spring.  This
was later done when the enrollment at Spring dropped nearly 40
percent between 1955 and 1960, with no signs of recovery indicated
in planning analysis.  This drop in enrollment reflected the mobility
of the area residents and the changing character of the neighborhood.

5.  The closing of Spring Elementary removed substandard
classrooms from elementary use.  The junior high school using the
same facility is still in operation, however.

6.  The School Board considered closing Miles School
for several years prior to 1969.  Again, neighborhood population
had been declining, prompting its use as a "reserve" school to
relieve overcrowded schools, as a location for special education
classes and for administrative offices.

7.  Miles was 55% minority in 1968-69 when its conversion
to an Exploratory Learning Center was proposed.  Miles' minority
enrollment had been increasing concurrent with an overall decrease

in enrollment, again, reflecting a change in the makeup of the
neighborhood.

8.   The reason for closing Miles was to convert it
into a "magnet" school.

9.   The conversion of Miles into the Exploratory
Learning Center gave it a balanced enrollment, closely approxi-
mating that of the District, along with an increase in its enroll-
ment closer to optimal capacity.

10.   Students in the former Miles attendance area who
preferred conventional programs were redistributed among nearby
Roskruge, Hughes and Robison Elementary Schools.  This redistri-
bution had no discernable effect upon the ethnic ratios of those
schools.

11.   The closing of Safford Elementary had been expected
for many years based upon the anticipation that business and
industrial expansion would cause a decrease in the neighborhood
population, making operation of a school less feasible.

12.   Low enrollment and a correspondingly small faculty
prompted parental concern over the educational program available
at Safford.  Several meetings with parents were held to discuss
the available options at Safford.

13.   In order to offer a more complete range of programs,
the decision was made to close Safford and redistribute its students
among nearby Borton and Carrillo, both of which provided a more
extensive program.

14.   The proposal at a School Board meeting on July 7,
1970, to close Safford met with opposition from people believed
to be parents of Safford students.  The Board responded to this
opposition by deciding to keep Safford open.  As it turned out,
there were very few Safford parents at the meeting; the Board
had mistakenly followed the wishes of people who had attended
the meeting on behalf of Model Cities and who had no current
involvement with the Safford situation.

15.  Roskruge Junior High School had long been con-
sidered for closing, but proved to be useful as a "reserve"
school to relieve areas on the growth fringe until more peri-
pherally located facilities could handle school population
growth.

16.  Prohibitive expense required to modernize the
Roskruge facility, an opportunity to improve racial/ethnic
balance at Doolen and Catalina in a reasonable fashion, and
the elimination of a need for Roskruge by the imminent opening
of a new westside junior high (Maxwell) were all factors which
coincided to prompt the decision to begin closing the school in
1971-72.

17.  School officials anticipated that Maxwell Junior
High would open about 35% Spanish-surnamed, 8% Black and 2%
Indian and Oriental, thus nearly perfectly representing the
ethnic ratio of the District.  But because of increases of
minority people moving into the Tucson Mountain area (which
caused Tolson Elementary to open as a minority-dominated school),
Maxwell Junior High opened nearly 50% minority rather than 40%
as had been expected.

18.  The closing of Roskruge Junior High eliminated
one minority imbalanced school (Roskruge), enabled one school
to open fairly well-balanced (Maxwell), improved ethnic balance
at Doolen, and had little or no effect on Safford.

19.  There has long been a recognition by the District
that Davis School was below the generally accepted standards for
modern school buildings.  Its physical facility and undesirable
location had caused the planners to recommend its eventual
abandonment.  At numerous times over the years, the structure
has been altered and renovated in attempts to maintain and keep
the building near acceptable standards.

20.  Because of the declining neighborhood population,
obsolete facilities, inadequate sites and the increasingly

uneconomical operational expense involved, Davis and University Heights were recommended for closing at the end of the 1974 school year.

21.  Business and industrial expansion and the building of the Community Center and governmental complexes had all contributed to the reduction of the Davis enrollment.  Enrollment at Davis had declined 50% since 1968.  In the 1975-76 school year, Davis housed only 151 students with a capacity of 406.  Because of its age, location and few students, it should have been closed.

22.  The University Heights site size was inadequate, as were parking facilities.  The neighborhood was filling with university students, with resident families leaving the area. With easy access to downtown business, the university and major traffic arteries, University Heights was thought to be an ideal location for Project MORE, the alternative high school.

23.  The racial and ethnic impact of the closing of Davis and University Heights was among the rationale in deciding to close the two schools.

24.  Opposition to closing the two schools was encountered, mostly from parent groups and the NAACP.  Pursuant to A.R.S. §15-349, an Advisory Meeting of the Board was called following the receipt of petitions opposing the closing.  Parents at the meeting expressed strong opposition to the Board's pending action.

25.  The Board of Supervisors and the governing bodies of Tucson and South Tucson submitted resolutions to the Board requesting a one-year moratorium on the closing of Davis and University Heights.



26.  The moratorium was thought to be a neutral act which would not be construed as a civil rights violation by HEW, as an absolute rescission of the decision might have been.  The moratorium thus enabled the Board to handle the dilemma imposed by parental and political pressure, on one side, and HEW on the other.

27.   The School Board ultimately decided that no amount
of persuasion and discussion about alternatives could convince
the community to support the closing of Davis and University
Heights.

28.   The action by the School Board in not closing
these schools was a reasonable response to the desires of the
parents of children attending Davis and University Heights
Elementary Schools.   This included members of the classes
represented by the plaintiffs in these cases.  The action
cannot reasonably be interpreted as having any unconstitutional
overtones or segregative intent.   The opposite inference is more
reasonable and rational.

29.   Each successful school closing has resulted in
fewer predominantly minority schools and an improvement in
the District's racial/ethnic balance.

30.   The evidence fails to support any finding of
segregative intent based on the closing of any school in the
District or the failure to close any school.

## WESTSIDE DEVELOPMENT

1. As early as 1946, real estate developers had tried
to subdivide the area west of Silverbell. The Byrd Investment
Company had plats approved by the Regional Planning Board and
FHA, but dropped the matter until 1948.

2. No racially restrictive covenants were ever estab-
lished in the Tucson Mountains west of Silverbell Road. There
was no private residential segregation on the basis of race in
the future Brichta Elementary School attendance area.

3. Around 1948-50, development partners, Byrd, Robert
Daru and Douglas Holsclaw tried again to subdivide the area west
of Silverbell, but from 1950 to 1953 the matter lay dormant.

4. In 1950, the District recognized the need to
purchase a site in the northwest quadrant in advance of develop-
ment, and on November 21, 1959, approved purchase of a site west
of Greasewood Road between Grant and Speedway. Later, an eight-
room school was designed for the site.

5. In the late 1950's, it was also realized by the
District that Menlo Park was greatly overcrowded and therefore
a new school would need to be built. The reason for building a
new school instead of an addition at Menlo Park was because the
Menlo Park site was too small to accommodate another addition.
The last addition had been built in 1955.

6. Between 1953 and 1955, the District made the
decision to build and did build Richey School to replace Pascua
School.

7. Again, as with other student assignment decisions,
the Board was then faced with the decision of determining where
to locate the school, how large to make the school and where to
draw its boundary.

8. The decision the Board made was to build a small
school (seven or eight rooms) in the center of Yaqui Village,

having boundaries that encompassed that Indian village.

9.  No particular effort was made to conform the boundaries of Richey to any particular major transportation arteries.  The boundary was set several blocks to the west of Miracle Mile, thereby requiring some children previously assigned to adjoining Roosevelt School to cross that artery.

10.  The reconstructed Richey School was 92.3% minority at a time when the adjoining school (Roosevelt) was almost 60% Anglo and had over 100 Anglos compared to only 18 at Richey.  This was a questionable decision because of the obvious effect such a school would have on the race or ethnicity of the school's population.  However, again, if Richey had not been rebuilt, but instead, if all the Richey students had been sent to Roosevelt, it appears this would simply have speeded up the transition of Roosevelt from an Anglo-dominated school to a Mexican-American or minority-dominated school.  Because even with construction of Richey and its minority-dominated population since opening, Roosevelt has gone from 59.9% Anglo in 1954-55 (when Richey reopened) to only 19.4% Anglo in 1975-76.  Consequently, the evidence does not support any reasonable inference of any present effect of the Richey rebuilding decision.

Also, when Richey was rebuilt in 1954, its other neighborhing school, Tully, was not yet built, but when Tully was opened in 1956, it had only 11% Anglos.  Thus it appears that in 1954, Richey could not have been rebuilt anywhere within a mile or so of where it was and have been other than a minority-dominated school.  If rebuilt closer to Roosevelt, it is likely that for a few years it would have had more Anglos.

11.  To relieve overcrowding at Pueblo Gardens in 1954-55, a 12-room addition was constructed.  As a result of that decision, Holladay remained 97.2% minority with 143 Black students and Pueblo Gardens remained only three percent minority with no Black students.  This was another questionable decision.  It indicates

segregative intent, but as stated elsewhere, because of changing
neighborhoods, regardless of where the school had been built or
how its attendance areas drawn, the result today would be the
same. (Again, however, the decisions regarding the building of
Pueblo Gardens, the determination of its attendance areas and
the use of portable classrooms to accommodate students there
rather than transport them to minority-dominated schools with
space available, indicates segregative intent.

12.  In the late 1950's and early '60's, the District
constructed Tully School (1956), (which has always been a pre-
dominantly minority school) and constructed a school to the
west -- Brichta (1960) -- that was opened as a predominantly
Anglo school.  However, in the 1975-76 school year, Tully had
59 Black students, 285 Mexican-Americans and 124 "Others" for
an Anglo or non-minority enrollment of 26.5%.  Brichta at that
time had 13 Black students, 126 Mexican-Americans and 228 Anglos,
with a 62.2% Anglo population.  Neither school can now be called
truly segregated by any reasonable standard. However, as discussed
elsewhere, it appears there are existing effects in this area from
prior segregative acts or policies of the District, in spite of
the fact that these schools represent the racial/ethnic makeup
of the neighborhoods as areas they serve.

13.  In building the Brichta School, District administrators
contended that they were providing a "neighborhood school" for the
Brichta children.  Taken in context with all the other factors then
existing, this is not a reasonable inference to draw.  Mr. Cooper
explained that Anglo parents felt strongly about their children
attending Brichta because that was their "neighborhood school".
When asked why they felt "strongly" about that, Mr. Cooper responded:

>"Counsel:    They felt strongly about it because
>            they didn't want to go into an inte-
>            grated school?
>
>Cooper:     Let's not use the word integrated.  They
>            didn't want to go to a minority school.

<pre>
Counsel:    They didn't want to go to a
            minority school, is that one
            of the reasons they felt
            strongly about it, Mr. Cooper?

Cooper:     I couldn't say that specifically,
            but I suspect it."
</pre>

14.  As explained by Mr. Cooper, the events on the west
side of town are indicative of a then existing attitude on the part
of many within the community and to which the District and its
decision-makers were sensitive.  This is not indicative, however,
of the way in which all decisions were made after "desegregation"
in 1951.  Mr. Cooper's comments deserve close attention in this
connection, as suggested by plaintiffs, but not necessarily only
for the reasons postulated by plaintiffs:

<pre>
"Counsel:   ---in a conversation that you say
            you recall having with the Brichta
            parents about this particular situation,
            was one of the things that they were
            concerned about, the quality of the
            temporary school to which their
            children would be moved, things like
            playground facilities?

Cooper:     They used these things, and let's face
            it, we are not kidding anybody around
            the table.  The whites wanted no part
            of this and you know that as well ...

Counsel:    Want no part of what?

Cooper:     Integration.  God almighty, look what
            happened in Boston, that would be the
            worst thing in the world to happen in
            a community, but it will happen and
            can happen.  They didn't want to go
            into those schools.

Counsel:    Did they tell you that they didn't
            want to?

Cooper:     No.  It's a rare person that ever came
            in and would be stupid enough to say
            in my presence that he didn't  want his
            kids to go with the minority kids.  But
            behind what they were arguing there was
            always the feeling on my part that this
            was the main reason.

            Look what happened in that area.
            When I came here there was quite a few
            whites that lived in that area, they
            moved out.  I am not condoning this,
            I am trying to face facts ...
</pre>

> So sure, these people feel that
> way, they still feel that way, they
> feel strongly that way...This was
> true any damn place in town."

15. In connection with community attitudes, it is rele-
vant to Mr. Cooper's conclusions to consider matters presented to
the Court in this case with respect to two separate class deter-
minations.  First, we consider the matter of the intervention as
defendants by Sutton, et al, Case No. 74-90 (Fisher v. Lohr).  These
intervenors-defendants came into the case as defendants and to
represent a class consisting of all non-Negro, non-Mexican-American
students enrolled in School District No. 1 in grades Kindergarten
through eight and their parents, guardians and next friends.
Approximately 28,000 notices were distributed to such class members.
In response to this notice and after much news-media publicity and
several meetings by those opposed to such class designation and
inclusion, the Court received 526 written communications in opposi-
tion thereto (class members opposed to the class certification).  A
hearing was conducted on January 9, 1976, where testimony was received
from some of those included within the class.  At that time it was
brought out that such a negative response (526 out of more than
28,000) indicated on a statistical basis a significant response
in opposition.  Plaintiffs elaborated on this in their argument
seeking to have the Court withdraw the class certification.  The
Court relied upon the testimony, conceded the validity of counsel's
argument and withdrew class certification.  Since the position of
the intervenors was opposed to the position of plaintiffs and
opposed to any mandatory busing which might result from these
lawsuits, it would appear that the class response was certainly
not indicative of any pattern of community prejudice against the
classes of plaintiffs.  Instead, a reasonable inference is that
it indicates a community attitude supportive of the minorities
represented by plaintiffs.  The class certification was, as above
stated, withdrawn on the grounds that there was no showing that
the intervenors' interests were typical or representative of the

class interests and that such intervenors did not represent the interests of the class.

Further, a group of non-Black, non-Mexican-Americans sought to intervene in this case as parties plaintiff to represent a class of persons similarly situated. This support of plaintiffs' position by the community again indicates a lack of any pattern of community attitudes supportive of segregation.

On the other hand, we must also consider the contentions of plaintiffs in the Mendoza case in light of the attitude of the class they represent. When a similar notice of the pendency of this action was sent to the class represented by plaintiffs Mendoza, et al (all Mexican-American students, Hispano-American students or students with Spanish surnames enrolled in Tucson School District No. 1 in grades Kindergarten through 12 and the parents, guardians and/or next friends of those students), there was a negative response of approximately 1,450 out of approximately 17,000 class members. Using the same criteria and argument presented by all plaintiffs in opposition to class certification for the Sutton intervenors-defendants, a reasonable inference is that there is an overwhelming opposition to plaintiffs' contentions in this case of a segregated school system in the District, and further indicates a lack of any existing community attitude supportive of segregation in the District.

It is doubtful that, in Case No. 74-204 (Mendoza), there is a broad-based support for all of plaintiffs' contentions within the class they represent.

16. In 1955, a Board-appointed, community-wide committee on school construction and site selection decided not to consider the racial and ethnic consequences of its site selection and construction policy. There is no evidence to the contrary.

17. Plaintiffs' witnesses bear down heavily on school site selections, construction decisions and use of portable classrooms

as evidence of segregative intent.  The evidence fails to reveal
that such conclusions are warranted in most instances.  A review
of any of the area maps in evidence showing the location of the
District's schools shows a fairly uniform dispersal of all schools.
This could not have happened if the District had intended to
operate a dual or segregated system.

18.   Considering only the site selection or location of
elementary schools, Defendant's Exhibit No. 694 shows the location
of all elementary schools in the District in 1976-77.  The history
of each school reveals some questionable District decisions as
to location of elementary schools only with respect to Richey,
Carrillo, Manzo, Menlo Park, Brichta, Tully, Holladay and Pueblo
Gardens.  The remainder of the decisions, 63 out of a total of 71,
could not have been altered substantially and still have schools
rationally and reasonably located and constructed to conveniently
serve the students or potential students the District was obligated
to serve.  These questionable decisions are discussed in more detail
elsewhere in these findings.

19.   The historical review noted above reveals the
following facts concerning school location.

20.   Davis Elementary opened in 1901 and served the
entire northwestern portion of the District.  It is less than
one-half mile east of the Santa Cruz River.  By 1918, it had 11
classrooms.  It was built to conveniently serve an area of residential
concentration which, of course, has changed drastically in the past
77 years.

21.   Menlo Park was built as a two-room school in 1918.
It lay one mile to the west of Davis and served that portion of
the former Davis attendance area west of the Santa Cruz.  Two-room
additions were made in 1921, 1927 and 1930.

22.   Menlo Park was predominantly an Anglo school while
Davis was left with a Mexican-American population well over the
District average (at that time the Mexican-American student average

was over 50%).

23.   The construction of such a small school in relative proximity to a large school was inexplicable at the time on grounds other than an intent to provide Anglos a separate school.  As both Menlo Park and Davis became overcrowded, rooms were added to each and the line between the two was maintained.  In 1930, Davis had 15 classrooms and Menlo Park had eight.  By this time, however, it was reasonable and necessary to have a school west of the Santa Cruz.

24.   The transfer of an "all Mexican room" (apparently a 1-C class) from Menlo Park to Davis in 1932, left Menlo Park with approximately 34 students per room and Davis with over 40 per room.  This indicates segregative intent.

25.   In 1939, El Rio Elementary School (now Manzo) was built with six classrooms, one-half mile north of Menlo Park. It received six-room additions in 1942 and 1946 while Menlo Park remained an eight-room school.

26.   The El Rio neighborhood consisted of very small lots with almost no building restrictions.  The inhabitants were mostly Mexican-American families of a lower socio-economic level who were generally looked down on by the Anglo and Mexican-American middle-class families in the Menlo Park area.  During the 1940's, El Rio and Davis were overcrowded while Menlo Park was underutilized.

27.   At the time it was constructed, Menlo Park was serving a substantial Anglo neighborhood and it was clearly fore-seeable (and no doubt intended) that Manzo would serve a Mexican-American area and keep Mexican-Americans out of Menlo Park.  This is indicative of segregative intent.  However, at best, Menlo Park could have been enlarged in 1939.  And assuming that it could have then been enlarged to accommodate the Manzo (El Rio) attendance area, as history has shown such an enlargement would simply have speeded up the minority domination of Menlo Park if the El Rio

students had been assigned there.  By 1950, Menlo Park was already down to 45.7% "Others".  In 1975-76, it was 91% minority, in spite of District attempts to retain it as an Anglo school.

28.    To elaborate on this, in the 1975-76 school year there was a total of 3,779 elementary school students enrolled in all the elementary schools within a two-mile radius of Manzo and lying within the District boundaries.  Of these, 472 were Black (12.5%), 2,425 were Mexican-American (64.4%) and 872 were Anglo ("Other") (23.1%).  The following table shows a breakdown of these figures and percentages:

|  | BLACK | M. A. | OTHERS | TOTAL | % OTHERS |
|---|---|---|---|---|---|
| Manzo | 1 | 483 | 14 | 498 | 2.8% |
| Brichta | 13 | 126 | 228 | 367 | 62.2% |
| Carrillo | 22 | 178 | 21 | 221 | 9.5% |
| Davis | 10 | 137 | 4 | 151 | 2.7% |
| Drachman | 50 | 195 | 22 | 267 | 8.3% |
| Menlo Park | 19 | 305 | 32 | 356 | 9.0% |
| Richey | 5 | 168 | 39 | 212 | 18.4% |
| Roosevelt | 66 | 92 | 38 | 196 | 19.4% |
| Roskruge | 16 | 68 | 98 | 182 | 53.8% |
| Safford | 11 | 135 | 19 | 165 | 11.5% |
| Tolson | 94 | 227 | 143 | 464 | 30.8% |
| Tully | 59 | 285 | 124 | 468 | 26.5% |
| University Heights | 106 | 36 | 90 | 232 | 38.8% |
| TOTALS | 472 | 2,435 | 872 | 3,779 | 23.1% |

29.    Taking elementary schools within what plaintiffs call "Region I", and adding Tolson Elementary, a perfect distribution of all students in those schools according to race or national origin would still leave Manzo with a 77.1% minority-dominated student body because only 23% of all students in the whole area are "Other" or Anglo and it appears it has always been so, although there have been population shifts.  For example, Anglos have moved

out of the older Roosevelt and Menlo Park areas and into the
Brichta and Tolson areas.  The same sort of transition or
population shifts occurred in the early days of the District,
when Anglos moved out of the older Davis area and into the then
newer Menlo Park area.

|  | BLACK | M. A. | OTHERS | TOTAL | % OTHERS |
|---|---|---|---|---|---|
| Manzo | 1 | 483 | 14 | 498 | 2.8% |
| Brichta | 13 | 126 | 228 | 367 | 62.2% |
| Davis | 10 | 137 | 4 | 151 | 2.7% |
| Menlo Park | 19 | 305 | 32 | 356 | 9.0% |
| Richey | 5 | 168 | 39 | 212 | 18.4% |
| Roosevelt | 66 | 92 | 38 | 196 | 19.4% |
| Tolson | 94 | 227 | 143 | 464 | 30.8% |
| Tully | 59 | 285 | 124 | 468 | 26.5% |
| TOTALS | 267 | 1,823 | 622 | 2,712 | 22.9% |

30.  It cannot be said that the School District caused
the Manzo, Davis, Richey or Tully areas to be Mexican-American
because it is without dispute that they were already such before
the schools were built.

31.  These decisions with respect to Menlo Park and Tully,
at the time they were made, were explicable only by an intent to
segregate at least lower-class Mexican-American students from the
rest of the students.  Although Menlo Park was not far from being
50% Mexican-American in enrollment in the early 1940's and over
50% later in the decade, it was perceived as a school acceptable
to Anglos or a higher socio-economic class school in the area and
was afforded the previously stated preferential treatment.

32.  By 1950, Menlo Park had ten classrooms, El Rio had
18 and Davis had 17.  Their percentage of "Others" (i.e., not Black
or Mexican-American) was:  Menlo Park - 45.7%, El Rio - 10.0% and
Davis - 21.9%.

33.  In 1950, the District acquired the site where Brichta

is now located.  Manzo and Menlo Park were both overcrowded by
1950, and the overcrowding was substantial.  This overcrowding
resulted in various reassignment decisions discussed elsewhere.
If Brichta had been built in the early '50's, as originally
planned, the District could have relieved the overcrowding at
Menlo Park and at Manzo, and Brichta would have been a well-
balanced school, drawing most of its Anglos from the area west
of Silverbell Road and most of its minority students from east
of Silverbell Road.

34.  Instead of building Brichta, the District acquired
a site one-half mile east of Silverbell, built Tully with 12 rooms
and added four rooms to Menlo Park.  Silverbell was used as the
western boundary for Tully.  This caused Tully to open 88.2%
minority, while Menlo Park had 66.5% minority students.

35.  Brichta was built in 1960 with six classrooms and
it used Silverbell as an eastern boundary.  The result was 3.9%
minority attendance at Brichta, 79.0% minority at Tully with 12
rooms and 81% minority at Menlo Park.  The small difference between
Menlo Park and Manzo (92.2% minority) with respect to minority enroll-
ment, shows that no effect  of prior decisions made Manzo a
Mexican-American neighborhood.

36.  Brichta has only ten classrooms today, whereas
Tully has 21.  Brichta has had severe overcrowding since 1971 and
Tully has been underutilized since 1961.  In 1973, Brichta had
400 students or 40 per permanent classroom, while Tully had 415
students, or 20 per permanent classroom.  In 1974, Brichta had
453 students or 45 per permanent classroom, while Tully had 452
students or 22 per permanent classroom.  Brichta was 34.2% minority;
Tully was 78.7% minority.

37.  All of these actions show a continuing intent to
segregate in this area.  Although the area served by Brichta and
Tully now needs two schools, much of the difference in racial
makeup between the schools over the past few years has been

unnecessary and counter to neutral educational goals.  Some
effects of these past segregative acts remain and should be
remedied.

38.  Pascua Elementary School was built in 1923 with
the express intent of housing Yaqui Indians.  The attendance
area was carved out of Roosevelt's, one mile to the southeast,
but when overcrowding came to Pascua, the students were assigned
to Davis, one and one-half miles to the south, not to Roosevelt,
the nearer school.

39.  Prior to 1950, there was in effect a transfer
policy which allowed a "non-Mexican-American child in an all-
Mexican district to attend school in an adjoining" district.
Defendants' evidence shows that this policy was administered
in such a way that Anglos and English-speaking Mexican-Americans
transferred from Davis to Roskruge, one mile to the east.  The
evidence failed to establish any substantial numbers of such
transfers.

40.  However, these two actions show the District's
identification of Davis as a lower socio-economic class or
minority school and that the identification and separation was
not strictly a result of housing patterns.

41.  Although the District accelerated the transition
in the Davis area, no possible action by the District could have
prevented its present state as a heavily minority area with few
school-age children.

42.  Likewise, the Richey area, even if treated
differently in early years, would not be substantially different
today, regardless of District action.

43.  Some Blacks lived in the area of Dunbar School
before it was built there.  The Black school appears to have
contributed substantially to the fact that many Blacks moved
into the area to be near the school and lived there in 1951.
This is the one example where it can reasonably be inferred that

*Segregative act:*

the District caused residential patterns by a segregative act. ⟶ ✳

44.   In 1951, Dunbar's name was changed to Spring,
apparently in an effort to erase the stigma attached to its
having been a segregated school.  It was changed to a "neighborhood"
school.  As then constituted, it was a six-room elementary school
and a 17-room junior high school.  It had by far fewer students
than any junior high in the District.

45.   An extremely small elementary district was carved
for Spring out of the Davis and Roosevelt attendance areas; the
resulting minority percentage for Spring was 84.2%.  Davis had
89.2% minority, but Roosevelt had only 31%.  Roskruge, bordering
Spring to the east, had only 26.6% minority students.

46.   Roskruge and Spring were both combination elementary/
junior highs.  It would have been a simple matter and logical
for the District to have sent the children it assigned to Spring
Elementary to Roskruge or Roosevelt instead.  The effect would
have been integrative in two ways:

      a.   The Black elementary children who had
           formerly attended an all-Black school,
           would have been sent to schools 50%
           Anglo; and

      b.   Spring Junior High could have accommo-
           dated 150 more students (many Anglo)
           who were either bused by Spring or who
           were bused to nearby Roskruge from the
           far east side.

47.   Spring Elementary was closed in 1961, but Roosevelt
still has over 33% Black students, partially as a result of a
material northward movement of Blacks from the nearby Dunbar
area.

48.   Roosevelt includes almost the entire former Spring
Elementary School attendance area, but even prior to Spring's
closing, Roosevelt had disproportionate numbers of Blacks in

attendance (25 or 8% in 1951-52 and 71 or 30% in 1960-61).

49.   Segregation is responsible, at least partially,
for the natural and foreseeable growth of the Dunbar or Spring
community of Blacks even after desegregation in 1951.   This
District policy is responsible to some extent for the fore-
seeable, though regretable, apparent abandonment of the Roosevelt
neighborhood by many Anglo families.

50.   The same pattern occurred in the University
Heights attendance area, parts of which are only a mile from
Dunbar or Spring.   This fact, together with the present treat-
ment of University Heights in regard to transportation decisions,
lead to the conclusion that some present effects of segregative
acts exist at University Heights.

51.   On the south side of the District, the expansion
of the Mexican-American population led to a series of schools
which served mainly Mexican-Americans:   Drachman, Ochoa, Mission
View and Carrillo.

52.   Within one-half mile of Drachman and Carrillo, are
Safford Elementary and Junior High Schools.   The elementary school
remained much more of an Anglo school than those schools immediately
to its west because the South Stone-South 6th Avenue line between
them was respected.   Given the location of the schools and the fact
that at the time this street was also U. S. Highway 80, the line
was not unreasonable.

53.   Even assuming an early discriminatory intent in
this area, time and the changes in the neighborhood served by
Safford have so attenuated the decision, as to make it of no present
consequence.   Further, with respect to this area, it has been
stated in these findings  that if Carrillo had been built in
1930 anywhere within a mile or two-mile or more radius of where
it was built, it would still be a minority-dominated school today,
and would have been so, in all probability, from the time it opened.

54.   Mission View was built as a two-room school in 1923.

It had a substantial percentage of Anglo students in attendance.
Hollinger (now Government Heights) was built with four rooms
one mile farther south in 1929.  This decision took the higher
income Mexican-Americans and many Anglos out of Mission View.
From 1929 until 1968, Government Heights maintained an Anglo
percentage from 11 to 30 percentage points higher than Mission
View.

        55.   The construction of the four-room school one mile
from the two-room school in a sparsely settled area of the
District, cannot be explained by any  motive other than an
intent to provide a separate school for the higher-class, pre-
dominantly Anglo, Government Heights neighborhood.

        56.   Rose Elementary was built one mile southwest of
Government Heights in 1949.  It had 15 classrooms, and Government
Heights had 18 at the time.  It is apparent that by 1949 at
least one school was needed on the southwest side in addition
to Mission View, which already had 19 classrooms.

        57.   The placement of Rose was reasonable, and although
the boundary lines as drawn left it 20% below the District average
of Anglo students and left Government Heights at the District
average, no evidence shows any reasonable alternative which
would have made a difference either in 1948 or in 1976.

        58.   In 1950, Lynn was built as a six-room school almost
two miles to the west of Government Heights.

        59.   As a result of these decisions, Lynn served all
of the southern portion of the District west of the Santa Cruz
and opened 73% Anglo in 1950; Government Heights went from 58%
Anglo in 1945 to 66.7% Anglo in 1950; Rose opened at approximately
50% Anglo in 1948 and had 46.6% Anglo attendance in 1950; Mission
View went from 47% Anglo in 1945 to 38.1% Anglo in 1950.

        60.   It was not absolutely necessary that Lynn be built
at the time it was.  Additions could have been built at Government
Heights and Rose, as was done later in 1953 and 1954.  If Lynn had

not been built in 1950, Rose and Government Heights could have
retained better balance for a few more years.  However, by 1954,
a school west of the Santa Cruz would have been necessary, and
the ultimate result would have been the same.  The timing of
the construction shows segregative intent; the placement does
not.  Lynn is over a mile from any other school.

     61.  Lynn and the four newer schools (White, Vesey,
Lawrence and Warren) carved out of its old attendance area, are
all ethnically and racially well-balanced.  The timing and
placement of the construction of these four newer schools is
reasonable in each case.

     62.  Van Buskirk was constructed in 1957 and took
parts of the Rose and Government Heights attendance areas.  Both
schools were severely overcrowded at the time.  Van Buskirk is
one mile southeast of Government Heights.  These decisions show
no segregative intent.

     63.  In 1948, instead of rebuilding Drachman, the
District could have enlarged Borton with rooms and playground
area and could have immediately built a large school at the site
of either Pueblo Gardens or Holladay.  This, combined with a
redrawing of attendance zones for Davis, Carrillo and Safford,
would have accommodated Drachman's students.  The effect of
this alternative would have been approximately as follows in
1951-52:

       a.  Davis and Carrillo would have remained
          near 90% minority in attendance;

       b.  Borton would have had 81% minority
          students instead of 78%;

       c.  Safford would have had 75% minority
          students instead of 52%; and

       d.  A large new school at the site of either
          Holladay or Pueblo Gardens would have been
          47% minority instead of the two schools

actually built, which were 92% and 2%
minority, respectively.

64.  The first two effects are racially neutral.  The
effect on Safford would have been to make it an impacted school
earlier than actually happened (1949 instead of 1956).  The failure
to take steps such as suggested herein, shows segregative intent
but any lasting effect is nil.  Davis, Carrillo, Safford and
Borton would all be minority impacted schools today in either
case.

65.  The fourth effect is the one which would have been
most integrative; however, it still could have been executed even
with the rebuilding of Drachman.  Since alternative actions are
easier to analyze by leaving as many factors as possible the same,
the decision to build two schools (Holladay and Pueblo Gardens) in
the area instead of one, should be analyzed by accepting the fact
that Drachman was rebuilt.

66.  Holladay was built as a six-room school in 1951 on
a site which had been planned for the second Negro school in
Tucson.  It was one mile south of a 12-room school (Borton) and
one mile west of a six-room school (Pueblo Gardens).  In 1951,
Holladay was 91.6% minority.  At the time, there was no valid
reason to split those 24 classrooms into three schools.  However,
by 1954 there was a need for 40 or more classrooms in the area, and
by 1956, for 50 or more classrooms.  Today, approximately 58 class-
rooms are needed in the five square mile area between South 6th
Avenue and the Southern Pacific tracks, which is now served by
Borton, Holladay, Pueblo Gardens and Cavett.

67.  It is apparent that at least three schools have
been needed in the area since 1954.  If there had been only two
schools built by 1951 and only three by 1956, the racial/ethnic
balance of the schools other than Borton, would have remained
much better until approximately 1965.  Holladay would not have
had over 90% minority students every year of its existence, as is

now the case.

68.  Even if we consider that all four schools should
have been built where they are, still Holladay School should
not have been bypassed when the District sent students from the
Government Heights and Rose attendance areas to Pueblo Gardens
and Cavett in 1955 and 1956, and when it sent students from
south of the Holladay area to Safford in 1954 and 1955.

69.  All of these actions show an intent on the part
of the District to keep Holladay a minority school.  If Pueblo
Gardens, Cavett and Safford were not now also overwhelmingly
minority-dominated, the conclusion would necessarily be that
the imbalance was to some extent a result of the District's
segregative actions.  Given the present makeup of all of the
schools involved, it is likewise inescapable to find that all
effects of the 20-year-old segregative actions regarding
Holladay and Pueblo Gardens have become attenuated.

70.  While it has been established, as previously
set forth in these findings, that the District has engaged in
discriminatory acts, the evidence simply does not support any
reasonable or rational finding that other than in the Spring-
Roosevelt-University Heights area, anything the District did
or did not do created or contributed to the overall present
racial or ethnic imbalance in the west-central portion of the
District.

71.  The west side of Tucson is where the earlier
inhabitants of Tucson lived.  They were mostly of Mexican
descent.  Since Tucson became a community, Mexican-Americans
have always lived in concentrations along the Santa Cruz River.
A natural expansion of their numbers has occurred along the
Santa Cruz.  As their numbers outgrew the original "barrios",
they expanded north, east, south and west.  For the District
not to have provided these residents with adequate and conven-
ient schools, would have been discriminatory; and it would have

been just as discriminatory not to have provided the expanding
eastside area with adequate, convenient schools.  To infer a
dual system simply because schools built to serve the tax-
paying inhabitants of the District are conveniently located
and because people do not choose to live in a homogenous flux,
which in turn results in racially or ethnically imbalanced
schools, would be an absurdity.  More is required to be proved
by competent evidence than racial or ethnic imbalance before
there can be a reasonable, rational and legally appropriate
finding of a de jure segregated system. There has been too
much emphasis on this factor (combined racial/ethnic imbalance)
alone in this case.

72.  Unless the interests, convenience and needs of
the students, their parents and the public in general is to
be completely ignored, the District could not rationally have
located reasonably sized schools anywhere in the western part
of the District and have them all be anywhere near racially or
ethnically balanced today.

73.  The decisions to build Holladay and Pueblo Gardens
and later Cavett in close proximity serving neighborhoods heavily
impacted with either Blacks and Mexican-Americans (Holladay) or
Anglos (Pueblo Gardens and Cavett), are, as previously stated,
indicative of segregative intent.  However, it bears repeating
that the changing racial and ethnic makeup not only of neighbor-
hoods  served by these schools, but the area as a whole, have so
attenuated the effect of these decisions as to make them of no
consequence at present.  For example, Holladay opened in 1950-51
with 113 Black students, four Mexican-Americans and ten Anglos.
In 1975-76, there were 123 Black students, 198 Mexican-Americans
and 28 Anglos.  The evidence fails to show any District action which
caused Blacks or Mexican-Americans to move into the Holladay area
or which kept Anglos out.  To further illustrate that the
District actions did not create or contribute to the influx of

Mexican-Americans or Blacks into the area, it is appropriate to
review the history of student attendance at Pueblo Gardens.
Pueblo Gardens opened in 1950 with no Black students, only
seven Mexican-Americans and 160 Anglos; its Anglo enrollment
was 95.9%.  The enrollment increased continually thereafter to
a high of 152 Black students (1970-71), a high of 640 Anglos
(1954-55) and a high of 340 Mexican-Americans (1975-76).   In
this same year (1975-76), there were 149 Black students and
182 Anglos, for only a 27.1% non-minority or Anglo population.
No reasonable inference can be drawn that the present racial/
ethnic imbalance at Pueblo Gardens was caused or contributed
to by the District or its policies or practices.  Assuming
the validity of all plaintiffs' allegations about the District's
intent to create and maintain Pueblo Gardens as an Anglo school,
the District failed in its purpose.

74.  Cavett Elementary School followed a similar
pattern.  It opened in 1956 with no Black students, only 95
Mexican-Americans and 304 Anglos.  It had a 92.5% Anglo enroll-
ment in 1957-58.  It had a high enrollment of 286 Blacks in
1967-68, a high enrollment of 127 Mexican-Americans in 1968-69
and a high enrollment of 320 Anglos in 1957-58.  In 1975-76, the
total enrollment was 301 students, 141 Black, 112 Mexican-American
and  48 Anglo, for only a 16% non-minority or Anglo enrollment.
The enrollment history of Cavett School does not support any
reasonable inference of a de jure segregated school.  The only
reasonable, rational inference that can be drawn from all of
this statistical data is that Mexican-Americans now dominate the
whole western part of the District, except the far southwest portion.
This includes not only the area served by Holladay, Pueblo Gardens
and Cavett, but also the formerly Anglo areas served by Keen and
Robison to the north and east.  The west side dominated by Mexican-
Americans includes the areas which were at one time predominantly
Anglo or substantially Anglo, served by Mission View, Rose,

Government Heights and Van Buskirk.  There are also substantial
numbers of Mexican-American students in Lynn and in the far
southwest portion of the District served by Vesey, Warren,
White and Lawrence.   They do not appear to have been contained
in any area or in any schools.  The same is true of Blacks.
Pueblo Gardens and Cavett became minority-dominated in spite
of any aforementioned segregative acts, not because of them.

   75.   The evidence fails to support any reasonable
inference other than no construction or boundary decision
affecting the east side of the District has been based on
anything other than neutral policies designed to provide
convenient neighborhood schools.

   76.   The evidence further fails to support any
inference that the eastside schools would be other than what
they were or are in racial or ethnic makeup if the District
had not engaged in the segregative acts set forth in these
findings.

   77.   The fairly uniform dispersal of existing junior
high schools is shown by Defendant's Exhibit No. 715.  This
illustrates that site selections and construction decisions
were intended to serve areas without regard for race or
ethnicity; no de jure segregated junior high school system with
regard to Mexican-Americans can reasonably be inferred from the
evidence as to the location, boundaries or operation of the junior
high schools in the District.  The junior high schools are dis-
cussed in more detail in other findings.

   78.   While it appears from the evidence that the District
has in the past made decisions as to elementary school sites and
construction of school facilities that were either racially or
ethnically motivated, there is no overall pattern of such decisions
and no continuity of such decisions either by any one school board
nor by the school boards collectively, or any individuals serving
thereon who have presided over the District affairs during the

extensive period of more than 50 years covered by the evidence.
There is no continuum of segregative acts or decisions.  There
is very little credible or relevant evidence of segregative acts
or decisions within the past five or six years.

79.  There have been no District decisions within the
last ten years with respect to site selection, construction,
maintenance or closing of schools that can reasonably or rationally
be held to have been made with segregative intent.  While the
Court has been critical of some of the District's construction
decisions, there was no evidence of any better site locations
for any of the District elementary, junior high or high schools,
or that reasonable site locations were available that would have
achieved better racial or ethnic balance and that the District
rejected them.

80.  The only evidence of the rejection of a site
location which plaintiffs have contended would have achieved
greater racial or ethnic mix and balance and which was rejected
by the District, was the proposed high school at or near the
intersection of South Alvernon and East 22nd Street.  The Court
has covered that matter elsewhere and found the rejection proper
and appropriate for reasons other than segregation or segregative
intent.

NEIGHBORHOOD SCHOOL CONCEPT

1.   The neighborhood unit concept was an integral part of the joint City-County Planning Department's plans for the orderly growth and development of both Tucson and Pima County in all areas, including school site selection and construction.

2.   In 1951, the District instituted the neighborhood school concept.

3.   The 1955 Master School Plan proposed by the joint City-County Planning and Zoning Department formally recognized the neighborhood school as the ideal model the District should follow.

4.   The neighborhood school policy is designed for the convenience and safety of the largest number of children; it appears the District has attempted to provide or build schools where children were in need thereof.  The policy with respect to neighborhood schools is that there would be an attempt to have a school in the center of a neighborhood and create its boundaries so that the children in that neighborhood would attend that particular school. The elementary school is conceived as the center of a square mile neighborhood constituting the school's attendance area.  One junior high is needed every four square miles and one high school every seven square miles.

5.   The neighborhood school concept was adopted by all of the duly elected governmental agencies, including the Mayor, City Council, Board of Supervisors and Tucson School District No. 1.  This concept was approved by the community as part of the master plan.

6.   Tucson School District No. 1 adopted the neighborhood unit concept soon after the Legislature enacted legislation allowing Blacks to attend schools wherever they lived, and this basic concept of school attendance has been utilized up to the present time.

7.   The Neighborhood Unit Concept was developed early in the Twentieth Century and used in urban planning before it was comprehensively adopted by school administrators as the fundamental determinant of student assignment.

8.   The shape and size of the neighborhood unit may vary according to topography, man-made determinants and population densities.   The ideal neighborhood unit reflected in City and County planning consists of a square mile framed by major streets with commercial areas at the intersections and an elementary school at the center providing a practical elementary district. The prototype of such a unit in the District is the Tierra del Sol subdivision served by Wheeler Elementary.

9.   The District's interest in accurate population projections and in efficient and consistent criteria for site selection and construction dovetailed with the Planning Department's use of the Neighborhood Unit Concept as the basic planning unit. This District-Planning Department cooperative effort produced a series of school plans tentatively beginning in 1952 and becoming formal in 1955 with the Plan for School Location and its subsequent reappraisals.

10.   The relationship between the District and the Planning Department, predicated upon the neighborhood unit, saved the District millions of dollars, introduced efficiency and con- sistency previously lacking in site selection and construction, and benefited the planners by keeping the schools in line to the extent that a more orderly growth could be planned for the Tucson community.

11.   Parents object strenuously when their children are moved out of their neighborhood school.   The reasons for such objections do not generally appear to be racially or ethnically motivated, although such factors do, at times, enter into such objections.

12.   The neighborhood school is intended to go beyond

the normal functions of education and associated activities;
it also provides a center for recreational and community
activities.

13.   A salient feature of the neighborhood schools
in Tucson is that such schools reflect integration which occurs
on the neighborhood level.   The process of neighborhood transition
and integration does not appear to have been impeded by school
officials and has occurred extensively over time in Tucson.
Menlo Park, Keen, Pueblo Gardens, Naylor and University Heights
were once predominantly Anglo schools.   But as minority people
dispersed and integrated throughout Tucson neighborhoods, these
schools were among those which came to enroll substantial numbers
of minority pupils.   Schools such as Brichta and Corbett enroll
more Mexican-American students than schools on the near west side.
In part, it is this dispersion of minorities (and Anglos) which
has led  to the presence of Anglos and Mexican-Americans in every
school in the District and Blacks in all District schools except
for two elementary schools.

14.   School plans were not analyses prepared solely
for the convenience of school administration.   School plans
were intended as subparts of the Master Plan for the City of
Tucson, as well as the General Land Use Plan and the various
neighborhood plans.

15.   In 1970 the District adopted a resolution opposing
construction of low income housing in minority-dominated neighbor-
hoods because of the racial and ethnic imbalancing impact such
construction would have on the neighborhood schools.

16.   From the evidence, it appears that after the
adoption of the neighborhood school concept during the mid '50's,
the District could not and did not adhere strictly thereto.   The
new development on the rather flat, unobstructed far east side
of the District appears to have been more amenable to the ideal
of such concept.

17.  The older elementary schools, particularly within or serving the areas with high concentrations of minorities, were built and added onto to serve those established neighborhoods. The effect was and is minority impacted schools, some with irregularly shaped attendance areas.  Generally, these neighborhoods developed and the schools were constructed prior to modern planning and zoning practices.

Further, while the neighborhood school plan called for an ideal or optimum elementary school size of 15 rooms to accommodate 450 students, many of the construction decisions resulted in schools ranging from six rooms to 30 rooms and school capacities from 300 to 900.

18.  As previously stated in these findings, while the District policy appeared to be that major thoroughfares should be avoided, this policy was not consistent or always practical. The greater Tucson area simply did not grow or expand in accordance with ideally located major thoroughfares.  Further, some major thoroughfares such as South Park Avenue, 22nd Street, Grant Road and perhaps others were not major thoroughfares or even anticipated as such when some schools, such as Davis, Borton and Roosevelt, were constructed.  The I-10 freeway is also of recent vintage, considering the history of the District, and could not possibly have been anticipated when some of the older schools were located.

19.  With respect to a major barrier created by the railroad tracks, the District appears to have attempted to avoid the need to have children cross the tracks to attend school.  Again, however, consistency either could not be effected or has, in some cases, been deliberately by-passed; for example, Van Buskirk School, the Davis attendance area, Manzo-Spring transfer.  Also, safe crossings, such as 22nd Street overpass, Palo Verde overpass and a new Broadway underpass have all lessened the barrier effect of the railroad tracks.

20.  With respect to six-room schools, there have been

ten of them constructed during the history of the District:

      a.   Manzo (1939)

      b.   Brichta (1960)

      c.   Lynn (1950)

      d.   White (1960)

      e.   Pueblo Gardens (1950)

      f.   Holladay (1951)

      g.   Blenman (1942)

      h.   Jefferson Park (1945)

      i.   Cragin (1950)

      j.   Spring (not opened, but so converted in 1951)

21. A review of the evidence lends itself to the inference of a discriminatory intent with respect to some of these deviations from the ideal neighborhood school concept, particularly in light of after events. The schools, in some instances, could have been located or constructed or could have had boundary changes or busing decisions which would have achieved a better racial or ethnic balance. Holladay, Tully, Pueblo Gardens, Cavett, Manzo, Brichta, Lynn and White are examples.

22. Plaintiffs overstate their case when they appear to argue that all schools which are built to serve an area are suspect simply because they may have been racially or ethnically imbalanced when opened. This simplistic approach overlooks too many factors other than race or ethnicity which must be considered. No such inference is rational or reasonable with respect to almost every school in the District, because at the time most of the District schools were located and constructed, they were placed so as to serve an area where there was a need, with very few exceptions which are discussed elsewhere.

PUEBLO GARDENS-HOLLADAY

     1.  The Holladay School site was purchased in 1946, five years in advance of its construction.

     2.  Three years later, on July 19, 1949, the Superintendent of Schools recommended that an elementary school building for Negro children be constructed on that site because of overcrowding at Dunbar and the then existing Arizona law requiring the District to segregate Black elementary school children.  A delegation of Black parents from the southside of Tucson had asked for a school in their section of town.

     3.  In 1949 the overcrowding at Dunbar School, the increasingly hopeless outlook for the abolition of segregation by the State Legislature and the growing discontent of Black citizens over the overcrowding at and the busing of Black students to Dunbar, seemed to offer no alternative but the construction of a second school for Black children.

     4.  The construction of Holladay School was based, in part, on the explosive population growth in 1940-50 in the Holladay area (in excess of 500%).  This was comparable to the highest increases throughout Tucson.

     5.  By April 17, 1951, the Board acted to establish new school boundaries and ordered that all children attend their neighborhood schools.  Holladay was subsequently constructed to serve as a neighborhood school.

     6.  Immediately following desegregation in 1951, 98 Black children remained in the new Spring Elementary School (the old Dunbar), and 113 Black children attended Holladay Elementary, which opened that year.  This meant that approximately 316 Black children (about 60% of all Black elementary school children in the District) attended elementary schools other than Spring and Holladay during the 1951-52 school year. Considering that this was in the year 1951 and three years before

the Supreme Court ruled in Brown I, this was quite a bold start
on desegregation.

7.  When legislation was passed and boundary changes
were made to facilitate desegregation, Borton Elementary School
was the only school in the southern part of Tucson that was
affected.  Holladay was created out of part of the Borton School
territory that had sent few, if any, students to Borton and
which was, in large part, empty of housing.  In 1951, Borton's
student body was 11.8% Black.

8.  During those years, the south side of Tucson was
in the ferment of growth and anticipated further growth.

9.  When the Holladay School area was established
in 1951, it was almost a perfect square.  It was not gerry-
mandered to include those Black students making up approxi-
mately 12% of the population of neighboring Borton School.

10.  Most of the vacant land surrounding Holladay
School at this time was zoned for multiple residence.

11.  In 1951, there was no reason to believe nor any
way to predict that the abundant vacant land would one day be
filled with members of any given ethnic group.  Anglos lived
across a short span of desert to the east in the Pueblo Gardens
district and Mexican-Americans lived immediately to the west and
southwest in Borton and Mission View areas.  The Black population
in the South Park area at that time was relatively small, as
evidenced by the fact that there were only 151 Black students
in Borton and Holladay combined.

12.  It was very clear that County and City planners
anticipated a great amount of growth in this area since the
1955 Master School Plan called for the acquisition of a high
school site in the vicinity of Silverlake Road and South Campbell.

13.  The Holladay Elementary School was designed for
community education, recreation and beautification and formed
the frontispiece of the 1955 school plan to illustrate the model

use of an elementary school site.

14.  The first principal of Holladay School, an Anglo, recommended in his first and second principal's reports that an effort should be made to redistrict the Holladay School area to assign more Spanish and Anglo-Americans to that school.

15.  In response to the principal's suggestion, a redistricting committee composed of the principals of Borton, Holladay and Mission View Schools, along with an administrative assistant, was established in 1953.  The purpose of the committee was to develop a plan to relieve overcrowding at Borton and Mission View and to attempt to obtain a better balance at Holladay School.

16.  On May 4, 1953, this committee reported it was unable to recommend a feasible plan through use of boundary changes to relieve overcrowding at the three schools by the beginning of the school year.

17.  Due to pressing overcrowding in other portions of the District, and in an attempt to spare Holladay School from double sessions, changes were not made in the Holladay attendance area until 1957, and then again in 1960.

18.  The boundary changes at Holladay School were handled with a great deal of care since the movement of the northern boundary line might have aggravated racial imbalance at the school.  When the Holladay northern boundary was moved south from 25th to 27th Street in 1957, Holladay School's Black population fell somewhat and an increase was noted at Borton School.

19.  If Holladay's western boundary had been expanded into the Borton and Mission View districts, it is probable that a large number of mono-lingual Mexican-American children would have then attended Holladay.  This would have created a programmatic problem at the time since there was not room for the placement of a 1-C class at Holladay to accommodate the need for additional

language instruction.

20.  The 1955 school plan recommended the addition
of six rooms to Holladay to be built in 1958, expanding its
capacity to approximately 360 students.  In addition, the plan
projected an optimum capacity of 510 by 1970.

21.  On September 10, 1957, as above noted, the
boundary between Holladay and Borton was changed, transferring
both sides of 25th Street and 26th Street to Borton.  This
affected 46 children.

22.  The 1957 boundary change and the addition built
to Holladay in 1959 were steps taken to rearrange the populations
among Borton, Holladay and perhaps Mission View to relieve the
long-standing problem of double sessions at Borton and Mission
View, and the need for more Spanish and Anglo-American children
at Holladay.

23.  Early completion of the addition to Holladay was
contemplated.  On April 21, 1959, a further southward adjustment
of Holladay's northern boundary to transfer 27th and 28th Streets
to Borton was made, reducing Holladay's Black percentage.

24.  In addition, a recommendation was made to move
Holladay's western boundary to South 4th Avenue.  This would
give Holladay all of the southern part of the Borton attendance
area and embrace part of census tract 23, which in 1960 contained
only 3.2% Blacks.  These moves would enable Holladay and Borton to
operate on full-day sessions.

25.  Some parents in the area west of the Southern
Pacific Railroad tracks between South 2nd and South 4th, bounded
by 29th Street and 33rd Street, and those living between 29th
Street and 36th Street, bounded by Tyndall on the east, objected
to the boundary change.  They requested that the Board build a
three-room addition to Borton to accommodate their children so
that they would not have to go to Holladay.  The Board did not
accede to their wishes.

26.   Although there was some delay due to costs in
the completion of the addition at Holladay, the boundary change
was finally effected in 1960, thereby creating a better racial
balance  at Holladay than there had been in the past.  By this
time, however, there were no Anglos in Holladay.

27.   Before 1953, Holladay School graduates attended
either Safford or Wakefield Junior High, the boundary between
them being Silverlake Road.

28.   After 1953 and until 1958, most of Holladay's
graduates went to Wakefield Junior High.

29.   In 1953, the western boundary of Pueblo Gardens
was expanded to include four city blocks to the west side of
Campbell Avenue, constricting the Holladay zone.

30.   The boundary change brought the eastern boundary
of Holladay Elementary School into an incidental configuration
with the overlying census data at Martin Road.  More importantly,
the Pueblo Gardens attendance area now took in the entirety of
Pueblo Gardens Subdivision, an area covered by a racially
restrictive covenant which had been imposed on May 21, 1948,
but which was never enforced.

31.   The change further had the effect of requiring
children attending Pueblo Gardens to cross Campbell Avenue -- a
major thoroughfare -- rather than cross a vacant lot to get to
school.

32.   As a result of this boundary change, several
children were assigned to Pueblo Gardens, none of whom were
Black.

33.   A 1954 Building Zone Map shows that only three
children lived on South Campbell Avenue in 1954, two second
graders and one first grader, who were transferred to Pueblo
Gardens so they would not have to cross three-quarters of a
mile of desert to Holladay.

34.   In 1957-58, a special education class from Borton

was transferred to Cavett.  These children, about 90% Black,
lived in the Holladay attendance zone, but could not be
accommodated there.  Cavett at the time was about 92% Anglo
before the move was made.

35.  Between 1951 and 1954, the Anglo population in
the area served by Pueblo Gardens Elementary School increased
substantially.  This increase was absorbed into Pueblo Gardens,
which was overcrowded, and Safford Elementary Schools.  Holladay
at the time was averaging  about 50.3% Black and 1.5% Mexican-
Americans.  Borton was averaging about 12.9% Black and 66.8%
Mexican-Americans.  Pueblo Gardens had no Blacks and was
averaging about 2.6% Mexican-Americans and Safford 1.6% Black
and 51.2% Mexican-Americans.  Holladay, during the period, had
an average of 31 seats available and Borton had none.  Safford
had an average of 200 seats available.  This indicates segregative
intent because of the opportunity for the District to place some
Anglo students into Holladay to aid in achieving a better balance,
and the District failed to do so.  Further, Borton's boundaries
could have been altered to send students to Safford and thus make
space available for part of the Anglo overflow from Pueblo Gardens.

36.  After 1958, all of Holladay's graduates went to
Utterback Junior High, along with all of Pueblo Garden's graduates
who, at the time, were mainly Anglo.

37.  A discontiguous part of the Safford Elementary
attendance area was partitioned between Holladay and Cavett in
1968.  Between 1967 and 1968, the minority percentage at Holladay
declined seven-tenths of one percent, and that at Cavett increased
by three-tenths of a percent.

38.  In 1975, 29 Anglo children were attending Holladay
with 127 Black children, and more Mexican-Americans were then
attending the school than Blacks.  It is a minority-dominated
school, however.

39.  On October 20, 1975, a Special Census revealed

-117-

that in tract 22 where Holladay is located, the following ethnic
diversity exists:  Anglo - 906, Negro - 1,091, and Spanish
origin - 1,683.

40.  Lynn School opened in 1950 to serve the large
southwestern portion of the District.  It opened with six rooms
and a 27% Spanish-surnamed enrollment.

41.  Upon desegregation in 1951, Lynn received the only
Black children being bused; those coming from the "A" Mountain
area.

42.  The growth rate of Black student enrollment at
Lynn was greater than that experienced at Holladay.

43.  The opening of White School in 1960 provided
relief for Lynn from overcrowding and provided a convenient
neighborhood school to what was then an outlying development.

44.  Residential growth in the southwestern part of
the District compelled the opening of several schools.  Vesey
provided relief for White School in 1968 and again provided a
convenient neighborhood school to an outlying development.  The
enrollment at White continued to increase, however, and Lawrence
School was built.  Lawrence, situated in the far southwest part
of the District, provides a convenient neighborhood school.

45.  There was no transfer of White School students
to Vesey in 1971 who did not live within Vesey's boundaries.
White's minority percentage increased after Vesey opened.

46.  On the opening of Vesey School in 1968-69, White
School lost 35 Mexican-Americans and  gained one Black.  In 1970-71,
White School enrolled more Mexican-Americans than it had prior to
Vesey's opening.  By 1975-76, White's minority percentage was
4.6% more than it was before Vesey's opening, going from 23.8%
in 1968-69 to 28.4% in 1975-76.

47.  Lawrence opened with 36.5% minority in 1972 and
under its capacity, but by the next school year, the school was
overcrowded by at least 35 students.  Mexican-American enrollment

at Lawrence has increased only one-half of one percent since
1972, but in numbers, by over 100 students.  Lawrence was
over capacity at time of trial.

      48.  Yaqui children living in the New Pascua Village
have attended either White or Lawrence Schools, both of which
have had Anglo majorities.

      49.  Several alternatives were considered by administrators
and the Board to relieve White School until Warren School could
open in 1974.  Among these were portables and double sessions.
It was decided to transfer children from White to Carrillo.
This matter is covered elsewhere in the Court's findings.

      50.  It appears from other specific findings of the
Court, that the neighborhood school policy of the District was
not always neutral in terms of race and ethnicity, nor was it
consistently neutral following desegregation of Blacks in 1951.

      While  it appears that the effort of the District
to desegregate Blacks and to dismantle the dual system then
existing with respect to Blacks was fairly successful and
effective, it also appears that the result was to place Blacks
disproportionately in schools which were heavily imbalanced
with Mexican-Americans.  The portion of the whole District
affected by the imbalances created by the desegregation decision,
was relatively small in 1951 and has grown substantially smaller
since, when the whole District, its growth and all the schools
are considered.

      51.  Defendants are justified in their position that
the District can be proud of the fact that substantial numbers
of Blacks and Mexican-Americans are scattered throughout the
system and the effects of the early segregative acts have been
largely attenuated over the past 26 years, but some effects
remain and the District failed to carry through on its early
commitment to desegregation.

      52.  It appears that at the time Brown v. Board of

Education, (Brown I) 347 U.S. 483, was decided in 1954, the
District was in compliance with its mandate insofar as Blacks
were concerned.  Further, considering Blacks alone, separate
and apart from Mexican-Americans, the District was also in
substantial complaince with Brown II (Brown v. Board of
Education, 349 U.S. 294 (1955).  For example, after 1951 there
was no de jure segregated schools in the District, only 90
Black students remained in Spring Elementary and Black students
attended schools with all other students living in the same
neighborhoods served by such schools.  Approximately 429 Black
students, other than those at Spring, were scattered throughout
the system.  However, 113 of those were in Holladay School.  In
1951, Blacks were attending 18 out of 27 elementary schools
in the District and by 1955, 19 out of 35.  Only Holladay
School had more Blacks than Lynn which was then predominantly
Anglo.  However, in light of the subsequent cases interpreting
what the United States Supreme Court meant in 1968 in Green v.
Country School Board, 391 U.S. 430, when it stated, at page 438,
that a dual system must be eradicated "root and branch", it now
appears that all effects of the dual system which existed in
1950-51, were not effectively eradicated, notwithstanding con-
siderable progress and attenuation.  What effect remains is discussed
elsewhere in these Findings.

TRANSITION AND DISCRIMINATION

1.  The school population within the District is and
has been fluid and fluctuating, not only as to numbers, but as
to race and ethnicity of most schools.  Some schools within the
District have experienced greater fluctuations than others.

2.  Almost all elementary schools within the District
either opened over capacity and became under-utilized or opened
under capacity and became overcrowded as years passed.

3.  Since 1950-51, with respect to each elementary
school which has at least a five-year history, there were times
when it was either over or under its rated capacity no matter
how such capacity is computed.  Some schools reflect consistent
overcrowding or under-utilization.  For example:

> a.  Carrillo.  In its early history, always
>     crowded, but under capacity since 1950-51.
>
> b.  Davis.  Overcrowded in early years, but under
>     capacity since 1950-51.
>
> c.  Drachman.  Overcrowded early in its history
>     but under capacity continuously since 1953-54.
>
> d.  Erickson.  Over capacity every year since its
>     opening (1968-69), except for 1975-76.
>
> e.  Ford.  Over capacity since construction (1971-72).
>
> f.  Fort Lowell.  Under capacity every year since
>     1954-55, except one (1968-69).
>
> g.  Fruchthendler.  Over capacity since opening
>     in 1971-72.
>
> h.  Jefferson Park. Under capacity since 1956-57.
>
> i.  Keen.  Over capacity since 1962-63.
>
> j.  Lineweaver.  Under capacity every year since
>     1959-60, until 1975-76 when it went over capacity.
>
> k.  Manzo.  Under capacity every year since 1960-61,
>     except for 1973-74.

l.   Marshall.  Over capacity every year since
     opening (1964-65).

m.   Myers.  Over capacity every year from
     opening in 1959-60, until 1974-75.

n.   Ochoa.  Over capacity every year but four
     (1968-69 to 1971-72 and 1975-76).

o.   Reynolds.  Over capacity each year since
     opening in 1971-72, and at rated capacity
     in 1975-76.

p.   Richey.  Under capacity each year since 1962-63.

q.   Roosevelt.  Under capacity every year except
     two (1962-63 and 1963-64).

r.   Safford.  Under capacity every year since
     opening (1959), except one (1960-61).

s.   Sewell.  Under capacity every year since
     opening (1959), except one (1960-61).

t.   Steele.  Over capacity every year since 1966-67.

u.   Tully.  Under capacity each year since 1961-62,
     after nine classrooms were added.

v.   University Heights.  Under capacity each
     year since 1958-59.

w.   Vesey.  Over capacity every year since opening
     in 1969.

x.   White.  Over capacity each year since 1967-68.

y.   Wright.  Under capacity each year since 1960-61.

4.  All of the older schools which in more recent years
have been under capacity, were chronically overcrowded in earlier
years.  As the areas which were formerly heavily populated lost
residents, the schools lost students.  Changing character or type
of neighborhoods has accounted for this.  Once heavily populated
residential neighborhoods are now business in nature. For example,
the area north and south of Congress Street, which was formerly the

-122-

downtown business center, was once residential; now the whole of
the "downtown" area from the Broadway underpass on the east to
the Santa Cruz River on the west and from the railroad tracks
on the north to Safford School and the Civic Center southward,
has relatively few people in residence.

     5. The only rational inference which can be drawn from
these statistics relating to over and under capacity, when one views
the attendance history of each school, is that the District was
generally behind the population expansion in all areas in the
District. As schools were built they either opened over capacity
or soon became overcrowded. Schools were built consistent with
population expansion patterns, i.e., if an area to the north
developed, a school was built to accommodate the growth; if
population spread east, schools were built to the east; the same
to the west and the south. The process is still going on. The
population first shifted from the older, core area of the City
to the north and south along the Santa Cruz River; Davis and
Drachman were built to accommodate this expansion. When these
schools were built, they housed virtually all the school-age
students in the District. A pattern developed with these two
schools that has persisted throughout the District history of
building schools either to accommodate expansion or in the path
thereof. As the population spread out east and west from core
areas along the east side of the Santa Cruz River, Roskruge,
Safford, University Heights, Menlo Park and Miles were built to
accommodate it. While, as pointed out elsewhere herein, Menlo
Park was built when and where it was as an Anglo school to escape
the predominance of Mexican-Americans in Davis, it eventually
became overcrowded and constituted a needed addition to the
system and was located in an area of westside development.

     6. As the population grew to the north from the original
population center, Roosevelt was built. This was basically an Anglo
area. The Mexican-American population generally expanded first

*Pages 123-125 discuss
segregative intent re Davis*

-123-

southward from the original center of the Mexican-American con-
centration around Drachman-Davis Schools, and Ochoa was built
to accommodate it.  As the population, both Anglo and Mexican-
American, continued expanding southward, Mission View was built
at the then southern end of the District.  Pascua Village School
was constructed in the extreme north-central part of the District
at about the same time as Mission View, to accommodate the wishes
of the Yaqui Indians living in that area.  The Mexican-American
population continued to grow and to be concentrated in the
southern and western part of the District.  Menlo Park area was
an Anglo concentration west of the Santa Cruz River.  There were
also substantial numbers of Anglos in the southern part of the
District around Safford, Borton and Mission View.  However, the
Anglo population was not increasing in these areas and the Anglos
were soon in the minority.  The Anglos were concentrating more
in the then east-central part of the District.  This area developed
rapidly with practically an all-Anglo population.  Miles no doubt
opened and remained an Anglo-dominated school for quite a few
years.  Hughes was built to serve a newly developed Anglo area
and has continued to be an Anglo-dominated school.  Then the
far northeast area around Davidson School, which had been a
separate district, was annexed to the District.  To meet a
growing population in the central and southern parts of the
District, Carrillo and Government Heights, respectively, were
built.  Then came Manzo to the west and Blenman to the East.

        7.  This process of building elementary schools to
house growing or developing neighborhoods is fairly defensible
by the District as part of a neutral neighborhood school policy
where the size and location of the schools and the boundaries
were fairly uniform, but they were not always so.  For example,
early in its history (1919), Menlo Park was built as a two-room
school to accommodate Anglos attending Davis, which was about 85%
Mexican-American and Indian.  By 1924-25 school year, Davis was

practically 100% Mexican-American and Menlo Park had already
received an addition (in 1921).  Menlo Park has always had
Mexican-American students who lived in its attendance area.
But it was located and built, as previously stated, to accommo-
date a substantially Anglo area, the residents of which wanted
to avoid Davis.

8.  Manzo (El Rio) was built in 1939 as a six-room
school to serve an impacted Mexican-American neighborhood and
to relieve Menlo Park, which by then was an eight-room school.
Obviously, Menlo Park could have added rooms and could have
accommodated some of the Mexican-American students assigned to
Manzo, because it was remodeled in 1949 and four classrooms
were added in 1955, bringing its capacity up to 420.

9.  Also, the use of Roskruge and the building of
Roosevelt while adding on to Davis, caused further separation
of Anglos and Mexican-American elementary school children.  Davis
was a large 15-room school while Menlo Park had only eight rooms.
El Rio, by 1945, became a large 18-room school; it was always
a predominantly Mexican-American school. Menlo Park remained
at eight rooms and accommodated most of the Anglos in the area.
The District's neighborhood policy was not neutral in this instance
and was not neutral when El Rio and Menlo Park are considered in
light of student assignments.  El Rio, in the early 1940's, was
overcrowded, while Menlo Park had available space.  Students
were assigned from El Rio to Davis, which was also overcrowded;
they were not sent to Menlo Park.  Since El Rio and Davis were
substantially Mexican-American in enrollment and Menlo Park had
the only substantial number of Anglos in the area, it is reasonable
to infer that the District policy was discriminatory, even though
Menlo Park was then also a predominantly Mexican-American school.

10.  A further matter bearing on the neutrality of the
District's neighborhood  school policy is reflected in the decision
to rebuild Richey School near the northern boundary line of the

District when it was known that the school had originally been
the old Pascua Village School, basically a school for Yaqui
Indians, and as rebuilt, would have only a small number of
Anglo students.  The new Richey School opened in 1954 with 89.9%
Mexican-American and Yaqui Indian students and only 7.7% Anglos.
Only in the 1967-68 and in the 1972-73 school years has Richey
housed any substantial numbers of Anglos.

     11.  Another issue concerning the neutrality of the
District's neighborhood school policy arises with respect to
the construction decisions affecting Brichta and Tully Elementary
Schools, along with some student assignment and busing decisions
in the areas served by these schools.

     12.  The Brichta School site was acquired in 1951 but
the school was not built until 1960.  During the nine-year interim,
El Rio and Menlo Park were overcrowded.  The Brichta School site
was apparently acquired to relieve this situation with a proposed
eight-room school, but construction was delayed because the Brichta
area was not developing as expected.  In 1954, before Brichta was
built, students from El Rio School, which had a heavily predominant
Mexican-American student enrollment, were sent to Spring, which
was then 98.1% minority (Black and Mexican-American).  The students
from Menlo Park, which then had a 36% Anglo student body, were
sent to overcrowded Jefferson Park, a predominantly Anglo school
(87.2%).

     13.  The District built Tully Elementary School in 1956
rather than Brichta.  It appears that at the time the Tully area
was more heavily developed, but Tully was a large 12-room school
serving a predominantly Mexican-American neighborhood, while Brichta,
when it finally opened in 1960, had only six classrooms and its
attendance area did not include any of the Tully Mexican-American
neighborhood.  Consequently, Brichta had, and appears to still have,
most of the Anglo students in the area and Tully had most of the
Mexican-Americans.  Also, in 1963 the District added four classrooms

-126-

to Brichta while Tully, Manzo (El Rio), Menlo Park and Davis
had space available.  It appears that the Brichta-Tully-Manzo-
Menlo Park decisions had little or no effect beyond the immediate
area.  However, it appears that these District decisions in the
extreme northwest part of the District, still have some segre-
gative effect.)  For example, if we consider all elementary
schools in the northwest part of the District in a two-mile
arc from Brichta, that is, Brichta, Tully, Richey, Manzo, Menlo
Park and Tolson, in the 1975-76 school year, there were 191 Black
Students (8.1%), 1,594 Mexican-Americans (67.4%) and 580 Anglos
(24.5%), while Brichta's enrollment is 13 Blacks (3.5%), 126
Mexican-Americans (34.3%) and 228 Anglos (62.2%).

14.  With respect to other schools in the west-central
part of the District, the evidence of District action in separating
students along race and ethnic lines is not convincing, particularly
when considering that prior to 1921, the whole District elementary
population was predominantly Mexican-American and Drachman, Davis,
Mansfeld (now Safford Elementary), were always predominantly
Mexican-American.   However, Mansfeld and Safford had substantial
numbers of Anglo students.  All these schools were chronically
overcrowded in their early history, and Ochoa, Mission View and
later Carrillo, were built to relieve this.  The evidence fails
to reveal any reasonable alternatives to the District's actions
which would have achieved less separation or greater ethnic-racial
balance.  Until the opening of Holladay, Pueblo Gardens and Cavett
Elementary Schools, the District appeared to be building schools
and assigning students in this area in accordance with a neutral
neighborhood policy.  The whole area served by Drachman, Safford,
Ochoa, Carrillo, Mission View and Borton was heavily populated
with Mexican-Americans.  However, the District compounded or
aggravated this situation when it constructed Holladay knowing
it would be minority-dominated and constructed Pueblo Gardens
knowing it would be an Anglo-dominated school.  Such was not the

case with Lynn, however.  It has always been a fairly well-
integrated school, regardless of the criticism of plaintiffs'
witnesses.  The decisions affecting Lynn simply fail to reflect
a discriminatory intent except for busing decisions, which sent
Lynn students to Cavett rather than to the older, more heavily
Mexican-American dominated schools such as Safford, Drachman
or Davis.  These decisions, however, do not appear to have had
any lasting or existing effect.  The evidence fails to show
existing racial or ethnic imbalances in the southwest part of
the area which are the result of or which can reasonably be
attributed to segregative or discriminatory acts or policies
of the District.  This matter is discussed elsewhere.

15.  With respect to the District decision to build
Holladay Elementary School when and where it was built and the
decisions to change student attendance boundaries between Holladay
and Borton and the construction of Pueblo Gardens and Cavett, the
drawing and changing of their student attendance boundaries, together
with busing decisions affecting these schools, they all establish
segregative design or discriminatory intent by the District.  However,
in viewing these decisions in light of all the evidence and
conditions existing in the District at the time of trial, the only
reasonable and rational conclusion to be drawn is, as elsewhere
set forth, that changing residential patterns have attenuated all
the effects of these decisions so that the neighborhood conditions
and the racial-ethnic imbalance now existing in all these once
affected schools is not the result of any District acts or policies,
however segregative they may have been at the time.

16.  The history of some elementary schools in the
District shows they have gone from being fairly well-balanced
between Anglos and minorities or heavily imbalanced Anglo, to
quite heavily imbalanced as to minorities.  For example, and using
at least a 15% variation, the following schools show such changes
since the 1950-51 school year:

a. Borton (34.5% - 3.8%)

b. Cavett (92.5% - 10.3%)

c. Government Heights (69.9% - 15.1%)

d. Keen (90.8% - 44.2%)

e. Lynn (73.2% - 36.4%)

f. Menlo Park (45.7% - 3.8%)

g. Mission View (38.1% - 16.7%)

h. Pueblo Gardens (98.0% - 27.1%)

i. Roosevelt (76.9% - 16.1%)

j. Rose (46.6% - 10.1%)

k. Roskruge (74.8% - 49.8%)

l. Safford (48.8% - 10.8%)

m. University Heights (96.8% - 29.6%)

n. Van Buskirk (65.2% - 21.0%)

The only rational and reasonable inference or conclusion to be drawn from the foregoing and as to these schools, under the evidence, is that the character of the neighborhood served by these schools has changed or is in transition. Even considering the busing decisions, boundary changes and other matters complained of by plaintiffs, it does not appear they have any present effect except, as noted, in the northwestern part of the District (Brichta, Tully, Roosevelt and Manzo).

17. There are elementary schools such as Miles which had a similar history, but it was converted to an exploratory learning center in 1969 and thereafter it was atypical of the changing neighborhood it formerly served. The evidence fails to support any inference of segregative intent from the conversion of Miles.

18. Although some elementary schools within the District show some increasing numbers of Anglos attending minority-dominated schools, such as Tolson, Tully and University Heights, no elementary school appears to have changed from being predominantly minority to predominantly Anglo. Anglos do not appear to move into

minority-dominated neighborhoods in substantial numbers.

19.  Brichta, which plaintiffs have properly criticized to some extent, and assuming the validity of all the criticism, has turned out to be a well-balanced school, but only if considered in light of overall District percentages.  As previously noted, it is imbalanced with Anglos when only the northwest area of the District is considered.  It opened as a heavily imbalanced Anglo school in 1960 with 130 Anglos, 5 Mexican-Americans and no Blacks.  In 1975-76, it had 13 Blacks, 126 Mexican-Americans and 228 Anglos.  The Anglo percentage dropped from 96.1 to 62.2.

20.  Menlo Park has been characterized to quite some extent by plaintiffs as an Anglo school or "Anglo sanctuary" because of District handling, and the Court finds this to be valid criticism for the most part.  However, notwithstanding the validity of the criticism, the effects of such District decisions with respect to Menlo Park, have become completely attenuated over the years.  The only existing effect of any discriminatory acts or policies of the District appears when we consider the whole of the northwest area of the District.  Perhaps it could have been used to house students from Brichta when Brichta was overcrowded.

21.  Menlo Park Elementary School has, over the years, changed its racial and ethnic makeup due to neighborhood changes, from being predominantly Anglo to predominantly minority.  In 1975-76, it had 19 Blacks, 305 Mexican-Americans and 32 "Other" (Anglos).  In 1950-51, it had no Blacks, 185 Mexican-Americans and 155 "Other".  As previously stated, in its early years it was a predominantly Anglo school.  The District's effort to maintain Menlo Park as an "Anglo sanctuary", as labeled by plaintiffs, failed.  It further appears that if the District had not attempted to maintain Menlo Park as an "Anglo sanctuary" and had taken all action which plaintiffs contend should have been taken with respect to this school, the effect would have

been that it would have become minority-dominated sooner than
it did.

     22.  Roosevelt Elementary School, which witnesses
testified the District was preserving for a time as an Anglo
school, had no Blacks, only 68 Mexican-Americans and 227 "Other"
in 1950-51; it had 102 Blacks, 76 Mexican-Americans and only 95
"Other" in 1965-66.  By 1975-76, it had 66 Blacks, 92 Mexican-
Americans and only 38 "Other".  The evidence did not show that
anything other than changing makeup of the neighborhood served
by this school accounted for these changes in the intervening
years.  However, as elsewhere noted in these findings, it appears
the District's policies have contributed in some degree to the
change and to the present racial imbalance.

     23.  University Heights is a second example of this
changing neighborhood pattern for which the District is partially
responsible.

     24.  It is entirely possible and conceivable that
Tully Elementary Sschool could reverse the trend which finds
formerly Anglo-dominated schools changing to minority-dominated
because of changing neighborhood makeup.  Tully had 7 Blacks,
274 Mexican-Americans and only 28 "Other" in 1957-58; in 1968-69, it
had 60 Blacks, 357 Mexican-Americans and 46 "Other".  By 1975-76,
it had 59 Blacks, 285 Mexican-Americans and 124 "Other".  It shows
some present effect from the segregatory acts of the District, as
elsewhere set forth.

     25.  Davis Elementary School has been basically a
Mexican-American school from its inception.  It has been sub-
stantially under-utilized since 1950.  Although its location was
excellent in 1901, today it is in a poor location for a school.
It is an old school building with substantial maintenance problems.
Sometime in January, 1974, the District proposed closing the school.
However, parental objections to the closing persuaded the District
to retain the school in operation.  The decision  to close the

school was valid.  No doubt, it should have been closed.  However,
the District, by acceding to the wishes of those within the class
whom plaintiffs Mendoza, et al. represent, is now criticized by
plaintiffs for such concession.  This is somewhat ironic.  The
District is and was in a position where plaintiffs' witnesses
no doubt would have criticized whatever decision was made.
However, the criticism is unjustified in that both the action
which the District took and that which it proposed (closing) fail
to indicate segregative intent.  A decision to bus any children
from any overcrowded schools to Davis would have been as unwise
as the decision to have it remain open simply to accommodate the
desire of those who voiced opposition to its closing.

26.   To a lesser extent, the same can be said of the
decision to rescind the proposed closing of University Heights
and Safford Elementary Schools, although it later turned out
that the objectors to the Safford closing were generally not
parents of attending students.  With hindsight, it appears one
or both of these schools should have been closed and the students
reassigned to the nearest school where their attendance would
have improved the racial or ethnic balance.

27.   Plaintiffs' assertions that the educational curricula
at Davis, University Heights and Safford Elementary Schools suffered
as the result of retaining these schools in operation, are not
supported by the evidence.

28.   It appears that the decisions to close these schools
were properly motivated, and the decisions to retain them as operative
schools were not indicative of segregative intent, but of an intent
to accommodate voter or neighborhood desire, i.e., political
expediency.  The residents of the neighborhoods served by these
schools apparently wanted them retained as operative schools,
racial/ethnic imbalance notwithstanding.  This is an indication
to the Court that there is not widespread class support for all
the contentions of the plaintiffs or their counsel.

29.  A review of the evidence indicates a general
pattern in Tucson and in the District similar, in many respects,
to most cities.  The older or earlier-established residential
neighborhoods near the "downtown" area, give way to business
or commercial development, civic centers, governmental centers,
apartments and substandard housing with corresponding shifts
in population and racial or ethnic makeup in the neighborhoods.
Such is generally neither caused by nor affected by school
district decisions or policies.  This sort of transition
occurred to quite some extent in Tucson as the result of factors
beyond the control of the District.  People move out of older
homes in older-established neighborhoods, attracted to newer
homes with more modern facilities, better home design, less
maintenance, larger lots, etc.  Children grow up and move away
from their former neighborhoods.  The inhabitants of such neighbor-
hoods, even if they remain, no longer contribute many students to
the neighborhood school.  Older residential neighborhoods attract
offices, stores, warehouses, apartments for city workers, students
and others who are generally without school-age children, and
school enrollment in the older schools declines.  To charge the
school districts with the responsibility either for creating these
conditions or with a duty to counteract them, borders on absurdity
and has never been constitutionally mandated.

30.  The transition pattern in this case with respect
to junior high schools is, in many respect, similar to that of
the elementary schools.  That is, changes from residential use
to other uses and changes in the racial/ethnic makeup of the
neighborhoods have resulted in changing student attendance and
racial or ethnic makeup of the schools.  For example, Mansfeld
Junior High School, during its first 30 years, served a dense
residential area, and in the 1950-51 school year, was crowded
with 90.7% "Other" (presumably Anglo) student attendance.  In
the 1975-76 school year, the student population was down to

-133-

49.2% "Other", with 15 Black students, 225 Mexican-American
students and 233 "Other".  It was 149 students over capacity
in 1950-51 and 49 under capacity in 1975-76, even after the
capacity was reduced by 50.  Naylor Junior High School, Wakefield
Junior High School and, to a lesser extent, Vail Junior High
School, show similar trends.  Utterback Junior High School,
while never over capacity, is showing a neighborhood transition
trend.

     31.  From a reading of some of the desegregation law-
suits, it appears that school authorities have been charged by
some Courts with a duty and a responsibility in transition
neighborhoods to correct conditions or situations which are not
only not entirely of their making, but often impossible of
correction.  While very often the result sought to be achieved
in such cases is laudible, the total burden for attempting such
corrections has on occasion been misplaced.  The duty of the
Courts in school desegregation cases is to fashion reasonable
remedies to correct only those existing inequities resulting
from past segregative acts, not to levy retribution or impose
penalties or punishment.

     32.  Transition, as discussed in these findings, is
also pertinent in considering high schools as well as junior
high schools.  However, because of the wider geographic attendance
areas of such schools, transition in neighborhoods is not as
readily apparent nor as direct in its effect as with elementary
schools.  In all schools within the District, however, such
transitions occur through the operation of factors other than
District policies or practices and the evidence fails to show
that District policies or practices have affected such neighborhood
transition one way or the  other except, to some extent, in an
area northerly from Spring, as elsewhere set forth.

TRANSPORTATION AND STUDENT ASSIGNMENT

1.   The District has not discriminated in the vast
majority of its transportation decisions.  It has shown that
its policy in this area is to transport children to the nearest
school with appropriate available space.

2.   At times, the District has deviated from its
policy, and those instances are generally indicative of segre-
gative intent.

3.   In considering the issue of transportation of
students and student assignments to determine whether these
matters are indicative of any segregative intent, we must nec-
essarily consider the matter of the capacity of any school
involved either as a sending, receiving or by-passed school.

4.   It appears that with respect to this matter of
capacity there is much inconsistency, confusion, argument and
disagreement by and between counsel and the witnesses.

5.   The nature of a school's capacity at any given
time, or the number of students which it can appropriately
educate, depends on a number of factors.  A school building
and its grounds must be considered as a flexible facility
insofar as its capacity is concerned in order to accommodate
the various courses and activities.  A fixed and rigid capacity
is only a general guideline.  However, the District generally
followed such a guideline in determining capacity.

6.   Many factors bear upon a school's capacity that
may vary the rate from year to year, even though the total
number of rooms in the school remains the same.

7.   Classes for gifted children, adaptive education
classes, special learning centers, library facilities, lounge
areas for teachers and numerous other uses are all factors to
be examined before a valid judgment can be made concerning the
amount of available space in any school or schools at a given time.

8.   Computing capacity for a particular school by
multiplying teacher-student ratio by the number of total
classrooms, while used by both sides in this case to some
extent, is too simplistic for purposes of making actual student
assignments and transfers and is often inaccurate.  For example,
the general ratio of 30:1 is inapplicable to classes in adaptive
education, vocational education or other specialized courses.
Utilization of such methodology to compute capacity can be
misleading and inaccurate.  However, as elsewhere stated, and
as set forth in other findings, the District has been quite
consistent in applying or utilizing such simplistic methodology.

9.   For anything but the broadest statistical purposes,
the rated capacities of schools, particularly older schools, are,
in general, an inadequate measurement for over-utilization or
under-utilization of the school.  School rooms differ in size
and layout from room-to-room and from school-to-school.  It is
not always proper to determine actual excess seating in an ele-
mentary school by subtracting average enrollment from rated
capacity.  The Court, in making its determination concerning
such matters, has utilized stipulated data and, generally, the
District's assessments, as well as other evidence bearing on the
matter.

10.   Plaintiffs' analyses of utilization of facilities
failed, at times, to consider programmatic elements, such as
special education and preschool classes, when ascertaining
under or over-utilization of schools.

11.   Plaintiffs' witnesses who proffered the greatest
amount of testimony regarding space availability, Mr. Lamson and
Dr. Stolee, did not enter any of the District's schools, failed
to speak to any District administrators, teachers or students,
and failed to examine any student registers in arriving at
their decisions respecting what schools historically have had
available space.

12.  An examination of figures for Tully School
illustrates how various factors work to alter available
excess seating in schools:

        a.  During the 1956-57 school year, Tully
           had one unoccupied classroom which
           could accommodate 28 additional students.
           Plaintiffs would suggest, using figures
           of rated capacity minus average enroll-
           ment, that 74 vacant seats existed.

        b.  During the 1958-59 school year, the special
           education class had to be moved to Roosevelt
           School due to overcrowding at Tully, and
           another class had to be held in the audi-
           torium.  Tully was obviously experiencing
           overcrowding at the time; yet plaintiffs
           have suggested there were 17 vacant spaces
           available.[1]

        c.  During the 1961-62 school year, despite the
           opening of a new addition, Tully had room
           for only 37 additional students.  According
           to plaintiffs' method of calculation, 131
           empty seats were available.

13.  In determining actual available space at an ele-
mentary school, it is proper to consider whether an entire room
is empty or simply a few scattered empty seats within occupied
classrooms.  When vacancies appear in occupied classrooms, such
space can be used to relieve overcrowding elsewhere only if
sufficient overages by grade at the hypothetical "sending"
school match vacancies by grade at the "receiving" school.

---------

[1]  The Court, in all its references to capacity and/or
utilization of facilities, and particularly in preparing Schedule
B, has used figures similar to those used by plaintiffs simply
because they were furnished by defendants in Exhibit No. 397.
However, as here illustrated, such figures were not always
accurate or reliable in specific instances.  When Defendants'
Exhibit No. 397 was inadequate, the Court utilized Plaintiff's
Exhibit No. 2233.

14.   Further, in transferring students about, different
procedures were used which reflect on capacity or space avail-
ability.  For example, all grade school students in one area or
neighborhood may be bused into a school and be absorbed through-
out the various grades or classrooms or one full grade of students
will be moved into one classroom.

15.   Without a year-by-year detailed analysis of each
busing decision and of each over or under-utilized school, the
simplistic approach mentioned herein has some validity and has
some probative value as to segregative intent, because it was
solely within the hands of the District how the rooms in each
school were to be utilized, whether as a music room, teachers'
lounge, special education, etc.

16.   The District also made decisions not to utilize
space available in that manner.  It placed offices, special
programs, adult evening educational courses, community rooms,
teacher lounges and a range of other activites into a facility.
These were decisions made by the School District and are decisions
controlled by them.

17.   In order to decide whether a school had appropriate
available space for a specific number of additional students, the
number of classrooms is multiplied by 30.  The evidence does not
indicate even one decision where District administrators, in
discussing the proper receiving school at the time of the decision,
mentioned any policy or practice of keeping minority schools less
crowded (28 per room).  Many minority schools have been chronically
over 30 students per room and the practice mentioned seemed to be
relatively unimportant.

18.   Junior high schools are rated by the District at
a capacity of 25 students per room.

19.   Special education classes contained 15 or fewer
students per room, and this must be taken into account in com-
puting capacity.  However, special education classes have always

been considered movable by the District whenever rooms have
been needed at a certain school.  A school which is 15 under
capacity and which has one special education class, is not
really under capacity at all.  Nevertheless, the District
can and has made room for 30 regular students by moving
the special education class to a nearby school.

        20.  When the special education classes at a
potential receiving school are considered movable, it is
because a nearby school had room for them that year.

        21.  Other programmatic uses such as kindergarten,
head start, reading rooms, etc., are considered as valid uses,
and their appearance at a school  subtracts 30 from the rated
capacity of a building; administrative uses do not.  Kinder-
garten children are not included in the statistics used in
the schedules attached to these Findings and Conclusions.

        22.  The difference between "average enrollment"
and "highest enrollment" is generally unimportant since it
tends to be the same in the actual receiving schools and in
the alternatives suggested by plaintiffs, i.e., it doesn't
change the relative space available.

        23.  At least in the last 25 years, transportation
of students has been a major tool utilized by the District in
attempting to relieve overcrowding.

        24.  The transportation of students has often been
regarded by the District as preferable to allowing patterns
of overcrowding to exist, requiring the use of half-day sessions,
requiring high teacher-student ratios or requiring the use of
facilities not designed for classroom use.

        25.  In the 20-year period between 1953 and 1973, it is
possible to identify in the records of the School District, a
total of at least 82 elementary and junior high school trans-
portation decisions to-relieve-overcrowding.

26.  A cataloguing of transportation decisions indicates that 29 of the 82 transportation decisions resulted in children attending overcrowded receiving schools -- that is, schools that had enrollments beyond their rated capacities.

27.  Thus, some 35% of all transportation to-relieve-overcrowding decisions resulted in overcrowding at the receiving schools.  To some extent, this was unavoidable.  For example, in 1957-58, there was a District-wide elementary school enrollment of 19,745, but a total elementary school capacity of only 19,060.

28.  A listing prepared by plaintiffs indicates that when overcrowding resulted at the receiving school, it was almost always a situation in which Anglos were being transported into an Anglo school, and in many cases, there was at least some available space in one or more predominantly minority schools.

29.  In the course of an analysis, a number of transportation decisions to-relieve-overcrowding were cited by plaintiffs to demonstrate their contention that it was the District's intent to utilize transportation to preserve the existence of a segregated system.  Seventeen transportation decisions have received particular criticism from plaintiffs.  These decisions, as well as others, have been reviewed in detail using the guidelines as set forth above.  Some show segregative intent, some do not:

     a.  Menlo Park to Jefferson Park (1955).

     b.  Mission View to Safford (1954-55).

     c.  Western Hills Subdivision (Pueblo Gardens) to Safford (1955-56).

     d.  Rose to Pueblo Gardens and then to Cavett (1956-57).

     e.  Government Heights to Pueblo Gardens and then to Cavett (1956-57).

     f.  Lynn to Cavett (1957).

     g.  Lynn to Cavett (1958).

     h.  Townsend to Utterback (1958).

    i.   Rolling Hills Subdivision to Townsend
       (1961-62).

    j.   Warwick Village to Shumaker (1964-65).

    k.   Warwick Village to Hughes and Bonillas
       (1965-66).

    l.   East side junior high school students
       to Mansfeld Junior High (1966-67).

    m.   Keen to Robison (1967-68).

    n.   Warwick Village to Hughes, Myers,
       Blenman and Bonillas (1967-68).

    o.   Keen to Robison (1968).

    p.   Roberts to Howell (1968).

    q.   Tolson to Carrillo (1972-73).

While there was little or no evidence detailing these decisions
as to race or ethnicity of those bused, from a consideration of
the areas and schools involved, a fair generalization is that
Anglos tended to remain in Anglo-dominated schools.  Anglos
were not generally bused into heavily minority-dominated schools,
even when space was available in such schools.

    30.a.1.  Ninety students were bused 4.5 miles from
Menlo Park to Jefferson Park in 1955-56.  Approximately 32 of
the students were minority.  The transfer left the 13-room
Jefferson Park 61 students overcrowded.  Jefferson Park's
percentage of "Others" became 87.2.

    30.a.2.  By moving two special education classes one-
quarter mile from Carrillo to Drachman, the District could have
made room for the 90 students at Carrillo two miles away from
Menlo Park.  Carrillo, with 16 rooms, would have been only 24
students overcrowded, and its percentage of "Others" would
have increased from 6.6% to 16.9%.

    30.a.3.  Other schools mentioned by plaintiffs would
not have been adequate receiving schools.

30.a.4.   The busing of the Anglo students to an Anglo-dominated school when a closer minority-dominated school was available with more available space, indicates segregative intent.

30.b.1.   One hundred fifteen students were bused in 1954-55 from the Mission View district just south of Holladay past Borton and Holladay to Safford.  The students were 44 minority and 71 "Other".  Safford was 46.9% "Other".

30.b.2.   The District could have merely shifted the boundaries of Safford, Borton and Holladay far enough south so that six-room Holladay could have accommodated the children who were bused.  No students needed to be bused since they lived within one-half mile of Holladay.  Instead of being the most minority impacted school in the City, Holladay could have had close to 30% "Others".  Safford would have dropped to 39% "Other".

30.b.3.   This type of use of a non-contiguous zone is an indication of segregative intent.

30.c.1.   Sixty students were bused in 1955-56 from 94.5% Anglo Pueblo Gardens to 49.2% Anglo Safford when Borton and Holladay were closer.

30.c.2.   Finding Number 30.b.2. is valid with regard to this decision also.  Borton's northern attendance area reasonably  could have been given to Safford and Borton could have accommodated the children.  Alternatively, additional classrooms could have been built at Borton or Holladay.  Borton could easily have been brought up to 50% Anglo students.

30.c.3.   This by-passing of Borton indicates segregative intent.

30.d.e.1.   In 1956-57, 144 students were bused from those portions of the Rose and Government Heights attendance areas lying east of South 6th Avenue to Pueblo Gardens, then Cavett.  Approximately two-thirds of the students were Anglo and the receiving schools were both Anglo-dominated.  Of the

-142-

minority schools, only Davis had sufficient capacity to
receive half of the students (83 from Rose, 61 from Government
Heights).

30.d.e.2.  The decision to use Pueblo Gardens and
Cavett was dictated by the fact that these future Van Buskirk
students were kept together and permitted to attend a single
school in that year, and by the fact that Davis would have
been a mile farther through much heavier traffic.  There was
no discriminatory intent shown by this decision.

30.f.  In 1957-58, 120 students were bused four
miles from Lynn to Cavett.  Lynn was 56.7% "Other" and Cavett
was 91.2% "Other".  No minority school had sufficient room
for the students.  Cavett remained under capacity even after
the transfer.  The decision was reasonable.

30.g.  The same trip was made by 90 Lynn students
the next year; the decision, again, was reasonable.

30.h.1.  Sixty students were bused in 1958-59 from
Townsend to Utterback Junior High.  This brought Utterback's
percentage of Anglos up to 59.1%.  Even after the transfer,
Utterback had space for 222 more students.

30.h.2.  If Safford had been used, the bus trip would
have been 7.7 miles rather than 8.0 miles, but it would have
been through downtown traffic.  Safford could have housed
the students, but would have had only 53 additional seats after
the transfer.  On balance, the decision to use Utterback rather
than Safford was reasonable.

30.i.1.  An unknown number of students were bused
approximately seven miles in 1961-62 from Rolling Hills sub-
division (southeastern portion of the District) to Townsend
Junior High.  As a result, Townsend was 41 students over
capacity, i.e., there were 27 students per room instead of
the 25 desired in junior highs.

30.i.2.  Spring, at the time, had 36 empty seats which could have been used, but is over ten miles from Rolling Hills. Since we do not know the number of students bused, it is impossible to tell whether the capacity was sufficient, but it is reasonable to decide that the saving of three miles through traffic-congested streets was worth the slight overcrowding at Townsend.

30.i.3.  Safford had over 100 empty seats and most likely had sufficient capacity to receive the students, but was also over ten miles away through heavily traveled streets. The decision  does not show segregative intent.

30.j.  In 1964-65, 187 students were bused from the Dietz area to Schumaker, 2.7 miles away.  Only Tully had sufficient capacity for 187 extra students, but it is 12.8 miles away.  Borton, the closest school mentioned by plaintiffs, is eight miles away.  The decision to use Schumaker was reasonable. The longer students are in transit on streets with considerable traffic, the greater the potential for harm to them.

30.k.1.  In 1965-66, 197 students from the same area were bused one-half to Hughes and one-half to Bonillas.  After the transfer, Hughes was still 37 under capacity and Bonillas was still 27 under capacity.  These two schools were 8.2 and 4.5 miles from Dietz, respectively.

30.k.2.  Borton had sufficient capacity to receive the students sent to Hughes, and is two-tenths of a mile closer to Dietz than Hughes is.  Furthermore, the entire distance to Borton is down a single major thoroughfare.  Borton would have been absolutely full instead of slightly under capacity as Hughes was.

30.k.3.  While this question is a close one, it appears probable, in light of other questionable busing decisions, that the desire to send Anglo students to Anglo schools was considered by the District to top the balance in favor of Hughes.  Hughes

-144-

was 2.5% minority and Borton was 77.2% minority.

30.1.1.  In 1966-67, 87 eastside students from south of 22nd Street were bused at least 8.2 miles to Mansfeld Junior High, leaving it 72 overcrowded.  Mansfeld was 73.5% Anglo. Utterback and Safford were 7.7 and 9.0 miles away, respectively, and each could have received the 87 students with substantial room to spare.  Utterback and Safford were 32.5% and 12.0% Anglo.

30.1.2.  The decision is not defensible on neutral grounds; it shows segregative intent.

30.m.0  The busing from Keen to Robison in 1967-68 and in 1968-69, was reasonable since Robison is the closest school to Keen and was not overcrowded by the decision.

30.n.1.  In 1967-68, 14 classrooms of children were bused from Warwick Village (the Dietz area) to various eastside schools: Hughes, Myers, Blenman and Bonillas.  All were predominantly Anglo schools.  Hughes received six classes, Myers received four, Blenman received two and Bonillas received two. Their distances from Dietz are:  Hughes - 8.2 miles; Myers -3.8 miles; Blenman - 8.5 miles; Bonillas - 4.5 miles.  After the transfer, Myers was 444 over capacity, Hughes and Blenman were at capacity and Bonillas was 40 below capacity.

30.n.2.  Borton was at least 100 under capacity and was five-tenths of a mile closer than Blenman, two-tenths closer than Hughes.  Safford was at least 120 under capacity and could have relieved the overcrowding at Myers.

30.n.3.  There is no doubt that the massive busing of the students from Dietz presented many severe problems; however, when the District remedied the problem by using only Anglo schools in spite of longer distances in two cases and severe overcrowding in another, it showed segregative intent.

30.p.1.  The busing from Roberts to Howell in 1968-69 was reasonable since Howell was the closest school with sufficient space.  Borton, the closest minority school, was

two miles farther away.

30.q.1.  The busing of Tolson students to Carrillo
in 1972-73, if it occurred, is not only reasonable, but
plaintiffs have not even tried to suggest a better alternative.
The only alternatives possible would have involved the same
racial consequences or would have necessitated four or more
extra miles of bus travel.

31.  In May of 1973, in order to relieve overcrowding
at White Elementary School, the Board voted to send those children
into an undercrowded minority school -- Carrillo.

32.  Upon learning of the decision, there was an
expression of considerable parental concern.  Ralph Roda, the
District's Assistant Superintendent in charge of student assign-
ment matters, attended a meeting at White School and the decision
was ultimately made that White could handle its overcrowding with
five portable classrooms.

33.  As a consequence of the rescission of the decisions
to bus these children into a historically minority school, White
opened in the 1973-74 school year vastly overcrowded, with a
high enrollment that was approximately 317 over its rated capacity.

34.  The decision not to bus students from White to
Carrillo in 1973-74, which left White 317 over capacity, was
not reasonable in light of prior District practices.  Many
students within White's attendance area were bused to White,
which was severely overcrowded.  The prior District practice
had been to send such children on to the nearest school with
room.  That would have been Carrillo.

35.  The District kept the students at White because
of parent pressures, but the parent pressure itself reflects
segregative intent.  The neutral policy of assigning children
to the nearest school with room should have been followed.

36.  At present, students living north of the Rillito
River between Campbell Avenue and a line which would be an

-146-

extension of Wilmot Road, are transported to Jefferson Park
and Cragin instead of attending Davidson or Whitmore, the
nearest schools.   Very few of these students are minority
students.  As a result, Cragin is at least 11 over capacity
and 95.1% "Other" or Anglo.  According to the District's
own figures, it is 110 over capacity.  Jefferson Park is 31
under capacity (or, according to the District's figures, 13
over capacity) and 83.3% Anglo.

37.  All of the students ride the bus over three
miles.  Approximately one and one-half miles farther southwest
is University Heights, which is 87 under capacity (or, according
to the District's figures, ten under capacity).  By using the
plaintiffs' figures consistently, it can be seen that University
Heights has been left under-utilized while Cragin and Jefferson
Park are at capacity.  Alternatively, using the District's
figures consistently, Cragin is over capacity while University
Heights is just below capacity, and is only 38.5% "Other" or
Anglo.

38.  Children attending an overcrowded school are
adversely affected by less teacher attention.  Children attending
severely under-utilized schools are adversely affected by the
necessary cut-back in programs.  In both cases, the adverse
affect is greater than that which might be caused by an extra
five minutes on a school bus, (the approximate time between
Jefferson Park and University Heights or between Cragin and
Jefferson Park).  This decision shows segregative intent.

39.  Student transportation has always been a sub-
stantial feature of student assignment practices in District
No. 1.  In the 1973-74 school year, for example, the District
was busing 4,150 K-6 students to school.  5,235 junior high
and high school students were also bused.

40.  Additionally, a large number of students utilized
the bus service provided by Tucson's public transit systems.

41.   There is one year in which detailed information
with respect to student transportation is available: 1973-74.
The information available for that year suggests that most
student transportation in the District may be characterized as
"Like-to-like", that is, Anglos are transported to Anglo schools
and minority children are transported to minority schools.  However,
much of this results from children being bused into the regularly
assigned school for their attendance area, where the attendance
area was large enough to warrant busing.

42.   When Spring Elementary was closed in 1962, its
students were redistricted between Davis and Roosevelt.  There
was no perceptible change in the ethnic/racial composition of
Davis and Roosevelt Schools due to the receipt of the former
Spring area students.

43.   The assignment of Menlo Park students to Safford
(for the first time since 1950) was perceived as temporary,
pending the construction of the new westside junior high, Maxwell.

44.   The assignments of Menlo Park students to Safford
and Brichta students to Mansfeld were temporary, pending the
opening of Maxwell.  The concerns were whether minority students
should be assigned even temporarily to a predominantly minority
school (Menlo Park, Safford), and whether Mansfeld could accommo-
date both Brichta and Roskruge elementary students.

45.   Mansfeld's minority percentage increased to 40%
with the closing of Roskruge, concurrent with the assignment of
Roskruge elementary and Brichta students to that school.  Anglo
children assigned to Masnfeld were not segregated from minority
children as a result of the assignment.

46.   In 1954, the sixth grade students from El Rio
Elementary were transferred to Spring Elementary to relieve
overcrowding at El Rio.  El Rio was 91.8% Mexican-American and
Spring was 98.1% Mexican-American and Black.

47.   When Brichta Elementary was opened in the 1960-61

school year, it was only 3.5% minority and did not include in its assigned area any of the Tully attendance zone when Tully was approximately 80% minority.

48.  In 1961, nine rooms were added to Tully; in 1962, four rooms were added to Richey. However, in 1963, four rooms were added to Brichta. As a result of these decisions, Tully and Richey remained predominantly minority schools and Brichta predominantly Anglo, yet Brichta students were being bused into that school rather than being bused into the under-utilized, space available Tully and Richey.

49.  Again in 1971-72, when Brichta was only 20.4% minority and overcrowded and Tully, Richey, Carrillo and Davis were heavily minority-dominated and under-utilized, with space available, Brichta students remained at that overcrowded school and were not bused to any of the minority-dominated schools. Further, the disparity in the makeup of the schools was continued by the use of portables at Brichta starting with 1972-73 school year.

50.  In May of 1972, the District further aggravated the situation by a boundary change between Tully and Brichta which sent the northwest portion of the Tully attendance zone, consisting mainly of Anglos, to Brichta.

51.  The Tully principal objected to this decision and the District allowed the Anglos affected to remain at Tully if they wished to do so.  Many so remained.

52.  The District rejected a suggestion from the City-County Planning Department for a Brichta-Tully boundary change which would improve the integration of the two schools.

53.  In 1948, when Drachman Elementary School burned, the predominantly Mexican-American students from that school were assigned to half-day sessions at Carrillo School, another predominantly Mexican-American school, rather than Safford Elementary, which had approximately 50% Anglos.

54.   In the course of questioning about decisions affecting the busing of junior high school students from the Tucson Mountains, Mr. Herbert Cooper -- the District's primary administrator in charge of student assignment decisions -- testified about those decisions:

> "Cooper:    ...I know what you are getting at and why we didn't integrate back in the '50's.  We didn't.
>
> Counsel:    Mr. Cooper, I have to ask:  Why didn't you?
>
> Cooper:     Well, I have told you some of the reasons.  If you want me to say parental pressure was one of them, it definitely was.  You can't run a public agency like that except back in Washington where you don't listen to the people who put you in office and elect your School Boards and pass your bonds.  I don't care what they say about it.  These people, any of them, including myself, wouldn't have been there two years if we would have operated without doing what the people wanted.  It's their schools."

55.   The establishment of the feeder pattern for Richey School in 1951 resulted in the entire student body of that school being assigned to Spring Junior High School.  This was a result of a boundary line being established directly to the east of Richey School rather than at the major artery, Miracle Mile.  Those students residing to the east of Richey School -- even though they might be much closer to Spring -- were assigned to Roskruge.  As early as 1954, a map prepared by Mr. Cooper indicates that there were at least seven children residing in the area to the east of Richey School and to the west of Miracle Mile.

56.   There was concern by the District Superintendent about the racial imbalance at Holladay School.  The principals of Holladay, Borton and Mission View were to determine if boundaries could be redrawn to improve the racial balance at Holladay.

57.   The only boundary change that was made between the predominantly Anglo Pueblo Gardens School and the overwhelmingly

minority Holladay School was the moving of the boundary between those schools one block closer to Holladay taking a few non-Black students out of Holladay and reassigning them to Pueblo Gardens.

58.  To relieve overcrowding at Pueblo Gardens in 1954-55, a 12-room addition was constructed.  As a result of that decision, Holladay remained 97.2% minority with 143 Black students and Pueblo Gardens remained only three percent minority with no Black students.

59.  Both schools had been six-room schools in 1951, and by the end of the 1954-55 school year, Pueblo Gardens was an 18-room school with 660 students and 120 students over capacity, at a time when Holladay was still only a six-room school, having 152 students and 28 vacant seats.

60.  There was an enormous amount of student transportation to relieve overcrowding in the mid-1950's on the south side.  Students were bused from the south of Holladay, north to Safford Elementary School; students were bused from the southeast of Holladay to Safford; students were bused from the west of Holladay to Pueblo Gardens and later from the west of Holladay to Cavett.  But on no occasion were students bused into Holladay School.

61.  District No. 1 at no time assigned Anglo children into Holladay School.  It did, however, redistribute students between Holladay and Borton in order to increase the Mexican-American enrollment.  Eventually, the District also terminated the use of non-contiguous attendance zone, which had for years sent children north to Safford and reassigned them to the Holladay attendance area, but this was at a time when that non-contiguous zone had become almost predominantly a Mexican-American neighbor-hood.

62.  Holladay, like some 15 other elementary schools in District No. 1, has generally been a heavily imbalanced minority school.

-151-

63.  In 1953-54, there was overcrowding at El Rio
Elementary School.  In order to relieve that overcrowding,
all sixth graders were transferred in the 1954-55 school year
to Spring Elementary.  Those children were required to walk
to Spring in some cases more than two miles, and in every case
required them to cross the Southern Pacific Railroad tracks.
It was also the only time that Spring had been utilized to
relieve overcrowding at some other elementary school and was
one of the few times that any of the minority schools had been
utilized as a receiving school to relieve overcrowding.  Both
schools, however, had high concentrations of minority pupils.

64.  During 1955, overcrowding at Menlo Park, then
a fairly well-balanced school as between Anglos and Mexican-
Americans (239 Anglos, 237 Mexican-Americans), was relieved by
transporting students, both Mexican-American (30%) and Anglo
(70%) across to the near east side of the District to Jefferson
Park.  On this occasion, Spring was not utilized as the receiving
school -- even though the transfer of the children to Jefferson
Park had the consequence of overcrowding that school.  The
Assistant Superintendent in charge of student assignment decisions,
Mr. Herb Cooper, offered the explanation that the decision was
the result of a response on the part of the District to what
they perceived to be parental preference:

> "Counsel:  If you said 'I am going to bus
> your kids to Spring or Jefferson',
> they would have said 'Take me to
> Jefferson Park', wouldn't they?
>
> Cooper:   Probably, I am sure that's the way
> they would have felt about it."

65.  The following year after Tully Elementary was opened
and an addition to Menlo Park completed, the children living west
of Silverbell Road and north of Speedway were reassigned to Menlo
Park.  Those living south of Speedway and north of St. Mary's Road
were sent to Tully.  These assignment decisions put the predominantly
Mexican-American neighborhood students in the predominantly

Mexican-American Tully School and the predominantly Anglo students
in Menlo Park, which still had about an equal mix.  Tully was as
close or closer to the homes of these Anglos as was Menlo Park
and Tully had space to receive them.  Further, the Mexican-
American students assigned to Tully by this decision had to
cross both Silverbell and Speedway, which were major thorough-
fares.

     66.  However, in 1961, Mr. Cooper refused to allow a
group of Anglo parents to transfer their children from Spring
to Roskruge.

     Also, in 1961, a group of Mexican-American parents
were allowed to have their children bused to attend Roskruge
rather than Safford (then a minority-dominated school).

     67.  In 1932, Menlo Park parents objected to Mexican-
American children from the El Rio area attending Menlo Park
School and a portion of these El Rio children were assigned
to El Rio School; apparently 25 of such El Rio children remained
at Menlo Park.  The evidence does not reveal the numbers of per-
centages of Mexican-Americans and Anglo then attending Menlo Park,
but it was probably Anglo-dominated.  However, the evidence does
reflect that the Menlo Park area did change thereafter from pre-
dominantly Anglo to an equal mix.  By 1945-46, Mexican-Americans
constituted 65% of the total enrollment in Menlo Park.

     68.  There were student transfers for many years following
the 1930's for linguistic reasons, i.e., so that Mexican-American
children could attend schools offering 1-C classes, which was an
English language course.  These 1-C classes were in schools pre-
dominantly Mexican-American.

     69.  There is no evidence that Mexican-Americans were
ever segregated into separate classrooms except for such 1-C
programs, which also included any student lacking proficiency
in the English language.

     70.  The evidence does not support a finding that from

-153-

the 1950's on, any transfer policy, official, unofficial, written
or unwritten, allowed for the transfer of Anglo students from
"Mexican" schools or that there was any substantial transfer
of this nature.

71. While the transportation and student assignment
decisions mentioned above show segregative intent, they do not,
of themselves, indicate that the District operated a dual system.
They are sufficiently indicative, however, when considered in
light of the other evidence in the case of segregative intent,
to warrant an order insuring against repetition in the future.
No existing effect of any of these segregative acts remains,
except in the area of Brichta, and that matter is discussed
elsewhere in the Court's findings.

COMMUNITY RELATIONS

1.  PTA groups from around the District have been asked
from time to time to designate members to attend Board meetings
and report back to the organization.  At times, the Board has
engaged in television discussions when topics of considerable
interest were brought to their attention.

2.  Recently, the District has instituted the utilization
of a budget questionnaire to attempt to involve parents in one of
its most complex activities.  In 1974, the concept of the community
partnership council was established by District No. 1.  Local
schools formed three area councils to establish a District-wide
group with direct involvement in School Board decision-making.

3.  Early in 1970, a report, which was purportedly an
official statement from the Office for Civil Rights, found its
way into the Tucson community.  The members of the Pueblo High
School Parent, Teacher, Student Association responded that the
findings were in error and that the School District was not guilty
of the charges made in the report.

4.  One of the goals of School District No. 1 has been
to make the schools focal points for activities and recreation
in the communities they serve.  Although, at times, problems beyond
the control of the School District have required the evening closing
of some facilities, the children and adults in an area may use the
ball field, basketball courts, etc., on an open and free basis.  At
times, auditoriums, stages and classrooms also serve a variety of
community functions.

5.  Tucson School District No. 1 has endeavored to populate
its administrative staff with consultants who are particularly able
to assist Mexican-American students.

6.  Any separation of Mexican-American pupils in the
Tucson Public Schools prior to 1951, was limited to those children
who needed assistance in learning English and was not based upon

"nationality".

7. Except for the placement of certain Mexican-American children in programs to increase their abilities in the English language, there was no effort or action on the part of the school administration to place minority groups in certain schools. Mexican-American children who were not proficient in English were not the only students placed in schools or classrooms for programmatic reasons. Children from Sweden, Italy and other countries were also placed in special language classes at Safford Junior High School during this time period.

8. Since the adoption of a Master School Plan in 1955, a joint undertaking has been assumed by Tucson School District No. 1 and the City and County Planning Departments to bi-annually publish a plan supplementing and updating the 1955 Plan.

9. The Master School Plan, created under the aegis of the City-County Planning Department in 1955, included comprehensive rules for the construction and development of elementary schools within the District following the Planning Department's neighborhood unit component.

10. As new subdivisions were proposed in an area not already covered by a neighborhood plan, one would be initiated. If such an area was within Tucson School District No. 1, the District would be alerted so future school sites could be purchased at a cheaper cost while the area was still unsubdivided acreage.

11. After the split between the City and County Planning Departments in 1964, the School District had little occasion to work with City planners as most new development and change was occurring outside the City limits.

12. Procedures used by the City and County Planning Department centered around the use of a neighborhood unit concept, representing roughly a square-mile neighborhood with centrally located schools to maximize safety by minimizing walking distance.

The neighborhood school concept is also discussed elsewhere.

13.   The philosophy of the Planning Departments as it was pursued in Tucson and Pima County from the 1930's through the 1960's, was to prepare and maintain reasonable plans and regulations aimed at providing orderly growth in the community revolving around the neighborhood unit.

14.   Although the City-County Planning Department maintained a close working relationship with the District, the two entities were separate and distinct from one another.  The City-County Planning Department was the ultimate force behind the 1955 Master School Plan and the neighborhood school concept, with the District offering concurrence.

15.   The Planning Departments and the District have, from time to time, considered alternative concepts to the neighborhood unit, including higher densities in urban areas, going to a two-school system per square mile, or going to a large, high-density centrally located school system.  It was jointly decided, however, that none of the alternatives would work any better than the neighborhood system already in use.

16.   District officials have always worked closely with the City and the County Planning Departments toward the goal of maximum safety, minimizing walking distances, reducing the number of children that were required to cross major streets and utilizing the neighborhood unit concept.

17.   Parental participation in education is a vital part thereof.  It is helped and encouraged by neighborhood schools.

18.   Low income housing was a factor in maintaining or aggravating the minority imbalance of several of the District's elementary schools, such as Carrillo, Drachman and Holladay.  However, such housing projects did not create any imbalances.

19.   The District and its decision-makers have long known that areas of low income are also areas in which high numbers and percentages of minority children can be found.

20.  With respect to the transfer policy which plaintiffs
have grossly over-emphasized and distorted, the evidence reveals
that it did in fact exist, but not as an escape valve for Anglos
to leave "Mexican" schools or vice versa, but basically for
linguistic purposes and the policy worked in both directions.
Mexican-Americans could transfer into a school having an English
language learning class (1-C) and Anglos could transfer out of
those schools.  The evidence shows that Anglos did avail them-
selves of such policy to transfer out of minority-dominated schools,
but the evidence fails to show how many students availed themselves
of it or whether it substantially affected the ethnic makeup of
any school.

21.  In June, 1969, the Educational Advisory Committee
of the Tucson Commission on Human Relations reported to the
District.  The report concluded that racial imbalance in the
distribution of students throughout the District existed, that
it was "de facto" segregation and that the District was not
responsible therefor, but that the District should take steps
to aid in achieving "true integration".

22.  In March, 1970, the Education Committee of the
Tucson Branch of the NAACP, sent a document to the District
indicating that it did not agree in full with a report of the
Tucson Commission on Human Relations entitled "Tucson School
District No. 1:  A Second Look", because it was too laudatory
of the District.  The NAACP document went on to make several
comments and recommendations to the District regarding dis-
criminatory practices and the ineffectiveness of District
advisory groups.  The document indicated residential patterns
resulted in segregation, but that the District had failed to
achieve better integration than it could have in its attendance
zone decisions in general, and in the Brichta School area in
particular.  The document urged more District communication with
"the rich cultures of Tucson's minority people".

-158-

23.    The District responded to the NAACP document
defending its attendance zone decisions generally as being
racially and ethnically neutral, so to speak.  The Brichta-
Tully area decisions were defended generally on the grounds
that growth in the area did not develop as anticipated.

24.    The District has failed to take affirmative
action over the past several years to achieve better integration
of its schools, as suggested by various organizations such as
NAACP, Tucson Human Relations Commission, HEW and Greenleigh
Associates.  It appears that while such suggestions were rejected
for the most part, the District exhibited a lack of inclination
to take affirmative action to achieve better integration in
some of its more racially and ethnically imbalanced schools.
No community relations program to achieve better integration
in District schools appears to have been undertaken.

## EDUCATIONAL POLICIES

1.  The policy of the School District has been to allocate an equal amount of its available funds to each student, and it has aggressively pursued all available federal and state funds to provide a whole range of programs designed for children who are deprived in any number of ways, including English language deficiency.

2.  Tucson School District No. 1 spends more money in those schools that have the highest percentage of minority students in attendance.  The District apparently spends comparable local tax dollars in all schools, but concentrates federal funds in those schools with higher percentages of minority students enrolled.

3.  There is a positive relationship between total per capita expenditures and minority enrollment in the District's elementary schools.  Average per capita expenditures in predominantly Anglo schools are approximately $700.00, while in predominantly minority schools they exceed $1,000.00.  However, it does not necessarily follow that an expenditure of more funds results in a better education.

4.  Federal grants are spent on programs at predominantly minority schools.  Before receiving this federal assistance, the District is required to show "comparability" in its local per capita expenditures.  That is, local expenditures must be approximately equal in all schools.  The District has never failed to satisfy federal comparability requirements.

5.  The District, at times, allowed lower pupil-teacher ratios in schools containing large numbers of disadvantaged students as an aspect of educational programming.  For example, in 1955-56, all but two of the ten elementary schools with the highest minority enrollment had pupil-teacher ratios lower than 30:1, the District-wide average.

6.  Educational policies include setting and changing

boundary lines for attendance at a particular school. The evidence fails to reveal any pattern of boundary changes indicative of any attempt by or intent of the District to segregate or contain either Blacks, Mexican-Americans or Whites, although ✳ some such decisions were indicative of segregative intent, as elsewhere discussed in detail.

7. Boundaries for schools are established through use of several criteria, including the location and size of the facility, the capacity of the school to accommodate a given population, and the safety and convenience of the children who will attend that school.

8. Schools such as Brichta, Lynn, Ft. Lowell, Wakefield and Roskruge, which served fringe areas of growth at various times in their history, have had broad attendance areas of sparse population. Conversely, schools such as Myers, Lineweaver, Manzo and Ochoa, which either have or have had neighborhoods of high population density, require smaller or geographically compact attendance areas.

9. Schools built since the adoption of the 1955 Master School Plan, have been established fairly consistent with square mile boundaries circumscribed by major streets with the school in the center. The boundaries of schools appear consistent with an attempt to avoid natural or potentially hazardous man-made boundaries; nevertheless, exceptions appear. Again, however, no consistent pattern has been shown which supports a reasonable inference of system-wide segregative intent. Children have been and are being compelled to cross major thoroughfares in some areas, while in others, such major thoroughfares are respected.

10. The evidence indicates that school attendance area boundaries generally have been neutrally changed due to either overcrowding or the construction of a new school. No pattern has been shown that attendance boundary changes are utilized to include or exclude anyone from any school for any reason other

than geography and neighborhood changes resulting in overcrowding
or under-utilization.   Those instances where changes in attendance
boundaries reflect segregative intent are discussed elsewhere.

11.   It has recently been the policy of the School Board
to consider and make provisions for the ethnic and racial makeup
of each particular school when the boundaries of that particular
school are established or changed.

12.   It has recently been the policy of Tucson School
District No. 1 to conform junior high school boundaries to ele-
mentary school boundaries so that all of the student body of a
particular elementary school would go to a particular junior high
school rather than sending a part of the elementary student body
to one junior high and the rest of the student body to another.

13.   Several responses have been available to Tucson
School District No. 1 officials to meet the problem of overcrowded
schools, including building permanent additions, temporary, short-
term transfers to other nearby schools and double sessions.   An
additional solution, first utilized in the 1960's and continued to
the present, is to place portable classrooms at schools to relieve
the permanent physical plant of temporary overcrowding.   As crowding
pressures are relieved and the number of students in the attendance
area is reduced as children grow up and leave the system, the
portables may be removed and relocated elsewhere.

14.   It is economically and administratively more feasible
to deal with peak year enrollments by the use of portable classrooms
rather than construction of permanent additions.

15.   The evidence revealed that generally a school's
enrollment would rise steadily for approximately seven years after
opening, peak about the seventh year and then decline rather steadily
until about the 15th year after opening, then level off.   It appears
this pattern is consistent with and caused by neighborhood growth
and development in the District.

16.   Before the use of portable classrooms by Tucson

School District No. 1, permanent additions were built to accommo-
date overcrowding at Blenman, Bonillas, Borton, Corbett, Davidson,
Richey, Tully and Kellond Schools.  Enrollment at these schools
is now under capacity.

17.  Portables were initially used as an experiment at
Ochoa School in 1960 to relieve overcrowding, believed to be
temporary, rather than building a permanent addition. With success
in relieving overcrowding at Ochoa, portables were provided in
1961 in four additional elementary schools experiencing serious
overcrowding.

18.  As a general rule, the District has operated
without any excess space at the high school level.  For example,
during the 1964-65 school year, all District high schools were
far over capacity.  Portables were used at Pueblo High School
to relieve part of the problem.

19.  The District operated 120 portable classrooms
during the 1975-76 school year, which were distributed throughout
32 of the District's 99 schools.

20.  Standardized reading tests were used by the District
as early as 1920-21.  "Intelligence Group Tests" were given to all
students entering high school in District 1 as early as the 1921-22
school year.

21.  District administrators recognized the potential
pitfalls in relying on standardized tests as measures of school
achievement.  C. E. Rose stated in his 1921-23 Report of the Super-
intendent, "It is not yet possible to measure the efficiency of all
instruction by standard tests".

22.  In 1930, the District gave the then new Stanford
Achievement Tests to all grades from 5B to 8A.  A standard had
been developed by the testers and District 1.  Children's scores
were compared with this standard.  The 1929-31 Superintendent's
Report stated the following about all classes District-wide:  "A
summary shows that 30 English-speaking classes were above standard

-163-

and 16 were below standard, while five Spanish-speaking classes
were above standard and 31 were below.  All four Negro classes
were below standard".

      23.  When individual schools in the District were
compared the results were similar: "From this table, it will be
noted that five of the eight English-speaking classes are equal
to or above standard, while all Spanish-speaking classes and
Negro classes are below standard".

      24.  The language handicap referred to by Superintendent
Rose in his 1924-25 Report appears to be one of the two major
causes of low promotion rates within the District.

      25.  The ability grouping of high school students based
upon IQ testing was expanded in the high school program according
to the 1927-28 Superintendent Report.

      26.  By 1928-29, the District had expanded to eighth
grade students (previously limited to the high school) the
use of IQ tests to divide students into ability groups when they
enroll in high school.

      27.  More recently, standardized test scores results
from minority schools have been substantially lower than Anglo
schools.  Scores on various standard achievement tests for the
school years 1968-69 through 1971-72 inclusive, show that minority
elementary schools consistently yield lower scores than Anglo
elementary schools.  These minority elementary schools feed
into predominantly minority junior high schools (which yield
lower mean scores than the Anglo junior highs) and these minority
junior highs in turn feed into the three high minority concentration
high schools -- Pueblo, Cholla and Tucson.

      28.  An examination of high minority percent and high
Anglo percent enrollment schools reveals that the Anglo school
students score consistently higher on third and fourth grade
Metropolitan Achievement Tests (MAT) than the minority school
students.  The Anglo schools consistently yielded higher improvement

(gain) rates from the third to the fourth grade.

29.   This analysis is sustained when groups of students'
are analyzed by ethnic/racial group rather than by school.   Mean
scores of Anglo students for the third and fourth grade MAT are
one higher than those of either Black or Mexican-American students.

30.   The differences between Anglo and minority students
can be seen as early as the first grade.   On the total Readiness
Test, Anglo students scored significantly higher than the Black
and Mexican-American children.   The mean scores of Black and
Mexican-American first grades were not significantly different.

31.   The District's Research and Development Department
has compared elementary children's achievement test scores with
their "intelligence" test scores.   It found a high correlation
between reading achievement when measured in the fourth grade and
"ability" as measured in the fifth grade.   The Department also
found, once again, that Anglo students scored consistently higher
on both the Stanford Reading Test (fourth grade) and Large-
Thorndike (fifth grade) than both Black and Mexican-American
students.

32.   An analysis of achievement and ability test scores
at the junior high school level reveals similar findings.

33.   The fall, 1971, seventh grade Large-Thorndike
Test scores show that project (minority) junior high schools
have a mean score of 2.81 while the overall District mean score
was 4.59 and the mean score of non-project junior highs was 4.85.

34.   The mean stanine of the four highest Anglo per-
centage junior high schools (93.5% Anglo on the average) was
5.37, while the mean stanine score on the Large-Thorndike Test
for the four highest minority percentage junior highs (84.6%
minority on the average) was 3.13.

35.   The fall, 1971, eighth grade District scores on
the C.T.B.S. Reading Test, further show the desirably consistent
pattern.

36. The mean stanine score for project junior highs was 2.72, while the District mean was 4.63 and the non-project mean was 4.81.

37. Magee, Townsend, Fickett and Carson (the four highest Anglo percentage schools) had a mean stanine of 5.43 and had 27.93% of their student bodies at the top three stanine levels of the C.T.B.S. Test.

38. Safford, Spring, Wakefield and Utterback (the four highest minority percentage schools), had a mean stanine of 2.91 and had only 1.91% of their student bodies at the top three stanine levels of the C.T.B.S. Test.

39. A more detailed analysis of junior high students' test scores over time is also available. Fourth, fifth, sixth and seventh grade scores on achievement and ability tests taken by Anglo, Black and Mexican-American students, reveals that Anglo students consistently score higher than Black and Mexican-American children.

40. The story of test score disparities culminates at the high school level. It can be seen that Anglo students and predominantly Anglo high schools show higher achievement and ability test scores than minority students and high concentration minority high schools.

41. As previously stated, minority elementary schools feed into minority junior high schools which, in turn, feed into predominantly minority high schools. All of these schools are attended by students who consistently score lower than the overall District average and lower still than the District's Anglo schools' students. These comparisons are made on the basis of standardized achievement and ability tests given to all students under similar test conditions.

42. The District has, in the past, used these standardized tests to determine curriculum for students and group students according to their "ability".

43.  The District has long had knowledge that standard-
ized tests are of dubious validity in determining ability, when
applied to minority children.

44.  The Board of Education and the District administra-
tion have had knowledge of minority children's relatively poor
performance on standardized achievement and ability tests.

45.  However, no segregative intent or discrimination
can be reasonably inferred from these statistics.  It is obvious
that there is a learning or achievement disparity reflected by
these tests, but the District utilizes standardized test results
as only one of several factors in assessing students' needs.  The
District also considers attitudes, levels of aspiration, work
and study habits, personality needs, temperament, adaptability,
social traits and other factors which are important in under-
standing needs.  Information derived from standardized test
results can yield data that is helpful and even indispensable
in educational decision-making.

46.  Any standardized testing program will tend to
rate minority students lower because of their ethnic or
linguistic differences, or on account of economic deprivation.
However, such students are not necessarily improperly assessed
on the basis of standardized test results.

47.  In addition to standardized test results, the
District utilizes additional measurement tools such as a teacher's
professional judgment, classroom performance scores on local tests,
cross-cultural influences, attendance, citizenship and parent
involvement.  Such criteria enable District personnel to more
properly evaluate students who may have recorded substandard
achievement test scores.  The District has adopted sufficient
safeguards to ensure that students will not be penalized because
of their inability to perform well on standardized tests.

48.  District students, as hereinabove set forth, have
historically exhibited differences in performance on standardized

tests as between Blacks, Mexican-Americans and Anglos.  Present
scientific knowledge does not afford satisfactory explanations
for such differences, and the existence of these intergroup
differences in average scores on standardized tests is a common
finding in school districts throughout the United States, and
not peculiar in any way to Tucson School District No. 1.  Standard-
ized test results for School District No. 1 students indicate that
the intergroup differences exist upon the entry of the students
into the school system and continue through the school career.
Consistently lower test results for minority group students do
not support a reasonable inference of unequal provision or delivery
of educational services.

49.  Standardized testing may be used by guidance
counselors in advising students in the areas of career planning
and curriculum choice; final decisions and selections of classes
is always left with the student.

50.  HEW representatives found the District to be inferior
in course offerings, textbooks and materials in minority-dominated
elementary and junior high schools.  However, at the time of trial,
all of the District's educational services were in full compliance
with federal standards.  This is not in controversy in this case
and matters pertaining thereto are considered only insofar as past
practices or deficiencies may have a bearing on the issue of
segregative intent, i.e., has the District operated an unconstitu-
tional dual system with respect to any or all schools; and, if so,
is it still going on, and/or are there any existing effects.

51.  In assessing educational policies, the matter of
drop-outs and discipline with the District are relevant.

52.  The evidence indicates that Blacks and Mexican-
Americans have a higher drop-out rate than Anglos.  No evidence
was presented, however, as to causes for this disparity.  No doubt
the causes are many and varied; no rational or reasonable inference
can be drawn from such bare statistics as presented in this case and

such bare statistics do not support an inference of discrimi-
nation or segregative intent.

      53.  The evidence further indicates that disciplinary
measures such as suspension and expulsion fall disproportionately
upon Blacks and Mexican-Americans in the District.  Again, such
bare statistics are unworthy of any inference.  No evidence at
all was presented to indicate the behavior underlying the dis-
cipline, nor was there any evidence that similar behavior by
Anglos resulted in disparate treatment.

      54.  Without more, such statistics are not probative
of any issue in this case.

      55.  The District's Compliance Plan, approved by HEW,
provides methods, procedures and commitments to provide all
students in the District with an equal access to the District's
schools and an equal opportunity for an education, regardless
of race, ethnicity or background and without reliance upon
disparate test results based on or stemming from language
difficulty or deficiencies.

FACULTY HIRING AND ASSIGNMENT

1.  The evidence fails to reveal any overall District discriminatory hiring practices with respect to faculty.

2.  However, teacher assignment practices or policies of the District indicate that Black and Mexican-American teachers were generally assigned disproportionately to minority-dominated schools.  During the past seven years, more or less, some of this disparity resulted from special programs such as bilingual education.  The Court was unable to ascertain from the evidence whether any of the disproportionate assignment of minority teachers to minority-dominated schools resulted from free choice by minority teachers.

3.  As stated elsewhere in these findings, in discussing Mexican-Americans, there was a disproportionate number of Mexican-American teachers in the District.  Further, Mexican-American teachers in the District in 1950 were disproportionately assigned to Mexican-American schools.  20.7% of such teachers were in schools with 80% minority enrollment; 55.2% were in schools over 60% minority.  Thus, over 75% of the Mexican-American teachers were located in schools which were predominantly Mexican-American.

4.  In 1945, 22 out of 28 minority faculty were assigned to schools in which the student enrollment was over 95% minority; 14 of these, however,  were assigned to Dunbar School which was then segregated as to Black students.  Thus, assuming that all 14 minority teachers assigned to Dunbar were Black, there were 14 Mexican-American teachers in 1945 and eight of them were assigned to heavily Mexican-American imbalanced schools.

5.  Prior to 1951, Black faculty members were assigned to Dunbar, the all-Black school.  No law required this.

6.  In 1951, following a voluntary desegregation effort by the District, Black faculty members at Dunbar School were assigned primarily to three minority-dominated elementary schools:

Holladay (3), Carrillo (3) and Spring (4).

      7.  In 1951, the first school year following desegre-
gation, Holladay was 88.7% Black in student enrollment; 50% of
its faculty was Black.

      8.  In 1951, all the Black teachers in the District
were assigned to schools that  were on an average 84% minority
in student enrollment.  Minority, as used here, means a com-
bination of Black and Mexican-American students.

      9.  Black teachers who wanted to be assigned in the
fall of 1951 from Dunbar to other schools, were permitted to
transfer.

      10.  By 1955-56, however, 89.5% of all Black elementary
and junior high school teachers were teaching in schools that were
more than 50% combined minority.

      11.  In 1955-56, only 10.5% of all Black teachers were
located in schools that were less than 25% in their minority
enrollments.  Those predominantly Anglo schools had 65.5% of
all teaching stations in the District.  Thus, Black teachers
were underutilized in predominantly Anglo schools.

      12.  In 1960-61, 89.2% of all Black elementary school
teachers and junior high school teachers were assigned to schools
which were more than 50% minority in student enrollment.

      13.  In 1960-61, three of the District's 28 Black ele-
mentary and junior high teachers were assigned to schools in
excess of 50% Anglo enrollment.

      14.  In 1960-61, there were 22 Mexican-American ele-
mentary school teachers.

      15.  In 1960-61, 73% of all minority faculty members
in the District were assigned to schools where the combined
minority enrollment exceeded 50%.

      16.  In 1960-61, 62% of all District elementary schools
were predominantly Anglo in student enrollment.  Seventeen percent
of all combined minority elementary teachers were assigned to those

schools.

17.   In 1965-66, there were 28 Black elementary teachers
in the District; 71.5% were assigned to schools with predominantly
combined minority enrollment, and 67.8% of all combined minority
teachers were assigned to schools predominantly combined minority
in student enrollment.

18.   Since 1971, 51.3% of the total minority teachers
in schools have taught in schools with over 70% minority student
enrollment.

19.   In 1973-74, 60.3% of all Black elementary and
junior high school teachers were in predominantly combined
minority schools and only 22% of all Black teachers were in
predominantly  Anglo schools.  It appears that a neutral or
non-racial assignment policy should have resulted in 62.5% of
all Black teachers being in those schools.

20.   Reviewing teacher assignments at five-year
intervals since 1950 to 1975, indicates a majority of all
minority teachers were assigned to schools having more than
the District average of minority students.

21.   Since 1970, however, this greater than District
average assignment of minority teachers to schools having a per-
centage of minority students greater than the District average,
is in part an outgrowth of federal programs such as bilingual
education.

22.   The District policy for assigning teachers provides
that as a teaching position becomes available in a particular
school, the principal of the school is furnished a list of qualified
applicants.  The principals conduct interviews and make the final
decisions.

23.   In 1967, the District rejected a proposal from
the Pima County Teachers' Union for a faculty transfer policy
permitting transfers on the basis of seniority.

24.   Student teachers from the University of Arizona have

been assigned to District schools by the University, not by the
District.

      25.  The teaching staff at Catalina High School has
always been overwhelmingly Anglo.  There were no minority teachers
at all in 1960-61, only one in 1965-66, less than 2.0% until 1970-71,
and less than 5.0% through the time this suit was commenced.  As
late as 1974-75, Catalina had only one Black and three Mexican-
American  teachers among a staff of 115.

      26.  Pueblo High School faculty since 1965 has always
had minority teachers:  19.4% in 1965-66, of whom 17 (13.2%) were
Mexican-American and four (3.1%) were Black; 22.6% (17 Mexican-
American, two Black) in 1970-71.

      27.  Catalina and Pueblo High Schools have been,
throughout their existences, imbalanced schools.

      28.  While these statistics lend support to an inference
of segregative intent, there are too many other factors which
should be considered in connection with teacher assignments, and
which were not adequately developed by the evidence, to warrant
any specific finding of segregative intent from bare statistics
concerning disparate teacher assignments.  For example, principals
make the decisions as to which of the qualified applicants gets
assigned to his or her school, there was no showing of a tailoring
of qualifications to exclude minorities or which had disparate
effect on minority teachers nor that qualified minority applicants
were rejected, systematically, or otherwise, from positions in Anglo-
dominated schools.

## JUNIOR HIGH SCHOOLS

1.   Junior high schools were first established in the
District in the fall of 1930, apparently to relieve the over-
crowding at the District's only high school, Tucson Senior High.
At that time, the junior high schools consisted of seventh,
eighth and ninth grades.

2.   Later on, the District policy changed with respect
to junior high schools and commencing with the school year 1954-55,
junior high schools consisted only of the seventh and eighth grades.
This continues to be the policy.

3.   The first junior high schools in the District were
Safford, Mansfeld, Dunbar (later Spring) and Roskruge.

4.   A short resume of each junior high school and the
attendance statistics with respect thereto are contained in
Schedules E and F attached.   There were, at the time of trial, 17
junior high schools with approximately 10,233 students; in the
1975-76 school year, 531 of these junior high school students were
Black (5.2%), 2,837 were Mexican-American (27.7%) and 6,865 were
"Other" (67.1%).

5.   Dunbar was the only junior high school in the District
which was ever segregated by law and that was only as to Black
students, until 1951.   In the 1951-52 school year, the Black junior
high school students were dispersed into the system to attend the
junior high school serving their neighborhood.   Five of the then
existing junior high schools had Black students in attendance,
with approximately 33% of the total Black junior high students
attending the former all-Black Spring Junior High.[1]   However, when
the Spring Junior High School boundaries were drawn for the 1951-52
school year, they were constructed so that the area to the west
where substantial numbers of Anglos lived, was excluded and made

*See note!*

_____

[1]   When Arizona's segregation law was repealed, the
District changed the name of the former all-Black Dunbar School
to Spring Elementary and Spring Junior High and boundary lines
were drawn to encompass surrounding areas.

a non-contiguous zone for Roskruge.  This area has developed
considerably since then and is now served by Maxwell Junior
High, which opened with the 1974-75 school year.

6.  In the 1951-52 school year, there were six junior
high schools in the District; their student enrollment and race
or ethnic composition was as follows:

| School | Blacks | Mexican-Americans | Other | Total |
|--------|--------|-------------------|-------|-------|
| Safford | 56 | 398 | 99 | 553 |
| Spring | 57 | 215 | 26 | 298 |
| Wakefield | 16 | 222 | 300 | 538 |
| Roskruge | 6 | 53 | 575 | 634 |
| Mansfeld | 4 | 44 | 423 | 471 |
| Doolen |  | 11 | 615 | 626 |
|  | 139 | 943 | 2,038 | 3,120 |
|  | 4.4% | 30.3% | 65.3% |  |

It is obvious that Spring and Safford, two schools dominated by
Mexican-Americans, had the majority of Black students.  This
resulted, in part, from continuing segregative effort or intent
on the part of the District because, as previously stated, the school
attendance zones could have been reasonably drawn so as to place
more Anglos in Spring and more Blacks and Mexican-Americans in
Roskruge.  Also, as can be determined from the table above, Spring
had the smallest attendance of any junior high school in the District.

7.  Ten years later in the 1961-62 school year, there were
11 junior high schools.  The student composition was as follows:

| School | Blacks | Mexican-Americans | Other | Total |
|--------|--------|-------------------|-------|-------|
| Safford | 63 | 364 | 63 | 490 |
| Spring | 45 | 348 | 16 | 409 |
| Wakefield | 30 | 422 | 343 | 795 |
| Utterback | 59 | 165 | 272 | 496 |
| Roskruge | 43 | 101 | 305 | 449 |

| School | Blacks | Mexican-Americans | Other | Total |
|--------|--------|-------------------|-------|-------|
| Mansfeld | 7 | 129 | 480 | 616 |
| Doolen | | 22 | 828 | 850 |
| Vail | | 15 | 762 | 777 |
| Townsend | 1 | 17 | 698 | 716 |
| Fickett | | 22 | 819 | 841 |
| Naylor | 3 | 23 | 518 | 544 |
| | 251 | 1,628 | 5,104 | 6,983 |
| | 3.6% | 23.4% | 73% | |

8.   It appears that Blacks and Mexican-Americans have remained rather static in numbers in Safford, Mexican-Americans increased in Spring and both Blacks and Mexican-Americans increased substantially in Roskruge and Wakefield.   Utterback, which opened with the 1958-59 school year, was fairly well-balanced considering its location in the south-central part of the District. It becomes obvious that by the year 1961, Blacks and Mexican-Americans are living in the west and south sections of the District by choice and are increasing in numbers in those areas.   However, it is also apparent that the Mexican-American and Black populations are not contained by State action and are spreading east and north into the Roskruge and Mansfeld attendance areas. There were no significant boundary changes during these years to otherwise account for any increase of minorities in these schools.

9.   Another ten years later, in the 1971-72 school year, there were 14 junior high schools.  The student makeup was as follows:

| School | Blacks | Mexican-Americans | Other | Total |
|--------|--------|-------------------|-------|-------|
| Safford | 86 | 433 | 61 | 580 |
| Spring | 39 | 427 | 71 | 537 |
| Wakefield | 6 | 639 | 113 | 758 |
| Utterback | 169 | 260 | 126 | 555 |
| Pistor | 41 | 132 | 375 | 548 |

| School | Blacks | Mexican-Americans | Other | Total |
|---|---|---|---|---|
| Roskruge | 37 | 106 | 118 | 261 |
| Mansfeld | 13 | 220 | 377 | 610 |
| Doolen | 36 | 52 | 761 | 849 |
| Vail | 5 | 77 | 724 | 806 |
| Townsend | 2 | 44 | 707 | 753 |
| Fickett | 11 | 44 | 789 | 844 |
| Naylor | 70 | 136 | 765 | 971 |
| Magee | 10 | 40 | 1,097 | 1,147 |
| Carson | 46 | 70 | 1,160 | 1,276 |
| | 571 | 2,680 | 7,244 | 10,495 |
| | 5.5% | 25.5% | 69% | |

10.   It can be seen that Blacks are dispersing through-
out the system percentage-wise, better than the Mexican-Americans,
but there are increasing concentrations in the Safford and Utterback
attendance areas.  Black students attending Utterback have increased
from 45 in 1958-59 when it opened, to 169 in 1971-72, an increase
of 276%, while there was only a 183% increase in total Black junior
high school enrollment.  However, Naylor and Carson, both clearly
eastside schools, had substantial numbers of Black students and
relatively few numbers of Mexican-Americans when overall or total
figures are considered.  Again, choice of area in which to reside
rather than State action appears to account for these concentrations
of minorities.

11.   Mexican-Americans and Blacks appear to be increasing
in the older areas of the District (Safford, Spring, Wakefield and
Mansfeld) both in numbers and percentage-wise when compared to
"Other".  Roskruge appears rather unchanged with respect to
minorities, but has lost substantial numbers of "Other" (Anglo)
students.

12.   The pattern which has developed with respect to
junior high schools is the same as developed with elementary

schools and that is, that the whole western part of the District is increasing in Mexican-American population at a greater rate than the Anglo population in the area, and this is reflected in school attendance figures.  At the same time, the older residential areas of the City are losing population in general, but are losing Anglo inhabitants at a faster rate than minorities.

13.  For example, in 1951-52, there was a total junior high school population of 3,120 students; 1,485 of these students (47.6%) attended Safford, Spring and Roskruge on the west side of the District.  In 1975-76, the last year for which we have figures, these same schools[2] served only 608 students out of a total of 10,233 junior high school students, which is 5.9% of the total junior high school students.  Even if we include all of Mansfeld student population within the west side, the total students in these three older schools (Spring, Safford and Mansfeld) in 1975-76 was only 1,251 out of a total of 10,233 junior high school students in the District (12.2%).

14.  While this change or shift in population was going on, the number of Mexican-American junior high school students in the western part of the District increased from 835 in 1951-52 to 1,923 in 1975-76.  In the District as a whole during this same period, Mexican-Americans in junior high school increased from 943 to 2,837; 1,923 of these Mexican-American students (67.8%) were living on the west side of the District.

15.  As stated above, the Mexican-American junior high school students on the west side of the District increased between 1951-52 and 1975-76 from 835 to 1,923; the "Other" (Anglo) population increased from 425 to 943.  The Black junior high school students on the west side increased from 129 in 1951-52 to 309 in 1975-76.  Thus, there was a total combined minority increase

---

[2]  Roskruge was closed after the 1971-72 school year, but its students then attended Safford, Spring and Mansfeld, with a few being assigned to Doolen on the east side.

on the west side during this period from 964 to 2,232.  The
percentages were 30.6% Anglo and 69.4% combined minority in
1951-52; in 1975-76, they were 29.7% Anglo, 71.3% combined
minority.

      16.  Thus, it can be seen that the overall total
westside percentages have remained fairly constant for 25 years,
although the westside Anglo population has shifted away from
the older areas of the City to more recently developed areas
away from "downtown".

      17.  The Mexican-American westside population is also
following the same pattern away from the older downtown areas,
but at a slightly slower rate, and to some extent, this is also
true of the Blacks.  Safford and Spring remain rather constant,
perhaps decreasing a little in numbers of combined minorities.

      18.  For the school year 1975-76, there were 17 junior
high schools in the District and their student enrollment and the
racial/ethnic composition was as follows:

| School | Blacks | Mexican-American | Other | Total |
|--------|--------|------------------|-------|-------|
| Safford | 71 | 281 | 55 | 407 |
| Spring | 27 | 327 | 17 | 371 |
| Wakefield | 3 | 593 | 85 | 681 |
| Utterback | 139 | 267 | 89 | 495 |
| Pistor | 11 | 215 | 423 | 649 |
| Maxwell | 58 | 240 | 274 | 572 |
| Roskruge | (Closed as a junior high school since 1972) | | | |
| Mansfeld | 15 | 225 | 233 | 473 |
| Doolen | 35 | 75 | 560 | 670 |
| Vail | 7 | 101 | 478 | 586 |
| Townsend | 2 | 37 | 573 | 612 |
| Fickett | 7 | 82 | 713 | 802 |
| Naylor | 75 | 157 | 632 | 864 |
| Magee | 16 | 55 | 656 | 727 |

| School | Blacks | Mexican-Americans | Other | Total |
|--------|--------|-------------------|-------|-------|
| Carson | 43 | 103 | 810 | 956 |
| Sabino | 2 | 12 | 447 | 461 |
| Secrist | 12 | 39 | 459 | 510 |
| Gridley | 8 | 28 | 361 | 397 |
|         | 531 | 2,837 | 6,865 | 10,233 |

19.  In 1967, 11 out of 13 junior high schools had Black students in attendance, as follows: Safford (49), Spring (43), Wakefield (26), Utterback (123), Roskruge (100), Mansfeld (16), Vail (1), Fickett (2), Naylor (20), Magee (4) and Carson (3).

20.  Beginning with the 1972-73 school year, Carson Junior High School on the far east side of the District, and Naylor Junior High School in the southeast part of the District, and Doolen Junior High School in the north-central part of the District, all had more Black students in attendance than the former all-Black junior high school, Spring; 56, 75 and 37, respectively.

21.  There was testimony from plaintiffs' witnesses that Spring Junior High School was under-utilized during the '50's and '60's, and had space available to receive Menlo Park and Brichta elementary students, but instead, they were sent to Roskruge and Mansfeld. This appears to be true. However, by 1957-58, Roskruge was a well-balanced school having 23 Blacks, 68 Mexican-Americans and 153 "Other" who were presumably Anglo. Also, from 1950-51 on, except for one year (1954-55), Roskruge was also under capacity until it was closed after the 1971-72 school year. The closing of Roskruge did not contribute to any considerable impaction of Blacks or Mexican-Americans at Spring or Safford. For example, Roskruge was closed at the end of the 1971-72 school year with 37 Blacks and 106 Mexican-Americans. The following school year (1972-73), Safford increased its Black students by 23, from 86 to 109, and Mexican-American students by 66, from 433 to 499. However, three years later, by the 1975-76 school year, Safford

-180-

was down to 71 Black and 281 Mexican-American students. At Spring,
Black students did not increase, and Mexican-American students
increased by only 24, from 427 to 451.  Thereafter, both de-
creased and in the 1975-76 school year, there were 17 Black
students and 327 Mexican-Americans in Spring.  Mansfeld, a
predominantly Anglo junior high school, increased its Black
and Mexican-American students, as did Doolen, another pre-
dominantly Anglo school, after Roskruge closed.  Mansfeld had
13 Black students and 220 Mexican-Americans in 1971-72; in
1972-73, it had 19 Black students and 298 Mexican-Americans.
Doolen had 36 Black students and 52 Mexican-Americans in 1971-72,
and 60 Black students and 60 Mexican-Americans in 1972-73.

     22.   Prior to 1951, Roskruge was an 80% predominantly
Anglo junior high school.  However, El Rio School (Manzo) which
was heavily imbalanced with Mexican-American students, fed into it,
while Menlo Park, which plaintiffs contend was an Anglo school,
fed into Safford, which plaintiffs classify as a 90% minority
school.

     23.   The busing of Tucson Mountain children (it appears
a majority were Anglo) into Roskruge and Mansfeld Junior High
School (predominantly Anglo), is indicative of segregative
intent because Spring Junior High School (predominantly minority),
as it appears from plaintiffs' evidence, had space to receive them.
However, throughout their elementary school years and prior to
the opening of Brichta, the Tucson Mountain children attended
schools with substantial numbers of minority students (Blacks
and Mexican-Americans).   When they were bused to Roskruge between
the years 1961 and 1971, the minority percentages at Roskruge
were:

|      |        |
|------|--------|
| 1961 | 31.9%  |
| 1962 | 46.0%  |
| 1963 | 51.5%  |
| 1964 | 50.8%  |

| 1965 | 55.1% |
| 1966 | 56.3% |
| 1967 | 58.7% |
| 1968 | 58.3% |
| 1969 | 53.7% |
| 1970 | 56.2% |
| 1971 | 54.8% |

24.   There is considerable question, however, about
space availability at Spring because substantial numbers of
minority students who would otherwise attend Spring if space
were available, were also bused to attend Roskruge.

25.   Following the closing of Roskruge Junior High,
students who formerly attended Brichta Elementary were bused
to Mansfeld Junior High School for the years 1972 and 1973.
Mansfeld at the time exceeded 40% minority students.

26.   With regard to Spring Junior High School, and
to no other junior high, the affirmative duty of the School
District to eliminate segregation "root and branch" arose.
The prior findings show that the District was trying, but failing
to institute and maintain a neighborhood school policy.   There
were segregative acts after 1951 with regard to Spring Junior
High School, but even a perfect neighborhood policy would have
been insufficient with regard to Spring (Dunbar) unless it had
removed the identification of Spring as a school that Anglos
did not attend.

27.   At no time since it ceased being an "all-Black"
school, has Spring Junior High School had more than 17.7% Anglos
in attendance.   For 18 out of the last 25 years, there have been
less than ten percent Anglos at Spring.   The non-Anglo identifi-
cation of Spring continues today, partially as a result of the
statutory segregation of Blacks prior to 1951.   The post 1951
acts of the District are indicative of the extent the District



-182-

failed in its affirmative duty to erase all vestiges of the
prior dual system.  It appears to the Court that if all vestige
of the formerly de jure segregated junior high system (as to
Black students) were erased, Spring would have had a racial
balance more in keeping with the overall westside percentages
or proportions, which averaged 10.1% Black and 34.0% Anglo over
the years from 1951-52 through 1975-76.

      28.  Commencing in 1974, elementary students from
Brichta attended Maxwell Junior High, which opened 49.9% minority
and increased to 52.1% minority in 1975-76.  Segregative intent
cannot reasonably be inferred from this evidence, even assuming
that Spring Junior High had available space to receive the
Brichta students.  The mere fact that the District may have
failed to take every available opportunity to achieve a better
racial/ethnic balance will not support an inference of segregative
intent nor a conclusion that the District operated a de jure
segregated system insofar as the junior high schools are con-
cerned.

      29.  During 1972-73 and 1973-74 school years, it also
appears that students from Roosevelt Elementary, which was then
75 to 80% minority in enrollment, had to bypass Spring Junior
High to attend Safford Junior High because of an apparent lack
of space at Spring.

      30.  The feeder patterns for Safford Junior High School
fail to sustain a reasonable inference that it was deliberately
maintained as a segregated school.  Plaintiffs have inter-
changeably referred to Safford Junior High as an Anglo sanctuary
when it received Anglo students, and a minority school when it
received minority students, ignoring other factors bearing upon
the decisions which affected transportation and student assignment,
such as bus routes, traffic, whether neighborhoods or classes were
bused, the nature and kind or extent of space available and the
time and cost involved.

31.   In retrospect, perhaps other decisions might have had a better integrative effect.  However, giving credence and full weight to plaintiffs' arguments, contentions and conclusions, no segregative effect of any questionable decisions, except for Spring, was apparent at the time of trial with respect to construction, busing decisions, student assignments or boundary decisions or teacher assignment, as they relate to the junior high schools in the District.  Racial and ethnic balances or imbalances in the junior high schools were shown to have fluctuated throughout the period covered by the evidence.  Except for Spring, no reasonable inference could be drawn that the imbalances present in the junior high schools at the time of trial resulted from segregative intent or acts on the part of the District.

32.   Again, with respect to junior high schools within the District, it appears that plaintiffs have attempted to charge the defendants with responsibility for racial and ethnic imbalances and fluctuations caused by a multitude of factors beyond defendants' control and which resulted in the main from the exercise of choices by people living in a free, complex and changing society.

33.   If schools are going to be built to serve students in a geographical area anywhere near their homes, imbalances as to race and ethnicity will necessarily occur.  And, as shown by the evidence in this case, even if every effort is made to locate a school so as to be reasonably well-balanced racially and ethnically, such balances fail to remain static because of forces and factors beyond the control of the school officials.  Such is the history of junior high schools such as Utterback and Wakefield.  No doubt Pistor and Maxwell will reflect the same changes within the next few years.

34.   Other junior high schools reflect neighborhood transition or changing racial/ethnic makeup of the area served. For example, Safford, during its first 15 years as a junior high school, was fairly well divided between Anglos and minorities.

Since 1951, it has been from between 9% and 17% Black and between
70 and 80% Mexican-American and its attendance population has
been steadily decreasing.  Mansfeld in the school year 1950-51,
had no Blacks, 65 Mexican-Americans and 634 "Other" who were
presumably Anglo.  By the 1975-76 school year, its student popu-
lation contained 15 Blacks, 225 Mexican-Americans and 233 "Other".
The percentage of those presumably Anglo decreased from 90.7%
in 1950-51 to 49.2% in 1975-76.  The evidence failed to reveal
that any segregative acts or policies of the District caused these
changes.

        35.  Utterback Junior High School opened in the 1958-59
school year with 224 presumably Anglo students, constituting 59.1%
of its student body.  By 1975-76, these figures had decreased to
89 Anglos, constituting 18% of the student body.  No segregative
action of the District appears to have caused or contributed to
this imbalance.

        36.  Wakefield Junior High School appears to follow the
Utterback trend.  In the 1950-51 school year, the "Other" student
population was 276, constituting 58.8% of the total student body.
By the 1975-76 school year, such "Other" portion of the student
body was reduced to 85, constituting only 12.5%.  Blacks in
attendance at Wakefield have fluctuated up and down from none to
a high of 47.  Mexican-American students have shown a fairly steady,
continuing increase from 276 to 593 during the 25-year period
between 1950-51 through 1975-76.

        37.  Mexican-American students in 1975-76 are in attendance
in substantial numbers in every junior high school in the District,
except the newly developed areas on the far east side served by
Gridley (28), Sabino (12), Secrist (39), Townsend (37).

        38.  Black students in 1975-76 were in attendance at
every junior high school in the District.  The fewest number are
in the far eastside schools, Fickett (7), Gridley (8), Magee (16),
Sabino (2), Secrist (12).  The largest number of Black students in

attendance at any junior high school is Utterback with 139.   Spring
Junior High, where all Black students attended prior to 1951, had
27.   Naylor Junior High School had the next greatest number of
Black students in 1975-76 with 75.   The combination of Black
and Mexican-American students in Utterback constituted 72% of
the student body there and only 26.9% of the student body at
Naylor.

     39.   Except as to Spring Junior High, a conclusion or
inference that the District has operated or is operating a dual or
segregated junior high school system with respect to either Black
students, Mexican-American students, or both, is not warranted
by the evidence.   Considering the District as a whole and con-
sidering housing patterns, the District has fairly well-integrated
junior high schools.   In a free society, people simply do not live
in well-organized patterns of any sort, particularly with respect
to race and ethnicity, and the Constitution neither requires such
nor would it permit the type of governmental control that would
be necessary to achieve it.

     40.   Doolen and Mansfeld in the central portion of the
District, and every junior high school on the west and south sides,
except Pistor  in the far southwest corner of the District, were
under-utilized by from 49 to 490 seats in the school year 1975-76.
This bears out the Court's finding that the older areas of the
District are losing population, while the fringe areas grow.
Mansfeld is only 49 under capacity because of its proximity to
the University of Arizona and because of the quality of the
neighborhoods it serves.

     41.   Pistor is the only school in the whole central and
western part of the District which is over capacity.   A reasonable
and rational conclusion that can be drawn from a review of the
junior high school attendance records, attendance zones, racial
and ethnic makeup of the various areas, land available for potential
development and historic patterns of cities, is:

(a)   That a large amount of land, available for immediate new development in the Pistor area, is being developed. At present, it is being developed in a rather well-balanced manner as to race and ethnicity of the people moving into the area.  Pistor had 649 students in the 1975-76 school year; 11 (1.7%) were Black, 215 (33.1%) were Mexican-American and 423 (65.2%) were "Other" (presumably Anglo).  How it will continue to develop is unknown, and the evidence fails to reveal anything which can reasonably be used as an indicator.

(b)   Maxwell's attendance area has a potential for much more future development.  Considering the whole north-west part of the District, it is a fairly well-balanced school as to race and ethnicity, with a total student population of 572, made up of 58 Black students (10.1%), 240 Mexican-American students (41.9%) and 274 "Other" (Anglo) (48%).  How it will develop hereafter is not reasonably ascertainable from the evidence.

(c)   Spring, if left alone, would in all likelihood, remain stable as to attendance, although its attendance area has some potential for future development to the northwest.  The southern part of the Spring attendance area is likely to deterio-rate and lose minority inhabitants, thus the racial/ethnic balance could improve.

(d)   Safford attendance area has pretty well stabilized as an older but fairly well-maintained neighborhood, except for some deteriorating areas.  Little change in race or ethnicity can be expected.

(e)   Mansfeld attendance area includes older neighborhoods ranging from excellent to not so good.  Little new development or change is apparent.  As stated herein, the University of Arizona is a stabilizing factor.

(f)   Wakefield appears to be in transition from fairly well-balanced as to Mexican-American and Anglo students to

-187-

a predominantly Mexican-American enrollment.  For example, in
the 1950-51 school year, Wakefield had 193 Mexican-American
and 276 "Other", presumably Anglo, students.  With a few ups
and downs, it has steadily increased in numbers of Mexican-
Americans and decreased in "Other".  It has had Blacks in
attendance in varying numbers, from none in 1950-51 to a
high of 47 in 1969-70, and only three in attendance in 1975-76.
The number of Mexican-Americans in 1975-76 was 593.  The number
of "Other" in that year was 85.  No segregative District practices
or policies are responsible for the imbalance at Wakefield.

(g)  Utterback attendance area appears to have
some potential for development, but how it may develop is not
apparent from the evidence.

42.  Except as to Spring Junior High, there is no
evidence that any segregative District practices or policies or
anything the District has or has not done has had any appreciable
affect on the manner in which the neighborhoods served by the
District junior high schools have developed or may hereafter
develop.  The schools are fairly well dispersed as to location
and reasonable in size so as to accommodate areas where people
live within the District.  Again, except for Spring, segregative
intent cannot reasonably be inferred from either the size, location
or attendance areas of the junior high schools within the District.

43.  Even considering the District's faults with respect
to Spring, and viewing the junior high school attendance figures
as a whole, no pattern of containment, separation or discrimination
by the District in the operation of the junior high schools, is
apparent.

44.  Certainly some of the junior high schools, other
than Spring, are racially or ethnically imbalanced, but the evidence
fails to support a reasonable and rational conclusion that this
was caused by any deliberate segregative action of the District,
nor does the evidence support a reasonable and rational finding

or conclusion of segregative intent on the part of the District
with respect to the overall operation of its junior high schools.
There is no dual junior high school system within the District,
even though Spring retains effects from former segregation as to
Black students.

## HIGH SCHOOLS

1.   Until 1956, all high school students, Anglo, Mexican-American and Black, attended one high school, Tucson High.   Tucson High is fairly well centrally located within the District boundaries.

2.   Additional high schools were built due to increased student population and overcrowding at Tucson High:

> Pueblo, 1956
> Catalina, 1957
> Rincon, 1959
> Palo Verde, 1962
> Sahuaro, 1968
> Cholla, 1969
> Santa Rita, 1969
> Sabino, 1972

3.   Pueblo and Catalina were built at about the same time; they were located almost equidistant northeast and southwest from Tucson High.   They were comparable in cost and facilities for student education and recreation.   However, Pueblo, now a minority-dominated school, is the only high school with a swimming pool located on site.

4.   Over one-half of the students attending Pueblo High School in 1956, the year it opened, were Anglo.   Although the percentage of minority students increased at Pueblo High School since its opening, the number of Anglo students also continued to increase.   Pueblo High School was predominantly Anglo in enrollment until 1964.   The number of minority students increased at a greater rate than the increase in the number of Anglo students, thereby causing the percentage of minority students to continue to increase through the late 1950's and early 1960's.

5.   The high school population in the western part of the District exceeded the District's high school capacity through-out the early 1960's.   City-County school plans indicated enrollments

far in excess of available capacity and recommended the con-
struction of a high school west of the Santa Cruz River by
the school year 1967-68.

      6.  As a result of the Tucson-Pueblo boundary change
in the fall of 1966, Pueblo did experience a slight decline in
enrollment.  This was short-lived.  The following year, enrollment
increased, necessitating double sessions.  The student enrollment
at Pueblo in 1967 was 2,441.  The average enrollment at Tucson
High was 3,218.  Both schools were over capacity.

      7.  Cholla High School is located on the far west side.
It was estimated that this high school would be over capacity
upon opening; therefore, a six-room addition was constructed at
Pueblo.  This was in addition to eight portable classrooms that
had already been placed there during the 1967-68 school year when
the school had 2,441 students and was considerably over capacity.

      8.  The boundaries to be established for Cholla High
received a good deal of attention by the public in 1969.  A great
deal of support was generated by the minority community for the
proposed boundaries.

      9.  The District has relied on the projections of the
City-County Planning Department concerning both the acquisition
of sites for potential high schools in the western part of Tucson
and the timing of the construction of these high schools.  The
District's solutions to enrollment pressures at Tucson and Pueblo
High Schools was also based upon information and projections
supplied by the City-County Planning Department.

      10.  Cholla High School opened in 1969 racially and
ethnically well-balanced -- 7.5% Black and 38.4% Mexican-American.
The Black population at Pueblo High declined between the 1968-69
school year and the 1969-70 school year from 10.2% to 9.4%.  During
the same period, the Mexican-American student enrollment in Pueblo
increased from 56.6% to 66.0%.  There was an increase in the Black
population at Tucson High for the 1968-69 school year from 9.5% to

10.9% and an increase in the Mexican-American student populations
from 46.4% to 51.5%.

11.   Since 1956, the percentage of minority students
enrolled in Tucson High has continually increased.  In the school
year 1955-56, the last year that the District had only one high
school, there was a total high school enrollment of 4,878 students,
102 Black students (2.1%), 673 Mexican-Americans (13.8%) and
4,103 Anglo (84.1%).  All these students were in Tucson High.  By
the 1975-76 school year, in spite of dispersal of substantial
numbers of minorities (4,312) in the eight high schools other
than Tucson High in 1975-76, Tucson High minority students increased
to 1,627 in that school year, while the Anglo population dropped
to 919.  In the 1975-76 school year, there was a total enrollment
in the District of 19,842 high school students, 983 Black students
(5%), 4,727 Mexican-Americans (23.8%) and 14,132 Anglo (71.2%).
This indicates that total minority enrollment is growing at a
faster rate than Anglo.  Anglo students in high school increased
less than three and a half times; total minority students increased
seven and one-third times (244% increase in Anglos, 636% increase
in minorities).

12.   From a review of Exhibit No. 729, it is apparent
that Pueblo and Catalina High Schools were located fairly equi-
distant northeast and south from Tucson High and were located so
as to most conveniently and adequately serve concentrations of
inhabitants of the District, not to contain any race or ethnic
concentrations nor to segregate.  The other District high schools
are also fairly uniformly distributed so as to most conveniently
serve the needs of all the inhabitants of the District.  There
is no credible evidence to support any finding of segregative
intent with respect to any of the site selections or the con-
struction decisions with respect to high schools.  There was no
evidence, except that pertaining to 22nd Street and Alvernon,
which is discussed elsewhere, that any alternatives were either

-192-

open or would have better served the purpose of providing reasonably convenient and adequate educational facilities and be better integrated.

13. As has been set forth elsewhere herein, the suggested site at 22nd Street and Alvernon was properly rejected. It would have been sheer folly to locate a high school at that intersection and it is highly questionable whether it would have had a good integrative effect.

14. It is also apparent from a review of Schedule G attached hereto, that there has been a steady changing of minority-Anglo balance in the high schools, particularly Cholla and Tucson High. This resulted from changing residential patterns, not District practices or policies, although opening of new high schools has had some effect as Anglos from outlying areas are absorbed into high schools nearer their homes.

15. The busing decisions affecting high schools do not reflect any pattern indicative of segregative intent.

16. The District has never operated a de jure segregated or dual system with respect to high schools. Two high schools out of a total of nine, are minority-dominated. One, Pueblo opened in the school year 1956-57, fairly well-balanced. It had 79 (6.3%) Black students, 486 (38.5%) Mexican-American students and 697 Anglos (55.2%). By 1975-76, the Black students had increased to 202 (10.3%), Mexican-American students to 1,486 (75.6%) and Anglos reduced to 278 (14.1%). The District was not responsible for the heavy increase in Black and Mexican-American students or the decreasing number of Anglos in the area served by this school or the imbalance in Tucson High.

17. The year-by-year totals of students enrolled in the District's high schools, with a breakdown as to race or ethnicity, is set out in Schedule G attached. From this schedule, it is apparent that in 1950 the District had a total of 2,174 high school students; in 1975-76 school year, there were 19,842. It

is also apparent that Black and Mexican-American students are
enrolled in each high school, although there are concentrations
of them in Tucson and Pueblo and Cholla.  The total percentage
of Anglo students compared to a combined minority (Black and
Mexican-American) enrolled in all high schools in the District,
has decreased from a high of 85.8% in the 1951-52 school year
to a low of 71.2% in the 1975-76 school year.

18.  In spite of a constricted attendance zone for
Pueblo High School over what it was in 1956-57, Pueblo's Mexican-
American students increased from 486 in 1956-57 to a high of
1,607 in 1974-75.

19.  Neither the plaintiffs in the Fisher case (No. 74-90)
nor the plaintiff-intervenor, United States of America, contend
there is or has been a de jure segregated high school system in
the District.  There has been no evidence presented from which it
can rationally or reasonably be inferred that the District has
operated a de jure segregated dual high school system or that
there is a current condition of segregation in any high school
in the District resulting from intentionally segregative State
or District action.

<u>COMMENT</u>

1.  As counsel for the Government has so cogently
stated it (page 119 Post-Trial Brief for the United States),
"<u>Keyes supra</u>, is the starting point for analysis in any school
desegregation case, for it establishes that the essential element
of <u>de jure</u> segregation is 'a current condition of segregation
resulting from intentional state action'".

2.  Throughout the case, counsel for plaintiffs and
their witnesses have had a rather flexible and confusing approach
to the case when describing schools as "Anglo", "minority", or
"predominantly Anglo", "predominantly minority".

These terms were not necessarily always in keeping with
the stipulated facts or other evidence.  They seemed to serve more
as a basis for argument and as support for opinions and conclusions
than as factual, descriptive terms.  The same can be said of much
of the use of percentages by both sides.

Further, both sides in this case presented much confusing,
conflicting or contradictory and cumulative evidence.  It was difficult
throughout the consideration of the evidence and argument to separate
out facts supported by evidence or stipulated to, from argument and
unwarranted or unsupported inferences or bare conclusion.

Certain professional witnesses or experts seemed more
partisan than "expert" at times.  Some of the opinions and conclusions
of some of the witnesses simply had to be discounted entirely or given
little weight because of lack of evidentiary support or because of
faulty, specious reasons therefor.

The Court as the finder of fact has the duty and responsi-
bility to weigh and judge the evidence and to judge the credibility
of the witnesses and determine what weight, if any, to give their
testimony.  In this connection, the Court has disregarded much
unsupported opinion type evidence and unreliable hearsay.

3.  The plaintiffs 25-year-old backward view of
the District and its decisions involved in this case is indeed
a narrow one.  It fails to take into consideration many factors
involved and faced by the District other than race and ethnicity.
Further, most of those taking such a backward look at the District
are either not old enough to have perceived the situation first-hand
through mature eyes, or were in no way familiar with either the
District or the area.  Some of the evidence and argument amounts
to carping criticism, ill-informed speculation, conjecture and
opinions of questionable validity.

Plaintiffs considerably overstate their case in attempting
to equate the District practices and policies and community conditions
with those cities and those school districts which did nothing to
accomplish desegregation, even after the Brown decision in 1954 and
even after the Civil Rights Act of 1964, where there were clearly
segregative policies such as overlapping attendance zones, disparate
facilities and every imaginable step being taken to retain artificial
racial and ethnic separation.

4.  Plaintiffs and the Government appear to be contending
the whole School District is a de jure or unconstitutionally
segregated system; the evidence fails to establish that any sub-
stantial portion of the present racial/ethnic imbalances resulted from
intentional   segregative state or District action.

5.  It appears from a review of the reported cases in-
volving school segregation, that a result of segregative intent or
segregative action is a rather clearly defined line between
minority-dominated schools and Anglo-dominated schools.  This
clear line of demarcation results in a substantial part from over-
lapping attendance zones and a continuing, carefully redrawing or
gerrymandering of attendance zones.  The evidence in this case did
not reflect this.  And further, there is no clear line between

the minority-dominated schools and the Anglo-dominated schools
in the District.  The Court has prepared from the base map used
by all the parties in this case, a scaled down version of defendants'
Exhibit 694 showing the location and attendance areas of all ele-
mentary schools in the District and their approximate ethnic balance.
It is attached hereto as Exhibit 2.  It graphically reflects what has
become a common residential phenomenon in almost every American city;
that is, an area of high minority concentration, generally in the
older part of the city, a transition area fairly well-balanced in
race and ethnicity and a high Anglo concentration farther out from
the older or core part of the city.

6.   The District elementary schools, as shown by this
exhibit, reflect this residential pattern.  Any inference that
this sort of pattern is the result of racially or ethnically
motivated acts or policies of the District, is not warranted.
The only reasonable conclusion which can be drawn from such housing
and attendance pattern is that people tend to live where they wish
or where their own economic circumstances dictate.

7.   Further, we have in this case evidence which indicates
that to some extent the imbalance as to Mexican-Americans in some
schools is caused by in-migrations, legal and illegal, of Mexican
citizens into neighborhoods already heavily Mexican-American.  This
also creates language and learning problems in the schools attended
by such immigrants.  The District cannot be charged with discriminatory
practices because of, nor held responsible for, imbalances resulting
from such factors.

8.   Exhibit 1 to these Findings and Conclusions is also
a scaled down version of defendants' Exhibit 694, but has not been
colored and keyed for racial and ethnic attendance percentages.
Exhibit 3, prepared from defendants' Exhibit 715, shows the location
and attendance areas of all junior high schools.  Exhibit 4, prepared

from defendants' Exhibit 729, shows the location and attendance
areas of all high schools.

9.  There is little doubt that in the Mendoza case
plaintiffs seek a determination that the District operated a
segregated system throughout, from kindergarten through high
school.  The Fisher case plaintiffs and the Government seek a
little less.  They concern themselves only with grades Kindergarten
through 8.  It appears they all are attempting to lay a foundation
for the possibility of a massive reshuffling of students from end
to end of the District as appropriate to achieve a better racial
or ethnic balance in all schools.  The evidence does not support
findings of fact necessary to such a decision.

10.  Plaintiffs' counsel and their witnesses left the
Court with the impression that they were attempting to fix
the blame on the District for substantially all the racial and
ethnic imbalance in all the District schools.  It appeared they
were of the opinion that the District had an affirmative duty to
take every possible measure to overcome any and all racial and
ethnic imbalance and that the District now should be punished for
whatever segregative acts  it was guilty of by a finding that the
District operated a dual or de jure segregated system which would
require Court orders designed to achieve a well-balanced ethnic-racial
mix throughout the system.  It further appears that plaintiffs, their
witnesses and counsel in arriving at their opinions, conclusions and
inferences failed to take into consideration any attenuation or any
other factors such as individual prejudices, economics, personal
preferences, etc., ad infinitum, which go into decisions as to
where people choose to live.  Unfortunately, some lower Court
decisions seem to have done this also.

11.  With respect to personal preferences and/or preju-
dices, one witness with substantial credentials summed it up very