WO

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., ) | |
|         Plaintiffs, ) | |
| v. ) | |
| United States of America, ) | |
|         Plaintiff-Intervenor, ) | |
| v. ) | |
| Anita Lohr, et al., ) | CV 74-90  TUC DCB |
|         Defendants, ) | |
| and ) | |
| Sidney L. Sutton, et al., ) | |
|         Defendants-Intervenors, ) | |
| ─────────────────────────────) | **ORDER** |
| Maria Mendoza, et al., ) | |
|         Plaintiffs, ) | |
| United States of America, ) | |
|         Plaintiff-Intervenor, ) | CV 74-204 TUC DCB |
| v. ) | |
| Tucson Unified School District No. One, et al.,) | |
|         Defendants. ) | |
| ─────────────────────────────) | |

The parties are currently engaging in discovery that commenced on March 3, 2005, for the purpose of enabling the Plaintiffs to respond to the Petition for Unitary Status and the Termination of Federal Oversight filed by the Defendants, Tucson Unified School District, et al., (TUSD or the District), on January 15, 2005.

On June 1, 2005, Plaintiffs Mendoza filed a Motion to Compel production of documents.  On June 6, 2005, Plaintiffs Fisher joined in the motion.  TUSD's argument against disclosing certain documents is that Plaintiffs' requests go beyond the scope of the Stipulated Settlement Agreement entered on August 31, 1978, and, therefore, are not relevant to determining the unitary status of the District.

The Settlement Agreement was stipulated to by the parties after the Honorable William C. Frey[1] made findings of fact leading to the following conclusions: "some effects of past intentional segregative acts by TUSD remained at" nine specified schools that warranted the Court's "use of its equitable powers to attempt to remedy any [such] segregative effects [],"and that "considering the past segregative acts as found by the Court and the seriousness thereof, a willingness to continue such acts must be inferred, and an injunction must issue to prevent any future reoccurrence of such constitutional violations." (Findings of Fact and Conclusions of Law at ¶ 59-61.)

Judge Frey issued the following injunctions for the Plaintiffs:

> Defendants are hereby enjoined from any acts or policies which deprive any student of equal protection of the law whether by intentional segregation or discrimination based on a student's race or ethnic grouping.

(June 5, 1978 Order at ¶¶ 4.)

---

[1]The Honorable William C. Frey presided over this case until February 26, 1979 when it was reassigned to the Honorable Mary Anne Richey.  She presided over the case until January 5, 1984, when the case was transferred to the Honorable Alfredo C. Marquez, who transferred it to this Court on October 17, 2003.  Reference to "this Court" in this Order covers all decisions and orders rendered in the case by all respective judges.  For the sake of clarity, the Court has adopted the language of the '70s, which explains any archaic or perhaps "politically incorrect" terminology used in this Order.

1

> Defendants are hereby enjoined until further order of the Court, from
> undertaking the construction of new schools or of permanent additions at
> existing schools without the specific authorization of the Court.

2

3   (June 5, 1978 Order at ¶¶ 5.)

4

> Hereafter, and until further order of the Court, all acts and/or policies of the
> District which substantially affect the racial or ethnic balance in any school
> in the District and/or which are discriminatory because based on race or
> ethnicity of any students in the District schools, shall be subject to Court
> review in these cases.

5

6

7   (June 5, 1978 Order at ¶¶ 7.)

8        The Plaintiffs' discovery requests are relevant to the equal protection clause

9   violations enjoined by Judge Frey, reflected in Paragraph 19 of the Settlement Agreement:

10  "The District shall not engage in any acts or policies which deprive students of equal

11  protection of the law whether by intentional segregation or discrimination based on a

12  student's race or ethnic group."

13       After Plaintiffs filed the Motion to Compel, TUSD filed a Motion to Define the

14  Scope of the Unitary Status Proceedings.   The Motion to Compel and the Motion to Define

15  the Scope of the Unitary Status Proceedings require the Court to determine the breadth of

16  Paragraph 19.

                    <u>Plaintiffs' Motion to Compel</u>

17       <u>Defendants' Motion to Define the Scope of Unitary Status Proceeding</u>

18       TUSD argues that the Settlement Agreement provisions represent specific and

19  precise measures required to address the effects of past intentional segregative acts found to

20  exist at nine specified schools.[2]  Accordingly, compliance can be pin-pointed by a specific

21  task being taken or completed at a specific time.   Each paragraph of the Settlement

22  Agreement, except for Paragraph 19, being drafted in such finite terms means that Paragraph

23  19 "represents a statement of federal law prohibiting discrimination on the basis of race," but

24  does not represent an issue presented at trial, addressed by Judge Frey's Findings and

25

26       [2]TUSD suggests that the unitary scope analysis only pertains to 9 schools specified by Judge
27  Frey as having vestiges of the past dual system remaining.  See n.  10.

28                                      3

1   Conclusions, or specifically addressed in the heavily negotiated Stipulation of Settlement.

2   (Defendants' Motion to Define the Scope of Unitary Status Proceedings (Ds' Motion) at 9.)

3          This Court rejects any such distinction between Paragraph 19 and the other

4   provisions in the Settlement Agreement.  Judge Frey's injunction against any future equal

5   protection violations whether by intentional segregation or discrimination based on race or

6   ethnicity was issued similarly to the other injunctions issued in the case.  All were based on

7   his findings of fact and conclusions of law, as noted in his Conclusions of Law at paragraphs

8   59-61.  His directives were incorporated, almost verbatim, in the Stipulated Settlement

9   Agreement at Paragraphs 19, 20 and 21.

10          When Judge Frey approved the Stipulated Settlement Agreement, he mandated that

11   the Settlement Agreement shall be the controlling document, *notwithstanding any prior*

12   *Orders or findings entered in the case*.  (Order Approving Settlement, filed August 31, 1978

13   at 5.)  Paragraph 23 of the Settlement Agreement reflects this requirement, and that in

14   "seeking enforcement of or relief in any federal court from the terms of this stipulation, no

15   party may rely upon prior findings and conclusions in this case to interpret the terms of this

16   stipulation or to determine the rights and obligations of the parties thereunder."  The Court

17   notes, however, that in respect to Paragraph 19, it is the mirror image of the injunctive

18   rulings issued by Judge Frey.

19          Of course, the Defendants were free to agree to more than the Court's judicially

20   imposed injunctions could have required.  *See*: *Alexander v. Britt*, 89 F.3d 194, 200 (4th Cir.

21   1996) ("in a consent decree, defendants may agree, within limits, to do more than a judicially

22   imposed injunction could have required.")  The record reflects this may have occurred here

23   because Plaintiffs filed motions to amend Judge Frey's findings and prepared to appeal the

24   case.  (Ds' M at 5.)  "The District, however, was satisfied with the Courts ruling and

25   announced that it would not appeal the ruling."  *Id.*  It appears likely that the Settlement

26   Agreement resolved the appellate issues raised by the Plaintiffs because Judge Frey approved

27

28                                              4

it without ruling on the pending motions and ordered that the Stipulation would be the controlling Order of the Court. (Order Approving Settlement at 6; Settlement Agreement at ¶ 23.)

Accordingly, the Court looks to the terms of the Settlement Agreement, as those terms and conditions have been interpreted by the parties and this Court over the past 27 years. The Stipulated Settlement Agreement contained 26 paragraphs, each of which required the District to undertake a specific task, implement a specific program or adopt a specific policy. (Ds' Motion at 6.) Not mentioned by the Defendants, the Settlement Agreement imposed ongoing responsibilities on them for the duration of the Settlement Agreement.

<u>Stipulated Settlement Agreement, August 31, 1978</u>

The first eight paragraphs required TUSD to adopt and implement student assignment plans for approximately 14[3] schools, utilizing specific notice and comment procedures to solicit community input.

Paragraph 9 required TUSD to restructure teacher assignments at Pueblo Gardens and Cavett Elementary School so that a disproportionate number of Black teachers, taking the District as a whole, is not on the faculty of either school. TUSD was required to implement the reassignments by the fall semester of the 1979-80 school year.

Paragraph 10 required TUSD to examine assignments of Black teachers and make reassignments so that a disproportionate number of Black teachers, taking the District as a whole, is not on the faculty of any given school commencing with the fall semester of the 1979-80 school year.

Paragraph 11 required TUSD to adopt a Statement of Non-discrimination in employment and establish procedures for hiring, placement, and promotion of District

---

[3]Ultimately, the Settlement Agreement covered magnet programs in approximately 25 elementary and junior high schools, and TUSD's high schools.

employees, and required compliance with Exhibit A, which in addition to requiring compliance with federal law and the Constitution, required TUSD to develop procedures to ensure that its schools are not racially identifiable solely as a result of its faculty and staff assignments, and to follow such procedures so as to prevent the creation of such identifiable schools, and that the School Board will regularly review its recruitment, hiring and promotion policies to ensure the absence of any discrimination or inequities.

Paragraph 12 required TUSD to develop and implement in-service training programs for employees involved in implementing the Settlement Agreement and student assignment plans.

Paragraph 13 required TUSD to implement good faith efforts to ensure that no student is discriminated against in the implementation of TUSD's uniform suspension and expulsion policy.

Paragraph 14 required TUSD to examine testing instruments to ensure that no student is discriminated against in this aspect of TUSD's education program, including efforts necessary for assessments unique to Black students and design and implement Programmatic Recommendations to Assist in the Quality Education of Black Students in Tucson.

Paragraph 15 required TUSD to not admit students to bilingual programs without parental permission, after notice and explanation of the program and available options including standard English as a second dialect (BASE), and required TUSD to evaluate its bilingual instructional programs, including external evaluation of such programs to determine whether there are adverse effects on non-program students, with the objective of correcting any such effects.

Paragraph 16 required implementation in 1978-79 of a voluntary 1-year pilot Spalding program at Menlo Park school for at least 25 students.

Paragraph 17, required TUSD to file quarterly then annual reports showing: 1) racial and ethnic student enrollment at all the schools involved in the plans implemented pursuant

to the Settlement Agreement; 2) faculty and staff assignments and reassignments and reasons for such decisions at such schools, and 3) all programmatic changes made pursuant to the Settlement Agreement and the effectiveness of such changes. During the term of the Settlement Agreement, TUSD was required to give Plaintiffs reasonable access to its records used to compile the Annual Report.

Paragraph 18, required TUSD to establish an independent citizen's committee to review and report to the School Board the progress of TUSD's compliance with the terms of the Settlement Agreement.  The citizen's committee was to include one member selected by Plaintiffs Fisher and one member selected by Plaintiffs Mendoza, with the School Board selecting other members from citizens of diverse ethnic and racial backgrounds.

*Paragraph 19 required TUSD to not engage in any acts or policies which deprive any student of equal protection of the law whether by intentional segregation or discrimination based on race or ethnic background.*

Paragraph 20 required TUSD to obtain Court authorization for any new construction or permanent additions to schools.

Paragraph 21 required TUSD to submit for the Court's review anything substantially affecting the racial and ethnic balance in any school or which is discriminatory because based on race or ethnicity.

Paragraph 22 specified that in 1983, after five years of operation under the Settlement Agreement and the student assignment plans, TUSD could file a motion with the Court to dissolve the Settlement Agreement.

Paragraph 23 specified that in addition to the Settlement Agreement governing the rights and obligations of the parties, the plans were deemed to be implemented as far as student assignments were concerned, assuming that the expected student enrollments set out in the plans are attained by 1979-80.

Paragraph 24, dismissed counts 2 through 7 of the Mendoza Amended Complaint.[4]

Paragraph 25 specified that any Order entered pursuant to Paragraph 22 resolves the case as to all parties and issues.

Paragraph 26, required TUSD to pay the Plaintiffs' past and future attorney fees in the specified amount of $500,000, except for any fees incurred as a result of Defendants' failure to comply with the terms and conditions of the Settlement Agreement.

<u>Paragraph 22: Dissolution in 1983 or After Five Years</u>

In 1983, if TUSD had moved, pursuant to Paragraph 22, to dissolve the Settlement Agreement it would have been far easier to assess what was and was not accomplished within that five year time frame, and to pin-point TUSD's compliance with the provisions of the Settlement Agreement and, thereby, find that it had attained unitary status. Instead, in 1983, the state legislature enacted legislation which generated funding availability[5] for districts incurring costs pursuant to court ordered desegregation. This opened the door for TUSD to obtain millions of dollars in local tax revenue.

For example, in 1986, the ICC, the independent citizens' committee created by Paragraph 18 of the Settlement Agreement, complained that approximately one million

---

[4]The Mendoza Plaintiffs' Amended Complaint contained eight counts: One, the creation and maintenance of a tri-ethnic segregated system; two, discriminatory tracking of students; three, inferior curricula and facilities for minorities; four, discrimination in the hot lunch program; five, discrimination in the special education program; six, failure to properly take into account linguistic differences; seven, the lack of bilingual notices; and eight, failure to employ and promote "Chicano" staff. (Findings of Fact and Conclusions of Law at 6, ¶ 2. The status of the case, pursuant to the Settlement Agreement is, therefore, distinguishable from Judge Frey's disposition of the segregation issues and his pretrial dismissal of counts three, four and seven; severance and stay of proceedings on counts two, five and six, and his finding that Plaintiffs Mendoza lacked standing to raise the employment issue.

[5]The state legislature did not provide additional money. It provided flexibility to deseg-districts to place desegregation costs outside educational spending limitations so that every one million dollars allocated in this fashion resulted in additional tax revenues of approximately 8.3 cents per $100 assessed valuation for TUSD residents. (Review and Report of the Progress of the District's Compliance . . . (ICC Report) filed 1986, Section 1: April 1, 1986 letter at 1-2.)

dollars of deseg-money had not been allocated, "especially since [it was] aware of many unmet needs in the desegregation schools dating back to 1978. (Review and Report of the Progress of the District's Compliance . . . (ICC Report filed 1986, Section 1: Unused Desegregation Funds at 3.)  In response, TUSD explained that desegregation funding was increased from $3,000,000 to $4,000,000 for FY 1986-87, explaining that the majority of the 1985-86 allocations and encumbrances were budgeted for additional staff and supplies in the desegregation schools. *Id.*, (Section 1: April 1, 1986 letter at 2.)  TUSD went on to explain its  budget proposals for the remaining unallocated funds, *id.* at 3-4, which is interesting in light of TUSD's current objection to Plaintiffs' discovery requests.  TUSD responded to the ICC by explaining that because the central administrative staff focus was on student outcomes as being the most significant of the many evaluation criteria for program effectiveness, the unallocated deseg-funds were geared toward providing at risk students with additional assistance to increase the chance for success.  TUSD suggested human relations training for raising awareness and increasing the sensitivies of teachers and other staff to the needs of the students being served by the desegregation plans; evaluation of 1985-86 site improvement activities against standard test scores from 1985-86 testing and other student assessment gains measured by "ITBS;"[6] revision of school improvement plans to reflect needs as identified by staff and parents; preparation for the opening of school for 1986-87 to include registration assignments, beginning of year parent conferences, and revision of various building-level procedures. *Id.* at 4.

Similarly in 1993, TUSD again responded to ICC inquiries regarding expenditure of $16,746,447 in deseg-money, as follows: "The conclusion is that the good judgment and discretion of the Board are the only legal limits to expenditure of these funds, so long as the expenditures are related to the 'expenses of complying with or continuing to implement activities which were required or permitted by a court order or OCR order or agreement

---

[6]The memo offers no explanation for this acronym.

directed towards remediating alleged or proven racial discrimination.'" (Plaintiffs Mendoza Response to Ds' Motion (Mendoza Response), Ex. 1: September 9, 1993 letter (quoting A.R.S. § 15-510(I)).   In conclusion, TUSD explained that the extremely broad sweep of the deseg-Order of 1978 was in keeping with the broad sweep of the School Board's discretion in utilizing the deseg-money.  *Id.* at 4.

These memos from TUSD are incongruent with its current position that it attained unitary status by simply implementing non-discriminatory policies and procedures with regard to all facets of its operations.   "In particular, the District has adopted a non-discrimination in employment policy, has implemented a uniform student discipline policy, employs non-discriminatory procedures to evaluate students for special education and gifted classes and otherwise operates a non-discriminatory school system."  (Ds' Motion at 13.)

The District would have been hard-pressed to expend its deseg-budget based on this limited formula for attaining unitary status.  For the purpose of appropriating the millions of dollars of deseg-money, "implementing the Settlement Agreement" has meant the financial requirements for operating the district pursuant to these adopted policies and procedures.

Defendants ask the Court to find, "the District need prove only that it has complied with the specific obligations set forth in Paragraphs 1 - 18, 20 and 21 of the Stipulation of Settlement, that it has eliminated the vestiges of the past dual system, as identified in and defined by the Stipulation of Settlement, to the extent practicable and that it has demonstrated a good faith commitment to the maintenance of a unitary, non-discriminatory system."  (Ds' Motion at 14.)  "The District further seeks a ruling that: (1) issues of extra-curricular offerings, the ethnic composition of Advanced Placement and honors courses, and the ethnic composition of the District's faculty are outside the scope of these unitary status proceedings; (2) that it need not prove equality in student achievement, suspension, expulsion, drop-out and graduation rates; and (3) that it need not prove that there has never

been an individual instance of discrimination based on race or ethnicity during the past twenty-seven years." *Id.*

While it is easy to grant the latter two requested rulings, TUSD's arguments to narrow the scope of the unitary status inquiry are more problematic. This Court cannot ignore the past 27 years and limit the scope of the unitary status analysis to what it may have been in 1983. While TUSD could have, it did not seek dissolution of the Settlement Agreement then nor did TUSD seek dissolution at the five-year bench mark identified for operating the district under the student assignment plans. (Settlement Agreement at 22.)

The desegregation student assignment plans required by the stipulation were filed as follows: Phase I Plan, submitted July 17, 1978, approved by the Court August 11, 1978; Phase II Plan, submitted May 2, 1979, approved by the Court May 11, 1979; Davis, Drachman, and Carrillo Phase III, submitted July 1, 1980, approved by the Court September 10, 1980; Safford Middle School Phase III, submitted May 29, 1981, approved by the Court June 2, 1981, and Phase III Vail Middle School amendment, submitted April 30, 1981, approved by the Court July 23, 1981. (See e.g., 1993 Annual Report at 7.) Every year TUSD files an Annual Report with this Court reporting that it continues to implement these plans, as amended by subsequent approved modifications made by Defendants.

The 27-year term of the Settlement Agreement serves to defeat Defendants' suggestion to limit the scope of the unitary status inquiry to a simple review of programs and policies as they were adopted by the District pursuant to the Settlement Agreement. Recognizing the ongoing nature of its obligations for the duration of the Settlement Agreement, TUSD has filed an Annual Report every year, pursuant to Paragraph 17.

The Annual Report records the following: 1) racial and ethnic student enrollment in the schools involved in the desegregation plans; 2) faculty and staff assignments and reassignments and any reasons therefor; 3) assignment of all Black teachers; 4) testing programs being utilized in the district, including programs unique to Black students; 5)

programmatic changes related to "Recommendation to Assist Quality Education of Black Students; 6) in-service programmatic activities (teacher and staff training and workshops), 7) all programmatic changes and their effectiveness; 8) school construction, boundary changes, and feeder patters.  (See e.g., 2005 Annual Report at I-IV.).

For example, in 1993, TUSD reported for Blenman Elementary School the following programmatic changes: student teachers from U of A; I Help Build Peace Program; Science Fair; Revision of Instructional Action Plan; Continued CHAMPS Self-Esteem; Expanded OASES Tutoring; reading and math resource teacher increased; additional aide time for reading and math resource room; GATE teacher providing more total population instruction; expanded Artist in Residence Program; Student Council activities varied; Cross-age tutoring in cooperation with Catalina High School; Computer lab experiences expanded; and the Bigg's/Little's Self-Esteem Program was being continued.[7]

---

[7]*See* (Mendoza Response to Ds' Motion at 18 (citing 2001 Annual Report) ("the District reported the following programmatic changes, among many others: Mayan Math Activities, Spanish Reading Group, and Success for All Reading at Blenman Elementary (at p. 83); the District Resource Liaison Working with Targeted Teachers to Improve Student Achievement at Borton Primary Magnet School Earth Night (at p. 85); Pursuant to its obligations under paragraph 12 regarding in-service training programs for 'all District 'employees involved in implementing this agreement (the Stipulation),' the District identified the following: Student Achievement– 504 plans, Student Achievement and Student Support Plans, and Student Achievement and High Stakes Testing at Townsend Middle School; (p. 209); AIMS/CCSA Test Score Review and Procedures, Assessment of Current Stanford 9 Test Scores, and New Math Adoption Training at Tully Accelerated Magnet Elementary School (p. 210); and Mexican-American and Latino Student and Student Achievement Related Issues at Vail Middle School (p. 213).  In the same report, the District reported numerous achievement measures in response to its duties under paragraph 14a."))

*See also e.g.,* 1980 Annual Report at Ex. C; (showing programmatic changes including: 6/hour aide to assist teacher who serves as designee for principal; enrichment resource program; Innovative Interracial Program; SESD Resource Program; Counseling Program; Community Representative Program; etc.); 1993 Annual Report at Ex. D (U of A Block Program; U of A Counseling Program; Fine Arts Back Pack Program; Peer Mediation; Teacher Study Group; Tutoring Program; At Risk Coordinator; terminating 8th Grade Pre-biology; K-1 Science/Play Program; After School Activities: Dance, Drama, and Drawing); 2004 Annual Report at Ex. D (similar); 2005 Annual Report at Ex. D(similar).

In summary, the Annual Reports reflect the programmatic changes taken over the course of the last 27 years, pursuant to the Settlement Agreement, and records such things as in-service training of staff and teachers, pursuant to Paragraph 12; testing, pursuant to Paragraph 14; and language programs, pursuant to Paragraphs 14 and 15.  The Annual Reports may also reflect Defendants' ongoing efforts to implement in a nondiscriminatory fashion its uniform suspension and expulsion policy, but the Court cannot so conclude given its cursory review of the Annual Reports.

The Annual Reports contain programmatic information similar to that sought by the Plaintiffs in this discovery request, except they fail to include information regarding the effectiveness of the programmatic changes made implementing the Settlement Agreement. In spite of Paragraph 17's requirement that Defendants report on effectiveness of all programmatic changes, there were no criteria for evaluating "effectiveness" until 1982. (1980 Annual Report at 4.)  "On January 30, 1982, a Committee representing the Assistant Superintendent of Instruction met to resolve certain matters pertaining to reporting criteria of effectiveness of programmatic changes," and "[i]n view of the need to document effectiveness, it was decided to report effectiveness, when possible, in terms of the findings of the several in-depth evaluations being made of the status of students affected by desegregation in Tucson Unified School District."  (2005 Annual Report at 4.)  A cursory review of the Annual Reports on file with this Court neither reflects the referred to criteria nor any effectiveness assessments.

The Court rejects Defendants' position that its duty to report the effectiveness of programmatic changes was only required for two programmatic changes specified in the Settlement Agreement: 1) the Standard English (S.E.S.D./B.A.S.E) program and 2) the Spalding Method pilot program.  The section of the Annual Report dedicated to recording programmatic changes was never so limited.  There is no such distinction in Paragraph 17 of the Settlement Agreement, which expresses to the contrary that TUSD report "all

13

programmatic changes pursuant to this stipulation and the effectiveness of such changes."

In addition to its ongoing reporting obligations, TUSD appears to have complied over the past 27 years with provisions of Paragraphs 20 and 21, which require it to secure this Court's authorization for new construction or permanent additions to its school system and to submit for this Court's review any decisions that affect the race and ethnic balance of the schools or which were based on race or ethnicity.[8]

In this same way, TUSD has an ongoing obligation, pursuant to Paragraph 19, to not engage in any acts or policies which deprive students of equal protection of the law whether by intentional segregation or discrimination.  The question before the Court is the scope of this obligation.

<u>Paragraph 19: The *Dowell/Freeman* Test</u>

---

[8]In 1993, TUSD sought and was denied leave to close the centrally located Catalina High School and construct a new high school in the Southwest area of the District.  (Memorandum Decision, filed May 4, 1993, at 12-13); In 1996, TUSD petitioned the Court for and was granted authority to continue implementing magnet programs at Palo Verde, Pueblo and Tucson High Schools, and to convert theme programs at Catalina and Cholla High Schools to magnet programs. (Petition filed January 9, 1996); In 1998, TUSD petitioned the Court for and was granted authority to institute magnet programs at Rogers Elementary School, Kellond Elementary School, Townsend Middle School and Pueblo High School.  (Petition filed April 22, 1998); In 1999, TUSD petitioned for and was granted authority to institute magnet programs at Howenstine High School, for approval of boundary change recommendations, and for approval of additions and renovations to certain district schools.  (Petition, filed November 18, 1999); In 2000, TUSD filed a motion, which was granted, allowing it to construct two new elementary schools, to confirm the Board's addition of a sixth, seventh, and eighth grade to Richey Elementary School, and for authority to conduct a traditional education program at Catalina High School.  (Motion filed October 25, 2000); In 2002, TUSD filed, and the Court granted, a motion to be allowed to operate a traditional studies educational excellence program at Catalina High School, to operate a Montessori Program at Drachman Elementary School, and for approval of the Three Percent Variance Rule (Administrative Regulation 5090), which is a race and ethnically based TUSD policy for determining deseg-school student assignments.  (Motion, April 12, 2002); In 2002,  TUSD also filed a Notice with the Court regarding its implementation of the "No Child Left Behind Act."  (Notice, filed October 2, 2002); In 2004, TUSD filed, and the Court granted, a Motion for Review of Closure of Keen Elementary School.  (Motion, filed March 10, 2004).

TUSD correctly argues that Paragraph 19 cannot be interpreted so that "any discrimination on the basis of race, any alleged instance of racial disparity or discrimination within the District, whether or not in an area covered by the Stipulation, is grounds to allege non-compliance with the Stipulation [because this] would lead to absurd results that are contrary to the overwhelming body of case law on the issue of unitary status." (Ds' Motion at 10.)  This Court agrees.  The equal protection afforded in Paragraph 19 fits within the context of the Settlement Agreement, which reflects the nature of this case.

First and foremost, this was a desegregation case aimed at reducing segregation between minority students and Anglo students by student assignment plans that shifted students from racially identifiable neighborhood schools to other schools to create more overall integrated schools throughout the District, with as little disruption to the overall neighborhood-school concept as possible.

The goal of desegregation is to improve the quality of education for all students by equalizing access, furthering diversity and giving effect to every child's right to equal educational opportunity under *Brown v. Board of Education*.

In 1968, the Supreme Court held that a school district, like TUSD,[9] that had at one time operated a statutorily mandated dual school system had an affirmative duty to eliminate all vestiges of state-imposed segregation.  *Green v. School Bd. of New Kent County*, 391 U.S. 430, 435-36 (1968).  The Court in *Green* explained that a school system achieves unitary status when it no longer discriminates between school children on the basis of race, and that a prima facie case can be determined by looking at whether or not racial imbalances exist in

---

[9]After a careful review of Judge Frey's Findings of Fact and Conclusions of Law, pages 206 to 223, the Court finds that *Fisher/Mendoza* falls squarely within the confines of a *de jure* case for purposes of determining whether or not TUSD has attained unitary status regardless of the fact that only Black students were statutorily prohibited from attending White schools. Judge Frey found that in dismantling the dual Black and White school system and, thereafter, there was some intentional segregation of minority students (Black and Mexican-American) from Anglo-students.

the following areas: 1) student body assignment, faculty, staff, transportation, extracurricular activities and facilities.

The *Green* factors are such things "where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, [then] a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown. *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 18 (1971).  Other *Green* factors fall within the context of educational resource allocations, such as teacher assignments for teachers with advanced degrees, teachers with more experience, library books, and per-pupil financial expenditures. *Freeman v. Pitts*, 503 U.S. 467, 482-83 (1992).

The *Green* factors reflect the proper inquiry under the Constitution, which is equal access to the pursuit of education, and that all students "be given equal breaks while attending school, it does not insist that they all finish even." *See Coalition to Save Our Children v. St. Bd. of Educ. for Delaware*, 90 F.3d 752, 766 (3rd Cir. 1996).  "The proper test under the Constitution is equality of opportunity, not of results." *Id.*

In other words, the *Green* presumption of discriminatory intent attaches to factors that reflect resource disparities because these types of disparities are unlikely to have a non-discriminatory explanation. *See cf, Save Our Children*, 90 F.3d at 776-777 (placing the burden of proof on Defendants in respect to *Green* factors, but requiring Plaintiffs to prove disparities in student achievement were vestiges of de jure segregation.)  The focus on equality of opportunity is an important distinction in relation to determining the meaning of "effectiveness of programmatic changes" as used in Paragraph 17 for purposes of determining whether or not Defendants have complied with the equal protection mandate of Paragraph 19.

The Court finds that the Settlement Agreement, together with the factors set forth by the Supreme Court in *Green*, constituted the marching orders for the school system over

1   the past 27 years.  *See Save Our Children*, 90 F.3d at 756 (finding similarly).  In fact, the

2   Settlement Agreement entered into in 1978, expressly included provisions addressing several

3   of the important *Green* factors: student assignment, faculty and staff, and facilities.

4          The Court shall apply the *Dowell/Freeman* legal standard for determining whether

5   or not to terminate the desegregation decree in this case, in other words, whether or not to

6   dissolve the Settlement Agreement.  *See Bd. of Educ. of Oklahoma City Pub. Schs. v. Dowell*,

7   498 U.S. 237 (1991); *Freeman v. Pitts*, 503 U.S. 467 (1992).  The two part *Dowell/Freeman*

8   test is: 1) whether the school district has complied in good faith with the decree since it was

9   entered; 2) whether the vestiges of the *de jure* discrimination have been eliminated "to the

10  extent practicable."  The latter question requires the Court to look to "every facet of school

11  operations," including the *Green* factors: student assignment, faculty, staff, transportation,

12  extra-curricular activities, facilities, and other resource related quality of education factors.

13  *Dowell*, 498 U.S. at 249-50; *Freeman*, 503 U.S. at 492.

14         The Court rejects Defendants' assertion that Paragraph 22 of the Settlement

15  Agreement shifts the usual burden of proof carried by a defendant in a unitary status case to

16  the Plaintiffs.  Paragraph 22 simply provides: 1) after five full school years of operation

17  under the terms of the agreement, the Defendants may move to dissolve the Settlement Order

18  and dismiss the actions; 2) unless the Plaintiffs object to dismissal on the basis that

19  Defendants have failed to comply with the terms of the agreement, the Court may grant

20  dissolution, and 3) if such an objection is made the Court must hear the parties regarding the

21  appropriate disposition of the action.

22         Such a motion and objections having been made and hearing given by the full

23  briefing of Defendants' Motion to Define the Scope of the Unitary Status Proceedings, the

24  Court finds as follows: 1) Pursuant to Paragraph 22 of the Settlement Agreement, unitary

25  status shall be attained "after five full school years of operation under the terms of the

26  agreement;" 2) To account for the ongoing obligations imposed by the Settlement Agreement

27

28                                                    17

for its 27-year duration, the District must establish that it is in compliance with the terms of the agreement as of the date it petitioned this Court for unitary status; 3) Pursuant to the first prong of the *Dowell/Freeman* test, Defendants' good faith compliance with the consent decree will be determined within the context of all the provisions agreed to by the parties for the desegregation of TUSD, which the Court finds were aimed at desegregating the schools and securing equal access to equal resources for minority students, and 4) Pursuant to the second prong of the *Dowell/Freeman* test, the Court shall consider the *Green* factors to determine whether the vestiges of the *de jure* discrimination have been eliminated to the extent practicable.

When assessing the Defendants' good faith compliance with the Settlement Agreement, this Court will be mindful that over 27 years and at a cost of millions of dollars, burdensome student assignments have been imposed for the sake of securing an equal educational opportunity. The Court is NOT inclined to now focus only on the former and completely ignore the latter in determining whether or not unitary status has been achieved under the provisions of the Settlement Agreement. As much as Paragraph 19 secures an equal educational opportunity as measured pursuant to the *Green* factors, it also reflects that deseg-student assignments place certain burdens, at the very least the burden of transportation, on some students but not on all students.

This explanation of the scope of Paragraph 19 is consistent with the Court's last interpretation of the Settlement Agreement in 1993, when TUSD sought and was denied leave to close the centrally located Catalina High School and construct a new high school in the Southwest area of the District. The Court denied TUSD leave to take such measures for the following reasons: 1) it would increase the minority enrollment at Tucson High with the matriculation of Jefferson Park area students; 2) it placed an undue burden on the predominantly minority Cavett Elementary area students; 3) it resulted in adding a racially identifiable high school to the Southwest part of the District; 4) it had a disparate impact on

Pueblo and Cholla by increasing minority enrollment, 5) it closed the only ethnically-balanced high school in the District.  The Court denied TUSD's request to close Catalina High School, based on the following standard of review: 1) whether the closure would have an adverse effect on the District's ongoing desegregation obligations; and 2) whether the impact of the closure places a disproportionate burden on minority students.  (Memorandum Decision, filed May 4, 1993, at 6 (relying on *Harris v. Crenshaw County Board of Education*, 968 F.2d 1090 (11th Cir. 1992).)[10]  The Court found that TUSD's proposal was inconsistent and defeated the purpose of the litigation and the Settlement Agreement. (Memorandum Decision, filed May 4, 1993, at 12-13.)

Interpreting Paragraph 19 as ensuring equal access to resources and guarding against equal protection violations in the implementation of the Settlement Agreement will also guide this Court's assessment of the effectiveness of the programmatic changes, reported pursuant to Paragraph 17 of the Settlement Agreement.

Applying this equal protection standard is fair given that TUSD's implementation of the Settlement Agreement for 27 years has required student assignments to non-neighborhood schools and has granted or denied access to certain academic programs offered at deseg-schools based on a student's race and ethnicity.  Most importantly, these operations, pursuant to the Settlement Agreement, have prevented parents for 27 years from utilizing the usual political process afforded parents to participate in and influence the operational decisions of their schools.  "Where control lies, so too does responsibility."  *Save Our Children*, 503 U.S. at 490.  Control having been with the District for the past 27 years, it

---

[10]In 1993, the Court rejected Defendants' assertion that because its high school system had never been declared unconstitutional because of de jure segregation, or because the District as a whole never operated a dual system, the Court's review was limited to whether the District was committing an act of intentional segregation prohibited by the Untied States Constitution.  The Court explained that the standard of review was provided in Paragraph 20 of the Settlement Agreement, which allowed new construction or permanent additions: if "deemed to be in the best interest of the community and not inconsistent with on-going efforts to reduce segregation."  *Id.* at 5-6.

1   must now answer for that responsibility.  Under the first prong of the *Dowell/Freeman* test,

2   the effectiveness of the   programmatic changes made implementing the Settlement

3   Agreement becomes a factor by which to measure TUSD's good faith compliance with the

4   Settlement Agreement.

5                              Waiver: Effectiveness of Programmatic Changes

6           This brings the Court to Defendants' alternative argument against the discovery

7   sought by Plaintiffs and for narrowing the scope of the unitary status inquiry in this case to

8   exclude factors which measure the effectiveness of TUSD's desegregation efforts.  TUSD

9   argues that for 27 years it has annually reported the steps being taken to comply with the

10  provisions of the Settlement Agreement, without any objection from Plaintiffs.    TUSD

11  argues that Plaintiffs have been silent for the past 27 years and may not now challenge the

12  adequacy of its efforts to implement the terms and conditions of the Settlement Agreement.

13  While it is true that Plaintiffs never filed a motion to compel compliance with the Settlement,

14  in this particular case such silence cannot be interpreted as a concession to the attainment of

15  unitary status.

16          This case,[11] a class action, has stretched over two and three generations of student-

17  plaintiffs, with the original named party-representative parents having their children,

18  grandchildren and even great-grandchildren educated under the provisions of the Settlement

19  Agreement.  The very nature of this case then affords some excuse for Plaintiffs' silence.

20          Under the terms of the Settlement Agreement, the Plaintiffs' attorneys fees, past and

21  future, were paid by Defendants as part of the Settlement Agreement in two installments,

22

23          [11]On May 24, 1974, individual parents of Black students and the N.A.A.C.P. filed a class

24  action lawsuit, *Fisher et al. v. Lohr, et al.,* CIV 74-90-TUC-WCF, to enjoin TUSD from segregating
    and discriminating against Black children in elementary and junior high schools.  October 11, 1974,

25  individual parents of Mexican-American children and MALDEF filed a class action lawsuit, *Mendoza,*

26  *et al. v. TUSD et al.,* CIV 74-204 TUC WCF, against TUSD charging illegal discrimination against
    Mexican-American children on the basis of race, color and national origin.  The two case were

27  consolidated.

28                                                20

totaling $500,000. (Settlement Agreement at ¶ 26.) Thereafter, including the representation afforded Plaintiffs now, Plaintiffs attorneys have served pro bono. Such an obligation while burdensome over five or so years, which the parties might have anticipated when they entered into the Settlement Agreement, became extremely burdensome over 27 years. During this time, counsel has repeatedly changed for Plaintiffs Mendoza as attorneys for MALDEF, a non-profit Latino litigation, advocacy and educational outreach institution, have come and gone. Plaintiffs Fisher have steadfastly been represented by Rubin Salter, a solo practitioner.[12]

Perhaps because of the above circumstances, Paragraph 18 of the Settlement Agreement required TUSD to establish an independent citizens' committee to review and report to the School Board on the progress of the Defendants' compliance with the provisions of the Settlement Agreement. One member of the committee to be selected by Plaintiffs Fisher and one member selected by Plaintiffs Mendoza, and the remainder of the members selected by the Board from citizens of diverse ethnic and racial backgrounds.

Under Paragraph 18, the independent citizens' committee (the ICC) reviews materials provided to it by the Defendants, reports back to the School Board regarding the progress of Defendants' compliance with the Settlement Agreement, and when necessary Plaintiffs' ICC members may contact their respective attorneys, who in turn may have reasonable access to TUSD's records to ensure compliance with the terms of the Settlement Agreement, pursuant to Paragraph 18. The weak link in this otherwise effective oversight scheme is the ICC's dependence on TUSD for its resources, financial and informational, to perform these duties. The 27-year term of the Settlement Agreement has exacerbated this innate flaw in the Settlement Agreement's oversight provisions.

---

[12]Plaintiffs Mendoza have made sporadic, and in large part unsuccessful, attempts to secure local counsel. Consequently, MALDEF, with offices in San Francisco and San Antonio, has been retained as counsel, but has had a very limited presence locally. Rubin Slater is local counsel.

1    Despite periodic head-butting,[13] the ICC fairly regularly reviewed and reported to

2    the School Board on the District's progress in complying with the Settlement Agreement.

3    For example, in 1999, the ICC presented a Report to the School Board, pursuant to

4    the following established desegregation goals: "1) to maintain or promote student diversity;

5    2) to improve achievement for all students regardless of race, ethnicity or gender; and 3) to

6    ensure equal access to schools, programs and activities, regardless of race, ethnicity or

7    gender." (ICC Annual Report filed June 10, 1999, at III-2.)  The ICC conducted site visits

8    to 31 of the 34 deseg-schools, and used benchmark data from TUSD's 1998 Annual Report.

9    *Id.* at I-2; III-2.  The ICC 's areas of inquiry were: schools with prescribed ratios; student

10   achievement; equal access to curriculum and programs; suspensions; professional (staff)

11   development; the desegregation budget, and the African American Studies Department.

12   Section IV of the ICC's Report contained 41 recommendations the ICC developed

13   from its review of available data, some being second requests having been initially made the

14

15   _____

16   [13]"For example, in 1989 Dr. Robert Peterkin requested information from the school district
     which would have been used to evaluate the effect of the compliance issues as stipulated in the

17   settlement.  He was told that the data he sought was unavailable.  Subsequent to Dr. Peterkin's
     request, similar requests from the ICC, the Superintendent's African American Advisory Committee

18   had been made but to no avail." (Fishers' Response at 14.)  There are other examples, two of which
     are as follows: 1) On February 16, 1996, the ICC filed a Response to TUSD's petition to continue

19   implementing the magnet program in certain schools.  The ICC complained that it was not consulted
     in the formulation of the proposal, nor did it receive a copy of the proposal, even after requesting it,

20   and that it had been unable to receive information pertaining to TUSD's proposal to enable it to
     conduct a comprehensive evaluation of the plan. Ultimately, the Court conditionally granted TUSD's

21   implementation of the magnet program based on a directive that the parties, including the ICC, to
     resolve the objections, (Order filed March 19, 1996 and Order filed April 29, 1996).  2) On February

22   24, 1997, the ICC sent a letter to the Court and filed an Application for Emergency Relief/Temporary
     Restraining Order/Injunctive Relief to stop the TUSD School Board from adopting bylaws governing

23   the ICC that were aimed at removing an ICC member because she was a litigant in an action against
     TUSD. (Application for Emergency Relief at 3.)  Attorneys for Plaintiffs argued that such bylaws

24   ran afoul of Paragraph 18 requirements that TUSD establish and maintain an independent citizens'
     committee to oversee compliance with the Settlement Agreement, that TUSD was attempting to

25   unilaterally modify the terms of the Settlement Agreement, and asked the Court to reaffirm the
     independence of the ICC.  Again the parties resolved the issues without Court intervention.

26

27

28                                         22

previous year. *Id.* at III-3.  Of particular note, the ICC identified the following: 1) the "continuing disparate achievement levels between minority students and the "Anglo/Other" student population and TUSD's implementation of "GAP Attack" to address the issue and 2) its request, given the deseg-budget had climbed to over 42 million dollars,[14] for more detailed information regarding its use and a non-voting seat on the Deseg-Budget Review Committee. *Id.*  The ICC identified the following areas of concern: 1) delays in school maintenance; 2) illogical bus transportation routes that caused longer than necessary bus rides, and 3) the magnet school one-for-one transfer policy that would not allow siblings to attend the same magnet schools.[15]

It appears that over the course of the past 27 years, the system created by Paragraph 18, worked more or less effectively, depending on the year, for the ICC to review and report to the School Board regarding TUSD's compliance with the Settlement Agreement.

In 2003, the parties stipulated that the role and purpose of the ICC was to funnel complaints from individual citizen's, that it determined fit within the confines of the *Fisher/Mendoza* Settlement Agreement, to the School Board.  (See Order filed December 19, 2003 (citing Stipulation Relating to Role and Purpose of the ICC, filed November 21, 2003 at 4.)  The role of Plaintiffs' ICC members as class party representatives to funnel issues of compliance to their respective attorneys was ignored.

Communication between Plaintiffs Fisher and counsel has been more effective than communications between Plaintiffs Mendoza and MALDEF, which has been dramatically impeded by staff attorney turnover at MALDEF.[16]  Nevertheless, MALDEF provided

---

[14]The Court assumes that this deseg-budget included federal deseg-money as well as  the state/local tax revenues available for implementing the *Fisher/Mendoza* Settlement Agreement.

[15]There are several Administrative Regulations pertaining to deseg-student assignments, such as Admin. Reg. 5090, 5095, and 5080.

[16]Repeatedly, members of the Mendoza class have complained about not having local counsel. *See e.g.* ( Motion by Maria Mendoza and Declaration of Yanagihashi, filed November 19, 2001).

1   representation in every instance when the Court requested MALDEF brief an issue on behalf

2   of Plaintiffs Mendoza, including briefing the issue of unitary status now before the Court.

3         In light of the difficulties presented for the oversight scheme in Paragraph 18 of the

4   Settlement Agreement to persevere over 27 years, this Court will not infer Plaintiffs'

5   concession that unitary status has been attained, nor will the Court bar or estop the Plaintiffs'

6   counsel from addressing it now.  In fact, the Court finds that the ICC, including the Plaintiffs'

7   ICC members, should be commended because they are a group of private citizens who have

8   faithfully volunteered their time and efforts for 27 years.

9         The work of the ICC is relevant to the Court's inquiry here.  Like the Annual Report

10   filed by the District, the work of the ICC reflects the issues the parties have perceived as

11   relevant over the past 27 years to attain unitary status through the implementation of the

12   Settlement Agreement.  In this way, the subject matter and types of issues routinely reviewed

13   and reported to the School Board by the ICC, just like those reported on by TUSD to this

14   Court in its Annual Reports, form a road map for the unitary status analysis now before the

15   Court.  This metaphoric road leads to or from the specific provisions contained in the

16   Settlement Agreement being implemented by TUSD over the past 27 years.

17         Simply put, the Court intends to look at the same data, factors, criteria, subject

18   matter, and/or issues that the parties have been tracking and reporting for the past 27 years,

19   not necessarily as independent goals or requirements of the Settlement Agreement, but as key

20   measurements by which to assess TUSD's good faith efforts to comply with the provisions

21   of the Settlement Agreement.  Such effectiveness assessments should have been made

22

23   _____

24   Without funding to pay attorney fees, local representation could not be secured pro bono. *See* (Order
filed December 19, 2003 at 4-5) (denying appointment of local counsel and award of attorney fees

25   because party representation could be secured pro bono if the Plaintiffs'-ICC representatives were
given periodic notices and kept updated by their attorneys regarding the proper channels to be used

26   for attorney-client communications); *see also* n. 13.

27

28                                          24

annually, but were neither reported by TUSD nor challenged by the parties.  Regardless, these assessments are appropriately made at this time, within the limited context of the first prong of the *Dowell/Freeman* test for unitary status.

Again it is important to note: "this case is closed."  (Order filed December 19, 2003 at 2.)  "'This Court's role is limited to jurisdiction to enforce compliance with the terms and conditions of the 1978 Stipulated Settlement Decree.  As the Court noted in 1998 when it refused to add new Plaintiff party representatives because their interests and goals diverged from the original parties' interests to desegregate the TUSD schools through bussing: 'Paragraph 25 of the Stipulated Settlement fully and finally terminated the case, resolving any and all disputes between the parties.'"  *Id.* (quoting Order filed February 26, 1998 at 6.)  "'This is not a case like *Vaughns v. Board of Education of Prince George's County*, 758 F.2d 983, 987 (4th Cir. 1985), where the court retained broad jurisdictional powers to oversee the integration plan and modify it, as necessary.'"  *Id.*  The Court now adds the caveat that to assess Defendants' compliance with the Settlement Agreement for the purpose of determining unitary status, this Court must consider the *Green* factors, pursuant to the second prong of the *Dowell/Freeman* test.

<u>Federal Rule Civil Procedure, Rule 26(b)(3): Discovery</u>

After reviewing TUSD's Response to Mendoza's Motion to Compel, the Court finds that TUSD has disclosed in large part all the information sought by Plaintiffs and that any remaining discovery dispute, if any exists, can most likely be resolved by the parties in light of this Court's determination here regarding the scope of the unitary status proceedings.

For clarification, the Court finds that the civil rights audit report of 1995 is not protected from disclosure as work product.  Rule 26(b)(3) provides three tests that must be satisfied for the work product exception to discovery: 1) the materials must be documents and tangible things; 2) prepared in anticipation of litigation or for trial; and prepared by or for the other party or by or for that other parties' representative.  The work product privilege

1    is destroyed if documents are disclosed to others so that an opposing party may see them

2    because the party who made the disclosure should not subsequently be able to claim

3    protection for the documents.  Charles Alan Wright, Arthur R. Miller, and Richard L.

4    Marcus, 8 Federal Practice & Procedure § 2024 at 367 (2nd ed. 1994).

5         Defendants assert that TUSD's outside counsel commissioned the 1995 civil rights

6    audit from other attorneys, and that meetings between the Board and the lawyers who

7    prepared the audit were conducted in legal advice executive sessions.  The audit was

8    disclosed to the ICC, but not to the Plaintiffs' ICC members.  TUSD argues that the ICC is

9    just another committee of the District's Governing Board, created by the Board, with a

10   District employee serving as the ICC's secretary, using District letterhead in its

11   correspondence, and subject to the open meeting laws of Arizona.  (Response at 7.)

12        It is important at this juncture for the Court to firmly reject TUSD's assertion that

13   the ICC is just another committee of the District's Governing Board, created by the Board.

14   The ICC is an "independent" citizens' committee created by Paragraph 18 of the Settlement

15   Agreement and is charged with performing duties specified in the Settlement Agreement,

16   including its adversarial role.  Defendants portrayal of the ICC as an arm of the School Board

17   turns Paragraph 18 of the Settlement Agreement on its head and impedes, if not destroys, the

18   degree of independence required for the ICC to perform its oversight functions and required

19   for Plaintiffs' to secure representation if necessary to enforce the Settlement Agreement.

20        Assuming that the 1995 audit report was commissioned by Defendants' counsel, the

21   Court questions Defendants' assertion that it was "commissioned by the District's attorneys

22   with the specific purpose of preparing for current and future desegregation litigation."

23   (Response at 6.)  In 1995, 11 years ago, there was no "current" litigation, and TUSD would

24   have been more interested in assessing its compliance with the Settlement Agreement than

25   in preparing to litigate the issue.  The audit was disclosed to the ICC, the very committee

26   charged with reviewing and reporting to the Board regarding TUSD's compliance with the

27

28                                        26

Settlement Agreement, which suggests the latter purpose for the audit.  Regardless, the disclosure of the audit to the ICC, even if it excluded the Plaintiffs' ICC members, substantially increased the opportunities for potential adversaries to obtain the information. *Id.* at 369.  This is adequate to destroy the privilege. *Id.*

Pursuant to Paragraph 17 of the Settlement Agreement, the 1995 audit is also a record to which Plaintiffs' attorneys must be allowed reasonable access because, having been disclosed to the ICC, it appears to be documentation related to the effectiveness of programs being reported in the Annual Reports.

Even if the audit report was protected as work product, it must still be disclosed because substantial need exists for its snap shot of the District, ten years ago.  Contrary to Defendants' assertions, (Ds' Response at 6), this is essential to pin-point precise dates when the various tasks were successfully completed and to determine the District's good faith compliance with the terms of the Settlement Agreement, including its ongoing obligations. The information in the audit will be hard to replicate by the Plaintiffs because of the tremendous amount of data and documents that would need to be reviewed, if such even exists because in many instances records are maintained only for one to three years.  (Ds' Response at 4.)

<u>Federal Rule Civil Procedure, Rule 53: Special Masters</u>

The Court gives notice to the parties that it is considering the appointment of a Special Master, pursuant to Fed. R. Civ. P.53.  The Court finds that there are exceptional circumstances, including the pro bono status of Plaintiffs' counsel as it affects their ability to present Plaintiffs' case, which may warrant the appointment of a Special Master, especially one which the parties might select by stipulation that would have special qualifications and experience in making unitary status evaluations, and addressing the civil rights and educational issues involved in this case.

Pursuant to Rule 53(b)(1), the Court gives the parties notice and an opportunity to be heard regarding such an appointment, and an opportunity to suggest candidates for the appointment.

**Accordingly,**

**IT IS ORDERED** that Plaintiffs' Motion to Compel (document 1073) is DENIED as moot.  Any discovery dispute that has not or cannot be resolved by the parties within 10 days of the filing date of this Order shall be simultaneously briefed and memoranda presenting the discovery dispute(s) shall be filed simultaneously by the parties within 15 days of the filing date of this Order.

**IT IS FURTHER ORDERED** that the Defendants' Motion to Define the Scope of Unitary Status Proceedings (document 1079) is GRANTED.

**IT IS FURTHER ORDERED** that pursuant to Paragraph 22 of the Settlement Agreement, unitary status shall be attained "after five full school years of operation under the terms of the agreement, and to account for the ongoing obligations imposed by the Settlement Agreement for its 27-year duration, the District must establish that it is in compliance with the terms of the agreement as of the date it petitioned this Court for unitary status.

**IT IS FURTHER ORDERED** that pursuant to the first prong of the *Dowell/Freeman* test, Defendants' good faith compliance with the consent decree will be determined within the context of all the provisions agreed to by the parties for the desegregation of TUSD, which the Court finds were aimed at desegregating the schools and securing equal access to equal resources for minority students, and pursuant to the second prong of the *Dowell/Freeman* test the Court will consider the *Green* factors to determine whether the vestiges of *de jure* discrimination have been eliminated to the extent practicable.

**IT IS FURTHER ORDERED** that the parties shall meet and confer regarding the Court's appointment of a Special Master, pursuant to Fed. R. Civ. P. 53, and be prepared to

provide the Court with 3 names that they agree on for appointment in this case.  The parties may file objections to the appointment of a special master within 30 days of the filing date of this Order.

**IT IS FURTHER ORDERED** that the Plaintiffs Mendoza's Request for Leave to File a Response in Excess of the Page Limit (document 1113) is GRANTED.

**IT IS FURTHER ORDERED** that the Plaintiffs shall file Responses to TUSD's Petition for Unitary Status within 120 days of Defendants' final disclosure of discovery, which shall be 30 days from the filing date of this Order.

DATED this 6th day of February, 2006.

David C. Bury
United States District Judge

*copy to ICC by cjs 2/06/06*

29