1  WO

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                          **DISTRICT OF ARIZONA**

8   Roy and Josie Fisher, et al.,              )
                                               )
9                    Plaintiffs,               )
                                               )
    v.                                         )
10                                             )
    United States of America,                  )
11                                             )
                     Plaintiff-Intervenor,     )
12                                             )
    v.                                         )
13                                             )
    Anita Lohr, et al.,                        )        CV 74-90  TUC DCB
14                                             )
                     Defendants,               )
15                                             )
    and                                        )
16                                             )
    Sidney L. Sutton, et al.,                  )
17                                             )
                     Defendants-Intervenors,   )
18  _____)        **ORDER**
                                               )
19  Maria Mendoza, et al.,                     )
                                               )
20                   Plaintiffs,               )
                                               )
21  United States of America,                  )
                                               )
22                   Plaintiff-Intervenor,     )        CV 74-204 TUC DCB
                                               )
23  v.                                         )
                                               )
24  Tucson Unified School District No. One, et al., )
                                               )
25                   Defendants.               )
    _____)
26

27

28

The Court orders Defendants to file a comprehensive report to support this Court finding that any vestiges of *de jure* segregation related to student assignments in TUSD have been eliminated to the extent practicable, orders that Policy 5090 is unconstitutional, and orders TUSD to establish its good faith commitment to the future operation of the school system in compliance with the constitutional principles that were the predicate for this Court's intervention in this case.

## Overview and Background

On February 7, 2006, this Court issued an Order discussing the scope of the *Dowell/Freeman* test for determining whether or not Defendants have attained unitary status in its operation of Tucson Unified School District (TUSD). The Court incorporates the findings of fact and conclusions of law made on February 7, 2006, into its disposition of this matter.

The Court must decide whether TUSD has attained unitary status so that judicial oversight may be terminated in this case. As noted in the Court's February 7, 2006, Order, Judge Frey made very limited, specific findings regarding student assignments and the existence of any vestiges of *de jure*[1] segregation remaining in the district. He ordered TUSD to propose a plan for desegregating nine schools and enjoined Defendants from any future acts depriving any student of equal protection by either intentional segregation or discrimination based on race.

Paragraphs 2 and 3 of the Settlement Agreement correspond to Phase I of TUSD's Desegregation Plan, which addressed the elimination of any vestiges of racial and ethnic segregation or discrimination found to exist in the nine schools: Spring Junior High School (formerly Dunbar School)[2] and Safford Junior High School, and Brichta, Tully, Manzo,

---

[1]Segregation existing by law; intentional segregation.

[2]Black students were statutorily segregated in kindergarten through eighth grades at Dunbar School until 1951-52, when desegregation of Dunbar School placed the majority of

2

Roosevelt, University Heights, Cragin, and Jefferson Park elementary schools.   Phase I called for student reassignments to improve racial and ethnic integration in these schools to the extent that would have exited absent constitutionally objectionable School Board actions. (See Order filed August 11, 1978 (discussing fact that Manzo Elementary School would still remain very heavily minority).   Judge Frey ordered Phase I to be implemented with the beginning of the 1978-79 academic year.   (TUSD's SOF at 32; Order Approving Desegregation Plan filed August 11, 1978: Phase I Plan.)

It was further ordered by Judge Frey that all parties would study the operation of the Phase I plans, formulate additional plans for future years, and without undue delay recommend preferred plans for future implementation.  A report was to be made to the Court by all parties of the operation of the approved plans as soon as possible following the end of the first term of the 1978-79 school year.  The report was to contain, but was not limited to, such matters as minority student acceptance and progress, successes and/or failures or problems resulting from the plans and any parental matters resulting from such plans.  *Id.*

Additional desegregation plans were included in the Settlement Agreement.  Phase II of TUSD's Desegregation Plan corresponded to paragraphs 4, 6 and 7 of the Settlement Agreement and required student assignment patterns to be altered so as to reduce minority enrollment below approximately 50 percent at Borton and Holladay elementary schools, Utterback Junior High School, and the junior high school into which matriculated the graduates of Pueblo Gardens and Cavett elementary schools.  Phase II was implemented in the 1979-80 school year.  (TUSD's SOF at 52-58, 60-62; Order Approving Stipulation Re: Desegregation Plan filed May 11, 1979: Phase II.)

---

the district's Black students at Spring and Safford, two Tucson schools dominated by Mexican-Americans. *See* (March 1, 1982, Report Re: Status of Safford Plan Implemenation, Ex. A: The New Safford Magnet Junior High School Report, (explaining the historical significance of the Safford desegregation plan).

Phase III of TUSD's Desegregation Plan corresponded to paragraph 5 of the Settlement Agreement, and required Defendants to implement a process for parent participation to examine future student assignment patterns for Davis, Drachman, and Carrillo (DDC) elementary schools, including deciding whether to close, consolidate, or continue operating these schools or to open a new inner city elementary school. Within the context of the DDC plan, programmatic transfers were designed to provide the maximum possible access to the educational programs at Davis, Drachman and Carrillo, as follows: 1) no more than 50 percent of incoming children could be members of minority groups; 2) transferring children must improve the racial and ethnic balance at the three schools and not imbalance the school from which they transferred; 3) children resident in either the Davis area or the Drachman and Carrillo combined area had priority consideration for transfers within the DDC schools; 4) the design rated capacity for the schools was to be determined within two years of the completion of all physical improvements and full implementation of the programs, and 5) the capacity of Davis and the combined capacity of Carrillo and Drachman would permit no more than 75 % minority student enrollment, and enrollments would be between 70 and 100 percent of the design rated capacities, within 3 years of full implementation of the DDC plan. (TUSD Revised Plan Re: Davis, Drachman and Carrillo Elementary Schools at 16; Stipulation filed September 5, 1980.) Phase III was implemented between 1980 and 1982. (TUSD's SOF at 68-75.)

It appears that these plans were implemented in the specified years. Defendants argue that the implemented plans met their expected student enrollments through the 79-80 school year, and therefore, insofar as student assignments are concerned ". . . the District was therefore deemed in compliance pursuant to paragraph 23" of the Settlement Agreement. (TUSD Memorandum Re: Compliance with Stipulation of Settlement (Memo of Compliance) at 10.) While paragraph 23 provides that the plans shall be deemed implemented if they attain their expected student enrollments, it does not provide for the District to, thereby, be

4

deemed in compliance with the terms of the Settlement Agreement.  Unfortunately, it is not that simple. TUSD may not be deemed "unitary," pursuant to paragraph 23 of the Settlement Agreement.

Paragraph 22 in the Settlement Agreement provides for "five full school years" of operation under the terms of the agreement and the student assignment plans before the Defendants can seek dissolution of the Settlement Agreement.  As this Court has previously held, unitary status depends on such operation for "five full school years."  (See Order filed February 7, 2006, at 17 (quoting Settlement Agreement at ¶ 22.)  The Court rejects Defendants assertion that ". . . the District complied with paragraphs 2 through 8 of the Settlement Agreement when it created and implemented the Phase I, Phase II and Phase III student assignment plans required by those paragraphs."  (Memo of Compliance at 23.)

The requirement to operate TUSD for five full school years under the approved desegregation plans is consistent with Judge Frey's Order approving Phase I, which contemplated an end of the year report to the Court regarding the operation of the plan and called for the parties to formulate additional plans for future years addressing first year successes, failures, and modifications.  The same date Judge Frey signed the Order approving the Phase I plan, the parties submitted the Settlement Agreement, which Judge Frey approved on August 31, 1978.  It contained the requirement that the parties operate the district pursuant to the terms of the Settlement Agreement and the student assignment plans for "five full years," before moving on or after July 1, 1983, to dissolve the Settlement Order to dismiss the action. (Settlement Agreement at ¶ 22.)

<u>Standards for Reviewing Unitary Status</u>

"Proper resolution of any desegregation case turns on a careful assessment of its facts." *Freeman*, *v. Pitts*, 503 U.S. 467, 474 (1992).  The assessment of the unitary status of a school district must be based upon proper findings made upon a record compiled in the district court. *United States v. Board of Comm'rs of Indianapolis*, 128 F.3d 507, 512 (7th Cir.

1997).  The factual examination must include not only consideration of whether a school district has complied with the orders in the case, but also whether vestiges of segregation have been eliminated to the extent practicable.  *United States v. Georgia* , 171 F.3d 1344, 1348 (11th Cir. 1999) (reversing ruling of unitary status where, among other things, the district court failed to make any finding concerning elimination of vestiges of segregation); *cf., Ho by Ho v. San Francisco Unified School Dist.*, 147 F.3d 854 (9th Cir. 1998) (denying review because plaintiff provided the appellate court with affidavits and reports provided to the district court, but failed to supply the appellate court with the facts found by the district court).  Even in cases where the parties agree that a school district has attained unitary status, district courts typically review the record and issue an opinion discussing the relevant factors pursuant to *Dowell* and *Freeman*.  *See eg*., *Jacksonville Branch, NAACP v. Duval County School Board*, 273 F.3d 960 (11th Cir. 2001) (court issued a 140-page opinion to conclude the school district had attained unitary status); *Coalition to Save Our Children v. State Board of Educ.*, 901 F. Supp. 784 (Del. 1995), *affd,* 90 F.3d 752 (3rd Cir. 1996) (making 308 separate factual findings, court concluded school district had attained unitary status).

Here, there is no agreement regarding unitary status.  To dissolve the Settlement Agreement in this case, this Court must find: 1)  TUSD has complied with the Settlement Agreement and related Court orders to the extent practicable for a reasonable period of time; 2) that the vestiges of past *de jure* discrimination have been eliminated to the extent practicable; and 3) that TUSD has demonstrated a good faith commitment to the whole of the Court's orders, the terms of the Settlement Agreement, and to the provisions of the law and the Constitution that were the predicate for the Court's intervention in this case.  *Dowell v. Oklahoma City Public Schools*, 498 U.S. 237, 249-50 (1991); *Freeman v. Pitts*, 503 U.S. 467, 491 (1992); *Missouri v. Jenkins*, 515 U.S. 70, 87-89, 101 (1995).

The good faith component requires TUSD to show past good faith compliance and a good faith commitment to the future operation of the school system, which can be shown

through specific policies, decisions, and courses of action that extend into the future. *See Lee v. Dothan City Board of Education*, 2007 WL 1856928 (Ala. 2007) (citing *Dowell v. Bd. of Educ. of the Oklahoma City Public Schools*, 8 F.3d 1501, 1513 (10th Cir. 1993), *after remand.*.

> Just as a court has the obligation at the outset of a desegregation decree to structure a plan so that all available resources of the court are directed to comprehensive supervision of its decree, so too must a court provide an orderly means for withdrawing from control when it is shown that the school district has attained the requisite degree of compliance.

*Freeman*, 503 U.S. at 489-90.

The idea behind the Court's inquiry is to determine whether TUSD has complied to the extent practicable with the desegregation decree since it was entered, thereby, eliminating the vestiges of past illegal discrimination to the extent practicable and establishing its good faith so that the public may be confident it will adhere to the Constitution. *Freeman*, 503 U.S. at 492; *Dowell*, 498 U.S. at 249-50.   Here, this inquiry spans the 27 years the District operated under the terms of the Settlement Agreement, up to and including the date Defendants petitioned this Court for unitary status.  (Order filed February 7, 2006 at 18.)

Based on the record presented by Defendants pertaining to student assignments, the Court cannot make the requisite finding as to: 1) Whether the provisions of the Settlement Agreement have been complied with in good faith; 2) Whether the vestiges of *de jure* segregation have been eliminated to the extent practicable, and 3) Whether the public can be assured that in the future TUSD shall act in good faith to comply with the provisions of the Constitution that were the predicate for the Court's intervention in this case.

The Court duly emphasizes that consent decrees like the Settlement Agreement entered here are not intended to operate in perpetuity. *Dowell*, 498 U.S. at 248.  Returning governmental entities to the control of local authorities "at the earliest practicable date is essential to restore their true accountability to our governmental system."  *Freeman*, 503 U.S. at 490.

7

TUSD asks this Court to declare it unitary, but retain jurisdiction over the case allowing it to be re-opened and amended to name the state as a defendant if the state legislature takes action to limit funding pursuant to A.R.S. ¶ 15-910(G), which provides funding for desegregation programs. (Petition at 18.) TUSD explains that funding pursuant to A.R.S. ¶ 15-910(G) provides for operation of the magnet programs, unique educational programs required by the Stipulation, multi-cultural studies departments, the student assignment plans, and for transportation required to implement the student assignment plans. *Id.* Elimination of this state funding means elimination of magnet and other special programs and a necessary return to strict neighborhood school assignments. *Id.* It appears that this Court may be more anxious than Defendants to return this case to the state,[3] nevertheless, this shall be done and shall be accomplished while meeting the parallel goal of assuring the public that TUSD has remedied the violation which the Settlement Agreement sought to cure and will continue to adhere to its principles. *Freeman*, 503 U.S. at 489.

The *Dowell/Freeman* test requires this Court to focus on whether the vestiges of *de jure* discrimination have been eliminated to the extent practicable by looking at various facets of school operations, including faculty, staff, transportation, extra-curricular activities, facilities and student assignment. *Dowell*, 498 U.S. at 249-50 *see also Freeman*, 503 U.S. at 492 (1992) (adding quality of education to the list of factors.) These *Green* factors form

---

[3]Since the mid-1980s, the financial benefits of operating under the desegregation order have been abundantly clear to all parties. (Order filed February 7, 2006.) Unfortunately, such operation removes accountability for school operations from the school board and the state legislature and creates the situation that has existed in the school district for the past 27 years, which is the nullification of the public's ability to oversee its public schools or secure recourse through political means. Given the limited jurisdiction of the Court, the public is left with no recourse regarding their schools. The "Catch 22" situation is especially ironic in that it provides for hundreds of millions of public dollars to be spent in the name of the public, for the public good, without any public oversight or public accountability. This cannot continue. *Dowell*, 498 U.S. at 248; *Freeman*, 503 U.S. at 489.

a constitutional litmus test for authorizing judicial displacement of local authority.  *Green v. County School Board*, 391 U.S. 430, 435-38 (1968).

Student Assignments

Settlement Agreement ¶¶ 2-8: Phase I, II, and III of the Desegregation Plan

Judge Frey's Order on August 11, 1978, approving the Phase I student assignment plan, is especially important in this case because the Phase I plan addressed Judge Frey's finding that vestiges of *de jure* discrimination existed at nine specific TUSD schools.  He ordered TUSD to prepare a plan to eliminate any vestiges of discrimination remaining in these schools, and TUSD responded with Phase I of the Desegregation Plan.

Judge Frey approved the plan, but explained his jurisdiction was limited as follows: "Under our federal system, the powers of government are divided between the United States, the individual states, and the people themselves.  The administration of schools is a matter firmly within the control of the individual states." *Id.* at 2-3.  He continued:

> Arizona has delegated substantially all of its powers to the school districts, superintendents of schools, officers and elected trustees of school districts, such as the defendants in these cases.  With very few limitations, they virtually have full authority concerning public education.  The people control these decisions through the exercise of their right to elect officials, to engage in free debate and to petition the officials for redress of grievances.  The United States may control such local school district decisions only insofar as the Fourteenth Amendment and other constitutional provisions allow.

> The jurisdictional grants by Congress and other complaints filed by the plaintiffs in these actions afford this Court the authority to protect the interests of the plaintiffs in receiving an equal educational opportunity.  To the extent that intentional racial or ethnic segregation or discrimination has been found, this Court has authority to order remedies. *The remedy which this Court has authority to order must work, it must work now, and it must not inflict additional burden on plaintiffs and the classes they represent, nor inflict further racial or ethnic segregation or discrimination on such plaintiffs.  This Court's jurisdiction or power does not extend any further than that.*  Concerning all other interests, parents and others must look to their elected officials.

> Federal Courts may not intrude into the business of the states any further than necessary to protect federal constitutional guarantees or rights of the people and in strict compliance with the limited grants of jurisdiction and authority rendered by Congress.

9

> In <u>Dayton Bd. of Ed. v. Brinkman</u>, 433 U.S. 406 (1977), the Supreme court of the United States held that the power of the federal courts to restructure the operation of local and state governmental entities was not 'plenary' but could be exercised only on the basis of a constitutional violation, and the scope of the remedy had to be tailored to fit the nature and extent of the constitutional violation.
>
> If there are various plans by which the constitutional violations properly can be remedied, this Court must defer to the local officials to choose which plan to use. So long as racial and ethnic discrimination is not a factor, the defendants in this case can consider and give all other factors whatever weight they deem appropriate.
>
> Defendants are free to do many things with which the Court may not agree, but which are outside the area of the Court's jurisdiction or authority in these cases.

(Order filed August 11, 1978 at 3-4) (emphasis added).

While free to do many things, the parties memorialized in the plans and the Settlement Agreement the measures they agreed would eliminate any vestiges of segregation in TUSD.

It is no coincidence that the Settlement Agreement tracked specific *Green* factors to form the constitutional floor for attaining unitary status.[4]  (Order filed February 7, 2006, at

---

[4]To the extent the Settlement Agreement reaches beyond *Green*, TUSD's obligations exist as a matter of contract, not constitutional law, *Little Rock School District v. North Little Rock School District*, 451 F.3d 528, 531 (8th Cir. 2006), and are relevant within the context of the *Dowell/Freeman* good faith analysis.  Furthermore, the Settlement Agreement is a binding consent decree, which creates mandatory obligations that are enforceable in every detail. (Order, filed February 7, 2006, at 4 (citing Order, filed August 31, 1978, at 5.)  The Settlement Agreement is a federal-court order that springs from a federal dispute and furthers the objectives of federal law.  *Frew v. Hawkins*, 540 U.S. 431, 438 (2004) (citing *Firefighters v. Cleveland*, 478 U.S. 501, 525 (1986)).  It has elements of both a contract and a judicial decree.  *Id.* at 437 (citing *Firefighters*, 478 U.S. at 519).  As explained by the Supreme Court, a consent decree may implement federal law in a highly detailed way, requiring state officials to take steps that the law does not specifically require.  Nevertheless, the decree reflects a choice among various ways that a state could implement the federal law.  As a result, enforcing the decree vindicates an agreement that the state officials reached to comply with federal law.  *Id.* at 439.

Dissolution based on mere compliance with the minimum requirements of federal law would be inequitable because it would permit re-litigation of the remedial measures required

10

17.)  The Settlement Agreement is, therefore, the starting point for determining whether or not TUSD has attained unitary status.  (Order filed February 6, 2006, at 24.)  At a minimum to become unitary, Defendants must have implemented the express provisions of the Settlement Agreement, the provisions must have attained the expected results, and Defendants must have operated TUSD in compliance with these provisions, consistently, for a full five years.  The 27 years that TUSD received hundreds of millions of dollars for operating under the terms of the Settlement Agreement make all the *Green* factors relevant because they identify resource disparities that are unlikely to have a non-discriminatory explanation, such as: extracurricular activities and facilities, teacher assignments for teachers with advanced degrees, teachers with more experience, library books, or per-pupil financial expenditures, etc.  (Order, filed February 7, 2006, at 16.)

Judge Frey made a detailed assessment of the three plans in Phase I: the Brichta, Manzo and Tully elementary school plan, the Roosevelt, University Heights, Jefferson Park and Cragin elementary school plan, and the Spring and Safford Junior high school plan.  In each instance he noted objections that he considered persuasive alternatives to the plans proposed by TUSD, but noted that none went to the adequacy or inadequacy of the options to remedy the segregative effects found by the Court to have been caused by past intentional acts of the defendants.  In each instance he found that the effects of discrimination  would be adequately remedied by the plan.  See (Order filed August 11, 1978 at 5 (discussing Brichta, Manzo, and Tully), Order at 6-10 (discussing  Roosevelt, University Heights, Jefferson Park and Cragin), Order at 10-11 (discussing Spring and Safford).

Assuming the evidence reflects that the Phase I plans were implemented and attained the expected student assignments, the schools were operated under such plans for five full

_____

in this case.  Under *Freeman,* Defendants must prove "full and satisfactory compliance with the decree."  *Freeman*, 503 U.S. at 491.  In other words, the inquiry goes beyond whether the vestiges of *de jure* segregation have been eliminated to the extent practicable.

11

years, absent some conflicting evidence, the Court may find that TUSD has eliminated the vestiges of *de jure* segregation as to student assignments in these nine schools. Assuming all of this is established, it would follow that there was good faith compliance with the terms and provisions of the Settlement Agreement in respect to student assignments in these nine schools.

This does not end the Court's inquiry, however, because as Judge Frey noted the seriousness of the past segregative acts raised an inference of TUSD's willingness to continue such acts, warranting a mandate for remedial desegregation and an injunction against Defendants from committing any future acts of intentional segregation or discrimination based on race and ethnicity. (Order, filed February 7, 2006 at 2 (citing Findings of Fact and Conclusions of Law at ¶ 59-61.) After Judge Frey found that the constitutional violation warranted displacement of local authority by an injunctive decree, the parties entered into the Settlement Agreement, tailoring the remedies they agreed fit the nature and extent of the constitutional violations found by the Court,[5] and they included Phases II and III in the Desegregation Plan.

Accordingly, the same comprehensive record required for the Phase I student assignment plans is required for the Phase II and III desegregation plans.

Student Assignment: Comprehensive Report

The United States Government concludes that the Annual Reports establish such compliance, but this Court is hard pressed without spending hours upon hours of rutting through the record to piece together the facts it needs to support a finding of unitary status. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.") Alternatively, it orders the Defendants to compile the record in a comprehensive Report to which this Court may cite and rely on in relation to the

---

[5]Plaintiffs filed motions to amend the Court's Findings of Fact and Conclusions of Law, which were resolved when the parties settled the remedial aspects of the case.

findings necessary for determining that the vestiges of the *de jure* segregation have been eliminated to the extent practicable as to student assignments. It shall be comprehensive so that it presents the goals and requirements of the Desegregation Plan and Settlement Agreement, the provisions and procedures for meeting these goals and requirements, and the evidence of compliance, including the dates of implementation and five full years of compliant operation. It should contain citations to the record and copies of relevant excerpts of records being relied on by the Defendants.

The Court anticipates that once compiled in a comprehensive report, the record will support a finding that the vestiges of *de jure* segregation have been eliminated to the extent practicable for student assignments in TUSD. The Court's confidence is based on the remedial desegregation plans approved by Judge Frey, which were designed to work and to work within 5 years of their implementation. The record in this case reflects that during the first years of this consent decree, the parties, the Court, and the community, were intent on its implementation and success. If failures occurred, compiling the record will identify them so that the Court may determine whether any further remedial measures are necessary and to narrowly tailor any remedy to work, and work now.

The inability to review the record in this case, comprehensively, in one place is an impediment to closing it. Most of the goals, procedures, and requirements are contained in documents dating back 27 years, while data and reports relating to compliance span 27 years up to the most recent filings related to the Petition for Unitary Status. It has been difficult for the Court to review this vast, complex, and sporadic record. It would be impossible for the public to understand this case based on the existing judicial record available to the public. After 27 years and close to $800,000,000.00 spent in public funds, the public is entitled to a clear comprehensive record regarding TUSD's unitary status.

As an example, the Court has compiled the record and made findings for the Phase I plan for Brichta, Manzo, and Tully elementary schools. In its Reply to Mendoza's

13

Response, Defendants compiled the record for Safford Middle School pertaining to student assignments required by the Desegregation Plan, which with some additions, supports a finding regarding any vestiges of *de jure* segregation there. TUSD must provide a similarly adequate record for the remaining school desegregation plans

<u>Brichta, Manzo, and Tully: Student Assignments</u>

<u>Goal:</u>   The goal of the Phase I plans was to improve the minority composition of these schools "as much as would have existed [] absent constitutionally objectionable School Board actions in previous years." (Order filed August 11, 1978, at 5, 6, and 10) (discussing adequacy to remedy segregative effects of intentional discrimination at Manzo and Tully; discussing sufficient integrative effect of plans for Roosevelt, University Heights, Jefferson Park and Cragin; discussing better racial balances for Safford and other junior high schools after Spring is closed).[6]

<u>Implementation:</u> Phase I was implemented in the 1979-80 school year. (Phase I plan, Order filed August 11, 1978: Stipulation at 11.)

<u>Goal Attained</u>: Phase I of the Desegregation Plan resulted in a drop in minority students at Manzo and Tully and increased the minority student population at Brichta. In 1977-78, Brichta was 39 % minority; Manzo was 97.7 % minority, and Tully was 73.4 % minority. (TUSD's SOF at 33.) [7] In 1978 as a result of the Phase I plan, the minority student

_____

[6]TUSD submits that the Phase I plan altered the attendance boundaries for Brichta, Tully, and Manzo, to eliminate overcrowding at Brichta. (Memo at 9; SOF at 32 (relying on Order filed August 11, 1978).) The Court rejects this argument, finding no support for this argument in Judge Frey's Oder. In 1981, Brichta was operating at 70 % of its capacity. (TUSD Petition to Modify Prior Orders Re: Proposed Boundary Changes, filed April 31, 1981, at 4-5.)

[7]Defendants cite to 1979-1980 Annual Report at Ex. A, but Ex. A is an Affidavit of Pamela Fine. This Court's copy of the 1979 Annual Report does not contain data related to the minority enrollment for these schools in 1977-78. Defendants also say that they will not attach copies of pleadings, exhibits and minute entries previously filed in the case, except upon request of the Court or any party. (TUSD's SOF at 2 n. 1) In the future, all evidence

population at Brichta was 59.7 % minority, Manzo was 88.2 % minority, and Tully was 60 % minority.  (1978-79 Annual Report at 11, 21, 27.)

Compliance: Five Years: minority students

| Brichta | 1978-79 | 1979-80 | 1980-81 | 1981-82 | 1982-83 |
|---------|---------|---------|---------|---------|---------|
|         | 59.7 %  | 56.9%   | 57.2%   | 62.1%   | 60.8%   |
| Manzo   | 1978-79 | 1979-80 | 1980-81 | 1981-82 | 1982-83 |
|         | 88.2%   | 89.5%   | 89.3%   | 90.5%   | 90.8%   |
| Tully   | 1978-79 | 1979-80 | 1980-81 | 1981-82 | 1982-83 |
|         | 60 %    | 58.5%   | 59.9%   | 61.4%   | 65.7%   |

(*See* 1979 Annual Report at 11, 21, 27; 1980 Annual Report at 13, 23, 29; 1981 Annual Report at 11, 21, 27; 1982 Annual Report at 17, 30, 36; 1983 Annual Report at 13, 26, 32.)

Contrary Arguments: Plaintiffs do not challenge these five-years of compliance, therefore, there is no explanation necessary regarding adjustments or modifications, or any other responsive measures taken by Defendants related to this time period.

Based on the above record, the Court finds that the Phase I plan for Brichta, Tully, and Manzo was implemented in the 1978-79 school year and was in place until 1983 (5 years) when TUSD petitioned, and the Court granted it leave, to return the boundaries to what they were prior to the Settlement Agreement.  (Memo at 9-10.)   The Manzo-Brichta attendance area, referred to as the Manzo Extended Neighborhood after the Settlement Agreement, was returned to Brichta's geographic attendance area.  According to TUSD's Petition, returning the Manzo Extended Neighborhood to Brichta removed a small number of non-minority students from Manzo, having little effect on the remaining 94.1 % minority student population at Manzo.  (Petition to Modify Prior Orders Re: Proposed Boundary Changes, filed April 31, 1981, at 3.)  First, the Court notes that the Annual Plan for 1983

---

relied on by the Defendants shall be provided as an attachment, but it is not necessary to provide voluminous documents in their entirety.  Only relevant excerpts may be attached.

reported a minority population of 90.8 % not 94.1 %, and that the minority population at Manzo had consistently risen since its initial drop from 97.7 % to 88.2 % upon implementation of the Phase I plan.

Nevertheless, the Court finds that the Phase I plan for Brichta, Manzo, and Tully, was implemented, attained its expected student enrollment, and that these schools were operated under the Phase I plan for five full years.  While Manzo remained heavily minority, Judge Frey had approved the Phase I plan knowing this would be the case and had found that the improvement was as much as would have existed at Manzo absent constitutionally objectionable School Board actions in previous years. (Order, February 11, 1978, at 5.)  The Court finds that as to student assignments at Brichta, Manzo, and Tully, any vestiges of *de jure* segregation were eliminated to the extent practicable as of 1983.

Safford Middle School: Student Assignments

Goal:  The goal of the Phase I plan for Safford Middle School was to close Spring Junior High School (formally Dunbar School, segregated for Black students) and reassign its  Black students to Safford, Doolen and Maxwell.  (Phase I plan, Order filed August 11, 1978, at 10-11.)  It contemplated the eventual closure of Safford and building a new junior high school, but in the interim the parties planned to implement a magnet school at Safford to stabilize its enrollment by improving the educational opportunities there.  *Id.*  After the requisite community input, full briefing and public hearing, the Court approved a plan for Safford, which instead of closing it established it as a "new school" for the 1981-82 school year with an alternative curriculum focused on basic skills, bilingual instruction, math and science, environmental education and fine arts.  (TUSD Proposed Plan, filed April 8, 1981; Safford Plan approved by Order filed June 2, 1981.)  In addition to curriculum criteria, the Safford Plan provided for the addition of 60 non-minority students in the 1981-82 7th grade class and an additional 80 non-minority students in the 1982-83 7th grade class.  (Order filed

16

June 2, 1981 at 2.)  The Court approved the plan because it was "legally sufficient to desegregate Safford Junior High School."  *Id.*

Implementation: The Phase I Desegregation Plan for Safford, Option V, was implemented as Phase III of the Settlement Agreement in the 1981-82 and 1982-83 school years. (Phase I plan, Order filed August 11, 1978: Stipulation at 11; Order approving Safford plan filed June 2, 1981 at 2.)  The curriculum was implemented by the 1981-82 school year. (Report Re: Status of Safford Plan Implementation at 5-21.)  Defendants enrolled 72 non-minority 7th graders in the 1981-82 school year, and anticipated enrolling an additional 80 non-minority 7th graders in the 1982-83 school year.  *Id.* at 2.

Goal Attained: The curriculum was developed, with community and parent participation as required by the Settlement Agreement.   (Report Re: Status of Safford Plan Implementation at 5-21.)  It was approved by the Court.  (Order filed June 2, 1981.)  The curriculum plan was implemented, and in February 1982, two curriculum specialists and student volunteers began visiting all the schools eligible to enroll students at Safford to recruit students.  (Report Re: Status of Safford Plan Implementation at Exhibit 19.)  The Safford plan resulted in a drop in minority students from 94.6 % in 1980-81 to 73 % minority students in 1981-82.   (1982 Annual Report at 34.)

Compliance: Five Years: minority students

| Safford | 1981-82 | 1982-83 | 1983-84 | 1984-85 | 1985-86 |
|---------|---------|---------|---------|---------|---------|
|         | 73 %    | 68.5 %  | 70.3 %  | 69.7 %  | 69.6 %  |

(See: 1981 Annual Report at 34 1982 Annual Reports at 30; 1983 Annual Report at 30; 1984 Annual Report at 31; 1985 Annual Report at 30.))

Contrary Arguments: Plaintiffs do not challenge these five-years of compliance, therefore, there is no explanation necessary regarding adjustments or modifications, or any other responsive measures taken by Defendants related to this time period.

Based on the above record, the Court finds that the Safford Desegregation Plan, including curriculum requirements, was implemented in the 1981-82 school year, attained the expected results, and Safford Junior High School was operated accordingly for five full years. The Court finds that as to student assignments at Safford Middle School, any vestiges of *de jure* segregation were eliminated to the extent practicable as of 1986.

Assuming Defendants can compile a similarly adequate record for the remaining student assignment plans required under the original terms of the Settlement Agreement and corresponding Desegregation Plan, the Court anticipates finding that as to student assignment any vestiges of *de jure* segregation have been eliminated to the extent practicable, absent contrary evidence.

This Order is not meant to resolve, address, or delay, this Court's resolution of the remaining challenges brought by Plaintiffs against Defendants' Petition for Unitary Status, most of which are aimed at TUSD's ongoing obligations over the last 27 years it has operated the district under the Settlement Agreement. In this respect, the Court does not foreclose that student assignments may again be an issue. The Court issues this Order to expedite compilation of the record, which is required to support a finding that as to student assignment any vestiges of *de jure* segregation that existed in TUSD have been eliminated to the extent practicable.

### Student Assignment Transfer Policy 5090

More importantly, the Court issues this interim Order in light of *Parents Involved in Community Schools v. Seattle School District No. 1 et al.*, 127 S. Ct 2738, 2766 (2007), the Supreme Court's recent ruling that judicial deference toward a local school board's use of racial classifications in student assignment plans is fundamentally at odds with equal protection jurisprudence. TUSD's student transfer policy 5090 is race based.

"As currently written, Policy 5090 includes two standards. It permits a student transfer to a school if the transfer "improves the ethnic balance of the receiving school and

does not further imbalance the ethnic makeup of the home school." When the policy applies, student assignment is determined by race. Policy 5090 is similar to those considered in *Parents Involved in Community Schools*, where various student assignment factors, such as student preferences, affected assignment decisions but when race came into play, it was decisive by itself. *Parents Involved in Community Schools*, 127 S. Ct. at 2753. Like the student assignment plans in *Parents Involved in Community Schools*, TUSD's transfer policy 5090 "does not provide for a meaningful individualized review of applicants" but instead relies on the race of the student in a non-individualized, mechanical way. *Id.* at 2754.

"'Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.'" *Id.* at 2767 (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 214 (1995)). Consequently, "when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed with strict scrutiny." *Id.* at 2751 (citing *Johnson v. California*, 543 U.S. 499, 505-506 (2005)). Racial classifications are not permitted except where there is the most exact connection between justification and classification. *Id.* (citing *Gratz v. Bollinger*, 539 U.S. 244, 270 (2003)). Two interests qualify as compelling: 1) the compelling interest of remedying the effects of past intentional discrimination, *Freeman*, 503 U.S. at 494, and 2) higher education's compelling interest in diversity, *Grutter v. Bollinger,* 539 U.S. 306, 328 (2003). Here, the Court must consider whether there is a compelling interest for Policy 5090. In other words, it is necessary to remedy the effects of past intentional discrimination.

*Parents Involved in Community Schools* made it quite clear that race based student assignments required pursuant to a desegregation decree become constitutionally prohibited once the vestiges of prior intentional segregation are eliminated. In *Brown v. Board of Education*, 347 U.S. 483 (1954), "[i]t was not the inequality of the facilities but the fact of legally separating children on the basis of race on which the Court relied to find a

1 constitutional violation in 1954." *Id.* at 2767. *Parents Involved in Community Schools*, the

2 Supreme Court rejected race-based tie-breaking student assignment provisions because they

3 determined admission to a public school on a racial basis. *Id.* at 1768.

4 Justice Thomas' concurring opinion offered the following definitions. Integration

5 outside the context of remediation for past *de jure* segregation is simply racial balancing. *Id.*

6 at 2769, n. 2. Racial imbalance without intentional state action to separate the races does not

7 amount to segregation. *Id.* at 2769. Racial imbalance is the failure of a school district's

8 individual schools to match or approximate the demographic makeup of the student

9 population at large. *Id.* at 2769. "Segregation is the deliberate operation of a school system

10 to 'carry out a governmental policy to separate pupils in schools solely on the basis of race.'"

11 *Id.* at 2769 (quoting *Swann v. Charlotte-Mecklenburg Bd. Of Ed.,* 402 U.S. 1, 6 (1971)).

12 Therefore, racial imbalances are not resegregation and government policies separating pupils

13 in school on the basis of race aimed at racial balancing is unconstitutional segregation. *Id.*

14 at 2769-70. In other words, racial balancing is sometimes a constitutionally permissible

15 remedy for the discrete legal wrong of intentional segregation, and when directed to that end,

16 racial balancing is an exception to the general rule that government race-based decision-

17 making is unconstitutional. *Id.* at 2768-2773.

18 Under *Parents Involved in Community Schools*, TUSD's student assignment transfer

19 policy 5090 is unconstitutional unless required to remedy the vestiges of intentional

20 segregation. Policy 5090 was originally adopted in 1969 to encourage desegregation through

21 voluntary student transfers and later was revised in 1971 and 1974. It supported the goals

22 of the Desegregation Plan required by the Settlement Agreement and the magnet programs

23 implemented in TUSD.

24 In 1994, the Arizona State Legislature adopted "open enrollment" statutes, A.R.S.

25 § 15-816, allowing a student to enroll in any school, including schools outside the student's

26 district. It included a provision, A.R.S. § 15-816.04, for districts, like TUSD, under court

27

28 20

orders of desegregation to implement additional selection criteria to "prevent any violation of the court order."  On December 2, 1994, this Court approved various TUSD student assignment policies, including policy 5090, to allow TUSD to implement open enrollment without violating the Settlement Agreement.  Students may transfer under open enrollment, if the transfer accords with policy 5090 by improving the ethnic balance of the receiving school and does not further imbalance the ethnic makeup of the home school.  There is a 3 % variance permitted by policy 5090 so that transfers to magnet schools may be made if it improves the racial balance of the receiving magnet school even though it will further racially imbalance the sending school as long as the total number of such transfers does not exceed three percent of the sending school population.

On May 30, 2007, TUSD admitted to violating policy 5090. *See* (Response Re: Assignment of Naylor Students.)  According to Defendants, "if policy 5090 were strictly enforced throughout the District, minority students would suffer a significant impact." *Id.* At 6.  "Because Policy 5090 focuses not only on the sending school but also on the receiving school, *minority students would not be able to transfer to half of the District's middle schools, regardless of the population of the sending school." Id.*  This is because more than half of TUSD's middle schools are predominately minority.

For example, review of TUSD's website for its Middle Schools' Ethnic/Gender Enrollment Breakdown for 8/14/2007 reflects only three middle schools with more than 50% Anglo-students: Gridley Middle School, Magee Middle School, and Secrist Middle School. Under policy 5090, the remainder of the middle schools are unavailable to a minority student transferring under policy 5090.  None of the magnet programs would be available, unless the 3 % variance was applied. *See* www.tusd.k12.az.us.

The discriminatory implications of policy 5090 have been dramatized at Naylor Middle School because it is rated as an underperforming school.  As the District admits, parents will not keep their children at an underperforming school, and if they are not allowed

to transfer to a better school within the district, they will leave the district all together, if they have a viable alternative such as a charter school or a private school. (Response Re: Assignment of Naylor Students at 7). "The District, in an effort to provide school choices to all students, minority and non-minority, has interpreted Policy 5090 very broadly and has allowed transfers into and out of Naylor Middle School in violation of Policy 5090." *Id.* at 8. The Court does not decide at this juncture whether or not TUSD's enforcement or lack of enforcement of Policy 5090 discriminated against minority students or reflects Defendants' bad faith. Regardless, Policy 5090 extends across the district to disproportionately limit open enrollment choices for minority students. Under *Parents Involved in Community Schools* this is unconstitutional segregation unless aimed at remedying *de jure* segregation. Given the Court's preliminary finding that any vestiges of *de jure* segregation in student assignments were eliminated to the extent practicable within five full years of implementation of the desegregation plans and it is now 27 years later, Policy 5090 is not narrowly tailored to achieve a compelling government interest. *See Parents Involved in Community Schools*, 127 S.Ct at 2752 (discussing this standard to justify racial classification in student assignments).

<u>Exit Plan: Future Good Faith Commitment</u>

TUSD reports that it has proposed a new policy (JFB) to replace policy 5090, which would allow "*more* District students to take advantage of school choice." *Id.* at 7 (emphasis added). The Court finds that *all* students must be allowed to take full advantage of school choice. The District submits that it will "work to enhance existing magnet programs and introduce other theme and magnet programs at numerous District schools, encouraging students to move voluntarily to enhance diversity throughout the District without establishing racial quotas or using race as the factor that controls placement, as is the case with Policy 5090." *Id.* at 8. Fortunately, TUSD has begun this work because it is necessary as a practical matter to present such an exit plan to the Court to establish Defendants' good faith

commitment to the future operation of the school system in compliance with the constitutional principles that were the predicate for the Court's intervention in this case.

Good faith means more than mere protestations of an intention to comply with the Constitution in the future. *Dowell v. Board of Educ. of Oklahoma City Public Schools*, 8 F.3d 1501, 1513 (10th Cir. 1993), *on remand*, (discussing *Freeman*). Specific policies, decisions, and courses of action that extend into the future must be examined to assess the school system's good faith. *Id.* (relying on *Brown v. Board of Educ.*, 978 F.2d 585, 592 (10th Cir.1992), *on remand*; *see also Morgan v. Nucci*, 831 F.2d 313, 321 (1st Cir. 1987) ("[U]nitariness is less a quantifiable moment in the history of a remedial plan than it is the general state of successful desegregation.); *Lemon v. Bossier Parish Sch. Bd.*, 444 F.2d 1400, 1401 (5th Cir.1971) (One swallow does not make a spring.))

As of now, the record is devoid of any specific policies, decisions, or proposed courses of action that extend into the future. Without this, the Court will not close the case. It is this Court's intention that such post-unitary provisions be developed which can be monitored by the community for compliance and with recourse for non-compliance to be addressed by the School Board. Post-unitary goals, requirements, and provisions shall be clearly stated, measurements of success and effectiveness shall be established, timely and periodic review and reporting to the community regarding implementation, operation, and progress shall be established, and there shall be mechanisms for direct communication from the public to the School Board. This Court shall approve the transparency of the post-unitary provisions to ensure that the community at large has access to all the information necessary to oversee TUSD's compliance with them.

<u>Summary</u>

This Court intends to close this case and return the TUSD schools to the state because oversight and control will be more effective placed in the hands of the public with

the political system at its disposal to address any future issues.[8]  This Court finds that given the approximately $800,000,000.00 [9] in public funds spent over the past 27 years in TUSD, and the general lack of control and input held by the community over these expenditures and operations, it is the Court's obligation to provide an orderly means for withdrawing its control that will ensure the public that TUSD will act in good faith in regard to future compliance with the principles of the Settlement Agreement.

The Court enters this Order in the interim to ruling on TUSD's unitary status.   As discussed in the Order, filed February 7, 2006,[10] it is more problematic to determine whether Defendants have complied with provisions of the Settlement Agreement to the extent practicable, if over 27 years TUSD has failed to monitor, review, and update policies or procedures aimed at ensuring equal educational opportunities for minority students.  These questions are further complicated by the broad sweep of programs and activities historically promoted by the Defendants as "directed towards remediating alleged or proven racial discrimination."  (Order, filed February 7, 2006, at 10 (citing September 9, 1993, letter).

Conversely, the desegregation plans called for specific remedial student assignments. Judge Frey went to great effort to be specific and limited in his findings of liability for intentional segregation and remediation for such segregation and even determined that any vestiges of intentional segregation as to student assignments would be remedied under the desegregation plans within five full years of the approved operations.  Accordingly, this Court's unitary status analysis is more specific, limited, and directed, regarding TUSD's compliance with the student assignment provisions of the Settlement Agreement, as

---

[8]Of course, TUSD remains subject to the Constitution and all other laws, and these obligations are enforceable by legal action.  *Little Rock School District*, 359 F.3d 957, 970 (8th Cir. 2004).

[9]$766,605,949 total funding over 20 years; $38,330,297.45 annual average program funds.  (Mendoza Reply Re: Naylor at p. 21: Table E.)

[10](Order, filed February 7, 2006, at 10-20.)

compared to other remedial measures that have been ongoing over the past 27 years. Currently, the inability of the Court to determine whether any vestiges of *de jure* segregation in student assignments remain in TUSD's schools is a matter of an inadequate record. This interim order is necessary to remedy this inadequacy.

Given the clear illegitimacy of Policy 5090, as of the June 28, 2007, ruling in *Parents Involved in Community Schools*, this Court issues this interim directive and takes this opportunity to inform the Defendants regarding the need for an exit plan, which will ensure the public and this Court that it is committed to the constitutional principles that were the predicate for this Court's intervention. In good faith, the parties shall work together to develop post-unitary provisions and proposals meeting the requirement of transparency called for by this Court. Such provisions should address the *Green* factors, especially those which were specifically included in the Settlement Agreement. The parties are reminded that in regard to future plans and provisions, they are relevant for ensuring Defendant's future good faith and are not remedial measures.

The Court considers the Petition for Unitary Status fully briefed in respect to all issues, except for the evidentiary record requested by the Court in respect to the student assignment plans and presentation of TUSD's post-unitary policies and proposals. The Petition is currently pending and being considered by this Court.

**Accordingly,**

**IT IS ORDERED** that Defendants shall file the comprehensive Report regarding the student assignment provisions of the Settlement Agreement within 30 days of the filing date of this Order. Plaintiffs shall have ten days to file any objections.

**IT IS FURTHER ORDERED** that within 11 days of the filing date of this Order, the parties shall meet and confer regarding post-unitary policies and provisions, including this Court's requirement for transparency aimed at achieving effective public over-sight, monitoring, and enforcement. Defendants shall file a post-unitary plan within 30 days of the

parties' meeting, identifying provisions agreed to by the parties and identifying those in dispute.  Plaintiffs shall have ten days to respond.  Defendants may file a Reply within 5 days.

**IT IS FURTHER ORDERED** that this is an interim order, and it is not anticipated that the above requested filings will delay this Court's determination as to whether TUSD has attained unitary status in relation to the remainder of the Settlement Agreement.

DATED this 21st day of August, 2007.

David C. Bury
United States District Judge

26