1    WO

2

3

4

5

6                    **UNITED STATES DISTRICT COURT**

7                        **DISTRICT OF ARIZONA**

8    Roy and Josie Fisher, et al.,                    )

9                    Plaintiffs,                        )
                                                       )
10   v.                                                )
                                                       )
     United States of America,                         )
11                                                     )
                    Plaintiff-Intervenor,              )
12                                                     )
     v.                                                )
13                                                     )
     Anita Lohr, et al.,                               )    CV 74-90  TUC DCB
14                                                     )    (lead case)
                    Defendants,                         )
15                                                     )
     and                                               )
16                                                     )
     Sidney L. Sutton, et al.,                         )
17                                                     )
                    Defendants-Intervenors,            )
18   _____)
                                                       )    **ORDER**
19   Maria Mendoza, et al.,                            )
                                                       )
20                   Plaintiffs,                        )
                                                       )
21   United States of America,                         )
                                                       )
22                   Plaintiff-Intervenor,             )
                                                       )    CV 74-204 TUC DCB
23   v.                                                )    (consolidated case)
                                                       )
24   Tucson Unified School District No. One, et al.,  )
                                                       )
25                   Defendants.                        )
     _____)

26

27

28

<u>Background</u>

The Court finds that the Settlement Agreement entered in this case in 1978, contained very express provisions, especially as it related to student assignment plans. The Settlement Agreement provided for Defendant to file a motion with the Court to dissolve it after five years of operation pursuant to its terms, if the student assignment plans were implemented and the expected student enrollments were attained by 1979-80. (Settlement Agreement, ¶¶ 22-23.) "In 1983, if TUSD had moved, pursuant to Paragraph 22, to dissolve the Settlement Agreement it would have been far easier to assess what was and was not accomplished within that five year time frame, and to pin-point TUSD's compliance with the provisions of the Settlement Agreement and, thereby, find that it had attained unitary status." (Order, filed 2/7/06 (Order, 2/7/06) at 8.) Instead, probably in response to state and federal funding for districts incurring costs pursuant to court ordered desegregation, it became beneficial to continue operating the district pursuant to the Settlement Agreement. *Id.*

On April 22, 2004, this Court ordered the parties to show cause why this case should not be closed, and if not– then to explain what was required for the District to attain unitary status. "Unitariness is less a quantifiable moment in the history of a remedial plan than it is the general state of successful desegregation." *Morgan v. Nucci*, 831 F.2d 313, 321 (1st Cir. 1987). Now, the inquiry spans 27 years.

Unlike the definitive result-oriented first years which followed the entry of the Settlement Agreement, for the next 20 some years the District exercised its discretion over a program with more obscure goals. The Petition for Unitary Status is a public accounting by the Defendant, which in large part consists of statistical data to show the effectiveness of its programs to address desegregation and quality of education issues in the District. A briefing schedule was necessary for the parties to gather data, analyze it, and present it to the Court.

After full disclosure and briefing, the Court finds that the Defendant failed to act in good faith in its ongoing operation of the District under the Settlement Agreement. Specifically, the Defendant failed to monitor, track, review and analyze the ongoing effectiveness of its programmatic changes to achieve desegregation to the extent practicable or "at least" not exacerbate the racial imbalances that exist in the District.

Petition for Unitary Status

On January 14, 2005, the Defendant ("TUSD" or "the District")[1] filed its Petition asking this Court to find that TUSD has attained unitary status. (Petition for Unitary Status, filed 1/14/05 (Petition) at 2.)   Defendant submits that the Settlement Agreement,[2] entered on August 31, 1978, required "the District to take certain actions within a short period of time (2-3 school years) after the Stipulation was entered." *Id.* at 3.  "In addition, the District had other continuing obligations with regard to implementing non-discriminatory employment and discipline policies, adopting and implementing the Programmatic Recommendations for the Quality Education of Black[3] Students in Tucson and operating the District in a non-discriminatory manner." *Id.*  "The District was also required to submit for court review or court approval any actions that would impact substantially on the racial or ethnic balance of any of the district's schools, and to report on an annual basis to the Plaintiffs and the Court regarding the status of implementation of the Stipulation." *Id.*

To attain unitary status, a dual system is converted into a unitary one in which racial discrimination has been eliminated root and branch.  *Id.* (citing *Green v. School Board of*

---

[1]Over the course of this litigation, Defendant has been referred to as both TUSD and the District.

[2]Over the course of this litigation, the Settlement Agreement, filed August 11, 1978, has also been referred to as the Stipulation, Stipulation of Settlement, Desegregation Order, and Deseg-Order.

[3]Over the course of this litigation, Black students have also been referred to as African American.

*New Kent County*, 391 U.S. 430, 437-38 (1968)).  Here, the Defendant must establish that the District has complied with the Court's orders for a reasonable period of time, that it has eliminated the vestiges of the former dual system to the extent practicable, and that the District has demonstrated a good faith commitment to maintaining a non-discriminatory system. *Id.* at 3 (citing *Freeman v. Pitts*, 502 U.S. 467 (1992); *Board of Ed. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237 (1991)).  Judicial oversight, which began in 1978, must end once TUSD attains unitary status.[4]

On February 7, 2006, the Court explained the scope of the unitary status inquiry in this case is unique because very specific findings were made regarding vestiges of a dual segregated school system that had existed at one time in TUSD.[5]  Prior to litigation, TUSD

---

[4]The District asks the Court to retain limited jurisdiction to allow Defendants to reopen the case and name the State as a Defendant if the legislature moves to limit funding, pursuant to A.R.S. 15-910(G) as it may be amended, renumbered or rescinded." (Petition at 19.) The Court finds that any benefit from its continued involvement in this case in the form of funding is offset by the disadvantages that result from suspension of public accountability that occurs during such periods.

[5]TUSD's elementary schools (K-8) were racially segregated for Black students by law until 1951, when the state legislature adopted legislation making segregation permissive. *See* Findings of Fact and Conclusions of Law, filed June 5, 1978, Findings of Fact: Segregation and Desegregation at 41-57. Thereafter, of its own accord, TUSD dismantled its *de jure* dual school system and began assigning Black students to neighborhood elementary schools. *Id.* at  4 ( ¶ 10), pp. 41-57. Black high school students had always attended the single high school in Tucson, but were assigned to segregated home rooms. *Id.* at 41-57 (¶¶ 11-12). In 1946, TUSD eliminated this practice, along with other similar segregative practices in athletics, choir, band, orchestra and all other school activities. *Id.*

There was no *de jure* segregation of Mexican-American students. In fact, the first schools opened in Tucson served primarily Mexican-American students. *Id.* at 4 (¶¶ 7-9); *see also id.* at 25, (¶¶ 1,4) (in 1891, there were two schools serving the entire District; in 1890 of the 365 students enrolled in the schools, 43% were of Mexican parents, 19% were of Mexican and Anglo parents and 38% were Americans (assumably Anglo students)). There was, however, heavy segregation of Mexican-American students in certain schools based on demographics. *Id.* at 29-40. And, there were a few schools in the western part of the District with racial/ethnic imbalances resulting in part from discriminatory practices of

4

had dismantled its *de jure* dual educational system so the Stipulation focused on eliminating vestiges that remained and was especially specific regarding the extent of student assignments necessary to address those vestiges.  The Stipulation expressly covered the *Green* factors: student assignments, faculty assignments, staff assignments, and facilities. The Court explained, however, it would not limit its inquiry to only the express paragraphs of the Settlement Agreement because over the past 27 years the parties have interpreted the Settlement Agreement to reach a broad array of programs, as exemplified by the District's requests for and utilization of millions of dollars in desegregation money appropriated specifically for implementation of undertakings pursuant to the "Deseg-Order." (Order, filed 2/7/06 (Order, 2/7/06) at 8-20, 24-25.)

The Court incorporates, here, these and other factual findings and conclusions of law made in its February 7, 2006, Order.

<u>The Green Factors: Student Assignments, Faculty Assignments, Staff Assignments, Facilities, and Other Resource Related Factors.</u>

<u>Student Assignment</u>

As anticipated by this Court when it issued its Order, filed August 21, 2007, directing the Defendant to prepare and file a comprehensive Report regarding student assignments, the desegregation plans, Phase I, II, and III, were implemented within a few years of the 1978 Settlement Agreement.  The Defendant's Report, filed September 20, 2007, reflects that to the extent practicable the student ratios established by the desegregation plans were met and maintained over a five-year period of time.  *See* (D's Report Re: Implementation of Student Assignments, filed September 20, 2007, (D's Report Re: Student Assignments)); *see also*, 1980-1985 annual reports.

---

the District.  *Id.* at 40; *see also*, Order, filed 2/7/06, at 8  (noting that pursuant to the Settlement Agreement ¶ 24 Plaintiffs Mendoza's count § 2 through 7 were dismissed, leaving count 1 (existence of tri-ethnic school district) and count 8 (failure to promote and employ Chicano faculty).

1
2
3
The Court adopts the factual findings contained in the District's Report Re: Student Assignments as its findings of fact. It does not adopt any legal conclusions included in the Report Re: Student Assignments.

4
5
6
7
8
By 1989, however, several of the schools under the Court's desegregation Order were no longer in compliance with the required ethnic and race ratios of the Settlement Agreement's Phase I, II and III plans. (Mendoza Response to Petition, filed July 19, 2006, (Mendoza Response), Ex. A: ICC Comprehensive Compliance Report (ICC Compliance Report) at 32-33 (citing 1990 ICC Report).

9
10
11
12
13
14
15
16
17
18
19
20
21
The ICC, the committee charged with monitoring TUSD's compliance with the Settlement Agreement, ¶ 18, has annually reported to the TUSD Governing Board the progress made under the Settlement Agreement and identified problems, omissions, or failures and recommended measures necessary for compliance. The ICC prepared a comprehensive report to the Board in November 2005 pertaining to the District's Petition for Unitary Status. The Governing Board, however, took action to petition for unitary status and filed the Petition for Unitary Status with this Court on January 14, 2005, without the benefit of the ICC's Compliance Report. In it the ICC again charges that the District is no longer in compliance with the desegregation student assignment plans and questions whether the student ratios required by the plans are realistic in light of dramatic demographic changes occurring in the District. *Id.* at 32-34 (citing ICC Reports: 1992, 1998, 1999, 2000, 2001, 2002, and 2003); *see also* (1986 ICC Report (noting non-compliance at Borton Primary Magnet School).

22
23
24
25
26
27
The ICC and Plaintiffs argue that TUSD's failure to request changes in the various prescribed ratios constitutes serious non-compliance with efforts to successfully desegregate the District. *Id.,* ICC Compliance Report at 40. This position is contrary to the Court's opinion that the vestiges of *de jure* segregation existing in the District related to student assignment would be eliminated to the extent practicable if the student assignment plans were implemented, accomplished their stated goals, and were maintained for a full five years.

28

However, Defendant's responsibility for desegregation did not end in five years. Instead, Defendant took further measures pursuant to the Settlement Agreement as reported in annual reports to this Court. TUSD collected and spent millions of dollars on these efforts. The continued operation of the district pursuant to the Settlement Agreement bound Defendants to affirmatively combat segregation. *See* (Order, 2/7/06, at 8-14, 17-20.)

In other words, since the Court finds that the student assignments required under the Settlement Agreement were attained, the Court's inquiry is limited to the District's affirmative duty to combat re-segregation of the District.

It is undisputed that the District's total minority population began increasing by approximately 1% per year shortly after 1978, (Mendoza Response, Ex. A: ICC Compliance Report at 34) and by 2002 it was increasing at a rate of 1.8% per year, *id.* (citing letter from Equity Development Office to Administration dated November 22, 2002). Minority students made up 36.3% of the student population in 1977-78, *id.* at 31, and were 55.2% by 1997-98, *id.* at 33, and reached 67% by 2005-2006, *id.* at 31.[6]

The Court accepts the Defendant's position that the demographic changes in the District have resulted in re-segregating its schools. For example, in 2004-2005, the 86 elementary schools in the District had 30 schools with 80% minority student populations, with 20 schools exceeding minority student populations of 90%. (Mendoza Response, Ex. A: ICC Compliance Report at 37.)

---

[6]Dr. Clark's expert opinion in this respect is unnecessary. *See* (D's Report Re: Student Assignments, Ex. 15B: The Impact of Demographic Change by William A.V. Clark (Clark Report: Demographics) at ex. 2 (1980 district minority population of 28.5%; 1990 district minority population of 34.6%; 2000 district minority population of 42.2%, and 2005 district minority population of 46.9%)); *see also*, Mendoza Reply Re: Assignment of Naylor Students, filed June 25, 2007, Ex. A1: Report on Student Assignment Issues by Leonard B. Stevens (Stevens' 6/22/07 Report) at 1 (estimating the District as a whole is 68% minority, with percentages varying by grade level; 72% for elementary grades; 69% for middle school, and 60% for high school).

The Court rejects the Defendant's position that once it implemented the desegregation plans required under the Settlement Agreement, it no longer had any obligation to remedy the racial imbalances caused by the demographic changes in the district. Until unitary status is attained, the District is committed to desegregation of the district to the extent practicable, and "at the very least," the District has a duty to not exacerbate racial imbalances caused by these demographic changes. (D's Report Re: Student Assignments, Ex. 16B: David Armor Report: Analysis of Student Assignments (Armor Report: Student Assignments) at 1) (explaining that until it attains unitary status, the district's duty under the Settlement Agreement is to maintain desegregated schools to the extent feasible); (Mendoza's Response to D's Report Re: Student Assignments at 7 (citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449, 459 (1979); *Green v. School Bd. of New Kent County*, 391 U.S. 430, 437-38 (1968); *Bd. of Educ. of Oklahoma City v. Dowell,* 498 U.S. 237 U.S. 237, 250 (1991) (discussing affirmative duty to take whatever steps necessary to eliminate vestiges of *de jure* segregation until district is determined to be unitary)), *see also,* (Mendoza Response, Ex. A: ICC Compliance Report at 6).

This is not contrary to the holdings in *Pasadena City Board of Education v. Spangler*, 427 U.S. 424 (1976), and *Freeman v. Pitts*, 503 U.S. 467 (1992), that "[o]nce the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors." *Freeman*, 503 U.S. at 494.

The Supreme Court in *Spangler*, 427 U.S. at 436, considered circumstances where a school district sought modification of a school desegregation order that required there be no school with a majority of minority students, a goal which had been attained in the first year of the plan. Like TUSD, subsequently, the district schools failed to meet the standard because of normal shifts in population patterns. The Supreme Court overturned a district court order that the school district make annual attendance zone adjustments because segregation in the schools was no longer linked to past *de jure* discrimination or any action

chargeable to the defendants.  Relying on *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 31-32 (1971), the Court explained that school authorities are not constitutionally required to make year-by-year adjustments to the racial composition of its schools once the affirmative duty to desegregate the district is accomplished and racial discrimination through official action is eliminated from the system.  *Spangler*, 427 U.S. at 434-37.

In *Freeman*, the Supreme Court considered a case similar to the one before this Court where the one fact that predominated was the undisputed remarkable change in the racial composition of the school district.  *Freeman,* 503 U.S. at 472 (citing *Green v. School Bd. of New Kent County*, 391 U.S. 430, 439 (1968)).  Like the plaintiffs here, those in *Freeman* argued that the school district had not used all available desegregative tools in order to achieve racial balancing.  For example, it did not break the district into subdistricts that could be racially balanced; it failed to expend sufficient funds for minority learning opportunities; it failed to create community advisory organizations; it did not make full use of "freedom of choice" desegregation plans.  Relying on *Spangler*, the Court supported an incremental withdrawal of judicial supervision and control in the area of student assignment because the racial imbalance in the district was no longer attributable to either the prior *de jure* system or to a later violation by the school district but rather to independent demographic forces.  *Id.* at 494.

In *Freeman*, the desegregation plan for DeKalb County, Georgia, School System (DCSS) in 1969, had included racially balancing student assignments.  Like the Settlement Agreement here, the desegregation decree in *Freeman* was designed to achieve maximum practicable desegregation.  Its central remedy was the closing of black schools and the reassignment of pupils to neighborhood schools, with attendance zones that achieved racial balance. The plan accomplished its objective in the first year of operation, before dramatic demographic changes altered residential patterns. For the 17-year period the desegregation decree was in place, the plaintiffs raised no substantial objection to the basic student

assignment system and like the parties here, concentrated on other mechanisms to eliminate the *de jure* taint.  *Id.* at 494.

In 1986, school officials filed a motion for final dismissal of the litigation, seeking declaratory judgment that the school district had achieved unitary status.  The district court found that the population changes which had occurred in DeKalb County were not caused by the policies of the school district, but rather by independent factors such as neighborhood demographics.  "Where resegregation is a product not of state action but of private choices, it does not have constitutional implications.  It is beyond the authority and beyond the practical ability of the federal courts to try to counteract these kinds of continuous and massive demographic shifts. To attempt such results would require ongoing and never-ending supervision by the courts of school districts simply because they were once *de jure* segregated.  Residential housing choices, and their attendant effects on the racial composition of schools, present an ever-changing pattern, one difficult to address through judicial remedies." *Id.* at 495.

Relying on *Swann*, the Court explained that the racial imbalance in student attendance zones was not tantamount to a showing that the school district was in noncompliance with the decree or with its duties under the law.  Racial balance is not to be achieved for its own sake, but is pursued when racial imbalance has been caused by a constitutional violation.  Once the racial imbalance due to the *de jure* violation has been remedied, the school district is under no duty to remedy imbalance that is caused by demographic factors. *Id.* at 493 (citing *Swann,* 402 U.S. at 31-32 ("Neither school authorities nor district courts are constitutionally required to make year-by-year adjustments of the racial composition of student bodies once the affirmative duty to desegregate has been accomplished and racial discrimination through official action is eliminated from the system.") "This does not mean that federal courts are without power to deal with future problems, but in the absence of a showing that either the school authorities or some other agency of the State has deliberately attempted to fix or alter demographic patterns to affect

the racial composition of the schools, further intervention by a district court should not be necessary." *Swann*, 402 U.S. at 31-32.

In *Freeman*, the Court explained that as the *de jure* violation becomes more remote in time and demographic changes intervene, it becomes less likely that a current racial imbalance in a school district is a vestige of the prior *de jure* system. The causal link between current conditions and the prior violation is even more attenuated if the school district has demonstrated its good faith in complying with the desegregation decree. The Supreme Court explained that in light of the finding that the demographic changes in DeKalb County were unrelated to the prior violation, the district court was correct to find the school district had no duty to achieve system-wide racial balance in the student population. "It was appropriate for the District Court to examine the reasons for the racial imbalance before ordering an impractical, and no doubt massive, expenditure of funds to achieve racial balance after 17 years of efforts to implement the comprehensive plan in a district where there were fundamental changes in demographics, changes not attributable to the former *de jure* regime or any later actions by school officials." *Id.* at 496.

The Supreme Court affirmed the district court's determination to not order continued student assignments and to instead order expenditures of scarce resources to improve the quality of education, pursuant to faculty assignment requirements in the desegregation order. The Supreme Court, however, concluded that before the district court could relinquish control over student assignments, it must make a specific finding that judicial control over student attendance was not necessary nor practicable to achieve compliance with the desegregation order in other facets of the school system and it must consider whether the school district had shown its good-faith commitment to the entirety of the desegregation plan. *Id.* at 496, 498-99.

"Racial balancing in elementary and secondary student assignments may be a legitimate remedial device to correct other fundamental inequities that were themselves

11

caused by the constitutional violation." *Id.* at 497. *Green* factors may be related or interdependent; two or more *Green* factors may be intertwined or synergistic so that a constitutional violation in one area cannot be eliminated unless the judicial remedy addresses other matters as well. *Id.*

<u>Racial Balancing</u>

This Court is bound by *Freeman*. The Court finds that the use of student assignment ratios to achieve segregation was aimed at eliminating vestiges of a dual system that had existed in the district until 1951, which resulted from statutorily mandated segregation of Black students from Anglo[7] students and was aimed at eliminating vestiges of discriminatory practices that had occurred in the distant past, which resulted in some intentional segregation of Mexican-American[8] students from Anglo students at a few schools on the west-side of town.[9] As such, the race and ethnic ratios under the Settlement Agreement targeted a limited number of schools and were limited to 5 years.

The ethnic and race sensitive boundaries for the student assignment plans adopted pursuant to the Settlement Agreement reflected the goal of desegregation within the context of a neighborhood school system. As far back as 1891, when the District opened its first two schools, it sought a neighborhood school system to serve people where they lived. *See* (Findings of Fact and Conclusions of Law, Findings of Fact: History of School Construction at 25 (¶1)).

The Phase II Plan, dated February 28, 1979 for Borton and Holladay elementary schools involved a primary magnet program to voluntarily desegregate K through third grade, with a backup mandatory student assignment if the magnet program failed. (D's

---

[7]Over the course of this litigation, Anglo students have also been referred to as White.

[8]Over the course of this litigation, Mexican-American students have also been referred to as Hispanic.

[9]*See* n. 3.

12

Comprehensive Report Re: Student Assignments at 3-4; Ex. 4: Phase II Plan at 2.)  The June 1, 1980, Phase III Plan for Davis, Drachman, Carrillo, and Safford also involved magnet programs.  (D's Comprehensive Report Re: Student Assignments at Ex. 10: Phase III Plan: Davis, Drachman, Carrillo, Safford.)  Eventually, the magnet program expanded from the elementary and middle schools to include the high schools.  *See* (Petition, Statement of Facts, (SOF) at ¶ 29 (citing Court Orders: May 16, 1983 (Bonillas), August 15, 1986 (Vail Middle School), April 7, 1987 (Roskruge), April 14, 1988 (Safford magnet program), March 18, 1993 (Tully magnet program), July 22 1994 (magnet programs at Palo Verde, Pueblo and Tucson High Schools, conversion of theme programs at Catalina and Cholla High Schools to magnet program), May 22, 1998 (Kellond, Rogers, Townsend, Pueblo), December 3, 1999 (Howenstine), June 20, 2002 (Drachman Elementary)).

In 1994, A.R.S. § 15-816.02 required the District to adopt an open enrollment policy, Board Policy 5091, which essentially allowed students to attend any school "limited" by the District's Ethnic and Racial Plan, Board Policy 5090.  (Petition, SOF at ¶¶ 91-92.)  Students were allowed to attend their school of choice as long as it improved the ethnic balance of the receiving school and did not further imbalance the ethnic makeup of the home school.  *Id.*, Ex. 15: Board Policy 5090); *see also*, (Petition, SOF, Ex. 16: Board Policy 5091 (allowing open enrollment and parental choice options), Ex. 11: Board Policy 5080 (requiring students to attend school within designated boundary, but allowing transfers to aid working parents or in cases of dire and extenuating circumstances).

Given the interrelated and voluntary nature of these measures, all schools within the district are necessarily implicated in the district's desegregation obligations.  *See* (Mendoza Reply Re: Assignment of Naylor Students, filed June 25, 2007, Ex.A1: Stevens' 6/22/07 Report at 8-14; Mendoza Response to D's Report Re: Student Assignments, filed October 24, 2007, Ex. A: Stevens' 10/22/07 Report at 3.)

The Court finds that the ethnic and race ratios required under the Settlement Agreement desegregation plans were implemented and maintained for 5 years, and

13

1
2
3
4
5

eliminated to the extent practicable the vestiges of *de jure* segregation. Plaintiffs admit that these ratios were not and are not practicable to resolve the demographic changes in the district. Plaintiffs ask the Court to reset and enforce "new" ratios to racially balance the schools. The Court finds no constitutional justification for such judicial control in response to demographic segregation.

6

TUSD'S Good Faith Commitment to the Entirety of the Settlement Agreement:

7

Student Assignment (con't)

8
9
10
11
12
13
14
15

The school district must show its good-faith commitment to the entirety of the desegregation plan so that parents, students, and the public have assurance against further injuries or stigma. *Freeman*, 503 U.S. at 498 (citing *In Board of Ed. of Oklahoma City Public Schools v. Dowell*, 498 U.S. 237, 249-50 (1991)). In *Freeman*, the Court explained that a history of good-faith compliance is evidence that any current racial imbalance is not the product of a <u>new</u> *de jure* violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future. *Id.* at 499.

16
17
18
19
20
21
22
23
24

In *Freeman*, the Court noted that the district court had been impressed by the successes achieved in the district (DCSS) and its dedication to providing a quality education for all students, throughout the period of judicial supervision. *Id.* at 499. "With respect to those areas where compliance had not been achieved, the District Court did not find that DCSS had acted in bad faith or engaged in further acts of discrimination since the desegregation plan went into effect." *Id.* Nevertheless, the Supreme Court explained this was *insufficient* to establish the district's good faith and remanded the case for a specific finding as to the school district's *affirmative commitment* to comply in good faith with the entirety of the desegregation plan. *Id.* (emphasis added).

25
26
27

*Freeman* requires an assessment of TUSD's efforts to address the demographic changes in the district. In other words, the Court considers the effectiveness of the measures taken by TUSD to address the district's demographic changes. Here, TUSD responded with

28

14

race and ethnic sensitive school boundaries; magnet programs, open enrollment, and by providing an equal education to all students including those attending minority-identifiable schools.

The Court has already dedicated five pages of its 29 page Order issued February 7, 2006, to discussing the importance of assessing the effectiveness of the programs implemented by the District in the name of desegregation. (Order, 2/7/06 at 20-25.)   The Court will not repeat itself here, except for its summation: "Simply put, the Court intends to look at the same data, factors, criteria, subject matter, and/or issues that the parties have been tracking and reporting for the past 27 years, not necessarily as independent goals or requirements of the Settlement Agreement, but as key measurements by which to assess TUSD's good faith efforts to comply with the provisions of the Settlement Agreement." *Id.* at 24.

Defendants submit expert opinions analyzing "the impact of student assignment plans and open enrollment and magnet transfers on desegregation in the District." (D's Report Re: Student Assignments at 10 (citing Exs. 15-16: Drs. Clark and Armor Expert Reports)).[10]  Dr. Armor's report provides the number of minority students demographically assigned to each school as well as the minority student population actually attending each school by TUSD. *Id.* at Ex. 16(C): Armor Report: Student Transfers at 4-6.

While the parties dispute each others methodologies for analyzing this data, the Court finds there can be no dispute that these two numbers offer a comparison between the student attendance that would exist based solely on demographic patterns and the actual attendance as it exists given student assignments that have been made in TUSD, pursuant to

---

[10]Plaintiffs Fisher seek to have these reports stricken because Defendant failed to present them to the Court in a timely fashion, and the Court ruled on July 16, 2007, that TUSD could not supplement their briefs regarding unitary status with these reports. Nevertheless, the Court shall allow the expert reports because they address the effectiveness of TUSD's operations over the past 20 some years, which is critical to this Court's ruling on the Petition for Unitary Status.

open enrollment, magnet programs, instructional placements for special educational needs such as gifted, language proficiency, and bilingual programs, and placements for extenuating family, health or personal circumstances.   What the raw data shows is what Dr. Armor asserts, "transfers under the current open enrollment plan plus magnet transfers are having no net effect on middle school desegregation in TUSD," *id.* at 3, and "generally, the net effect of elementary transfers is neutral . . .," *id.* at 6.   In other words, the data reflects that the student assignment programs, practices, and procedures in place and used in TUSD have had no net effect on the demographic segregation in the district.   *Id.* at 4: Table 1.

For example, in the 2004-05 school year, the District-wide minority enrollment in middle school was 69%.[11]   *Id.* at 3.   Dr. Armor reports that there were 19 middle schools. *Id.* at 7.   Based on Dr. Armor's opinion that changes over 3%[12] between the residential demographic composition of a school and actual student body composition are significant, actual minority student enrollment differed from neighborhood demographics at six middle schools, as follows: Safford Magnet (95% to 87%); Utterback Magnet (74% to 6 %); Ficket Magnet (45% to 56%); Townsend (50% to 58%); Naylor (69% to 78%); and Mansfield (76% to 81%).   *Id.* at 7: Table A.

A positive change occurs if the student body at a school moves closer to district-wide average for a middle school; a negative change occurs if the student body regresses. Therefore, TUSD's student assignment programs resulted in positive changes compared to

---

[11]Plaintiffs assert the middle schools were 66% minority in 2004-05.   (Mendoza Response  to D's Report Re: Student Assignments, SOF, Ex. A: Stevens' 10/22/07 Report at 16.)

[12]"When the actual racial composition is compared to the residential composition, a criterion is needed to decide whether the difference is significant."  (D's Report Re: Student Assignments at Ex. 16(C): Armor Report: Student Transfers at 2.  " It is virtually impossible for a student or staff member to detect a difference between a school that is, say, 61% minority versus one that is 64% minority."  *Id.*  If the difference is 3 percentage points or less, it is not significant.   This 3% threshold allows as many transfers as possible without changing the composition to a degree that generates noticeable adverse effects.

neighborhood demographics at four middle schools (Safford Magnet, Utterback Magnet, Ficket Magnet, and Townsend) and negative changes occurred at two schools (Naylor and Mansfield). (D's Report Re: Student Assignments , Ex. 16C: Armor's Report: Student Transfers at 7.)  The minority student populations at the remaining 11 middle schools were unaffected by TUSD's student assignment activities.

In the 2004-05 school year, district-wide minority enrollment in elementary school was 72%.[13]  (D's Supplemental SOF at ¶ 3.)  There were 70 elementary schools: 31 elementary schools had demographic populations over 72% and 39 had less than 72% minority students in their demographic areas.   Again using the 3% threshold measurement for noticeable change, Dr. Armor identified 27 elementary schools where the minority student population was noticeably affected by the student assignment system operating in TUSD. (D's Report Re: Student Assignments , Ex. 16C: Armor's Report: Student Transfers at 9-10: Table B.)

Of the 27 schools having over a 3% change between their residential demographic composition and actual minority student enrollment, 16 schools had a positive change, as follows: Blenman (54% to 58%), Corbett (73% to 68%), Cragin (60% to 65%), Davidson (65% to 69%), Fort Lowell (57% to 69%), Howell (56% to 68%), Lineweaver (48% to 56%), Reynolds (49% to 58%), White (95% to 90%), and Wright (67% to 71%), Booth Magnet (60% to 69%), Borton Magnet (97% to 54%), Davis Bilingual Magnet (96% to 82%), Drachman/Carrillo Magnet (91% to 83%), Holladay Magnet (98% to 54%), and Tully Magnet (95% to 86%). *Id.*

TUSD student assignments negatively changed demographic student populations in eleven elementary schools, as follows: Dietz (59% to 55%), Ford (55% to 51%), Henry (39% to 35%), Jefferson Park (69% to 74%), Maldonado (82% to 86%), Myers-Ganoung (77% to

---

[13]Plaintiffs assert the elementary schools were 70% minority in 2004-05. *Id.*

81%), Roberts (90% to 95%), Robinson (83% to 89%), Roskruge (71% to 88%), Safford (91% to 95%), and Schumaker (51% to 45%). *Id.*

The remaining 43 elementary schools were unaffected by TUSD student assignment programs; their actual student populations reflected the neighborhood demographics. *Id.*

To assess the degree of successful integration in TUSD, the parties suggest the Court apply a desegregation standard +- 15% or +- 20%. This measures the minority composition of a school + or -, 15 or 20 percentage points compared to the district-wide percentage of minority students for elementary, middle school, and high school student populations. In 2004-05, the District's elementary schools were 70% minority. The middle schools were 66% minority, and the high schools were 57% minority. ( Mendoza Response to D's Report Re: Student Assignments, SOF, Ex. A: Stevens' 10/22/07 Report at 16.)

Plaintiffs urge the Court to apply 15% because 20% results in finding schools to be successfully integrated that have minority student bodies that exceed 90%. The Court has looked at the data using both percentages for the year 2004-2005, the year the Defendant's filed the Petition for Unitary Status.

In 2004-2005, using a +-15% desegregation standard in relation to the district-wide minority student rate of 70% for elementary students, there were 31 elementary schools that were racially identifiable with 85% or more minority students, and 20 of these schools had 90% or more minority students. Twenty-three elementary schools were racially identifiable as Anglo-schools with 55% or less minority students. *Twenty-two of the 76 elementary schools in 2004-05 were desegregated.* (Mendoza Response to D's Report Re: Student Assignments, SOF, Ex. A: Stevens' 10/22/07 Report at 26-27.)

Applying a +-20% desegregation standard, the district had 20 elementary schools with over 90% minority students and 15 schools with 50% or fewer Anglo-students. *Forty-one of the 76 elementary schools in 2004 were desegregated. Id.*

In 2004-05, applying a +-15% desegregation standard to the district-wide average of 66% minority students in the middle schools, there were six middle schools that were

18

racially identifiable with 81% or more minority students, with two of these schools having over 90 % minority students.  Five middle schools were racially identifiable as Anglo-schools with 51% or less minority students.  *Eight of the 19 middle schools in 2004-05 were desegregated.  Id.* at 27.

Applying the +-20% desegregation standard, the district had five middle schools with 86% or more minority students, and three schools with 46 % or fewer Anglo-students.  *Eleven of the 19 middle schools in 2004-05 were desegregated.  Id.*

In 2004-05, applying a +-15% desegregation standard to the district-wide minority rate of 57% for high school students, the district had two high schools that were racially identifiable with 72% or more minority students, with one being  93% minority students.  Four high schools were racially identifiable as Anglo-schools with 42% or less minority students.  *Five of the 11 high schools in 2004-05 were desegregated.  Id* at 28.

Using the +-20% desegregation standard for 2004-05, the district had two high schools with 77% or more minority students, and four schools with 37% or fewer Anglo-students.  University Heights had exactly 37% minority students.  *Five of the 11 high schools in 2004-05 were desegregated.  Id.*

While the parties argue over the merits of which percentage point best assesses TUSD's good faith compliance with the student assignment plans established under the Settlement Agreement, the Court finds that TUSD's lack of good faith is proven by the simple fact that these expert reports were only secured by the Defendant to belatedly[14] support its Petition for Unitary Status.  TUSD fails to present any evidence that over the past 27 years it monitored and reviewed the effectiveness of its race and ethnic sensitive school boundaries, magnet programs, and open enrollment to address demographic segregation.  Without such review, TUSD has been incapable of making logical or meaningful changes to its student assignment policies, practices, or procedures related to desegregation.  Any

---

[14]See n. 10 (asking Court to strike Reports as untimely.)

success would have been mere coincidence.  Under such circumstances, this Court can not find that TUSD has acted affirmatively to address  demographic re-segregation to the best of its abilities.

Given the failure to look at the effectiveness of its ongoing desegregation efforts, it is no surprise that TUSD simply stopped applying ethnic transfer policy 5090 when it appeared that students would leave the district entirely if not allowed to transfer from poorly performing schools like Naylor Middle School to other district schools.  (D's Response Re: Assignment of Naylor Students, filed May 30, 2007, at 7.)  Defendant's decision to not enforce its ethnic transfer policy at Naylor was in part based on its experience that "parents will not keep their children at such a school if they have a viable alternative," *id.*, which leaves those without viable alternatives behind in underperforming schools.  It appears that under the Defendant's current assignment system approximately one-third of the students attend schools other than their home attendance zone school, leaving approximately two-thirds of the students behind. (Mendoza Reply Re: Assignment of Naylor Students, Ex. A1: Steven's 6/22/07 Report at 18.)  The Court finds that TUSD transferred students from Naylor in direct contradiction of the goals of desegregation and equality for all students to educational opportunities. (Order issued May 10, 2007 (denying petition to reopen Lowell Smith Elementary School as Lowell Smith Middle School because of the racial and ethnic impact on Naylor Middle School.))

More than refusing to look, TUSD refused to see those programmatic problems, failures, and successes, which were brought to its attention.

As already noted herein, over the past 27 years the ICC repeatedly, on an annual basis, reported to the TUSD Board regarding compliance issues pertaining to the Settlement Agreement.  In addition to repeatedly noting TUSD's noncompliance with the prescribed race and ethnic ratios, (Mendoza Response, SOF, Ex: A: ICC Compliance Report at 32-35), the ICC repeatedly made recommendations to the TUSD Board to improve magnet recruitment strategies. *Id.* at 35.

In 1998, the ICC asked TUSD to engage in an enhanced public relations effort to recruit and enroll students in magnet and/or preparatory curricula.   (Mendoza Response, SOF, Ex: A: ICC Compliance Report at 35.)   In 2001, the ICC asked the Defendant to look at K-12 magnet schools and consider whether the schools needed assistance recruiting, whether magnet themes needed to be reviewed and changed, whether the existing magnet school themes ensured curricular articulation, and consider the capacity of the magnet schools to determine the number of magnet transfer students they could accommodate. *Id.* The ICC has repeatedly criticized the concentration of magnet programs in west-side schools, which are in high percentage minority neighborhoods, because these locations only draw Anglo-students into the magnet schools, do not move minority students out of their neighborhood schools, and limit access for minority students to move freely within the magnet system. *Id.* at 39.  As recently as its Compliance Report, the ICC complained about the fiscal proposal to cut principals, who are responsible for magnet recruitment, from full time to half time at Drachman, Carrillo, Borton, Holladay, Jefferson Park and Richey.[15]  *Id.* at 36, 39.

The ability of TUSD's magnet program and open enrollment to induce voluntarily student assignments that will offset the demographic segregation in the district depends on equal access to curriculum, especially gifted and talented education, advanced placement, and special education, because student achievement is critical to accessing the system.  The importance of student achievement to a successful magnet program is best exemplified by the Office of Civil Rights (OCR) Compliance Monitoring Committee's Progress Report from 1991, which assessed three minority high schools (Tucson, Pueblo, and Cholla), University High School and the GATE program.  (Mendoza Response, SOF, Ex. D: 1991 OCR Compliance Report.)   In 1991, University High School, TUSD's high school focusing on

---

[15]Likewise, the Court notes that responsibility for implementing several of Defendant's proposed programs in its Post-Unitary Status Plan fall on the school principals and these cuts may jeopardize the effectiveness of the proposed Post-Unitary Status Plan.

academics and college preparation, reported difficulty in attracting qualified minority students "because target minority populations have not received the academic preparation required for admission to UHS." *Id.* at 59. "The Committee *reiterates* its concern that predominantly minority middle schools and their feeders generally are not instilling the basic skills or providing the academic training that would enable a greater proportion of their target students to meet UHS entrance criteria." *Id.* The Committee reported that unless this concern was sufficiently addressed, the District cannot reasonably expect UHS to achieve the 30 percent goal[16] of target minority enrollment. *Id.*

After noting and discussing specific curriculum deficiencies, the Committee recommended: "Instead of identification at Grade 8, the identification method should begin in Kindergarten with a process that recognizes the similarity of all students in figural-spatial abilities, and not the traditional verbal and quantitative focus. Moreover, the curriculum and instruction should then reflect the basis of identification not only furthering those abilities but also addressing the verbal and quantitative needs." *Id.* The Committee recommended early identification of gifted and talented students at middle school and elementary school level, as recommended by the GATE Advisory Committee Report of 1987, and development and implementation of curriculum and instructional strategies that would assist such identified students in achieving academically at the same level as their Anglo counterparts. In this way, the pool of target minorities would expand to meet the recruitment needs of University High School. *Id.* at 59-61.

---

[16]The goal in 1991, established in 1989, was to enroll 30% minority (American Indian, African American and Hispanic) students at University High School. (Mendoza Response, Ex. D: 1991 OCR Compliance Report at 59.) In 1989, there were 41 percent minority students district wide. *Id.* at 48. In 1991, there were 44% percent minority students district wide. *Id.* By comparison, in 2004-05, University High School enrolled 37% minority students, but the district wide minority student population had increased to 57%. (Mendoza Response to D's Report Re: Student Assignments, SOF, Ex. A: Stevens' 10/22/07 Report at 28.)

The GATE Advisory Committee wrote that it had examined many issues concerning TUSD's GATE programs and had noted inaction on most past recommendations in previous OCR annual reports. The Committee reported that in addition to target minority student enrollment being disturbingly low, Limited English Proficient (LEP)[17] students were not receiving GATE services. *Id.* at 62.

This could not be blamed on a lack of resources or time because TUSD had received a three year federal grant in 1987 to develop and offer GATE services to 279 LEP students from five minority elementary schools, which were selected because of high concentration of LEP students, history of poor participation in gifted programs, the need for developing non-traditional testing for GATE programs, and to develop a bilingual GATE program. *Id.* at 70. The Committee reported that four years after the grant award, it appeared nothing had changed based on data presented to the Committee and that the five elementary schools remained under-represented in TUSD's GATE programs. *Id.*

In 1998, TUSD contracted for an external audit of its bilingual education and Hispanic studies department, which again noted that students who were developing proficiency in English had less access than other students to the gifted and talented program and advanced placement course. (Mendoza Response, SOF, Ex. C: 1998 Bilingual Education and Hispanic Studies Department Audit at (iii)).

---

[17]Students that are not proficient in the English language have been referred to as LEP (Limited English Proficient), SDPE (Students developing proficiency in English), ELL (English Language Learners), PHLOTE (Primary Home Language Other Than English) and ESL (English as a Second Language) students. Programs addressing English proficiency are distinct from Bilingual Programs, which are dual English/Spanish classes open to all students and aimed at primary language development (English for English speakers and Spanish for Spanish speakers), secondary language development (English for Spanish speakers and Spanish for English speakers), primary language instruction in content areas of study and secondary language instruction in content areas. (Mendoza Response, SOF, Ex. C: 1998 Bilingual Education and Hispanic Studies Department Audit at 54-56.)

The academic standards for schools in minority neighborhoods must prepare students attending these schools to take advantage of magnet and academic programs offered district-wide. *See* (Mendoza Response, SOF, Ex. A: ICC Compliance Report at 43-71, 80-100 (discussing equal access to curriculum programs such as GATE, special education and student achievement). Otherwise, students attending minority schools are being denied equal access to educational opportunities: magnet and open enrollment programs. Without equal access, these programs become part of the problem instead of part of the solution to the demographic segregation that exists in the district.

In the ICC Compliance Report, the ICC asked the following questions: how is ethnicity/race considered in the District's analysis of all GATE resource and self-contained classes by school; is any ethnic/racial group disproportionately under-represented within GATE; is there any established pattern of under-representation, and if yes, what time period and what intervention has taken place; how are integration efforts being supported by GATE programs? *Id.* at 46. In preparation of its Compliance Report, the ICC requested information regarding the ethnic and racial composition of students attending Advanced Placement classes by high school.

The Defendant responded, "In order to comply with this request, each high school would have to conduct its own research and accumulate the data . . .." *Id.* at 50.

In its Compliance Report, the ICC sought data regarding over-representation of minority students, especially Black and Native American students, in Special Education programs. The ICC complained that the data presented by the Defendant was admittedly skewed, without explanation, and that TUSD failed to assess whether there were correlations between withdrawal of students from ELL (English Language Learners). "'To the extent that minority students are missclassified, segregated, or inadequately served, special education can contribute to a denial of equality of opportunity, . . ..'" *Id.* at 70 (citing 2001 press release: *Harvard Studies Find Inappropriate Student Education Placements Continue to Segregate and Limit Educational Opportunities for Minority Students Nationwide*.)

The Defendant provided raw data regarding student enrollment, without any analysis or assessment as to whether or not minority students were disproportionately represented within any Special Education area. *Id.* at 28.

The ICC makes legitimate inquiries, which are necessary to assess the effectiveness of TUSD's magnet and open enrollment programs to integrate TUSD's schools and afford minority students an equal educational opportunity. Defendant offers, "as an example of its ongoing efforts to review test instruments and ensure culturally unbiased testing and screening, the District has for several years offered an alternate GATE testing instrument to students whose primary language is other than English, and the District has recently adopted a pilot for a GATE screening test that is believed to more accurately identify gifted minority students." (D's Reply to Fisher Supplemental (Supp.) Opposition, filed July 10, 2007, at 14.)

The Defendant provides an affidavit from its Director of Exceptional Education Department, which covers both Special Education and Gifted and Talented Education (GATE program), which explains that since the District has no choice regarding the assessment instruments for admission to these programs, it has focused its efforts on recruiting minority students for evaluation and not on the testing process. (D's SOF, Ex. J: McPerson Affidavit at 3-4.) According to the Defendant the percent of minority students enrolled in GATE are as follows: 1995-96 (38%); 1996-97 (39%); 1997-98 (4%); 1998-99 (45%); 1999-00 (48.8%); 2000-01 (49.3%); 2001-02 (52.2%); 2002-03 (54%); 2003-04 (53.4%), and 2004-05 (57.5%). *Id.* at 5.

The comparable minority student enrollment for middle school is as follows: 1995 (55%); 1996-97 (56%); 1998 (57%); 1999 (58%); 2000 (61%); 2001 (63%); 2002 (65%); 2003 (66%); 2004 (68%), and 2005 (69%).   The comparable minority enrollment for elementary school is as follows:  1995 (57%); 1996 (58%); 1997 (59%); 1998 (61%); 1999 (63%); 2000 (65%); 2001 (66%); 2002 (68%); 2003 (70%); 2004 (71%), and 2005 (72%). (D's Report Re: Student Assignments, Ex. 16B: Armor Report: Student Assignments at Tables 1 and 2.)

Defendant's lauded 57% percent minority enrollment in GATE programs for 2004-05 still lags substantially behind minority student enrollment, which was 68-69% for middle school and 71-72% for elementary school.

The flip side to the GATE programs are the Special Education programs. The Defendant asserts: "Although African American students have been slightly over-represented in special education enrollment, Anglo students have been over-represented to an ever greater extent. See Exhibit E. (D's Reply to Fisher Supp. Opposition at 20.) Exhibit A reflects "Five Year Exceptional Education Enrollment by Ethnicity" from 2002 until 2006. The first page reflects that Anglo, African American, and Native American students are participating in TUSD's Exceptional Education programs in slightly higher proportion than their overall enrollment in the district. This first page, however, includes participation in GATE, to which the Anglo over-representation is attributed.[18] The remaining pages of exhibit E reflect the Special Education programs, as follows: Emotional Disability (ED), Mild Mental Retardation (MD), Specific Learning Disability (SLD), and Speech Language Impairment (SLI). These pages reflect for all Special Education programs, except ED, minority students, especially Black and Native American, are over-represented by several percentage points. Asian American students are under-represented. The most interesting statistic, however, is the Emotional Disability program where Anglo students are over-represented by 20.8% and minority Hispanic students are under-represented by 20.5%. (D's Reply to Fisher Supp. Opposition at Ex. E.)

Just as advancements in GATE recruitment are "recent," the Special Education statistics presented by the Defendant were compiled in 2006. The Court concludes that over the past 27 years the Defendant has failed to comprehensively assess its GATE, Advanced

_____

[18]For example, if you do the math to subtract out the Special Education students for 2002-03 the numbers remaining reflect GATE participation by ethnicity as follows: Anglo (46%); African American (9%); Hispanic (37%); Native American (6%), and Asian American (2%).

Placement, or Special Education programs with an eye for determining over or under-representation by minority students to identify and rectify any access problems. As noted many years ago by OCR and more recently by the ICC, this is imperative because without equal access to curriculum, minority students do not have equal access to magnet programs and open enrollment opportunities.

The Court finds that TUSD has failed to make the most basic inquiries necessary to assess the ongoing effectiveness of its student assignment plans, policies, and programs, which include: race and ethnic sensitive school boundaries; magnet programs, open enrollment, and providing an equal education to all students including those attending minority-identifiable schools. Instead, TUSD has ignored evidence and refused to answer questions concerning the effectiveness of these programs to address the demographic shifts in its schools. The Court finds that TUSD has failed to make a good faith effort to combat the demographic changes in the district to the extent practicable. Additionally, Defendant has exacerbated the inequities of these racial imbalances because its failure to assess program effectiveness has impeded its ability to use its resources to the extent practicable to secure its minority students equal access to educational opportunity.

<u>Faculty and Staff Assignments</u>

The Settlement Agreement required TUSD to restructure teacher assignments at Pueblo Gardens and Cavett elementary schools so that a disproportionate number of Black teachers, taking the District as a whole, would not be on the faculty of either school and required TUSD to examine assignments of Black teachers and make reassignments so that a disproportionate number of Black teachers, taking the District as a whole, would not be on the faculty of any given school. (Settlement Agreement at ¶¶ 9-10.)

During the 1979-80 school years, Cavett Elementary School had two Black teachers out of a total 15 teachers in the Fall and 17 teachers in the Spring. Pueblo Gardens Elementary School had one Black teacher out of 23 total teachers in the Fall and 24 faculty in the Spring. The District had a total of 52 Black teachers at the elementary school level in

the Fall of 1979 and 47 in the Spring of 1980 so it did not concentrate its Black teachers at Cavett or at Pueblo Gardens.  (D's Memorandum Regarding Compliance, filed January 14, 2005 (D's Memorandum), SOF at ¶¶ 93-95 (citing 1980 Annual Report at § D.))

The 1980 Annual Report reflected that in the Fall of 1979, only 12 of its 71 elementary schools had more than one Black teacher, and of the 12, only one had more than two Black teachers.  No school had more than three Black teachers.  In the Spring of 1980, only ten of the 71 elementary schools had more than one Black teacher, and none had more than two.  *Id.* at 96-98.

At the junior high school level, in the Fall of 1979, six out of 16 junior high schools had no Black teachers, four had one Black teacher, five had two Black teachers, and one had three Black teachers.  During the Spring 1980 semester, six of the 16 junior high schools had no Black teachers, four had one Black teacher, four had two Black teachers, and two had three Back teachers.  *Id.*

Plaintiff Fisher's expert, Dr. Ruth B. Love, agrees that in 1979-80 there was not, and now there is not, a disproportionate number of Black teachers at Pueblo Gardens, Cavett Elementary or any other school in the district.  The problem was, and is, a "serious under representation of Black teachers at the two schools and District wide." (Fisher Supplemental Opposition to Petition for Unitary Status, filed June 5, 2007, (Fisher Supp. Opposition) Ex. 1: Supplemental Expert Report, Dr. Ruth B. Love, April 2007, (Dr. Love's Report) at 10-11.)

The Settlement Agreement also required TUSD to address the question of under-representation by adopting a statement of non-discrimination in employment and establish procedures for hiring, placement, and promotion of District employees and required compliance with Exhibit A, which in addition to requiring compliance with the Constitution and federal law, required the District to regularly review its recruitment, hiring and

promotion policies to ensure the absence of any discrimination or inequities.  (Settlement Agreement at ¶ 11.)[19]

It is undisputed that the Defendant adopted the statement of non-discrimination in employment as provided for in Exhibit A to the Settlement Agreement on September 19, 1978.  (D's Petition, SOF at ¶ 102: Ex. C2.)  On September 4, 1984, the Governing Board adopted the statement of nondiscrimination as a formal board policy, including grievance procedures.  *Id.* at ¶ 103: Ex. C3: Policy 4004.)  The policy included procedures for implementation, which provided for affirmative action to recruit minority and women employees.  It included reporting provisions to track the success, strengths, and weaknesses of the policy.  The policy was revised in 1995[20] and remains in effect today.  (D's Memorandum, SOF at ¶ 104.)

According to the District it attempts to recruit a diverse field of applicants by sending job postings to local Department of Economic Security offices, all TUSD schools and program sites, and TUSD's internet site.  It advertises teaching and administrative positions on the Arizona Department of Education's web site and a national education publication.  It participates in job fairs sponsored by Pima Community College, Tucson Newspapers, and the Tucson Urban League, and recruits actively from the three state universities.  (D's Memorandum at 28.)

When the Settlement Agreement was implemented in 1978, there were 45 Black elementary school teachers.  (Fisher Supp. Opposition, Ex. 1: Dr.Love's Report at 11.)  By 2006, the number was reduced by 8; there were 37 Black teachers in the elementary schools.  *Id.*  Over the past 27 years, the number of Black teachers in TUSD's elementary  schools dropped from 3.8 percent in 1986 to 2.2% in 2004-05.  Over 27 years, the number of Black

---

[19]*See* Order 2/6/07 at 8 (citing Settlement Agreement, ¶ 24, dismissal of Mendoza Complaint counts 2 through 7; remaining count 1 alleged a tri-ethnic segregated school district and count 8 alleged failure to hire and promote Chicano teachers.)

[20]The Court is not informed regarding the substance of the 1995 revisions.

teachers in TUSD's middle schools declined from 3.8% in 1986 to 3.6% in 2004. *Id.* at attachment 7 (not numbered on original)).  In the high schools, there were 3.56% Black teachers in 2002.  The number steadily decreased to 3.20% in 2004; 3.52% in 2005, and 3.21% in 2006.  *Id.* at attachment 6 (not numbered on original).  The number of Black minority students in TUSD has ranged from 4.5% in 1980, 5.5% in 1990, 5.1% in 2000, and 4.3% in 2005.  (D's Report Re: Student Assignments, Ex. 15B: Clark Report: Demographics at Ex. 3.)

Relying on the ICC Compliance Report for the 2005 school year, Plaintiffs Mendoza agree with Plaintiffs Fisher's expert, Dr. Love, that all minority teachers are under-represented in reference to minority student populations in TUSD.  Hispanic faculty comprise 26.2 percent of the teachers, while Hispanic students make up 53.4 percent of student enrollment.  African American teachers comprise 5.44 percent of the faculty, but African American students make up 6.8 percent of student enrollment.  Anglo faculty are 64.64 percent of the teachers, while Anglo students are 33 percent of the student body.  The numbers reflect racial disparities between faculty and students.  (Mendoza Response at 12 (citing ICC Compliance Report at 105)).

The Defendant argues that these simple disparities are meaningless without further analysis of the district's labor demographics.  (D's Reply to Mendoza Response, filed August 29, 2006, at 14.)  This echos the ICC's complaint that the Defendant has failed to examine work force availability for ethnic and racial minorities to determine the degree of under-utilization for the District, relative to the various job groups, and then expand recruitment efforts to include a larger geographic area to address any lack of reflective diversity in the local workforce.  (Mendoza Response, Ex. A: ICC Compliance Report at 105-106.)  By TUSD's own admission, the analysis urged by the ICC is warranted.  But it has not been done.

Perhaps this lack of progress exists after 27 years because Defendant failed to comply with the requirement in the Settlement Agreement, Exhibit A, to regularly review

recruitment, hiring, and promotion policies to ensure the absence of any discrimination or inequities. Defendant does not present any measures it has taken, not even a study, to examine the effectiveness of its hiring, promotion, and retention programs for minority employees. For example, "there are approximately 107 historically Black colleges and universities in the United States who graduate hundreds of teachers each year," which can become fertile ground for recruitment. (Fisher Supp. Opposition at 26.) "Additionally, the African American media would provide additional access for minority recruitment." *Id.* Instead, the District cut programs that increased minority hiring, such as the "Grow Your Own" program, (Mendoza Response at 13 n. 2), which it now proposes to re-introduce as part of its Post-Unitary Plan, (Post-Unitary Plan at 8).

The 1978 Settlement Agreement, Exhibit A, also required the District to develop procedures to ensure that its schools are not racially identifiable solely as a result of its faculty and staff assignments See (Order, 2/7/06, at 5-6 (citing Settlement Agreement at ¶¶ 9-11)); *see also* (Mendoza Response at 12.) As Dr. Love explained, concentration was not the issue for Black faculty; the issue was under-representation. Concentration is, however, an issue for Hispanic faculty.

In 2004, only 14 schools had faculty that was 50% or more Hispanic. (D's Reply to Mendoza Response at 14.) Of those schools, five had Hispanic student enrollment between 50% and 55%: Brichta (50%), Grijalva (51%), Richey (54%), Robinson (52%), and Van Buskirk (55%). (D's Supplement SOF, filed 8/2/06, at ¶¶ 10-14.)). Seven schools had Hispanic enrollment between 60% and 69%: Mission View (64%), Ochoa (63%), Oyama (68%), Rose (69%), Roskruge Bilingual Magnet (64%), Tolson (68%), and Wakefield (67%). *Id.* Hollinger had 75% Hispanic students, and Davis Bilingual School had 85% Hispanic students. *Id.*

In 2004, there were 3981 faculty members and 926 Hispanic faculty members. (D's Supplement SOF, filed 8/2/06, at ¶ 4.) The Hispanic faculty at the 14 schools listed by

Defendant as having more than 50% Hispanic faculty and more than 50% Hispanic student enrollment account for 243 of the Hispanic faculty.  *Id.* at Ex. A.

In 2004, the total Hispanic faculty in the District was 26.2% compared to Hispanic student enrollment, which was 53.4%.  (Mendoza Response, Ex. A: ICC Compliance Report at 105.)  Approximately half of the Hispanic faculty worked at 14 predominately Hispanic schools, with the remaining Hispanic teachers spread over the district at 86 other schools and approximately 30 other academic programs.  *Id.*  These numbers warrant a closer look, which TUSD has not taken.

In the ICC Compliance Report, the ICC raised concerns that due to budget constraints, the Board had cut funding for full-time elementary principals at desegregation schools: Drachman, Carrillo, Borton, Holladay and Jefferson Park.  One principal was assigned per two schools, with Jefferson Park sharing a principal with Richey, not a designated desegregation school but having a student population that is 95.3% ethnic and racial minority.  (Mendoza Response, Ex. A: ICC Compliance Report at 102.)  The impact of these cuts on magnet school recruitment was discussed in the preceding section of this Order.  Additionally, these schools will experience a reduction in instructional leadership, a critical factor in school performance.  *Id.*

In contrast, the ICC alleges that Magee Middle School, a predominately White school (28% minority),[21] was approved two additional part-time administrators.  Magee Middle School normally has a principal and assistant principal so it now has a total of four assigned administrators.  Magee is comparable in size to Fickett, Pistor, Utterback and Valencia middle schools, yet no additional staffing is allocated for these sites which range in minority student populations from 50% to 80%.  The ICC complains that expensive private consulting contracts were negotiated for central administrative staff positions such as a

---

[21](D's Report Re: Implementation of Student Assignments, Ex. 16C: Armor Report: Student Transfers at 4: Table 1.)

principal supervisor and a principal coach. The ICC complains that these administrative add-ons are especially unfair given the desegregation schools are experiencing administrative cuts at the school level. *Id.* While true, it is also a violation of the Settlement Agreement, ¶ 11, Exhibit A, if TUSD's schools are racially identifiable as minority schools because faculty and staff assignments are not filled or under-filled in comparison to counterpart faculty and staff assignments that exist at nonminority schools.

The Court finds that TUSD has failed to make the most basic inquiries necessary to assess the effectiveness of its recruitment, hiring, promotion, and placement of minority faculty to satisfy the provisions of the Settlement Agreement requiring regular review to guard against discrimination or inequities. Further, TUSD failed to respond to the ICC's legitimate and important inquiry regarding staff-cuts in principals at minority predominated schools.

<u>Suspension and Expulsion</u>

"In September and October 1978 and February 1979, the District held public meetings to discuss student discipline. At the time, the high schools had different student handbooks and a disproportionate number of Black students were suspended. A joint committee, including teachers, parents, administrators, and police, reviewed disciplinary policies and administrative rules and regulations." (D's Memorandum at 30.)

"Policy 5060 governs student discipline and has been in place since 'at least' 1960." *Id.* "It was revised numerous times, including revisions made subsequent to the Stipulation of Settlement pursuant to the recommendations of the Programmatic Changes' committee of disciplinary policy." *Id.* (citing (1982 Annual Report, § F at 418-419). Today, discipline is governed by uniform policy guidelines, Policy 5060, and implementing regulations, the District's Guidelines for Student Rights and Responsibilities, which were adopted in 1993 to ensure uniformity in discipline. (D's Memorandum at 30-31, SOF at ¶¶ 119-134.) All students have a right to due process before any suspension or discipline, except in emergency cases. *Id.* at 31, SOF at 126-134.

In the 1977-78 school year, Black students were suspended from school in excess of Black student enrollment by 7.8%. In 1978, Hispanic student suspensions were below their proportionate share of the student population by 3%.[22] In 2003-04, Black student suspensions still exceeded Black student enrollment by 5.3%, and Hispanic suspensions were below Hispanic student enrollment by .9%. "As this data demonstrates, the number of Hispanic students who are suspended is almost exactly representative of their overall enrollment, by percentage, while African American students remain over-represented, albeit by a smaller difference than existed at the time of the Stipulation." *Id.* at 32.

In the 1977-78 school year, Black students were expelled from school above Black student enrollment by 37.7%. In 1978, Hispanic student expulsions were below Hispanic student enrollment by 5.6%. *Id.* at 33. In 2002-03, Black student expulsions were below Black student enrollment by 2.3%. Hispanic student expulsions were below Hispanic student enrollment by 3.2%. Expulsions for Anglo students were above Anglo student enrollment by 4%. *Id.* In 2003-04, the numbers reversed and Black student expulsions exceeded Black student enrollment by 3.3%, and Hispanic expulsions exceeded Hispanic student enrollment by 10.5%. Expulsion of Anglo students was below Anglo student enrollment by 6.1%. *Id.*

Defendant argues that expulsions should be viewed over two years because the low number of total expulsions means that one or two additional students of any one race can increase the percentage of that race dramatically. *Id.* at 34. From 2002 through 2004, Black student expulsions exceeded Black student enrollment by .8%, and Hispanic expulsions exceeded Hispanic student enrollment by 4.9%. American Indian expulsions were below American Indian student enrollment by .4%, and expulsions for Anglo students were below Anglo student enrollment by 1.71%. *Id.* at 33.

----

[22]Defendant provides minority student enrollment data from 1975-76 because it did not have minority enrollment data for 1977-78 school year, but enrollment was "relatively static" between 1974 and 1976. (D's Memorandum at 32 n. 5.)

"This data demonstrates that minority over-representation in expulsions has drastically decreased from 1977-78 to the present." *Id.* at 34.  There is, however, an alternative way of looking at the data, which was done by the ICC for the last several years and reflects over-representation of suspensions for African American, Hispanic, and Native American students.  (Mendoza Response, Ex. A: ICC Compliance Report at 73.)

Suspensions for TUSD's high schools in 2004-05 reflect out-of-school suspension rates by race and ethnicity as follows: .099% of all Anglo students were suspended; .252% of all African American students were suspended; .125% of all Hispanic students were suspended, and .194% of all Native American students were suspended.  Suspension rates for middle schools were as follows: Anglo students (.122%), African American students (.265%), Hispanic students (.200%), and Native American students (.277%).  Suspensions for elementary schools were as follows: Anglo students (.009%), African American students (.016%), Hispanic students (.004%), and Native American students (.007%).  *Id.* at 74.

The 2004-05 data presented by the ICC reflects that district-wide  .066% of all Anglo students were suspended out-of-school;  .140% percent of all African American students were suspended; .078% of all Hispanic students were suspended, and .114% of all Native American students were suspended.  *Id.* at 75.  In other words, minority student suspensions may not have exceeded minority student enrollment in 2004-05, but minority students were nevertheless suspended in higher percentages than Anglo students.  *Id.* at 74.  Especially African American students were disproportionately suspended and especially at the middle and high school levels.  *Id.* at 74-76.[23]  The ICC also found adverse impact on

[23]The ICC applied an adverse impact ratio formula for assessing negative actions, using a methodology to determine if disparity is found when comparing one group to another, such as minority group to non-minority group.  This methodology is utilized by agencies such as the Office of Federal Contract Compliance and the Equal Employment Opportunity Commission.  The rate of suspensions is calculated within each group.  If the rate of suspensions for an ethnic or racial group is greater than the rate of suspensions for the non-minority group, further calculation is conducted to determine the extent of the difference: the

minority students in some suspension categories, such as: general misconduct, use of profane or abusive language, and fighting. *Id.*

Plaintiffs complain that Defendant has not monitored and/or reviewed its disciplinary policies, including suspensions and expulsions, to ensure that no student is discriminated against in its implementation. (Mendoza Response at 14-15 (citing Settlement Agreement at ¶ 13.)) The District responds that it "has undertaken measures to address any disparity in suspension and expulsion rates and to decrease the academic affect on students who are subject to suspension." (D's Memorandum at 35.)

Since 1993, the District has utilized a comprehensive guidance program, with specific standards, competencies and a framework for counseling that includes focused interventions for students in need of more concentrated services particularly in the areas of discipline, suspensions, and expulsions. *Id.* at 35, SOF, Ex. H: Bowers Affidavit at ¶ 5. The District provides school counselors at all schools to work with students at risk of suspension, and maintains a lower student/counselor ratio at desegregation schools than the district-wide average. *Id.* at 35.

In 2000, the African American Studies Department's (AASD) service goal was to reduce short term suspension rates amongst Black students, which made up 10% of all short term suspensions. (2000 Annual Report at 341-347.)

Beginning in 2001-02, each middle school created one in-house "Alternative to Suspension" program and an Alternative to Suspension staff position. This program requires a student on suspension to complete their assignments, attend class, and participate in counseling. (D's Memorandum at 35; SOF, Ex. N: Lopez Affidavit at ¶ 2.)

---

negative impact on the group. The rate for the minority group is divided by the rate for the non-minority group, resulting in the percent of adverse impact. If the result is greater than 120%, adverse impact is indicated. (Mendoza Response, Ex. A: ICC Compliance Report at 73.)

The District offers "antidotal" evidence it has periodically reviewed its disciplinary policies and practices by removing the "defiance of authority" category of misconduct because of concerns that cultural biases and differences may result in minority students being disproportionately found to have engaged in such conduct.  (D's Memorandum at 35-36.)

Except for the 1993 review of Policy 5060, which resulted in development of the District's Guidelines for Student Rights and Responsibilities, the District has not undertaken a comprehensive analysis of suspension and expulsion data by ethnicity and race.  Only recently, in 2004, with the appointment of the Executive Director of Multicultural Education, has Defendant charged a responsible party to "[work] to eliminate the over-representation of minority students in drop out, absenteeism, suspension, and expulsion rates." *Id.*, SOF, Ex. I:Chavez Affidavit at ¶ 3.

The District's Post-Unitary Plan proposes to implement training in 2007 for Long Term Suspension Hearing Officers and Site Administrators aimed at cultural proficiency, bias, and non-discriminatory imposition of suspensions.  In 2008, the District will implement a pilot program to provide mediation or other intervention programs to students who have been suspended to assist in successful transition back to the classroom and will expand its in-school suspension programs at the middle schools to avoid out-of-school suspensions. The District will also *begin* tracking data and consequences to provide feedback to administrators regarding consistency in the implementation of its disciplinary policies. (Post-Unitary Plan at 17-18.)  This is the type of ongoing monitoring and review required pursuant to the Settlement Agreement, ¶ 13.

Testing Instruments[24]

---

[24]In the annual reports, this is commonly referred to ¶ 14A.

37

The Settlement Agreement, ¶ 14 required TUSD to examine its testing instruments to ensure that no student is discriminated against in respect to testing, including efforts necessary for assessments unique to African American students.

Plaintiffs submit that academic test data can be used to assess the District's efforts, and that the acknowledged "gap" between Anglo and minority achievement as measured by test scores reflects the disparity that exists today and proves TUSD has been ineffective in meeting its obligations under the Settlement Agreement.  (Mendoza Response at 15; Fisher Supp. Opposition at 13-14.)  Plaintiffs' argument would be persuasive, if the achievement gap is caused by discriminatory test instruments.  There is no such evidence or argument.

Instead, the record reflects that the Defendant examined the District's testing instruments, with the necessary community input, to ensure that tests are not used to "track" students or improperly assign students to special education programs.  (D's Memorandum at 38-44.)  The Committee for Assisting in the Quality Education of Black Students, responsible for completing the design and implementation of the "Programmatic Recommendations to Assist in the Quality Education of Black Students in Tucson" had its first meeting on October 30, 1978. *Id.* at 38-39, SOF at ¶ 155: 1979 Annual Report §D, Ex. 22.  The Committee evaluated testing instruments for ethnic, geographic or sex bias. *Id.* at 39.  Testing instruments were examined in terms of "achievement, intelligence, informal inventories, process tests, psychological tests and teacher-made tests." *Id.* The Committee studied how test results were interpreted and used, and whether those administering them were properly trained. *Id.*

For three years, the Committee reviewed reports regarding testing in Adaptive Education (now called Special Education) and conducted an analysis of bias on certain questions being asked on the standardized test used to evaluate special education students. The Committee conducted a comprehensive assessment of testing instruments, procedures, and practices used by Adaptive Education, with an eye for safeguarding against inappropriate Adaptive Education referrals.  Through 1980, the District continued to receive and evaluate

input regarding testing and implemented changes to its test protocols.  In the 1982 Annual Report, the District recorded that the Committee had fulfilled its obligations under the Settlement Agreement, ¶ 14a.  *Id.* at 39- 41, SOF ¶¶ 155-166: 1979 Annual Report § D, Ex. 22-23, 25-66; 1980 Annual Report § C pp. 128-129; 1982 Annual Report § F, pp. 389-90.

The standardized tests currently being administered by the District are controlled by state and federal mandates.  The District administers the AIMS (Arizona's Instrument to Measure Standards) test and the CCSA (Core Curriculum Standards Assessment) test.  The AIMS is required by Arizona law, A.R.S. § 15-741(A)(2).  The CCSA is a test that closely approximates AIMS and is administered to students in non-AIMS testing grades.  *Id.* at 37-38, SOF at ¶ 147-154.

The District used the Stanford 9 from 1996-97 through 2003-04 as required by Arizona law and the Department of Education.  Now the state requires the District to use the Terra Nova, which like the Stanford 9 is "norm-referenced," meaning that the test results are reported in comparison to the achievement of all students nationwide in the same grade.  *Id.* at 38, SOF at ¶ 151.  Currently, Special Education placements are made in conformity with the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*  *Id.* at 43, SOF at ¶174.  The District is required by state law to use a specific testing instrument for GATE.  *Id.* at 43, 63, SOF ¶ ¶241.

As noted in the preceding section discussing student assignments, the District has in the last several years offered an alternate GATE testing instrument to students whose primary language is other than English, and the District has recently adopted a pilot for a GATE screening test that is believed to more accurately identify gifted minority students."  (D's Reply to Fisher Supp. Opposition at 14, SOF at ¶ 175.)

The District uses test data to tailor each student's education to fit their academic achievement on each sub-topic covered by a test in a particular subject.  Student grouping changes for each new set of skills so that tutoring may be provided in one area and enrichment in another.  This avoids tracking because children are not placed on a particular

39

track for all subjects or even for a single subject.  Students are instead grouped according to mastery on each sub-topic and regrouped when the class moves on to another sub-topic. Each year a student's test scores are re-analyzed and a student's grouping re-arranged accordingly.  All students are taught the same skills because all students must achieve mastery in each area.  Grouping is based on achievement and not perceived ability so there is less room for cultural biases to influence placement.  (D's Memorandum at 43-44, SOF at ¶¶ 176-78, Ex. K: Rameriz Affidavit.)

The District's testing instruments satisfy the Settlement Agreement, ¶ 14, because they do not assign students to Exceptional Education programs, such as Special Education and GATE based on improper test bias or prejudice.  TUSD does not improperly track students based on cultural biases, but instead groups students based on achievement. There is no evidence that the achievement gap in TUSD is a result of the testing instruments being used in the District.

Programmatic Recommendations to Assist in Quality Education[25]

The Settlement Agreement, ¶ 14, required the District to "complete the design and implementation of the 'Programmatic Recommendation to assist the Quality Education of Black Students in Tucson,'" with assistance from qualified parents or their qualified representatives and Black educators.  The Fisher Plaintiffs presented the Programmatic Recommendations, incorporated by reference in the Settlement Agreement, with the following components: Black Awareness Education; Black Alternative: Standard English; Student Services, and Central Administration.[26]  (D's Memorandum at 48 (citing Stipulation, Attachment.))

---

[25]In the annual reports, this is commonly referred to ¶ 14B.

[26]The Central Administration goal was to "encourage" Defendant to desegregate its administrative staff.

The purpose of Black Awareness is to help TUSD staff, students, and the community, gain knowledge and understanding of the Black student's historical and cultural background from a positive perspective. *Id.* at 49.

Black Alternative: Standard English (BASE) also called Standard English as a Second Dialect (SESD) assists Black students who do not differentiate between Black dialect and when to use standard English. *Id.* at 49-50.

The goal for Student Services is to change policies and practices that served to push Black students out of school. The focus was on drop-out prevention, lack of career and educational goals for African American students, counseling services, attendance and discipline issues. *Id.* at 51-53.

When the parties entered into the stipulated settlement, a pilot program in SESD was already in its second year of operation at Borton, Cavett, Safford, and Utterback. *Id.*, SOF at 186. By the 1979-80 school year, TUSD proposed expanding the program by employing two full time Resource Teachers to serve classroom teachers and to take referrals for assistance on an "on-call" basis in Phase I and II schools and the pilot program schools. *Id.,* SOF at 188.

Plaintiffs Fisher objected to the program because it emphasized indirect instead of direct services, but the Court ruled that the program was reasonably calculated to reach the goal of providing SESD/BASE instruction to all students who need it. (D's Memorandum, SOF at ¶ 190: Court Order, filed 8/8/79, at 4.) The SESD program became a regular program in all Phase I and II schools. At the same time, the District established another pilot program, TOLD (Test of Oral Language Development) based on a recommendation from the Fisher Plaintiffs. These two programs provided district teachers with knowledge of Black dialect, sensitivity to the needs of Black children in relation to language development and use, and strategies and materials for instruction. (D's Memorandum at 49-51.)

By 1980, TUSD appointed an Assistant Director for Instruction of Black Studies for the African American Studies Department (AASD), which was providing counseling services

to Black students, acting as advocates for Black students, monitoring attendance and grades, providing mentors, and encouraging planning for college and beyond.  (D's Memorandum at 52-53 (citing 1980 Annual Report § C, pp. 149-189 (describing career counseling, parent/teacher/student counseling, programs to overcome negative self-concept, career planning, and educational planning activities.))

In 1980, the Defendant's Annual Report, § C, showed the programmatic changes made pursuant to the stipulation and the effectiveness of such changes, (1980 Annual Report at 03).  Defendant explained that programmatic change meant any meaningful alteration to a plan of instruction and that no criteria for measuring effectiveness of Programmatic Changes had been set, *id.* at 04, but effectiveness would continue to be assessed because changes were recently implemented, *id.* at 57-75.  Programmatic changes were reported as follows: Part 1: programmatic changes pertaining to the student assignment plans, pursuant to ¶¶ 2-4, 6, and 8 ; Part 2: inservice programmatic changes, pursuant to ¶ 12, and Part 3: district-wide programmatic changes, pursuant to ¶ 14*, id.* at 05, which covered implementation of the SESD/BASE program, *id*. at 137-148, and implementation of recommendations from the committees for Assisting in Quality Education of Black Students, *id.* at 149-90.

In 1982, the Annual Report listed Programmatic Changes at each school without specifically linking them to the Settlement Agreement.  (1982 Annual Report at 101-108.) The Annual Report contained a comprehensive section: "Report: Effectiveness of Programmatic Changes," which examined academic achievement for the Phase I and II desegregation schools from 1978 to 1981.  (1982 Annual Report at 110-248.)

The 1982 Effectiveness Report was based on 11 student achievement studies for mathematics and reading which generally showed that minority students made greater gains than losses in relation to national norms, but Anglo/Other students evidenced greater losses than gains.  The significance of both results was tempered by the study's inability to control

42

for regression, which tends to inflate gains for low achieving student and conversely reduce gains for high achieving students. (1982 Annual Report at 114.)

The 1985 Annual Report contained an extensive list of ongoing Programmatic Changes, without directly connecting them to the Settlement Agreement and failed to make any assessment for program effectiveness. The 1989 Annual Report was similar.

In 1990, the Annual Report reflected that a Black Studies Review Committee had been appointed and AASD budgeted $309,000 from a federal Magnet School Assistance Program budget of $3,438,312.00 for the 1989-90 school year.[27] (1990 Annual Report at 164, 175.) The AASD was removed from under the Multicultural Education superstructure, appointed its own Director, and its staff was substantially increased. The AASD would serve the entire student body, not just African American students, with an emphasis on providing direct services to students to improve academic success. *Id.* at 158-177.

By 1995, the Annual Report reflected ¶ 14A Programmatic Changes as the District Assessment Plan: 1994 Essential Skills Testing instrument and test results for the District distinguished by race and ethnicity, and ¶ 14B Programmatic Changes included an annual report from AASD. Other than the obvious conclusion to be drawn from the raw test data, that minority student achievement was significantly lower compared to Anglo students, Defendant did not summarize, discuss, analyze, or comment in any way regarding the achievement gaps between minority and Anglo students. The AASD report reflected some successes, but noted budgetary problems and staff shortages, and that data from 1993-94 for suspensions, dropouts, Special Education, and academic performance reflected a generally unfavorable experience for African American students. The AASD Director complained that data based priorities should be developed to better utilize AASD resources. (1995 Annual Report at 146-147.)

---

[27]The grant covered July 1, 1989 to June 30, 1991.

Over the next ten years, the annual reports would continue to include an AASD report, reflecting AASD's annual goals and by 2000, AASD began to include some statistical analysis regarding its effectiveness to meet these goals.  For example, in 2000, goal 1, was to improve attendance rates of all students to 95%, as an important indicator of school success because attendance is related to school success.  "At AASD targeted schools,[28] the attendance rates for African American students were 94% at elementary schools, 92% at middle schools, and 93% at high schools."  "While African American students did not achieve 95% attendance, they did have better attendance rates than the District as a whole," which was 94% for elementary schools, 91% for middle schools, and 92% for high schools.  (2000 Annual Report at 338, 341.)

Goal 2 was to reduce the number of students placed on short-term suspension by 10% for the 1997-98 school year.  The AASD reported drop-out rates had been reduced over the last four years, and suspensions had decreased during 1998-99, but had increased the previous 3 years.  Suspensions for African American students remained slightly over 10% of the District's suspensions.  The AASD failed to include drop-out and suspension comparison rates for Anglo students.  *Id.* at 341-347.

For goal 3, ensure that students in target schools score at the District's mean for all students taking the Stanford 9, AASD tracked test scores, and concluded that for 12 elementary target schools, African American students improved at seven schools in reading, improved at nine schools in mathematics, and improved at six schools in total language skills.  At six target middle schools, African American students improved at three schools in reading and mathematics, and in the "total language" area four schools showed improvement.  At

---

[28]Defendant complains that Plaintiff Fisher's expert, Dr. Love, refers to target schools without explanation.  (D's Reply to Fisher Supp. Opposition at 13.)  The Court assumes that Dr. Love refers to the target schools identified by the Defendant, which are schools having 10% or more African American students.  (2000 Annual Report at 337; 2004 Annual Report at 474.)

1   three target high schools, one high school showed improvement in all three areas, but the
2   other two failed to make any improvements. *Id.* at 348-349.

3       Goal 4 was to assist students with reading difficulties so that 24% of the target
4   students would reach grade level during the 1998-99 school year. The AASD considered a
5   rubric score from 1997-98 for grades 3 through 8 for students at targeted schools and district-
6   wide, which showed students receiving AASD services scored higher in middle and high
7   schools than district-wide scores, but slightly lower in Mathematics. *Id.* at 351-364.

8       As for Goal 6, decrease the number of African American students placed in special
9   education, AASD reported a decrease from 8% to 7.9%. *Id.* at 368.

10      There was no statistical data for goal 5, increase parental involvement at three target
11  schools by 10%, *id.* at 365, nor goals 7 through 10, which involved AASD's efforts to
12  increase the number of African American certified staff within TUSD, the number of African
13  American counselors at TUSD's high schools, and to hire behavioral specialists. *Id.*

14      By 2004, Defendant began including student achievement data in its annual reports.
15  In 2004, it contained 356 pages of computer printouts reflecting ethnic breakdowns for
16  Stanford 9 summary test results by grade and school for the district from 2001-02 to 2002-03:
17  Stanford 9 Achievement Results; Stanford 9 Cohort Analysis: New State Measure of
18  Academic Progress; Core Competency Standards Assessment (CCSA) Summary Results:
19  Percent Mastery Changes, and Student Achievement Accountability for Results (STAAR).
20  There was, however, no discussion, explanation, or analysis of this voluminous data. (2004
21  Annual Report at 107-463.) In 2005, the District again included approximately 340 pages
22  of computer printouts reflecting minority student achievement, without comment or analysis.
23  (2005 Annual Report at 107-453.)

24      In both the 2004 and 2005 annual reports, AASD measured Black student
25  achievement based on the Arizona Instrument to Measure Standards (AIMS): reading,
26  mathematics, and writing performances. (2004 Annual Report at 466; 2005 Annual Report

27

28                                          45

at 457.)[29]   AASD explained that AIMS is the primary source of data to gauge academic achievement across subjects, and Stanford 9 is a comparative analysis.   The AIMS is a criterion-referenced test that looks at student achievement according to standards and the current measurement for accountability, with Stanford 9 being a cohort measure looking at the percentage of students able to make one year's growth.  (2004 Annual Report at 476, 2005 Annual Report at 468.)

By 2004, AASD was serving the entire student body, but focusing its efforts at target schools where Black minority students exceed 10% of the school population.  In 2004, AASD served 4,568 students or 7.45% of TUSD's 61,300 students, as follows: 1,116 or 28.04% of the total 3,980 African American students; 1,573 or 5.22% of the total 30,118 Hispanic students; 125 or 4.97% of the 2,513 Native American students; 129 or 7.99% of the 1,614 Asian American students, and 1,625 or 7.04% of the 23,075 Anglo students.  (2004 Annual Report at 469.)

In 2005, AASD served 4,200 students or 7.25% of TUSD's 60,806 students, as follows: 880 or 21.72% of the total 4,052 African American students; 1,628 or 5.28% of the total 30,820 Hispanic students; 109 or 8.14% of the 2,481 Native American students; 116 or 4.39% of the 1,600 Asian American students, and 1,467 or 6.71% of the 21,853 Anglo students.  (2005 Annual Report at 460.)

---

[29]In 2004, Impacted Students, those students receiving services through AASD, were the lowest percent of students meeting or exceeding the AIMS standards.  There was no consistency in terms of target school students versus district-wide students; sometimes target school students had a higher percentage of students meeting or exceeding the standards and sometimes district-wide the scores were better.  (2004 Annual Report at 476.)

The AIMS data in the 2005 Annual Report, however, reflected that by the 8th grade the test scores for all Impacted Students (Anglo, Black, Hispanic, etc.) were higher than the test scores for all students district wide and all students at the target schools.  However, when test scores were narrowed to just Black Impacted Students they were substantially lower than the test scores for all students district-wide and at targeted schools, especially test scores for Black students, district-wide and at target schools, were lower than the test scores for "all" Impacted Students (Anglo, Black, Hispanic, etc.).

In 2004, the Defendant "re-created"[30] the Multicultural Education Department, bringing the four ethnic departments back together under its umbrella, charging the Executive Director with coordinating efforts by the ethnic studies departments (African American Studies, Native American Studies, Mexican American/Raza Studies, and Pan Asian Studies)[31] to increase cultural proficiency and to focus efforts on increasing academic achievement for minority students and "working to eliminate the over-representation of minority students in drop out, absenteeism, suspension, and expulsion rates." *Id.*, SOF, Ex. I:Chavez Affidavit at ¶ 3.

In 2004, AASD had 21 staff members,[32] Native American Studies had 16 staff members, Mexican American/Raza Studies had 8 staff, and Pan Asian Studies had 5 staff members. AASD was serving 20 to 30% of the Black student population, which by 2003-04 was approximately 6.7% of the total student body. (D's Memorandum at 33.) Even with AASD serving approximately 5% of the Hispanic student population, it is unimaginable that the 8-staff Mexican American/RAZA Studies department would be capable of serving the 30,118 Hispanic students. *Id.* While the Settlement Agreement did not expressly require such service, the annual reports reflect the District's own undertakings broadened the scope of its obligations to reach all minority students not just African American students.

---

[30]In 1990, Defendant removed AASD from the Multicultural Education superstructure and elevated it to an independent department, which would "endeavor to achieve educational and cultural excellence for all children attending school in [TUSD]." (1990 Annual Report at 459.)

[31]The Native American Studies department was established in 1976. *Id.* at ¶ 5. The Black Studies Department was created in 1980. (D's Memorandum at 54.) The Mexican American/Raza Studies (formerly Hispanic Studies) and the Pan Asian Studies departments were established in 1998. *Id.*, SOF, Ex. I:Chavez Affidavit at ¶¶ 11, 15.

[32]In 1990, AASD had 22 staff positions, with an anticipated staff of 29, including the newly appointed Director's position. (1990 Annual Report at 160.)

Between 1983 and 2004, TUSD received almost three-quarters of a billion dollars in state desegregation funds and federal grants from the Office of Civil Rights (OCR grants). (Fisher Supp. Opposition at 22, Attachment: TUSD Maintenance & Operation Budget 23 Year Comparison.)   Specifically, since 1990, TUSD has received $498,427.83, under Arizona's funding availability legislation for costs incurred pursuant to a desegregation order, such as the Settlement Agreement.  TUSD has received $217,305,811 in OCR funding. In combination, TUSD received $744,402,928 from 1990 to 2006, for civil rights programs and projects.  (Mendoza Reply Re: Assignment of Naylor Students, Ex. 3: Table E.)

"The ICC has historically requested that the desegregation budget for the district be delineated by line item and purpose so that it would enable a good tracking and evaluation system relative to accounting for desegregation dollars."  (Mendoza Response, Ex. A: ICC Compliance Report at 108; *see also* Order 2/6/08 at 8-10 (discussing complaints by the ICC from 1986 and 1993).   The ICC's proposed budget reporting format would improve accountability.

Plaintiffs Fisher complain that between 2001 and 2004, almost 4 million dollars in desegregation money was unspent by the District and, instead, was transferred back into the general district budget.  (Fisher Supp. Opposition at 22.)  Plaintiffs accuse Defendant of "sweeping" the school desegregation funds.  *Id.*  During this same period, the budget for AASD was frozen.  *Id.*  Specifically in 2004, there was $3,148,892.00 in desegregation capital unexpended. (Fisher Supp. Opposition, Attachment TUSD Maintenance & Operation Budget 23 Year Comparison.)  In 2003, there was $1,498,451.00 in desegregation capital unexpended and $1,134,847.00 in desegregation maintenance and operation unexpended. *Id.* In 2002, there was $1,382,557.00 in desegregation capital unexpended and $1,603,614.00 in desegregation maintenance and operation unexpended.   *Id.*   In 2001, there was $1,949,413.00 in desegregation maintenance and operation unexpended.  *Id.*  This alleged sweeping occurred in other years too, but to a lesser extent.  *Id.*

Defendant explains that at the end of the year, unused desegregation maintenance funds cannot be carried over to the subsequent year and are returned to the taxpayers as a reduction in property tax. (Memorandum at 22, Beaty Affidavit.)  "It is within the Board's discretion, however, to determine the appropriate funding for programs and activities under its direction, and to return excess funds to the taxpayers, . . .."  (Memorandum at 22.)

Whether the Defendant has exercised this discretion in good faith is the question now before this Court.  After reviewing the annual reports from 1980 to 2005, the Court finds that within the first five or so years of the Settlement Agreement, the Defendant implemented the Programmatic Recommendations to Assist in the Quality Education of Black Students, expressly required pursuant to the Settlement Agreement, ¶ 14, and the attached Programmatic Recommendation document, and subsequent recommendations generated by the Programmatic Recommendation committees and subcommittees. (1980 Annual Report; 1982 Annual Report; 1985 Annual Report.)

Thereafter, "The African American Studies Department has continued to play an active role in the education of African American students at TUSD," (D's Memorandum a 54), and since 1990, AASD has provided its services to all students at TUSD target schools needing its assistance in reading, math and writing, as well as various social services.  AASD participates in all initial evaluations for African American students being considered for Special Education; provides tutorial support; works with students who are at risk of dropping out or who have dropped out; serves as an advocate for African American students and parents; and develops curricular materials.  (Memorandum at 55.)

The Court finds that the sheer magnitude in the number of minority students in the District, makes it improbable that the limited AASD staff, even in combination with other minority study department staff, could have effectively provided these services.  The answer is "no" to the AASD Director's 1995 question, "Has real time and attention truly been given to how the AASD can best be utilized?"  (1995 Annual Report at 147.)

Annual Reports: Ongoing Inservice Training and Program Effectiveness

Just like it convened the committees and undertook the programs necessary to accomplish the Programmatic Change Recommendations covered by the Settlement Agreement, ¶ 14, the District complied with the prohibition against admitting any student to a bilingual instruction program without specific parental permission. (Settlement Agreement at ¶ 15; 1982 Annual Report.)  The District implemented a one-year pilot instructional program at Menlo Park Elementary School utilizing the "Spalding Method" of instruction. (Settlement Agreement at ¶ 16; 1982 Annual Report.)  TUSD has diligently filed annual reports with the Court, (Settlement Agreement at ¶ 17), created the Independent Citizens' Committee (ICC), (Settlement Agreement at ¶ 18), sought specific authorization for constructing new schools or permanent additions and renovations to schools, (Settlement Agreement at ¶ 20; D's Memorandum, SOF at ¶¶ 284-290), and submitted for Court review changes in student assignments or attendance boundaries which might impact the racial or ethnic balance of any school and its open enrollment and ethnic transfer policy 5090, (Settlement Agreement at ¶ 21; D's Memorandum, SOF, Ex. O; Order filed August 21, 2007, at 21.)

In addition to the OCR Compliance Monitoring Committee Report of 1991, the External Audit of the Bilingual Education and Hispanic Studies Department from 1998, and the ICC Reports, the Court has before it the annual reports, which reflect the ongoing operation of the District for the past 27 years pursuant to the Settlement Agreement.  The annual reports reflect the racial and ethnic student populations at the desegregation schools, but do not reflect racial and ethnic faculty and staff information, and record ongoing programmatic changes and inservice programs.

The 1980-1982 annual reports reflect student assignment Programmatic Changes and Inservice Programs being offered to District employees directly responsible for implementing the student assignment plans and other Settlement Agreement requirements.   (D's Memorandum at 28, SOF at ¶ 113-114; 1979 Annual Report § C, Prat II; 1980 Annual Report § C, Part II; 1982 Annual Report, Ex. H .)

Over the past 27 years, the annual reports reflect that TUSD continues to offer inservice training to its employees, but Plaintiffs complain that it has been inadequate to transform and maintain the attitudes and behaviors of those who bring the District's academic services to TUSD students because staff turnover has resulted in faculty that continues to believe that students who are a certain ethnicity, race or linguistic background are not able to achieve the same as their non-minority counterparts. (Mendoza Response, Ex. A: ICC Compliance Report at 111.)

Plaintiffs argue that inservice training for cultural awareness could be an effective corrective action to address the issues of racial, ethnic and linguistic disparity in student achievement and disparity in minority representation in GATE, Advanced Placement, Special Education, and suspensions. *Id.* Before such inservice training would occur, however, TUSD would have to perceive the existence of, or at least potential for, inequities in its GATE and other programs and link inequities to faculty and staff bias or insensitivity affecting student selection for these programs. Apparently, TUSD has done this because in 2006-07, TUSD begins the first year of a 3-year plan for Intercultural Proficiency inservice training, which will be implemented district-wide for administrators and faculty. (D's Reply to Fisher Supp. Opposition at 13.)

In 2006, this Court rejected the Defendant's position that its duty to report the effectiveness of programmatic changes was only required for two programmatic changes specified in the Settlement Agreement: 1) the Standard English (S.E.S.D./B.A.S.E) program and 2) the Spalding Method pilot program. (Order filed 2/6/07 at 13-14.)[33]  This Court

---

[33]*But see*, (D's SOF at ¶ 223 (Brammer affidavit, December 2001, declaring that Defendant understood ¶ 17 to require reporting effectiveness of programmatic changes to pertain only to be programs specifically required under the Settlement Agreement: Standard English as a Second Dialect/Black Alternative: Standard English (SESD/BASE) and implementation of Spalding Method pilot program)), *but see*, (D's SOF at ¶ 224-226 (in 1979, the Court rejected the Plaintiffs' argument that SESD/BASE was subject to annual reporting requirements of the Settlement Agreement, ¶ 17.)) In 1979, the Court distinguished

criticized the Defendant's failure to provide information regarding program effectiveness and noted that there were no criteria for evaluating "effectiveness" until 1982, *id.* at 13 (citing 1980 Annual Report at 4), which was when the Defendant included the only comprehensive "Report: Effectiveness of Programmatic Changes" based on comparative student achievement test scores for minority and non-minority students in deseg-schools and non-deseg schools. (1982 Annual Report at 110-256.) By 1990, AASD was identifying improving academic achievement as a primary goal, and by 2000, Defendant was providing statistical data that included standardized test scores for each school. (D's Reply to Fisher Supp. Opposition at 16.) By 2004, Defendant was routinely including raw data reflecting student achievement in the annual reports.

The Court, therefore, finds that as a measure of effectiveness, student achievement is relevant to TUSD's good faith commitment to the entirety of the Settlement Agreement, even if "the Stipulation does not make any specific reference to minority student achievement, nor [] require that TUSD close the gap between minority student test scores and Anglo student test scores." (D's Memorandum at 44.)

Defendant provides Stanford 9 test scores broken down by ethnic groups for 1996-97 school year and 2003-04 school years. *Id.* at 47. Defendant asserts that the data demonstrates, the gap between African-American and Anglo students is 1.1 to 5.5%, which is less than the national average gap of 27%. *Id.* (citing Richard Rothstein, *Class and Schools: Using Social, Economic, and Educational Reform to Close the Black-White Achievement Gap* (Washington, D.D.: Economic Policy Institute) (2004) (explaining socioeconomic factors that are beyond schools' control as reason why desegregation and equal financial resources will not close the achievement gap.)

---

between programs expressly required under the Settlement Agreement as compared to SESD/BASE which was included in a document referred to in the Settlement Agreement, ¶ 14. Over the years, however, this distinction was lost by the Defendant's practice of identifying a broad array of programs and program changes in the Annual Report.

1

2

3

4

Defendant has miscalculated the achievement gap by comparing the data within each ethnic/race group instead of comparing Anglo students and minority students.   When calculated correctly, the 2004 student achievement gaps range from 10 to 15% for Black and Hispanic students, and up to 21% for Native American students.

5

6

7

8

9

For 1996-97, Anglo students scored in the 56 percentile for Reading as compared to minority student's percentile scores, as follows: African American (42.8), Hispanic (40.3), and Native American (34.4).   The results reflect Anglo-minority student achievement gaps for Reading of 13.2% for African American students, 15.7% for Hispanic students, and 21.6% for Native American students.[34]   *Id.* at 47.

10

11

12

13

14

For 1996-97, Anglo students scored in the 52.2 percentile for Language Arts as compared to minority percentile scores, as follows: African American (40.2), Hispanic (38.2), and Native American (32.3).   The results reflect Anglo-minority student achievement gaps for Language Arts of 12.0% for African American students, 14% for Hispanic students, and 19.9% for Native American students.

15

16

17

18

19

For 1996-97, Anglo students scored in the 53.8 percentile for Mathematics as compared to minority percentile scores, as follows: African American (39.8), Hispanic (39.6), and Native American (32).   The results reflect Anglo-minority student achievement gaps for Mathematics of 14% for African American students, 14.2% for Hispanic students, and 21.8% for Native American students.

20

21

22

23

24

For 2003-04, Anglo students scored in the 55.3 percentile for Reading as compared to minority percentile scores, as follows: African American (43.9), Hispanic (42.8), and Native American (37.7).   The results reflect Anglo-minority student achievement gaps for Reading of 11.4% for African American students, 12.5% for Hispanic students, and 17.6% for Native American students.

25

26

27

[34]Asian American students scored in higher percentiles than Anglo students.

28

53

For 2003-04, Anglo students scored in the 53.4 percentile for Language Arts as compared to minority percentile scores, as follows: African American (42.9), Hispanic (42.3), and Native American (37). The results reflect Anglo-minority student achievement gaps for Language Arts of 10.5% for African American students, 11.1% for Hispanic students, and 16.4% for Native American students.

For 2003-04, Anglo students scored in the 58.8 percentile for Mathematics as compared to minority percentile scores, as follows: African American (45.3), Hispanic (46.6), and Native American (39.9). The results reflect Anglo-minority student achievement gaps for Mathematics of 13.5% for African American students, 12.2% for Hispanic students, and 18.9% for Native American students.

The data reflects that the achievement gaps between 1996-97 and 2003-04 school years differed for Reading by only 1.8% for African American students, by 3.2% for Hispanic students, and by 4% for Native American students. During these seven years, the achievement gaps narrowed for Language Arts by 1.5% for African American students, by 2.9% for Hispanic students, and 3.5% for Native American students. The achievement gaps narrowed for Mathematics by .5% for African American students, 2% for Hispanic students, and 2.9% for Native American students. In other words, the achievement gaps between Anglo students and minority students that existed in 1996-97 were reduced by only .5 to 4 percentage points over the seven years reported by the Defendant.

"Most troubling are the low achievement rates by English Language Learners [(ELL)] on the Arizona Instrument to Measure Standards (AIMS) exam." (Mendoza Response at 18.) From 2002 through 2004, ELL students failed the reading section of AIMS in grades 3, 5, 8, and 10 between 73 and 96%. (*Id.*, Ex. B: ICC Compliance Report at 86-88.) Anglo student failure rate ranged from 20 to 42%. ELL students failed the mathematics section up to 98% as compared to the highest percentage failure rate of 70% for Anglo students in the 8th grade. Excluding the 8th grade, the highest percentage failure rate for

Anglo students was 56% in 10th grade math in 2003 as compared to a 95% failure rate for the ELL students.

Defendant may have reported Stanford 9 test scores for minority students, but except for the analysis conducted in 1982, Defendant failed to review student achievement as a measurement for program effectiveness. Instead, it has spent millions of dollars to implement programmatic changes to improve the quality of education, gathered student achievement data, and never looked at the two together until its Petition for Unitary Status. The data presented by Defendant now and proposed to be gathered and reviewed in the future as part of the Post-Unitary Plan has been equally important over the past 27 years. Then, now, or in the future, ongoing review of program effectiveness is the only way to ensure that to the extent practicable program changes address demographic segregation and the quality of education for minority students.

Proper resolution of any desegregation case turns on a careful assessment of its facts. (Order, filed August 21, 2007, at 5 (citing *Freeman v. Pitts*, 503 U.S. 467, 474 (1992)). The question, here, is whether TUSD has demonstrated a good faith commitment to the whole of the Court's orders, the terms of the Settlement Agreement, and to the provisions of law and the Constitution that were the predicate for the Court's intervention in the case. *Id.* at 6 (citing *Dowell v. Oklahoma City Public Schools*, 498 U.S. 237, 249-50 (1991), *Freeman*, 503 U.S. at 491).

"The good faith component requires TUSD to show past good faith compliance and a good faith commitment to the future operation of the school system, which can be shown through specific policies, decisions, and courses of action that extend into the future." *Id.* at 6-7 (citing *Lee v. Dothan City Board of Education*, 2007 WL 1856928 (Ala), *Dowell*, 8 F.3d 1501, 1513 (10th Cir. 1993), *after remand*.) While TUSD made a good faith effort to implement the program changes expressly required under the terms of the Settlement Agreement for the first few years, it failed to act in good faith in its ongoing operation of the District under the Settlement Agreement, specifically, by failing to monitor, track, review

and analyze the effectiveness of its programmatic changes.  Consequently, millions of dollars were spent arbitrarily, without the ability to analyze the ongoing effectiveness of programmatic changes to address desegregation and quality of education issues to the extent practicable.  In the face of demographic re-segregation, Defendant's duty to not exacerbate racial imbalances for students attending minority resegregated schools made effective quality of education programs an important ongoing obligation under the Settlement Agreement.

Defendant's after-the-fact gathered data and anecdotal evidence is less than persuasive regarding Defendant's position that its ongoing operations maintained a non-discriminatory school system to the extent practicable for 27 years.  Even if the data presented by the Defendant were more persuasive, the Defendant's lack of good faith is established by the District's failure to monitor the effectiveness of its ongoing operations to meet these goals.  Therefore, this Court must guard the public against future injuries or stigma.  *Freeman*, 503 U.S. at 498 (citing *Dowell*, 498 U.S. at 249-50).

To do this, the Court has two equally important goals: first, to ensure that future operation of the District improves the quality of education for all students by equalizing access, furthering diversity and giving effect to every child's right to an equal educational opportunity under *Brown v. Board of Education,* (Order 2/7/06 at15); and second, to return this governmental entity to the control of local authorities at the earliest practicable date and to restore true accountability to this public educational system, (Order 8/21/07 at 7 (citing *Freeman*, 503 U.S. at 490)).

"'Unitariness is less a quantifiable moment in the history of a remedial plan than it is the general state of successful desegregation.'" (Order 8/21/07 at 23 (citing *Morgan v. Nucci*, 831 F.2d 313, 321 (1st Cir. 1987)).  The Court finds that given the facts of this case, successful desegregation will exist when the School Board is accountable to the public for its operation of the District in compliance with the above principles of equality.  In other words, TUSD will attain unitary status upon the adoption of a Post-Unitary Plan that ensures

transparency and accountability to the public regarding the operation of a non-discriminatory school system.

Post-Unitary Plan

Defendant presents a promising post-unitary plan, which appears in large part to ensure that the District's future operations will adhere to the constitutional principles at issue in this case. Nevertheless, both Plaintiffs object for the same reason: lack of sufficient accountability. Plaintiffs Fisher complain that Defendant fails "to include data necessary for the evaluation of the claimed success of the policies, programs and departments contained in [the] Post-Unitary Plan." (Fisher Opposition to Post-Unitary Plan at 3.) Plaintiffs Mendoza explain, that unless the summary statement, plus the policies and plans in the Post-Unitary Plan, are adopted by the Governing Board, they are non-binding. (Mendoza Reply to Post-Unitary Plan, Ex. A: Stevens' Report at 3.)

The Defendant should address the concerns and recommendations of the Plaintiffs because they are shared by this Court, with the exception of the recommendation to hire three external experts to evaluate and assist the District's progress pursuant to the Post-Unitary Plan. This Court is committed to a Post-Unitary Plan that can be monitored by the public, without the assistance of experts, the judiciary, or even counsel. The parties should review the Post-Unitary Plan as proposed to determine how to present it with greater specificity regarding the goals of each proposed program, including program benchmarks, and measurements of effectiveness and success for each proposed program, including data collection and reporting formats for each proposed program. Such specificity ensures meaningful transparency, not just a deluge of meaningless reports containing overwhelming data and information. Up front, the parties should agree on the data to be gathered, the required analysis, and meaningful presentation of data and information to the public. In this way, clear public expectations will drive public comment. The public comment aspects of the Post-Unitary Plan must also include some formal mechanism for responding to the

public's questions and comments, without which there is only public comment but no accountability.

It occurs to the Court that various committees may be utilized to assist the Defendant in various aspects of the Post-Unitary Plan. At least one committee has already provided assistance related to the goal of improving student achievement. (Post-Unitary Plan at 2.) As the ICC has exemplified, a committee of committed members of the community is very capable of reviewing and analyzing data, making recommendations, and asking hard questions on behalf of the public. As the ICC has done over the past 27 years in this case, future school committees may choose to file public comments or reports regarding the Post-Unitary Plan, which should be made part of the public record and treated accordingly.

Given the comments by the Court, the parties shall meet and confer regarding changes or additions to the Post-Unitary Plan to improve its transparency and accountability, and shall solicit public comment. Thereafter, if necessary the Court will decide any disputes. Once the Post-Unitary Plan is adopted by the TUSD Board, the Court shall grant the Petition for Unitary Status.

**Accordingly,**

**IT IS ORDERED** that the Petition for Unitary Status and Termination of Court Oversight (document 1056) is GRANTED, pending the acceptance by this Court of Defendant's Post-Unitary Plan.

**IT IS FURTHER ORDERED** that the parties shall meet within 30 days of the filing date of this Order to discuss changes and additions to the Post-Unitary Plan to improve its transparency and accountability.

**IT IS FURTHER ORDERED** that the parties shall jointly file the Revised Post-Unitary Plan within 60 days of the filing date of this Order and file a proposed schedule for securing public comment and final Board approval.

**IT IS FURTHER ORDERED** that the Plaintiffs' Fisher request to hire and pay expert witness Dr. Love (document 1213) is GRANTED. Her expert report complied with

this Court's previous directive to assess unitary status in respect to specific provisions, requirements, and obligations imposed by the Settlement Agreement.  Her report was of assistance to this Court as referenced herein.  She spent 41.50 days on her report and her fee is $700 per day.  Within 10 days of the filing date of this Order, Defendant may file an objection to either the time spent or fee charged.

DATED this 23rd day of April, 2008.


David C. Bury
United States District Judge