**May 27, 2014**

**To: Parties**

**From: Bill Hawley**

**Re: R&R Requested by Fisher Plaintiffs Regarding the District's Boundary Process Plan**

*Pursuant to the Stipulated Agreement related to the I.D.1 process, I submitted this R&R to the parties 10 days prior to its submission to the Court. The purpose of this period is to allow the district to align its proposals with those of the R&R, should it wish to do so. The District did not exercise that option. It should be noted that the dates provided in the District's plan have been superseded by dates set in response to amendments to the Implementation Addendum. In any event, the ates were not sources of objections by the Fisher plaintiffs.*

## Introduction

This report and recommendation (R&R) relating to the boundary process is the result of a request by the Fisher plaintiffs. The Mendoza plaintiff's had requested a R&R but withdrew that request when the district amended its boundary process plan at the end of March, 2014. The Department of Justice did not request a report and recommendation. Note that this R&R deals only with process for developing a boundary plan, not with the content of the plan under development or the ways the processes to develop new boundaries is being implemented.

The issues addressed here have to do with the extent to which the District's boundary plan embodies the provisions and intent of provisions of the USP most relevant to the Fisher objections. Those provisions are in Section II.B:

> **B. Attendance Boundaries, Feeder Patterns, and Pairing and Clustering**
>
> > *1.    All schools in the District shall have an attendance boundary unless the District has specifically designated a school to have no attendance boundary.*

2.  *The District shall review and/or redraw its attendance boundaries when it opens a new school; closes, repurposes or consolidates a school; alters the capacity of a school; or designates a school without an attendance boundary.  The Parties anticipate that such changes may result in the redrawing of some attendance boundaries.  When the District draws attendance boundaries, it shall consider the following criteria:  (i) current and projected enrollment; (ii) capacity; (iii) compactness of the attendance area; (iv) physical barriers; (v) demographics (i.e., race, ethnicity, growth projections, socioeconomic status); and (vi) effects on school integration.  In applying these criteria, the District shall propose and evaluate various scenarios with, at minimum, the Plaintiffs and the Special Master in an effort to increase the integration of its schools.*

3.  *By April 1, 2013,[the date was changed by agreement of the parties and the process is now underway] the District shall review its current attendance boundaries and feeder patterns and, as appropriate, amend such boundaries and patterns and/or provide for the pairing and/or clustering of schools to promote integration of the affected schools.*

The district first proposed a process for developing new boundaries in the spring of 2013.  However, when a new superintendent for the District was appointed in July 2013, the District requested that the boundary process be postponed to allow for extensive studies that would inform the development of the boundary plan and new dates were set for submission of the proposed process to the plaintiffs. The plaintiffs agreed. Proposals by the district to establish processes for establishing new boundaries were proposed to the plaintiffs in September 2013 and a detailed plan was submitted to the plaintiffs on February 27, 2014 (see Exhibit A).

On March 6, 2014, the Fisher plaintiffs filed a formal request for R&R identifying numerous shortcomings it found in the district's February plan (see Exhibit B). The Mendoza plaintiffs also opposed portions of the plann and indicated their intent to request an R&R.

On March 25, 2014, the District submitted another version of its boundary process plan (see Exhibit C). After some discussion, the Mendoza plaintiffs withdrew their request for an R&R on April 1, 2014. The District's March 25 plan and a further revision of timelines and sequencing submitted to the plaintiffs  addressed several of the concerns identified by the Fisher plaintiffs, but not all. This R&R is limited to those aspects of the March 6, 2014, Fisher request for an R&R that do not appear to have been adequately addressed by the District. These concerns deal with:

1. Composition of the boundary committee.
2. The district's use of language from TUSD Governing Board policy rather than language from the USP.
3. Delays in providing information to the plaintiffs that undermine their ability to contribute to the development of the boundary plan.
4. Claims that District policy relating to students affected by school closings undermines the potential effects of boundary changes to promote integration.

<u>Composition of the Boundary Committee</u>

In March 2014, the advisory committee was comprised of 24 members, 16 of whom were district employees. This committee is one of two groups involved in the development of the boundary plan. The other is an "Advisory Team" comprised of district employees and external consultants and is responsible for guiding the development process and making proposals to the Boundary Committee. It is also responsible for assuring the effectiveness and feasibility of all options. The Fisher plaintiffs' apparent concern is that the plaintiffs, parents and community stakeholders have inadequate representation on the Boundary Committee. Following a meeting of the parties by phone on March 25, 2014, four representatives of the private plaintiffs were added. This leaves the committee with 16 of the 30 members being district employees. There are 10 alternative members, all but one of whom are white.

The USP does not provide for a Boundary Committee much less define its composition. The proposed plan mentions boundary committees (note plural) but does not define their composition.

Presumably, the purpose of a boundary committee is to provide those affected by boundary changes with the opportunity to be heard in the development of options for boundary changes. It is hard to imagine that the membership of the current boundary committee serves this goal.

The boundary development process is well underway and changing the membership of the committee at this point would be disruptive. However, the boundary review process is ongoing. Thus, the District plan should be amended to require that the boundary committee should be comprised of between 15-25 members whose racial composition generally reflects the racial composition of the population living in TUSD. Employees of the

District should not comprise more than a third of Committee members. This provision of the plan would become effective once the current boundary process is completed (this is scheduled for September 2014).

## The District's Use of Language from District Policy Rather than the USP

The Fisher plaintiffs object to the substitution of language from related District policies affecting boundary changes for wording in the USP on the grounds that this alters priorities and meaning. The Fisher plaintiffs summarize their concerns in a table in Exhibit B (p.14).

The District argues in response, that (1) it is committed to implementing the USP and the language at issue is not inconsistent with that of the USP and (2) that considerations other than those in the USP should play a role in boundary decisions.

It seems likely that in drafting the USP, the alternative meanings of words were not fully explored. For example, the terms "integration" and "desegregation" are seemingly used inter-changeably in the USP. Some researchers do this too, but many define schools that are racially mixed as a result of intentional policies as desegregated and define integrated schools as those that have significant positive interracial interaction among students, whether as a result of desegregation or not. That is, desegregation is a strategy, integration is an outcome. But, the parsing of terms seems unproductive. It is also unlikely that the provisions of the USP were meant to exclude other considerations for drawing boundaries. The provisions of the USP were not authored by people who are responsible for drawing boundaries so the District's addition of  considerations to those in the USP seems quite reasonable.

That said, in its order of April 26, 2013, the Court pointed out  that local policies must give way to Court orders in desegregation(and other) cases. Thus, when the District decides not to use the language in the USP to describe the criteria for drawing school boundaries, it is obligated to show that (1) the wording does not alter the priorities or meaning of the relevant provision of the USP and (2) that any new criteria do not alter priorities or undermine provisions of the USP.

To resolve each contested issue related to language used in the proposed boundary plan for developing school boundaries in this R&R does not seem wise. I cannot know what is in the minds of either the plaintiffs or the District. What may seem to me a minor matter may be non-negotiable to others. Rather, the Court should require that the parties meet to resolve the contested language within 14 days of the issuance of a court order to this effect. If they cannot do so within seven days, the Special Master should be commissioned to propose the language that should be embodied in the boundary process plan. (The stipulated process for review and comment could have been applied here. It was not. The discussion stretched over many months and when it seemed agreements were within reach, other issues dominated efforts at resolution).

However, the process is underway and leaving the issue of contested language unresolved may be problematic. The USP specifies six criteria (see sections of the USP cited on page 1 above). No weight is assigned to these. But it is clear that the intent of Section D is to use boundary changes to facilitate integration. As the final sentence in II.D.2 says:

> *In applying these criteria, the District shall propose and evaluate various scenarios with, at minimum, the Plaintiffs and the Special Master in an effort to increase the integration of its schools.*

The District's proposed plan, however, says that in order to implement the provisions of the USP, the District's actions shall be based on Policy JC-R, passed by the TUSD Governing Board on February 11, 2014 (see Exhibit D). Policy JC-R lists a somewhat different set of criteria from that in the USP:

a.  demographics (i.e., race, ethnicity, current and projected enrollment, current and project development patterns, socioeconomic status)

b.  targeted operating capacities

c.  current and planned instructional programs

d.  compactness of the attendance area and distance to schools

e.  physical barriers and subdivision/neighborhood boundaries

f.  effects on school desegregation

g.  student transportation

h. feeder patterns

i. previous, recent boundary changes affecting the area

j. fiscal impacts

Until the parties are able to meet and resolve differences in language as suggested above, the Court should order the District to use the criteria in the USP, giving heaviest weight to the effects of boundary change on school integration. Other criteria added by Board Policy may also be used, but not if they would undermine decisions based on the criteria in the USP. This is not as major a change as it may seem since the District argues that its policy is not inconsistent with the provisions of the USP. For example, after listing the criteria above, Policy JC-R says: "In applying these criteria the district shall propose and evaluate various options in n effort to desegregate its schools."

I note that many of the challenges of the plaintiffs to other District proposed Action Plans relate to decisions by the District to substitute wording for provisions of the USP. This often results in delaying action when there is little disagreement about intent.

Concern about Information Provided

The Fisher plaintiffs assert that their ability to contribute to the development of a boundary plan is impeded by the District's incomplete or delayed provision of information needed to play an informed role in the process. This complaint is not unique to this plan or to objections by the Fisher plaintiffs. But it is sometimes difficult, once a process for developing an action plan is underway, to know what information will be asked for and to develop the information in a timely manner. Indeed, the development by the District of requested information can be time and resource consuming so that the review and comment processes get extended. The District has said that is unwilling to respond to all of the requests for information made by the Fisher plaintiffs. The USP provides a process for dealing with this situation (X.E.3). However, the District has been unwilling to use this provision because it seems uncooperative to do so. Moreover, the provision leaves the plaintiffs only seven days to make their requests in order to invoke Section X.E.3 which puts the Special Master in the position of determining whether to, in effect, require the District to comply or to decide that the request is

excessively burdensome. If the District doesn't agree with the Special Master's decision, it can appeal to the Court. I have initiated the X.3.E process  and  asked the District to explain its decision not to provide the information requested by the Fisher plaintiffs.

Months ago the parties had worked on a plan to reduce conflict over information requests but this effort was sidetracked by the volume of Action Plans that backed up and were coming to deadlines over short time spans. The Court should ask the parties—again--to come together to identify more effective and efficient ways to provide the plaintiffs with information that would result is less contentious and better informed collaboration.

## Should Students Moved because of School Closings be Exempt from School Reassignment as a Result of a Boundary Change?

The Fisher plaintiffs claim that District policy relating to students affected by school closings undermines the effects of policies that promote integration. District policy allows students who have been moved because of school closings to remain in their new school if the boundaries of that school are changed and would be moved again as a result of changes in school boundaries. The Fisher plaintiffs cite the Court's April 26, 2014 order related to school closings to assert that local policy cannot be sustained in the face of a federal court order:

> "School policies must yield to the Constitution where they stand to impede or otherwise limit the implementation of the USP". (p.5)

This does not mean, however, that the Court cannot allow local policy to stand when it believes the local policy is in the interest of the students involved and facilitates the implementation of the USP over time. In this instance, I recommend that the Court not change the District's boundary plan insofar as it allows students previously affected by school closure to remain in their new school if a  boundary change would result in their assignment to a third school.

While sustaining this element of the District plan could reduce the impact of the boundary changes aimed at improving the integration of schools, this effect seems relatively small and does not outweigh the potential educational costs to students reassigned for a second time over two years. The Court's

concern for the educational hazard of forced student mobility was central to its decision in the April 26, 2013 school closure order from which the Fisher plaintiffs draw their argument. In this 2013 decision, the Court required certain actions and additional funding to mitigate the negative effects of forced mobility. Moreover, retaining this policy is not likely to have a major effect on the potential for integration of any given boundary change. First, the number of students affected is limited to those moved in 2013 (the boundary changes being considered now will not be effective until the 2015-16 school year). In some cases, these students have left that school by the time a boundary change affected them. At least two thirds would have left their middle school o attend high school. Still others would have changed schools. Second, boundary changes are constrained by criteria in the USP, particularly the "compactness of the attendance area", so that major changes in the demographics of a school are difficult to achieve. Third, because parents have many options in Tucson, forcing students recently moved to move again might well cause parents to look beyond TUSD or beyond the school to which they are assigned for their student's education.

Summary of Recommendations

1. The District plan should be amended to require that the boundary committee should be comprised of between 15-25 members whose racial composition generally reflects the racial composition of the population living in TUSD. Employees of the District should not comprise more than a third of Committee members. This provision of the plan would become effective once the current boundary process is completed (this is scheduled for September 2014).


2. The Court should require that the parties meet to resolve the contested language. If they cannot do so, the Special Master should be commissioned to propose the language that should be embodied in the boundary process plan. Until the parties are able to meet and resolve differences in language as suggested above, the Court should order the District to use the criteria in the USP, giving heaviest weight to the effects of boundary change on school integration. Other criteria added by Board Policy may also be used, but not if they would undermine decisions based on the criteria in the USP.

3. The Court should require the parties to come together to identify more effective and efficient ways to provide the plaintiffs with information that would result is less contentious and better informed collaboration. This might lead to changes in the USP or a stipulated agreement. Such a process should be developed within 30 days of the issuance of this court order. If the parties are unable to agree on a process, the Special Master shall make such a proposal to the Court in the form of a Report and Recommendation with the attendant briefing provisions.

4. The Court should not change the District's boundary plan insofar as it allows students previously affected by school closure to remain in their new school if a  boundary change would result in their assignment to a third school.

# EXHIBIT  A

# *TUSD*

## *Tucson Unified School District*

## Boundary Review Process

EXHIBIT A

## I.      USP LANGUAGE

## *II. STUDENT ASSIGNMENT*

### *D. Attendance Boundaries, Feeder Patterns, and Pairing and Clustering*

*1. All schools in the District shall have an attendance boundary unless the District has specifically designated a school to have no attendance boundary.*

*2. The District shall review and/or redraw its attendance boundaries when it opens a new school; closes, repurposes or consolidates a school; alters the capacity of a school; or designates a school without an attendance boundary. The Parties anticipate that such changes may result in the redrawing of some attendance boundaries. When the District draws attendance boundaries, it shall consider the following criteria: (i) current and projected enrollment; (ii) capacity; (iii) compactness of the attendance area; (iv) physical barriers; (v) demographics (i.e., race, ethnicity, growth projections, socioeconomic status); and (vi) effects on school integration. In applying these criteria, the District shall propose and evaluate various scenarios with, at minimum, the Plaintiffs and the Special Master in an effort to increase the integration of its schools.*

*3. By April 1, 2013, the District shall review its current attendance boundaries and feeder patterns and, as appropriate, amend such boundaries and patterns and/or provide for the pairing and/or clustering of schools to promote integration of the affected schools.*

## II.    POLICIES THAT APPLY

To implement this project in compliance with the USP, revisions to Policy JC, School Attendance Boundaries, were approved by the Governing Board on February 11, 2014. Revisions to Policy JFB, Enrollment and School Choice, are in process to align with the Admissions Process for Oversubscribed Schools approved by the Governing Board on December  10, 2013.

## III.    ROLES AND RESPONSIBILITIES

The Director of Planning and Student Assignment will manage the project with the help of two  third-party firms: DLR Group, a K-12 educational planning firm with experience in districts

under desegregation orders, and Applied Economics, the firm that prepared a demographic study  for the District (together the Project Team). Funding has been allocated to this project.

The Project Team will be responsible to develop a public outreach program that provides  multiple venues for public consultation with means to give voice to those who may not be  engaged.

Boundary options will be generated by the Project Team and then presented to boundary committees, the Plaintiffs and Special Master and the public for review, comment and refinement. An advisory team of staff and outside professionals will be responsible for assuring  the effectiveness and feasibility of all options.

At key points the Project Team will update District leadership, the Governing Board and the  Plaintiffs and Special Master. All submittals to the Plaintiffs and Special Master will be  submitted through the Director of Desegregation and legal counsel; they will provide the Project  Team with any responses on same, from same.

The Project Team will collect all responses, make any necessary revisions and draft the final  product and all sub-products.

In accordance with Policy JC, the Director of Planning and Student Assignment will be responsible for notifying parents/guardians of TUSD students, landowners and other affected  persons/groups after the final approval of any boundary changes.

Annually, the Director of Planning and Student Assignment will review the District's Annual  Report (USP section G.2) to determine if any schools are oversubscribed and will review  boundaries to determine if any changes should be made.

## IV.    INPUT OF THE PLAINTIFFS AND SPECIAL MASTER

Before the District amends boundaries, the District must first "propose and evaluate various  scenarios with…the Plaintiffs and the Special Master in an effort to increase the integration of its  schools." This process includes multiple opportunities for the Plaintiffs and Special Master to  receive and comment on information as the District develops scenarios (rather than waiting to  involve them after scenarios have already been developed) and to be involved in the evaluation  of options before recommendations are

presented to the Board. Once the District makes  recommendations, it will be available to the Board, the public, and to the Plaintiffs and Special  Master.  Once the Board approves a set of recommendations, the parties will have additional  time for review and resolution of remaining conflicts. If conflicts cannot be resolved, the Special  Master shall submit recommendations to the Court in a report.

Party input into the boundary review process is as follows **(See Exhibit A)**:

1. **Inform/Consult/Involve**

   The Plaintiffs and Special Master will participate in a number of ways such as consultation meetings (by phone, in person, or a combination of both) or focus groups.

2. **Notices of Board Action**

   The District will notify the Plaintiffs and Special Master at key points in the process  immediately after the Board makes key decisions.

**V.     UNDERSTANDING OF ISSUES AND OBJECTIVES**

Early in the project, the Project Team will identify issues, objectives and evaluation approaches  and then, through the Director of Desegregation, will work with the Special Master to further  define the project.  This will include defining any perceived ambiguities in the USP.

## VI.   GENERAL TIMELINE (2014)

| | |
|---|---|
| January | Update Policy JC and JC-R (Student Attendance Boundaries) |
| | Complete Demographic Study |
| | Submit initial plan proposal and timelines to Board |
| February | Inform Special Master and Parties of the process and timeline for feedback |
| | Hire service providers |
| | Form and meet with Advisory Team to specify goals, develop objectives, evaluate potential options and issues, create the initial plan proposal and timelines, and draft evaluation criteriaDevelop the Communication Plan including participation of the PartiesInitiate public information and consultation |
| March | Advisory Team begins scenario development |
| | Form Boundary Committee and hold informational meetings |
| | Refine scenarios and select a wide range of feasible options |
| April | Boundary Committee continues to meet to develop options; they host public meetings in impacted regions; they refine options based on public feedback |
| May | Advisory Team and Boundary Committee evaluate and prioritize options |
| | Develop a preliminary Desegregation Impact Analysis (DIA) and  Notice and Request for Approval (NARA) |
| | Draft boundary recommendations prepared and submitted to leadership |
| | Presentation of Draft Plan with DIA to Governing Board |
| June | Draft School Master Plan Implementation Plan including recommendations for the next phase |
| | Compilation of Boundary Review with the Magnet Plan and other elements of the District Strategic Plan |
| | Final Board Approval |
| July | Complete and submit Implementation Plan to Board |
| September | Notification of parents and landowners |

Exhibit A

## II. TUSD School Master Plan (SMP) 2014 Phase I - Strategic Boundary Review

Phase I - Strategic Boundary Review

Task

SMP Preparation
- Prepare Datasets
- Interview Consultant
- Scope of Work and Bid
- Hire Consultant

Draft Magnet Plan

Demographic Study
- Scope of Work
- Interview and Hire Consultant
- Refine SOW
- Prepare Datasets
- Demographic Projections
- Peer and Board presentations

Enrollment Projections

Marketing Study

Efficiency and Curriculum Audit

Communication Plan
- Draft Plan
- Refine Plan with Consultant
- Community Surveys
- Inform and Consult
- Involve and Collaborate
- Report and Close

Aug  Sep  Oct    Nov   Dec   Jan    Feb   Mar   Apr    May   Jun   Jul    Aug   Sep   Oct

## III.   TUSD School Master Plan (SMP) 2014 Phase I - Strategic Boundary Review

Phase I - Strategic Boundary Review

| Task | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Advisory/Leadership Teams** | | | | | | | | | | | | | | | |
| Objectives and Evaluation Criteria | | | | | | | | | | | | | | | |
| Potential Options and Issues | | | | | | | | | | | | | | | |
| Scenario Development | | | | | | | | | | | | | | | |
| Select Options | | | | | | | | | | | | | | | |
| Refine Options | | | | | | | | | | | | | | | |
| Implementation Plan w/ Phase II | | | | | | | | | | | | | | | |
| **Special Master and Plaintiffs** | | | | | | | | | | | | | | | |
| Inform/Consult/Involve Notice | | | | | | | | | | | | | | | |
| of Board Action | | | | | | | | | | | | | | | |
| **Inform and Engage the Public** | | | | | | | | | | | | | | | |
| Disseminate and Solicit Interest | | | | | | | | | | | | | | | |
| Form Boundary Committees | | | | | | | | | | | | | | | |
| Boundary Committee Meetings | | | | | | | | | | | | | | | |
| Public Meetings | | | | | | | | | | | | | | | |
| **Governing Board** | | | | | | | | | | | | | | | |
| Update | | | | | | | | | | | | | | | |
| Approve Consultants and Process | | | | | | | | | | | | | | | |
| Approve Objectives and Criteria | | | | | | | | | | | | | | | |
| Approve Draft Plan | | | | | | | | | | | | | | | |

Legend:
- Holidays and breaks
- Staff Work
- Consultant Work
- Staff and Consultant Work
- Others

|   **Tucson, Arizona**  **GOVERNING BOARD POLICY** | POLICY TITLE: School Attendance Boundaries |
| | POLICY CODE:  JC |
| | LEAD DEPARTMENT:  Planning and Student Assignment |

The attendance boundary for each school in the District will be established by the Governing Board and is subject to change.  All schools in the District shall have an  attendance boundary unless the District has specifically designated a school to have no  attendance boundary.  Each student will be assigned to an attendance boundary school  based upon the student's legal residence.  Students will attend school in the attendance  zone in which their respective residences are located, their neighborhood schools.

Exceptions to this policy may be made for open enrollment, state and federal laws,  special placements based on Individualized Educational Programs, disciplinary actions,  specific curricular programs such as Magnet schools/programs, pipeline schools, and in  the case of homeless students, continued attendance in their school of origin.

The Governing Board recognizes that the proposed adoption of attendance boundaries  or change in existing attendance boundaries is a topic which will generate much  concern and interest by all who may be affected. Therefore, procedures to notify  affected parties are delineated in this policy.

The Superintendent shall present recommended boundary changes and/or alternatives  for boundary changes to the Governing Board.  These recommendations will be made  after the Superintendent has:
1. evaluated the proposed changes relative to objectives established by the District;
2. proposed and evaluated various scenarios in an effort to desegregate schools;  and,
3. held public meetings to discuss proposed changes and hear public comments  regarding such changes.

The Governing Board shall conduct at least one public meeting at which the proposed  maps of boundary changes are displayed and public comments heard.

IV.    **Public Meetings and Public Hearings**

Parents and guardians of students and residents of the households to be affected by  the proposals being discussed shall be notified in the following manner at least one  week prior to any public meeting:

- TUSD website,
- Notices posted at the affected schools, and
- Press release.

These notices shall include a referral to the TUSD website where proposed maps may be reviewed and to another district location where the proposed maps may be viewed.

Following Board action, parents, guardians and residents affected by a boundary change decision will be informed by means of the minutes and other school and District communications as well as bulk mail to all landowners in the affected boundaries. This notice will also be placed on the District's web site.

Within ninety (90) days of the adoption of a boundary change by the Governing Board, attendance boundaries will be updated, made available to the public and placed on a District website. A direct link to the School District's attendance boundaries will be sent to the Department of Real Estate. If the boundary changes adopted by the Governing Board affect any school built on land donated to the District within the past five (5) years, the entity which donated the land will be informed of the Board's decision.

The Superintendent will develop the specific procedures necessary to implement the actions, notification, and documentation required by this policy. The Superintendent's procedures for determining a recommendation to bring forward to the Governing Board shall include a process for public meetings and comments regarding proposed boundary changes.

Adopted:     February 11, 2014 Revision:

Review:

**LEGAL REF.:** A.R.S. §15-341A.38; 20 U.S.C. 9532 No Child Left Behind; 42 U.S.C.

11301, McKinney-Vento Homeless Assistance Act of 2001

**CROSS REF:**      JC – School Attendance Zones

JF – Student Admissions

JFABD – Admission of Homeless Students
JFB – Enrollment and School Choice

V.     **Replaces TUSD Policy:  None**

|   **Tucson, Arizona**  **GOVERNING BOARD POLICY** | POLICY TITLE: School Attendance Boundaries |
|---|---|
| | POLICY CODE:  JC-R |
| | LEAD DEPARTMENT:  Planning and Student Assignment |

**Purpose:** To provide guidelines for boundary changes that address the demographic, facility and educational aspects of the District for the next 5 to 10 years.  The process for these changes shall include the notification and involvement of stakeholders to help improve decisions and create support for the boundary changes.

**Review of Attendance Boundaries:** The Superintendent shall direct a review of attendance boundaries when the District:

    a.  opens a new school;
    b.  closes, repurposes, or consolidates a school;
    c.  alters the capacity of a school;
    d.  designates a school without an attendance boundary;
    e.  identifies oversubscribed schools; or,
    f.  in other situations where a boundary change is indicated to, among other things, balance enrollment with capacity, allow a change in academic programs, meet fiscal objectives or desegregate schools.

**Criteria for Drawing Attendance Boundaries:** When the District creates and evaluates attendance boundaries, it shall consider the following:

    a.  demographics (i.e., race, ethnicity, current and projected enrollment, current and project development patterns, socioeconomic status)
    b.  targeted operating capacities
    c.  current and planned instructional programs
    d.  compactness of the attendance area and distance to schools
    e.  physical barriers and subdivision/neighborhood boundaries
    f.  effects on school desegregation
    g.  student transportation
    h.  feeder patterns
    i.  previous, recent boundary changes affecting the area
    j.  fiscal impacts

In applying these criteria, the District shall propose and evaluate various options in an

effort to desegregate schools.

**Superintendent's Committee:**  The Superintendent will establish two committees:

1. an advisory committee of staff and external professionals to guide the boundary committee by conducting a preliminary evaluation of  potentially affected areas, establishing a framework for the project, and developing a range of options based on the criteria for drawing attendance boundaries set forth above; and

2. a boundary committee of staff and community members to review options and make recommendations to the Superintendent for attendance boundary changes.

VI.   **Criteria for Selecting Boundary Committee Members**

Committee members should meet one or more of the following criteria:
  a.  Be a TUSD parent
  b.  Represent a reasonable mix of the diversity and ethnicity of the affected communities
  c.  Be a staff member of one of the schools in the potentially affected areas
  d.  Be an interested member of the community

VII.   **Roles and Responsibilities of the Boundary Committee Members**

Committee members shall:
  a.  Attend all committee meetings and public meetings hosted by the committee
  b.  Be familiar with the framework, including:
      i.    scope and objectives of the project
      ii.   roles and responsibilities of the committee
      iii.  schedule for boundary committee and public meetings
      iv.   community notification means and requirements
      v.    criteria for evaluating boundary changes
  c.  Review background data relative to the criteria (see above) for drawing attendance boundaries, such as demographics, attendance patterns, etc.
  d.  Become familiar with the affected areas/communities through self-directed tours and study
  e.  Create recommendations that equitably address enrollment growth and adequately consider the criteria set forth above.
  f.  Prepare for and hold public meetings; help to facilitate public input
  g.  Review public meeting results and refine boundary recommendations
  h.  Prepare a report of recommendations for the Superintendent

The District shall take notes at all Boundary Committee meetings; these with any supporting documents and any committee reports will be available for public review.

VIII.   **Public Meetings**

The Boundary Committee will hold at least one public meeting in each potentially affected area/region at which they will discuss attendance boundary changes and engage the public in an evaluation of options

Notification

These meetings will be announced at least one week prior to the date of the meeting by press releases, notices posted at schools within the potentially affected areas, and the TUSD website. These notices shall include a referral to the TUSD website and to another district location, both of which will include the proposed boundary maps.

Conduct

At the public meeting(s), the boundary committee will present its findings and the public will have an opportunity to evaluate the options through small-group processes or surveys. The public will also be asked to submit comment cards to be included, with the results of small-group sessions or surveys, in the committee's report to the Superintendent.

IX.   **Unitary Status Plan Review Requirements**

The District will prepare Desegregation Impact Analyses for any options to be presented to the Governing Board. After Governing Board approval of boundary changes, the District shall prepare a Notice and Request for Approval per Section X.C of the USP.

X.   **Following Board Action**

Boundary Committee Notification

Following Board action, the District will notify the Boundary Committee members of the Board's decision and disband the committee.

Public Notification

Following Board action, when all necessary approvals have been granted, parents and guardians of students residing in the areas affected by boundary changes will be informed of the decision by means of the minutes, bulk mail to addresses in student records and

other school and District communications. Landowners in the affected  boundaries will also be notified by bulk mail and a notice will be placed on the District's  web site.

Boundary Maps and Other Notification

Within ninety (90) days of the adoption of a boundary change by the Governing Board, and when all necessary approvals have been granted, attendance boundaries will be updated, made available to the public and placed on a District website. A direct link to the School District's attendance boundaries will be sent to the Department of Real  Estate and the Tucson Association of Realtors. Digital maps will be provided to the  Pima County GIS Department, TUSD Transportation Department and to the GIS server

accessed by Mojave programmers. A direct link or hard copy maps will be provided to School Community Services, Leadership Offices and affected school principals.

If the boundary changes adopted by the Governing Board affect any school built on land donated to the District within the past five (5) years, the entity which donated the land will be informed of the Board's decision.

Reviewed:    January 6, 2014

Revision:    February 5, 2014

**LEGAL REF.:**  A.R.S. §15-341, 20 U.S.C. 9532 No Child Left Behind; 42 U.S.C. 11301, McKinney-Vento Homeless Assistance Act of 2001

XI.    **Summary of the Approach of, and Changes to, Policy Regulation JC-R**

Policy Regulation JC-R implements the State law and USP requirements in Policy JC. It incorporates these requirements with existing procedures in the current Policy JC-R and with best practices for boundary changes as recommended by the Council of Educational Facility Planners International.

Key changes are:
- Incorporation of USP stipulations in the following sections
  - Review of Attendance Boundaries
  - Criteria for Drawing Attendance Boundaries
  - Unitary Status Plan Requirements
- Incorporation of State Law in the following sections:
  - Public Meetings (the Notification subsection)
  - Following Board Action (the Public Notification, and Boundary Maps and Other Notification sections)
- Establishment of an Advisory Committee to guide the process. This is a group of internal and external professionals, independent of the Boundary Committee, to provide guidance and support for that committee and for the superintendent.  Its functions are similar to a steering committee at the start of the project and in the review of the results, but with less week-to-week, month-to-month control of the project.
- Clear delineation of the responsibilities of Boundary Committee to ensure they understand how they will actively participate to create solutions.
- Specifics related to the conduct of public meetings hosted by the Boundary Committee so the public is engaged and their comments are recorded and presented.
- Notification, to Boundary Committee, of the Board's decision and the completion of their work.

``   **EXHIBIT B**

1

2   Rubin Salter, Jr. ASBN 001710
3   Kristian H. Salter ASBN 026810
    Attorneys for Fisher Plaintiffs
4   177 North Church Avenue Suite 903
5   Tucson, Arizona 85701-1119
    (520) 623-5706 (phone)
6   rsjr3@aol.com (email)
7   kristian.salter@azbar.org (email)

8   _____UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

9   ROY and JOSIE FISHER, et al.,          )     No. CV 74-90 TUC DCB
9                                          )
                                           )
10              Plaintiffs,           )XII.   **FISHER PLAINTIFFS REQUEST**
                                           )   **FOR REPORT AND**
11              Plaintiff-Intervenor,      )   **RECOMMENDATION**
12                                         )   **REGARDING DEFENDANT**
                                           )   **TUSD'S 02/14/14 BOUNDARY**
13    vs.                                  )   **REVIEW PROCESS**
                                           )
14    ANITA LOHR, et al.,                  )
                                           )
15              Defendants,                )
16                                         )
      SIDNEY L. SUTTON, et al.,            )
17                                         )
18              Defendants-Intervenors,    )
      _____)   Submitted to Special Master Willis
                                               Hawley on 03/06/14
19    MARIA MENDOZA, et al.,               )    No. CV 74-204 TUC DCB
                                           )
20                                         )
                Plaintiffs,                )
21                                         )
22    UNITED STATES OF AMERICA             )
                                           )
23              Plaintiff-Intervenor,      )
24                                         )
25    vs.                                  )
                                           )
26    TUCSON UNIFIED SCHOOL                )
      DISTRICT NO. ONE, et al.,            )
27                                         )
28              Defendants.                )
      _____)

XIII.   **Case 4:74-cv-00090-DCB**        **Submitted 03/06/14**                **Page 1 of 17**

# 1. FISHER PLAINTIFFS' REQUEST FOR REPORT AND RECOMMENDATION

COME NOW, Plaintiffs Roy and Josie Fisher (hereinafter the Fisher Plaintiffs), by and through counsel undersigned, Rubin Salter, Jr. to submit the following request for a report and recommendation regarding the below-detailed objections to Defendant Tucson Unified School District's (hereinafter TUSD or District or Defendant) 02/14/14 boundary review process (BRP).

IN SUPPORT WHEREOF, counsel undersigned cites the following facts and authority:

On 04/04/13, counsel for the Fisher Plaintiffs notified TUSD Desegregation Direct Sam Brown and former TUSD counsel Heather Gaines of the Fisher Plaintiffs' categorical opposition to the District's plan to conduct a "bifurcated" boundary review (see Salter 04/04/13 email to Gaines and Brown).  The issue remains unresolved and the objection is repeated here:

> A review of the proposed revised deadlines for the USP shows that the District has set two boundary-review deadlines: one for schools located East of Country Club Road and one for schools located West of Country Club Road.  This is extremely concerning.  The establishment of the two separate deadlines suggests that the District intends to review boundaries for the two halves of the District in isolation from one another.  This division of labor will place a massive impediment to integration by precluding the possibility of drawing attendance boundaries and establishing feeder patterns that bridge, rather than divide, the two halves of the District.  The division would raise a virtual wall at Country Club Road and segregate the District's identifiably White Eastside from its identifiably minority Westside.  The Fisher Plaintiffs objected to this exact policy in their 2007 opposition to the PUSP.  At that time, the District was in the process of forming a boundary review task force similarly divided into East- and Westside groups.  The

XIV.   **Case 4:74-cv-00090-DCB**        **Submitted 03/06/14**                    **Page 2 of 17**

1    <u>Fisher Plaintiffs objected to that policy then, as now, as exacerbating residential</u>
2    <u>segregation and thwarting the possibility of District-wide integration.  The Fisher</u>
3    <u>Plaintiffs consider the division to be constitutionally suspect and in blatant</u>
4    <u>violation of the language of and the rationale behind the USP.</u>  Without
5    reassurance that the boundary review will proceed as contemplated under the USP,
6    the Fisher Plaintiffs will petition the Court for an order restraining the District
7    from dividing the boundary review process into East- and Westside components
8    (see Salter 04/04/13 email to Gaines and Brown emphasis added).

9

10   On 09/27/13, the Fisher Plaintiffs submitted comments on the District's boundary review
11   process (BRP).  The majority of these concerns remain unresolved and are repeated here:
12   [<u>In reference to outstanding concerns with the BRP,</u>] [t]he Fisher Plaintiffs
13   incorporate by reference all previously submitted comments relevant to the
14   boundary review process (especially to their ongoing objection to a bifurcation of
15   the boundary review).  Those questions remain unresolved and clearly pertain to
16   the proposed boundary review process contemplated here.  [<u>In reference to the</u>
17   <u>BRP's compliance with the requirements of the USP,</u>] [t]he Fisher Plaintiffs join
18   the Mendoza Plaintiffs in their observation that the requirements of the magnet
19   plan set forth in Section II (E) (3) of the Unitary Status Plan (USP) are intimately
20   linked to the outcome of the boundary review process and should, therefore, be
21   memorialized in the language of the boundary review plan.  The coordination of
22   the timing of the boundary review process with the magnet plan is not evident in
23   the current draft of the boundary review plan where it contemplates the January
24   2014 completion of the comprehensive magnet plan informed by boundary
25   decisions that will not be completed until late May 2014 (see TUSD School
26   Master Plan (SMP) 2013-14 circulated as an attachment to Sam Brown's 09/16/13
27   email to counsel).  [<u>In reference to provisions for plaintiff input in the BRP,</u>] [t]he
28   Fisher Plaintiffs join the Mendoza Plaintiffs in their concern that the current draft

XV.    **Case 4:74-cv-00090-DCB**        **Submitted 03/06/14**                **Page 3 of 17**

of the boundary review process does not provide a time frame for reporting the data necessary for informed plaintiff and SM analysis and commentary.  As noted by the Mendoza Plaintiffs, the SMP contemplates a demographic study.  The scope and intended purpose of that study would be usefully informed by early plaintiff and SM review and input.  [In reference to plaintiff participation in focus groups,] [t]he Fisher Plaintiffs likewise join the Mendoza Plaintiffs and the Special Master (SM) where they appreciate the additional opportunity for plaintiff input contemplated in the District's willingness to "invite the Parties/Special Master (or their representatives) to [participate in] Focus Groups in November and February" (see Boundary Review Process circulated as an attachment to Sam Brown's 09/16/13 email to counsel).  However, like the Mendoza Plaintiffs, the Fisher Plaintiffs believe participation in focus groups "may not be the most effective method for the Special Master and the Plaintiffs to provide feedback and comment to the District" (see Mendoza marginal comments to Boundary Review Process circulated as an attachment to Lois Thompson's 09/19/13 email to counsel).  [In reference to the "general timeline" for the BRP,] [t]he Fisher Plaintiffs join the Mendoza Plaintiffs in all of the comments they make on this section of the process, especially the identification of the composition of an advisory team, the need for expert input, the appropriate sequencing of the establishment of a boundary committee, the need to ensure a representative membership of the boundary committee, the justification for treating UHS separately from the rest of the District's schools and finally the above-noted need to coordinate the boundary review process with the development of the comprehensive magnet plan (see Salter 09/27/13 email and attached Fisher 09/27/13 comments on TUSD 09/16/13 BRP).

XVI.   **Case 4:74-cv-00090-DCB**        **Submitted 03/06/14**            **Page 4 of 17**

Additionally, the Fisher Plaintiffs note, and object to, the deletion from the "general outline" appearing in the 02/14/14 BRP of the language explicitly stating the District's intention to "[c]onsult the Special Master and Parties in the development and refinement of objectives and criteria; refine objectives and criteria" (compare the general outlines included in the 09/16/13 and 02/14/14 versions of BRP). The contemplated consultation should have, but never actually occurred. This failure should be rectified by reintroducing the language deleted from the BRP in a timeframe that will allow the contemplated consultation to occur *well prior to* the District's prematurely scheduled, community-wide "boundary discussion" (see Brammer 02/04/14 email announcing, with less than two weeks' notice, the District's unilateral decision to schedule a "boundary discussion" meeting for 03/17/14 to be held with "other participants" at an undisclosed location).

The Fisher Plaintiffs join the Mendoza Plaintiffs' objection to the District's failure to disclose the demographic study conducted in conjunction with the school master plan:

> [And] object to the Boundary Review Process' omission of a schedule and commitment for getting the Plaintiffs the information that we will need to make informed comments, such as enrollment projections. As Mendoza Plaintiffs stated in their September 2013 comments: "We note that the SMP includes a demographic study. We urge the District to provide the Plaintiffs and the Special Master information on the scope of that study now so that they can make suggestions about it before it is concluded rather than having us find ourselves having to ask for essential information late in the process." According to the schedule, the enrollment projections are completed. Presumably, they are part of the demographic study we have requested. This sort of information should be routinely delivered to the Plaintiffs without us having to ask so that we can indeed be responsive in this process (at page 2 of Mendoza 02/25/14 request regarding TUSD BRP emphasis added).

XVII.   **Case 4:74-cv-00090-DCB**          **Submitted 03/06/14**                    **Page 5 of 17**

1   The Fisher Plaintiffs also join the Mendoza Plaintiffs in their objection to the District's

2   claims regarding "perceived ambiguities" in the USP.  Specifically, the Fisher Plaintiffs

3   join the Mendoza Plaintiffs where they:

4          object to the "Project Team's" role in "defining any perceived ambiguities in the

5          USP." (Page 3.) No such ambiguities can be "defined" without the participation

6          and agreement of the Plaintiffs (at page 3 of Mendoza 02/25/14 request regarding

7          TUSD BRP).

8

9   The Fisher Plaintiffs object to the 02/14/14 BRP where it inappropriately seeks to limit

10  the SM's access to, and communication with, District employees, representatives and

11  staff.  The BRP states in relevant part that:

12         At key points the Project Team will update District leadership, the Governing

13         Board and the Plaintiffs and Special Master.  All submittals to the Plaintiffs and

14         Special Master will be submitted through the Director of Desegregation and legal

15         counsel; they will provide the Project Team with any responses on same, from

16         same (at page 2 of TUSD 02/14/14 BRP).

17

18  The inclusion of this provision in the BRP both impedes the collaborative process

19  envisioned by the Court and directly contradicts the language of Section VIII of the

20  Court's 01/06/12 order appointing the SM, which section explicitly delineates the SM's

21  access to and communications with District representatives, employees and staff and

22  provides in relevant part that:

23         The Special Master [...] may have ex parte communications with Party

24         representatives or employees outside the presence of counsel [;] shall have

25         unfettered access to District staff [; and] may communicate directly with District

26         personnel (i.e. without counsel present).  (at pages 15-16 of 01/06/12 order

27         appointing SM).

28

XVIII. **Case 4:74-cv-00090-DCB**        **Submitted 03/06/14**                    **Page 6 of 17**

The Fisher Plaintiffs seek not only the deletion of the objectionable language, but seek also the addition of language positively and explicitly affirming the District's commitment to honoring the spirit and letter of the above-cited provisions of 01/06/12 order appointing the SM.

The Fisher Plaintiffs reiterate their objection to the District's stated intention to limit or in any way minimize the scope of the boundary review process where it will impact students affected by the round of school closures in occurring in 2013.[1]  In its 03/21/13 notice and request for approval (NaRA) regarding boundaries for closing and receiving schools, the District argued that:

> As the District moves forward under the USP with a comprehensive review of boundaries throughout the District, including the possibility of magnet schools without attendance boundaries, clustering or pairing schools and otherwise examining boundaries, the District is committed to minimizing the impact of such changes on students whose schools have been closed.  Under applicable District policies, students are permitted to continue attending any school in which they are enrolled through the highest grade offered at that school, so no student would be forced to move in the future as a result of a change in boundaries, except in the event of a school closure (at page 7 of 03/21/13 NaRA regarding boundaries).

---

[1] In a 03/14/13 email to plaintiff counsel and the Special Master, former TUSD counsel Heather K. Gaines stated that "[w]hen [the District] undertake[s] the comprehensive review of boundaries, [it] will be considering the impact of the above changes as a factor. It takes a few years for the pattern of the change to be established, thus a recent change is one criterion that is used (as a negative) in the evaluation of boundary options" (see attached 03/14/13 Gaines email).

XIX.   **Case 4:74-cv-00090-DCB**          **Submitted 03/06/14**                    **Page 7 of 17**

In their 04/06/13 response to the District's 03/21/13 NaRA, the Fisher Plaintiffs objected

to the District's plans, explaining that:

> [T]he District has prematurely and unilaterally concluded that none of the
> estimated 14,768 students impacted by the school closures[2] will be subject to
> reassignment as a result of the upcoming, District-wide review of school
> boundaries required under Section II (D) (3) of the USP [...].  In support of its
> conclusion, the District cites "applicable District policies" permitting students "to
> continue attending any school in which they are enrolled through the highest grade
> offered at that school" (idem).  This, the District asserts, means that "no student
> would be forced to move in the future as a result of a change in boundaries, except
> in the event of a school closure" (idem).  The District's apparent readiness to
> disregard the requirements of the USP illustrates its continued failure to
> acknowledge its obligations under the USP.  Whatever student assignment policies
> a school district may have in effect must yield where, as is the case here, they
> stand to impede or otherwise limit the implementation of a federally mandated
> remedial desegregation plan (at pages 8-9 of Fisher 04/06/13 response to TUSD
> 03/21/13 NaRA).

In its 04/12/13 reply in support of its 03/21/13 NaRA, the District reiterated its

"commitment to minimize future impacts to students impacted by these school closures,"

(at pages 6-7 of TUSD 04/12/13 reply) explaining that its "commitment in this regard has

been made as a result of the Special Master's specific recommendations and instructions

to the District, and the District concurs that this should be a primary concern as the

District moves forward with other USP student assignment strategies" (idem).  The Court

---

[2] An attachment to the District's 01/02/13 request states that "approximately 14,768
students will be directly affected by [the 2013 round of] school closures" (at pages 3-4 of
document number 1419-9 filed 01/02/13).

XX.    **Case 4:74-cv-00090-DCB**          **Submitted 03/06/14**                    **Page 8 of 17**

addressed the District's argument in its 04/26/13 order and concluded that "[t]he District is wrong" (at page 5 of 04/26/13 order) explaining that it was the District's failure:

> to apply the entirety of the boundary change criteria [which was] a dis-service to the students, who now may be subject to further movement to accomplish the goal of integration to the extent practicable in the TUSD.  <u>Just to be clear, the Plaintiffs are correct.  School policies must yield to the Constitution where they stand to impede or otherwise limit the implementation of the USP.</u>  See North Carolina State Bd. of Ed. v. Swann, 402 U.S. 43, 46 (1971) (where policy limits a school from operating a unitary school system or impedes disestablishing a dual school system, it must fall) (idem at 5 emphasis added).

On the basis of the foregoing, the Fisher Plaintiffs strongly object to the omission from the boundary review process of an explicit commitment by the District to adhere to the requirements of the Court's 04/26/13 order).

On 02/14/14, the District provided the plaintiffs and the Special Master with its boundary review process (BRP).  Attached to the BRP was a copy of Governing Board (GB) Policy Regulation (PR) JC-R, which policy sets forth guidelines for the review of attendance boundaries and provides in relevant part that:

> [t]he Superintendent shall direct a review of attendance boundaries [...] where a boundary change is indicated to [...] desegregate schools (at page 9 of TUSD 02/14/14 BRP).

XXI.   **Case 4:74-cv-00090-DCB**          **Submitted 03/06/14**                    **Page 9 of 17**

PR JC-R then identifies ten criteria to be considered "[w]hen the District creates and evaluates attendance boundaries" (idem). Those criteria are ordered and described as shown below:

    a. demographics (i.e., race, ethnicity, current and projected enrollment, current and project development patterns, socioeconomic status)

    b. targeted operating capacities

    c. current and planned instructional programs

    d. compactness of the attendance area and distance to schools

    e. physical barriers and subdivision/neighborhood boundaries

    f. effects on school desegregation

    g. student transportation

    h. feeder patterns

    i. previous, recent boundary changes affecting the area

    j. fiscal impacts

PR JC-R then states that, "[i]n applying these criteria, the District shall propose and evaluate various options in an effort to desegregate schools" (idem). The final page of the District's 02/14/14 BRP provides a summary of the District's rationale for its recent revision of GB PR JC-R and claims that:

    Policy Regulation JC-R implements the [...] USP requirements in Policy JC. It incorporates these requirements with existing procedures in the current Policy JC-R [...]. Key changes are [i]ncorporation of USP stipulations in the following sections [:] Review of Attendance Boundaries[;] Criteria for Drawing Attendance Boundaries [; and] Unitary Status Plan Requirements (idem at 13).

1    The Fisher Plaintiffs strongly dispute the District's claim that its 02/05/14 revision of GB
2    PR JC-R "implements" and "incorporates" the District's boundary review requirements
3    of the USP.  This is an issue that came before the district court in the conjunction with the
4    District's 03/21/13 NaRA regarding boundaries for closing and receiving schools.  At
5    that time, the Fisher Plaintiffs objected to the District's inappropriate conflation of the
6    boundary review requirements of GB PR JC-R with the boundary review requirements of
7    the USP.  The District argued that its adherence to the boundary review requirements of
8    its policy also satisfied the requirements of the USP, because "Policy JC-R, while it
9    should be revised in compliance with the USP, <u>includes the same criteria as set forth in</u>
10   <u>the USP</u>" (at page 5 of TUSD 04/12/13 reply emphasis added).  The Court disagreed,
11   explaining that:

12           The Fisher Plaintiffs point out that the District guideline JC-R for making
13           boundary decisions, which was the guideline applied to the boundaries proposed
14           here, is not the same as the guideline under the USP, which includes two of five
15           criteria aimed at assessing integration: demographics (i.e., race, ethnicity, growth
16           projections, socioeconomic status) and effects on school integration, and requires
17           that in applying the five criteria, the District shall propose and evaluate various
18           scenarios in an effort to increase the integration of its schools [...].  The problem is
19           apparent in the District's Reply.  It continues to maintain that it has satisfied the
20           conditions of the USP by "factoring the goal of integration into the decisions."
21           The JC-R guideline provides six factors, one of which is natural and legal
22           parameters including neighborhood boundaries, natural boundaries, current and
23           future subdivision growth, and ethnic mix.  <u>The District is wrong</u>.  This guideline
24           is not the same as what is required under the USP.  Even if looking at "ethnic mix"
25           when considering the criteria "natural and legal parameters" is construed the same
26           as considering "demographics (i.e., race, ethnicity, growth projections,
27           socioeconomic status) and effects on school integration," the District has
28           admittedly failed to apply the entirety of the boundary-change criteria by

considering various scenarios in an effort to increase the integration of its schools. This is a dis-service to the students, who now may be subject to further movement to accomplish the goal of integration to the extent practicable in the TUSD. Just to be clear, <u>the Plaintiffs are correct</u>. School policies must yield to the Constitution where they stand to impede or otherwise limit the implementation of the USP. See North Carolina State Bd. of Ed. v. Swann, 402 U.S. 43, 46 (1971) (where policy limits a school from operating a unitary school system or impedes disestablishing a dual school system, it must fall) (at pages 4-5 of 04/26/13 order emphases added).

Although the District did subsequently revise GB PR JC-R, its revision, while improved, nevertheless fails to conform with the plain requirements of Section II (D) (2) of the USP, which section provides that:

The District shall review and/or redraw its attendance boundaries when it opens a new school; closes, repurposes or consolidates a school; alters the capacity of a school; or designates a school without an attendance boundary. The Parties anticipate that such changes may result in the redrawing of some attendance boundaries. When the District draws attendance boundaries, it shall consider the following criteria: (i) current and projected enrollment; (ii) capacity; (iii) compactness of the attendance area; (iv) physical barriers; (v) demographics (i.e., race, ethnicity, growth projections, socioeconomic status); and (vi) effects on school integration. In applying these criteria, the District shall propose and evaluate various scenarios with, at minimum, the Plaintiffs and the Special Master in an effort to increase the integration of its schools (at page 9 of 02/20/13 order entering the USP into record).

Instead of simply incorporating the USP's express requirement to consider "physical barriers," (idem) as would seem logical, the District has revised GB PR JC-R to require consideration of "physical barriers <u>and subdivision/neighborhood boundaries</u>" (at page 9 of TUSD 02/14/14 BRP emphasis added).  In so doing, the District has revised GB PR JC-R to misrepresent, rather than accurately implement or incorporate, the requirements of Section II (D) (2) of the USP.  Given the District's stated intention to limit the scope of the boundary review process (see above), the Fisher Plaintiffs have good reason to fear that the District's inclusion of GB PR JC-R as an attachment to its BRP and its explicit claim at the final page of its BRP that that policy "implements" and "incorporates" the boundary review requirements of the USP, is indication of the District's continued intent to limit the scope of the boundary review process by applying the requirements of PR JC-R rather than the plain requirements of Section II (D) (2) of the USP, which section requires consideration of six, equally-weighted criteria:

| Section II (D) (2) of the USP | XXVI. TUSD GB PR JC-R | |
|---|---|---|
| "current and projected enrollment" | | |
| | | |
| | ... is subordinated to and conflated with ... | "demographics" |
| "capacity" | ... is limited to ... | "targeted operating capacities" |
| "compactness of the attendance area" | ... is expanded to ... | "compactness of the attendance area <u>and distance to schools</u>" (emphasis added) |
| "physical barriers" | ... is expanded to ... | physical barriers and subdivision/neighborhood boundaries |
| "demographics (i.e., race, ethnicity, growth projections, socioeconomic status)" | ... is expanded to subordinate ... | "demographics (i.e., race, ethnicity, <u>current and projected enrollment, current and project[ed] development patterns,</u> socioeconomic status)" (emphasis added) |
| "effects on school integration" | ... is reworded as ... | "effects on school <u>desegregation</u>" (emphasis added) |
| N/A | (new) | "current and planned instructional programs" |
| N/A | (new) | "student transportation" |
| N/A | (new) | "feeder patterns" |
| N/A | (new) | "previous, recent boundary changes affecting the area" |
| N/A | (new) | "fiscal impacts" |

28

XXVII.                                    **Case 4:74-cv-00090-DCB**                    **Submitted 03/06/14**
                                          **Page 14 of 17**

**2. CONCLUSION**

On the basis of the foregoing facts and arguments, the Fisher Plaintiffs respectfully

request a report and recommendation by the Special Master granting the requested relief.

Respectfully submitted this 6th day of March, 2014

 s/ Rubin Salter, Jr.

RUBIN SALTER, JR., ASBN 01710

Counsel for Fisher Plaintiffs

XXVIII.                                   **Case 4:74-cv-00090-DCB**                 **Submitted 03/06/14**
                                          **Page 15 of 17**

1

**4. CERTIFICATE OF SERVICE**

2

3   I declare and certify that foregoing document was transmitted via electronic mail to the

4   following recipients on this 6th day of March, 2014:

5

6   WILLIAM BRAMMER ASBN 002079
    OSCAR S. LIZARDI ASBN 016626

7   MICHAEL J. RUSING 006617
    PATRICIA L. VICTORY 029231
8   Attorneys for Defendant TUSD
    Rusing, Lopez & Lizardi, PLLC
9   6363 N. Swan Rd., Suite 151
10  Tucson, Arizona 85718
11  (520) 792-4900
12  brammer@rllaz.com
    olizardi@rllaz.com
    mrusing@rllaz.com
13  pvictory@rllaz.com
14

15  LOIS D. THOMPSON CSBN 093245
    JENNIFER L. ROCHE CSBN 254538
16  Attorneys for Mendoza Plaintiffs
    Proskauer Rose LLP
17  2049 Century Park East, Suite 3200
18  Los Angeles, California 90067
19  (310) 557-2900
20  lthompson@proskauer.com
    jroche@proskauer.com
21

JULIE C. TOLLESON ASBN 000000
Attorney for Defendant TUSD
Tucson Unified School District
Legal Department
1010 E 10th St.
Tucson, AZ 85719
(520) 225-6040
julie.tolleson@tusd1.org

NANCY A. RAMIREZ CSBN 152629
Attorney for Mendoza Plaintiffs
Mexican American LDEF
634 S. Spring St. 11th Floor
Los Angeles, CA 90014
(213) 629-2512
nramirez@maldef.org

22

23

24

25

26

27

28

1   ANURIMA BHARGAVA, Chief

2   ZOE M. ZAVITSKY
    Educational Opportunities Section

3   Civil Rights Division USDOJ

4   950 Pennsylvania Avenue, NW
    Patrick Henry Building, Suite 4300

5   Washington, D.C. 20530

6   (202) 305-3223
    anurima.bhargava@usdoj.gov

7   zoe.savitsky@usdoj.gov

8

WILLIS D. HAWLEY
Special Master
2138 Tawes Building
College of Education
University of Maryland
College Park, MD 20742
(301) 405-3592
wdh@umd.edu

9

Respectfully submitted this 6th day of March, 2014

10

11

 s/ Rubin Salter, Jr.

12

RUBIN SALTER, JR., ASBN 01710

13

Counsel for Fisher Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit C

# TUSD

## Tucson Unified School District

## Boundary Review Process March 25, 2014

**I.      USP LANGUAGE**


**II. STUDENT ASSIGNMENT**


**D. Attendance Boundaries, Feeder Patterns, and Pairing and Clustering**


*1. All schools in the District shall have an attendance boundary unless the District has specifically designated a school to have no attendance boundary.*


*2. The District shall review and/or redraw its attendance boundaries when it opens a new school; closes, repurposes or consolidates a school; alters the capacity of a school; or designates a school without an attendance boundary. The Parties anticipate that such changes may result in the redrawing of some attendance boundaries. When the District draws attendance boundaries, it shall consider the following criteria: (i) current and projected enrollment; (ii) capacity; (iii) compactness of the attendance area; (iv) physical barriers; (v) demographics (i.e., race, ethnicity, growth projections, socioeconomic status); and (vi) effects on school integration. In applying these criteria, the District shall propose and evaluate various scenarios with, at minimum, the Plaintiffs and the Special Master in an effort to increase the integration of its schools.*

*3. By April 1, 2013, the District shall review its current attendance boundaries and feeder patterns and, as appropriate, amend such boundaries and patterns and/or provide for the pairing and/or clustering of schools to promote integration of the affected schools.*

### E. Magnet Programs

*3. <u>Magnet School Plan</u>. …the District shall develop…a Magnet School Plan…ensuring that this Plan aligns with [the District's] other student assignment strategies…The District shall at a minimum: (i) consider how, whether, and where to add new sites to replicate successful programs and/or add new magnet themes and additional dual language programs, focusing on which geographic area(s) of the District are best suited for new programs to assist the District in meeting its desegregation obligations…(iv) determine if each magnet school or school with a magnet program shall have an attendance boundary…*

*…the Magnet School Plan shall, at a minimum, set forth a process and schedule to: (vii) make changes to the theme(s), programs, boundaries, and admissions criteria for existing magnet schools and programs*

## II.    POLICIES THAT APPLY

To implement this project in compliance with the USP, revisions to Policy JC, School Attendance Boundaries, were approved by the Governing Board on February 11, 2014. Revisions to Policy JFB, Enrollment and School Choice, are in process to align with the Admissions Process for Oversubscribed Schools approved by the Governing Board on December 10, 2013.

## III.    ROLES AND RESPONSIBILITIES

The Director of Planning and Student Assignment will manage the project with the help of two third-party firms: DLR Group, a K-12 educational planning firm with experience in districts under desegregation orders, and Applied Economics, the firm that prepared a demographic study for the District (together the Project Team). Funding has been allocated to this project.

The Project Team will be responsible to develop a public outreach program that provides multiple venues for public consultation with means to give voice to those who may not be engaged.

Boundary options (including potential changes to magnet boundaries, feeder patterns, and pairing and/or clustering of schools) will be generated by the Project Team and then presented to boundary committees, the Plaintiffs and Special Master and the public for review, comment and refinement. An advisory team of staff and outside professionals will be responsible for assuring the effectiveness and feasibility of all options.

At key points the Project Team will update District leadership, the Governing Board and the Plaintiffs and Special Master. All submittals to the Plaintiffs and Special Master will be submitted through the Director of Desegregation and legal counsel; they will provide the Project Team with any responses on same, from same.

The Project Team will collect all responses, make any necessary revisions and draft the final product and all sub-products.

In accordance with Policy JC, the Director of Planning and Student Assignment will be responsible for notifying parents/guardians of TUSD students, landowners and other affected persons/groups after the final approval of any boundary changes.

Annually, the Director of Planning and Student Assignment will review the District's Annual Report (USP section G.2) to determine if any schools are oversubscribed and will review boundaries to determine if any changes should be made to promote desegregation, especially regarding magnet schools and programs.

## IV.    INPUT OF THE PLAINTIFFS AND SPECIAL MASTER

Before the District amends boundaries, the District must first "propose and evaluate various scenarios with…the Plaintiffs and the Special Master in an effort to increase the integration of its schools." This process includes multiple opportunities for the Plaintiffs and Special Master to receive and comment on information as the District develops scenarios (rather than waiting to involve them after scenarios have already been developed) and to be involved in the evaluation of options before recommendations are presented to the Board. Once the District makes recommendations, it will be available to the Board, the public, and to the Plaintiffs and Special Master.  Once the Board approves a set of recommendations, the parties will have additional time for review and resolution of remaining conflicts. If conflicts cannot be resolved, the Special Master shall submit recommendations to the Court in a report.

Throughout the process, the District is committed to providing background information (like the demographic study) at key consultation points. Party input into the boundary review process is as follows **(See Exhibit A)**:

1. **Inform/Consult/Involve**
   The Plaintiffs and Special Master will participate in a number of ways such as consultation meetings (by phone, in person, or a combination of both), focus groups, and consultation through the submittal and review of draft options and plans.

2. **Notices of Board Action**
   The District will notify the Plaintiffs and Special Master at key points in the process immediately after the Board makes key decisions.

The general timeline for Plaintiff and Special Master involvement is as follows:

**March 2014:**

- Submit the revised proposed Boundary Review Process to the Plaintiffs and Special Master.
- Consult with the Plaintiffs and Special Master within the Boundary Review Process.
- Conduct a focus group to propose and evaluate various scenarios with the Plaintiffs and the Special Master in an effort to promote the continuing desegregation of its schools.

**April 2014:**

- Provide potential options to the Plaintiffs and the Special Master for a two-week review and comment period.

- Conduct conference calls, as needed, to clarify options or to respond to requests for information. These will take place primarily during the two-week review and comment period to ensure the parties fully understand the potential options and are able to provide definitive responses.

- The District reviews the comments from the public and from the Parties/Special Master to develop draft options.

**May 2014:**

- Provide draft options (including a Desegregation Impact Analysis) to the Plaintiffs and the Special Master for a two-week review and comment period.

- Conduct conference calls, as needed, to clarify the draft options or to respond to requests for information. These will take place primarily during the two-week review and comment period to ensure the parties fully understand the draft options and are able to provide definitive responses.

- The District reviews the comments from the Parties/Special Master to develop a draft Boundary Review Plan.

**June 2014:**

- Provide draft plan (including a Desegregation Impact Analysis) to the Plaintiffs and the Special Master for a two-week review and comment period.

- Conduct conference calls, as needed, to clarify the draft Boundary Plan or to respond to requests for information. These will take place primarily during the two-week review and comment period to ensure the parties fully understand the draft plan and are able to provide definitive responses.

- Resolve any remaining issues and/or objections.

- The District reviews the comments from the Parties/Special Master to develop a final Boundary Plan that is supported by the Parties/Special Master.

**V.      UNDERSTANDING OF ISSUES AND OBJECTIVES**

Early in the project, the Project Team will identify issues, objectives and evaluation approaches and then, through the Director of Desegregation, will work with the Special Master and Plaintiffs to further define the project.  This will include defining any perceived ambiguities in the USP.

## VI.    GENERAL TIMELINE (2014)

| January | Update Policy JC and JC-R (Student Attendance Boundaries) |
| | Complete Demographic Study |
| | Submit initial plan proposal and timelines to Board |
| February | Inform Plaintiffs and Special Master of the process and timeline for feedback. |
| | Hire service providers |
| | Form and meet with Advisory Team to specify goals, develop objectives, evaluate potential options and issues, create the initial plan proposal and timelines, and draft evaluation criteria. Develop the Communication Plan including participation of the Parties. Initiate public information and consultation |
| March | Conduct a focus group for the Plaintiffs and Special Master |
| | Advisory Team begins scenario development |
| | Form Boundary Committee and hold informational meetings |
| | Refine scenarios and select a wide range of feasible options |
| April | Provide potential options for Plaintiff/Special Master review and comment |
| | Boundary Committee continues to meet to develop options; they host public meetings in impacted regions; they refine options based on public feedback |
| May | Provide draft options for Plaintiff/Special Master for review and comment |
| | Advisory Team and Boundary Committee evaluate and prioritize options |
| | Develop a preliminary Desegregation Impact Analysis (DIA) and  Notice and Request for Approval (NARA) |
| | Draft boundary recommendations prepared and submitted to leadership |
| | Presentation of Draft Plan with DIA to Governing Board |
| June | Provide draft Boundary Plan for Plaintiff/Special Master review and comment |
| | Draft School Master Plan Implementation Plan including recommendations for the next phase |
| | Compilation of Boundary Review with the Magnet Plan and other elements of the District Strategic Plan |
| | Final Board Approval |
| July | Complete and submit Implementation Plan to Board |
| September | Notification of parents and landowners |