**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

| | |
|---|---|
| Roy and Josie Fisher, et al.,<br><br>                  Plaintiffs,<br><br>    v.<br><br>United States of America,<br><br>                  Plaintiff-Intervenor,<br><br>    v.<br><br>Anita Lohr, et al.,<br><br>                  Defendants,<br><br>    and<br><br>Sidney L. Sutton, et al.,<br><br>                  Defendants-Intervenors, | CV 74-90 TUC DCB<br>(Lead Case) |
| Maria Mendoza, et al.,<br><br>                  Plaintiffs,<br><br>United States of America,<br><br>                  Plaintiff-Intervenor,<br><br>    v.<br><br>Tucson Unified School District No. One, et al.,<br><br>                  Defendants. | CV 74-204 TUC DCB<br>(Consolidated Case) |

# SPECIAL MASTER'S REPORT AND
# RECOMMENDATION RE ADVANCED LEARNING EXPERIENCES

Introduction

Section V.A of the USP requires the District to improve the academic achievement of African American and Latino students and to "… ensure that African American and Latino students have equal access to the District's Advanced Learning Experiences" ("ALE").

This report suggests that the District is working hard to increase African American and Latino enrollment in ALEs, but there is further progress that needs to be made, especially for African American students. The District does not dispute that reality and appears to be poised to build on its past achievements.

The USP identifies several different types of Advanced Learning Experiences (ALE): gifted and talented programs (GATE); "advanced academic courses" (AAC); and University High School (UHS). Advanced academic courses include advanced placement (AP) courses, Pre-AP Advanced, and Pre-AP Honors courses, middle school courses that carry high school credit, "dual credit" high school courses that can be used to satisfy college requirements, and International Baccalaureate (IB) courses. *See* Table I.

| Table I. Types of Advanced Learning Experiences and Who Can Participate | |
|---|---|
| *Type of ALE* | *Where Offered** |
| Advanced Placement | Students at comprehensive high schools except Santa Rita and Cholla |
| International Baccalaureate Programme | Cholla students who enroll in IB Courses |
| Dual Credit (High School and College) | Santa Rita |
| Middle School Courses with High School Credit | Middle Schools |
| Pre-AP advanced and Pre-AP Honors courses: Course titles vary by school | All 6-8 grade students on all schools |
| Gifted and Talented Programs<br>• Self-contained-admission by test<br>• Pull out- admission by test<br>• Resource | • 10 schools as of 2016-17<br>• Schools w/1-5 grades<br>• Most schools with 6-8 grades and some high schools |
| *There are exceptions but the number of students involved is very small in the exceptional cases. | |

The parties subsequently added dual language courses to the list of ALE. However, this R&R does not address access to or success in dual language courses because the effectiveness of the District's implementation of the provisions of the USP relating to dual language will be the focus of a separate analysis.

In efforts to arrive at a plan to implement Section V.A of the USP, the parties have been unable to agree on what the goals for access and participation in ALE should be and whether these goals should apply to all ALE and all schools.

The District proposed to set the goals for 2016-17 at not less than 15% of the District's African American and Latino populations at the grade levels in which particular programs were offered. In addition, the District proposed that this target should apply to 80 percent of the individual ALE programs D district-wide rather than all schools. The District proposed to increase its goal from 15 percent to 10% for 2017-18. The Mendoza plaintiffs proposed that the goal for each ALE be parity for all programs in all schools.

Because efforts to reach an agreement about the goals have been unsuccessful, on January 27, 2016, the Court recognized that the parties were unlikely to resolve their differences and ordered the Special Master to:

> file an R&R with the Court, which shall be a comprehensive review of the original ALE action plan and the supplement and include UHS and ELL goals, and report to the Court whether TUSD is on a trajectory to meet the requirements set out in the ALE provisions of the USP. If not, the Special Master's R&R shall include recommendations for specific measures which could practicably be undertaken by TUSD acting in good faith to implement the provisions of the USP aimed at improving minority student access to ALE and improving the completion rate of minority students in these programs.

This R&R addresses three broad questions:

1.  To what goals with respect to both access to and participation in an ALE should the District be held accountable?

2.  How successful has the District been in attaining those goals and where there is evidence, what are the success rates for students participating in ALE?

3. What actions should the District take to improve its efforts to enhance participation and success rates in ALE?

**Part One: and Goals**

What goals should the District be accountable for achieving? The USP wording with respect to ALE focuses on access. However, it would be difficult to determine access without examining actual participation. To its credit, the District has agreed to use participation as the goal to be pursued. Moreover, the Court order that generated this R&R identified "completion rates" as an issue the R&R should address. This report includes information about some student outcomes on the assumption that "completion rates" implied results of participation in ALE.

The Mendoza plaintiffs argue that students of all racial backgrounds should participate in all ALE at equal rates. This would be an extraordinarily difficult standard for the District to attain. Access to some ALE is conditioned by tests and the performance of students on these tests is shaped significantly by the family and community environments in which students live. Family and community characteristics are, in turn, correlated with race. Because of limits on financial resources, teacher interest and qualifications, and other influences, the availability of ALE varies by school. And, participation in ALE is voluntary on the part of students and large numbers of students who are eligible to participate in ALE choose not to do so.

Establishing goals district-wide and those for specific school represent different challenges. Thus, this part of the R&R deals with each separately.

District-wide Goals

The District engaged a nationally prominent researcher – Dr. Donna Ford of Vanderbilt University – who studies "minority" student access to and success in academic programs that are exceptionally rigorous. Dr. Ford (who is an African American) indicated that when districts consult with her on this question and when she serves as an expert witness in court cases, she

recommends the use of what she calls a 20% "rule of thumb" but acknowledged that she did not have in-depth information about the students in TUSD.

The District adopted its consultant's 20% rule of thumb for 2015-16 and committed to attaining a 15% participation rate for African American and Latino students for the 2016-17 school year. The District proposed to apply this standard to 80% of the programs district-wide.

How the participation rate proposed by Dr. Ford is determined is important. For each ALE, the percentage of African American and Latino students enrolled district-wide in the grades where the ALE is offered is multiplied by 80% (if the 20% rule of thumb is applied) to determine the percentage of students of each race that need to be enrolled in order to meet the 20% standard. The percentage of students of each race who are actually enrolled in the specified ALE is then compared to the District goal. For example, assume that 60% of Latino students are enrolled district-wide in the grade levels in which a specific ALE is offered. Eighty percent of 60% is 48%. If the total number of students enrolled were 1000, the District goal for enrollment of Latino students would be 480. If more than 480 Latinos were actually enrolled, the District would have met its goal.

The Court expects that ALE goals will be set for ELL students. There apparently is no research or state or national data upon which to base such goals. The most sensible strategy may be to ask the parties to meet to determine practicable goals going forward using data on current participation by ELLs in each ALE as the base upon which to build rates of increase over the next three years. The same approach could be used for exceptional education students with goals varying by disability.

I recommend that the District be held accountable to a 15% rule, except for ELL and students with disabilities, calculated as above for 2016-17 and beyond, and that this goal apply to each ALE. This goal should be applied to all schools unless there are conditions which make that

exceptionally difficult.  I discuss this caveat below.  The 15% goal is a more ambitious goal than that proposed by the District's consultant but falls short of the parity rule the Mendoza plaintiffs have advocated.[1]

Parity is not a reasonable goal for all students.  Participation in ALEs is voluntary and choice is influenced by perceptions of likely attainment of the putative benefits of participating in a given ALE.  These perceptions can be influenced by teachers and counselors and other educators, a point returned to later, but family and student perceptions of whether students will benefit from ALEs is importantly influenced by numerous factors including the prior experiences of family members, stereotype threat, and students' sense of academic confidence and competence.

The Mendoza plaintiffs have urged that more ambitious goals be set for courses available to all students, such as pre-AP courses.  However, the same factors that would influence choice by parents and students apply whether the goal is 15% or 10%.  Further, it seems unlikely that the District would do anything different in the pursuit of achieving the 15% goal if the goal were lowered to 10% or even five percent.  This is illustrated by the fact in 2016-17, when the 20% rule was in effect, this higher goal than the one being proposed did not seem to reduce the District's effort to increase participation of African American and Latino students.  In 2016-17 Latino participation in four the five pre-AP programs would have met a 10% goal and a 5% goal would have been met in three of the five cases.

Goals for UHS

I recommend that the 15% rule not be applied to UHS because admission is determined by an examination and prior academic performance.  Efforts by the Special Master to compare the

[1] At one point, the District agreed to try to meet a 10% goal for 2017-18. However, the District coupled this proposal with a provision that this target should be achieved in 80% of the ALE programs and this stipulation seems unacceptable.

diversity at UHS to that in other exam schools suggests that UHS is uncommonly diverse. It is difficult, therefore, to know how to set goals for UHS. The Special Master has requested that the District collect information on the racial composition of other top exam schools. These data may provide insights as to an appropriate set of goals for UHS.

In the meantime, efforts that the District is making to increase the diversity of UHS and the success of those efforts should be examined. *See* discussion of UHS in the next section of this R&R.

The Uniqueness of ALEs

When specific goals for enrollment in rigorous courses and programs are part of the discussion in other districts, most debates over what the goal should be are typically focused on participation in gifted and talented programs and other programs where participation is determined by tests or prior academic performance." In other words, the USP's expansive definition of academic programs for which the District should be held accountable for significant enrollment by African American and Latino students, is unusual and testifies to the District's and the plaintiffs' commitment to the pursuit of equity.

ALE Goals for Individual Schools

As noted earlier, overall progress being made may provide a different picture than that one would see by examining whether enrollment goals are being made for all ALE in all schools. That there are differences among schools is clear, and it would be surprising if this were not the case because the factors that influence access and participation can vary by school. But because some of these factors are beyond the practicable influence of the District, the 15% rule should not apply for all ALEs in individual schools.

To determine whether the District is doing what it reasonably can to enhance the opportunities of African American and Latino students to participate in ALE, it would be useful

to answer the following questions:

1. Are there consistent differences in the extent to which African-American and Latino students participate in a particular ALE?

2. If so, what are the reasons for these differences?

3. Are there practicable actions the District could take to reduce or eliminate the effects of the influences on differences in student ALE enrollment?

 In order to answer these questions, it will be necessary to undertake a study for which the necessary data are not readily available but could be assembled with reasonable effort by the District. The study would examine separately each ALE that is offered or offered differently in some schools but not others at the same grade levels. The characteristics of the two sets of schools would then be compared to examine whether the differences account for the availability of the ALE. The analysis would then examine differences in participation rates among African American and Latino students across the schools that do offer that ALE. Among the factors that would be examined as potential explanations for differences are: teacher interest, teacher qualifications, grade structure (K-8 and middle schools can have different schedules), and magnet status.

 It seems worth repeating that a major reason for differences across schools in ALE is the "known unknown" of student and parent decisions. That is, we cannot determine why students and parents opt out and what could be done to change their minds. The cost of such a study would be prohibitive and the results problematic.

 Before turning to a discussion of TUSD's progress in achieving the goals just proposed, this report addresses the Mendoza plaintiffs' concern that without information about participation of white students in ALE, an analysis of the District's efforts would be incomplete.

 The actual percentage of white students enrolled in ALE is similar to Latino students in many instances. However, because white students comprise a significantly smaller percentage of

total enrollment at each grade level, white students are disproportionately enrolled in most ALE. A couple of examples illustrate this point. First, while the percentage of white and Latino students in early grades self-contained GATE is almost exactly the same, white students exceed the 15% goal by 36 percentage points while the percentage of Latino students in this program fall short of the 15% goal by eight percentage points. Second, in AP, whites exceed the 15% goal by 17 percentage points while Latino students exceed 15% goal by less than a single percentage point. The degree of this disparity varies by ALE with the smallest differences between the 15% and actual enrollment being about 4 to 5% in those ALE offered at a small number of schools.

These differences in the enrollment of white students in ALE is not surprising and would be found in almost all districts where, as in Tucson, white families are more affluent and parents have higher rates of the attainment in post-secondary education and families of other races. The District cannot change the socioeconomic status of families in the short run.[2]

The disparity between white students' participation in ALE and the participation of African American and Latino students raises the obvious question: why not base goals for African-American and Latino students on the performance of white students, an approach often used when "narrowing the achievement gap" is discussed. One problem with this approach is that the goals would change each year. But more important to understanding the differences in the participation of students from different backgrounds in ALE is that family and community influences have an enormous impact on students' academic achievement, at least as it is measured by standardized test scores like those used to measure student achievement in Arizona.

Numerous researchers have studied how much of the variance in student achievement can be accounted for by measurable variations in school characteristics. The consensus is that

---

[2] Many districts create barriers to taking more rigorous classes, including AP. These barriers include teacher recommendations and grade-point averages. TUSD has no such obstacles other than GATE and UHS.

schools, on average, account for less than a third of the variance in student achievement. Differences in family and community characteristics that are highly correlated with student performance on standardized tests are also correlated with race.

This does not mean that good schools do not make a big difference in students' lives in many ways. The point here is that setting goals the achievement of which are beyond the capabilities of schools to achieve is not fair may direct attention away from actions the District can implement to increase participation of Latino and African American students in ALE.

**Part Two: The Status of the District's Efforts to Increase African American and Latino Student Enrollment in ALE**

<u>Status in 2016-17 Overall</u>

The following analysis focuses on the District's attainment of the 15% goal across most of the ALE programs but excludes dual language programs, which will be the focus of a separate analysis in the Special Master's annual report for 2016-17; the IB programs at Safford and Robison because they have been terminated as magnet programs; and UHS, which is discussed separately below.

There is a total of 15 programs examined here defined by type of ALE, grade level (*e.g.*, GATE, K-5). The analysis treats each of these 15 programs as having two goals, one for African American students and one for Latino students – 30 in all. The 15% rule is used as a measure of goal attainment. The data used are from 2016-17 unless otherwise noted (when trends are discussed).

Of the 15 African American programs, the District met the 15% goal in three cases. With respect to the 15 Latino programs, the District met the 15% goal in 12. Of the programs where the 15% rule was not met for African-Americans, two of these came within 1% of meeting the goal. In one of the three Latino programs that did not meet the 15% goal, the goal would have been met if a one percent margin were allowed. The largest shortfalls in attaining the 15% goal

were in self-contained GATE for both African American and Latino students and pull-out GATE

for African American students.  *See* Table II, which is appended to this report, for relevant data.

GATE enrollment is discussed in more detail below.

District-wide, goal attainment at the 15% level masks differences by school.  For example,

as will be noted below, participation in AP classes varies considerably in the District's high

schools.  Self-contained GATE is available in a small number of schools.  While African

American and Latino students who do not live within the boundaries of the schools with self-

contained GATE may transfer to the schools offering the self-contained program and receive free

transportation, many African American and Latino students choose to stay in schools closer to

their homes.

The reason for the relatively low participation in self-contained GATE programs by

African American and Latino students is not because most are located in schools that are located

in parts of the city with low proportions of African American and Latino families.  Many self-

contained GATE programs are offered in schools serving relatively large proportions of African

American and Latino students. Low participation by African American and Latino students is

primarily a product of the inability of many of these students to perform well enough on the

cognitive tests for admission.  The District recognizes this problem and is testing the efficacy of

"open GATE" programs in three schools at which admission will not be affected by student

scores on a test.

The number of students involved in each type of ALE varies from year to year and from

program to program.  An analysis of trends over the last two years can shed some light the

District's trajectory and goal attainment as well as providing information about the effectiveness

of efforts to increase enrollment.  Data are available for the period 2013-14 to 2016-17 but the

number of schools has changed and the District's efforts to enhance attainment in ALE has

increased significantly. For the purposes of this analysis, the proportion of African American and Latino students in each program is examined rather than specific goal attainment because the goals changed from year to year. As Table II data show, the pattern is mixed with some progress made in some programs and not others and in some cases the level of participation declined.

African American student enrollment in self-contained grade 1-5 GATE programs increased significantly – a 57% increase from 2015-16 to 2016-17 (an increase of 12 students)[3]; Latino students had a 41% increase (an increase of 78 students). This is due in part to the implementation of a new "Open GATE" program in Tully elementary school. But enrollment in middle school self-contained GATE declined somewhat for both African-American and Latino students from 2015-16 to 2016-17. The largest proportional increase for African Americans was in pre-AP honors courses. The proportion of Latino students in particular ALE programs was greatest in dual credit (which is offered primarily at Santa Rita High School), IB at Cholla High School, and Advanced Placement.

A simple way to get a sense of what is happening is to look at progress made from 2015-16 to 2016-17 across the ALE being examined. Measuring progress by percentage changes in participation (the measure used to calculate progress toward the 15% goal) and treating one percent changes either way as inconsequential, for African American students four ALE improved, seven lost ground, and four did not change. For Latino students, eight ALE indicated improvement, two lost ground, and five remained unchanged. If we look at the number of students in each ALE the story for African American students is the same but for Latino students, because of their much larger numbers, participation improved noticeably in twelve ALEs,

---

[3] The number of African American students in particular ALE programs is usually small, so small numbers of students enrolling can have a relatively large effect on the percentages.

decreased in one, and did not change in two. In at least half of the ALEs where the number of Latino students increased, the number of students was quite small.

This summary is not only simple, it is simplistic. Some ALE affect many more students than others just as some ALE have greater impact on student learning than others.

ELL Students

There are virtually no African American (or white) ELL students in an ALE of any type in 2016-17. The number of Latino ELL students in an ALE varies by the type of ALE and over time. Across the most recent four years, Latino ELL participation was greatest in 2016-17 for Resource GATE, middle school classes for high school credit, pre-AP advanced, pre-AP honors and AP. No or one Latino ELL student was enrolled in UHS or dual credit courses. ELL enrollment varied in no particular pattern for pullout GATE and self-contained GATE.

Participation of Latino ELL students in ALE meant to prepare students for enrollment and success in AP classes increased dramatically, from 14 in 2013-4 to 126 in 2016-17.

Exceptional Education Students

Exceptional education is a broad category of students including students are labeled as "gifted" based on their scores on cognitive tests and students with various physical and mental disabilities. Knowing the number of exceptional education students participating in ALE without knowing the particular reasons they were classified as exceptional education students is not useful. Specific information for each category of exceptional education was not requested from the District but the total number of exceptional education students in ALE is quite small.

A Closer Look at AP, IB, Dual Credit, GATE, and UHS

*GATE Enrollment*

As was pointed out in the discussion of the extent to which the District met its ALE goals district-wide, self-contained GATE and pullout GATE are two of the types of ALE where the

District has fallen short of the 15% goal. African American and Latino students who qualify for self-contained GATE programs receive free transportation to one of the 10 schools, if they do not reside within that school's boundary. However, a large number of students who have this option choose not to exercise it. The fact that two of the 10 schools are dual language places a practical limit on African-American student enrollment because success in these programs in grades three and beyond it is affected by the student's ability to speak Spanish.

The racial composition of self-contained GATE classrooms ranges from 21 percent to 24% African American and 24-88% Latino.[4]

Pullout GATE – which provides students with approximately 90 minutes of GATE learning each week – is available in all elementary schools and participation is limited to students who have met the minimal test score on the access exam. There are three exceptions to this, which are referred to as the cluster pullout GATE schools. The three schools are Fruchthendler, Dunham, and Robins. The first two are majority white schools; Robins is racially concentrated. This issue is addressed in the recommendation section of this report. In cluster pullout programs, students who did not pass the test required for GATE enrollment can participate in the pull-out GATE experience in that school.

GATE resource provides an elective course or other GATE-like experience for approximately 50 minutes five days a week in all middle and K-8 schools that use middle school schedules (this excludes some smaller K-8 schools) as well in some high schools. The high school elective experiences are to be expanded to all comprehensive high schools. Resource GATE is one of the ALE whose characteristics depend on the availability of teachers and student

---

[4] It should be noted that racial composition of self-contained classrooms is sometimes considerably different than the racial composition of the schools within which those classrooms exist. Thus, such schools are characterized by *de facto* tracking.

interests. Issues of equity among resource programs can best be discovered by the study proposed in the previous section.

Enrollment in self-contained and pullout GATE is contingent on student scores on a cognitive test. To increase the pool of students who might qualify for GATE and who might therefore be encouraged to participate, the District tested almost all first and fifth graders in 2015-16. Based on AR 15-16 – REVISED Table 5.6 GATE Testing Data, the number of African American students testing for GATE (District students in grades K-6) increased from 435 in 2014-15 to 917 in 2015-16, an increase of 482 (110.8%). The number of Hispanic students testing for GATE (District students in grades K-6) increased from 3045 in 2014-15 to 6343 in 2015-16, an increase of 3298 (108.3%).

The effects of testing on enrollment would only be evident in elementary grades where relevant recent data are available. There was a significant 57% increase enrollment of African-American students and a 41% increase in the number of Latino students in self-contained GATE. Nevertheless, as noted earlier, further progress is needed for the District to meet the 15% goal. In contrast to the self-contained GATE picture, virtually no progress was made increasing the number of Latino and African American students in pullout GATE.

*ALE that Have the Potential for College Credit: AP, IB and Dual Credit*

Any student may enroll in an AP class without having to take a test. Table III lists the number of courses at each of the District high schools over the last two years as well as enrollment of African American and Latino students in 2016-17.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Table III.  High School AP Report - Based on the 40th Day** | | | | | | | |
| Site | AP Courses 2015-16 | AP Sections* 2015-16 | AP Enrollment AA and H 2015-16 Each Student is Counted Once | AP Courses 2016-17 | *Dual Credit Courses 2016-17* | AP Sections* 2016-17 | AP Enrollment AA and H 2016-17 Each Student is Counted Once |
| Catalina | 4 | 6 | 43 | 6 | *2* | 6 | 50 |
| Cholla | 18(IB) | 31(IB) | 0 | 19(IB) 1(AP) | *0* | 34(IB) 1(AP) | 12 |
| Palo Verde | 10 | 12 | 166 | 9 | *0* | 15 | 146 |
| Pueblo | 14 | 18 | 222 | 14 | *2* | 19 | 246 |
| Rincon | 16 | 21 | 189 | 12 | *1* | 18 | 133 |
| Sabino | 13 | 13 | 106 | 13 | *0* | 14 | 117 |
| Sahuaro | 10 | 29 | 215 | 12 | *0* | 32 | 226 |
| Santa Rita | 9 | 2 | 42 | 1 | *5* | 2 | 1 |
| Tucson | 15 | 30 | 352 | 18 | *3* | 29 | 318 |
| University | 21 | 92 | 386 | 23 | *1* | 114 | 431 |

\* Section allocation is determined by the high school for a variety of site specific reasons and may not be used in a consistent manner across high schools. For example, 1 class period may include multiple sections.

Table III understates the number of students enrolled in AP classes because the number of enrollees is the number of individual students who take one or more AP classes rather than the total number of students who enroll in all AP classes.  However, Table III does provide a picture of differences in access from school to school.

It is difficult to determine what an equitable number of courses and enrollment should be in each school because – as suggested earlier – AP offerings are determined by student demand, whether teachers have relevant training and interest to offer such courses, and other factors.  A student's decision to enroll in an AP class is influenced by the student's own sense of confidence in their ability to succeed and support they receive from parents and teachers accordingly.  Some parents appear to believe that having their student take an AP class would negatively affect their grade point average and, hence, their students' opportunities to attend college (even though colleges often give weight to AP classes in making decisions about admission even when student do not pass AP exams).  In addition, teachers and counselors sometimes decide that a student will

not benefit from a more rigorous curriculum (despite evidence to the contrary) and explicitly or implicitly discourage students from enrolling in an AP class.

TUSD received national recognition for the increase in the number of AP courses offered and students tested in 2013-14 and 2015-16. However, all of the increases in the number of classes offered are accounted for by increases in two high schools; UHS and Sahauro. In other schools, the aggregate number of courses actually declined.

An examination of the school level access to and participation in AP classes usefully excludes UHS students. With 7.5% of all TUSD high school students, UHS accounted for 32% of all of the District high school students enrolled in one or more AP classes 2015-16.[5]

It is not surprising that schools with the largest percentage of African American students have the lowest proportion of students enrolled in AP classes. African American and Latino students participate at somewhat lower rates in ALEs aimed in part at readying students to succeed in AP. Since African American and Latino students as a whole perform academically at a lower rate than the District average, the students and their families may feel that AP classes are too demanding. But, as Table III indicates, the differences among schools and participation are significant. At Pueblo High, where 91% of the student are African American and Latino, and at Tucson High, where 79% of the students are African American and Latino, only one-sixth of the students take at least one AP course. In comparison, in the two comprehensive high schools where African American and Latino students make up less than 50% of the student population – Sahauro and Sabino – one fourth and one third of their African-American and Latino students enrolled in at least one AP class.[6]

---

[4] Counting total enrollment in all AP classes (students count more than once), UHS accounted for 46% of all students enrolled in AP in 2015-16.

[6] If we look only at grades 11 and 12, the proportion of African-American Latino students enrolled in one or more AP courses was 70% at Sabino and 57% at Sahauro.

The number of African American students taking AP courses between 2015-16 and 2016-17 declined slightly and the number of Latino students increased slightly.

African American and Latino student AP test taking increased substantially between 2013-14 and 2015-16, with increases in all but one of the high schools offering more than one or two AP courses.  However, the number of African American and Latino test takers declined slightly between 2014-15 and 2015-16.

Of those students taking the test over the three-year period beginning in 2013-14, the number and percentage of white, African American and Latino students scoring three or higher on AP exams increased noticeably though students in all three racial groups scored three or more on AP exams more often in 2014-15 than in 2015-16.  Decreases for African American and Latino students were very small in 2015-16.  Over the three-year period, the actual number of African-American and Latino students passing the AP test increased by 37% and 35% respectively.

While University High School students accounted for 66% of the passing scores among TUSD students, 32% of the African American students who took the exam scored a passing grade and 40% of Latino test takers did so.  2013 data for Arizona (the most recent national data) suggest that African American and Latino students in TUSD who took AP exams did substantially better on AP tests than African American and Latino students throughout the state.

At least three concerns are manifest in Table III regarding college credit options:  the relatively small number of courses available at Catalina, the virtual absence of AP classes at Santa Rita, and the fact that students at Cholla have limited ways to receive college credit other than by taking an IB class because AP classes are offered in only four subjects not covered by IB courses.

Catalina

Only six AP courses are available for the 741 students who were enrolled in 2016-17. In contrast, in Sabino High School, where 196 more students are enrolled, there are almost twice as many AP courses available. Not surprisingly, the number of individual students enrolled at Sabino in an AP class significantly exceeds the number of African American and Latino students enrolled in an AP class at Catalina. And, while Catalina is somewhat smaller enrollment, the number of African American and Latino students at Catalina exceeds the number of African American and Latino students at Sabino by 126. Catalina has a substantially larger number of ELL students than does Sabino and the proportion of African American students who are ELL is greater in Catalina than Sabino. The relatively large proportion of ELL students at Catalina affects both demand and opportunity with respect to AP. But this does not explain all the significant differences between the two schools. In any case, the small number of African American and Latino students in AP is almost unbelievable; the average class size is less than 10. Not a single African American or Latino Catalina student passed an AP exam in the most recent year for which the district provided data.

Santa Rita

In 2015-16, nine AP classes were offered at Santa Rita. Currently, Santa Rita offers only one AP class – a class in studio art with very small enrollment. The District explains this situation by saying that students at Santa Rita have the option of taking dual credit courses – courses that can be counted as meeting requirements at the college level. However, students enrolled in these courses are *guaranteed* only that their dual credit class will count for college credit in Arizona. In comparison, students who take an AP classes and pass with a grade of 3 (out of 5) have the possibility of receiving college credit at many colleges and universities (though more selective institutions may require a higher test grade than 3).

In other words, students who graduate from Santa Rita and seek admission at a college or university outside of the state of Arizona may be at a disadvantage as compared to students who take and succeed in traditional AP courses. Parents of Santa Rita students should be advised that their student could be at a disadvantage compared to students who take an AP class because their student may not receive out-of-state college level credit for their dual credit courses should they enroll outside Arizona.

Cholla

Cholla offers International Baccalaureate (IB) courses for ALEs. Additionally, the school offers only select AP classes to fill a need if a course is not offered through the IB program. Students who take IB classes and receive a passing grade on the independently graded IB test for that course have at least as good a chance of receiving college credit as a student who has taken an AP class at a different high school. While any student at Cholla may enroll in an IB course, only students in the diploma program may take an IB exam.

The IB diploma is highly prestigious (very few students receive the IB diploma), and IB courses are recognized internationally as exceptionally rigorous. But, Cholla students may be at a disadvantage vis-à-vis students and other high schools that offer AP. Further, there is a greater range of content in AP courses than is the case for IB.

*UHS*

University High School is considered one of the best high schools in America. Admission to UHS is based primarily on performance on admission test (the CogAT) and grade point average above 3.0. It is also among the most racially and ethnically diverse "exam schools," especially if diversity is measured by the relative ratios of African American, Latino, and white students. In 2016-17, the racial composition of the UHS student body was:

White – 46%;

African American – 3.4%;

Latino – 36%;

Native American –.2%;

Asian Pacific Islander – 8.7%;

Multiracial – 5.8%

Another indication of diversity is the fact that 56% of current UHS enrollment receives free and reduced lunch.

In 2013-14, the Court ordered a change in admission criteria to allow students who fell slightly below the 50 point admission bar based on the test and grade point average to write short answer essays to demonstrate their qualifications. Between 2013-14 and 2016-17, Latino enrollment at UHS increased by 18% and African American enrollment by 20%. All of the gains for African American students (that resulted in a total enrollment of 37 students in all grades), occurred for African Americans in 2014-15. The number of Latino students has grown each year over the last four years, with the biggest annual growth having occurred in 2016-17.

These increases in the number of African American and Latino students occurred while the total enrollment in UHS has increased so the percentage of the UHS student population of African American and Latino students has increased .5% for African American students and 3.8% for Latino students. (The proportion of white students at UHS has declined slightly).

Most core academic courses at UHS are Advanced Placement courses; 94% of white students score 3 or higher on AP tests while 85% of African American students and 87% of Latino students score 3 or higher. UHS students accounted for two-thirds of all TUSD students who achieved passing scores on AP tests

UHS provides considerable academic support for all students who need it; a small percentage of students of all races withdraw from UHS for academic reasons. In general, African

American and Latino students are successful at UHS. Attrition rates among African American students went from 7% in 2013-14 to 3% in 2015-16, the same as the retention rate for white students. During the same period, the attrition rate among Latino students increased from 4 to 6%. Graduation rates for both African American and Latino students at UHS are greater than the graduation rates for high school students District-wide.

**Part Three: Recommendations for Moving Forward**

<u>Recommendations for the District</u>

In making the recommendations here, the assumption is made that the Court will adopt the goals the Special Master is recommending in this R&R. Many of the recommendations made here do not lend themselves to specific orders by a court. Moreover, this Court has indicated that it is prepared to give the District leeway in how it goes about meeting the requirements of the USP while it holds the District accountable for achieving the intent of the USP.

The ALE action plan and a supplement to that plan identify numerous steps the District should take to recruit African American and Latino students suitable as to bring about an increase in the participation and support in ALE. The District has implemented all of these provisions.

The District has made progress in enhancing the access to and participation in ALE for Latino students though more has yet to be done. The picture is quite different for African American students as compared to Latino students. Of the 15 African American programs, the District met the 15% goal in only three cases. With respect to the 15 Latino programs, the District met the 15% goal in 12. Of the 12 African American programs where the 15% rule was not met, two of these came within 1% of meeting the goal. In one of the three Latino programs that did not meet the 15% goal, the goal would have been met if a 1% margin were allowed.

The good news is that the District appears to be committed to achieving the intent of the USP.

*Tests*

Opportunities to participate in ALE would, of course, be significantly enhanced if students did not have to pass a test in order to participate. However, the elimination of tests as requirement for access to UHS and GATE programs has not been on the table and making this change would alter in fundamental ways the nature of these programs. Considerable discussion among the parties has been focused on altering the criteria for eligibility – changes in the tests themselves or in the cut scores. Changing the tests has already been done at UHS as a consequence of court action and the District has since changed the criteria and evaluated the effects of changes. The District should continue to explore tests and other admission constraints but a court order to that effect seems unnecessary. With respect to cut scores for GATE, the District has examined the effects of significantly lowering the cut scores, and the results of its analysis is that it would not significantly change the number of African-American and Latino students who would qualify. The Special Master will in the future look closely at these analyses but accepts their validity for now.

*Increasing Voluntary Enrollment*

One of the reasons that the District gives for differences among schools and ALE is that participation is largely voluntary. But this rather begs the question. Why are there such differences in student and family willingness to participate in particular ALE at different sites? Answering that question would provide direction to policies and practices that would eliminate some of the differences.

The Court could order the District do a job better marketing. But the District has rather fully implemented the marketing aspects of the ALE action plan and the plan's supplement and gone beyond that with respect to GATE (see Appendix A).

But more important than telling parents about the ALE programs would be efforts that provide families and students with confidence that the students will be successful in these more demanding programs. The District works with families in this way now through family and community liaison personnel but for the Court to define how this would be better done is not advisable. Many considerations are involved that the District is better able to determine than is the Court. No doubt family and community liaisons provide a useful function going to family homes to share information. But experiences elsewhere suggest that the teachers, and particularly parents of other children participating successfully in a particular ALE who are of the same background as families with whom they are communicating, can have more impact.

As important as families are in shaping students' dispositions about course taking is the role of the schools play in developing students' capabilities and confidence that they have the ability to benefit from the ALE. There is no way effective to mandate teachers, counselors, or other staff to do this. In any event, they probably believe they already do enhance students' capabilities and ambition. No doubt many educators do.

Moreover, developing academic self-confidence is not "simply" the product of interactions between individual educators and their students. It is also the outcome a school-wide culture where academic excellence is valued and celebrated. In this regard, it is somewhat concerning that the District asserts that "individual school participation rates can be heavily influenced by the racial and ethnic makeup of the particular school rather than the effectiveness of school." Hopefully, the implication here is not that students come to school with firmly held dispositions about their academic prospects that are highly correlated with their race and ethnicity and are beyond the ability of schools to alter. There is considerable evidence that teachers, administrators and other educators can have a significant impact on students' motivation and self-confidence.

To be sure, cultures are not easy to change in the short run, but what some researchers call an ethos of achievement can be developed and sustained by school administrators, teachers, counselors and families. Establishing such school cultures where needed should be a high priority for the District that will not only result in stronger outcomes with respect to ALE but for student outcomes in general.

*Advanced Placement*

There are substantial differences among the District high schools with respect to student access to and participation in AP courses. There are understandable reasons for these differences in some cases. The situation at Catalina demands immediate attention. Tucson High, Rincon, Pueblo, and Palo Verde also stand out as schools with low AP participation. The District should develop plans to enhance enrollment in the five schools identified above. These plans should be shared with the plaintiffs and the Special Master and should be used by the District to demonstrate its commitment to implementing the provisions of USP as it seeks unitary status.

*GATE*

The District's way forward with GATE would be informed by answers to two important questions:

1.  How much do students benefit from different forms of GATE and does this difference differ for students from different backgrounds?

2.  Do different approaches to GATE contribute to integration? Looking at the available information suggests that the contribution is not great, at least using the definition of integration in the USP. But this is speculative. First year data from Tully's magnet self-contained "Open GATE" program suggests that the potential for promoting integration exists, at least when no test is required for participation.

The District has taken a number of steps recently to increase the number of African American and Latino students who accept GATE placement. These efforts are summarized in a letter from the District to the Special Master that is attached as Appendix A. One additional step would be to involve parents of students who are now participating in GATE programs to ensure

-25-

to assure other parents who are not convinced that their students would benefit from GATE programs.

The District should evaluate and consider changing the cut scores related to grade point averages for qualification to participate in self-contained and pullout GATE programs. The consequential validity of the cut scores on the students' grade point average is that are required to pass to participate in GATE has not been tested in TUSD. In other words, we do not know whether students with somewhat lower grade point averages can benefit from GATE.

When one examines the characteristics of instruction and the curriculum and GATE programs, it seems quite clear that virtually all students would benefit.

The District could undertake an analysis of the racial distribution at different test score levels to know how the effects of changing the grade-point average requirement would shape the eligibility pool.

*Financial Subsidies for AP Test Taking*

The provision in Title I of NCLB that provided funds to support student fees for taking the AP tests was eliminated in the revision of the law and the funds given to the states in a block grant. These funds help the District to minimize student costs for taking the exam (no TUSD student on free and reduced meals has been paying more than $20 per test). The District should work with state officials to ensure that funding for AP test taking is sustained. A very large percentage of African American and Latino students in the District qualify for free or reduced meals.

*Middle School Courses for High School Credit*

These courses are not available to all middle grade students because they are not available at all K-8 schools. If these courses are valuable, they should be available to all students.

*Dual Credit*

Santa Rita High School abandoned AP classes in favor of dual credit. This may place Santa Rita students (and students at other schools taking dual credit courses) at a disadvantage should they be pursuing college enrollment outside of Arizona. The District is considering increasing the number of dual credit options at other high schools. The District should ensure that families understand the differences between dual credit and AP courses with respect to their potential benefits when their students enroll in post-secondary institutions outside of Arizona.

*UHS-Attrition of Latino students*

As noted in Part Three of this report, the attrition rate for Latino students is now higher than it is for African-American and white students. The attrition rate has increased by one percent over each of the last three years. One percent a year is not cause for excessive concern, but UHS should study why this is the case and determine whether steps can be taken, in addition to the substantial support and is now given to struggling students, to remedy this apparent problem.

*UHS-Admission Criteria and Initiatives*

As noted earlier, the District's effort to increase the percentage of African-American students at UHS appears to have stalled. Because every African-American student who applies and is qualified is personally contacted and recruited by UHS staff, new initiatives may be necessary to increase the pool of interested and qualified candidates. Two ideas worthy of consideration involve: (1) a more intensive and extensive summer preparation program for students with high promise of being successful in UHS the need considerable strengthening and areas of weakness (*e.g.,* math is one of these area), and (2) recruiting students to the sophomore class who have demonstrated by their work in another high school that they can handle the rigor of the UHS curriculum. Both of these initiatives are complex. The first involves significant cost.

The second might be resisted by principals in other high schools. In both of these initiatives, affirmative action would be required in order to ensure a significant representation of African American and Latino students.

UHS continues to experiment with strategies for increasing the enrollment of African American and Latino students. The most recent changes in the criteria for admission has resulted in a noticeable increase in Latino students but not African American students. This reality seems to warrant further study. For example, the consequential validity of placing considerable weight on grade-point average – which is subject to the quality of the education students are receiving in middle grades – should be analyzed.

*Provide Information about White Students in Future District Annual Reports*

The Mendoza plaintiffs argue that it is difficult to understand the implications of the data presented on trends for African-American and Latino students in the absence of comparable data for white students. In some cases, the District provides information about white students and sometimes it does not. There seems no reason why such information should not be provided whenever trends in meeting the requirements of the USP are involved.

**Recommendations to the Court**

District-wide Goals

The Court should require that the District be held accountable to meeting a 15% goal for student participation in the ALE discussed in Part Two of this report with attainment calculated as explained in Part One above. This goal should apply for 2017-18 and beyond. This goal should also be applied to all schools where practicable, with practicality to be determined as a result of further study. Where the 15% rule does not apply at the school level, the Special Master, after consulting with the parties, shall recommend alternative measures of compliance.

The District has already agreed to the 15% rule but believes that this rule should not be applied to individual schools.

Individual School Goals

The District opposes the creation of goals for individual schools arguing that too many variables affect enrollment at individual schools to set goals that applies to each equally. However, some types of ALE are offered at all schools and enrollment is not limited by tests. Two such ALE are: (1) a combination of AP, dual credit, and IB and (2) pre-AP. These ALE are important because they affect the capacity and motivation of students to attend postsecondary education.

Table III shows that there are substantial differences among high schools with respect AP. Setting goals for individual schools will motivate the District to reduce these inequities. However, the 15% rule might not be appropriate for all schools. An alternative approach would be to hold the District accountable for narrowing the participation among schools. In order to deal with the fact that a school that offers more than one type of ALE that might compete for student enrollment – as is the case with respect to AP, dual credit and IB – at a given school can be aggregated.

The Court should direct the Special Master to work with the District and the plaintiffs to set goals for a combined enrollment in AP/DC/IB and in pre-AP courses based on average enrollment in the two highest high schools (not counting UHS) and the three highest pre-AP enrollment schools and develop plans for reducing the participation gap in an amount to be determined after relevant data are analyzed.

Whether the 15% rule should apply to individual schools for other ALE needs to be determined because the 15% rule is based on district-wide enrollments. A different approach would be needed as suggested in Part One of this R&R that would involve comparisons among

schools. While the reasons for the variations among schools may justify the differences, it is clear that there are substantial variations among schools that need to be addressed.

<u>Increase the Number and Accessibility of Cluster GATE Programs</u>

The Court should direct the District to restore the number of GATE programs and increase the current number of 3 to at least 12 over the next three years in order to increase the number of Latino, and especially and African American, students who benefit from GATE instruction and curricula.

There are two reasons for this. These programs are accessible to all students because no test is required for participation. When one looks at the characteristics of these programs, there is no reason to believe that all students would not benefit. The substantial recent reduction in the number of schools where GATE cluster programs are available has significantly reduced access to meaningful ALE learning opportunities and this is especially true for African American students who are underserved in general by ALE.

In 2013-14, 14 schools offered GATE cluster programs. Now there are three and two of the three schools retaining cluster programs have significantly more white students than the District average.

That 8 of the 11 schools that lost cluster programs had higher proportions of white students than the District average, a reality that suggests that discrimination was not involved. However, three of the schools that lost cluster GATE programs had a higher percentage of Latino students than the District average. But 11 of the schools losing cluster programs had higher proportions of African American students in the District average. African American participation in ALE is lower than either white or Latino students. Adding cluster GATE programs where there are substantial numbers of African American students is a way to remedy this situation.

According to the District, the major obstacle to maintaining a larger number of cluster GATE programs is the number of teachers who are GATE certified. But it is hard to imagine that teachers would not be interested in the opportunity to be GATE certified, especially if such a professional learning opportunity were adequately incentivized. The District says that it wants to increase the number of cluster GATE programs and would no doubt argue that there is no need for the Court to act but the District's intentions lack urgency, to put it mildly. The District says that it will increase the number of these programs from 3 to 4 in the next year.

Respectfully submitted,


_____/s/_____
Willis D. Hawley
Special Master

Dated: August 3, 2017

**CERTIFICATE OF SERVICE**

I hereby certify that on, August 3, 2017, I electronically submitted the foregoing **SPECIAL MASTER'S REPORT AND RECOMMENDATION RE ADVANCED LEARNING EXPERIENCES** for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

J. William Brammer, Jr.
wbrammer@rllaz.com

P. Bruce Converse
bconverse@steptoe.com,

Oscar S. Lizardi
olizardi@rllaz.com

Michael J. Rusing
mrusing@rllaz.com

Patricia V. Waterkotte
pvictory@rllaz.com

Rubin Salter, Jr.
rsjr@aol.com

Kristian H. Salter
kristian.salter@azbar.org

Zoe Savitsky
Zoe.savitsky@usdoj.gov

Anurima Bhargava
Anurima.bhargava@usdoj.gov

Lois D. Thompson
lthompson@proskauer.com

_____
Andrew H. Marks for
Dr. Willis D. Hawley,
Special Master