**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
| Plaintiffs | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
| Defendants-Intervenors, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

Advanced Learning Experiences: Goals

Section V, Quality of Education, Subsection A, Access to and Support in Advanced Learning Experiences (ALEs) requires the District to improve the academic achievement of African American and Latino students in part by ensuring they, including English language learners (ELL) students, have equal access to ALEs. (USP (Doc. 1713) (revised to correct typographical errors); (Doc. 1450) (original filed February 20, 2013) at § V.1 and 2.)

ALEs are Gifted and Talented (GATE) programs, including GATE Pull-out, GATE Self-Contained, and GATE Resource; Advanced Academic Courses (AACs), including Pre-Advanced Placement (Pre-AP) courses, such as Honors, Accelerated, or Advanced; middle school courses offered for high school credit; Advanced Placement (AP) courses; Dual-Credit courses; International Baccalaureate (IB) courses; and the University High School (UHS). USP § V.A.2.a, 3-5.

On March 3, 2014, Tucson Unified School District (the District) submitted its plan to enhance and support ALEs. On August 13, 2014, the Special Master filed a Report and Recommendation (R&R) addressing objections from the Mendoza Plaintiffs,[1] and attached the Advanced Learning Experiences (ALE) Access and Recruitment Plan (ALE Action Plan). (R&R, ALE Action Plan (Doc. 1645-2), Ex. A.)

The Plaintiffs' objections to the ALE Action Plan were limited to the District's proposed statistical goal for assessing success: the "Not less than" 20% Rule. The Plaintiffs did not raise objections to the specifics of the detailed plan of action the District proposed to undertake to increase access to ALE programs for minority students. (Order (Doc. 1771) at 2.) Under the "Not less than" 20% Rule, discrimination may be occurring if any subgroup has a participation rate in something deemed desirable (like ALEs) that is 20% less than the subgroup's total enrollment rate in the district. The District proposed a district-wide goal of reaching this "Not less than" 20% threshold for African American and Latino students within five years.

---

[1] The Fisher Plaintiffs joined in the Mendoza Plaintiffs' objections.

The Plaintiffs argued this goal was too low; there should be parity in ALE participation between White and minority students, including outcome parity for minority students participating in each ALE program. The Court rejected the "Not less than" 20% Rule as the ALE goal, but allowed it to be used as a red-flag indicator for when discrimination may exist in one of the ALE programs. The Court noted that TUSD agreed "to continue gathering and tabulating the relevant data necessary to assess each ALE program, individually[.]" (Order (Doc. 1771) at 6.) The Court afforded the parties an opportunity to work together to determine how to comprehensively measure the effectiveness of the ALE Action Plan, including increased participation of ELL students in ALE's. The Court ordered the District to file an ELL Supplement to the ALE Action Plan. *Id.* at 6-9.

The District filed the ELL Supplement to the ALE Action Plan (Doc. 1788) on April 14, 2015. Again, the Plaintiffs Mendoza objected that TUSD again proposed a district-wide aggregate measurement of the effectiveness of its ALE Action Plan. The Court denied the Plaintiffs' request that it direct the Special Master to work with the parties to formulate a standard to determine whether the District achieves unitary status with respect to ALEs. The Court reasoned it had already so ordered to no avail. Because it was so close in time to the SY 2016-17 deadline for assessing unitary status, the Court found a better approach was to call for the Special Master to formulate a standard to determine whether the District achieves unitary status with respect to ALEs. Pending the Special Master's R&R, the Court did not adopt the ALE Action Plan or the Supplement. (Order (Doc. 1895)).

On August 3, 2017, the Special Master filed his R&R. (Doc. 2041.) Again, the Mendoza Plaintiffs object (Doc. 2069), and TUSD responds to the Mendoza objections and makes limited objections to the R&R (Doc. 2073). The Mendoza Plaintiff Reply. (Doc. 2078).

/////

/////

### A. The Report and Recommendation

The Special Master addresses three broad issues: ALE plan goals, 2016-17 Status of the ALE plan, and recommended improvements.

1. Goals

The Special Master believes the District's accountability under the USP for increasing access to ALEs should include goals to increase participation and completion rates in ALE programs. The District agrees to the first goal, but not the latter. Increasing completion rates is especially important because of the voluntary nature of participation in ALEs. It is very difficult for the District to influence increased enrollment in ALEs, but once a student is participating in an ALE program, the District has more direct influence over the student's ability to successfully complete the course by providing any needed academic support.

The Court agrees with the Special Master and finds that his recommendation is in accordance with the USP provisions contained in § V, which include: § 1, defining purpose as ensuring equal access to ALEs; § 2.a, assigning the District the responsibility to develop ALE Access and Recruitment Plan, implement it, and develop annual goals for progress; § 2.b, requiring a school by school assessment of existing access gaps, barriers to enrollment and successful completion of ALEs offered at each school, and to develop means for tracking student access and participation; § 2.c, requiring District to develop ALE action plan including strategies to encourage enrollment, increase number of ALE students, and to support students in successfully completing ALEs; § 2.d, requiring District to recruit and encourage application and enrollment with strategies, including development and distribution of materials describing ALE programs, community based promotion of ALE programs, and providing professional development to administrators and certificated staff to identify and encourage African American and Latino students, including ELL students, to enroll; § 2.v, requires the District to ensure equitable access to ALES by assessing feasibility of testing all students at appropriate grade levels using multiple measures of selection, increasing academic preparation

programs such as AVID, eliminating barriers to enrollment including providing weighted grades for pre-AP and AP students, offering free and reduced AP exams fees, waiving other participation fees, integrating ALE preparedness into summer academies, and creating structure for peer mentoring and pairing, and providing requisite resources for ALEs.

The Special Master agrees with the District's proposed "Not less than" 15% Rule, which is more challenging than the earlier proposed "Not less than" 20% Rule. He agrees with their proposal to apply the "Not less than" 15% Rule to each ALE district-wide, except for ELL students and students with disabilities. The logic for the exclusions is due to program uniqueness, which applies equally to Dual Language ALEs. Also, without objection from the District,[2] the Special Master recommends excluding UHS because admission there is determined by an examination and prior academic performance. The Court adopts the Special Master's recommendation regarding applicability of the 15% Rule.

The "Not less than" 15% Rule calculation compares the number of minority students for each subgroup, African American and Latino, in each ALE program to the total number of those students enrolled in the grade level in which the ALE is offered, to derive a representative percentage for the subgroup and then sets the "Not less than" 15% goal for participation in that ALE. The 15% Rule has not been applied retroactively or to individual schools. *See example*: Table II-Self-Contained GATE enrollment in Middle School grades 1-5 for SY 2016-2017 (Latino) (reflecting 59.85% Latino students enrolled in elementary schools grades 1-5, resulting in a 15% Rule goal of 50.87%, with a "less than" actual participation rate of 42.52%). (R&R (Doc. 2041), Attachment 1.)

District-wide progress, or lack thereof, is reflected by actual percentage participation levels for each subgroup going back to SY 2012-2013. *See example*: Table II-Self-Contained GATE enrollment in Middle School grades 1-5 for SY 2016-2017

---

[2] TUSD Objection to Mendoza Objection to R&R (Doc. 2073) at 8-9 (discussing recommendation to exclude UHS from 15% Rule without objection.)

(Latino) (reflecting actual participation rates for SY 2015-16 at 43.20 %; SY 2014-15 at 46.30%; SY 2013-14 at 45%, and SY 2012-13 at 45%).[3] There is no explanation by the Special Master or the Parties regarding the reductions in participation over the life of the USP.

As the Special Master notes, the district-wide focus "masks differences by school." (R&R (Doc. 2041) at 11.) And, differences, if studied by the District, might lead them to solutions on how to increase access to ALEs for minority students. He recommends that the District compare individual schools by ALE to determine if either some schools and/or some ALE programs are more successful at increasing participation than others. After assessing the reasons for these differences, the District should eliminate/reduce or initiate/increase, if possible, any influences determining these differences.

He agrees with the District that the main difference between White and minority ALE enrollments is that enrollment is voluntary and there is no accounting for parental decisions, which he describes as significantly shaped by family and community environments and these community characteristic are in turn correlated with race. Alternatively, as described by the District, "'individual school participation rates can be heavily influenced by the racial and ethnic makeup of the particular school rather than the effectiveness of [the] school.'" (R&R (Doc. 2041) at 24).

Nevertheless, according to the Special Master all is not lost. While the District has implemented the marketing aspects of the ALE Action Plan, the Special Master recommends as an offset to the problematic voluntary nature of ALE programs that District solicit parents of children participating successfully in particular ALEs to recruit others to participate. He believes that the shared background between these families will result in parent-to-parent recruitment efforts being highly persuasive. Peer to peer

---

[3] The USP provides for a 2012-13 baseline year, but Department of Education regulatory changes related to ethnic coding resulted in changes in student data collection over the life of the USP so that SY 2013-2014 is the better baseline year because then there was student data and USP data collection continuity.

- 6 -

recruitment seems a viable option to more traditional marketing venues, which may or may not be warranted depending on the effectiveness of the implemented traditional marketing strategies. *Cf.,* USP § V.2.d. (providing for community involvement as means to recruit students for ALEs)

Misconceptions regarding disadvantages from taking ALE courses can be addressed with public education programs. *See* USP § VII.A.1: Family and Community Outreach (requiring District to adopt strategies to increase family and community engagement in schools, including providing information to families about services, programs and courses of instruction available in the District).

The Special Master advises that the District can address explanations for access differences between schools, as follows: differences based on teacher interest, teacher qualifications, and grade structure (K-8 and middle schools can have different schedules). Most importantly the District should focus on developing school-wide cultures where academic excellence is valued and celebrated. According to him, an ethos of achievement can be developed and sustained by school administrators, teachers, counselors and families. Because of the District's limited ability and responsibility for overcoming socio-economic discriminatory effects, the District needs to make clear efforts to influence access where it can. This is why it is important for the District to implement measures, such as those outlined in the ALE Action Plan, which are aimed at ensuring support for African American and Latino students, once enrolled in ALEs, stay in them and successfully complete them, including taking and passing any requisite ALE tests to actually secure credit for ALE participation. Unlike the voluntary nature of enrollment, the District's influence can be readily accounted for in respect to attrition and completion rates for minority student participation in ALEs.

2. "Not less than" 15% Status Report for SY 2016-17 and Recommendations

Table II of the District's Assessment and Evaluation of the ALE 40th Day Enrollment for November 1, 2016, reflects the status of the 15% Rule, district-wide. In short, the District reports for both subgroups, African American and Latino students, the

following: 1) Self-Contained GATE in elementary schools (1-5) and middle schools (6-8) do not meet the 15% goal for either subgroup. 2) Pull-out GATE programs in elementary (K-5) do not meet the 15% goal. 3) Resource GATE in middle school (6-8) meets the 15% goal in middle schools for Latino students, only; Resource GATE in high school (9-12) meets the 15% goal for both subgroups. 4) The AP high school ALEs program meets the 15% goal for Latino students but not African Americans. 5) Pre-AP Advanced ALEs in elementary schools (K-8, grades 6-8) meet the 15% goal for both subgroups, but only meet the 15% goal for Latino students in its middle school program. 6) Pre-AP Honors ALEs are offered in elementary (K-8, grades 6-8), middle and high schools, with the 15% Rule being met for African American students in middle school and the goal being met for Latino students in all grades. 7) Dual Credit classes offered in high school meet the goal for Latino students but not African American students. 8) For the IB high school program, the goal was not met for African American students, but was met for Latino students; the goal was met for both subgroups in the elementary and middles schools but the District discontinued the Safford (K-8) and Robison (K-5) IB programs. 9) The Middle School Credit for High School did not meet the "Not less than" 15 % goal for African American students, but met it for Latino students.

In summary, there are 15 ALE programs if you categorized them by grade-level. For African American students, the 15% goal is met in three programs: 1) Resource GATE (high school), 2) Pre-AP Advanced (K-8, grades 6-8), and 3) Pre AP Honors (middle school). The "Not less than" 15% goal was met for Latino students in 12 programs, as follows: 1-2) Resource GATE in middle school (6-8) and high school programs, 3) AP high school courses, 4-5) Pre-AP Advanced ALEs in elementary (K-8, grades 6-8) and middle schools, 6-8) Pre-AP Honors ALEs in elementary, middle, and high schools, 9) Dual Credit classes offered in high schools, 10) the IB high school program, and the 11-12) Middle School Credit for High School for elementary (K-8, grades 6-8) and middle school. According to the Special Master, if you allow for approximately a 1% margin, you sweep in two more ALE programs for African

American students and one more ALE program for Latino students.  (R&R (Doc. 20141) at 10.)

The question is what does this tell us: district-wide, which of the ALE programs are red-flagged as problematic?  Applying approximately a 1% margin to identify the ALE programs where the 15% threshold is met or soon to be met, there remain some ALE programs red-flagged as having access issues, especially for African American students: Self-Contained GATE at both elementary and middle school grades, Pull-out GATE, AP Courses, Pre AP Honors at all grade levels, and the Middle School for High School ALE programs.

More important is what the "Not less than" 15% Rule, applied district-wide, does <u>not</u> tell us.   First, and foremost, it does not establish unitary status has been attained for the ALE program, district-wide, or in any specific ALE program.  (Order (Doc. 1771) at 6-7.)  It does not reflect changes in access to ALE programs over the life of the USP.  The 15% Rule does not apply to White students because there is no assertion that discrimination may be occurring for White students in any ALE program.  Parity is not the question either.  What is relevant is whether the District has simply increased access to ALEs for all students or has increased access to ALEs for minority students.  While the former is not prohibited and is expected, it is the latter which is required under the USP.  Without comparative data for White students, the District runs the risk of increasing White student participation at the expense of African American and Latino students.  The Court rejects the District's objection to providing comparative date for White students.

Because the Court affirms, here, its prior determination that the "Not less than" rule shall be limited to a rule-of-thumb red-flag indicator for possible discrimination, the Court will not rely on this simplistic marker as the sole basis for assessing the District's efforts to increase access for African American and Latino students to ALEs.  (Order (Doc. 1771) at 6-7 (rejecting as overly simplistic "less than 20% rule" to determine unitary status, but allowing it as rule-of-thumb red-flag indicator of discrimination); *see*

*also* ((R&R (doc. 2041) at 13) (admitting 15% Rule is not only simple, but "it is simplistic"). The Court adopts the Special Master's recommendation to compare individual schools by ALE. As is reflected below in the Special Master's ALE analysis, individual school comparisons provide meaningful insight whether the District has increased access to ALEs under the USP.

### GATE Enrollment:

Self-Contained GATE is a comprehensive full-time elementary and middle school GATE learning experience offered in 10 schools, with two of them being dual language. The Special Master reports that minority students receive free transportation to Self-Contained GATE programs if they do not reside in the GATE school's boundary, but many students don't choose to travel outside their neighborhoods. African American students are further limited in access because two of the 10 Self-Contained GATE programs are dual language, with grades three and beyond being affected by the ability to speak Spanish. With the exception of two "open" GATE programs at Tully and Robert Naylor, access to Self-Contained GATE programs is restricted by a minimum assessment test score. Under the open GATE program at Tully and Robert Naylor, these schools operate like a Self-Contained GATE ALE in their entirety, whereas participation in Self-Contained GATE programs at other schools are limited to only those students who tested into the program.

Pullout GATE provides approximately 90 minutes of GATE learning each week and is available in all elementary schools. Access to Pullout GATE programs is restricted by a minimum test score, except for the cluster GATE program. Without taking placement test, students may participate in the Pullout GATE program at a cluster school: Fruchthendler, Dunham, and Robins. Fruchthendler and Dunham are majority White schools. Robins is racially concentrated.

Resource GATE provides an elective course or other GATE-like experience for approximately 50 minutes five days a week in schools with 6-8 grades that use middle-school schedules. There is no assessment test required and Resource GATE programs are

- 10 -

available at all middle school grades and some high schools. TUSD intends to expand this program to all high schools.

Because enrollment in GATE programs depends on student scores on a cognitive test, the District increased the pool of potential GATE students by testing almost all first and fifth graders in 2015-16. This resulted in increases in elementary GATE programs as follows: 57% increased enrollment of African American students and a 41% increase in Latino students. He reports that the District has considered lowering the cut scores for GATE assessment tests, but has concluded it would not significantly change the number of qualifying students. The Special Master believes that the characteristics of GATE instruction and curriculum suggest students with somewhat lower academic abilities can benefit from GATE. He recommends that the District assess the racial distribution of eligible GATE candidates for a range of lower cut scores.

As an offset to the socio-economic factors which negatively influence ALE enrollment given the voluntary nature of ALEs, the Special Master recommends improved marketing through peer-to-peer, such as parent-to-parent, recruiting; and the importance of developing and sustaining school-wide ethos of achievement by school administrators, teachers, counselors and families. The District can influence these goals to increase enrollment and keep students in GATE programs as they move from elementary, to middle school, to high school.

The Special Master reports that the most expeditious and effective way to increase access to GATE programs, especially for African American students, is to increase the number of cluster GATE programs, which offers GATE Pullout without regard to testing. He reports that in SY 2013-14 there were 14 cluster GATE programs and now there are three, with two being in majority White schools. The third is located at Robins, a racially concentrated school. He seeks a directive from the Court that the District open cluster schools to at least the 2013-14 level and place them strategically at schools serving minority students, and especially target them at schools serving substantial numbers of African American students. He reports that the District has resisted this request because

it asserts it does not have sufficient number of teachers who are GATE certified, but the Special Master recommends that an incentive program will readily draw teachers to become certified. Without this directive from the Court, the Special Master reports that the District intends to add just one[4] more open GATE program next year.

### College Credit ALEs: AP, IB and Dual Credit

These programs offer college-level curricula and examinations to high school students. They advance college bound students by offering college credit in high school. These ALE offerings are determined by student demand and whether teachers have relevant training and interest to offer such courses. Whether students receive college credit for AP and IB courses depends on whether students pass specified high school exams at levels determined by the colleges in which they enroll. The Special Master reports that test-taking and test-passage rates have improved, but still pose a hurdle to access. He recommends that the District work with state legislators to ensure funding continues for AP testing to minimize student costs; this funding was eliminated from legislative revisions to block-grant funding under Title I. Taking these courses, even without passing the certifying test proves some benefit because colleges tend to give more weight for AP-type high school courses.

For AP ALEs, a student must take and pass the AP exam for the course by a score of three or more, and then they will receive college credit at many colleges and universities, with the exception of some more selective institutions which may require a higher test score than three. IB ALEs are similar, but additionally students may enroll in the IB diploma program. Few do so because the diploma program is exceptionally challenging. In comparison, Dual Credit ALEs[5] provide students who pass a dual-credit class with college credit only in Arizona institutions of higher education. It is his opinion

---

[4] The District reports it intends to begin planning to add to expand the cluster programs at five additional elementary sites in SY 2017-18. (TUSD Response (Doc. 2073) at 16.)

[5] There is also a middle school Dual Credit program, which is not offered in all K-8 schools. The Special Master does not address this program except to recommend that it should be universal.

- 12 -

that the AP classes offer the most advantage to students because they transfer college credit to more institutions, and in comparison to IB courses, they have a greater range of content. He recommends that the District ensure families understand the difference between AP and Dual Credit courses, especially the limited value of Dual Credit courses outside of Arizona.

  Not surprisingly, the Special Master reports that schools with the largest percentage of African American students have the lowest proportion of students enrolled in AP classes. Of course, the lower participation rates by both African American and Latino students in Pre-AP ALEs aimed at readying students to succeed in AP, correlates to lower participation rates in AP classes. Likewise, lower academic achievement by minority students may cause them and their families to believe rightly or wrongly that AP courses are too demanding.

  According to the Special Master, there are more than just cultural and socio-economic generalizations at play in the disparities between minority student participation in AP courses found between schools. For example, he reports at Pueblo High, where 91% of the students are African American and Latino, and Tucson High, where 79% of the students are African American and Latino, only <u>one-sixth</u> of them take at least one AP course. In comparison, in Sahuaro and Sabino high schools, where African American and Latino students make up less than 50% of the student population, <u>one fourth</u> and <u>one third</u> of them, respectively, are enrolled in at least one AP class. And, he has serious direct-access concerns about three high schools: Catalina, Santa Rita and Cholla. These schools, especially Santa Rita, have very few AP courses. Catalina has six, Santa Rita has one, and Cholla has one because of their IB program; Cholla has 19 IB courses.

  He compares Catalina to Sabino High School, which have similar student enrollments: Catalina has 741 students, and Sabino has 937 students. While Sabino has 196 more students than Catalina, there are 126 more African American and Latino students at Catalina. At Sabino High there are <u>13</u> AP courses, with <u>117</u> African American or Latino students enrolled. Catalina, with its six AP courses plus <u>two</u> dual

credit courses, has 50 African American or Latino students enrolled. In his opinion, the small number of African American or Latino students enrolled in AP-type classes at Catalina is "almost unbelievable." (R&R (Doc. 2041) at 19.) At Catalina, the average AP class size is less than 10, and not a single one of these African American and Latino students passed an AP exam in the most recent year for which the District provided data. *Id.* In SY 2015-16, Santa Rita had nine AP courses but currently has only one, which is a studio art class with a very small enrollment. Santa Rita does offer five dual credit courses. Cholla High School offers one AP but unlike Santa Rita offers no dual-credit courses because it offers the IB program with 19 IB courses.

In addition to addressing direct-access disparities, the Special Master recommends that the District focus on developing school-wide cultures where academic excellence is valued and celebrated to ensure that disparities are not the result in differing academic ethos at the various schools.

### UHS: Pipeline and Attrition Issues

The Special Master reports that with only 7.5% of all TUSD high school students attending UHS, it accounted for 32% of all the District high school students enrolled in one or more AP classes in SY 2015-2016. He reports that increases in the number of AP courses offered and students tested in 2013-2014 and 2015-2016 are all accounted for in two high schools: UHS and Sahauro High School. (R&R (Doc. 2041) at 17.) In other schools the number of courses declined. UHS students accounted for 66% of the passing AP scores. *Id.* at 18. Because including UHS numbers in district-wide assessments may skew the picture, especially the "Not less than" 15% analysis, UHS must be assessed separately from the District's other high schools. The Court accepts this recommendation, and notes that the AP numbers in Table II, ALE 40th Day Enrollment 15% Rule includes UHS. The Court adopts the Special Master's recommendation that a more meaningful approach to assessing access issues at UHS is to look at strategies designed and undertaken by the District to increase diversity and resolve pipeline issues

that are unique to UHS, and to address participation impediments of attrition and completion.

### B. Mendoza Plaintiffs' Objection[6]

The Mendoza Plaintiffs have fleshed out some of the issues raised by the Special Master in the R&R. The Plaintiffs describe an "all boats rising" scenario, with ALE participation increasing for all students, but the participation gap between White and minority (African American and Latino) students actually widening from SY 2011-12 to SY 2015-16. They, like the Special Master, recognize problems related to completion rates for African American and Latino students. They argue that the District's efforts must be assessed by whether it has taken a look at successes and failures in the strategies it has implemented to increase ALE access, including participation and completion, and determined and undertaken subsequent responsive measures to remedy failures and promote successes.

The Court agrees and will apply an assessment matrix to determine whether the District has implemented specific strategies identified in the USP, the ALE Action Plan, the Supplement, or any other planned course of action designed to improve ALE access, participation or completion rates for African American or Latino students. For example, the Mendoza Plaintiffs complain that the 2015-16 Annual Report identified specific support and retention efforts for UHS, but there is no record regarding implementation of teacher-led tutoring two mornings a week; BLAST, as summer support program for juniors; Fast and Furious, which is an after school study skills course, etc. This data is important for analyzing the District's efforts to improve ALE completion rates for African American and Latino students.

The Mendoza Plaintiffs also complain about the district-wide approach and that it fails to identify problem areas where, either by program or school, there is exceptionally low ALE enrollment, such as in Self-Contained GATE at the middle schools where

---

[6] The Fisher Plaintiffs join in Mendoza Plaintiffs' Reply to TUSD Response. (Doc. 2082.)

enrollment numbers are so low in some schools (less than 5 students at Pistor and Vail) that they cannot even be reported without violating FERPA. In Doolen, the one middle school with high enough numbers to report, there are 85 white students (44%); seven African American students (7%), and 38 Latino students (12%). The Court adds that the district-wide approach also fails to reflect whether disparities in access exist between racially concentrated schools and integrated school, which may or may not be compounded for schools between schools depending on how the school is graded, A through F.

Individual school comparisons, as noted by the Special Master, may lead to solutions on how to increase access, including increasing access in schools were it appears to be most limited. For example, The Mendoza Plaintiffs note two programs that have been successful: ELL programs have drawn Latino students into pre-AP courses and AVID provides for minority student recruitment into ALEs and support, thereafter. The Plaintiffs argue that the record reflects that the District has not readily expanded these efforts.

The Court finds that the Mendoza Plaintiffs ask good questions and raise good points, which can be addressed by a school by school assessment matrix, which can be compounded for a district-wide overview. The Special Master shall prepare the matric format for the District to use to revise the ALE section in its Analysis of Compliance with Unitary Status Plan: An Annex to the District Annual Report for SY 16-17 (Doc. 2075).

### C. Conclusion

The many recommendations made by the Special Master calling for immediate action by the District to increase access to ALE programs calls into question his finding that the District has implemented all of the steps in the ALE Action Plan and Supplement. This remains to be determined.[7]

The Court agrees with the District, "The USP requires the District to provide equal

---

[7] Even if true, there remains the question of whether the District has reviewed these strategies for effectiveness and concluded that no further strategies would have any practicable effect on increasing access to ALEs.

- 16 -

access and support for ALEs, actions that focus on the District's behavior and process." (Response (Doc. 2073) at 7.) The goal of the USP ALE provisions, USP § V, is for the District to implement strategies designed to increase participation by African American and Latino students in ALE programs. The USP calls for the design, implementation, and ongoing operation, which necessarily includes review and revision when warranted, of strategies to increase access, participation, and completion by African American and Latino students in ALE programs. *See* (Mendoza Reply (Doc. 2078) at 2 (citing *Fisher v. Tucson Unified School District,* 652 F.3d 1131, 1135 (9th Cir. 2011) (finding fault with District's failure to review program effectiveness including review of student achievement data).

The Court intends to review the District's performance under the USP, Section V, pursuant to a matrix which will track the District's behavior and processes in respect to implementing the specified ALE access support strategies set forth in the USP, the ALE Action Plan, the Supplement, or any other relevant plan or strategy proposed or agreed to by the District or ordered by the Court.

The Court defines access as the number of ALE programs available to minority students and opportunities for participation, and defines participation as the number of students enrolled in ALE courses and includes completion, defined as the number of students passing ALE courses and number of students taking and passing requisite certification tests necessary for African American and Latino students to secure the benefit of participating in ALE programs. The Court defines support as strategies aimed at increasing enrollment and participation in ALE programs, including strategies aimed at assisting minority students in passing ALE courses and taking and passing any requisite tests. Increases will be actual percentage increases made district-wide and at individual schools, and include comparable data for White students. Actual increases will not be determinative of unitary status.

The Court adopts the Special Master's recommendation to apply the "Not less than" 15% Rule district-wide, and reaffirms that the 15% Rule will be a rule-of-thumb

indicator of possible discrimination in an ALE program.  It is not applicable to evaluate UHS, Dual Language, ALEs designed for students with disabilities, or ELL student increases in ALE programs.  It will not be determinative of unitary status.

In assessing the District's behavior and process related to the ALE provisions in the USP, § V, the Court will consider three factors, the 15% Rule as limited herein, the strategy assessment matrix, and actual increases or decreases in ALE enrollment, participation, or completion.

**Accordingly,**

**IT IS ORDERED** that the Court ADOPTS the ALE Action Plan (Doc. 1645-2), Ex. A, and Supplement (Doc. 1788).

**IT IS FURTHER ORDERED** that the Court ADOPTS IN PART the Special Master's Report and Recommendation (Doc. 2041) as follows: 1) the District should assess the racial distribution of eligible GATE candidates for a range of lower cut-test scores; 2) the District should focus on developing school-wide cultures where academic excellence is valued and celebrated; 3) in addition to existing marketing efforts, the District should recruit parents of children participating successfully in particular ALEs to recruit others to participate; 4) the District should create an incentive program that will draw teachers to become GATE certified; 5) the Dual Credit program should be universally available in all middle schools; 6) the District should immediately address the access problems at Catalina, Santa Rita, and Cholla high schools; 7) the District should ensure that parents understand the difference between AP and dual-credit courses, especially the limited value of dual credit courses outside Arizona, and 8) the District should work with state policy makers to ensure funding continues for AP testing.

**IT IS FURTHER ORDERED** that the District shall open cluster Pullout GATE programs to at least the 2013-14 level and place them strategically at schools serving minority students, and especially target them at schools serving substantial numbers of African American students.

**IT IS FURTHER ORDERED** adopting the "Not less than" 15% Rule as a rule-of-thumb red-flag for when discrimination may exist in a particular ALE program district-wide.

**IT IS FURTHER ORDERED** STRIKING the ALE section in the "Analysis of Compliance with Unitary Status Plan: An Annex to the District Annual Report for SY 16-17." (Doc. 2075).

**IT IS FURTHER ORDERED** that within 60 days of the filing date of this Order, the District shall file a Revised ALE section to the "Analysis of Compliance with Unitary Status Plan: An Annex to the District Annual Report for SY 16-17," in accordance with the district-wide and individual school analysis called for by the Court in this Order.

**IT IS FURTHER ORDERED** that by February 1, 2018, the Special Master shall file a Report and Recommendation (R&R) to the Revised ALE section to the "Analysis of Compliance with Unitary Status Plan: An Annex to the District Annual Report for SY 16-17." The Parties' Objections and the District's Reply shall follow accordingly.

Dated this 24th day of October, 2017.

_____
Honorable David C. Bury
United States District Judge