# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
| Plaintiffs | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
| Defendants-Intervenors, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

Report and Recommendation (R&R) Re: SY 2017-18 USP (910G) Budget: Adopted.

On June 28, 2017, the District filed the SY 2017-18 USP (910G) Budget, adopted by the School Board on the 27th, after an eight-month budget process which included review and comment from the Plaintiffs and Special Master. In July, both Plaintiffs filed Objections. (Fisher Objection (Doc. 2032); Mendoza Objection (Doc. 2038)). The Special Master filed a Report and Recommendation (R&R) on September 8, 2017. (Doc. 2070.)[1] The District filed a Response and Limited Objection to the R&R. (Doc. 2072.) The Mendoza Plaintiffs filed a Response to the District and Limited Objection to the R&R. (Doc. 2074.)

The Special Master prepared the R&R, relying on what he described as an "admonition," which was made by this Court last year when it approved the 2016-17 USP Budget: "In the last years of judicial oversight the Court finds that it is important for the District to act on its own accord and to be accordingly held responsible." (Order (Doc. 1981) at 9.) To be clear, this is not a "hands off" admonition. To the contrary, the Court reminds the parties that the Unitary Status Plan (USP) was designed as a road map for attaining unitary status in approximately three years. The Order appointing the Special Master expressly provided that the USP should lead "to unitary status after three full school years from adoption of the USP, subject to annual extensions by the Court for reason of unattained compliance by the District with the USP." (Order (Doc. 1350) at 6 ¶ 7.) The USP, adopted as revised, was filed on February 20, 2013. (Doc. 1450); (Doc. 1713) (correcting typographical errors).

The Court affirms the January 6, 2012, Order, paragraph 7, directive that annual extensions of judicial oversite beyond three years will be based on reasons of unattained compliance by the District with the USP. Three years out, the Court is taking an inventory of the District's progress towards unitary status. The District has filed the 2016-17 DAR, (Docs. 2057-2068), and the corresponding Report on Analysis of

---

[1] On May 10, 2017, the Special Master also filed a Report and Recommendation Regarding Version 3. Because no further briefing was made regarding this R&R, the Court assumes that any relevant issues were reurged in the R&R and briefs filed subsequent to the Board's June 28, 2017, adopted SY 2017-18 910G Budget.

- 2 -

Compliance with the USP, (Doc. 2075) (2016-17 USP Compliance Report). The Special Master's mirror SMAR is due at the end of December.

Going forward, the Special Master must identify specific non-compliance issues; identify specific activities necessary for compliance, and specific deadlines for the District to complete such activities. Deadlines will be limited to the extent possible to maintain the integrity of the USP's design to attain unitary status in approximately three years.

The SY 2016-2017 review is the first comprehensive analysis of the District's accountability for behavior and processes taken pursuant to the USP. The roll of the Special Master in assessing accountability is of course not "hands off," it is the exact opposite. (Order (Doc. 1350) at 7-9); (USP (Doc. 1713) at § X.D), *see also* (Order (Doc. 1981) at 11) (authorizing Special Master to advise the Court regarding any procedural changes necessary for him to carry out general oversight and monitoring responsibilities, pursuant to USP § I.D, undertaken in the context of compliance assessments, and authorizing him to establish the data needs, both substantive and format, for compliance review).

With the current posture of the case clearly in mind, the Court turns to the SY 2017-18 USP Budget and the Special Master's R&R. Money is where the rubber meets the road, and this cuts in favor of holding the District accountable for funding programs and activities at levels rationally related to compliance demands under the USP. On the other hand, the 2017-18 USP Budget was adopted without the benefit of the SY 2016-17 unitary status review that is currently underway. Therefore, this Court, like the Special Master, has taken a conservative approach to recommendations that require District action. All such recommendations are linked to implementation or operation of programs required by provisions adopted in the USP, any USP Action Plan, or any other action either required by an order of the Court or a stipulation and/or agreement between the District and the Plaintiffs and the Special Master. The District is responsible in the first instance for reviewing program effectiveness and where justified making changes, but it

must nevertheless persuade the Special Master, the parties, and ultimately the Court, that any such changes were made in good faith by the District in compliance with the USP.

With these distinctions in mind, the Court turns to the limited objections to the R&R filed by the District. Generally, the District agreed to all of the Special Master's recommendations, but some agreements were qualifiedly limited to agreeing to changes without agreeing to the Special Master's underlying legal or factual premises for recommending those changes. The following recommendations were disputed in part by the District: 1) Criteria for Determining Mentor Support for First and Second Year Teachers and for Teachers of Culturally Relevant Courses (CRC)); 2) Higher Ground; 3) Effective Practices File for Discipline, and 4) Family Engagement. Following the District's Response and Limited Objections, the Mendoza Plaintiffs responded and added objections related to: 5) Student Success Specialists and 6) Goals for Magnet Schools. The Court adopts the recommendations of the Special Master as agreed to by the District, and addresses the remaining partially disputed budgetary issues below.

**1) Criteria for Determining Mentor Support for First and Second Year Teachers and for Teachers of Culturally Relevant Courses (CRC)):** The District operates two teacher-mentoring programs: 1) to mentor new teachers the first two years they teach to ensure they become effective educators, USP § IV.I.1, and 2) a peer-mentoring program developed within-and across-school networks designed to encourage teachers with experience and success in using culturally responsive pedagogy to mentor their peer teachers, USP § IV.I.4, J.3.b, J.6. In 2016, this Court ordered the District, with oversight from the Special Master, to develop teacher-mentor ratios to use for budgetary purposes so that once the District identifies teachers needing mentoring in a school year, it can meaningfully budget for the corresponding number of mentors needed that year. (Order (Doc. 1981) at 11.)

The Court finds these two mentoring programs have distinct goals, and the new first and second year teacher-mentors do not have direct teaching assignments, USP § IV.I.1, while the CRC mentors are peer teachers, *id.* at 4. The teacher-mentor ratios

should be logically consistent, (R&R (Doc. 2070) at 3), but the ratios must also be logically consistent with the distinct program goals. Therefore, the Court looks at each teacher-mentoring program and proposed ratios, separately.

A. First and Second Year Teachers

Section IV.I.1 of the USP requires the District to provide teacher-mentors to new teachers in their first two years of teaching, and is now being used to address Section IV.E.5, which expressly requires TUSD to make efforts to increase the number of experienced teachers and reduce the number of beginning teachers hired to teach in racially concentrated schools or schools in which students are "underachieving academically."[2] "Based on the Special Master's comments, it appears that beginning teachers continue to be hired to teach in both. Assuming hiring new first and second year teachers at these schools is a matter of necessity, [due to a shortage of experienced teacher candidates], the need, pursuant to § IV.E.5, for mentors at these schools for these beginning teachers will be greater than those needed by first and second year teachers at other TUSD schools." (Order (Doc. 1981) (citing R&R (Doc. 1954) at 8-9.)

The District proposes a 1:15 point ratio system: 3 points for first-year teachers and 2 points for second-year teachers at "underperforming[3] or racially concentrated schools"; 2 points for first-year teachers and 1 point for second-year teachers at performing or non-racially concentrate schools.[4] Under this point system, mentor-teacher ratios may be as low as 1:5 or as high as 1:15. For example, if there are 5 first-year teachers to be employed in SY 2017-2018 to teach at under-achieving or racially concentrated schools,

---

[2] By "underachieving academically" the Court means: "schools in which students are achieving at or below the District average in scores on state tests or other relevant measures of academic performance." USP § IV.E.5.

[3] The Court assumes underperforming is the equivalent of "schools in which students are achieving at or below the District average I scores on state tests or other relevant measures of academic performance." USP § IV.E.5.

[4] The Court assumes "performing or non-racially concentrated schools" is the same as "all other schools," but if there is a distinction, there is no prohibition against the logical prioritization for placement of teacher-mentors in any schools other than racially concentrated schools or schools in which students are achieving at or below the District average.

- 5 -

then the 3 point ratio is applied per new teacher for a total of 15 points so the District needs to hire 1 teacher-mentor for these five new teachers. Compare, if fifteen first-year teachers are to be teaching at other schools, then the 2 points per teacher totals to 30 points, and the District would need only two teacher-mentors for these 15 new teachers.

The R&R does not explain the basis for the District's proposed 1:15 point system. Nevertheless, because the Special Master recommends its adoption, the Court assumes it is rationally based on the District's past experience with teacher-mentor programs and/or based on best practices. The Special Master recommends the Court adopt the District's proposed 1:15 ratio, with two exceptions.

As he did in 2016, the Special Master reiterates that new teachers teaching under-achieving students "face exceptional challenges." (R&R (Doc. 2070) at 4.) He recommends that these new first-year teachers need more support and proposes a teacher-mentor ratio of 1:10. (R&R (Doc. 2070) at 4), *see also,* USP § IV.E.6 (calling for a "pilot plan to support first-year teachers serving in schools where student achievement is below the District average.)

The Special Master clarifies that there is nothing about the racial concentration of a school that translates into a teaching challenge. (R&R (Doc. 2074) at 3.) Given the negative optics, he recommends that the District exclude new teachers at high-achieving schools from the 3-point ratio for first and second year teachers at underperforming and racially concentrated schools.

The District neither agrees nor objects to these recommendations. Because the issue has consumed substantial time and remains unresolved the Mendoza Plaintiffs, while disputing its rationale, are willing to accept the Special Master's recommendation regarding the District's proposed teacher-mentor ratios, with one exception. They object to his exclusion of "high-achieving" racially concentrated schools from the District's proposed ratios for first and second year teachers at "underperforming or racially concentrated schools. (Mendoza Plaintiffs' Objection to R&R (Doc. 2074) at 3.)

The Mendoza Plaintiffs object to the Special Master's recommendation for a "high achieving" racially concentrated school exclusion. First, they note that the Special Master does not define what would be considered a "high-achieving" school, but the Court assumes it to be the opposite of "schools in which students are underachieving academically." USP § IV.E.5. The Court agrees with the Mendoza Plaintiffs' objection to the high-achieving school exclusion because the USP expressly requires the District to make efforts to increase the number of experienced teachers and reduce the number of beginning teachers hired to teach in racially concentrated schools <u>or</u> schools in which students are underachieving academically. USP § IV.E.5.

The requirement to place experienced teachers at racially concentrated schools is not due to any difficulty associated with teaching minority students; [t]he District was attempting to improve quality of instruction and academic achievement at those schools . . . to increase the likelihood that those schools would attract students of other races/ethnicities to attend those schools and bring them closer to being integrated. (Mendoza Objection to Budget (Doc. 2038) at 19 (*citing* Order (Doc. 1996) discussing transition plans and need to focus on improving academic achievement as one effective means of promoting integration). "Because 'the most powerful school-based influence on student learning is teacher effectiveness,' (R&R (Doc. 1954) at 10), professional development and professional support ensures that TUSD will be able to develop and retain strong teachers capable of carrying out the mandates of the USP." (Order (Doc. 1981) at 7.) Regardless of optics, the Court finds that the District's formula is responsive to the express provision in the USP which requires it to increase the number of experienced teachers at racially concentrated schools, especially given that teacher shortages preclude the District from directly hiring more experienced teachers to teach at these schools.

Accordingly, the Court adopts the Special Master's recommendation to approve the District's proposed teacher-mentor 1:15 point ratio, except for first-year teachers teaching at underperforming/underachieving schools. There, the Court adopts the Special

Master's recommendation for a 1:10 teacher-mentor ratio. The District should amend its formula and budget.

B. Teachers of Culturally Relevant Courses

In considering the CRC peer-mentoring program, USP § IV.I, the Court looks to the Stipulation Re: Implementation of USP Section V.E.6.a.ii: Culturally Relevant Courses, filed with the Court on January 30, 2015. (Doc. 1761.) It provides: "A designated cadre of experienced CR teachers shall serve as Peer Mentors and assist the Program Coordinators in modeling effective CR instruction and in developing additional CR unit lessons, (Implementation of USP Section V.E.6.a.ii: CRC Intervention Plan at 2); (2015 Intervention Plan ( Doc. 1761) at 5, ECF[5]17), and "[n]ew CR teachers will receive support from the CRP team as well as from CR mentor teachers. . . . A mentor teacher will be assigned to any new site where no CR class offerings previously existed. The mentor teacher will make contact with new CR teachers once a week," (Implementation of CRC Intervention Plan at 6). The Stipulation, 2015 Intervention Plan, required the cadre of experienced CR teachers and district staff to work on curricular and programmatic alignment in the summer in preparation of SY 2015-16, and for Mentor/Itinerant Teachers to develop extensive curricular units for the middle and high school level. (2015 Intervention Plan at 6, ECF22.) It called for a mentoring model "pairing an experienced and highly successful educator with a less experienced colleague. Mentors will be chosen based on their credibility among their colleagues and their ability to initiate curriculum and school change. This model will offer a high individualized approach to professional development and can benefit both of the individuals involved." *Id.*

The 2015 Intervention Plan called for the District to hire 12 Itinerant Teachers, with these teachers to teach three CR courses at two high or middle school sites, and to have non-instructional duties including: CR student and teacher recruitment; community outreach; model instruction for non-CR teacher and new CR teachers; curriculum

---

[5] Electronic filing page cite.

- 8 -

development; observation, and conducting training symposiums. *Id.* at 18, ECF 34. This "Itinerant Teacher Model" was designed as a capacity building model and meant to be transitional, with the intent being to "develop CR Teachers at every site <u>over the next two years</u> and move away from having itinerant staff at this level." *Id.* In other words, itinerant staff will be reduced over time. In the end, central staff will be responsible for program and curriculum development. *Id.* The Court assumes that, likewise, the CR teachers will become more exclusively responsible for the peer-mentoring work. In other words, the CR teacher-mentors should spend less time on program and curriculum development and more time peer-mentoring.

Two years out from the SY 2015-16 Intervention Plan, the Special Master reports that some CRC teacher-mentors, who have now assumed the title of Master Teachers, continue to perform additional responsibilities related to curriculum development and/or are conducting other work not related to peer-mentoring. The District does not have a formula for determining the level of effort involved in these "beyond mentoring duties." (R&R (Doc 2070) at 4.) Without this breakdown, it is impossible to track employee time spent mentoring versus time spent doing non-mentoring tasks, which is necessary data to determine the budget for the CRC peer-mentoring program. The District agrees and will amend the ratio, 1:10 (first-year teaching CRC) and 1:15 (second-year teaching CRC), peer-mentoring formulas accordingly.

**2) Higher Ground:** The Special Master reports that the Mendoza Plaintiffs objected to the District's contract with Higher Ground, a private organization which provides services in the juvenile justice system, to provide the social and emotional learning (SEL) program for the District's Alternative Educational Program (DAEP). The Mendoza Plaintiffs were concerned the criminal justice tenor of the program might stigmatize students in DAEP, but the Special Master recommends that the District be allowed to contract with Higher Ground because of the benefits of the alternative suspension program which are: improved capacity for self-management, impulse control, and other so-called executive functions that contribute to positive behaviors both in

school and in the community. (R&R (Doc. 2070) at 6.)

The Mendoza Plaintiffs withdraw their objection but ask the Court to note that Higher Ground is another example of the District bringing in outside consultants instead of developing its own capabilities, and the District is missing the opportunity to integrate the skills of the Higher Ground consultants into the fabric of the District's pedagogy. The Mendoza Plaintiffs point out that the Collaborative for Academic, Social and Emotional Learning organizational material referred to by the Special Master in his R&R "is enlightening" because it suggests that SEL programs become a coordinating framework for how educators, families, and communities partner to promote students' social, emotional, and academic learning, with SEL embedded in the schools and districts' strategic plans, staffing, professional learning, and budgets. The Mendoza Plaintiffs submit the District cannot have such a broad sweeping SEL program if the SEL services are provided by an outside consultant. (Mendoza Objection (Doc. 2074) at 6.) Duly noted.

**3) Effective Practices File: Discipline:** The Special Master recommends that the District set aside $100,000 to develop, test and effectively implement a Discipline effective practices file, unless the District can develop the file without any cost which would be excellent. The District agrees, and submits the Discipline Effective Practices File will not require a set aside of $100,000 because its cost will be minimal. The District objects to the Special Master's assertion: "'The USP requires the District to create a resource that will give teachers and administrators access to information about effective practices with respect to discipline.'" (TUSD Response (Doc. 2072) at 5 (quoting R&R (Doc. 2070) at 12.) So while the District does not oppose implementing the Special Master's idea of an "online resource of best practices," according to the District, the USP requires no such thing.

/////
/////
/////

The USP states in relevant part as follows:

> If the data collected and reviewed indicates that a school has been successful in managing student discipline, the District RPPC[6] shall examine the steps being taken at the school to determine whether the approach adopted by the school should be adopted by other schools within the District, and if the RPPC determines the approach should be replicated, the District RPPC will share the strategies and approach with the District to consider replication at other schools.

USP § VI.F.3: Discipline, Monitoring.

The District refers to this as the Replicating Best Practices provision and refers the Court to its DARs, 2013-14 through 2016-17 to rebut the Special Master's further assertion that the District has not done much in the past to implement the relevant provision of the USP.

In the 2013-2014 DAR, the District reported:

> The USP requires the District to seek to replicate best practices based on the data and analyses from the quarterly reviews. USP §VI(F)(3). Based on the quarterly reviews conducted in the 2013-14 school year, the District's Student Services Directors are working with the designated RPCC (Assistant Superintendent Eugene Butler, Jr.) to research practices at sites that were identified in the 4th Quarter review as sites that may serve as models for others.

(2013-14 DAR (Doc. 1686) at ECF174)).

In the 2014-15 DAR, the District reported that after the first quarter review of disciplinary data, its staff had "identified schools that were successful at managing student discipline," . . . "Student Services staff discussed various approaches being implemented at those sites and made recommendations to elementary and secondary school leadership for successful strategies that struggling sites could potentially replicate. In developing corrective actions with sites, the directors from elementary and secondary school leadership worked one on one with principals to incorporate the replication of best practices into corrective action plans." And last, "[a]t the end of the school year, the District initiated steps to strengthen the practice and impact of replicating best practices related primarily to PBIS [Positive Behavior Intervention and Supports] practices and identifying strategies for improving school culture and climate. At the District's June

---

[6] Restorative and Positive Practices Coordinator.

1  2015 training, principals from various schools shared their successful strategies with
2  other principals." (2014-15 DAR (Doc. 1918-1) at ECF271-272.)

3  In 2015-16, the District reported a peer-to-peer methodology for sharing best
4  practices, which ranged from requiring principals to meet monthly with the school-site
5  discipline team and to share success stories with each other at periodically held trainings
6  designed to develop leadership, Instructional Leadership Academy (ILA) sessions.
7  (2015-16 DAR (Doc. 1958-1) at ECF342-344.)

8  In its 2016-17 DAR, the District reported that in July and August it had
9  "developed a specific plan to enhance its previous efforts to identify and replicate
10 successful strategies for addressing behavior and disciplinary issues and attached the
11 plan: Appendix VI-58: Best Practices Plan. (2016-17 DAR (Doc. 2057-1) at ECF360;
12 Appendix VI-58 (Doc. 2064-7)). In the Best Practices Plan, dated August 2016, the
13 District included the proposal to share best practices on line, which is the subject of the
14 R&R. *Id.,* Appendix VI-58 at ¶ 2.

15 To be clear, the USP requires the District to develop strategies for sharing
16 disciplinary best practices between schools. In August, 2016, the District prepared a Best
17 Practices Sharing Plan, and included a provision for directly sharing best practices on-
18 line. The District's August 2016 Best Practices Plan is fair game for discussion in the
19 context of the District's 2017-18 USP Budget. The Court understands the Special
20 Master's conclusion that the District has not done much in the past relates to the on-line
21 sharing plan it agreed to implement in August of 2016. This appears to be true, given the
22 District again in its September 20, 2017, Response and Objection to the R&R agrees to
23 "develop, test and effectively implement the discipline effective practices file."
24 (Response (Doc. 2072) at 4); (2016-17 DAR (Doc. 2057-1), Appendix VI-58: August
25 2016 Best Practices Sharing Plan ¶ 2 (Doc. 2064-7)). The Court adopts the Special
26 Master's recommendation for the District to fund and implement the on-line sharing
27 component of its Best Practices Plan this year.
28

**4) Family Engagement:** The USP § VII, Family and Community Engagement, recognizes that "family and community engagement is a critical component of student success" and requires the District to adopt strategies, including but not limited to: "(a) developing and implementing an outreach plan to families; (b) providing information to families about services, programs and courses of instruction . . . ; (c) learning from families how best to meet the needs of their children: and (d) collaborating with local colleges and universities, and community groups to provide information and guidance designed to improve the educational outcomes of African American and Latino students, including ELL students, and provide relevant information to their families." USP § VII.A.1.

The Special Master recommends that the District develop family engagement guidelines for its principals and other school staff. The District objects. The District submits it has both developed a family engagement plan, as required by the USP and, as noted by the Special Master, it is abiding by it—with the exception of placing computer-kiosks at individual schools. The District argues that if the District's approach now appears "minimalist," the boat for that complaint has sailed because both the Special Master and the Plaintiffs approved the Action Plan: Family and Community Engagement (FACE) Plan. The District objects to the imposition of "yet another set of guidelines." (TUSD Response (Doc. 2072) at 6-7.) The District admits, "[t]he development of said guidelines may be a good idea—but it should be up to the District to decide whether to implement the idea." *Id.* at 7.

Without asking the obvious question of "if it's a good idea, why not"—the Court turns to the District's argument that the recommendation is overreaching. The Court disagrees. The Special Master confined his R&R to activities the District proposes to, or not to, fund in the 2017-18 USP Budget and to the parameters of the FACE Action Plan. The Court comprehensive undertakings made by the Parties and the Special Master to develop Action Plans for each USP provision was not an assignment in busy-work. The Action Plans are the backbone of the USP. The Court looks to the FACE Action Plan.

In preparation of the FACE Action Plan, revised effective September 26, 2014, the District reviewed the strengths and weaknesses of its existing family and community engagement programs and researched best practices. Pursuant to the FACE Action Plan, "[t]he District plans to focus family engagement on 'learning-centric' opportunities," using the Harvard Family Research Project (HFRP) to strengthen the link to learning in family engagement." (2014-15 DAR, FACE (Doc. 1852-1) at 13.) Accordingly, the FACE tracked the three core elements of HFRP: 1) creating district-wide strategies; 2) building school capacity, and 3) reaching out to and engaging families. *Id.* at 13, 14-21.

In the FACE Action Plan, the District committed to utilizing learning-centric[7] family engagement rather than family engagement in student activities because "family engagement practices linked to learning have a greater positive effect on student outcomes." *Id.* at 19. The District adopted this priority in comparison to what it described as its historical practice of focusing primarily on family involvement in student activities. Further it noted: "Providing leaning opportunities discussed in Building School Capacity is vital to engage families in student focused learning." *Id.*

The FACE Action Plan, "Building School Capacity" provision provides for school-based goals, including the express requirement that "all District schools will: . . . ii. Create a learning-centric environment to support the academic success of all students by implementing strategies such as the Academic Parent Teacher Team (APTT)[8] model of parent engagement." *Id.* at 18.

The FACE Action Plan, "Building School Capacity" provision requires an outreach model that "creates opportunities and an environment of teachers and parents as partners in educating children." *Id.* at 18. The District's overarching strategy for partnering with families is Supportive and Inclusive Learning Environments (SAIL). Through SAIL training, the District will provide school certified and administrative staff

---

[7] Defined as: a learning climate where adults focus on student learning. (2014-15 DAR, FACE (Doc. 1852-1) at 4.)

[8] The Court views APTT as an example, not a mandate.

"strategies for how teachers and principals can learn from families regarding how to meet the needs of their children." (2014-15 DAR, FACE (Doc. 1852-1) at 16.)

According to the Special Master, the 2017-18 USP Budget does not reflect any school-level undertakings aimed at creating these learning-centric environments or two-way parent-school/teacher partnerships. He recommends the District develop guidelines for school principals and school staff regarding the types of activities which should be undertaken at the schools to create the requisite learning-centric environments and partnership relationships.

The District would have been better served by simply identifying its relevant district-wide "Building School Capacity" activities rather than objecting to the Special Master's authority to recommend the District prepare guidelines for the schools to implement these aspects of the FACE Action Plan. The Special Master reports that his review of past DARs suggest that there is a disconnect between the FACE directives and actual implementation of the directives in the schools. He reports that the Implementation Committee observed that "the effectiveness and scope of family and community engagement efforts vary across schools." (R&R (Doc. 2070) at 17.) The FACE Action Plan, "Recommendation 1" is "Create District-Wide Strategies." *Id.* at 14.

This brings the Court to the Special Master's recommendation that the District develop guidelines for principals and school staff to ensure that district-wide there is effective implementation of the FACE Action Plan--Building School Capacity provisions at the individual schools. He does not overstep his bounds. The District presents no evidence or even any argument that such activities have occurred or are occurring or are even planned. The FACE Action Plan clearly requires the District to create such district-wide strategies. Without hesitation, the Court finds that the District's responsibility does not stop there. The District is responsible for effective implementation of the district-wide strategies it creates, including those related to Building School Capacity at the individual schools.[9] The District admits that the Special Master's guideline

---

[9] The FACE requires the District to create an infrastructure to support family

- 15 -

recommendation is a good idea, and the Court adopts it.

The District asks the Court, if it is inclined to grant this recommendation, to preclude the Special Master from applying USP § I.D.1 review and comment provisions. "For all new or amended plans, policies, procedures, or other significant changes . . . , The District shall solicit the input of the Special Master and the Plaintiffs and submit such items for review before they are put into practice or use." The Court does not see the District's development of guidelines for principals and other school staff to use at the school-level for implementing the FACE Action Plan to be a program or plan change governed by USP § I.D.1. The Mendoza Plaintiffs do not seek such review. Of course, the Special Master is free to seek input from any party at any time. The Parties and the Special Master will all have an opportunity to weigh in on the adequacy of the school-level guidelines for the FACE Action Plan during the 2016-2017 analysis of compliance with the USP.

The Court defers to the Special Master's determinations regarding his data needs for purposes of monitoring USP compliance, but does not see these recommendations as budget issues. He explains that he cannot rely on family surveys because they are not taken in sufficient quantity to be statistically determinative. He should direct the District as to his data needs, such as what data they need to give him for him to determine how many parents are involved and in what kinds of activities. (R&R (Doc. 2070) at 15.) If he intends to determine the breadth of family engagement efforts by comparing family engagement activities in TUSD to those described in the six-component model developed by the National Network of Partnership Schools at Johns Hopkins University, he should direct the District as to the requisite data he needs to make this comparison. *Id.* at 16. The Special Master reports that past DARs have not included any evidence of the

---

engagement that includes a staffing structure providing for an Assistant Superintendent for Equity that supervises the Director of Family and Community Engagement, who in turn supervises a Family Engagement Coordinator, who with the Director of Family and Community Engagement, works closely with the Student Services Directors for Title 1 and other District departments "and directly with schools to support the implementation of [FACE]." *Id.* at 15.

effectiveness, if any, of SAIL training as it relates to family and community engagement. The Special Master should work with the District to ensure that it is gathering and producing data for assessing the effectiveness of SAIL.

**5) Student Success Specialists:** The USP, Section V, which covers Quality of Education issues, calls for the District to have coordinated "efforts to work directly with students to improve academic achievement, provide mentorship and guidance, reduce dropout and increase the college-going rate" for both African American and Latino students. USP § V.E.4.a and b. The District has been hiring Student Success Specialists to work directly with students, but now seeks to reduce their numbers. The Special Master does not object. He reports that "it is not reasonable to expect a small number of SSS who are under-funded, and under-paid and under-trained to have a significant impact on the learning needs of tens of thousands of students." (R&R (Doc. 2070) at 7.) He explains that, regardless of their sincere commitment to advocate for students, they do not have the training nor experience to deliver interventions that substantially improve academic and behavioral outcomes, and further when they "serve as advocates, they take on a responsibility that should be the responsibility of all teachers, administrators, counselors, and other staff," *id.,*—all better equipped and positioned to deliver interventions that can substantially improve academic and behavioral outcomes. According to the Special Master "there is little evidence that they have made a significant difference for the students they serve. If they didn't exist now, we would not invent them. Indeed, the plaintiffs have worked to ensure that tutoring was done by certified teachers." *Id.* at 8.

The Special Master believes the District needs to devote more attention and resources to improving outcomes for struggling students, especially African American students, *id.* at 7, and believes the District is searching for better ways to serve African American and Latino students. The District reports it has been working with the Fisher Plaintiffs to develop agreements regarding African American Student Services Department (AASSD) funding and once finalized the agreement will be shared with the

Special Master and the Plaintiffs. The Mendoza Plaintiffs ask for similar treatment from the District so that they too may have direct input into the reorganization of the Mexican American Student Services Department (MASSD). (Mendoza Objections (Doc. 2074) at 7-8.)

It is so ordered, with commendation to the Parties for proceeding to make adjustments where and when they become warranted based on experiences derived through the implementation and operation of USP provisions and action plans.

**6) Magnet Goals:** The Special Master recommends, and the District, agrees that academic performance goals will not be lower than previous years, that the District will evaluate progress towards these goals on a regular basis, including determining what each school needs to do to reach their goals, and will inform each school of these evaluations. The District advises that when the AZMerit scores are released, the District will submit revised budgets for schools no later than September 30, 2017, and the revised budgets will identify all sources of funding and specify the outcomes to be expected from the particular investments embodied in the revised budgets. (R&R (Doc. 2070) at 9-10); (TUSD Response (Doc. 2072) at 3-4.)

The Mendoza Plaintiffs ask the Court to order the District to inform schools of Court-approved academic achievement goals contained in individual school improvement plans because these goals have disappeared between the SY 2015-16 and SY 2016-17 school improvement plans. Without full briefing, the Court is not prepared to answer the question of whether or not the academic criterion of narrowing the achievement gap may be abandoned. The Court can say, generally, that Court approved goals and strategies, especially those adopted in the USP, may not be changed and/or abandoned without Court approval.

The Mendoza Plaintiffs are correct, the USP includes Quality of Education provisions, which include a provision for "Student Engagement and Support" which has the goal of improving "the academic achievement and educational outcomes of African American and Latino students using strategies to seek to close the achievement gap and

eliminate the racial and ethnic disparities for these students in academic achievement[.]" USP § V.E.1.a. The Magnet provisions in the USP are found in Section II, Student Assignments, which is aimed at affording all students the opportunity to attend an integrated school. Magnet schools are one strategy for achieving integration, but even here the District is required to focus on two goals: 1) promoting integration and/or 2) educational quality. USP § II.E.3. In addition to the universal sweep of Section V, the Magnet Plan expressly includes the goal of educational quality. Measuring changes in the achievement gap, if any, is certainly one way to track program effectiveness for attaining the goal of educational equality. Where an improvement plan proposed to decrease the achievement gap, the success or failure of related efforts must be reported and if the goal is necessarily abandoned, the reason for the change must be explained. Without further briefing, the Court will go no further. The issue may be reurged, with comprehensive briefing, in the context of the 2016-17 USP Compliance Report.

**Magnet and Transition Plan Funding:** The Mendoza Plaintiffs' complain that the 2018 budget makes substantial reductions in the level of funding for magnet and transition plans. The District responds that this is not so because some activities that previously received 910G (USP) funding are now being funded from other sources, such as Title 1 or M&O budgets. The Special Master recommends, and the District agrees to resolve the Mendoza Plaintiffs' concerns by September 20, 2017, when it revises its school budgets to reflect changes related to the most recent AZMerit test scores. In these revisions, the District will: 1) identify all sources of funding and 2) specify the outcomes to be expected from the particular investments embodied in the budgets. (TUSD Response (Doc. 2072) at 4.) The Court adopts the recommendation, as agreed to by the District.

**Accordingly,**

**IT IS ORDERED** that the Report and Recommendation (Doc. 2070) is adopted as follows:

1. Adopting the Special Master's recommendation to approve the District's

proposed teacher-mentor 1:15 point ratio, except for first-year teachers teaching at underperforming/underachieving schools where there shall be a 1:10 teacher-mentor ratio. The District should amend its formula and budget, accordingly.

2. Adopting the Special Master's recommendation, as agreed to by the District, to amend the ratio formula, 1:10 (first-year teaching CRC) and 1:15 (second-year teaching CRC), to reflect time spent by CRC teacher-mentors doing non-mentoring work.

3. The Court adopts the Special Master's recommendation for the District to fund and implement the on-line sharing component of its August 2016 Best Practices Plan.

4. Adopting the Special Master's recommendation that the District prepare FACE Action Plan guidelines for principals and school staff for Building School Capacity provisions for creating learning-centric environments and two-way parent-teacher/school partnerships.

5. The District shall work with the Mendoza Plaintiffs to reorganize MASSD with the intent to improve outcomes for Latino students.

6. Adopting the Special Master's recommendation, as agreed to by the District, that the September 20, 2017, revisions to school budgets, will include: 1) identification of all sources of funding and 2) specification of the outcomes to be expected from the particular investments embodied in the budgets. This shall also be required in all future budgets.

**IT IS FURTHER ORDERED** that the R&R (Doc. 2020) is MOOT.

Dated this 7th day of November, 2017.

Honorable David C. Bury
United States District Judge