**UNITED STATES DISTRICT COURT**
**DISTRICT OF ARIZONA**

Roy and Josie Fisher, et al.,

              Plaintiffs,

      v.

United States of America,

              Plaintiff-Intervenor,

      v.

Anita Lohr, et al.,

              Defendants,

     and

Sidney L. Sutton, et al.,

              Defendants-Intervenors,

CV 74-90 TUC DCB
(Lead Case)

Maria Mendoza, et al.,

              Plaintiffs,

United States of America,

              Plaintiff-Intervenor,

      v.

Tucson Unified School District No. One, et al.,

              Defendants.

CV 74-204 TUC DCB
(Consolidated Case)

# SPECIAL MASTER'S 2016-17 ANNUAL REPORT

**INTRODUCTION**

The Special Master is required by the Court to submit an annual report on the status of this case, hereafter called the SMAR. The observations in this report are based on information provided by the District, the plaintiffs and the Implementation Committee (IC). Members of the IC are experienced educators who are knowledgeable about the District.

The Implementation Committee reports directly to Special Master and its members are appointed by the Court. The District's Annual Report (DAR), which is available on the District's website, provides District staff, the plaintiffs and the public with extensive information about progress it determines is being made in implementing the Unitary Status Plan (USP).

The DAR, understandably, focuses on progress that the District is making in its efforts to implement the USP. This Report does not assess whether the District has implemented every provision of the USP with respect to those elements the Special Master recommends for unitary status though the members of the IC have agreed that the District has acted accordingly. Rather, it seeks to focus on the challenges of greatest significance and those that are most in need of attention in the District's pursuit of unitary status.

Following the filing of the Special Master's Annual Report (SMAR) for 2015-16, the District and some of the plaintiffs objected to several statements made in the report. The Court directed the Special Master to address these objections in this 16-17 Report. In particular, this Report focuses more on the outcomes of District's efforts to implement provisions of the USP (although the District argues that is not responsible for outcomes if it does what is mandated by the USP and the Court). This Report also recognizes that some conclusions reached by the Special Master and the 15-16 SMAR are based on inadequate data and now calls for the District to provide additional information as the condition of the District's attainment of unitary status.

Further, this Report includes in most analyses the effects of District actions on white students as well as African American and Latino students.

This SMAR is substantially more than an analysis of the progress the District made in implementing the USP during the 2016-17 school year; it also includes recommendations to the Court as to whether the District should be awarded unitary status (*i.e.*, be relieved of Court supervision) for some requirements spelled out in the USP. Such recommendations, of course, needed to take into account issues raised by the parties about the Special Master's previous Annual Report.

## I.    OVERVIEW

The general purpose of desegregation cases is to seek remedies that would eliminate or reduce, to the extent practicable, the vestiges of past segregation and discrimination. A primary instrument for achieving this broad goal is the integration of schools and classrooms and this is important in this case. However, school integration in and of itself is a limited remedy because, while it creates opportunities to learn – formally and informally – that cannot otherwise be experienced, the quality of education that students receive depends on numerous factors. This case has long addressed a broad range of potential remedies.

The USP is a "consent decree" endorsed by the parties and approved by the Court in February 2013. In addition to strategies to promote and sustain integration, the USP includes provisions to provide students with transportation, increase the diversity and effectiveness of teachers and school administrators; strengthen and enrich the curriculum and increase access to advanced learning experiences; develop safe, productive, inclusive and supportive school environments; provide services to students with special needs; meaningfully engage families; ensure equity in facilities and technology-facilitated learning resources; provide students with extracurricular activities; and create information systems and budgetary processes that facilitate

accountability, strategic resource allocation and effective management.

The USP is the most comprehensive plan ever developed to remedy the vestiges of past discrimination and segregation.  That the District agreed to support this plan is, in itself, an indication of the District's commitment to the needs of all its students.  Given the scope of this plan, it should not be surprising that the District and one or more of the plaintiffs disagree about how effectively the District has implemented the many elements of the USP.

This Report recommends that the District be granted unitary status for many elements of the USP but also recommends that the Court maintain supervision of several other provisions of the USP about which more work by the District needs to be done.  For those matters, the Special Master identifies what the District needs to do order to achieve unitary status and specifies "completion plans" with timelines for implementing these actions.

In making the recommendations in this Report the Special Master sought to answer the following questions:

1.    Did the District attain the goals specified in the USP, the action plans related to the USP that were approved by the parties and the Court, and any requirements ordered by the Court subsequent to February, 2013?  However, in a number of instances, the goals to be attained are unclear and whether the goals are achieved by the District are adequate to satisfy the intent of particular provisions of the USP may be contested.

2.    When goals for student outcomes or goals for creating policies, processes or structures are not specific, did the District make progress since the 14-15 school year?[1]

3.    When the available evidence does not demonstrate that the District has made noticeable progress and/or the District and the plaintiffs disagree about the extent

---

[1] The 13-14 school year was the first full year after the approval of the USP.  Moreover, it was not until that year that the parties agreed to criteria for coding the ethnicity/race of individual students.  It would be surprising to see the District making significant progress in the 13-14 school year.  Research on school improvement, an organizational change more broadly, often finds what is called an "implementation dip" during which people need to learn new techniques and unlearn less effective default behaviors.

of progress that has been made, did the District act in good faith to do what was practicable?[2]

4.    If the District has fallen short of its goals and those specified by the USP, the Special Master asks:  is there a strategy the District could undertake that has a good chance of improving student outcomes?  If there is no answer to this question, Special Master concludes that the District shall be granted unitary status for that particular element of the USP.

5.    Has the District put in place the policies, processes and conditions that one could reasonably expect to continue to be implemented after the Court supervision is removed.  Too often, when districts are granted unitary status, the progress made in eliminating the vestiges of discrimination and segregation withers away.  This concern about continuity is embedded throughout the USP in the many provisions that are meant to build and sustain capacity and provide transparent and accessible data about student outcomes.

As much as possible, the Special Master seeks to use empirical analysis to determine the adequacy of the District's efforts to implement the USP.  When such evidence is not clear, the Special Master relies on "expert judgment."  Special Masters are engaged by courts on the presumption they have relevant expertise.  In this case, the Special Master has sought the expert judgment of several researchers through several consultations and the review of relevant research.

The numerous provisions of the USP vary in their consequences for students' opportunities to learn.  It would not make sense to report on the progress the District has made in implementing every one of these actions.  The District seeks to describe how it addresses these many requirements in its 2016-17 Annual Report.

This SMAR focuses on a limited number of issues that are fundamentally important to the equity and quality of education affecting current and future TUSD students.  Some of these issues are found throughout the USP, including the professional development of District staff and the technical and human capabilities to use empirical evidence in making decisions from the

---

[2]  For example, the success the District is able to achieve in increasing the diversity of the teaching staff depends importantly on the number of African American and Latino teachers who make up the pool of potential candidates.

classroom level to the Governing Board.  The factors that determine the effectiveness of the District in implementing these two sets of actions are common across specific applications.  For example, the success of professional development depends on how it is provided regardless of the content or the recipients.  Therefore, Part X and XI of this Report treat evidence-based decision-making and professional development as clusters of actions rather than assessing progress in dozens of specific instances where these actions are required.

Within each of the several sections of the USP there are two or more elements.  In some cases, the Special Master recommends full unitary status for all of the actions covered by that section.  For other sections, the Special Master recommends that unitary status be withheld for specified reasons.

It could be argued that if all the provisions of the USP related to a particular topic are not worthy of unitary status, none of the sections should be granted partial unitary status.  There are at least three reasons why this argument should not be sustained:

1.  If this position was to hold, it would not be possible to award unitary status to almost any element of the USP because almost all actions are affected in some way or another by other actions.  For example, professional development is required by almost all sections of the USP.  And, multiple sections of the USP require evidence-based decision-making including disciplinary actions, PLCs, MTSS and program evaluation.

2.  Withholding unitary status from provisions of the USP that the District has satisfied would negatively affect family and public confidence in the District falsely implying a lack of commitment and capability on the part of the TUSD Governing Board and staff.

3.  Freeing the District from Court supervision when evidence indicates particular goals have been met will allow the District to focus on work yet to be completed.  And, by clarifying what specifically the District needs to do to achieve unitary status with respect to specific requirements of the USP will give direction to the District and provide clarity to monitoring efforts.

## II.    STUDENT ASSIGNMENT

Districtwide Integration

Eight schools were integrated in 2017-18 that had not been integrated in the previous year. Given the measure of integration provided for in the USP, a small change in the number of students can change the status of the school. But it is also the case that the proportion of TUSD students enrolled in integrated schools has also increased. *See Table II-1A and Tables II-1 and II-2*. These documents are provided by the District. The Special Master did not consider alternative schools in his analysis.

All tables and exhibits are appended to the Report.

It is possible, of course, that a small change in the percentage of students of a particular race (in most cases this will be Latino students), can push a school from integrated to racially concentrated-and vice versa. It is important, therefore, to look at the trend-lines See Table II-3. In five of nine newly integrated schools, the trends in the percentage of students of different races is consistent over the last two or three years, including the 17-18 school year. Project MORE is a clear exception – the percentage of Latino students went from 80 to 68% in the last two years. And the student population at that school varies considerably from year-to-year suggesting that it should not be part of any calculation. Drachman is a special case; its K-5 enrollment trends toward integration but in 17-18 middle grades were added with enrollment of over 70% Latino.

Two of the newly integrated schools, Erickson and Hudlow, had been integrated before the 2016-17 school year but not in 2016-17.

As noted, small changes in student populations can change schools from racially concentrated to integrated and from integrated to racially concentrated in a single year. Sewell lost its integrated status in 17-18 because the number of Latino students declined (from 49 to 42 percent) and Wright lost its integrated status because the percentage of African-American

students increased by four percent.[3]

The District's recent progress in integrating its schools can be attributed to the cumulative effect of more productive implementation of provisions of the USP and the relevant action plan along with prodding by the Court to implement suggestions from the plaintiffs and the Special Master.  For example, the District has only recently advised families of the research showing the benefits of an integrated education and created an Integration Initiative.  Could more progress be achieved?  Perhaps.  The strategy that is most likely to produce additional integration is the improvement and/or expansion of magnet schools.

The District has done those things with respect to student assignments that it was required to do by the USP, putting aside its ambivalence with respect to magnets.  In no other state are the challenges of integrating schools greater than in Arizona where state policy not only strongly supports charter schools but essentially incentivizes suburban schools to recruit students from more diverse Districts like TUSD.  In addition to state policy impediments, the geographic and demographic characteristics of the District work together to make the time getting from home to a school beyond students' "neighborhood schools" greater than is the case in many districts.

In summary, not counting Project MORE there is a net gain of eight integrated schools in the District in 2017-18 and the proportion of students in integrated schools increased from 18 to

---

[3]  The USP provides that a school may not be considered integrated if the proportion of students of a particular race or ethnicity is plus or minus 15% of the District-wide enrollment of students of that race or their enrollment of students from a particular ethnicity/race exceeds 70%.  In applying these rules, the student population of each of the four grade structures are used as the base.  In calculating the 70% criterion, the District has used the state practice and provided numbers as whole numbers using conventional rounding rules.  The number of schools that could be considered integrated would be fewer than those reported here if fractions of a percent were included in the measure.  In other words, with respect to the 70% rule, the Special Master counted schools as integrated when they had fewer than 70.5% of students of a particular race.

25%.[4]

*Recommendation*

The District should be granted unitary status with respect to the provisions of Section II of the USP – Student Assignment, except for magnet schools.  It might be argued that unitary status should be withheld for another year to be certain that recent progress holds.  But the trends are clear and, given the considerable barriers to integration beyond the control of the District, and the comprehensive efforts to which the District now appears to be committed, unitary status is warranted.

Magnet Schools

In a voluntary desegregation plan such as the USP, the primary tools for integration are magnet schools.  Moreover, magnet schools have the potential of bringing new families to the District.  The District had 19 such schools in 2015-16, 13 of which were "racially concentrated."  Even though many of these magnet schools did not come close to meeting the criteria established for maintaining them as magnet schools, the District opposed every effort to remove magnet status from the schools that were not achieving the fundamental purpose of magnet status.  One new magnet school has been established since the USP was approved by the Court though the theme for Tully elementary school was changed.[5]

---

[4]  Plaintiffs have expressed concern that this recommendation would mean that the District could engage in changes in school boundaries without review by the plaintiffs or the Special Master.  However, Section X. C of the USP requires the District to seek review by the plaintiffs and the Special Master of actions relating to the assignment of students which shall include a Desegregation Impact Analysis.  In any event, boundary changes are precarious.  They mean that many families need to rethink the choices they have made to send their students to a TUSD school.  This, in turn, invites families to consider whether they should look at other options like charters and suburban schools.  Moreover, families most likely to abandon TUSD will be those whose students are, generally, higher achievers.

[5]  Because of the success of the Tully conversion to an open access self-contained gifted and talented school, an action taken primarily to increase the number of advanced learning experiences, Roberts Naylor is being converted to an open access gifted and talented magnet school.

The District has shown limited interest in strengthening magnet schools much less expanding its magnet options.  The District should not be granted unitary status for magnet schools until it shows that it has the commitment and the capability to develop magnet schools that facilitate integration going forward.  It would be difficult to show that the District has the commitment and capacity.  Consider:

- The District frequently hires consultants to help it with important initiatives (*e.g.*, dropout prevention, discipline and dual language).  But it did not hire a consultant to help its development of a proposal for federal funding of magnet schools (the proposal was not funded).

- In its marketing efforts to advise families about the choices they can make among schools – including video, handouts, text on the website – there had been no mention until the recruitment for the 2017-18 school year of the significant research showing that attending an integrated school provides students with important learning opportunities they would not otherwise have.

- As a result of demands by the plaintiffs and pursuant to a requirement approved by the Court, the District finally launched an "Integration Initiative" in the spring of 2016 – more than three years after the approval of the USP.

- Until recently, the staff member serving as Director of Magnet Schools who was appointed in the fall of 2016 reported to the Director of Operations whose primary responsibilities deal with facilities and transportation.  Given that magnet schools are fundamentally education programs, the success of which are important to the attainment of unitary status, one might have expected the person responsible for this integration initiative to report to District leaders on the academic side.

- In its Annual Report, the District asserts that changes in the grade structures at Borman and Drachman enhanced integration.  However, the racial composition at Borman changed little and the changes at Drachman resulted in less rather than more integration.

- The person who served as Director of Magnet Schools through the 2014-15 was a forceful advocate for magnet schools.  However, the scope of her responsibility was continuously narrowed until she was not allowed to perform her functions.

- The position of Director of Magnet Schools, which is provided for in the USP, was left unfilled for half of the 2015-16 school year.  When a new director was appointed during the fall term of 2016-17, that position was redefined from full-time to half-time.  When the plaintiffs and the Special Master objected to this violation of provisions of the USP, the District removed the half-time appointee

and replaced him with an interim director.  The interim director was later appointed as Director without a search.

- In the development of its magnet school plans, the District has allowed several schools to set achievement goals lower than those they already had attained.  This can be explained as a lack of commitment to higher achievement in magnet schools or a failure to monitor the development of the plans.

- During the development of the 2017-18 budget, the Mendoza plaintiffs argued that the District was not adequately funding the magnet schools.  The District responded by saying that it would reconsider its goals when it had the opportunity to analyze the new AZMerit scores.  The plaintiffs and the Special Master took this response as an indication that the budgets would be revisited.  But the District made no changes in magnet budgets after review of the state test scores despite the fact that students at two of the magnets previously thought of as highly effective academically – Drachman and Palo Verde – performed below the District average in the growth of student performance in English language arts and mathematics schoolwide.  Further, students in these two schools who were performing in the bottom 25% scored below expectations in both of the subjects tested.

In addition to looking at whether the District has the commitment and capacity to expand magnets that would attract families to the District, it seems important to be assured that the District has the capability and commitment to engage in a process of continuous improvement with respect to magnets now in place.

The District has developed a walk-through protocol (WTP) for assessing the effectiveness of magnet schools.  That WTP, coupled with the systematic analysis of student outcomes, are essential tools for facilitating continuous school improvement.  When the District can demonstrate effective use of these processes that will provide confidence that the District has in-place procedures for improving and sustaining educational quality in its magnet schools.  This, in turn, is likely to motivate families to choose magnets schools.

*Recommendation*

Court supervision should be retained with respect to magnet schools so that the District can demonstrate that it has the commitment and capability to identify and implement a new magnet school with the clear potential to increase the opportunities TUSD students have to

benefit from an integrated education.

This recommendation does not require the District to establish a new magnet school. But one of the tests the Special Master believes is important to being free of Court supervision is that the District demonstrates that it has the commitment and capacity to entertain actions to sustain the progress made that justified its award of unitary status. It is entirely likely that one or more of the current magnet schools will lose magnet status should it fail to meet the criteria for magnet status established by the Court. Some current magnet schools are integrated only because of the neighborhood enrollment and others have failed to demonstrate that they can provide a quality education to the students they enroll. It would make little sense to sustain those schools as magnets.

*Completion Plan: Magnet Schools*

    A.    Existing Magnet Schools

        1.    Using data from the current school year, the Special Master shall determine by September 2018 whether each magnet school has met the standards for a magnet school currently set by the Court. *See* ECF 1753 at 9:3-16.

        2.    For each school that does not meet that magnet school standards:

            a.    The Special Master may recommend to the Court at any time that the school lose magnet status and/or

            b.    The District shall determine whether the magnet school can meet the magnet school status by the end of the 2018-19 academic year using funding, effort and tools reasonably projected to be available during that period.

        3.    For those schools not recommended by the Special Master for termination of magnet status that the District determines will likely be able to meet magnet school standards by the end of the 2018-19 academic year, the District shall prepare a magnet plan for that school no later than October 1, 2018, which is designed to enable the school to meet magnet standards.

        4.    The District will develop a transition plan for any school that loses magnet status. The transition plan will conform to the same form and standards as the transition plans that the District developed for prior former magnet schools.

-12-

**B.**     Potential Magnet Schools or Programs

1.     By the end of the current school year, the District shall undertake an assessment of potential magnet schools or programs for TUSD.

2.     The District shall identify the preferred choice(s), explain its reasoning for selecting the option(s) over other viable choices, and decide whether such an option(s) should be implemented and how this can be accomplished.

3.     This does not mean that the District must establish a new magnet school as a condition of being awarded unitary status.

## III.     TRANSPORTATION

Three-plus years of interviews with transportation administration, review of data from transportation and various reports, and review of proposed and budgeted expenditures for both magnet and incentive transportation confirm a systematized and equitably provided support and implementation of USP goals related to student transportation. School activity busses have been increased, bus passes have been provided to students to allow for flexible interscholastic participation at high schools, incentive transportation ridership has increased, information is available to prospective and enrolled parents regarding the availability of free transportation, express shuttle options were introduced, and transportation eligibility is reflected in each student's data dashboard.[6]

*Recommendation*

The District's provision of transportation services deserves recognition as having satisfied the provisions of the USP in Section III of the USP. However, there are numerous instances

[6] In its objections to the 15-16 SMAR, the Mendoza plaintiffs argue that it is necessary to study whether changing bus routes would change the interests of white families. It is not clear, however, how this would be relevant given that families don't choose schools by bus routes, except for time. There is no reason to believe that the District does not choose the fastest routes from neighborhoods to schools. A survey would not help answer this question in any case. At one point, the District surveyed parents about whether there was interest in having students take an express bus to Magee in order to foster integration. More than 100 families expressed interest but when the express bus was introduced fewer than a dozen students participated. No student who is eligible for transportation is denied transportation and all students are eligible if their choice of school will enhance integration. The fact that many white families don't choose to have their students ride buses out of their neighborhood tells us that integration is not that important to these white families, not that something in the transportation plan needs correction.

-13-

throughout the USP that depend for successful implementation on the provision of transportation. Moreover, awarding the District unitary status for transportation would not alter any of its commitments in the short run.  Therefore, it seems sensible to defer the award of unitary status for transportation with the assumption that the Special Master would recommend unitary status for transportation when full unitary status for all provisions of the USP involving transportation is awarded.

*Completion Plan:  Transportation*

The Special Master identifies no further actions relating to transportation.  When the elements of the USP that require transportation are released from court supervision, the District shall be awarded unitary status for transportation.

**IV.    STAFFING**

Districtwide Diversity of Professional Staff

Over the last five years, the District has made little progress with respect to increasing the proportions of African American and Latino teachers and administrators.  *See Table IV-1.*

Table IV-1 shows some increased diversity over the five-year period, but the last four years show year-to-year variation of little consequence.  The one exception to this generalization is that the number African American site-based administrators, though small, has increased.

The number of African American central office administrators is quite small.  There is, however, no reason to believe that this is the consequence of discrimination.  The paucity of African American district leaders is unlikely to be addressed through conventional recruitment strategies.  Rather, as recommended below, the District can enhance its internal leadership

-14-

development efforts.[7]

Before 2015-16, certified staff and teachers were grouped together in District reports. Since then, the proportion of African American teachers has remained low at three percent of the teaching corps while Latino teachers make up between 27% and 28% of all teachers. Comparing the proportion of teachers to other certified staff prior to 2015-16, it seems likely that the earlier years are similar to more recent years with respect to the proportions of African American and Latino teachers.

The District has done what it was asked to do by the USP and the relevant action plan. There are a limited number of actions the District could take to diversify its professional staff. One strategy would be to significantly increase teacher salaries but the cost of this initiative is prohibitive.

There are four elements of Section IV of the USP that might be implemented more productively: improving upon the "grow your own" programs, reducing employee attrition, increasing the diversity of teaching staffs at school levels and reducing the number of first year teachers appointed to lower achieving schools.

A fundamental problem confronting TUSD's efforts to increase the diversity of its teaching staff is that there is a nationwide teacher shortage. The dwindling supply of African American and Latino teachers also affects administrators since virtually all administrators come from the ranks of teachers. Moreover, Arizona ranks at the bottom among the states as attractive places for teachers to start their careers.[8]

---

[7] TUSD has a difficult time competing for talent with districts that pay considerably more and that serve communities with much larger African American populations in the quality of life that goes with a large ethnic population.

[8] The magnitude of this problem of inadequate salaries is stunning. Teachers in Arizona have declined in buying power more than almost any other state. Teacher salaries in Arizona are 17% lower than jobs that require similar levels of experience in education, even after adjusting for time teachers have (Continued…)

School Level Teacher Diversity

The USP requires that the District have a racially/ethnically diverse staff (Anglo, African American and Latino) at the school level.[9]  The District did little to address this requirement until the spring term in 2016 when the Special Master worked with the District to develop a Teacher Diversity Plan (TDP).  The TDP gave the District two years starting in the fall term of 2016 to achieve school level diversity.  The Special Master, without objection from the parties, exempted several schools from this requirement because they were dual language schools that needed Spanish-speaking teachers and schools that had a diverse teaching staff even though the actual percentages did not meet the diversity criteria in the USP.  Twenty-six schools were targeted in the TDP.  At the beginning of the 16-17 school year less than half of the 26 school teaching staffs met the diversity criteria.  After the hiring process in the spring and summer of 2017, 12 schools did not have sufficiently diverse teaching staffs.  The District has more work to do to meet this provision of the USP.

Reducing Attrition

One way the District could manage down its challenges in recruiting new teachers to work in TUSD would be to reduce the number of positions that need to be filled is to reduce attrition.

The rate of educator attrition in TUSD is not particularly high overall but that does not mean that it could not be lower.  There is a disconnect between the very significant proportion of teachers who say, in an annual survey, that they want to continue to work in TUSD and the proportion of teachers who actually leave the District.

off during the summers and extended holiday breaks.  Three fourths of Arizona teachers who changed jobs leave the profession entirely.  To put an exclamation point on the inadequacy of teacher pay, Arizona teachers who head families of four are eligible for seven need-tested federal aid programs – more than teachers in any other state.

[9]  Diversity is defined as a staff that is within 15% plus or minus the racial composition of the District's teachers for each of the four grade structures (elementary, middle, K-8 and high school).

The District has not undertaken a systematic study of the influences on attrition.  In addition to identifying ways to reduce the rate of attrition and reduce the substantial costs involved in teacher turnover, there are a number of other possible benefits of such a study.  Such a study (1) could identify ways to improve working conditions and leadership behavior which, in turn, would lead to increased student performance and (2) would result in improving both the quality and the diversity of the candidates from which the District can make appointments.  Reducing teacher turnover would, of course, mean that fewer students were taught by beginning teachers and this will improve the quality of teaching that students experience resulting in higher student achievement.

Grow-your-own Programs

Some Districts confronting difficulty in recruiting and retaining African American and Latino teachers have developed programs that support the certification of teachers and administrators from among District employees.  Other Districts have worked with colleges and universities to develop cadres of teacher candidates that nurture interesting capabilities even among high school students.  Such an initiative is now underway identifying TUSD graduates who have enrolled at the University of Arizona.

The District now has grow your own programs that have had limited success, especially with respect to the development of African American administrators.  No doubt the District has learned from these programs and could improve upon them at the same time that it explores a full range of options assessing their relative costs and benefits.  For example, the District's recent efforts need to be more proactive – it is not enough to advertise programs and wait for applicants.

Indeed, as is the case for the military and some federal agencies, individuals with leadership potential are recruited to entry positions and assigned to career paths that accelerate movement to leadership positions if the initial estimates of leadership potential are confirmed.

-17-

<u>Hiring of Beginning Teachers</u>

The USP encourages the District to avoid placing beginning teachers in racially concentrated schools or in schools where students are performing below the District average.[10] The obvious reason for this is that beginning teachers are typically less effective than teachers with some experience so this policy seeks to affect the allocation of teacher expertise to schools that serve students who need highly effective teachers the most. But another reason is that attrition rates are higher among beginning teachers in schools where students are low performing for beginning teachers than in above-average schools. The District has complied with the letter of this provision of the USP but not with its intent. The USP grants the superintendent the right to approve the appointment of beginning teachers to racially concentrated schools or schools serving students who achieve below the District average, but it is clear that the appointment of beginning teachers to these schools was to be an exception rather than the rule. For the both the 2016-17 and 2017-18 school years, almost three out of four beginning teachers started teaching in racially concentrated or lower achieving schools  at the beginning of the school year.

*Recommendations*

The District should be granted unitary status for the provisions of Section IV of the USP except for the following:

1.   School-site teacher diversity.

2.   The evaluation and potential strengthening of actions to reduce attrition of certified staff.

3.   The evaluation and improvement and possible expansion of so-called grow-your-own programs aimed at increasing teacher and administrator diversity.

---

[10]  The USP provision relating to beginning teacher placement deals with racially concentrated schools and schools where students are performing academically below the District average. But there is no research that supports the idea that it is more difficult to teach students in racially concentrated schools than in schools where students achieve above the District average.

-18-

4.      Reducing the number of beginning teachers being assigned to racially concentrated and low performing schools.

*Recommendations*

A.      Site-level Teacher Diversity

1.      The District shall continue to implement the current Teacher Diversity Plan (TDP) through the 18-19 academic year.

2.      No later than April 15, 2018, the District shall evaluate additional incentive program(s) to add to the TDP to increase its impact, determine what incentives, if any, to add for the 18-19 school year, and prepare a report for the Special Master and the plaintiffs identifying the option(s) considered, and explaining the rationale for its decision.

B.      Attrition

1.      The District's Assessment and Evaluation (A&E) department shall conduct a study, designed in consultation with the Special Master, to identify the reasons underlying teacher and administrator attrition over the past three years.  The study shall include utilizing a third party to conduct intensive interviews of those who have left the District.

2.      Using the results, along with other information (such as survey results), the District shall evaluate strategies to reduce teacher and administrator attrition including support and in-school conditions teachers and administrators need to enhance student academic performance, identify the strategies to be implemented.

3.      The District shall provide a report to the Special Master on the study and strategies to be implemented by June 2018 so that strategies to reduce attrition could be implemented during the 2018-19 school year.

C.      Grow Your Own Programs

1.      The District shall review what is known about the effectiveness of "Grow Your Own" programs existing across the country, especially those aimed at increasing the proportion of African American and Latino professional educators.  This inquiry shall identify options with potential for TUSD, assess their costs and benefits, and determine what if any modifications to make to existing programs.  This review shall also consist of an assessment of the District's own recruitment efforts, especially as they relate to Latino and/or African American staff participation.  The District shall prepare a report for the Special Master describing its review and analysis, and explaining the basis for its decision regarding existing programs.

-19-

2. This study shall be completed no later than August 2018, so that any promising initiatives could be implemented during the 2018-19 school year.

D. Hiring of Beginning Teachers

By April 30, 2018, the District shall explore alternative strategies for reducing the number of appointments of beginning teachers to lower achieving schools. If this is not practicable because of potentially negative consequences for retaining teachers, the District shall explore strategies for mitigating the negative effects on students of appointing beginning teachers to lower achieving schools. A preliminary report on options shall be submitted to the plaintiffs and the Special Master no later than May 15, 2018.

Among the strategies for reducing attrition are those that enhance teacher performance through mentoring and providing extra support to teachers who are struggling. The District's efforts in this regard are modeled on programs that research has shown to be effective in other Districts. While there has been no systematic study of these programs in TUSD, the models used appear to be implemented with fidelity and there is no reason to believe that they are not reasonably effective. Other strategies involve reducing course load, placing master teacher teams in schools with a number of beginning teachers (rather like teaching hospitals) and providing incentives to induce outstanding principles to take beginning teachers to fill open positions.

Professional Development

As indicated in the introduction to this SMAR, professional development is called for throughout the USP including in Section IV (entitled administrators and certified staff). Part XI of this Report deals with actions the District could and should take to improve the effectiveness of professional development.

**V.    QUALITY OF EDUCATION**

<u>Advanced Learning Experiences</u>

    <u>Overview</u>

On August 3, 2017, the Special Master submitted a Report and Recommendation with respect to the status of progress the District was making to implement the provisions of the USP related to Advanced Learning Experiences ALEs.  The USP identifies several different types of Advanced Learning Experiences (ALE):  gifted and talented programs (GATE); University High School (UHS) advanced placement (AP) courses, Pre-AP Advanced, and Pre-AP Honors courses, middle school courses that carry high school credit, "dual credit" high school courses that can be used to satisfy college requirements, and International Baccalaureate (IB) courses.

The plaintiffs and the District raised objections to particular parts of the R&R.  The court, recognizing that the Special Master was to prepare an annual report that would include recommendations with respect to unitary status for all or some of the ALEs, directed the Special Master to make whatever changes the deemed appropriate in light of the objections and additional information and to incorporate his analysis and recommendations in this report.

Since one of the unresolved issues with respect to ALEs has been to determine what the goals are that the District should be held responsible for attaining, this aspect of the Special Master's Annual Report will precede the analysis of District's progress.  The remainder of the discussion related to ALEs examines (1) overall progress and (2) a closer examination of each of the ALEs, including the analysis access, participation and outcomes for individual schools as appropriate and feasible, depending on the availability of relevant data.

It is important to recognize that student participation in an ALE is voluntary and that outcomes students experience from any given ALE are significantly affected by influences on student learning – such as student prior academic experiences and education and developmental

factors that reside in families and communities.  These influences mitigate or enhance student outcomes regardless of how effectively an ALE is designed and implemented.

**Goals**

What goals should the District be accountable for achieving?  The USP wording with respect to ALE focuses on access.  However, it would be difficult to determine access without examining actual participation.  To its credit, the District has agreed to use participation as the goals to be pursued.  Moreover, the Court order that generated this report identified "completion rates" as an issue the Special Master should address.  This Report includes information about some student outcomes on the assumption that "completion rates" implied results of participation in ALE.

The Mendoza plaintiffs argue that students of all racial backgrounds should participate in all ALE at equal rates.  For reasons identified earlier in this report, this would be an extraordinarily difficult standard for the District to attain.  Access to some ALEs is conditioned by tests and the performance of students on these tests is shaped significantly by the family and community environments in which students live.  Family and community characteristics are, in turn, correlated with race.  Because of limits on financial resources, teacher interest and qualifications and other influences, the availability of ALE varies by school.  And, as noted, participation in ALE is voluntary on the part of students and large numbers of students who are eligible to participate in ALE choose not to do so.

District-Wide Goals

The District engaged a nationally prominent researcher – Dr. Donna Ford of Vanderbilt University – who studies "minority" student access to and success in academic programs that are exceptionally rigorous.  Dr. Ford (who is an African American) indicated that when districts consult with her on this question and when she serves as an expert witness in court cases, she

recommends the use of what she calls a 20% "rule of thumb" but acknowledged that she did not have in-depth information about the students in TUSD.

The District adopted its consultant's 20% rule of thumb for 2015-16 and committed to attaining a 15% participation rate for African American and Latino students for the 2016-17 school year. The District proposed to apply this standard to 80% of the programs District wide.

How the participation rate proposed by Dr. Ford is determined is important. For each ALE, the percentage of African American and Latino students enrolled Districtwide in the grades where the ALE is offered is multiplied by 80% (if the 20% rule of thumb is applied) to determine the percentage of students of each race that need to be enrolled in order to meet the 20% standard. The percentage of students of each race who are actually enrolled in the specified ALE is then compared to the District goal. For example, assume that 60% of Latino students are enrolled District-wide in the grade levels in which a specific ALE is offered. Eighty percent of 60% is 48%. If the total number of students enrolled were 1,000, the District goal for enrollment of Latino students would be 480. If more than 480 Latinos were actually enrolled, the District would have met its goal.

The Court expects that ALE goals will be set for ELL students. There apparently is no research or state or national data upon which to base such goals. The most sensible strategy may be to ask the parties to meet to determine practicable goals going forward using data on current participation by ELLs in each ALE as the base upon which to build rates of increase over the next three years. The same approach could be used for exceptional education students with goals varying by disability.

As noted, parity is not a reasonable goal for all ALEs. Participation in ALEs is voluntary and choice is influenced by perceptions of a likely attainment of the putative benefits of participating in a given ALE. These perceptions can be influenced by teachers and counselors

-23-

and other educators, but family and student perceptions of whether students will benefit from ALEs is importantly influenced by numerous factors including the prior experiences of family members, "stereotype threat," and students' sense of his or her own academic confidence and competence.

The Mendoza plaintiffs have urged that more ambitious goals be set for courses available to all students, such as pre-AP courses. However, the same factors that would influence choice by parents and students apply whether the goal is 15% or 10%. Further, it seems unlikely that the District would do anything different in the pursuit of achieving the 15% goal if the goal were lowered to 10% or even five percent. This is illustrated by the fact that in 2016-17, when the 20% rule was in effect, this higher goal than the one being proposed did not seem to reduce the District's effort to increase participation of African American and Latino students. In 2016-17 Latino participation in four the five pre-AP programs would have met a 10% goal and a 5% goal would have been met in three of the five cases.

The Uniqueness of ALEs

It should be noted that the concept of ALE is not common and most debates over what the goals should be, when specific goals for enrollment in rigorous courses and programs are part of the discussion in other Districts, are typically focused on participation in gifted and talented programs and other programs where participation is determined by test scores or prior academic performance. In other words, the USP's expansive definition of academic programs for which the District should be held accountable for significant enrollment by African American and Latino students, is unusual and testifies to the District's and the plaintiffs' commitment to the pursuit of equity.

Overall progress being made may provide a different picture than that one would see by examining whether enrollment goals are being made for all ALE in all schools. That there are

differences among schools is clear and it would be surprising if this were not the case because the factors that influence access and participation can vary by school.  But because some of these factors are beyond the practicable influence of the District, the 15% rule should not apply for all ALE in individual schools.  Moreover, in many schools, the number of African-American students is so small as to render statistical analysis inappropriate.  And, many TUSD schools experience substantial mobility.  In the discussion below of individual schools, the very large variability from year to year within and across races is illustrated suggesting that there are no systematic or systemic explanations for most of these variations.

To determine whether the District is doing what it reasonably can to enhance the opportunities of African American and Latino students to participate in ALE, it would be useful to answer the following questions:

1.      Are there consistent differences in the extent to which African American and Latino students participate in particular ALE?

2.      If so, what are the reasons for these differences?

3.      Are there practicable actions the District could take to reduce or eliminate the effects of the influences on differences in student ALE enrollment?

It seems worth repeating that a major reason for differences across schools in ALE is the "known unknown" of student and parent decisions.  That is, we cannot determine why students and parents opt out and what could be done to change their minds.  The cost of such a study would be prohibitive and the results problematic.

Districtwide, white students' participation in ALEs is greater than the participation of African American and Latino students.  This raises the obvious question: why not base goals for African American and Latino students on the performance of white students, an approach often used when "narrowing the achievement gap" is discussed.  One problem with this approach is that the goals would change each year.  But more important to understanding the differences in the

participation of students from different backgrounds in ALE, as discussed in the introduction to this Report, is that family and community influences have an enormous impact on students' academic achievement, at least as it is measured by standardized test scores like those used to measure student achievement in Arizona.

Numerous researchers have studied how much of the variance in student achievement can be accounted for by measurable variations in school characteristics.  The consensus is that schools, on average, account for less than a third of the variance in student achievement. Differences in family and community characteristics that are highly correlated with student performance on standardized tests are also correlated with race.

This does not mean that good schools do not make a big difference in students' lives in many ways.  The point here is that setting goals the achievement of which are beyond the capabilities of schools to achieve is not fair may direct attention away from actions the District can implement to increase participation of Latino and African American students in ALE.

*Recommendation:  District-wide Goals*

The District shall be held accountable to a 15% rule districtwide, except for ELL and students with disabilities, calculated as above for 2018-19 and beyond and that this goal shall apply to each ALE except UHS[11].

The 15% rule should not be applied to UHS because admission is determined by an examination and prior academic performance.

---

[11]  Efforts by the Special Master to compare the diversity at UHS to that in other exam schools suggests that UHS is uncommonly diverse.

-26-

The 15% goal is more ambitious goal than that proposed by the District's consultant but falls short of the parity rule the Mendoza plaintiffs have advocated.[12]

The Status of the District's Efforts to Increase
African American and Latino Student Enrollment in ALE

Status in 2017-18 Overall

This Report  addresses the Mendoza plaintiffs' concern that the August 2017 ALE R&R provided inadequate information about the status of Anglo students in ALEs by including data on Anglo students, especially in the discussion of individual schools.  The conclusions here are based on "Updated Version of Table II from the ALE R&R" in Exhibit V-A, pp.6-10, which – as with all tables and exhibits – is appended to this Report.

Much of the data used in this report it is embedded in Exhibit V-A. Exhibit V-A was provided by TUSD.  Rather than pulling out or reconstructing data from this source, providing data in this way allows the readers of this report to place the data in context and to examine related information Special Master chose not to cite.

The analysis in this section of the SMAR focuses on the District's attainment of the 15% goals across most of the ALE programs but excludes dual language programs, which will be the focus of a separate analysis in this Special Master's Annual Report for 2016-17; the IB programs at Safford and Robison because they have been terminated as magnet programs; and UHS, which is discussed separately below.

The actual percentage of white students enrolled in ALE is similar to Latino students in many instances.  However, because white students comprise a significantly smaller percentage of total enrollment at each grade level, white students are disproportionately enrolled in most ALE.

---

[12]  At one point, the District agreed to try to meet a 10% goal for 2017 – 18.  However, the District coupled this proposal with a provision that this target should be achieved in 80% of the ALE programs and this stipulation seems unacceptable.

A couple of examples from 17-18 illustrate this point.  First, while the percentage of white and Latino students in early grades self-contained GATE is almost exactly the same, white students exceed the 15% goal by 26 percentage points while the percentage of Latino students in this program fall short of the 15% goal by ten percentage points.  Second, in AP, whites exceed the 15% goal by 18 percentage points while Latino students fall short of the 15% goal by over 4%.  Disparities vary by ALE with the smallest differences between the 15% and actual enrollment occurring in those ALE offered at a small number of schools.

These differences in the enrollment of white students in ALE is not surprising and would be found in almost all districts where, as in Tucson, white families are more affluent and parents have higher rates of the attainment in post-secondary education and families of other races.  The District cannot change the socioeconomic status of families in the short run.[13]

There is a total of 15 programs examined here defined by type of ALE, grade level (*e.g.* GATE, K-5).  The analysis treats each of these 15 programs as having two goals, one for African American students and one for Latino students – 30 in all.  The 15% rule is used as a measure of goal attainment.  The data used are from 2017-18 unless otherwise noted (when comparisons trends are discussed or when data for 2017 -18 are not yet available-such as graduation rates).

In both 2017-18 and 2016-17, of the 15 African American programs, the District met the 15% goal in three cases.  With respect to the 15 Latino programs, the District met the 15% goal in 12.  Of the programs where the 15% rule was not met for African-Americans, one of these came within 1% of meeting the goal.  In one of the three Latino ALE programs that did not meet the 15% goal, the goal would have been met if a one percent margin were allowed.  The largest

---

[13]  Many districts create barriers to taking more rigorous classes, including AP.  These barriers include teacher recommendations and grade-point averages.  TUSD has no such obstacles other than GATE and UHS.

-28-

shortfall in attaining the 15% goals were in self-contained GATE for both African American and Latino students and pull-out GATE for African American students. *See* Exhibit A, pp.6-10, which is appended to this Report, for relevant data. GATE enrollment is discussed in more detail below.

District-wide, goal attainment at the 15% level masks differences by school. For example, as will be noted below, participation in AP classes varies considerably in the District's high schools. Self-contained GATE is available in a small number of schools.

The reason for the relatively low participation in self-contained GATE programs by African American and Latino students is not because most are located in schools that are located in parts of the city with low proportions of African American and Latino families. Many self-contained GATE programs are offered in schools serving relatively large proportions of African American and Latino students. Low participation by African American and Latino students is primarily a product of the inability of many of these students to perform well enough on the cognitive tests for admission. The District recognizes this problem and is testing the efficacy of "open GATE" programs in two self-contained GATE schools at which admission it is not affected by student scores on a test.

The number of students involved in each type of ALE varies from year to year and from program to program. An analysis of trends over the last two years can shed some light the District's trajectory and goal attainment as well as providing information about the effectiveness of efforts to increase enrollment. Data are available for the period 2012-13 to 2017-18 but the number of schools has changed and the District's efforts to enhance participation and outcomes in ALE has increased significantly. For the purposes of this analysis, the proportion of African American and Latino students in each program is examined rather than specific goal attainment because the goals changed from year to year. As Exhibit A, pp. 6-1 shows, the pattern is mixed

-29-

with some progress made in some programs and not others and in some cases the level of participation declined.

African American student enrollment in self-contained grade 1-5 GATE programs increased significantly – a 57% increase from 2015-16 to 2016-17 (an increase of 12 students)[14] as a small increase from 2016-17 to 17-18.  Latino students had a 41% increase (an increase of 78 students) but enrollment in 17-18 decreased by 10%.  Enrollment in middle school self-contained GATE increased noticeably for both African American and Latino students from 2016-17 to 2017-18.

A simple way to get a sense of what is happening is to look progress made from 2015-16 to 2017-18 across the ALE being examined.  Measuring progress by percentage changes in participation (the measure used to calculate progress toward the 15% goal) and treating one percent changes either way as inconsequential, for African American students four ALE improved, seven lost ground, and four did not change.  For Latino students, eight ALE indicated improvement, two lost ground and five remained unchanged.  If we look at the number of students in each ALE the story for African American students is the same but for Latino students, because of their much larger numbers, participation improved noticeably in twelve ALE, decreased in one and did not change in two.  In at least half of the ALE where number of Latino students increased, the number of students was quite small.

It is important to recognize that some ALEs affect many more students than others just as some ALEs have greater impact on student learning than others.

ELL Students

There are virtually no African American (or white) ELL students in an ALE of any type in

---

[14]  The number of African American students in particular ALE programs is usually small, so small numbers of students enrolling can have a relatively large effect on the percentages.

2016-17.  The number of Latino ELL students in an ALE varies by the type of ALE and over time.  Across the most recent four years, Latino ELL participation was greatest in 2016-17 for Resource GATE, middle school classes for high school credit, pre-AP advanced, pre-AP honors and AP.  No or one Latino ELL student was enrolled in UHS or dual credit courses.  ELL enrollment varied in no particular pattern for pullout GATE and self-contained GATE.

Participation of Latino ELL students in ALE it is putatively meant to prepare students for enrollment and success in AP classes increased dramatically, from 14 in 2013-4 to 126 in 2017-18. Latino ELL participation and in IB courses went from 3 to 12.

Exceptional Education Students

Exceptional education is a broad category of students including students are labeled as "gifted" based on their scores on cognitive tests and students with various disabilities.  The total number of exceptional education students, other than those identified as cognitively gifted, enrolled in ALE is quite small.  The Special Master was unable to determine what a reasonable expectation for involvement in ALE of students of various disabilities.

*Recommendation*

The Special Master's recommendations with respect to specific ALEs and related completion plans are set out following the discussion of each of the ALEs.  One of the strategies that would be relevant to the increasing success in many a LE programs would be to increase the number of avid programs being implemented throughout the district.  Special Master does not however make such a proposal because the District is implementing a long-term plan to that effect.  Adding AVID programs is costly and success depends on buy-in from teachers and administrators.  The District's incremental strategy with respect to avid seems reasonable.

The District is adding AVID at Wright Elementary school next year, which will cost about $40,000, and will have additional costs for teacher training (and the AVID membership cost) in

-31-

the following years.

Catalina already operates an AVID program within the school.  Next year the program will go school-wide with the goal of having AVID strategies embedded at each grade level and in all content areas.  The anticipated cost for this expansion is approximately $185,000.  This cost includes an added FTE, added AVID tutors, Path training for 65 teachers, and student supplies, and other ancillary costs.

A Closer Look at Particular ALEs

To better understand what could be done to increase access participation and outcomes for African-American and Latino students in ALEs the Special Master undertook a more in-depth analysis of the data for each ALE.

ALE Enrollment in Elementary Grades:  GATE

As was pointed out in the discussion of the extent to which the District met its ALE goals districtwide, self-contained GATE and pullout GATE are two of the types of ALE where the District has fallen short of the 15% goal.  African American and Latino students who qualify for self-contained GATE programs receive free transportation to one of the 10 schools, if they do not reside within that school's boundary.  However, a number of students who have this option choose not to exercise it.  The fact that two of the 10 schools are dual language places a practical limit on African American and Anglo student enrollment because success in these programs in grades three and beyond it is affected by the student's ability to speak Spanish.[15]

[15]  In selecting its model for dual language, the District chose the approach research has shown to be the best for developing fluency in English and a second language – in TUSD that second language is Spanish.  However, this TWDL model has limited potential for promoting integration.  The students who do not speak reasonably good Spanish by the beginning of the third grade will have trouble catching up with their fellow students.

In 2016-17, the racial composition of self-contained GATE classrooms ranges from 21 percent to 24% African American and 24-88% Latino.[16]

Pullout GATE – which provides students with approximately 90 minutes of GATE learning each week – is available in all elementary schools and participation is limited to students who have met the minimal test score on the access exam.  In 2016-17, there were three exceptions to this called cluster pullout GATE schools.  The three schools are Fruchthendler, Dunham and Robins.  The first two are majority white schools, Robins is racially concentrated.  In 2017-18, the District committed to increase the number of cluster pullout programs.  This issue is addressed in the recommendation section of this report.  In cluster pullout programs, students who did not pass the test required for GATE enrollment can participate in the pull-out GATE experience in that school.

Enrollment in self-contained and pullout GATE is contingent on student scores on a cognitive test.  To increase the pool of students who might qualify for GATE and who might therefore be encouraged to participate, the District tested almost all first and fifth graders in 2015-16.  Based on AR 15-16 – REVISED Table 5.6 GATE Testing Data, the number of African American students testing for GATE (District students in grades K-6) increased from 435 in 2014-15 to 917 in 2015-16, an increase of 482 (110.8%).  The number of Hispanic students testing for GATE (District students in grades K-6) increased from 3045 in 2014-15 to 6343 in 2015-16, an increase of 3298 (108.3%).

The effects of testing on enrollment would only be evident in elementary grades where relevant recent data are available.  There was a significant 57% increase enrollment of African-American students and a 41% increase in the number of Latino students in self-contained GATE.

---

[16]  It should be noted that racial composition of self-contained classrooms is sometimes considerably different than the racial composition of the schools within which those classrooms exist. Thus, such schools are characterized by *de facto* tracking.

Nevertheless, as noted earlier, further progress is needed for the District to meet the 15% goal.  In contrast to the self-contained GATE picture, virtually no progress was made increasing the number of Latino and African American students pullout of GATE.

Self-contained and Pullout GATE

While Anglo students exceed the 15% goal for SC and PO GATE, African-American students full short of the 15% goal for both and Latino students fall short for self-contained GATE.  However, the Latino participation rates and pullout GATE is less than 1% of the 15% goal.  The fact that the 15% goal is not met may be because access is limited by cut scores on the required tests and or students who are eligible choose not to participate.

Evidence from the District indicates that virtually all students who qualify for pullout GATE choose to enroll.  That is not the case for self-contained GATE no doubt because students not enrolled in school the limited number of schools that offer self-contained GATE must leave their neighborhood school to attend the self-contained program.  While substantially more white students qualify for self-contained and pullout programs, the percentage of Anglo, African American and Latino students who accept the opportunity for GATE program is similar.

The numbers of students of different races to qualifie for self-contained and pullout GATE in 2017-18 were:  Anglo-241; African American-39; and Latino-258.  It follows that the most promising way to increase access participation in self-contained and pullout GATE would be to alter cut scores on the tests of cognitive ability.  At the request of the Special Master the District examined this possibility and concluded that lowering the cut scores by 2 deciles did not significantly alter the percentage of African-American and Latino students.  But, lowering the cut score at this level in 2016 would have resulted in more than 200 Latino students being eligible to participate in GATE programs.  A small number of African-American students would have been eligible.

*Recommendation*

The District should not be awarded unitary status for self-contained and pullout GATE.

*Completion Plan*

The District shall be awarded unitary status for self-contained and pullout GATE if the eligibility scores for these programs are lowered by NCE points.  There is every reason to believe that this will not negatively affect the quality of existing programs.  African American and Latino students pass the current cluster GATE programs in the District did not report any need to water down these curricula.  The fact that the students in the open GATE programs appear to be handling the curriculum adequately, and in the case of Tully, have shown improvement in the state test scores is another indicator that lowering the cut scores on tests for admission to GATE is an workable.

Teachers shall be trained to offer GATE programs and, if necessary, the District shall provide appropriate incentives.

The District shall increase the number of cluster GATE programs to at least 10 by the beginning of the 2019-2020 school year.

ALE Courses Available to Middle Grade Students

Middle grade students (6-8) have access to four types of ALEs depending on the school they attend:  Pre-AP Honors and Pre-AP Advanced Courses, Resource GATE, and middle school courses that carry high school credit (MS-HS).  There is some overlap in that some Pre-AP courses carry high schools credit. See Exhibit A, pp. 26-28, Exhibit B and Table V-III (which deals with Resource GATE in both middle and high schools).

Pre-AP advanced courses are offered at the middle school grades and are limited to more rigorous math courses.  Pre-AP honors courses are offered at middle grades and in all high schools.  As the name of the courses implies, honors courses are meant to be more rigorous but

-35-

they do not, nor do pre-AP advanced courses carry extra credit or credit for the next level of grades, *e.g*., MS to HS.

Resource GATE provides an elective course or other GATE-like experience for approximately 50 minutes five days a week in all middle and K-8 schools that use middle school schedules (this excludes some smaller K-8 schools) as well in some high schools.  The high school elective experiences are being expanded to all comprehensive high schools.

Middle school courses for high school credit, or courses that students can take while in grades 6-8 and receive credit for these courses on the high school transcript.  As Exhibit A, pp. 26-28 and Exhibit B show, there is considerable variation among schools and among races within schools and across schools.  This ALE may be particularly important for students who need to work after school when they entered high school.  A major reason for this variation and student enrollment is that this ALE is not offered six of the schools with middle school grades; in four additional schools, only one course is offered each school year.

As Exhibit V-A, pp. 3-5, and pp. 35-36 and Exhibit B show, there is considerable variation among schools, within schools, among and within races.  There do not appear to be any clear trends and, while white students are more likely to participate in these courses in many schools, this is not always the case. In some schools and some years, African American and/or Latino students participate at higher rates in pre-AP courses than Anglo students.

Variation among schools and races is related to the size of school and the number of students of each race in the school.  Four schools with middle grades offer neither of the two pre-AP options.  Increasing the enrollment in these courses by increasing school size is not a viable strategy.

There have been no studies to show that there are clear benefits from participating in these courses.  Research in other settings suggests that more rigorous courses benefit students but only

if students received adequate support (the only ALEs for which tutoring is regularly provided by are AP, IB and UHS. The Special Master's analysis of the data found that students who take pre-AP classes are only modestly more likely to take AP courses and that taking a pre-AP course is unrelated to whether students achieve a grade of three or higher on AP exam, an achievement that can lead to them receiving college credit and being more likely to be admitted to a competitive entrance college or university.[17]

While the variation among schools with respect to the number and proportion of students of these each race who enroll is large, the proportion of students who complete the school course and who pass is very high and there is not much variation from school to school. While Anglo students are more likely than African-American students to complete the course, African-American students who complete the course are more likely to receive a passing grade. The picture with respect to comparisons between Anglo and Latino students is more complicated,

Middle school courses that carry high school credit, on the other hand, provide tangible benefits to students who take them. However, these courses are not available in all middle schools.

Pre-AP honors are offered at all high schools. The greatest participation in pre-AP honors is at the two high schools with the greatest percentage of African American and Latino students, except for Cholla where the focus is on IB. Not surprisingly, the greatest participation in AP honors is in University High School. No high school shows a positive trend towards increasing enrollment for all races. Anglo students are more likely (five percentage points or more) to enroll in high school honors courses than are African Americans at Palo Verde, Pueblo and Tucson High. Anglo students are more likely than Latino students to enroll in high school honors courses

---

[17] Pre-AP courses do not "map" on the AP curriculum or exam and are not explicitly intended to prepare students to succeed in AP classes.

at Pueblo and Tucson High.

The great variation in enrollment and completion among the different middle school ALEs suggest that learning opportunities available to middle grades students in TUSD is the product of incremental policy developed over time.  The data suggest that there are significant disadvantages for students of different races.

There is nothing inherently wrong about having variation courses available from school to school though the possibility that closer analysis of data on middle school ALEs could discover needs for reallocation of resources.  An exception to this proposition is middle school courses for high school credit (MS-HS).

There is considerable variation among schools and among races within schools and across schools regarding MS-HS courses and participation.  A major reason for this variation in student enrollment is that this ALE is not offered in six of the schools with middle school grades and in four additional schools only one course is offered each school year.

As noted in the discussion above, having access to courses that carry high school credit may be a particularly important option for students who need to work or want to participate extensively in extracurricular activities.  And, since satisfactory completion of MS-HS courses carry significant benefit to students the District should consider whether there is need to provide tutoring support for these courses in schools where success rates are low.

*Recommendation*

The District should not receive unitary status with respect to ALE for students in middle school grades at this time. While almost all students succeed in these high school credit courses in some schools, this is not the case in several schools, a reality that warrants further investigation.

-38-

*Completion Plan*

The District shall identify schools that (1) of the largest participation among African American and Latino students in ALE and (2) the smallest differences between participation among students of different races to determine what, if any, structural, demographic and cultural characteristics of these schools differentiate them from schools that are less successful in facilitating student participation in middle school ALEs.

This study shall be completed during the current school year.

The District shall develop a practicable plan for increasing participation of middle grade students in ALEs.  This plan shall ensure that all students have access to at least one middle school course that carries high school credit.

The District shall determine why there is substantial variation among schools and the success that middle school students have in undertaking courses for high school credit.  Results of this inquiry shall include, if warranted, strategies for increasing student success (such as the provision of tutoring).

The District shall provide students in all schools with at least two so-called pre-AP courses.  If this is not practicable, the District shall explain why.[18]  One of these courses, at least, shall be available during the 18-19 school year.

High School ALEs: AP, IB. Dual Credit and UHS

Advanced Placement (AP)

Any student may enroll in an AP class without having to take a test.  Table V-I lists the number of courses at each of the District high schools over the last two years as well as

_____

[18]  It would appear that there are alternative strategies.  As it does for some middle school courses for high school credit, students could be provided with opportunities to take courses in schools near their neighborhood schools and then provided with transportation; since the pre-AP courses cover topics offered in the conventional curriculum, it seems possible to increase the rigor of at least one of the relevant courses; or students could enroll in online courses offered filed several schools at once.

-39-

enrollment of African American and Latino students in 2016-17.

Table V-I understates the number of students enrolled in AP classes because the number of enrollees is the number of individual students who take one or more AP classes rather than the total number of students who enroll in all AP classes. However, Table V-I provides a picture of differences in access from school to school.

It is difficult to determine what an equitable number of courses and enrollment should be in each school because – as suggested earlier – AP offerings are determined by student demand, whether teachers have relevant training and interest to offer such courses, and other factors. A student's decision to enroll in an AP class is influenced by the students' sense of confidence in their ability to succeed and the support they receive from parents and teachers accordingly. Some parents appear to believe that having their student take an AP class would negatively affect their grade point average and, hence, their students' opportunities to attend college (even though colleges often give weight to AP classes in making decisions about admission even when student do not pass AP exams) and teachers and counselors sometimes decide that a student will not benefit from a more rigorous curriculum (despite evidence to the contrary) and explicitly or implicitly discourage students from enrolling in an AP class.

TUSD received national recognition for the increase in the number of AP courses offered and students tested in 2013-14 and 2015-16. From 2015-16 to 2017-18, the number of individual African American and Latino students who enrolled in AP classes has stabilized at about 1700 students.

An examination of the school level access to and participation in AP classes usefully excludes UHS students. With 8.1% of all TUSD high school students, UHS accounted for 25%

-40-

of all of the District high school students enrolled in AP classes 2017-18.[19]

It is not surprising that schools with the largest percentage of African American students have the lowest proportion of students enrolled in AP classes. African American and Latino students participate at somewhat lower rates in ALEs aimed in part at readying students to succeed in AP. Since African American and Latino students as a whole perform academically at a lower rate than the District average, students and their families may feel that AP classes are too demanding. But, as Table V-I indicates, the differences among schools and participation are significant. At Pueblo High, where 90% of the student are African American and Latino, and at Tucson High, where 78% of the students are African American and Latino, only 15% of the students take at least one AP course. In comparison, in the two comprehensive high schools where African American and Latino students make up less than 50% of the student population – Sahuaro and Sabino – one fifth and one third of their African American and Latino students enrolled in at least one AP class. [20]

The number of African American students taking AP courses between 2016-17 and 2017-18 increased slightly and the number of Latino students enrolled in AP decreased slightly.

Of those students taking the test over the three-year period beginning in 2013-14, the number and percentage of white, African American and Latino students enrolled scoring three or higher on AP exams increased noticeably though students in all three racial groups scored three or more on AP exams more often in 2014-15 than in 2015-16. Decreases for African American and Latino students were very small in 2015-16.[21] Over the three year period, the actual number of

---

[19] Counting total enrollment in all AP classes (students count more than once), UHS accounted for 46% of all students enrolled in AP in 2015-16.

[20] If we look only at grades 11 and 12, the proportion of African-American Latino students enrolled in one or more AP courses was 70% outlet Sabino and 57% it's Sahuaro.

[21] In Exhibit A, the District identifies a number of other school systems and compares AP engagement with TUSD. While the sample is not random, these data shine a positive light on TUSD. The (Continued…)

African-American and Latino students passing the AP test increased by 37% and 35% respectively.

While University High School students accounted for 66% of the passing scores among TUSD students, 32% of the African American students who took the exam scored a passing grade and 40% of Latino test takers did so. 2013 data for Arizona (the most recent national data) suggest that African American and Latino students in TUSD who took AP exams did substantially better on AP tests than African American and Latino students throughout the state.

African-American and Latino student enrollment in AP classes seem particularly low at Tucson High (where enrollment has declined each of the last three years) and especially at Catalina. Only six AP courses are available for the 741 students who were enrolled in 2017-18. And, there were only six AP classes available to Catalina students in 2016-17 as well. In contrast, in Sabino High School, where 196 more students are enrolled, more than twice as many AP courses and five times as many sections are available. Not surprisingly, the number of individual African American and Latino students enrolled at Sabino in an AP class significantly exceeds the number of African American and Latino students enrolled in an AP class at Catalina. And, while Catalina is somewhat smaller enrollment, the number of African American and Latino students at Catalina exceeds the number of African American and Latino students at Sabino by 126. Catalina has a substantially larger number of ELL students than does Sabino and the proportion of African American students who are ELL is greater in Catalina than Sabino. The relatively large proportion of ELL students at Catalina affects both demand and opportunity with respect to AP. But this does not explain all of the significant differences between the two schools. In any case, the small number of African American and Latino students in AP at

---

Special Master compared AP test taking and passing in TUSD with Denver, a school system that is highly regarded, and found that TUSD compared quite favorably.

Catalina is almost unbelievable; the average class size is less than 10 in 2016-17. Not a single African American or Latino Catalina student passed an AP exam in the most recent year for which the District provided data.

*Recommendation*

The District should not be awarded unitary status for Advanced Placement at this time.

*Completion Plan*

The District shall undertake a study to identify reasons for (1) low interest in AP at Catalina and (2) the slide in the number of African-American and Latino students enrolling in AP classes at Tucson High and develop strategies for addressing the challenges at these schools.

International Baccalaureate (IB)

Juniors and seniors at Cholla High School have the opportunity to participate in the International Baccalaureate program. There is every reason to believe that the IB program, while its per student costs are relatively high, is a successful initiative. Large proportions of Cholla students take at least one IB course, take the IB exam for that course and pass the exam at a level that will earn them college credit.

The IB experience can be thought of as having two strands. The first is the diploma program, the second is the opportunity to take IB courses that can result in college credit, as is the case with AP courses. The diploma program is extremely rigorous and only a small number of students choose that strand. Well over half of the juniors and seniors at Cholla High School take an IB course. The proportion of white and Latino students who take the IB course increased by three percent over the last three years; the percentage of African-American students increased by seven percent, 85% of 12th grade students who took an IB course also took an IB exam, 54% of students who take the IB exam earned a score of four or higher while 84% earned a grade of three or higher thus qualifying them for college credit at most four-year colleges. This is remarkable;

during the spring 2017, 41% of non-UHS students earned a qualifying score of three or better (which is comparable to the score 3 on the IB exam).

It is generally thought that IB is more rigorous than AP. The relatively high rate of success among Cholla students may be, in part, because students are tutored by IB course teachers. This model might be explored for AP tutoring.

*Recommendation*

The District should receive unitary status for IB.

Dual Credit

Dual credit courses are high school courses that can be used for credit in postsecondary institutions, at least in Arizona (*see* Table V.I).

The District currently offers 22 such courses, 12 of which are offered at Santa Rita. The District intends to expand the number of these courses. Priority in the expansion of these courses should be placed in high schools serving the largest proportion of students eligible for free and reduced meals. The District has informed the Special Master that this is its intent.

The advantage for students of dual credit courses is that they are guaranteed credit at Arizona colleges and universities including community colleges. Many TUSD students start their postsecondary education at community colleges. Virtually all students who take dual credit courses received passing grades. This high success rate is in contrast to the experience of students taking AP or IB classes who must pass a more rigorous examination in order to receive college credit.

The downside of these courses is that when students who have taken them seek admission at a college or university outside of the state of Arizona, they may be at a disadvantage as compared to students who take and succeed in traditional AP or IB courses. Families should be advised accordingly.

-44-

*Recommendation*

The District should be awarded unitary status for dual credit ALE when it makes at least two dual credit courses available to students in all high schools.

UHS

University High School is considered one of the best high schools in America.  Admission to UHS is based primarily on performance on admission test (the CogAT) and grade point average above 3.0.  It is also among the most racially and ethnically diverse "exam schools," especially if diversity is measured by the relative ratios of African American, Latino and white. In 2017-18, the racial composition of the UHS student body was:

White-46%; African American-3.4%; Latino-35%; Native American-.20%; Asian Pacific Islander-10%; Multiracial 6%.  This is almost exactly the same as the percentages of Anglo, African American, and Latino students in 2016-17.

Another indication of diversity, is the fact that 56% of UHS enrollment in 2016-17 were eligible for free and reduced meals.

In 2013-14, the Court ordered a change in admission criteria to allow students who fell slightly below the 50 point admission bar based on the test and grade point average to write short answer essays to demonstrate their qualifications.  Between 2013-14 and 2016-17, Latino enrollment at UHS increased by 18% and African American enrollment by 20%.  All of the gains for African American students (that resulted in a total enrollment of 37 students in all grades), occurred for African Americans in 2014-15.  The number of Latino students has grown each year over the last four years, with the biggest annual growth having occurred in 2016-17.

These increases in the number of African American and Latino students occurred while the total enrollment in UHS has increased so the percentage of the UHS student population of African American and Latino students has increased .5% for African American students and 3.8%

-45-

for Latino students.  (The proportion of white students at UHS has declined slightly).

Most core academic courses at UHS are Advanced Placement courses; 94% of white students score 3 or higher on AP tests while 85% of African American students and 87% of Latino students score 3 or higher.  (*See* the section in this report dealing with Culturally Relevant Courses to see the District's efforts to develop an AP CRC course.  The College Board currently lists an Advanced Placement course titled AP World History which is listed as leading toward twenty four college majors including African American Studies and Ethnic Studies).

UHS provides considerable academic support for all students who need it; a small percentage of students of all races withdraw from UHS for academic reasons.  In general, African American and Latino students are successful at UHS. Attrition rates among African American students went from 7% in 2013-14 to 3% in 2017-18, the retention rate for white students was 4%.  During the same period, the attrition rate among Latino students increased from 4 to 7%. Graduation rates for both African American and Latino students at UHS are greater than the graduation rates for high school students district-wide.

A significant number of UHS students had not enrolled in the TUSD school before enrolling in UHS or live in communities outside the boundaries of TUSD.  However, this does not affect the admission of African American or Latino students who have attended TUSD school because all students who meet the admission requirements are accepted.  The District has reviewed and revised the process and procedures used to select students for admission to UHS to ensure that multiple measures for admission are used and that all students have an equitable opportunity to enroll at University High School using all the criteria and input as directed by the Unitary Status Plan.  Exhibit V-C describes some of the efforts the District has made to increase the number of Latino, and especially, African-American students the only strategy that appears to have had a non-incremental affect this is the short essay option for students on the borderline

for admission.

Each year there are a number of students who are eligible for admission to UHS chose not to enroll. In 2016-17, 14% of African-American, 10% of Latino and 27% of Anglo students declined the offer. In 2017-18, 27% of African American percent Latino and 12% white students declined admission to UHS. This means that there is a sizable pool of potential African American and Latino students whose enrollment in UHS would increase its diversity further. As Exhibit V-B shows, the District has undertaken a number of efforts to attract the students. One reason for reluctance to do enrolling in UHS may be a concern on the part of families, if not the students themselves, that the rigor of the UHS curriculum would be too stressful. To the extent that this is of concern, providing prospective eligible candidates an opportunity to experience what academic work at UHS involves and to learn that they will have support of UHS faculty and fellow students could encourage some students to enroll.[22]

*Recommendation*

The District should not receive unitary status for UHS at this time.

*Completion Plan[23]*

1. Borderline qualified students should be offered an opportunity to complete an additional essay which will be considered as part of the multiple measures with the goal of increased African American student enrollment. *See* Exhibit V-C for discussion of efforts by UHS to find an admissions policy that would

---

[22] What may be at work here is a phenomenon called "stereotype threat" – the adoption by individuals from stereotyped groups of negative social attributions. The College Board currently lists an Advanced Placement course titled AP World History which is listed as leading toward twenty four college majors including African American Studies and Ethnic Studies.

[23] The Mendoza plaintiffs want the Court to direct the Special Master to set goals for UHS, at the same time that they acknowledge that the 15% goal would be inappropriate. Arguably, UHS is among the most aversive not the most diverse "exam school" in America. Whatever goals were set by the Special Master would be arbitrary and given that UHS already engages in a number of activities to encourage the attendance of African-American and Latino students, the only certain way to reach whatever goals were set would be to continually alter the admission requirements until the goal was reached. *See* Exhibit V-C for a summary of UHS actions with respect to admission requirements.

further enhance student diversity.

2. Documentation that all students who do not accept an enrollment invitation have been contacted for additional recruitment purposes as well as to provide rationale for enrollment refusal.

3. The District shall inquire as to why the attrition rate for Latino students at UHS is twice the attrition rate for white and African-American students and report the results of this inquiry to the Special Master and the plaintiffs.

4. The District shall continue to recruit African American and Latino students who have qualified for admission to UHS engaging African American and Latino families in these recruitment efforts to the extent feasible.

5. The District shall explore the usefulness of a summer program for seventh and eighth grade students who have qualified for admission to UHS that provides them with the opportunity to know what the level of academic demand is in UHS courses.

When the District submits the results of the implementation of the above items, the Special Master shall recommend that the District receive unitary status or UHS.

Culturally Responsive Pedagogy (CRP)

One of the key themes of the USP is its emphasis on the importance of effective teaching, particularly culturally responsive pedagogy. TUSD may be the only school district to make CRP integral to its conception of effective teaching regardless of the subject being taught.

This commitment to CRP requires significant professional development and finding ways to evaluate teaching to ensure that teachers get appropriate feedback and support. While TUSD has worked to ensure that all teachers of all subjects master CRP, it has work yet to do.

The Special Master has been concerned for some time about the fact that the basic training for teachers in TUSD is EEI while teachers are being evaluated using the Danielson instrument as modified by an expert panel and TUSD teachers. There are two potential problems. First, are these two approaches to instruction aligned? Second, EEI, which was developed many years ago,

has little focus on culturally responsive pedagogy. The Danielson instrument, as modified in TUSD is almost certainly the most culturally responsive evaluation of teaching in existence.

The Special Master commissioned a member of the National Academy of Education to compare EEI and the TUSD evaluation instrument (this was not paid for from District funds). The consultant is, Dr. Jacqueline Irvine. She is one of a small number of internationally prominent scholars in the field of culturally responsive pedagogy. She confirmed that the two instruments are not well aligned, at least with respect to culturally responsive pedagogy, and that EEI pays little attention to culturally responsive pedagogy.

But in her analysis, Dr. Irvine also found that, with a couple of exceptions, the only culturally responsive content in the Tucson evaluation instrument is in the highly proficient category of each rubric. This means that a teacher could be scored as highly proficient without having any capacity to engage in culturally responsive pedagogy.

*Recommendation*

The District should not be granted unitary status with respect to culturally responsive pedagogy at this time.

*Completion Plan*

1. The teacher evaluation instrument used by TUSD shall be amended to include culturally responsive pedagogy as an element of teacher proficiency.

2. Administrators who evaluate teachers shall be trained to evaluate teacher proficiency in culturally responsive pedagogy. The District shall develop a procedure for validating the capabilities of administrators to undertake such evaluation.

3. Teacher training to employ culturally responsive pedagogy shall be an integral part of their training to implement the curriculum (*e.g.*, teaching students to read through culturally responsive instruction).

Culturally Relevant Courses (CRC)

As Table V-CRC indicates, the number of high school CRC and CRC modules in other grades has grown steadily over the last three years.  The number of students enrolled in high school courses is understated by the Table because many students take more than one CRC courses during the year.  Examining individual course enrollment suggests that the total enrollment in high school CRC has been about 2000 students over the last two years.  High school courses cited here are conventional CRC courses, either African American or Mexican-American perspectives.  This count does not include multicultural courses for multiethnic courses.

The number of students enrolled in CRC infused modules in grades eight to five has doubled over the last two years.  It should be understood that CRC modules are parts of other courses – often social studies and English language arts – below the high school level.  These courses, for the most part, are not electives.

Teachers of CRC courses receive substantial professional development.  It is the case that teachers have different levels of prior knowledge when they begin teaching CRC courses so they vary in the level of professional development need.  While some teachers teach CRC courses with minimal preparation to do so, unlike most of any other new course offering in TUSD, CRC teachers receive substantial real-time mentoring over a two-year period as they teach.  This level of investment in the initiation of the curriculum is almost unprecedented.

CRC are offered at all high schools except Santa Rita and UHS.  The reason for this at UHS is that virtually all core courses (CRC are core courses) and all core courses at UHS are AP.  The District is working collaboratively with the College Board to develop one or more CRC AP courses.  The process involved is laborious.  These courses will be offered under a special College Board program.  Teachers will be trained in 2018-19 and the courses offered in 19-20.

The Director of CRPI has met with staff at Santa Rita and they report that there is little student interests in CRC.  The Director is working with the principal to identify teachers at the school who would be interested in teaching CRC and this, in turn, should result in greater student interest.

The District developed a reasonable formula for determining the number of so-called itinerary teachers to support the program, primarily through mentoring.

Pursuant to the Court order appointing the Director of Culturally Responsive Pedagogy Instruction, the District has engaged a prominent African American expert as a consultant to ensure that the aspects of culturally responsive pedagogy that are particular to African Americans are embedded in the training of CRC teachers as well as cultural responsive pedagogy which all teachers are learning to employ.

The District has convened a national panel of prominent scholars to review the curriculum and pedagogy for CRC.  The members of this panel review main themes of courses, suggest materials and provide general guidance to the director of CRPI but they do not undertake detailed analyses of lesson plans, a task appropriately undertaken by District staff.

*Recommendation*

The District shall be awarded unitary status for culturally relevant courses.

Multicultural Curriculum

The District has worked to infuse multicultural content in the District's curriculum.  But before unitary status with respect to multicultural education should be awarded, the processes for expansion of these efforts need to be clarified and  an accurate description of the extent to which multicultural content has been infused throughout the curriculum, including science and mathematics, needs to be presented.

-51-

*Recommendation*

Unitary status with respect to multicultural education shall be deferred.

*Completion Plan*

The District shall prepare a report by the end of the 2017-18 school year which:

1.   Describes the progress made in infusing multicultural content throughout the curriculum.

2.   Specifies the processes for review, curriculum modification, and relevant professional development, and ensures that, as books and other hard copy or electronic materials are purchased for school-level libraries or as resource materials for LIRC, those materials are selected with multicultural perspectives taken into consideration as a component of the selection process.

3.   Provides a schedule for infusing multicultural content to curriculum domains not yet revised, including reviewing the science curriculum during the current school year.

4.   Describes the frequency with which review of curriculum is recurrently undertaken to determine whether further infusion of multicultural content is warranted.

Dropout Prevention, Graduation, Retention and Absenteeism

The District's graduation rates are relatively high.  Dropout rates, and retention rates are exceptionally low.  Absenteeism rates are reasonable.  Most Districts serving diverse students would be pleased to trade numbers with TUSD.  For example, the most recent available national data indicate a dropout rate of 6.5% and the dropout rate in Arizona is 4%.  The 16-17 dropout rate for TUSD was 2.5%.

Even though graduation rates in the District for all students is exemplary and rates of retention and absenteeism are low, the District has made modest and consistent progress since 2012-13 on each of these metrics.  The one exception to this is graduation rates for African American students though the rates of graduation have improved in the last two years and exceed state and national averages.  Indeed, in 2016-17, African American students graduated at rates the same or higher than whites students at UHS, Sahuaro, Rincon, Cholla, Palo Verde and Catalina.

-52-

In 2016-17, African-American graduation rates were higher for the same as graduation rates for Latino students at Sabino, Sahuaro, Cholla, Rincon, Pueblo and Catalina. Graduation rates for Latino students were the same or higher than white students at UHS, Sabino, Sahuaro, Cholla and Pueblo and Catalina. The overall graduation rates are the highest they have been since 2012-13. Between 2015 16 and 2016-17, the African American graduation rate increased by 7.5% and the Latino graduation rate increased by 4%.

The District has a number of activities in place that are aimed at improving graduation and reducing dropouts.

Data for assessing how ELL students compare on these four aspects of student engagement vary from year to year. Further work is needed to compare the efforts and success of TUSD's efforts to improve rates of graduation, dropouts, retention and absenteeism.

*Recommendation*

The District should be awarded unitary status with respect to rates of graduation, dropout, retention and absenteeism except with respect to ELL students.

*Completion Plan*

The parties shall meet to identify a practicable graduation rate for ELL students.

Improvement of Data Systems with Respect to at-risk Students

*See* Part X of the draft SMAR. Progress has been made in this domain but more needs to be done.

Special Education

It appears that the District has met the goals listed in the USP. The Special Master analyzed data for placement in 16 categories of disability from 2016 to 2018 pay particular attention to categories that studies suggest or possible venues for discrimination, such as, emotional disability, mild intellectual disability and language impairment.

-53-

The assignment to these different categories of disability roughly mirror the proportion of white, African-American and Latino students in the larger school population.  The number of students in each of the categories over the last two years is similar, suggesting that placements and special education are consistent and not arbitrary.

The District has a systematic process for reviewing referrals to special education. Referrals are examined by psychologists who determine whether the alleged symptoms of need for special education warrant the placements.  Central office professionals currently review the placements looking for potential misplacement and whether students are making progress in light of the services they are being provided.  Senior staff conduct quarterly reviews of placements, trends and the relevancy of services provided to individual students.

*Recommendation*

The District should be awarded unitary status for exceptional education.

Inclusive School Environments

The best way this can be assessed is by looking at student surveys.  Data for a single year is not sufficient to make such an assessment.  Data analyzed by the Special Master for the one year for which data has been provided suggests that there is work to be done with respect to relationships among students of different races.  In addition to survey data, it is necessary to know what specific actions have been taken at the school level to improve the dispositions and skills that affect students' dispositions and capabilities to learn with and from students from different racial and cultural backgrounds.

*Recommendation*

Unitary status for this aspect of the USP should be deferred.

*Completion Plans*

1.  No later than May 2018, the District shall provide a report that includes an analysis on the inclusiveness of school environments based on student survey data by race and by school structure over at least three years.  This study shall be conducted in collaboration with the Special Master prior to the beginning of the 2018-19 school year.  The report shall describe the strategies the District has utilized to improve inclusive school environments and identify any additional strategies that the District believes will improve inclusive school environments.

2.  If the data suggests the levels of inclusiveness need to be improved and/or these perceptions vary by race, the District shall (a) identify strategies for increasing inclusiveness and (b) put in place a plan to implement evidence-based strategies during the 2018 19 school year.

3.  If the data suggests the levels of inclusiveness need to be improved and/or these perceptions vary by race, the District shall (a) identify strategies for increasing inclusiveness and (b) put in place a plan to implement evidence-based strategies during the 2018 19 school year.

MASSD and AASSD

The roles and levels of investment in these departments has been a continuing source of conflict between the Fisher and Mendoza plaintiffs on the one hand and the District on the other. Evidence that these departments have made a difference for the students they serve is limited, at best. But the Fisher and Mendoza plaintiffs argue that if those departments were adequately funded and changes were made in the functions of these departments and how they are staffed, this would result in enhancing the academic achievement and reducing discipline problems of African American and Latino students.  The Fisher and Mendoza plaintiffs argue that the very existence of these departments is symbolic evidence of the District's commitment to the welfare of African-American and Latino students.

In January 2018, the District and the Fisher and Mendoza plaintiffs developed a completion plan for how these departments would function going forward.  These plans provide very little information about how the departments will actually function.  The plans basically retain the current staffing but appear to give some of the people different titles.  The staff of the

-55-

proposed departments have multiple and poorly defined functions in direct contradiction to recommendations made by the District in its evaluation of the efficacy of these departments. The District provides no evidence that the departments have had noticeable positive effects on the outcomes for African American and Latino students.

There can be no doubt that the educational outcomes and social and emotional development of Latino and African American students should be enhanced. The question is whether this is the best way to invest $1,500,000 each year. No school district in the country uses the proposed TUSD strategy for enhancing the outcomes of struggling students. If these programs are essential, why is it that the per-student investment in African-American students is 10 times greater than the investment in Latino students? If the plaintiffs have been consistently and appropriately aggressive about the need to have fully certified teachers to tutor students, what is the logic of having personnel who are uncertified undertake much more complicated tasks than tutoring?

The Fisher and Mendoza plaintiffs have persistently worked with the District to develop a plan that provided evidence of the District's commitment to the students they represent. The willingness of the District to agree to this proposed plan represents its desire to demonstrate its commitment to working productively with the plaintiffs. But the Special Master has the responsibility to recommend actions to the Court that have a reasonable chance of enhancing the learning opportunities and outcomes of African American and Latino students. If the Special Master were to endorse the proposal made by the District and the plaintiffs, that would be professionally irresponsible and would contradict a central premise of the USP, namely that decisions should be based on research or empirical evidence.

*Recommendation*

The District should not be awarded unitary status with respect to the activities to be performed by either of the two departments.

*Completion Plan*

It would not be difficult to identify effective strategies for enhancing the achievement and social-emotional development of African American and Latino students. Indeed, the District is already implementing some of the strategies. But, given the history that contextualizes the struggles to define and support effective ways to enhance the quality of education that African American and Latino students in TUSD experience, it would be unwise for the Special Master to develop such a plan. Instead, the District shall:

1. Continue to meet with the Fisher and Mendoza plaintiffs to identify activities to be performed by staff of the two departments and demonstrate how these activities are integral to the core functions of the District (*e.g.*, enhancing the effectiveness of the MTSS system and enhancing the quality of teaching).

2. Specify the qualifications that members of the department staffs should have to perform specific functions and describe how staff with these qualifications can be recruited, trained and retained (*e.g.*, current salary levels will not do it).

3. Convene a small panel of experts (no more than four people) who are knowledgeable about research on effective practices in meeting the needs of African-American and Latino students. This panel shall advise the people working on the development of the plan.

4. The District shall submit a revised plan no later than May 1, 2018, for the student success departments or alternative ways of addressing the needs of African American and Latino students who need exceptional help.

Academic Interventions

Section V.F.7 of the USP requires, among other things, that the District provide academic support to struggling students. However, the USP and the relevant sections of the DAR, are vague about what this means and no systematic evidence about the efficacy of the many activities in which the District engages to support students who need more academic support than others is

provided.  However, since many students receive more than one intervention simultaneously and the support is provided to individuals in many cases, it would be difficult to assess the effectiveness of particular interventions.  Before the District is awarded unitary status for its efforts to support struggling students that is implicit in this Section of the USP and will, the District should clarify:  (1) how the needs of students are identified, (2) the range of interventions the District can employ, and (3) whether those who are responsible for seeing that the needs of struggling students are met have the technical and professional capabilities to ensure that students get the support they need.

*Recommendation*

Unitary status for this Section of the USP should be deferred as it applies to the provision of support to students who need extra academic support.  Section X below also deals with these issues.

Dual Language

The District has struggled to meet it obligations with respect to dual language provisions of the USP.  It has been caught between the desire to increase the number of programs and the need to improve the programs already in place.  A nationally prominent consultant hired by the district in 16-17 actually orders of the district start over.

The District's efforts to enhance its dual language programs are repeated by state policy. The District's efforts to gain a waiver from the restrictive policies have not been successful.  The major obstacle for increasing the number of dual language programs is the problem of finding qualified teachers.  The District has initiated an incentive program that will allow teachers to both increase their income (the District recently doubled the stipend )and have their efforts to be certified paid for by the District.  Of the 50 teachers who showed up for an information session, only three have taken advantage of the opportunity.

After declining enrollments, the addition of new programs has resulted in a small increase in enrollment.  Current efforts to expand dual language are focused on Bloom and McCorkle schools.

*Recommendation*

The District should not receive unitary status for dual language at this time.

*Completion Plan*

1.      Continue advocacy with the state to provide alternatives that will increase ELL eligibility to participate in dual language programs.

2)      Develop a comprehensive plan for expanding dual language laying out the obstacles and the costs for developing additional sites.  This plan should be submitted to the plaintiffs and the Special Master by the end of the current school year.

3)      Include an assessment of evidence of TWDL program implementation in the principal evaluations for principals at TWDL schools.

4)      Evaluate the possibility of establishing a full K-8, no-boundary magnet at Roskruge.

## VI.    DISCIPLINE

There has been a large reduction in the number of in-school and out of school suspensions between 2013-14 and 2016-17.  However, the number of in-school suspensions grew by about 28% between 15-16 and 16-17 although the number of out of school suspensions declined slightly from 2322 in 15-16 to 2253 and 16-17.  *See Table VI-1*.

The numbers used in this analysis are not based on data provided by the District in the most recent DAR but from a response to requests by the Special Master to use the definitions of disciplinary action in place in 2013-14.  These data were submitted to the plaintiff's earlier this year.

Throughout this four-year period, African American students were more than twice as

likely to be suspended either short-term or long-term than were Anglo students.[24]  The suspension rates for Anglo and Latino students were comparable over this four year period.

In its Annual Report, the District provides a detailed description of the processes it indicates it has put in place for problem solving and communication.  These processes seem sensible.  However, the District's Annual Report, interviews with District staff and reports by the Implementation Committee as the members tour the schools, indicate that the processes described in the DAR are not being reliably implemented throughout the District.  There does not appear to be records that would allow one to identify what issues confront which schools or what has been done to address identified problems and with what effect.

Such extensive documentation may seem bureaucratic and it is time-consuming.  But, without such documentation it is difficult to ascertain whether different strategies are more effective than others or, overall, whether the different offices that get involved are working collaboratively and systematically.  With the exception of the Coordinator of Discipline, all of the key central office personnel who are involved in addressing important disciplinary problems have other important roles so that the allocation of their time to discipline issues is potentially problematic.

The District says that its implementation of PBIS is fundamental to its effort to reduce discipline issues or problems and create positive learning environments free of disruption resulting from student misbehavior.[25]  It was not until the end of the 15-16 school year that the District provided principals with a protocol for evaluating progress made at the school level with

---

[24] Disproportionality does not, in itself, demonstrate discrimination but it does indicate that this is a matter of concern deserving of study and the provision of effective professional development.  Districts that work to reduce disproportionality can be effective in doing so.

[25] Often, the District couples its emphasis on the importance of PBIS with "Restorative Practice."  But Restorative Practice is most usefully thought of as a tool to be used in the context of PBIS rather than a separate strategy.

-60-

PBIS.  Principals are held accountable for the implementation of PBIS and they are to report on a regular basis as to how well PBIS is working in their schools.  There does not appear to be a regularly scheduled process for monitoring the accuracy of the reports principals provide.  While members of the IC do not systematically evaluate the implementation of PBIS, they report that the artifacts of effective implementation vary noticeably from school to school.

Since principals are responsible for implementing PBIS, it is important that they have significant professional development in this regard.  Based on the evidence provided by the District in its Annual Report about the content of this training, it appears that much of the training deals with administrative matters – how to use sources of data and how to collect, enter and report data.  Some of the training also deals with how to be aware of one's biases.[26]  This administrative training is not without value but it does not address the challenges involved in bringing about changes in the culture of the school or how one manages difficult situations that threaten school safety.  Nowhere in the District's Annual Report is there an indication that there is training for individual principals.

One process used to oversee the implementation of PBIS is "walk-throughs" by District personnel who have responsibility for oversight of multiple schools.  There does not appear to be on-going analyses of reports on these walk-throughs.

When the TUSD's central office review of data from schools sets off alarms that there are problems with respect to the administration of disciplinary policies and practices, the schools involved are asked to prepare Corrective Action Plans (CAPs).  Reviews of sample CAPs by the Special Master and members of IC identified substantial variety in the comprehensiveness of these plans.  Some are little more commitments to work on the challenges identified.  In early

---

[26]  There is no evidence that such training typically affects changes in behavior.  Being aware of potential biases has no logical connection to knowing what to do to deal with students who violate school policies and undermine the learning opportunities of their peers.

November 2017, an IC member asked to examine CAPs for the first quarter of 17-18. He was told that these plans, presumably turned in the beginning of October, were not available. Nor was it possible to find a running record of what improvements have been made as a result of the CAPs.

The District is still finding its way in developing and implementing coherent policies and practices related to discipline. In addition to the concerns noted above, consider:

- Responses to surveys conducted by the District indicate that discipline problems persist in many schools. A large number of staff members from several schools indicate that staff and students do not feel safe at school, bullying and harassment are not uncommon and that the principal is not fair and consistent.

- IC members' interactions with teachers indicate a frequent lack of understanding regarding disciplinary practices, the GSRR, PBIS and Restorative Practices.

- At the October 24, 2017 Governing Board meeting, TUSD's Superintendent stated that training for PBIS and Restorative Practices was inadequate and required additional investment.

- Administrators report that Fred Jones training for teachers and site and central administrators contradict the premises of PBIS and Restorative Practices.[27]

- At the beginning of the 2016-17 school year, the District informed families that students would be suspended immediately for fighting. This practice violates the provisions of the GSRR and the District was required to retract this information. Issues remain regarding the handling of fights, as recent incidents in turn data raise the concern that some schools in some cases routine fights are being mischaracterized as assaults to justify suspension in cases where they are not permitted under the GSRR.

*Recommendation*

There are at least two reasons why the District is not yet ready for unitary status with respect to discipline.

The first reason has to do with the reversal of progress with respect to in-school suspensions during the 16-17 school year, the modest improvements of out-of-school suspension,

---

[27] There is no reliable research confirming the efficacy of Fred Jones training.

and the persistence of disproportionality in suspensions comparing white and African American students.

The second reason is that there is insufficient evidence to be confident that the District has put in place processes and developed the capabilities of key actors that will enable the District to make progress in the future to reduce levels of discipline, especially that which involves suspensions, and further reduce the disproportionality in disciplinary actions involving African American students.

*Completion Plan*

The District shall take the following steps no later than the beginning of the 2018-19 school year:

A.      Data on student offenses and responses to them shall use measures that were in place in 2013-14 to ensure that trends can be accurately assessed and distinctions between types actions that respond to student misbehavior are clear.  The District shall report such discipline data both by number of each type of disciplinary consequence imposed and by number of students receiving each type of disciplinary consequence.

B.      Teachers, principals and others shall have easy access to information about how best to deal with particular offenses as defined by the GSRR.  Such information shall be available in real time (*e.g.,* online), and be based on research in other districts and effective practices identified within TUSD.  Such information could include individual teachers and other professional personnel who have demonstrated relevant expertise and be willing to provide peer support.

C.      The District shall hire or designate an individual whose sole focus is the implementation of discipline-related desegregation efforts (the "Discipline Coordinator").

D.      The Office of the Coordinator of Discipline shall be staffed with full-time personnel sufficient to:

1.      Analyze school level data, including all data the District is required to collect and analyze under USP Section VI, F, 2, and bring any issues warranting investigation or remediation to the attention of the chief academic officer of the District.

2.      Review schools' use of exclusionary discipline to ensure that it is fair and equitable and complies with the GSRR, including ensuring that exclusionary discipline is not inappropriately used for low-level incidents involving physical aggression (including "fights" that do not lead to significant injury) and that catch-all offenses such as "disorderly conduct" and "other aggression" are not used to improperly impose exclusionary discipline.

3.      Provide technical assistance to school level personnel.

4.      Contribute to the design of professional development that focuses on handling potential disciplinary problems at the classroom level and it recognizes that disciplinary problems are often related to the need for improved instruction.

5.      Assist schools in developing corrective action plans ("CAPs"), review CAPs for consistency and efficacy, monitor the implementation of CAPs, suggest modification or support as needed, and track any improvements resulting from the implementation of CAPs.

6.      Conduct and monitor site-level walkthroughs of PBIS implementation and conduct follow-up in an effort to make PBIS implementation across schools consistent and effective.

E.      The Coordinator of Discipline shall report to the chief academic officer for the District.

-64-

F.     The process for dealing with hotspots and high visibility problems shall be streamlined.  It shall not be necessary to regularly convene meetings of central office staff who have other responsibilities than discipline in order to determine how best to address challenges.

G.     For any student offered a DAEP placement, the District will include any days suspended prior to the DAEP placement in calculating the length of the DAEP placement offered.

These actions shall be put in place no later than the beginning of the 2018-19 school year.

## VII.   FAMILY AND COMMUNITY ENGAGEMENT

The District has invested substantially in the development of four family centers located throughout the District where they may be of most help to the families living in those areas.  The four regional family centers are open, accessible, and staffed under the leadership of the Director of Family and Community Outreach.  Each Center provides a range of services, classes, information about educational options (school choice, magnet application, transportation options, etc.), higher education information, various events, community connections, and family support.  Many staff members are bilingual and dissemination of information to parents is available in all major languages.

The Centers appear to be functioning well though given the limited data provided by the District it is hard to know how many families are involved in what kinds of activities.  The District says that it will improve in this respect as the new student information system comes on line. It is particularly important, and particularly difficult, to determine whether these Centers are serving families of students who are struggling and what they are doing to help those families.

The Family Resource Center staff assisted families in accessing transportation for open enrollment by using the School Choice Calculator to determine transportation eligibility to a

-65-

selected school site.

Computer access is available to parents and some other family members at each of the family centers. While there is no available evidence of the specific implementation of Computer Kiosks in each school providing families with easy access to TUSDStats Parental Account, computer access is generally available to families at each site.

There is evidence of collaboration with both the AASSD and MASSD in providing family information events. Families and community organizations have access to information about learning opportunities for themselves and students that is enhanced by extensive translation and interpretation services.

The Family and Community Engagement Plan is guiding the District toward improved family engagement. Computerized data tracking has been implemented at each Center though continued improvement in tracking and assessment of all family engagement data is needed.

The Mendoza plaintiffs and the Special Master have consistently observed that they see the District's approach to family engagement as traditional and limited. The District's response is that it abides by the letter of the family engagement plan. And, that seems to be true with the exception of the placement of information kiosks at each school. The District says that it relies on family surveys to set priorities. It is difficult to see how such guidance from families could be meaningful since the number of respondents to many survey items is often under 20 and these surveys are administered at Centers that serve families from numerous schools. Moreover, there is little consensus among families except, perhaps, that families are interested in how to improve their children's health and how to apply for colleges and scholarships.

In their objection to the 2018 Budget for family engagement, the Mendoza plaintiffs cite the provision in the family engagement plan (that commits the District to use research on best practices to "…create a learning-centric environment to support the academic success of all

students." The meaning of this commitment is ambiguous – nothing in the DAR defines activities as "learning-centric."

One way to determine the breadth of family engagement efforts is to compare family engagement activities in TUSD to those described in the six-component model developed by National Network of Partnership Schools at Johns Hopkins University. When the Special Master asked the District if it was using the research and resources available from the Network, the District's response was that at least one of these compounding components were in place at every school in the District. But this does not tell us much because it could mean that every school has some activity as common as parent-teacher conferences. In contrast, one of the strands of family engagement promoted by the Network is the involvement of families in school planning and leadership. But none of the meetings or resources to which the District draws attention as evidence of its commitment to family engagement has anything to do with family involvement in planning and leadership at the school level.

The FACE, coupled with the information on family engagement provided in the District's Annual Report, suggest that the District has focused much of its energy promoting family engagement at the District level and through the Family Centers. For example, the FACE provides that the District should promote strategies to create welcoming environments and relevant educational activities. But the discussion of how that will be achieved makes it clear that the intent is to promote such environments and activities in the Centers.

The Special Master has encouraged the District to undertake a "two-way" approach to family engagement. This two-way strategy means that in addition to providing information to parents about how they can assist their children to achieve at higher levels, involves learning from parents and other family members about the needs, interests and problems that their children have so that teachers can use this knowledge to improve instruction and know how they can best relate

to their students.  Such an approach puts greater emphasis than usual on cultural responsiveness and seeks to build genuine partnerships an shared responsibility between schools and families.

The revised family and community engagement plan does include a requirement that teachers and principals should seek to learn from families about how to meet the needs of their students.  FACE also says that the District bases its family and community engagement efforts on a model strategy called Academic Parent-Teacher Teams (APTT).  However, the APTT model does not involve two-way family-teacher information sharing.

The District says that training for certified and administrative staff with respect to two-way engagement is embodied in the training for Supportive and Inclusive Learning environments (SAIL).  As with the commitment to create welcoming environments and relevant educational activities, the family and community engagement plan makes learning from families a function of the Centers.  There is no solid evidence in the DAR about the amount or effectiveness of SAIL training as it relates to family and community engagement.

The IC and the Special Master's interaction with District staff suggests that they recognize the need for and benefits of inclusive and culturally responsive family and community engagement.  But it is difficult to assess the effectiveness of the District's efforts.  While the family and community engagement plan identifies general goals, there is not a set of guidelines that spell out ways to implement these activities and achieve these goals at the school level.  No doubt there are effective practices underway.  Observations by the Implementation Committee members when they visit schools and talk to teachers and principals indicate that, as with most educational practices, the effectiveness and scope of family and community engagement efforts vary across schools.  There is no systematic process for identifying activities underway at the school level, much less identifying and monitoring effective practices that could be shared throughout the District.  Indeed, a significant number of school principals did not file reports on

family engagement in their schools.

In summary, family engagement activities that are carried out by the Family Centers and central offices responsible for family engagement appear to satisfy requirements for supporting family engagement. However, the District's family engagement activities that are handled directly by schools are difficult to assess and vary widely from school to school. There does not appear to be a protocol to guide principals and facilitate monitoring of family engagement activities.

*Recommendation*

The District shall be granted unitary status for those family engagement activities administered directly by the Family Engagement Coordinator. The District needs to improve its work on the school level and unitary status related to school level activities should be deferred. While schools should have discretion to develop different activities related to family engagement that are particularly relevant to the populations they serve, the District needs to provide guidance that will facilitate the implementation of family engagement activities that reflect what is known about how such activities can contribute to family support and student learning. These guidelines can also be used by the District leaders monitor school level actions and to support improvement where needed. Further, the District should clarify how the effectiveness of school-level implementation of the family and community engagement guidelines will be monitored and how needed improvements will be supported. The Family Engagement Coordinator does not have supervisory authority with respect to school leaders, so the Coordinator is not in a position to hold school leaders accountable or to direct them to engage in improvements.

*Completion Plan*

The District shall:

1.  By the end of the current school year, develop guidelines for fostering family engagement at the school level.  These guidelines shall be shared with the Special Master and the plaintiffs for expedited comment.  These guidelines shall enable teachers to (a) learn from families how best to teach and otherwise interact with their children and (b) participate meaningfully in school plans and activities.

2.  Continue its current program to facilitate communication with families in the context of family conferences.

3.  Train principals, assistant principals, and school-level personnel to implement the guidelines for fostering family engagement at the school level.

4.  Record family participation by race at each school in ways that describe the specific activities in which families of different races are involved.

5.  Ensure that responsibility for overseeing the implementation of school-level strategies for family engagement rests primarily with the principal of each school. Oversight of the principals' efforts in this area shall be District supervisors personnel who are responsible for the District's general oversight of principals.

## VIII.   EXTRACURRICULAR ACTIVITIES

Principal surveys were used to determine program availability at the elementary, middle, and high school level.  Input and tracking of participation data has been computerized and coupled with staff training.

At the elementary level, there are participation differences reflected among schools in lower as compared to higher socioeconomic areas of Tucson.  These differences may be due to extracurricular offerings by parent volunteers outside of the District funding structure and/or better data tracking at one school versus another.  An analysis of school level in participation comparisons, particularly between racially concentrated and integrated schools is required to document participation parity.

Activity bus and bus pass availability have increased to reach the District benchmark of providing late in the day transportation to every eligible school.

The District appears to be doing extensive work in the development of student leadership and character development that sets it apart from many other Districts. Among other outcomes, this is intended to foster positive relationships among athletes and activity leaders.

Interviews, review of student participation data, and review of reports reflect equitable access and increased student participation as well as the implementation of a District wide data reporting system for extracurricular participation. The District has changed the data components to develop a more comprehensive approach to assessing participation but this has created difficulty in comparing year-to-year data. Two years of like data comparing participation rates may provide documentation for further improvements. The District has improved the parent survey participation during 16-17 by posting the survey on ParentLink.

After school tutoring is supported by the offices responsible for extracurricular activities. Such tutoring is provided or closely supervised by certified teachers.

There is no reason to doubt that the District is allocating resources equitably. For example, the District has changed the way schools can raise funds for team sports needs or activity. Fundraising must be for entire teams not specific individuals, *i.e.* tax credit contributions are not tagged towards specific student costs but toward entire teams. Waivers are available as well as EEF interscholastic fee scholarships. Assessing equity is not easy and cannot be determined solely by funds allocated or participation rates. Participation is, of course, voluntary and will depend on many factors. Options available relate to student interests and the availability of staff to meet those interests at a cost TUSD can afford. Students may lack the skills to participate whether in sports or band or other activities. Moreover, extracurricular activities compete for participants. Some activities, like sports, virtually eliminate student time to

participate in any other activity.  Students in need of tutoring may feel that they don't have the time for extracurricular activities.  Older students may have the need to work to help support their family.

Determining whether the District has met its responsibilities with respect to extracurricular activities is complicated by the fact that the data available are inadequate:

1.    Data from past years are not based on similar ways of describing activities.

2.    Data on participation in 21st Century Project funded activities are not reported.

3.    Procedures for collecting data have changed.

4.    Not all schools have reported data.

*Recommendation*

While it appears that the District has pursued the implementation of the USP's provisions with respect to extracurricular activities fairly, unitary status should be deferred until additional information can be made available and the procedures and formats for such information can be specified in some detail.

*Completion Plan*

1.    The District shall revise its reporting on extracurricular activities to include all such activities clearly delineating which are funded by parents, the community, the District, or other sources outside the District that are funded by 21st Century or similar grants**.**

2.    Data shall be reported by grade level and race of student participants in particular activities.

3.    By May 2018 the District shall conduct the study of participation in its schools with particular attention to racially concentrated schools and those schools at which Anglo student enrollment exceeds 25%.  If disparities exist, the District should explain the reasons for these and identify strategies for eliminating them, if practicable.

4.    By May 30, 2018, the District shall have put in place and implemented a process by which principles are responsible for reviewing the extent to which extracurricular activities at their schools are providing opportunities for interracial contact and positive settings of shared interest as mandated by the USP.  To the

-72-

extent such opportunities are determined to be inadequate, principals – with the support of central offices – shall propose strategies for remedying that situation.

## IX.    FACILITIES AND TECHNOLOGY

Facilities

The Multi-Year Facilities Plan and Multi-Year Technology Plan have been completed and were filed with the Court on the same date, 2/27/15.  During the school year 2015-16, the formula for the Facilities Condition Index (FCI) was altered by the District without plaintiff input.  To enable accurate year-to-year comparisons, the District should return to the originally agreed-upon FCI formula delineations.  If changes in the assigned weights within the FCI index are needed, such proposals should be submitted to the plaintiffs and the Special Master for review and comment.

The FCI and ESS measures have been completed and assessments have been made and the District is using these indices (FCI and ESS) as decision-making tools in the Multi- Year Facilities Plan (MYFP) as capital dollars are available for repair and/or improvement.

While there are critical capital improvement needs throughout the District, conditions of current facilities appear equitable.  There is no evidence that racially identifiable schools have lower FCI or ESS scores than integrated schools.

Plaintiffs have expressed concern that (1) scores assigned to each school using the criteria set out in the FCI may not be accurate and (2) the conclusion reached by the Special Master that the differences in FCI scores are not correlated with the racial composition of students would be altered if the criteria used prior to the 16-17 school year were applied.

The members of the Implementation Committee, all experienced educators, visited a sample of the District schools to rate their facilities.  They concluded that the FCI scores assigned by the District staff correspond very closely with the ratings of the IC.

-73-

*Recommendation*

The District shall recalculate the FCI scores using the criteria prior to that applied in 16-17 school year. Assuming this demonstrates that racial composition is not correlated with the schools FCI score. The District should be granted unitary status with respect to the provisions of the USP related to facilities. During the spring term 2018, the District shall submit its revisions to the Facilities Condition Index to the plaintiff's and the Special Master for review.

Technology

The Multi-Year Technology Plan was filed with the Court on 2/27/15. The Technology Condition Index (TCI) has been developed and implemented as delineated in the Plan. The TCI has been and continues to be used to determine needed technology "refresh" and upgrades in the District.

Teacher surveys as delineated within the Multi-Year Technology Plan are utilized to determine needed improvement in teacher skills and comfort with instructional technology. However, teachers (and most people) may not be good judges of how much they need to know about how to use technology to facilitate student learning. People with limited expertise often understate what additional knowledge in skills they need to become reasonably proficient.

The District has made a significant investment in the acquisition of hardware and software that were used extensively for the first time in 2016-17 thus making significant and exponential progress in addressing the provisions of the USP dealing with technology. Increasing the access students have to learning technology and software is important and this effort focused on schools serving the largest numbers of African American and Latino students. These initiatives have largely eliminated differences among schools with respect to the access students have to technology.

Access to technology is essential but how it is used to facilitate learning is also important. Studies elsewhere indicate that access is more equitable than how the technology is used. The number of hours in a day or week a student has access to computers in the classroom or school does not, in itself, usefully describe the learning experience of students have. How students use technology, especially with respect to the development of higher order skills, depends significantly on their teachers' proficiency to make the most of learning opportunities that technology-facilitated learning provides. For most teachers, their proficiency in using technology to facilitate student learning depends on the professional development and hands-on support they receive as they teach.

In its filing for partial unitary status with respect to facilities and technology in May 2017, the District acknowledged that it had more to do with respect to training teachers to use technology in the most productive ways. The District provides technology training in three ways:

- During sessions in which teachers are brought together in classroom type settings.

- Through online courses that are voluntary but these do not appear to be used extensively.

- The District identifies teachers who are considerably more proficient than their peers to serve as teacher technology liaisons (TTLs) who serve teachers in their own schools but teach a regular course load.

TTLs are paid a modest stipend for taking on this peer-coaching responsibility in addition to their full-time teaching assignments. This approach to support for teachers has the virtue of being school-based and responsive to the particular needs of individual teachers or small groups of teachers – at least potentially. However, the amount of time that TTLs have to work with their colleagues is quite limited because it must take place during the school day when TTLs have their own classes to teach or after school when teachers need support may not be able or willing to stay at school.

-75-

As evidence of the success of its TTL training of teachers, the District reports that on average a little more than an hour of professional learning per teacher had been provided. It takes considerably more than one hour for a teacher to learn how to use technology to facilitate student learning, especially with respect to more complex courseware. Moreover, most teacher-training thus far appears to be focused on simple tasks in the management of data rather than the facilitation of students' learning more advanced knowledge and skills.

The District has acknowledged that it needs to update the TCI/Multiyear Technology plan to include a wireless conductivity category. The wireless conductivity category scores will generally reflect the access to wireless Internet in TUSD schools. As a result, the District will update TCI data to reflect school conditions related to wireless connectivity to the extent the revised and updated TCI reveals that in adequate wireless Internet access disproportionately affects racially concentrated schools, the District will develop and implement a plan to correct such disproportion during the next school year.

*Recommendation*

The District should be granted unitary status with respect to technology except for its responsibilities to enhance teachers' and administrators' capabilities to utilize that technology to facilitate student learning. *See* Part XI of this report where professional development with respect to technology is covered.

## X.    EVIDENCE-BASED ACCOUNTABILITY SYSTEM AND ORGANIZATIONAL LEARNING

A core concept that is essential to the success of TUSD going forward is that decision-making will be driven by collaborative evidence-based problem solving. This concept is reflected in numerous provisions of the USP, the most obvious of which is the Evidence-based Accountability System (EBAS) referred to in Section X of the USP. However, to think of EBAS as a stand-alone piece of software used to track students is to misunderstand what it is and how it

-76-

is related to numerous other provisions of the USP that focus attention on the systematic and systemic use of information to facilitate decision-making from the classroom to the Governing Board that will result in continuous improvement.[28]

So as not to limit how one thinks of EBAS, and to emphasize the importance of the relationships between the various elements of the USP that focus on evidence-based decision-making, it seems useful to describe the various components as an Organizational Learning System. This TUSD OLS would include at least the following elements of the USP: EBAS, professional learning communities, MTSS, discipline monitoring and program evaluation. This is not all there is to the OLS. It includes, for example, the use of evidence by teachers as they make their day to day instructional decisions. When the District demonstrated capabilities and commitment with respect to the five domains of OLS just noted, one can have confidence that the District can implement the essential elements of the Organizational Learning System.

When these various inter-related elements of the OLS, which can be thought of as grounded on EBAS, are integrated and functioning effectively, they will provide the District with detailed information that integrates an array of data sources that previously could not "talk" to other sources (*e.g.*, teacher data and student data). Users of EBAS have access not only to student outcomes of all kinds but to a broad range of potential influences on student learning such as teacher and administrator experiences and characteristics, the courses students take, and student mobility from school to school. Embedded in the OLS are programs to facilitate data analysis as well as suggestions about effective practices for addressing challenges identified in the analyses.[29]

---

[28] There is abundant research showing that Districts that make significant use of data throughout the school system are more nimble and more likely to engage in productive school improvement.

[29] Software that provides research-based guidance in problem-solving are increasingly common in other professions (medicine is a good example) and are characterized as "expert systems." As artificial intelligence applications become increasingly easy to use, the TUSD system will be able accommodate these capabilities.

It is important to know that in developing EBAS, TUSD did not simply buy software off-the-shelf. It works with developers of student information systems to design a resource that is likely to be seen as a model by other Districts. Among the elements of EBAS are data dashboards available to professionals in the District to both track and support student learning, identify needed interventions, provide instructional support and examine student needs and involvement. Further, the District has incorporated items in its evaluation instruments for both teachers and administrators that deal with their proficiency in the use of evidence to facilitate decision-making.

Over the last two years, the District has done a very good job on the development of EBAS and has implemented the other elements of the OLS in ways that vary in effectiveness from school to school. The pieces are there but they are not yet well integrated in part because they are the responsibility of different people and a concerted effort to fit the pieces together has not yet been completed.

However robust and accessible the evidence being developed may be, the utilization of such data routinely and effectively, especially at the school level, will require a significant amount of additional training (see Part XI of this report).

*Recommendation*

While the development of EBAS and the other components of what is labeled here as OLS deserves recognition, it would be premature to award unitary status to any of the components discussed in this section of the Special Master's Report.

In laying out the path to unitary status for EBAS, MTSS, PLC, discipline monitoring and program evaluation that would facilitate the development of a genuine organizational learning system in which all of the parts function effectively and coherently, it would be most productive to treat the award of unitary status to these five elements as parts of a larger system to facilitate evidence-based decision making and continuous improvement. Such a strategy would encourage

-78-

the District to focus on how improvements of each of the elements can enhance the effectiveness of others.  Individually these elements of the USP are useful; collectively, they will be powerful.

*Completion Plans*

    A.    <u>EBAS</u>

        1.    The District shall place responsibility for the use and operation of an effective EBAS system in the District's chief academic officer (currently denominated as the Assistant Superintendent for Curriculum and Instruction) who reports directly to the superintendent.

        2.    The head of the Department of Assessment & Program Evaluation shall report to the District's chief academic officer.

        3.    The District shall engage an expert, approved by the Special Master, to assess the District's overall use of its data and integration into its decision-making processes.  Among the factors to be considered are the extent to which the District:

            a.    Identifies evidence that would be available covering the range of influences on student learning and strategies for improving student outcomes;

            b.    Organizes the evidence in ways that facilitate decision making (including ways to lower the "search costs" for teachers and support staff) and ensures that viable alternatives for improvement are considered;

            c.    Designs frameworks for problem-solving for PLCs linked to data that would be helpful in designing improvement strategies; and

            d.    Has developed the capacity to link data from different sources in the District (*e.g.*, human resources and student academic achievement);

The Special Master shall determine whether the District's use of its data and integration into its decision making processes providing the District staff and Governing Board members with information needed to facilitate continuous improvement at classroom, school and District levels and allows families and community members to know the progress being made to ensure that all students develop the cognitive, social and emotional capabilities they need to lead productive lives and contribute to the welfare of others.  If the OLS it is well developed, the Special Master shall recommend that the District shall be granted unitary status in this area.  If

not, the Special Master shall recommend specific, feasible steps to achieve unitary status within one year.  The District shall be granted unitary status if it implements those steps.

       B.     MTSS.

The MTSS Facilitators and Leads shall:

     1.     Evaluate student data to help identify needed improvement in student achievement, discipline, absenteeism, and other challenges identified by District leaders.

     2.     Make evidence-based practical suggestions for resolution of problems identified by the data.

     3.     Provide relevant professional development to Tier 1 teachers (*e.g.*, as an instructional coach) and/or work with site-level administrators to identify other resources for professional learning.

     4.     Assist professional learning communities in identifying relevant data and potential solutions and resources.

     5.     Facilitate Tier 2 or 3 support an act as a case manager.

The District shall develop, in collaboration with the Special Master, a rubric for assessing the effectiveness of MTSS Facilitators and Leads and performing these responsibilities.  These rubrics shall be used to identify needs for further professional learning and ways to improve MTSS.

       C.     Professional Learning Communities.

The District shall:

     1.     Implement the PLC guidelines that have been provided to principals.

     2.     Identify the EBAS resources available to support PLC functions, and provide that information to principals and MTSS Facilitators or Leads.

     3.     Provide training in the use of EBAS resources available to support PLC functions, to principals, teacher leaders and MTSS Facilitators or Leads.

-80-

D.    Program Evaluation

The Assessment and Evaluation Department (AED) shall be charged with the following

responsibilities, functions and tasks:

1.    Undertake the systematic and systemic evaluation of new initiatives.

2.    Identify for problem areas deserving of attention from District leaders through the systematic analysis of data that is part of the EBAS evidence base.

3.    Regularly identify schools that are positive and negative outliers with respect to success in implementing particular initiatives or achieving particular goals and make the knowledge of effective practices accessible throughout the District.  Such an "effective practices" resource library could also identify individuals who could provide support to their colleagues.

4.    Support PLCs by consultation and the identification of research that would help PLCs make effective decisions.

By the end of this school year, the District shall provide a report detailing how the

department is or will perform these responsibilities, functions and tasks, including a schedule for

implementation.

**XI.    PROFESSIONAL LEARNING**

There is broad consensus among researchers and educators that the most significant

school-based influence on student learning is the quality of teaching students experience.  And,

the second most significant influence what key administrators do to facilitate effective teaching

and create conditions in schools that promote student learning.  Therefore, the USP is replete with

requirements for professional development.  It would be possible to create a list of such

requirements and determine whether the named professionals were exposed to the particular

topics and for how long.  But that would tell us little of importance in any case.  The USP does

not specify the amount of professional development required, content is only broadly defined, and

the strategies for professional development are unnamed.  Each year the District provides the

-81-

plaintiffs and the Special Master with a detailed description of who (teachers, administrators etc.) receives professional development for particular topics and for how many hours.  This inventory of thousands of professional learning activities is impossible to monitor on each of its dimensions – who, what, how much – much less with what affects.  Moreover, many of the strategies TUSD uses to provide professional development have been shown to be ineffective by researchers in other districts.  If teachers taught students as districts teach teachers and administrators, teachers and administrators would be guilty of malpractice.[30]

Top leadership in TUSD recognizes the limitations of current practices and the District appears to be adopting new and more productive strategies for professional development that will almost certainly be welcomed by teachers and administrators.  Without making these changes, it is likely that the District, once relieved from Court supervision, would cut back on investments in professional development because reducing investments in poorly provided professional development would make little difference in improving student performance.  It is unlikely that such cutbacks could be effectively challenged in Court.

The reason professional development is delivered as it is in TUSD – and in many other Districts – is that it is easy to do logistically and relatively inexpensive.  It requires no restructuring of roles and few changes in how schools are organized or how time is allocated.

---

[30] The Mendoza plaintiffs have indicated that they want the Special Master's Annual Report to deal with the efficacy of virtually every one of the dozens of professional development activities called for in the USP.  This is not possible.  We already have a listing of all of the professional development activities that is part of the annual budget process.  We are left to take the word of the District that all of the work has in fact been accomplished. Moreover, the District plans for professional development it may turn out that this is not fully needed so that the budget does not tell us all we need to know.  Why not measure effectiveness by monitoring changes in teacher behavior by assessing related student outcomes?  There is no way that the Special Master and the Implementation Committee could assess changes in teacher behavior and we know with some certainty that the processes of formal evaluation of teachers and administrators lack specificity and consistently overstates educator effectiveness (this reality is not unique to TUSD).  Judging the effectiveness of professional development by looking at student outcomes would involve controlling for numerous potential explanations for student learning and would be prohibitively expensive.

Given that the District is embarked on promising initiatives with respect to professional development – perhaps better described as professional learning – it seems an opportune time to encourage the District's efforts at reforming professional learning by describing the essential elements of professional learning for which the District could be held accountable and testing its capacity and commitment to implement the strategies with respect to high-priority needs for improvement. Such priorities might include culturally responsive pedagogy, ways of reducing student misbehavior and creating cultures of civility in schools, and enhancing teacher and administrator proficiency in the use of technology.

If this approach to improving the capabilities of teachers and administrators is to be productive, especially if we expect the changes needed in how professional learning is to be implemented within this year and the next, the particulars of what the Court should order will need to be built on what is already underway. Such professional learning would, among other things:

- Be job embedded, *i.e.*, it would occur at the school level, during the school day and during the school year.

- Be based on collaborative analyses of differences between actual student performance and goals for student learning.

- Make use of systematic analyses of educators' strengths and weaknesses especially regular evaluation of actual performance, and be targeted at what individual educators' need to know and be able to do.

- Mirror the instructional approaches teachers and administrators are expected to master (*i.e.* professional learning would be facilitated by culturally responsive pedagogy).

- Be continuous and ongoing, involving follow-up evaluation of improvement and support for further learning.

The District shall demonstrate its commitment and capability to restructure professional learning by focusing on at least three high-priority needs for improvement. Structural changes

-83-

and professional expertise will be necessary to implement these professional learning actions that will enable the District to alter the ways it goes about professional learning in all areas of professional practice.

*Recommendation*

Unitary status for professional development related to culturally responsive pedagogy, ways of reducing student misbehavior and creating cultures of civility in schools, and enhancing teacher and administrator proficiency in the use of technology should be deferred until a comprehensive research-based plan for how professional learning is provided to teachers and administrators is put in place.  This plan would be developed by the District in collaboration with the Special Master before the end of the 2017-18 school year.  At the end of the 2018-19 school year a report would be provided to the plaintiffs along with recommendations as to whether unitary status should be awarded for these domains of professional learning.

*Completion Plan*

The District shall take the following steps:

1.  No later than April 2018, the District shall work with the Special Master to establish rubrics for guiding implementation and conducting evaluation of professional learning;

2.  Prior to the start of the 2018-19 school year, the District will provide a report to the Special Master demonstrating how the District will implement professional development in a manner aligned with Exhibit C in the following areas:

    a.  discipline and fostering of civility
    b.  technology facilitated learning
    c.  culturally responsive pedagogy in implementing the curriculum

3.  Beginning in school year 2018-19, evaluate professional development conducted by the District using the rubrics developing collaboration with the Special Master;

4.  Designate a single individual with the responsibility to both oversee all professional development in the District and to organize professional development.

-84-

## XII.   BUDGET

The USP Budget identifies priorities and facilitates monitoring the progress made by the District in meeting the responsibilities outlined in the USP and related court orders.

Because the District budget is complex and reflects the resolution of different perspectives about how best to move forward, the parties have found it difficult to undertake the comment and review process called for in the USP.  Each year, modification of the budget processes are made in an effort to facilitate review by the plaintiffs and the Special Master by giving the District the opportunity to reallocate funds throughout the school year.  But the guidelines could be better implemented.  For example, in the fiscal year ending in June 2017, the District made major changes involving millions of dollars in mid-year to the Budget without submitting these proposals to the agreed-upon reallocation process.

In preparation for budget development for 2018-19, the parties agreed on another revision of the procedures for review and comment for implementing the budget process required by the USP.

*Recommendation*

When the District receives unitary status, it will no longer be submitting its budget as it relates to the specific provisions of the USP.  Until then, the District shall demonstrate that it has followed procedures agreed to by the parties and the Special Master.

Exhibit V-C ATTACHMENT A
(Prepared by District Staff)

January 17, 2017

**What has the GATE Department done to increase the number of African American and Hispanic students accepting GATE placement?**

**Response:**

The District held numerous recruitment and outreach activities to increase the number of African American and Latino students' response and acceptance to placement offers in GATE Self-contained and GATE Dual Language Self-Contained programs.

**2015-16 School Year**

Beginning in the fall of the school year, the GATE department held pre-testing GATE Nights to inform parents of the opportunity and benefits of participating in GATE programs as an ALE. Representatives from the African American and Mexican American Student Services department attended the GATE nights. GATE self-contained and itinerant teachers assisted in recruiting students for GATE testing by visiting classrooms and posting informational signs at each school and having GATE informational items available for parent teacher conferences at each site.

A GATE representative regularly attended African American and Mexican American Student Services quarterly meetings. By sharing information, the AASS and MASS staff informed African American and Hispanic families about GATE testing and other services provided in order to increase testing for GATE and acceptance of GATE placement offers. A Spanish-speaking GATE representative attended all Mexican American Student Services quarterly meetings. A GATE representative also attended Parent University, District sponsored parent events and one of the SCPC meetings.

GATE Open Houses were held at each site once placement statements were sent. In addition to sending invitations to GATE Open Houses, staff at each site called families to invite them to the GATE Open House at their site. African American and Mexican American Student Services assisted the GATE department in calling families who did not return their placement statements or declined placement. A survey was also sent to families that did not respond or

declined services and a follow up telephone contact was made to families that did not return surveys.  The GATE department maintained a data base of all survey and telephone contact responses to determine reasons for non-responses and or declining services and reviewed this information to set goals for improving outreach and program services.

**2016-17 School Year**

For SY2016-17 the GATE department continue the procedures and practices from SY2015-16 but added additional efforts to increase the number of African American and Hispanic students testing and accepting placement in GATE programs.

GATE representatives and itinerant teachers hosted or participated in parent meetings "Cafecitos" at most of our elementary schools to inform parents of the benefits of participating in our GATE program and encouraging them to have their students tested.  Permission to test invitations were readily available.  GATE representatives collaborated with site principals and teachers at sites with low number of students signed up for testing to send out additional notices and encourage families to sign up for testing.  The GATE department extended the permission to test due date for Kindergarten and sent a second invitation to test home with kinder students.  The extension was also posted on the GATE website.  Ten schools with high populations of our underrepresented students or feeder schools to our GATE schools that have low representation of student participation, were targeted to pilot a kinder whole grade screener GATE assessment to identify students for further testing or invitation to participate in GATE services.

Itinerant GATE teachers also provide whole class or small group lessons that provide skills in critical thinking and reasoning at each of our elementary schools to benefit students in testing and increase their interest in participating in GATE programs.  Weekly kindergarten lessons were provided at several targeted schools.  Data will be gathered to determine if these efforts have any correlation to number of students receiving these lessons and number of these

students qualifying and choosing to participate in GATE programs.

For an update of this memo, see pages 19 to 21 in Exhibit V-A.

Respectfully submitted,

/s/
Willis D. Hawley
Special Master

Dated:  February 27, 2018

**CERTIFICATE OF SERVICE**


I hereby certify that on, February 27, 2018, I electronically submitted the foregoing via the CM/ECF Electronic Notification System and transmittal of a Notice of Electronic Filing provided to all parties that have filed a notice of appearance in the District Court Case.

Andrew H. Marks for
Dr. Willis D. Hawley,
Special Master