# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
| Plaintiffs | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
| Defendants-Intervenors, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

Adoption in Part and Modification in Part: SY 2016-17 SMAR & Unitary Status

# Table of Contents

Historical Perspective: Unitary Status Review ................................................................ 4

Special Master's 2016-17 Annual Review (SMAR): Unitary Status Review ..................................... 7

1. Student Assignment: USP § II .......................................................................... 15

   a.   § II.E: Magnet Schools and Programs ........................................................ 19

2. Transportation: USP § III ............................................................................ 34

3. Administrators and Certificated Staff: USP § IV ...................................................... 38

   a.   Increasing Diversity .................................................................... 39

   b.   Reducing Attrition ..................................................................... 40

   c.   Grow-Your-Own (GYOP) .................................................................. 41

   d.   Placement of Beginning Teachers ....................................................... 42

4. Quality of Education: USP § V ........................................................................ 45

   a.   § V.A: Advanced Learning Experiences (ALEs) ........................................... 45

      a-1.   District-Wide ALEs ............................................................... 51

      a-2.   GATE Programs: Elementary Schools and K-8 (grades 1-8) ........................... 53

      a-3.   AACs and GATE Resource: Middle Schools, K-8 (grades 6-8) and High Schools ........ 59

      a-4.   ALE Action Plan: Effectiveness of Planned Strategies .............................. 63

      a-5.   Summary: ALE Policy Manual ....................................................... 97

   b.   § V.C: Dual Language Programs ......................................................... 98

   c.   § V.D: Exceptional Education ......................................................... 101

   d.   § V.E: Student Engagement and Support ................................................ 103

      d-1.   Academic Intervention and Dropout Prevention .................................... 104

      d-2. .....Culturally Relevant Curriculum (CRC) and Professional Development and Training for CRC ................................................................................ 105

      d-3.   Support Services for African-American and Latino students and Support for Parent and Community Participation ............................................................ 118

   e.   Maintaining Inclusive School Environments: USP § V.F .................................. 122

5. Discipline: USP § VI ................................................................................ 124

6. Family and Community Engagement: USP § VII ........................................................... 132

7. Extracurricular Activities: USP § VIII ............................................................... 137

8. Facilities and Technology: USP § IX .................................................................. 138

   a.   Facilities ............................................................................ 138

     b.    Technology ................................................................................................ 139

9.    Accountability and Transparency: USP § X ........................................ 140

     a.    Evidence Based Accountability ............................................... 140

       a-1.    Professional Learning: Professional Development ................... 143

     b.    Budget ................................................................................. 146

Conclusion ................................................................................................ 147

## A.
## Historical Perspective: Unitary Status Review

Prior to launching into what will be the most comprehensive analysis of the unitary status of the Tucson Unified School District (the District/TUSD), to be done since the adoption of the Unitary Status Plan (USP) in February 2013, the Court provides a brief historical perspective of this case.[1] In 1974, two class action lawsuits were filed alleging segregation in TUSD between White students and African-American students (Fisher Plaintiffs), CV 74-90 TUC DCB, and Mexican-American students (Mendoza Plaintiffs), CV 74-204 TUC DCB. The cases were consolidated in 1975 and went to trial in 1977. [2]

In 1978, the Court found that *de jure* discriminatory segregation existed in TUSD. Regardless of the fact that only Black students were statutorily prohibited from attending White schools, Judge Frey found that even as the District dismantled the "dual Black and White school system and, thereafter, there existed some intentional segregation of minority students (Black and Mexican-American) from Anglo-students." (Order (Doc. 1119) at 15 n.9),[3] *see also Fisher v. Tucson USD*, 652 F.3d 1131, 9781 n.9 (9th Cir. 2011) (citing finding of *de jure* discrimination without criticism). Judgment was entered for Plaintiffs, but nevertheless both Plaintiffs filed motions to amend the Court's findings and prepared to appeal.

Then, the parties entered into a Settlement Agreement to resolve the consolidated case. "It appears likely that the Settlement Agreement resolved the appellate issues raised by the class Plaintiffs because Judge Frey approved it without ruling on the pending motions and ordered that the Stipulation would be the controlling Order of the Court."

_____

[1] More detailed discussions of the history of this case have been given by this Court in prior Orders. (Docs. 1119, 1270), *see also Fisher v. Tucson USD*, 652 F.3d 1131, 9781 n.9 (9th Cir. 2011) (citing *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1341 (9th Cir. 1980) (describing early case history)).

[2] Used interchangeably: Anglo, Black, Hispanic, and Latino.

[3] All page citations are to the CM/ECF page.

(Order (Doc. 1119) at 4-5); *Fisher,* 652 F.3d at 1137 n.10 (quoting Settlement Agreement as providing once it was implemented: "the rights and obligations of the parties to be determined solely by its terms and the terms of any subsequent stipulations or orders entered herein pursuant to it.")

The 1978 Settlement Agreement provided for TUSD to implement "its proposed desegregation plans in a number of specified schools, cooperate with parents to develop and examine future student assignment policies at several additional schools, and eliminate discrimination in faculty assignments, employee training, and in polices on bilingual education, testing, and discipline." *Fisher*, 652 F.3d at 1137 (citing *Mendoza,* 623 F.2d at 1342). The Settlement Agreement prohibited TUSD from "engaging 'in any acts or polices which deprive any student of equal protection of the law' based on race or ethnicity." *Id.*

The District was supposed to operate for five years under the terms of the Settlement Agreement before TUSD could file a motion to dissolve it. Around the end of this period, in 1983, the Arizona State Legislature enacted a funding provision, A.R.S. § 15-910G, to allow school districts operating under court orders to generate additional tax revenues above and beyond educational spending limitations to pay for desegregation activities. By and large the express provisions of the Settlement Agreement had been implemented within the five year period, but the case did not end. (Order (Doc. 1119) at 8, 10, 18, 23.) Instead, TUSD spent millions of dollars, *id.,* over the course of approximately twenty years before the Court called for TUSD to show good cause why unitary status had not been attained. (Order (Doc. 1052)).  The question was briefed by the parties, and on April 24, 2008, this Court found unitary status had been attained, but not without finding some fault with the District's failure to consider the effectiveness of the programs financed by desegregation dollars over this extended period of time. (Order (Doc. 1270)). This Court's decision was reversed by the Ninth Circuit Court of Appeals on August 10, 2011.

The case was remanded to this Court "to maintain jurisdiction until it is satisfied that the School District has met its burden by demonstrating – not merely promising—its 'good-faith compliance . . . with the [Settlement Agreement] over a reasonable period of time.'" *Fisher v. Tucson USD*, 652 F.3d at 1143-44 (quoting *Freeman*, 503 U.S. at 498 (1992)). "The court must also be convinced that the District has eliminated 'the vestiges of past discrimination . . . to the extent practicable' with regard to all of the *Green* factors." *Id.* at 1144 (quoting *Freeman,* 503 U.S. at 492).

"The Green factors are such things 'where it is possible to identify a 'white school' or a 'Negro school' simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities.'" (Order (Doc. 1119) at 16 (quoting *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 18 (1971)). In the context of educational resource allocations, there are other factors such as teacher assignments for teachers with advanced degrees or more experience, availability of library books, and per-pupil financial expenditures. *Id.* (citing *Freeman*, 503 U.S. at 482-83).

Upon returning the case to its active docket, the Court appointed the Special Master to develop a plan by which the District would attain unitary status. Given the history of the case, this Court directed the plan to be specifically designed to address the *Green* factors relevant to attaining unitary status in this case and for a plan of action that would avoid a repeat performance of the District operating under court jurisdiction in perpetuity. The parties entered into a stipulated plan, i.e., a consent decree: the USP. The Court adopted the USP in 2013. The USP called for the development of specific action plans for each of its provisions, implementation of the action plans, operation pursuant to the action plans for a time period sufficient for the District to determine the effectiveness of the various plans and make modifications accordingly, and an end date "not prior to the end of the 2016-2017 school year." (USP (Doc. 1713) § XI.A.2.)

A desegregation decree, like the USP, is not intended to operate in perpetuity. *Id.* at 1143 (citing *Board of Educ. Oklahoma City Public Sch. v. Dowell,* 498 U.S. 237, 247-

48 (1991)). Given "local autonomy of school districts is a vital national tradition," the Court adopted the three-year minimum operational component in the USP in order to return TUSD to the control of local authorities at the earliest practicable date to restore true accountability to the government. *Id.; Freeman,* 503 U.S. at 491. The Court will do this when the District has demonstrated good faith implementation, monitoring, revision, and operation of the District under the USP for at least three years and the elimination of the vestiges of past discrimination to the extent practicable.

## B.
## Special Master's 2016-17 Annual Review (SMAR): Unitary Status Review

Annually, the District files a report of activities undertaken pursuant to the USP: the District's Annual Report (DAR). The Special Master follows with his annual report: the SMAR. The parties may make objections. This year marked the three-year presumptive end-date, SY 2016-17, for the USP. Therefore, the Court required both the DAR and SMAR to include a comprehensive analysis of the District's progress under the USP and a status report to the Court on whether or not unitary status has been attained in whole or in part.

The Special Master recommends that the Court award unitary status for some elements of the USP and retain jurisdiction over other parts of the USP. The Special Master has developed completion plans, including implementation time-lines, for these remaining elements of the USP.

The USP is an ambitious and comprehensive plan developed to remedy the past vestiges of discrimination and segregation that existed in TUSD.

> In addition to strategies to promote and sustain integration, the USP includes provisions to provide students with transportation, increase the diversity and effectiveness of teachers and school administrators; strengthen and enrich the curriculum and increase access to advanced learning experiences; develop safe, productive, inclusive and supportive school environments; provide services to students with special needs; meaningfully engage families; ensure equity in facilities and technology-facilitated learning resources; provide students with extracurricular activities; and create information systems and budgetary processes that facilitate accountability, strategic resource allocation and effective management.

(2016-17 SMAR (Doc. 2096) at 3-4.) These elements are contained within interconnected

or interrelated sections of the USP, which generally address: 1) Student Assignment; 2) Transportation; 3) Administrators and Certificated Staff; 4) Quality of Education; 5) Discipline; 6) Family and Community Engagement; 7) Extracurricular Activities; 8) Facilities and Technology, and 9) Accountability and Transparency. (USP (Doc. 1713)).

Like the 1978 Settlement Agreement, the parties entered into the USP "to resolve the longstanding desegregation case against the District." *Id.* § I.A. It was a plan designed with "specific substantive programs and provisions to be implemented to address all outstanding *Green* factors and all other ancillary factors." *Id.* (citing *Green v. County School Board of New Kent County VA,* 391 U.S. 430 (1968)). In addressing whether or not the District has attained unitary status this Court considers that "'[t]he duty and responsibility of a school district once segregated by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de jure* system.'" *Id.* at 6 (quoting *Freeman v. Pitts*, 503 U.S. 467, 485 (1992)).

"A school district under a desegregation order, [such as the USP,] is obligated to: (1) fully and satisfactorily comply with the court's desegregation decree(s) for a reasonable period of time; (2) eliminate the vestiges of the prior *de jure* segregation to the extent practicable; and (3) demonstrate a good-faith commitment to the whole of the court's decrees and to the applicable provisions of the law and the Constitution." *Id.* (citing *Freeman,* 503 U.S. at 491-92; *Dowell*, 498 U.S. at 248-50). "'A school board has no obligation to remedy racial imbalances caused by external factors, such as demographic shifts, which are not the result of segregation and are beyond the board's control.'" *Fisher,* 652 F.3d at n.4 (quoting *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.,* 244 F.3d 927, 941 (11th Cir. 2001)).

"The test used to determine when unitary status has been achieved, and accordingly when federal court oversight may end, is well-established: 'The ultimate inquiry is whether the constitutional violator has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination

have been eliminated to the extent practicable.'" *Fisher,* 652 F.3d at 1134-35 (citations omitted).

The Supreme Court has instructed that courts should "give particular attention" to the school system's record of compliance because in this regard a school district is better positioned to demonstrate good faith by committing to a predetermined constitutional course of action and undertakings that form a consistent pattern of lawful conduct directed to eliminate earlier violations. *Fisher,* 652 F.3d at 1135 (citing *Freeman,* 503 U.S. at 491). Good faith compliance since the inception of a desegregation decree through the entirety of the desegregation plan demonstrates a school district's commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution and guarantees "that parents, students, and the public have assurance against further injuries or stigma . . .." *Id.* at 1141 n.25. "A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and [the school system] will not suffer intentional discrimination in the future." *Freeman,* 503 U.S. at 498–99. In other words, good faith compliance over time "reduces the possibility that a school system's compliance is but a temporary constitutional ritual." *Morgan v. Nucci,* 831 F.2d 313, 321 (1st Cir. 1987). Therefore, good faith compliance by the District with the USP over a reasonable period of time "*is a factor to be considered* in deciding whether or not jurisdiction [should] be relinquished." *Fisher,* 652 F.3d at 1141 n. 25 (citing *Dowell,* 498 U.S. at 249-50).

In 1968, the Supreme Court established that a school district, like TUSD, that at one time operated a statutorily mandated dual school system had an affirmative duty to eliminate all vestiges of the state-imposed segregation. *Green v. School Bd. of New Kent County*, 391 U.S. 430, 435-36 (1968). The Court in *Green* explained that a school system can make a prima facie case for unitary status by showing that racial imbalances no longer exist in student body assignment, faculty, staff, transportation extracurricular

activities and facilities. The *Green* factors cover things that readily identify a school as White or Black, such as the racial composition of staff or quality of school buildings and equipment, or in the context of educational resource allocations, such as teacher assignments for teachers with advanced degrees or more experience, then a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown. (Order (Doc. 1119) at 16 (citing *Swann*, 402 U.S. at 18; *Freeman*, 503 U.S. at 482-83)). In other words, there is a *Green* presumption of discriminatory intent which also attaches to factors that reflect resource disparities because both types of disparities are unlikely to have nondiscriminatory explanations. *Id.* (citing *Save Our Children*, 90 F.3d at 776-77 (placing the burden of proof on Defendants in respect to *Green* presumptive factors, but requiring Plaintiffs to prove disparities in student achievement were vestiges of *de jure* segregation.)

The test for determining when unitary status has been achieved is two-sided. The District has the burden to show that any current imbalance is not traceable, in a proximate way, to the prior violation, but as the *de jure* violation becomes more remote in time and demographic changes intervene, it becomes less likely that a current racial imbalance is a vestige of the prior *de jure* system. *Fisher,* 652 F.3d at 1144 n.10. Still, good faith remains paramount: 'The causal link between current conditions and the prior violation being even more attenuated if the school district has demonstrated its good faith.'" *Id.* The test describes two-sides of the same coin, with the Plaintiffs and Defendants relying on its different sides. The Plaintiffs argue lack of good faith; the Defendants argue lack of any vestiges of the *de jure* violations which were the subject of the law suit. The analysis is not, however, one test versus the other; the Court must consider both.

The burden is on the school district to prove it has attained unitary status. *Fisher,* 652 F.3d at 1135. Disparities in *Green* factors are presumptively vestiges of *de jure* segregation, but Plaintiffs have the burden to link disparities that fall beyond *Green,* such as performance disparities in student achievement, to vestiges of *de jure* discrimination. *Save Our Children,* 90 F.3d at 776.

The Court rejects the District's argument that supervision over the Mendoza class action, CV 74-204 TUC DCB, should be terminated because Judge Frey found TUSD did not operate a dual educational system in respect to Hispanic students. This Court has held that the 1978 Settlement Agreement was the operative document resolving this case, and it did not distinguish remedies between the two classes. (Order (Doc. 1119) at 5-8, 16-17.) This Court, when it previously found unitary status and closed this case, concluded "after careful review of Judge Frey's Findings of Fact and Conclusions of Law, pages 206 to 223, that *Fisher/Mendoza* falls squarely within the confines of a *de jure* case for purposes of determining whether or not TUSD has attained unitary status regardless of the fact that only Black students were statutorily prohibited from attending White schools." *Id.* at 15 n. 9, *see also Fisher,* 652 F.3d at 1137 n. 9 (referencing this finding without criticism). The appellate court followed the same approach of not distinguishing between Black and Hispanic classes when it remanded the case for this Court "to decide whether partial withdrawal is warranted in this case." *Fisher,* 652 F.3d at 1144. It instructed that this Court's discretion should be informed by the following:

> whether there has been full and satisfactory compliance with the [Settlement Agreement] in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the [Agreement] in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race[s] and ethnicities], its good-faith commitment to the whole of the [Agreement] and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.

*Id.* (quoting *Freeman,* 503 U.S. at 491). The parties did not propose partial unitary status upon remand and instead negotiated an updated consent decree, the USP, which was expressly designed to resolve this case. The USP does not treat Hispanic students as less deserving of relief.

Like the 1978 Settlement Agreement, the USP addresses desegregation pursuant to student assignment policies, student achievement,[4] faculty assignments, employee

---

[4] The 1978 Settlement Agreement's approach to eliminating discrimination was focused on testing, whereas the USP student achievement provisions are exceedingly broader. But even under the 1978 Settlement Agreement, this Court rejected a narrow scope of factors for assessing unitary status and held that TUSD

training, polices on bilingual education, and discipline. The Court considers good faith in the context of the District's implementation, review and operation of TUSD under the USP. The USP was designed expressly to address the *Green* factors relevant in this case and to be a pathway to attain unitary status to the extent practicable. The Court will assess practicability within the context of the USP's minimum three-year operational time-frame, not an open-ended meandering towards unitary status.

The Court rejects the Defendant's objection to completion plans as new requirements, not contained in the USP. Completion plans will only be approved by the Court upon a finding that *de jure* discrimination has not been eliminated to the extent practicable as planned in the action plans. The USP called for the action plans to be developed based on data and research, therefore, the time for conducting studies has passed. Generally, the Court will not authorize further studies unless required pursuant to an action plan, necessary because there are no best practices to draw on to address an issue, or where an action plan addressing an issue failed or was limitedly effective and further study is necessary to determine whether an alternative remedy exists.

The District makes only three specific objections to issues presented in the SMAR, which are: 1) new ALE participation rate requirements, 2) any requirement to set a required ELL graduation rate, and 3) further requirements in teacher attrition. The Special Master has not recommended any such requirements, and the Court does not order them.

As for all of the other recommendations made by the Special Master, the District reports "it is deep into planning and execution of the Special Master's many completion steps set out in the SMAR, and will of course comply with all of them that the Court may order. The District began its compliance effort upon receipt of preliminary drafts of the SMAR from the Special Master in December, 2017 and January, 2018, and has worked with the Special Master to refine many of the completion steps set out in the SMAR. Indeed, the District hopes to be able to report completion of a significant number of the

_____

had spent millions of desegregation dollars over the course of this case to close the student achievement gap, therefore, student achievement was at least one measure of program effectiveness. (Order (Doc. 1119) at 15 n.7, 22-23.)

steps even before the Special Master's Reply to the parties' objections is due (on May 11, 2017)." (TUSD Response (Doc. 2099) at 4.)

Over the past year, the Court detected a change in attitude. From its previous reticence, the District now appears committed to bringing this case to a conclusion by implementing Completion Plans for USP provisions where unitary status has not yet been attained. Plaintiffs, however, argue against any finding of unitary status, even in part.

The interconnectivity of the various programs called for under the USP makes it awkward, but not impossible, to grant partial unitary status on elements that may have been achieved in one section but not another of the USP. Hesitancy to grant unitary status in part is offset by the goal of returning TUSD to the control of local authorities and to enable the public to hold them accountable. More importantly, the Court finds it is important for the community to understand the progress made by the District pursuant to the USP and for the District and the community to focus on the work that remains under the USP.

"To be sure, district courts possess ample discretion to fashion equitable relief in school desegregation cases, to tailor that relief as progress is made, and to cede full control to local authorities at the earliest appropriate time." *Fisher,* 652 F.3d at 1142 (citing *Freeman,* 503 U.S. at 486–92). This Court will not, however, "abdicate its responsibility [in part or in whole] to retain jurisdiction until [the District] has demonstrated good faith and eliminated the vestiges of past discrimination to the extent practicable." *Id.* at 1143. Only after the District has "'shown that [it] has attained the requisite degree of compliance" may [the Court] craft "an orderly means for withdrawing from control.'" *Id.* "'[T]he court's end purpose must be to remedy the violation* and, in addition, to restore state and local authorities to the control of a school system that is operating in compliance with the Constitution.'" *Id.* (quoting *Freeman,* 503 U.S. at 489) (emphasis added).

The Plaintiffs are concerned, as expressed by the Fishers, "that granting partial unitary status could cause the District to lose focus in these areas and allow the situation

- 13 -

to return to unsatisfactory levels." (Fisher Response (Doc. 2100) at 2.) The Plaintiffs and the Special Master are not, however, without recourse where the Court has awarded unitary status in part, should future problems, foreseen or unforeseen, arise. The Court expressly retains jurisdiction to enforce every term of the USP, whether or not partial unitary status has been awarded or not. The Notice and Request for Approval (NARA) provisions of the USP § X.C will continue to apply in full without exception to any award of partial unitary status. Data reporting requirements remain in place unless removed by the Special Master by recommendation, with opportunity for Plaintiffs to be heard and approval by the Court. The District shall continue to report annually on all USP provisions.

"The Court affirms the January 6, 2012, Order, paragraph 7, directive that annual extensions of judicial oversight beyond three years will be based on reasons of unattained compliance by the District with the USP. Three years out, the Court is taking an inventory of the District's progress towards unitary status." (Order (Doc. 2086) at 2.)

The District has filed the 2016-17 DAR, (Docs. 2057-2068), and the corresponding Analysis of Compliance with USP (USP RAC) (Doc. 2075), and Revised ALE USP RAC (Doc. 2092). The 2016-17 SMAR tracks the District's compliance analysis. Pursuant to the Special Master's authority to make recommendations to this Court regarding his compliance assessments, (Order (Doc. 2086) at 3) (citations omitted), the Special Master identifies specific non-compliance issues, makes specific recommendations for activities necessary for compliance, and provides specific deadlines for the District to complete such activities. The Plaintiffs, who have had full and ongoing discovery rights including the ability to make requests for disclosures and answers, have filed Responses and made objections, which this Court directed should be equally detailed and specific. This Court has reviewed thousands of pages, including the above referenced briefs and any referenced supporting evidence.

The Court grants unitary status in part only to provisions of the USP where it is confident that there has been full and satisfactory compliance with the express terms of

the USP. The Court does not grant unitary status in full because it finds that the School District has not yet demonstrated to the public, including African-American and Hispanic parents and students, its good-faith commitment to the whole of the USP and to those provisions of the law and the Constitution that predicated judicial intervention.

The Court will look to this Order when making further unitary status determinations as to the parts of the USP over which it continues to retain jurisdiction. The Court finds that an extension of judicial oversight beyond three years is necessary for reasons of unattained compliance by the District with the USP as identified below.

### 1.    Student Assignment: USP § II

The Student Assignment provision of the USP provides that "[s]tudents of all racial and ethnic backgrounds shall have the opportunity to attend an integrated school." (USP (Doc. 1713) § II.A.1.) The USP required the District to develop and implement a coordinated process of student assignment, incorporating as appropriate four strategies for assigning students to schools: attendance boundaries; pairing and clustering of schools; magnet schools and programs, and open enrollment. *Id.* The Special Master recommends that unitary status be granted with respect to these districtwide integration efforts pursuant to § II, Student Assignment, of the USP, except for magnet schools.

The Court takes a hard look at student assignment because it is one of the vestiges expressly addressed in the original 1978 Settlement Agreement. When this case commenced in 1974 and when the Settlement Agreement was entered into by the parties, segregation was addressed by strategically changing school boundaries and bussing students to achieve desegregation. Now, students may attend any school by choice, A.R.S. § 15-816 *et seq*, with charter and out-of-District schools competing for student enrollment, A.R.S. § 15-181 *et seq*. Given today's choices, student assignment strategies aimed at remediating segregation are more limited, less direct, and less effective. Demographic changes in the District require special definitions. An "Integrated school" (INT) is any school in which no racial or ethnic group varies from the district average for that grade level (elementary, middle, K-8 schools, and high schools) by more than +/- 15

percentage points, and in which no single racial or ethnic group exceeds 70% of the school's enrollment. A "Racially Concentrated" (RC) school is any school in which any racial or ethnic group exceeds 70% of the school's total enrollment. (USP (Doc. 1713) § II.B.1-2.)

According to the Special Master, "[t]he District has done those things with respect to student assignments that it was required to do by the USP, putting aside its ambivalence with respect to magnets." (2016-17 SMAR (Doc. 2096) at 8.)

He reports recent progress in integrating TUSD schools, which he attributes to the cumulative effect of more productive implementation of provisions of the USP and the relevant action plan for integration, such as the District's recent undertaking to advise families of research showing the benefits of an integrated education and its creation of an Integration Initiative. He reports that integration is trending up.[5] He relies on reductions in racial concentration (Hispanic) at Racially Concentrated magnet schools which began dropping below the 70% mark in SY 2016-17. *Id.,* Table II-3 (Doc. 2096-1) at 1. There has been a reduction in Racially Concentrated schools in the District from 40.7% in SY 2013-14 to 35.3% in SY 2017-18. Integrated schools have increased from 21.2% to 31.8% for these same years, with all Integrated schools being magnet schools. In this

_____

[5] The Special Master reports that from 2014-15 to "the current year," the number of Racially Concentrated schools went from 35 to 30; the number of Integrated schools went from 17 to 25. Total enrollment in an Integrated school has increased by 2,154 and the number of students in Racially Concentrated schools dropped by 2,542. (Reply (Doc. 2111) (Second Reply) at 10.) The Special Master suggests that a more conventional definition of integration would result in finding that more than half of the District's students have the benefit of an integrated education. *Id.* at 8, 10. The District classifies schools as "highly diverse" if no group is over 70% and two groups, each, make up 25% or more of the student body. *Id.,* USP Integrated Schools (Doc. 2111-1) at 1.) Both Plaintiffs move to strike this Second Reply by the Special Master because the USP definition for an Integrated school is the only relevant definition. The Court agrees, but that does not mean that racial percentages other than +/- 15% are not relevant at schools which are neither Integrated nor Racially Concentrated. In other words, it is relevant whether schools are more or less trending towards integration or racial concentration. It is relevant whether schools are +/- 15%, +/- 20%, or +/- 25%, with every percentage decrease in racial concentration and percentage increase towards integration being a good thing. The Court does not strike the Second Reply, but it does not base any ruling in this Order on any standard defining integration other than +/1 15%.

- 16 -

way, although the opportunity for students to attend Integrated schools dipped from 19% in SY 2013-14, 2014-15, and 2015-16, to 18% in 2016-17, the opportunity to attend an Integrated school increased to 25% in SY 2017-18. *Id.* at Table II-2 (Doc. 2096-1) at 2.

"In no other state are the challenges of integrating schools greater than in Arizona where state policy not only strongly supports charter schools but essentially incentivizes suburban schools to recruit students from more diverse Districts like TUSD." (2016-17 SMAR (Doc. 2096) at 8.) "The geographic and demographic characteristics of the District work together to make the time getting from home to a school beyond students' 'neighborhood schools' greater than is the case in many districts." *Id.* In short, "[i]n a voluntary desegregation plan such as the USP, the primary tools for integration are magnet schools. Moreover, magnet schools have the potential of bringing new families to the District." *Id.* at 9.

The Special Master reports that "[t]he District has shown limited interest in strengthening magnet schools much less expanding its magnet options." *Id.* at 10. As evidence, the Special Master reports the following:

> The District frequently hires consultants to help it with important initiatives (e.g., dropout prevention, discipline and dual language). But it did not hire a consultant to help its development of a proposal for federal funding of magnet schools (the proposal was not funded).

> In its marketing efforts to advise families about the choices they can make among schools – including video, handouts, text on the website – there had been no mention until the recruitment for the 2017-18 school year of the significant research showing that attending an integrated school provides students with important learning opportunities they would not otherwise have.

> As a result of demands by the plaintiffs and pursuant to a requirement approved by the Court, the District finally launched an "Integration Initiative" in the spring of 2016 – more than three years after the approval of the USP.

> Until recently, the staff member serving as Director of Magnet Schools who was appointed in the fall of 2016 reported to the Director of Operations whose primary responsibilities deal with facilities and transportation. Given that magnet schools are fundamentally education programs, the success of which are important to the attainment of unitary status, one might have expected the person responsible for this integration initiative to report to District leaders on the academic side.

> In its Annual Report, the District asserts that changes in the grade structures at Borman and Drachman enhanced integration. However, the racial composition at Borman changed little and the changes at Drachman resulted in less rather than more integration.

The person who served as Director of Magnet Schools through the 2014-15 was a forceful advocate for magnet schools. However, the scope of her responsibility was continuously narrowed until she was not allowed to perform her functions. The position of Director of Magnet Schools, which is provided for in the USP, was left unfilled for half of the 2015-16 school year. When a new director was appointed during the fall term of 2016-17, that position was redefined from full-time to half-time. When the plaintiffs and the Special Master objected to this violation of provisions of the USP, the District removed the half-time appointee and replaced him with an interim director. The interim director was later appointed as Director without a search.

In the development of its magnet school plans, the District has allowed several schools to set achievement goals lower than those they already had attained. This can be explained as a lack of commitment to higher achievement in magnet schools or a failure to monitor the development of the plans.

During the development of the 2017-18 budget, the Mendoza plaintiffs argued that the District was not adequately funding the magnet schools. The District responded by saying that it would reconsider its goals when it had the opportunity to analyze the new AZMerit scores. The plaintiffs and the Special Master took this response as an indication that the budgets would be revisited. But the District made no changes in magnet budgets after review of the state test scores despite the fact that students at two of the magnets previously thought of as highly effective academically – Drachman and Palo Verde – performed below the District average in the growth of student performance in English language arts and mathematics schoolwide. Further, students in these two schools who were performing in the bottom 25% scored below expectations in both of the subjects tested.

*Id.* at 10-11.

In assessing whether unitary status has been attained in the context of the District's Comprehensive Magnet Plan (CMP), it is important to look at whether the District has the commitment and capability to engage in a process of continuous improvement with respect to magnets now in place and likewise to expand magnets that would attract families to the District. Recently, the District developed a walk-through protocol (WTP) for assessing the effectiveness of magnet schools. The Special Master reports that the WTP, coupled with the systematic analysis of student outcomes, are essential tools for facilitating continuous school improvement. He suggests that unitary status not be ordered until the District demonstrates effective use of these processes and procedures over time.

The Special Master also recommends the Court retain supervision with respect to magnet schools until the District can demonstrate its commitment to future identification and implementation of new magnet schools with the clear potential to increase the

opportunities TUSD students have to benefit from an integrated education. The Court agrees, and finds that this will serve the dual purpose of affording the District ample time to establish an effective WTP. The Court shall reconsider the WTP in the context of reconsidering unitary status of the Magnet program as set out below.

**a.      § II.E: Magnet Schools and Programs**

The USP Magnet School Plan provision provides:

> By April 1, 2013, the District shall develop and provide to the Plaintiffs and the Special Master a Magnet School Plan, taking into account the findings of the 2011 Magnet School Study and ensuring that this Plan aligns with its other student assignment strategies and recruitment efforts. In creating the Plan, the District shall, at a minimum: (i) consider how, whether, and where to add new sites to replicate successful programs and/or add new magnet themes and additional dual language programs, focusing on which geographic area(s) of the District are best suited for new programs to assist the District in meeting its desegregation obligations; (ii) improve existing magnet schools and programs that are not promoting integration and/or educational quality; (iii) consider changes to magnet schools or programs that are not promoting integration and/or educational quality, including withdrawal of magnet status; (iv) determine if each magnet school or school with a magnet program shall have an attendance boundary; (v) determine admissions priorities/criteria for each magnet school or program and a process for review of those criteria; and (vi) ensure that administrators and certificated staff in magnet schools and programs have the expertise and training necessary to ensure successful implementation of the magnet.

> Pursuant to these considerations, the Magnet School Plan shall, at a minimum, set forth a process and schedule to: (vii) make changes to the theme(s), programs, boundaries, and admissions criteria for existing magnet schools and programs in conformity with the Plan's findings, including developing a process and criteria for significantly changing, withdrawing magnet status from, or closing magnet schools or programs, that are not promoting integration or educational quality; (viii) add additional magnet schools and/or programs for the 2013-2014 school year as feasible and for the 2014-2015 school year that will promote integration and educational quality within the District, including increasing the number of dual language programs; (ix) provide necessary training and resources to magnet school and program administrators and certificated staff; (x) include strategies to specifically engage African American and Latino families, including the families of English language learner ("ELL") students; and, (xi) identify goals to further the integration of each magnet school which shall be used to assess the effectiveness of efforts to enhance integration.

(USP (Doc. 1713) §  II.E.3.)

Pursuant to the USP, "The District shall, to the extent practicable, implement elements of the Plan in the 2013-2014 school year, and shall fully implement the Plan in the 2014-2015 school year."  (USP (Doc. 1713) § II.E.4.)

It is undisputed that the USP § II.E.3 Magnet School Plan (CMP), was not completed by the District until January 28, 2016. The Court does not repeat the long and torturous path taken by the District to draft the CMP to comply with the provisions of the USP, especially those provisions that required it to identify goals to further integration at each magnet school which could be used to assess effectiveness or lack thereof. Progress stalled when it came to changing existing magnet schools or programs to better promote integration and educational quality, especially if change meant withdrawing magnet status. *See e.g.,* (Orders (Docs. 1753, 1870) (describing deficiencies and requiring revisions)).

On January 16, 2015, the Court rejected the CMP as adopted by the Board on July 15, 2014, and required a major rework. Specifically, the Court adopted two goals as measures for assessing the effectiveness of a magnet school: 1) progress towards achieving the USP definition of an Integrated school and 2) progress towards enhancing the educational quality of the school. The Court required an immediate implementation schedule for improvement plans, transition plans, and removal of non-compliant schools or programs as magnets.

It bears repeating, here:

> Integration and student achievement are linked together because the goal of a magnet school is by definition "to attract a racially diverse student body by creating a school so distinctive and appealing – so magnetic – that it will draw a diverse range of families from throughout the community eager to enroll their children, even if it means having them bused to a different, and perhaps, distant neighborhood. To do so, the magnet schools must offer educational programs of high caliber that are not available in other area schools." (2011 Magnet Study (Doc. 1738) at 3). In the best magnet schools, the magnet components, many of which are associated with effective schools, add up to higher student achievement. *Id.* In other words, high academic standards will draw students to a magnet school, and an effective magnet program will improve student achievement.

(Order (Doc. 1753) at 10.)

The Court held that it could not approve the CMP because it was not a comprehensive plan as required by the USP. The Court complained that it had to piece together information from various studies and reports. The Court asked for one comprehensive plan reflecting that within the time frame for attaining unitary status the

District had developed, implemented, and would operate a magnet plan to attain the USP goal: "Students of all racial and ethnic backgrounds shall have the opportunity to attend an integrated school." *Id.* at 16 (quoting USP (Doc. 1713) § II.A.1).

The Court expressly identified the CMP deficiencies, as follows:

> The CMP fails to present for easy comparison and evaluation the basic rubric information for the current magnet schools and programs or identify the strength of the various magnet themes operating in these schools. The Court does not know how each school fits into an overall magnet feeder school plan. In short, the CMP fails to reflect the District's vision for a meaningful operational Magnet School Plan, which it can support long term. Within the context of implementing such a plan, the CMP fails to identify the specific activities which must be undertaken by each school to attain magnet status. There is no budgetary assessment as to how much money it will take to make the requisite improvements or even how many schools it can maintain as magnets long term. There is no transportation component in the CMP, which is the most expensive factor in operating a magnet school system. School boundaries have not yet been factored into the plan. The CMP speaks to developing Improvement Plans, but until detailed plans, complete with budget and resource estimates, are prepared for a school, it is impossible to ascertain what actions, if any, a school can undertake to attain true magnet status by the USP target date for attaining unitary status: SY 2016-17.

*Id.* (emphasis added).

The Court ordered the District to revise the CMP and file it within four months. *Id.* at 18.

On June 11, 2015, TUSD filed a Revised CMP which upon filing already did not conform to further stipulations between the parties for further revisions. On November 19, 2015, the Court approved the Revised CMP as further revised by stipulation and ordered the District to file the Final Revised CMP. On January 28, 2016, the District filed the Final 2015-16 CMP (Doc. 1898).

The Court has reviewed the District's SY 2016-17 Annual Report (DAR) and its USP compliance report (USP RAC). As would be expected, given the development of the CMP in 2015-16, the bulk of magnet program activity has occurred since SY 2015-16. In short, the criteria for magnet schools has been developed and used for evaluating the effectiveness of the existing magnet schools, *see* (CMP (Doc. 1898) (establishing criteria for magnet improvement plans and developing improvement plans for magnet schools where necessary)), magnet status has been withdrawn from some schools and programs

that did not meet the criteria for the designation, (Order) (Doc. 1983), and transition plans were developed and implemented at these schools.

In SY 2015-16, TUSD identified 19[6] magnet schools/programs in the CMP, with only two meeting the magnet criteria: Dodge Middle School and Palo Verde High School. (CMP (Doc. 1898) at 10.) Four magnet schools, Borton Elementary School, Booth Fickett K-8, Dodge Middle School, and Palo Verde, met the integration criteria for magnet status, with 1) every racial or ethnic student population being within +/- 15% of the District average for the relevant racial/ethnic group at the relevant grade level, and 2) no group exceeding 70% of the school's total population, i.e., the school is not Racially Concentrated. (USP RAC § II (2075-2) at 19.) Improvement plans were developed for the remainder. On December 27, 2016, magnet status was withdrawn from Ochoa and Robison elementary schools, Safford K-6, Utterback 6-7, and Cholla and Pueblo high schools. (Order (Doc. 1983) at 2.) Thirteen remained.

In 2016-17, five magnet schools were Integrated: Borton, Holladay, and Tully elementary schools, Dodge Middle School, and Palo Verde High School. *Id.* (citing 2016-17 DAR (2057-1) at 53.) At seven schools, Hispanic students exceeded 70% of the school's total student population, i.e., they were Racially Concentrated: elementary schools (Bonillas 71%), Carillo (79%) and Davis (75%)); K-8 schools (Drachman (71%) and Roskruge (78%)); Mansfield Middle School (73%), and Tucson High School (73%). Carrillo failed both integration tests, and Booth Fickett failed the +/-15% integration test. (2016-17 DAR (2057-1) at 53.)

The Court notes by September 28, 2017, the District's 40th Day enrollment report reflects the addition of four more Integrated Schools: Bonillas and Davis elementary schools and Drachman K-8 and Mansfield Middle School. (Mendoza Response, Ex. 1

---

[6] Cragin Elementary School (INT) was eliminated as a magnet program in SY 2015-16, reducing the SY 2015-16 total from 20 to 19.

(Doc. 2101-1) at 2-3: 40[7] Day Enrollment 9/28/2017).[7] In other words, nine magnet schools were Integrated schools.

To be clear, there are two magnet school criteria, Integration and Student Achievement, which are as follows:

> [1.] Integration: [a]) is being an Integrated school as defined under the USP using the 70% and +/- 15% thresholds and [b]) a school is progressing towards integration if it is Integrated at the incoming class at its lowest grade and such integration can be maintained as these student matriculate through two grades.

(CMP (Doc. 1898) at 10);[8] *see also* (Order (Doc. 1753) at 9), (USP RAC § II (2075-2) at 58 (Data Markers for Integration)).

> [2.] Student Achievement: [a]) A or B school as defined by the state school letter grade system; [b]) students score higher than the state median in reading and math on the state assessment; [c]) show academic growth of all students higher than the state median growth in reading and math; [d]) secure the growth of the bottom 25% of the students of the school at a rate higher than the state median growth, and [e]) reduce achievement gaps between ethnic groups so that achievement gaps between these groups are less than those in schools with similar demographics and socio economic factors and that are not magnet schools in the district. The gap shall be defined as the difference between performance in math and reading/literacy of the highest ethnic group compared to other ethnic groups within the school.

(CMP (Doc. 1898) at 15); *see also* (Order (Doc. 1753) at 9-10), (USP RAC § II (2075-2) at 59 (Data Markers for Achievement)).

The Court points out that the first three criteria for measuring student achievement are aimed at ensuring the school is academically attractive to potential students: the school's student achievement profile. The last two criteria measure the effectiveness of a school to teach students, especially minority students. This distinction is important because, as noted above: "high academic standards will draw students to a magnet

---

[7] In the remainder of this Order, the Court identifies Integrated Schools (INT) and Racially Concentrated (RC) Schools as classified on September 28, 2017. (Mendoza Response, Ex. 1 (Doc. 2101-1) at 2-3: 40th Day Enrollment 9/28/2017); (Revised ALE USP RAC (Doc. 2092-1) at 17-19).

[8] The Court defined integration as existing, "pursuant to the definition of the USP § II.E.2, based on the number of accepted magnet applications for entry grades K, 6, 9 and which is maintained at the cohort grade levels, i.e., as these students matriculate through two grades. (Order (Doc. 1753) at 9.) The Court defers to the CMP definition.

school, and an effective magnet program will improve student achievement." Both are necessary components of a successful magnet school or program.

In the District's USP RAC, it records that "it is not possible" to report on all of the goals as delineated by the Court, and hence it measures academic achievement by only two criteria: 1) proficiency rates for magnet schools meet or exceed the overall state proficiency rates and 2) achievement gaps between racial groups participating in magnet programs will be less than the achievement gaps between racial groups not participating in magnet programs. (USP RAC § II (Doc. 2075-2) at 62.) Of special concern to the Court is the District's omission of the State's accountability scores for the schools. The Court notes that the State Board of Education is mandated by law, A.R.S. § 15-241, to provide annual achievement profiles: A-F Accountability Scores (AZMerit grades). On May 21, 2018, the State Board of Education finalized the AZMerit grades for 2017-18. The 2017-18 AZMerit grades dramatically differed from prior accountability scores, which TUSD relied on in the CMP, as follows: Bonillas (INT) C to B; Borton (INT) C (no change); Carillo (RC) A to B; Davis (INT) B (no change); Holladay (INT) D to C; Tully (INT) C (no change); Drachman (INT) A to F; Booth-Fickett C to D; Roskruge B to D; Dodge (INT) A to B; Mansfeld (INT) C to B; Palo Verde (INT) A to D, and Tucson High (RC) B to C.

Even with improved integration, the existing magnet schools cannot survive the CMP criteria that they be A or B schools. No parent choosing a school will ignore its highly visible, publically posted AZMerit grade. Neither can the District. It must propose an alternative measure of the school's student achievement profile capable of countering a low AZMerit grade. For example: Is there a means to identify C schools that are ascending, i.e., C+ schools? Should there be a 2-year probationary period before a low AZMerit grade triggers termination. The point is, magnet criteria such as the "A or B AZMerit grade" included in the CMP and adopted by the Court may be revised, but cannot be ignored.[9] This is especially true because, pursuant to the CMP, these schools

---

[9] For example, the Marzano Report measures academic achievement based

are subject to termination as magnets. The District cannot move forward by ignoring the elephant in the room: an academically "failing" magnet school or program.

The Special Master is currently responsible for recommending the termination of non-compliant magnet schools or programs, with the exception of any school or program where the District has prepared an improvement plan for that school no later than October 1, 2018, which has been approved by the Special Master. In both instances, the Special Master shall expressly identify the criteria guiding these determinations as being relevant to improving: 1) integration, 2) the minority student achievement gap,[10] and 3) the school's student achievement profile. The Court notes that improvement plans[11] were developed for these schools in 2015. Therefore, these magnet schools or programs are subject to having their magnet status withdrawn immediately, unless the Special Master finds it is highly likely that magnet status will be attained by SY 2018-19. (2016-17 SMAR (2096) at 12.)

The Special Master shall base his recommendations on express criteria and guidelines for identifying a successful magnet school or program. Such criteria and guidelines, developed by the Special Master, shall be provided to the District for incorporation into the CMP for future use. Clear criteria and standards for magnet schools or programs are especially important to guide the District in making the sometimes politically unpopular decisions that are required to create and operate a viable district-wide magnet plan now and in the future. The record must reflect that the District can

---

on "whether achievement gaps between the racial groups participating in magnet programs were less than the achievement gaps between racial groups," (USP RAC § II (Doc. 2075-2) at 10), (Marzano Report (Doc. 2058-3) at 94-99), utterly failing to consider the student achievement profile of the schools.

[10] The student achievement gap is the gap "between racial groups participating in the magnet programs is less than the achievement gaps between racial groups not participating in the magnet programs." (Mendoza Response (Doc. 2101) at 12), *see also* (Order (Doc. 1898) at 15.)

[11] The Court assumes that transition plans have been developed in case magnet status is withdrawn.

move forward of its own accord before the Special Master and the Court may step away. Now is the time for the District to make that record.

The District shall review the existing criteria and standards and propose modifications to address the inadequacy of the A & B AzMerit grades and to be used in the future to determine magnet status. The District should the procedures for creating new magnet programs and procedures for terminating future non-compliant magnet programs. The Court assumes it goes without saying that the District shall establish a review schedule for the Magnet Program, thereby creating potential need for future improvement plans and transitions plans. The District with the Special Master's assistance should review the CMP sections Processes and Schedules to Improve Magnet Programs, Strategies to Improve Student Achievement, and Processes and Strategies to Eliminate Magnet Programs and revise them to be generic prototypes for future use in the event magnet schools and programs fail to meet the magnet criteria and standards in the future. To be clear, the Court does not mean to suggest that any of the current non-compliant magnet schools and programs may remain so after SY 2018-19; the existing improvement plans and transitions plans apply to them.

The Court refers the parties and the Special Master to the discussion in its Order (Doc. 1753) issued January 16, 2015, at pages 13 through 17, describing the deficiencies in the CMP at that time. They remain today and are the focus of the Special Master's request that the District demonstrate its commitment and capability to identify and implement new magnet schools and programs to maintain a vibrant magnet plan which affords future increased opportunities for TUSD students to benefit from an integrated education. (2016-17 SMAR (2096) at 10.)

The Court adopts the Special Master's recommendation that the District undertake an assessment of potential magnet schools or programs for TUSD, including identifying preferred choices and explaining its reasoning for selecting options and deciding whether such options should be implemented. *Id.* at 13. The Court agrees. The Court provides the discussions above and below to guide that endeavor, which shall culminate with the

District's filing a 3-Year Plus Integration Plan: CMP (3-Year PIP: CMP) by the end of this school year.

The District reports that residential patterns across the District are racially concentrated within particular geographic areas, with the overall Hispanic student population being 61%. (USP RAC § II (Doc. 2075-2) at 1-2, 15.) The integrative impact of a magnet school or program is limited by the distances between target populations and Racially Concentrated schools. To have an effective Magnet School Plan, "the District must strategically place magnet schools in central locations, generally, within an eight mile radius of the center of the District, because parents will not send their children where travel time exceeds approximately 20 minutes." (Order (Doc. 1753) at 13), *see also* (2016-17 DAR (2057-1) at 108 (describing the District as spanning 231 square miles, including east-west span greater than 30 miles[12] without a crosstown freeway). For example, in SY 2016-17, the District introduced a pilot[13] Express Bus Program to move students south-east to south-west from Mansfield and Magee middle schools to the Drachman Montessori K-8 (INT), and south-east to north-east from Cholla (RC) and Tucson (RC) high schools to Sabino High School.

There is an up-side to the confluence of the District's racially concentrated demographics and geographic sprawl with State policies like ARS 15-861.01 (mandatory open enrollment) and ARS 15-181 *et seq.* (tuition-free charter schools), that "create[s] difficult challenges" in addressing segregation. (USP RAC § II (2075-2) at 5.) These same factors limit plan options and simplify the planning process. With all the variables and options known, there is no reason to delay adopting a future CMP for the District.

---

[12] Travel times of 60 to 90 minutes are not attractive to parents and may be harmful to students. (2016-17 DAR (2057-1) at 108.)

[13] The Court notes that in 2015, when TUSD sought this Court's permission to add the seven and eighth grades to the Drachman Montessori magnet school (INT), it advanced the idea that an east side express bus would "alleviate concerns about long bus rides and increase the likelihood of recruiting target students to attend Drachman [(INT)]." (Drachman Desegregation Impact Analysis (DIA) (Doc. 1869-4) at 6.)

Given the direct link between magnet status and more money for a school, which incentivizes and politicizes the creation of magnet schools and programs without regard for magnet requirements, CMP criteria and guidelines shall be rationally related to identifying schools that have the ability to act as magnets for integration purposes. The existing CMP is a start, but as of now the District relies far too much on the discretion of the Special Master and the judicial authority of this Court to make the hard decisions necessary to operate an effective Magnet Program. *See* (2016-17 SMAR (Doc. 2096) at 12 (proposing that Special Master shall determine by September 2018 whether each magnet school has met the standards for a magnet school and "may" recommend to the Court at any time that the school lose magnet status). The Court finds that the District is well positioned to phase-out the discretionary role of the Special Master. He shall develop the criteria and guidelines for identifying currently effective magnet schools and programs and follow them for making his recommendations for removing the existing magnet schools and programs. He shall provide these criteria and guidelines to the District for incorporation in the 3-year PIP: CMP for future use by the District in developing new magnets and/or eliminating old ones.

The District has already developed criteria for assessing the viability of adding a new magnet school, revising an existing magnet program, and/or relocating a magnet program, which include: racial/ethnic composition; academic achievement; facility condition/capacity; and geographic location. (Order (Doc. 1753) at 14.) The District also recognizes that budget and pipeline concerns factor into future magnet school and program planning. (CMP (Doc. 1898) at 8-9.)

October 6, 2016, Marzano Research, a private consultant for the District issued a Report (Marzano Report), (2016-17 DAR (2057-1) at 72-73) (citing Marzano Report (2058-3) at 145-168), identifying the top five magnet themes parents find the most attractive: STEAM, Fine and Performing Arts, Early College preparatory, Dual Language English/Spanish, and GATE. (USP RAC § II (2075-2) at 10.) The USP expressly requires the District to increase the number of dual language programs. (USP (Doc. 1713) §

II.E.3.) The Special Master reports that "[t]here are themes not explored by the District that have been proven successful elsewhere." (Reply (Doc. 2111) (Second Reply) at 7.) The District shall explore these "proven successful magnet themes" to be included 3-Year PIP: CMP. The 3-Year PIP: CMP shall "inform[] and support the direction to be taken in [the future for] developing magnet initiatives." (USP RAC § II (2075-2) at 10 (citing 2016-17 DAR (2057-1) at 103-13)). Schools interested in developing magnet themes should have an approved array of theme choices with proven track records.

For each potential future magnet school or program, the District shall apply the criteria and guidelines for assessing the strength of its ability to improve integration, including the school's student achievement profile and potential for improving the achievement gap between minority and non-minority students enrolled in the magnet program. The CMP should overlay the criteria for ranking the strength of the proposed magnet for each of these requisite assessments in a manner to allow easy comparisons and prioritization. The 3-Year PIP: CMP shall "demonstrate [] how any proposed new magnet school or program will demonstrably increase the number of students attending integrated schools in the District." (Mendoza Response (Doc. 2101) at 13.)

In short, the District knows where existing schools are located, and it knows the District's demographics, including the racial concentrations within school boundaries and in its schools. This is the beginning point for the 3-Year PIP: CMP. In other words, geographic and demographic information which reflects the physical location of potential magnet schools and programs in relation to target populations within 20 to 30 minute travel distances shall inform the plan. A target population is a student population in a "racially concentrated boundary,"[14] racially diverse from the racial composition of the student population of the magnet school. In this way, the District shall identify candidate schools for magnet status. Without taking this first step, the District runs the risk of moving students for the sake of moving them, which is a concern reflected in the Mendoza objection that the District presents no direct evidence that integration is being

---

[14] The Court understands this to mean: a school attendance boundary.

achieved due to the District's efforts. *Cf.,* (2016-17 SMAR (Doc. 2096) at 12) ("Some current magnet schools are [I]ntegrated only because of the neighborhood enrollment and others have failed to demonstrate that they can provide a quality education to the students they enroll. It would make little sense to sustain those schools as magnets.") [15]

The Court notes the difference between the Sabino High School Express Bus and the Drachman Express Bus. The Sabino Express Bus moved 20 students from Cholla (RC) and Tucson (RC) high schools, both Racially Concentrated schools, north to Sabino High School, which is neither an Integrated nor Racially Concentrated school. It is also not a magnet. It is, however, a B school in comparison to Cholla High School (RC), a D school, and Tucson High Magnet School (RC), a C school. It is undisputed that these 20 students made Sabino High School more integrated.

Only five students used the Magee Drachman Express shuttles routing students first from elementary schools Mansfield Magnet, a B school, and Howell (INT), a C school, to Magee Middle School, a D school, and next from Magee and Whitmore Elementary School, a C school, to Drachman Montessori Magnet K-8 (INT), an F school. The Mansfield and Howell (INT) elementary schools are both Integrated schools and Whitmore Elementary School is neither Integrated nor Racially Concentrated. Drachman Montessori Magnet (INT) is Integrated already, so the logic for this east west movement is not apparent, without explanation.[16] The Mendoza Plaintiffs are right to complain that the District has not even tracked the race of students using the express busses.[17]

---

[15] The Court's use of this example does not mean it agrees with the Mendoza Plaintiffs' suggestion that the District's integration efforts must go above and beyond integration resulting from demographic changes. (Mendoza Response (Doc. 2101) at 12.)

[16] The Court is aware that prior to changes in 2017-18 when the Drachman Express Bus Pilot was implemented, it was an A school, but this fact alone does not provide an apparent link between the bus and integration.

[17] If the District is financing the Express Busses, pursuant to the USP, the District must establish that the busses are being used in efforts to integrate its schools or improve student achievement, not just that minority students can use the bus. This evidentiary obligation is not negated by the District's technological limitations to only "track eligibility for transportation broken down by race and ethnicity," not "actual transportation ridership." (Mendoza Response, Ex. 3 (Doc.

The logic for selecting future magnet schools and programs must include budgetary considerations based on estimated resource needs and availability, projected over time to arrive at planned start-up dates for future magnet operations. Given magnet schools and programs are the primary mechanisms available for integrating the District, the Court rejects the conclusion that "budget capacity does not exist to adequately resource and staff new and replicated programs." (CMP (Doc. 1898) at 8.) If true, there is no comprehensive integration plan for the District because its primary component is in jeopardy. The 3-Year PIP: CMP shall factor in budgetary costs and constraints, based on resource demands including staffing, marketing, and transportation, to arrive at a long-term fiscally sustainable CMP.

While the Magnet Program may be the most effective and primary integration strategy, it is only one tool in the District's toolbox for promoting integration in TUSD. The USP does not call for integrated magnet schools; it requires district-wide integration. The Mendoza Plaintiffs object to the Special Master's treatment of non-magnet and magnet schools by "lumping" them together to support his recommendation that unitary status be awarded for integration district-wide because almost all the Integrated schools are magnet schools. (Mendoza Response (Doc. 2101) at 5, 8, 10.) The Court finds no fault in the Special Master's conclusion that more TUSD students now attend Integrated schools. He is correct. Still, the Mendoza Plaintiffs' point is well taken. As the Sabino Express Bus pilot project demonstrates, integration can be promoted at non-magnet schools. The natural consequence of identifying TUSD schools that are potential future magnet schools is the identification of schools that are not. For these schools, the 3-Year PIP: CMP shall identify viable non-magnet strategies like the Sabino High School Express Bus that promote integration. On a school-by school basis, the District shall identify the non-magnet strategies, if any, that would improve integration at that school and adopt school specific integration plans. Priority shall be given to creating Integrated schools and integrating Racially Concentrated schools.

2101-1): Request for Information (RFI) # 1711 at 17.)

This brings the Court to the Plaintiffs' objection that the Court should not award unitary status, not even in part, to the District because not enough non-magnet schools meet the USP definition of an Integrated school. The 3-Year PIP: CMP will inform the more relevant question to be answered on a school-by-school basis: what non-magnet undertakings, if any, are practicable to reduce racial concentration and promote integration. The Mendoza Plaintiffs ask for further inquiry and study related to integrating non-magnet schools. As noted in the context of the Magnet Program, viable options for integration are limited, with all the variables and options being known. Just as there is no reason to delay in developing the future CMP for the District, there is no need to delay future non-magnet integration plans. It may be the natural consequence of this comprehensive inquiry that the District identifies schools that are currently and in the future may always be Racially Concentrated or never Integrated. For these schools, the 3-Year PIP: CMP shall include individual plans to improve integration, where practicable, and focus on academic student achievement.

To be sustainable, both future magnet and non-magnet integration plans require factoring in budgetary costs and constraints, based on actual resource availability and demands including staffing, marketing, and transportation, to arrive at estimated start dates for implementation.

The District shall include a transportation plan in the 3-Year PIP: CMP, considering it as a budget item and a criterion for assessing the strength or weakness of potential candidates for future designations as magnet or Integrated schools. Because transportation is a driving force fiscally, it must inform future plans or the District may annually repeat its determination that "budget capacity does not exist to adequately resource and staff new and replicated programs." The purpose of the 3-Year PIP:CMP is sustainability, with geographically and demographically focused transportation plans that limit costs while at the same time maximizing transportation's impact on integration or student achievement.

The Court retains jurisdiction over USP §§ II.I, Outreach and Recruitment, and III, Transportation, with its jurisdiction over these sections of the USP limited in context to assessing unitary status subsequent to the filing by the District of the 3-Year PIP: CMP.

Since the adoption of the USP, the District's integration efforts, pursuant to § II, have been ongoing and are continuing now and in the future. The Court finds that unitary status may not be awarded in relation to the USP, § II.E, Magnet Programs, for all the reasons explained above. Likewise, the Court retains jurisdiction over § II.I, Outreach and Recruitment, to the extent necessary to review whether unitary status has been attained in relation to § II.E.

The parties and the Special Master refer the Court to the SY 2017-18 Integration Initiative described as a pro-active, pro-integrative marketing strategy, which resulted in a "surge" of magnet program applications: 3,803 magnet applications in SY 2016-17 surged to 9,790 applications in SY 2017-18. (2016-17 DAR (Doc. 2057-1) at 52), *see also* (USP RAC (2075-DAR (Doc. 2075-1) at 66-77). The same marketing strategies resulted in increased open enrollment applications of 3,803 in SY 2016-17 to 4,834 in SY 2017-18. (2016-17 DAR (Doc. 2057-1) at 83.) The Court has reviewed the parameters of the District's new marketing strategies, including geo-advertising, social-media, new marketing venues and a mobile enrollment unit, community partnerships for positive messaging, web-based video tours of schools, new school websites, YouTube videos, and bilingual marketing materials including a Facebook page, Instagram and Twitter accounts. The Court does not repeat here all the new 2016-17 Outreach and Recruitment developments, but they are described in great detail in the 2016-17 DAR. *Id.* at 88-93.

The Court finds that the District is now well positioned to review the effectiveness of these new initiatives with past marketing practices, such as the MORE Plan developed in 2013-14. The USP requires the District "to review and revise strategies for the marketing to and recruitment of students to District schools to provide information to African American and Latino families and community members throughout the District about the educational options available in the District." (USP (Doc. 1713) § II.I.) The

USP also calls for the development of an Advanced Learning Experiences (ALE) Access and Recruitment Plan, which overlaps to a large extent in strategies. *Id.* § V.A.2.c-d.

It is time for the District to assess the effectiveness of the various outreach, marketing and recruitment strategies for its Magnet Program, which are equally effective for the ALE Program, and identify the strategies found to be the most effective at promoting integration to be used by the District going forward. This Outreach and Recruitment Addendum shall identify strategies universally applicable to both the Magnet and ALE programs, and identify strategies limited to one or the other. The intent is for the Outreach and Recruitment Addendum to satisfy both §§ II and V, discussed later herein, of the USP. The District may rely on the Addendum, as appropriately referenced, for either the Magnet Program or the ALE Program.

The District shall file the 3-Year PIP: CMP by the end of this school year, including non-magnet integration plans for individual schools where practicable, with the Outreach and Recruitment Addendum attached. This filing shall trigger reconsideration of unitary status for the USP § II.E.

## 2.     Transportation: USP § III

The Mendoza Plaintiffs object to the Special Master's conclusion that the District has demonstrated satisfactory compliance with USP § III, Transportation. The Plaintiffs reiterate their concern that the District is not tracking/reporting the racial/ethnic configurations for students using transportation. This accusation harkens back to the 1978 Settlement Agreement when the District spent desegregation money in schools with predominately minority students and asserted compliance because it benefitted African-American and Mexican-American students. The Mendoza Plaintiffs are correct that the District must do more than merely establish that, indisputably, it provides non-discriminatory transportation routes to all students. So for example, the activity busses placed by the District at magnet and Integrated schools give all students attending these schools the opportunity to participate in extracurricular activities. This makes these schools more attractive to all students, but it is especially important for the magnet

program to make the school attractive to out-of-boundary students, whose attendance increases integration. Here, the bus is linked to integration.

Compare, the Mendoza Plaintiffs' Express Bus concerns. On the one hand, an express bus moves students from Racially Concentrated C and D schools, Tucson and Cholla high schools, to a B school that is not Racially Concentrated, Sabino High School. The other express bus moves students from Integrated schools on the east side of the District to Drachman Montessori, an Integrated magnet school, on the west side. There is no link for the Drachman express to either USP goal, integration or improved student achievement. It is legitimate for the Mendoza Plaintiffs to question whether the Drachman Express Bus pilot program has been an effective integration strategy.

The USP provides, as follows:

> The District has (a) utilized transportation services as a critical component of integrating schools; (b) made transportation decisions that promote student attendance at Integrated and magnet schools and programs; (c) included District transportation administrators in planning and monitoring activities related to student assignment and integration; (d) provided free transportation to District students enrolled in magnet schools and programs and to students enrolled in racially-concentrated schools where such transfers increase the integration of the receiving school and when those students live outside the "walking zone" of the school in which they are enrolled; (e) provided prospective and enrolled families with information regarding the availability of free transportation at school sites, Family Centers, the District office, and on the website; (f) not permitted race- or ethnicity-based discrimination by a private party with which it contracts to provide transportation; (g) included the transportation each student receives in the student's data dashboard entry by July 1, 2013; and (h) included data in the Annual Reports regarding student use of transportation, disaggregated by school attended and grade level.

(USP RAC, Transportation (Doc. 2075-3) at 3 (citing USP (Doc. 1713) § III.A-C)).

There are no challenges to the Special Master's conclusion that the District is doing these things. The challenge is whether or not the District can show that it is using transportation as a critical component of its integration plan. The Mendoza Plaintiffs ask for actual ridership data and user surveys.

The District reports that by 2013 it was including the transportation each student was "eligible" to receive in the student's data dashboard record. "For USP purposes, the District reports on eligible riders." (2013-14 DAR (Doc. 1686) at 66.)

In SY 2014-15, the District explained:

> It does not track actual riders, either manually or electronically, because such tracking is neither possible nor realistic. The manual method would require the bus drivers to check the identity of each student boarding the bus, which would increase the amount of time required for boarding the bus; additional buses would then need to be added to the fleet to keep transit times reasonable. The electronic method would require a barcode reader to be installed on each bus, and students would be required to carry an ID card with a barcode. The District did not have the needed equipment on the fleet, but would consider proposals for implementing this method in the future. Moreover, because of the USP mandate to provide magnet and incentive transportation, the resulting routes must be planned and driven whether usage is high or low, and the cost is largely a function of mileage rather than the number of riders.

(Amended 2014-15 DAR (Doc. 1918-1) at 71.)

"In the absence of ridership data, the District uses eligibility to report ridership." *Id.* "'Eligible students' includes all students offered free transportation to and from school, excluding any students who specifically declined it." *Id.* This has been described as: "students enrolled in magnet schools and programs and to students enrolled in racially-concentrated schools where such transfers increase the integration of the receiving school and when those students live outside the 'walking zone' of the school in which they are enrolled," (USP RAC (Doc. 2075-3) at 3), or "all students enrolled in magnet schools and programs, and to students who transfer and enroll in racially concentrated schools where the transfer increases the integration of the receiving school," *id., see also* (2016-17 DAR (Doc. 2057-1) at 107) (describing eligible students as: "students attending a school beyond home attendance boundaries if the student's attendance improved integration at the target school"). The District is tracking ridership based on student enrollment/attendance criteria that track the USP integration goals. Therefore, the reported data is meaningful to establish whether the District is using transportation to promote integration.

Seemingly, ridership should mirror increases in students attending magnet schools[18] and reductions in Racially Concentrated schools. Transportation numbers are,

_____

[18] The Special Master and Mendoza Plaintiffs attribute increased integration, exclusively, to magnet schools and programs, but to be exact: of 18 Integrated elementary schools, five (Carrillo, Bonillas, Borton, Davis, and

however, stagnate, if not down. For example, total eligible ridership went from 23,618 in 2013-14, to 23,450 in 2014-15, to 22,746 in 2015-16, and 22,557 in 2016-17. *Id.* 48. Why?

This inquiry should inform the District as it moves forward to plan for the future. Transportation is critical to attaining the USP's goals. For example, in the context of student achievement, the Mendoza Plaintiffs highlight the dichotomy in connection with the GATE program. The District's Revised ALE USP RAC reflects "that one of the reasons most frequently given for why families decide not to send their qualified students to self-contained programs is transportation." (Mendoza Response (Doc. 2101) at 14) (quoting Revised ALE USP RAC (Doc. 2092-1) at 88.) According to the Revised ALE USP RAC, "representatives of the TUSD GATE and Transportation Departments met to discuss increasing alternative routes to reduce travel time to GATE sites but '[b]udget constraints prevented significant transportation changes.'" *Id.*

The District tracks transportation for students enrolled in Advanced Learning Experiences (ALE) - Gifted and Talented Education (GATE), Advanced Academic Courses (AACs) and University High School (UHS). The District tracks data regarding transportation availability by site, disaggregated by grade level as required by USP § III(C). Although not required by the USP, the District also tracks district-wide data on transportation availability disaggregated by program and by race and ethnicity. The Court finds that the District is sufficiently tracking transportation data and rejects the Mendoza Plaintiffs' request for further data and studies, except for the express bus pilot projects. The Court finds that the past three years of operations under the USP provides sufficient data and information for the District to develop sustainable future transportation plans to support ongoing and future integration and student achievement programs planned for the District.

---

Holladay) are magnets; the only Integrated K-8 school, Drachman Montessori is a magnet school; of three Integrated middle schools, Mansfield and Dodge are magnets, and of three Integrated high schools, only Palo Verde is a magnet. *See* (CMP (Doc. 1898) at 10), (Mendoza Response, Ex. 1 (Doc. 2101-1): 9/28/2017 40th Day Enrollment at 2-4).

The Court retains jurisdiction over the USP § III, Transportation, to the extent relevant to the questions of unitary status remaining.

### 3.     Administrators and Certificated Staff: USP § IV

This *Green* factor is aimed at identifying the vestiges of discriminatory hiring of administrators and certificated staff, i.e., teachers; there is no assertion of discriminatory hiring practices in TUSD. The USP goal is to increase staff diversity because: 1) teachers [and administrators] of color tend to expect more from minority students, and those higher expectations can lead to increased academic achievement; 2) positive exposure to a variety of races and ethnic groups can help reduce stereotypes, and 3) children who see people like themselves as role models are more likely to follow in their footsteps. (2016-17 DAR, Appendix IV-29 (Doc. 2060-2) at 2.)

The USP, § IV, includes provisions addressing: 1) outreach and recruitment, 2) hiring, 3) staffing assignments, 4) retention, 5) reductions in force, 6) evaluations, and 7) professional support and professional development. According to the Special Master, "[t]he District has done what it was asked to do by the USP and the relevant action plan." (2016-17 SMAR (Doc. 2096) at 15.) Nevertheless, "[o]ver the last five years, the District has made little progress with respect to increasing the proportions of African American and Latino teachers and administrators." *Id.* at 14. With one exception, he reports there has been a small increase (quite small) in African-American central office administrators. *Id.*

The District finally began reporting data distinguishing between certified staff and teachers in 2015-16. As of today, approximately 3% of teachers are African-American and approximately 27 or 28% are Latino. The Special Master recommends four areas where the District should be directed to make improvements, with the District attaining partial unitary status as to the remainder of § IV. The four areas are: 1) increasing the diversity of teaching staff at the school-site level, 2) reducing employee attrition, 3) developing Grow-Your-Own programs (GYOP), and 4) reducing the number of first year teachers teaching at lower achieving schools. The Mendoza Plaintiffs would add:

increasing the diversity of administrative staff and reducing the number of first year teachers teaching at Racially Concentrated schools.

The Special Master describes a severe nationwide teacher shortage as a fundamental problem facing TUSD's efforts to recruit diverse teaching staff. Teacher shortages affect administrative diversity because administrators typically come from the ranks of teachers. "Moreover, Arizona ranks at the bottom among the states as attractive places for teachers to start their careers." *Id.* at 15. Arizona teacher salaries are 17% lower than jobs that require similar levels of experience and education; "Arizona teachers who head families of four are eligible for seven need-tested federal aid programs--more than teachers in any other state." *Id*. at 15 n.8.

## a.      **Increasing Diversity**

In 2016, the Special Master, working with the District, developed a Teacher Diversity Plan (TDP), which was just implemented in the spring semester. With agreement from the parties, the Special Master excepted dual language schools with Spanish speaking teachers and schools with diverse teaching staff from the plan. The TDP targeted 26 schools with "significant disparities" (more than the 15% USP INT/RC distinction) between African-American and Latino certificated staff and the district-wide minority percentages for schools at the comparable grade level. After spring and summer hiring in 2017, twelve remain without sufficiently diverse teaching staff. (2016-17 SMAR (Doc. 2096) at 16.) The Court has reviewed the TDP and finds it to be an ambitious and commendable undertaking by the District. (2016-17 DAR, Appendix IV-28 (Doc. 2060-1) at 184-186.)

Without objection, the Special Master recommends continued implementation of the TDP. "No later than April 15, 2018, the District shall evaluate additional incentive program(s) to add to the TDP to increase its impact, determine what incentives, if any, to add for the 2018-19 school year, and prepare a report for the Special Master and the plaintiffs identifying the option(s) considered, and explaining the rationale for its decision." (2016-17 SMAR (Doc. 2096) at 19.) *The Court adopts the recommendation.*

The Court is eager to see the District's assessment of the TDP's effectiveness, especially the review of the financial incentives. While it is not possible for the District to increase salaries to make employment in TUSD more competitive with other school districts, the TDP reflects that the District can offer bonuses, stipends, and other incentives of monetary value which logically may extend to new hires to increase the District's ability to confront teacher shortages. *See e.g.,* (2016-17 DAR, Appendix IV-28 (Doc. 2060-1) at 184) ($3000 school supply stipend for recruiting and hiring teacher who reduces racial disparity). For reasons explained below, the Court finds that the TDP should extend to administrators, not just teachers, and directs that incentives used successfully this past year be expanded to promote GYOP.

**b.      Reducing Attrition**

The Special Master recommends a study be undertaken to identify ways to reduce attrition. The study will enable the District to identify ways to improve working conditions and leadership behavior, which in-turn will reduce teacher turnover and the number of new teachers, thereby improving both teacher performance and corresponding student performance. (2016-17 SMAR (Doc. 2096) at 17.) There is no objection to this recommendation, but the Mendoza Plaintiffs call for an inquiry into an alleged blacklist maintained by the District which Plaintiffs believe may have impeded the progress of the District to improve staff diversity. The Special Master reports that in November 2017, the District examined the records of professional staff that have been listed as "not to hire," i.e., blacklisted. The District then invited any wrongly categorized former employee to be a candidate for employment. He reports that there were a few responses, but no hires from this relatively small group of former employees. He finds no reason to delay awarding unitary status due to this alleged blacklist. (Reply (Doc. 2109) (First Reply) at 15.) The Court has reviewed the District's response to the Special Master's inquiry regarding this matter, *id.*, Ex. 1: TUSD Response (Doc. 2109-1) at 1-2), and agrees. Strategies resulting from the attrition study determined to be effective to reduce attrition shall be included in the 2018-19 TDP.

### c.      Grow-Your-Own (GYOP)

The District has GYOPs. The Special Master reports the District is now identifying TUSD graduates who are attending the University of Arizona to recruit them as future teachers in TUSD. The Special Master reports that the biggest problem with the District's GYOPs is that the District "could no doubt" improve on them by evaluating what it has learned from its programs and "what is known about the effectiveness of GYOPs existing across the country, especially those aimed at increasing the proportion of African American and Latino professional educators." (2016-17 SMAR (Doc. 2096) at 17-19.) The Special Master recommends such an inquiry: to "identify options with potential for TUSD, assess their costs and benefits, and determine what if any modifications to make to existing programs. This review shall also consist of an assessment of the District's own recruitment efforts, especially as they relate to Latino and/or African-American staff participation." *Id.* at 19. The Special Master recommends that the District prepare a report describing its review and analysis, and explaining the basis for its decision regarding existing programs. *Id.* There are no objections, and the Court adopts it. The Court finds it is clearly practicable for the District to review and assess the effectiveness of its GYOPs and determine whether other or additional programs exist that are more effective.

Additionally, the Court adds that the study shall identify the promising GYOP initiatives the District intends to implement in SY 2018-19, with a GYOP Addendum added to the 2018-19 TDP. Specifically, the District shall report on the GYOP involving TUSD graduates who are attending the University of Arizona to recruit them as future teachers in TUSD, especially as CRC teachers.

The Mendoza Plaintiffs are correct that the USP makes no distinction between school-site and non-site administrative staff. Both the Special Master and the Plaintiffs agree that over the last five years there has been virtually no increased diversity in teaching or administrative staff at its schools or central office. The Court finds no reason for the District's GYOPs to be limited to teaching staff or site-based administrators,

especially because "virtually all administrators come from the ranks of teachers." (2016-17 SMAR (Doc. 2096) at 15.) The GYOP study should determine whether there is a viable pilot program for African-American administrators and, if possible, implement it this year. The study shall include the type of proactive recruitment programs suggested by the Special Master, such as those adopted by the military which seek out and groom individuals with leadership potential from entry level positions through assigned career paths leading to the District's top administrative positions. *Id.* at 17. The study shall provide for incentives, including monetary bonuses and stipends, to be applied in the GYOP to the maximum extent possible. Strategies resulting from the GYOP study shall be included in the 2018-19 TDP, as a GYOP Addendum.

The District shall file the 2018-19 TDP, revised pursuant to the directives given here, which shall trigger reconsideration of unitary status for USP § IV.A, F.1, and I.3.

**d.      Placement of Beginning Teachers.**

The Court turns to § IV.E.5 of the USP, which requires that TUSD "increase the number of experienced teachers and reduce the number of beginning teachers hired to teach in racially concentrated schools or schools in which students are 'underachieving academically.'" (Order (Doc. 2086) at 5) (addressing for budget purposes staffing ratios for peer-mentoring of beginning teachers placed at these schools). This is an issue which affects student achievement because inexperienced teachers are less effective teachers. Attrition rates are higher for beginning teachers where students are lower performing than in above-average schools, which compounds the problem of securing the most effective teachers for the students who need effective teachers the most. (2016-17 SMAR (Doc. 2096) at 18.)

Therefore, the USP requires the District to place more experienced teachers where the need is greatest to improve student achievement. Again, the Special Master reports difficulty in attaining this USP goal due to nation-wide teacher shortages. As has previously been brought to this Court's attention, new teachers are being hired to teach at both Racially Concentrated and academically underachieving schools. *Id.* To off-set the

negative impact of placing inexperienced teachers in these schools, the District is providing teacher-mentors to new teachers during their first two years of teaching, pursuant to § IV.I.1. *Id.* at 20.

In his 2016-17 SMAR, the Special Master continues to point out, as he did when this issue was previously before this Court, that there is nothing about racial concentration that makes "it more difficult to teach students in [R]acially [C]oncentrated schools than in schools where students achieve above the District average." While true, Racially Concentrated[19] schools are a necessary consideration because, as noted in the Student Assignment analysis above, integration as defined under the USP may not be possible in some schools; for these schools, student achievement will be of the utmost importance. The Court will not eliminate the "beginning teacher" prohibition at Racially Concentrated schools until it is convinced that this express protection is not necessary for this constitutionally protected suspect class of students. The District may, however, provide student achievement data for Racially Concentrated schools that are "high achieving"[20] to exempt them as a group or grant exemptions on a case by case basis.

It is undisputedly "clear that in developing the USP no one intended that the number of beginning teachers in what some call 'hard to teach schools' would be as great as it is." (Reply (Doc. 2111) (Second Reply) at 14.) Whether the Court relies on the Special Master's number (75%) or the Mendoza Plaintiffs' higher estimates (77.5 or 78.7%) for beginning teachers teaching in under-achieving and Racially Concentrated schools, the numbers are too high. The importance of limiting the number of beginning teachers in these schools cannot be overstated because good experienced teachers are the most important factor needed to improve student achievement.

---

[19] There are no Anglo "Racially Concentrated" schools in TUSD.

[20] "High-achieving" is not defined and it is not clear that it is necessarily the reverse of "under-achieving," as defined in the UPS: "schools in which students are achieving at or below the District average in scores on state tests or other relevant measures of academic performance." USP § IV.E.5. Important terms must be clearly defined for purposes of any studies or plans.

With this in mind, the Court finds that further studies regarding alternative strategies for placing beginning teachers more strategically is insufficient. The Court adopts the Special Master's recommendation to centralize the teacher-hiring process. The Special Master explains that currently teachers apply directly to and are hired directly by school Principals. "The consequence of this practice is that many teacher candidates do not typically seek out schools that serve large proportions of low achieving students or schools serving children who come from low income families. Like exceptional coaches who seek out the best players, effective principals seek to recruit teacher candidates they believe have the greatest promise. The consequence of this is that the District lacks the capacity to place beginning teachers in schools that do not have diverse teaching staffs or to recruit teachers with the greatest promise of effectiveness to schools serving students who are performing below the district average." (Reply (Doc. 2111) (Second Reply) at 15.)

The Court finds that the USP called for such centralization, (USP (Doc. 1713) § IV.E.5), and adopts the recommendation that "the District alter its recruitment and placement policies with respect to all teachers, including beginning teachers, so that the central office can act more strategically with respect to the placement of teachers than is now the case." Likewise, the Court finds that the USP charges the Superintendent with making exceptions to the "beginning teacher" provisions on a case by case basis. *Id.* The Special Master notes that the Mendoza Plaintiffs complain that the Superintendent does not review the appointment of each individual teacher but delegates this responsibility. The Court finds that such delegation of responsibility is within the spirit of the USP which allows the Superintendent to delegate responsibilities for offices and positions. (USP (Doc. 1713) § I.D.8.)

The Court finds that what is more important is that either the Superintendent or his delegate shall strategically grant exceptions to the prohibition against placing beginning teachers in Racially Concentrated or under-achieving schools, and include mitigating strategies. The Superintendent shall certify each exception and expressly identify the

strategy or strategies being employed in the school to mitigate the negative impact of the beginning teacher appointment. For example, the appointment might be accompanied by a mentoring or alternative strategy for providing extra support for new or struggling teachers. At the other extreme, the appointment might not require any extra support if made in a Racially Concentrated, high-achieving, school.

The Court adopts the recommendation by both the Special Master and the Mendoza Plaintiffs for the District to undertake a study to identify effective strategies, if any, for reducing the number of appointments of beginning teachers in lower achieving schools or, where a beginning teacher appointment cannot be avoided, the study shall identify mitigating strategies which must be in place at a school for such an appointment to be approved. These mitigating strategies shall inform on a case by case basis the Superintendent's certification of each exceptional placement, with the certification expressly identifying the mitigating strategy or strategies being employed in the school where the beginning teacher is being appointed. Over the current school year the District shall implement any strategies identified by the study, centralize the hiring procedures, and implement the certification procedures for beginning teacher appointments at Racially Concentrated and lower achieving schools.

The District shall file a Notice and Report of Compliance regarding the directives herein related to centralizing the hiring process and certification for placing beginning teachers at Racially Concentrated or under-achieving schools, which shall trigger reconsideration of unitary status.

### 4. Quality of Education: USP § V

#### a. § V.A: Advanced Learning Experiences (ALEs)

The purpose of § V.A is "to improve the academic achievement of African American and Latino students in the District and to ensure [these] students have equal access to Advanced Learning Experiences [(ALEs)]." (USP (Doc. 1713) § V.A.1.) ALEs include: "Gifted and Talented ("GATE") programs, Advanced Academic Courses ("AACs"), and University High School ("UHS")." *Id.* § V.A.3-5.

"AACs include Pre-Advanced Placement (Pre-AP) courses, which were formerly referred to as Honors, Accelerated, or Advanced, and any middle school course offered for high school credit; Advanced Placement (AP) courses; Dual Credit [high school for college credit] courses; and International Baccalaureate (IB) courses." *Id.* § V.A.2.

UHS offers a rigorous academic curriculum and is a highly-ranked college preparatory high school. *Id.* § V.A.5.

The Special Master emphasizes that there are limitations to the District's ability to improve student achievement, generally, and especially in the context of increasing access, i.e., actual participation in ALE.

> It is important to recognize that student participation in an ALE is voluntary and that outcomes students experience from any given ALE are significantly affected by influences on student learning – such as student prior academic experiences and education and developmental factors that reside in families and communities. These influences mitigate or enhance student outcomes regardless of how effectively an ALE is designed and implemented.

(2016-17 SMAR (Doc. 2096) at 21.) "Access to some ALEs is conditioned by tests and the performance of students on these tests is shaped significantly by the family and community environments in which students live. Family and community characteristics are, in turn, correlated with race. . . . And, as noted, participation in ALE is voluntary on the part of students and large numbers of students who are eligible to participate in ALE choose not to do so." *Id.* at 22.

Parity is not a reasonable goal for ALEs because voluntary participation in ALEs is "influenced by perceptions of a likely attainment of the putative benefits of participating in a given ALE. These perceptions can be influenced by teachers and counselors and other educators, but family and student perceptions of whether students will benefit from ALEs is importantly influenced by numerous factors including the prior experiences of family members, 'stereotype threat,' and students' (sic) sense of his or her own academic confidence and competence." *Id.* at 23-24. "It seems worth repeating that a major reason for differences across schools in ALE is the 'known unknown' of student and parent decisions. That is, we cannot determine why students and parents opt out and

what could be done to change their minds. The cost of such a study would be prohibitive and the results problematic." *Id.* at 25.

In the context of the participation gap, which reflects that White students' participation in ALEs is greater than African-American and Latino students, he wrote:

> [T]he differences in the participation of students from different backgrounds in ALE, . . . is that family and community influences have an enormous impact on students' academic achievement, at least as it is measured by standardized test scores like those used to measure student achievement in Arizona. . . . The consensus is that schools, on average, account for less than a third of the variance in student achievement. Differences in family and community characteristics that are highly correlated with student performance on standardized tests are also correlated with race.

*Id.* at 26, *see also id.* at 28 (describing differences as not surprising and would be found anywhere where White families are more affluent with post-secondary education compared to other races), *id.* at 34 (attributing District's failure to meet the 15% goal in Self-contained and Itinerant Pull-out GATE programs due in part to "students who are eligible choose not to participate").

The Special Master also found it difficult to determine what an "equitable number" of [AP] courses and enrollment might be because:

> . . . AP offerings are determined [in part] by student demand, . . . A student's decision to enroll in an AP class is influenced by the students' sense of confidence in their ability to succeed and the support they receive from parents and teachers accordingly. Some parents appear to believe that having their student take an AP class would negatively affect their grade point average and, hence, their students' opportunities to attend college (even though colleges often give weight to AP classes in making decisions about admission even when students do not pass AP exams) and teachers and counselors sometimes decide that a student will not benefit from a more rigorous curriculum (despite evidence to the contrary) and explicitly or implicitly discourage students from enrolling in an AP class.

*Id.* at 40.

The Special Master was also not surprised "that schools with the largest percentage of African-American students have the lowest proportion of students enrolled in AP classes. African-American and Latino students participate at somewhat lower rates in ALEs aimed in part at readying students to succeed in AP. Since African American and Latino students as a whole perform academically at a lower rate than the District average, students and their families may feel that AP classes are too demanding." *Id.* at

41. In describing the "sizable" pool of potential African American and Latino students whose enrollment in UHS would increase its diversity further, he again described the "concern on the part of families, if not the students themselves, that the rigor of the UHS curriculum would be too stressful" and described "what may be at work" as "a phenomenon called 'stereotype threat'—the adoption by individuals from stereotyped groups of negative social attributions." *Id.* at 47.

The Court has previously considered the Special Master's concern that there are limited student engagement and support strategies available to the District to improve the achievement gap through ALE access. The Court refers to its Order issued on October 24, 2017, and its conclusion that "once a student is participating in an ALE program, [and] the District has more direct influence over the student's ability to successfully complete the course by providing any needed academic support," then the District has greater responsibilities. (Order (Doc. 2084) at 4.)

This approach looks beyond statistics to the strategies designed to increase actual student enrollment and engagement, including academic and behavioral support strategies. Implementation is especially important for strategies that are designed to offset the problematic voluntary nature of ALE programs. *See e.g.,* (Order (Doc. 2084) at 6-7) (calling for peer-to-peer recruitment, developing school-wide cultures celebrating academic excellence, and addressing misconceptions perpetrated by school counselors and teachers). In other words, is the District implementing strategies aimed at growing its own African-American and Latino, including ELL, ALE students?

On October 24, 2017, the Court made it clear that it would not take a singular statistical approach to determining unitary status, and that it intended "to review the District's performance under the USP, § V, by tracking the District's implementation of specified ALE access and support strategies set forth in the USP, the ALE Implementation Plan (ALE Action Plan) (Doc. 1645-2, Ex. A),[21] the ALE Supplement

---

[21] ALE Access and Recruitment Plan.

Action Plan (Doc. 1788), or any other relevant plan or strategy proposed or agreed to by the District or ordered by the Court." *Id.* at 17.[22] (Order (Doc. 2084) at 15.)

The Court found that the Mendoza Plaintiffs asked fair questions and raised good points. *Id.* at 16. It struck the ALE section from the District's USP RAC, which had been filed October 2, 2017, and held it would apply a "not less than" 15% rule of thumb red-flag for when discrimination may exist in a particular ALE program. *Id.* The Court ordered the ALE USP RAC revised to reflect a comprehensive matrix-type assessment district-wide and school by school. *Id.* at 19.

The Court, adopting the Special Master's recommendation, ordered: "1) the District should assess the racial distribution of eligible GATE candidates for a range of lower-cut test scores; 2) the District should focus on developing school-wide cultures where academic excellence is valued and celebrated; 3) in addition to existing marketing efforts, the District should recruit parents of children participating successfully in particular ALEs to recruit others to participate; 4) the District should create an incentive program that will draw teachers to become GATE certified; 5) the Dual Credit program should be universally available in all middle schools; 6) the District should immediately address the access problems at Catalina (INT), Santa Rita, and Cholla (RC) high schools; 7) the District should ensure that parents understand the difference between AP and dual credit courses, especially the limited value of dual credit courses outside Arizona, and 8) the District should work with state policy makers to ensure funding continues for AP testing." *Id.* at 18.

---

[22] The ALE Supplement Action Plan was filed on April 14, 2015, after the Mendoza Plaintiffs requested the Special Master file an ALE R&R for non-compliance. Again the Mendoza Plaintiffs objected and asked the Court to instruct the Special Master to work with the parties to formulate a standard for determining whether the District achieves unitary status with respect to ALEs. Reasoning it had already so ordered, the Court instructed the Special Master to formulate the standard. (Order (Doc. 1895)). The Special Master filed an R&R on August 3, 2017, (Doc. 2041), which subsequent to further objection from the Mendoza Plaintiffs, resulted in this Court's Order (Doc. 2084), issued on October 24, 2017, containing the directives described herein this Order**.**

The Court Ordered "the District to open cluster Pullout GATE programs to at least the 2013-2014 level and place them strategically at schools serving minority students, and to especially target them at schools serving substantial numbers of African American students." *Id.*

Following the Court's lead, the District's Revised ALE USP RAC included a matrix-type analysis for ALE programs district-wide and school by school. (Revised ALE USP RAC (Doc. 2092 and 2092-1.) The 2016-17 SMAR reviewed the Revised ALE USP RAC. The Plaintiffs have both filed objections. The Court addresses them accordingly.

The USP ALE goal is to improve the academic achievement of African-American and Latino students in the District by ensuring these students have equal access to ALEs. The Court has adopted definitions, as follows:

> [A]ccess [is] the number of ALE programs available to minority students and opportunities for participation, and defines participation as the number of students enrolled in ALE courses and includes completion, defined as the number of students passing ALE courses and number of students taking and passing requisite certification tests necessary for African American and Latino students to secure the benefit of participating in ALE programs. The Court defines support as strategies aimed at increasing enrollment and participation in ALE programs, including strategies aimed at assisting minority students in passing ALE courses and taking and passing any requisite tests.

(Order (Doc. 2084) at 17.)

The Court has held that "increases" for the purpose of assessing effectiveness will be actual percentage increases made district-wide and at individual schools, and it will consider comparable data for White students to address concerns that ALE increases are merely an "all boats rising" phenomena. *Id.* at 15-17. The Court adopted a "not less than" 15% Rule to be applied district-wide as a rule-of-thumb indicator of possible discrimination in an ALE program. *Id.* at 9, 18 (citing (Order (Doc. 1771) at 6-7). The Court expressly held that neither actual increases nor the 15% Rule will be determinative of unitary status. *Id.* at 18. To be clear, in combination they may also be insufficient. The Court required implementation plans, i.e. action plans, to be developed for each major component of the USP, including § V. Therefore, the Court considers the status of the strategies contained in the ALE Action Plan. *Id.* at 17.

**a-1.   District-Wide ALEs**

The Court starts with the "not less than" 15% Rule. "How the participation rate proposed by Dr. Ford is determined is important. For each ALE, the percentage of African-American and Latino students enrolled Districtwide in the grades where the ALE is offered is multiplied by [75]% (if the [15]% rule of thumb is applied) to determine the percentage of students of each race that need to be enrolled in order to meet the [15]% standard. The percentage of students of each race who are actually enrolled in the specified ALE is then compared to the District goal. For example, assume that 60% of Latino students are enrolled district-wide in the grade levels in which a specific ALE is offered. [Seventy-five] percent of 60% is [45]%. If the total number of students enrolled were 1,000, the District goal for enrollment of Latino students would be [450]. If more than [450] Latinos were actually enrolled, the District would have met its goal." (2016-17 SMAR (Doc. 2096) at 23.) In other words, there should not be less than 45% Latino students enrolled in the specified ALE.

The Special Master's application of the 15% Rule in his SMAR is nearly identical to the Court's review in 2017, which was as follows:

> In summary, there are 15 ALE programs if you categorized them by grade-level. For African American students, the 15% goal is met in three programs: 1) Resource GATE (high school), 2) Pre-AP Advanced (K-8, grades 6-8), and 3) Pre AP Honors (middle school). The "not less than" 15% goal was met for Latino students in 12 programs, as follows: 1-2) Resource GATE in middle school (6-8) and high school programs, 3) AP high school courses, 4-5) Pre-AP Advanced ALEs in elementary (K-8, grades 6-8) and middle schools, 6-8) Pre-AP Honors ALEs in elementary, middle, and high schools, 9) Dual Credit classes offered in high schools, 10) the IB high school program, and the 11-12) Middle School Credit for High School for elementary (K-8, grades 6-8) and middle school. According to the Special Master, if you allow for approximately a 1% margin, you sweep in two more ALE programs for African American students and one more ALE program for Latino students.

(Order (Doc. 2084) at 8 (citing (R&R ALE (Doc. 2041) at 10-11)), *compare* (2016-17 SMAR (Doc. 2096) at 28-29).

In other words, all ALE's are red-flagged as problematic for African-American students <u>except</u> for Resource GATE in high schools (grades 9-10), Pre-AP Advanced in middle schools, and Pre-AP Honors in middle schools and K-8 (grades 6-8). For African-

American students, the vast majority of ALEs are red-flagged. (2016-17 SMAR, Ex. 5: V-A (Doc. 2096-5) at 8-10.) For Latino students, there are only four ALE programs red-flagged as having access issues: Self-contained GATE in elementary and middle schools, Resource GATE in high schools, and AP in high schools. *Id.*

According to the Mendoza Plaintiffs, sheer increases in numbers of students enrolling in ALEs have minimal evidentiary value in the face of data that reflects a participation gap which has remained constant or has actually increased slightly over the life of the USP.

In SY 2011-12, 37.4% of all White students enrolled in grades 6-12 were in ALEs (other than GATE which was separately reported) while 24.4% of Latino and 20.5% of African-American students enrolled in these grades were in ALEs. The percentages were roughly the same for participation rates in AP courses in 11th and 12th grade. (Mendoza Objection (First) to R&R (Doc. 2069) at 4.)

By 2015-16, the overall percentage participation rates in grades 6-12 ALEs were 43% for Whites (an increase of 5.6%) compared to 29% for Latinos (an increase of 4.6%) and 24% for African Americans (an increase of 3.5%). AP participation rates were: 47% (an increase of 9.6%) for Whites as compared to 26% for Latinos (an increase of 1.6%) and 25% (an increase of 4.5%) for African Americans. *Id.* 4-5.

The Mendoza Plaintiff point out that the gap widened from 2011-12 and 2015-16. In 2011-12 there was a 13% difference between White and Latino students and a 17.15% between White and African-American students. In 2015-16, the gap between White and Latino students widened to 14% and 19%, respectively. The numbers are similar for GATE. From SY 2011-12 to SY 2015-16, the percentage of White students enrolled in GATE increased from 12.4% to 13.3% or by 0.9% while the numbers for Latino students saw a small decrease from 6.4% to 6.3%, and numbers for African-American students increased from 4.4% to 5%. (Mendoza Objection (First) to R&R (Doc. 2069) at 4-5.)

The Mendoza Plaintiffs argue "that there can be no meaningful discussion of "goals" – be they 15%, 20%, or some other number, or be they based on program or at

each individual school – until the Special Master (and the District) address the overarching question relating to equal access – that is, why the District's ALE efforts not only are more successful with its white students but are increasingly successful with those students even as TUSD operates under a mandate to increase the relative participation of the Latino and African American students in ALEs in the District." *Id.* at 5.

The Court reaffirms its earlier determination that unitary status cannot be based solely on statistical increases in participation, pursuant to the "not less than" 15% Rule. The Court turns to the District's elementary GATE programs, which were red-flagged by the "not less than" 15% Rule for both African-American and Latino students. The Court finds this to be especially problematic because the GATE elementary school programs, Self-contained or Pull-out, are the entry-level, gateway, ALEs for most TUSD students.

### a-2. GATE Programs: Elementary Schools and K-8 (grades 1-8)

Self-contained GATE programs provide instruction for elementary students grades 1-8 in all core academic subjects from a GATE endorsed teacher for approximately 90 minutes per week. (ALE Action Plan (Doc. 1645-2) at 17, 43.) Itinerant Pull-out GATE provides instruction in grades 1-5 of approximately <u>one</u> 90 minute GATE class per week. *Id.* at 17, 44.[23] All elementary schools offer Pull-out programs. In Pull-out GATE programs itinerant teachers provide instruction for GATE identified students for an hour and a half outside of their mainstream classroom. Self-contained GATE programs are the most advantageous for students, but are only offered in a few elementary schools, with most students having to travel to attend Self-contained GATE programs. Free transportation is provided for Self-contained GATE programs to students who do not reside within the school's boundary. (2016-17 SMAR (Doc. 2096) at 32.)

---

[23] *But see* (ALE Supplement Action Plan (1788) at 13 n.5) (describing Pull-out GATE as available for K-5, but Self-contained GATE available for grades 1-5.)

The Special Master reports that the GATE programs require cognitive testing, which is a bar to participation. TUSD has addressed this access issue by expanding testing to increase the pool of students who might qualify for GATE and could be encouraged to participate. In SY 2015-16, TUSD began whole-testing where it tests almost all first and fifth graders, with the number of African-American students testing for GATE (District students in grades K-6) increasing from 435 in 2014-15 to 917 in 2015-16, an increase of 482 (110.8%). The number of Latino students testing for GATE (District students in grades K-6) increased from 3045 in 2014-15 to 6343 in 2015-16, an increase of 3298 (108.3%). *Id.* at 33, (2016-17 SMAR, Ex. 5: V-A (2096-5) at 17.)

The Special Master reports that there was a significant 57% increase in enrollment of African American students and a 41% increase in the number of Latino students in Self-contained GATE. (2016-17 SMAR (Doc. 2096) at 30.) Nevertheless, Self-contained GATE remains red flagged for both African-American and Latino students by the "not less than" 15% Rule. *Id.* at 33. African-American students made up 5.13% of Self-contained GATE students, grades 1-5, in 2016-17, which was less than 15% of African-American students' enrollment district-wide for these grades (which was 8.08%). Latino students made up 42.31% of Self-contained GATE students, grades 1-5, in 2016-17, which was less than 15% of Latino students' enrollment districtwide in these grades, (which was 52.20%). Both instances violated the "not less than" 15% Rule. (2016-17 SMAR, Ex. 5: V-A (Doc. 2096-5) at 6-7.)

In summary, there were dramatic increases in the number of students tested, with decreased numbers of students qualifying overall for enrollment and increased enrollment by African-American students but decreased enrollment by Latino students, as follows: Qualified Students (2014-15: White 314, A-A 51, Latino 419), (2015-16: White 309, A-A 40, Latino 380), (2016-17: White 304, A-A 48, Latino 359), (2017-18: White 241, AA 39, Latino 258); GATE Enrollment (2014-15: White 232, A-A 26, Latino 302), (2015-16: White 244, A-A 31, Latino 284), 2016-17: White 227, A-A 33, Latino 281), (2017-18: White 185, A-A 30, Latino 203). In short, the number of qualified African-American

students decreased from 51 to 40 to 48 to 39, but African-American GATE enrollment increased from 26 to 31 to 33 to 30. In short, the number of qualified Latino students decreased from 419 to 380 to 359 to 258 and GATE enrollment decreased from 302 to 284 to 281 to 203. (Revised ALE USP RAC (2092-1) at 12: Participation Rates table.)

The District reports that of students who qualify for GATE services, those eligible to enroll do enroll in GATE in similar proportions. In other words,

> White, African American and Hispanic/Latino students choose to participate in GATE at the same or similar rates. In SY 2017-2018, 77% of White students, 77% of African American students, and 79% of Latino students who qualified for GATE services chose to participate in those GATE services. Prior years also had similar participation percentages. Moreover, if the students who choose out of District options are removed from the calculation, approximately 90% or more African American and Latino students who qualified for GATE services participate in GATE services.

*Id.* at 11. The Court notes that this evidence is contrary to the assertion of a "known-unknown" factor that causes eligible minority students to disproportionately decline enrollment in programs, at least for the GATE ALE program.

Of the District's 48 elementary schools, five have Self-contained GATE programs. Of fifteen K-8 schools, two have Self-contained GATE programs. Of 11 middle schools, three have Self-contained GATE programs. In total, there are 10 Self-contained GATE programs, with two being dual language programs. (2016-17 SMAR (Doc. 2096) at 32, Ex. 5: V-A (Doc. 2096-5) at 2-5); (Revised ALE USP RAC (Doc. 2092-1) at 17-19) (reflecting seven elementary schools (Kellond (INT), Lineweaver (INT), Tully (INT), Wheeler (INT), White (RC), Hollinger K-8 (RC), Roberts-Naylor K-8[24]), and three middle schools (Doolen, Pistor (RC), and Vail), with dual language Self-contained GATE programs at Hollinger K-8 (RC), and Pistor Middle School (RC)). (Revised ALE USP RAC (Doc. 2092-1) at 17-19); (Mendoza Response, Ex. 1 (Doc. 2101-1) at 2-3).

Of the seven Self-contained GATE programs in the elementary schools only two are in Racially Concentrated schools, White Elementary School (RC) and Hollinger K-8

---

[24] In 2010, Roberts Elementary School merged with Naylor Middle School to create Roberts-Naylor K-8 School.

(RC), with Hollinger being dual language. Of the three located in middle schools, Doolen, Pistor (RC), and Vail (INT), only one, Pistor, is in a Racially Concentrated school, and it also is a dual language Self-contained GATE program. (Revised ALE USP RAC (Doc. 2092-1) at 17-20); (Mendoza Response, Ex. 1 (Doc. 2101-1) at 3).

This is important because the dual language Self-contained GATE programs place "a practical limit on African American and Anglo student enrollment because success in these programs in grades three and beyond it is affected by the student's ability to speak Spanish." (2016-17 SMAR (Doc. 2096) at 32.) The Fisher Plaintiffs complain that African-American students are forced to leave a school that does not have an English track—which is the case in regard to these Self-contained GATE programs. The Revised ALE USP RAC reflects that 25% of GATE qualified African-American students left the District in SY 2016-17. (Revised ALE USP RAC (Doc. 2092-1) at 90.) Spanish-speaking students compete with non-Spanish speaking African-American, Anglo, and Latino students for these limited Self-contained GATE programs. For example, the dual language Self-contained GATE programs reduced Self-contained GATE programs at Racially Concentrated Schools for non-Spanish Speaking students to one elementary school and zero middle schools.

To offset the preclusive impact of the GATE testing requirements, the District added Cluster GATE and Open GATE programs. Cluster GATE programs allow students who have not tested into a Pull-out GATE program to attend it, nevertheless.[25] GATE students in Cluster programs are "clustered" together in a classroom with non-GATE, mainstream students, and an endorsed gifted teacher is assigned to a classroom at each grade level, grades 1-5, to provide instruction in all core areas using gifted strategies. Open GATE programs are Self-contained GATE programs without the testing requirement.[26]

_____

[25] Teachers know which GATE students have tested in and which have not.

[26] Teachers do NOT know the students' test scores.

In 2016-17, TUSD added three Cluster GATE programs at Fruchthendler, Dunham and Robins (RC) elementary schools. The first two are majority White schools, Robins (RC) is Racially Concentrated. In its Order (Doc. 2084), issued October 24, 2017, the Court reviewed the Cluster GATE programs in the District, which according to the Special Master were much reduced in comparison to the 14 Cluster GATE programs offered in 2013-14. The Special Master sought an Order from the Court, which was granted, that the District open Cluster GATE programs to at least the level existing in SY 2013-14 and place them strategically at schools serving minority students, and especially target them at schools serving substantial numbers of African-American students. (Order (Doc. 2084) at 11.)

Currently, the District reports nine "sc"[27] Cluster GATE programs at: elementary schools Blenman (INT), Cavett (RC), Dunham, Fruchthendler, Grijalva (RC), Maldanado (RC), Myers/Ganoung (INT), and Wright, and K-8 Drachman Montessori (INT) Magnet. (2016-17 SMAR, Ex. 5: V-A (Doc. 2096-5) at 2-5); (Mendoza Response, Ex. 1 (Doc. 2101-1) at 2-3), *but see* (Reply (Doc. 2015) at 10 (citing 2016-17 DAR reporting planning for five additional Cluster GATE programs in 2017-18 at Cavett (RC), Grijalva, Maldonado (RC), Myers/Ganoung (INT) and Wright). The Court notes that the changes in the Cluster GATE programs since this Court's directive last year included removing Robins K-8 (RC), the only Racially Concentrated school of the three programs created last year, *id.* at 4.

The Special Master reports that the open GATE program at Tully (INT) Elementary School has been a great success, including student improvement in state test scores, and this year the District intends to add an open-access GATE program at Roberts-Naylor so that the students in the Tully (INT) open-access program may continue through a GATE pipeline to Roberts-Naylor K-8 School, and so the Roberts-Naylor program could become a magnet program. (2016-17 SMAR (Doc. 2096) at 35), *but see* (Order (Doc. 2084) at 10 (discussing plan in 2017 to operate open GATE at Roberts-

---

[27] The Court does not know the meaning of "sc."

Naylor)). The open GATE program at Tully (INT) is a "modified" GATE Self-contained model, where gifted-endorsed teachers provide gifted instruction to all students in regular classrooms. (2016-17 SMAR, Ex. 5: V-A (Doc. 2096-5) at 19.)

The Tully Open Gate program has led the Special Master to recommend that unitary status should be awarded for Self-contained and Pull-out GATEs, if TUSD lowers the eligibility cut scores for ALEs. (2016-17 SMAR (Doc. 2096) at 35.) And, if the District increases "the number of cluster GATE programs to at least 10 by the beginning of the 2019-2020 school year." *Id.* Based on a prior recommendation by the Special Master, this Court already ordered Cluster GATE programs increased to 14.

All the parties object to lowering eligibility cut scores. The Fisher Plaintiffs "are strongly opposed to increased enrollment of African-American student enrollment by lowering standards." (Fisher Response (Doc. 2100) at 4.) The Fisher Plaintiffs argue that standards would not need to be lowered at all, if the District simply enrolled all qualified students who pass the GATE test. The Fisher Plaintiffs ask the District to apply the same enrollment policies to gifted programs that it applies to remedial programs, which would be automatic assignment to a remedial or gifted program without requiring parental permission. *Id.*

According to the Mendoza Plaintiffs, the Special Master is recommending a 10 point change for an increase of 82 eligible students. The Mendoza Plaintiffs believe the increase will be either 61 or 67 students, and they do not believe the Special Master has identified the racial breakdown of these additional students. (Mendoza Response (Doc. 2101) at 30.) In other words, changing cut scores is an "all boats float" approach, and the Mendoza Plaintiffs call first for more targeted approaches aimed at specifically increasing African-American and Latino participation in GATE ALEs. The Mendoza Plaintiffs argue that a more targeted approach is especially important because the number of students who qualified for GATE services, using the assessments the District currently has in place, dropped dramatically between 2015-16 and 2016-17. *See* (Revised ALE USP RAC (Doc. 2092-1) at 12, 95-96: Table 5.7) (summarizing dramatic increases in

number of students tested; decreased numbers of qualified African-American students but increased African-American enrollment and decreased numbers of qualified and enrolled Latino students).

According to the Mendoza Plaintiffs the drop in eligibility is greater than the number of potential GATE participants that would be accounted for by a 10 point reduction in the eligibility score. The District agrees. (Revised ALE USP RAC) (Doc. 2092-1) at 28.)

Given the Parties' objections, the Court does not adopt this recommendation. A better more cost-effective strategy might be Plaintiff Fishers' recommendation to simply enroll all qualified students like it does for remedial classes. The Special Master correctly notes that students cannot be enrolled in classes over parental objections, but opt-out provisions can be utilized to address such objections. (Reply (Third) (Doc. 2115) at 17.) This would directly address the "known-unknown" factor which the Special Master highlights as the number one impediment to the District's successful implementation of § V of the USP. In fact, "this would almost certainly increase the number of African American and Latino students enrolled in ALEs." *Id.* However, such a policy might have significant implications, such as "substantial effects on the allocation of resources." *Id.* As recommended by the Special Master, the District shall consider whether this is a practicable strategy for increasing enrollment numbers for African-American and Latino students in ALE's that require test scores for eligibility. *Id.* at 18.

### a-3.    AACs and GATE Resource: Middle Schools, K-8 (grades 6-8) and High Schools

In middle schools, K-8 (6-8 grades), and in high schools, TUSD offers GATE Resource for grades 9-10 and Advanced Academic Courses (AACs): Pre-AP Advanced or Honors (Pre-AP), AP Advanced or Honors (AP) for grades 11-12, International Baccalaureate (IB), and Middle School class for High School Credit (MS-HS), High School class for College Credit (HS-CC).

Resource GATE: In grades 6-12, students receive either core or enrichment classes.[28] GATE identified students get priority placement and others are eligible based on AIMS scores, grades, teacher recommendation, and/or parent or student requests. (ALE Action Plan (Doc. 1645-2) at 18.) [29]

Pre-AP: These programs are designed as more rigorous studies to prepare students for AP or IB classes, (2016-17 DAR (Doc. 2057-1) at 195), and are seen as "a pipeline for eventually taking AP classes in high school," (Revised ALE USP RAC (Doc. 2092-1) at 60: Pre-AP Honors (language arts, social studies, and science) or Pre-AP Advanced (accelerated mathematics)), *but see* (2016-17 SMAR (Doc. 2096) at 37) (Special Master reports that students who take Pre-AP courses are only modestly more likely to take AP courses, there is no correlation to achieving grade of three or higher on AP exam, and Pre-AP courses do not "map"[30] on AP curriculum or exam and are not intended to prepare students to succeed in AP classes).

AP: Advanced Placement classes are College Board approved, college level, classes that use a standard curriculum and students may receive college credit by taking and passing a national exam at the end of the year.

IB: International Baccalaureate is a K-12 international program for students who aspire to be rigorous learners as part of a global community. The IB high school curriculum program provides either individual IB courses or an entire IB Diploma Programme. Students enrolled in IB courses or the IB Diploma Programme may earn college credits. Both require students to take and pass an end-of-year exam. The IB Programme, a standardized college-preparatory course of study, is offered at Cholla High

---

[28] *But see* (Supplement ALE Plan (1788) at 13 n.5) (describing Resource GATE in high school for grades 9-10 and AP courses for grades 11-12).

[29] The Court does not know if the open access philosophy for AACs applies to Resource GATE.

[30] The Court does not have an understanding of the meaning of "map" but assumes that as used here it means there is a programmatic disconnect between Pre-Ap and AP courses.

School (RC), Safford K-8 (RC), and Robison ES (RC). (2016-17 DAR (Doc. 2057-1) at 195.)

Dual Credit: Students simultaneously earn credit in middle school for high school (MS-HS), and in high school earn college credit (HS-CC).

AACs in the middle school and high school grades are intended to be an open access program, with no eligibility prerequisites except for content requirements.[31] This was not the case when the USP was adopted; then, the middle school and high school AACs had different and varied identification policies for eligibility ranging from course grades, state-standardized scores, benchmark testing, teacher recommendations, and/or allowed placement pursuant to student or parent requests. (ALE Action Plan (Doc. 1645-2) at 20.)

According to the District, ALE access is equitable. "Most" K-8 schools, grades 6-8 provide access to multiple ALEs, including Pre-AP classes and all provide GATE services," with two schools having only one GATE service and "one is Racially Concentrated and one is not." (Revised ALE USP RAC (Doc. 2092-1) at 18-19.) The District's report is similar in regard to its middle schools, concluding: "[i]ndeed, all middle schools offer at least three types of ALEs, with no schools standing out as having fewer [ALEs] than all other schools." *Id.* at 15.

As the Court reads the data reported by the District, it sees fifteen K-8 schools, grades 6-8, with seven Resource GATE programs out of a total of fifteen schools. Five K-8 schools have robust ALE programs: Booth-Fickett, Hollinger (RC), Roberts-Naylor, Roskruge (RC), and Safford (RC), with Safford being a pipeline for the IB program at Cholla High School (RC). Six K-8 schools, grades 6-8, have one ALE: Dietz, Drachman (INT), Lawrence, Morgan Maxwell (RC), and Rose (RC). Borman has no ALE programs. McCorkle (RC) and Pueblo Gardens (RC) have two ALE programs, with one being a Dual Language program. Miles has a Resource GATE program and a Dual Credit (MS-

---

[31] The Court does not know whether this open access philosophy applies to GATE Resource programs.

HS) program; Robins (RC) has the same. (Revised ALE USP RAC (Doc. 2092-1) at 19), (Mendoza Response, Ex. 1 (Doc. 2101-1) at 3).

There are 10 middle schools. Of these, Utterback and Valencia are Racially Concentrated schools. All have Resource GATE programs, except Magee, and all have Dual Credit (MS-HS) programs, except Secrist. All have a Pre-AP Honors program, except Dodge (INT). All have a Pre-AP Advanced program. *Id.* at 20. Three even have Self-contained GATE programs: Doolen, Pistor (RC) and Vail (INT), with Pistor (RC) being a Dual Language ALE. (Revised ALE USP RAC (Doc. 2092-1) at 20); (Mendoza Response, Ex. 1 (Doc. 2101-1) at 3).

There are nine high schools, excepting University High School (UHS). All have Resource GATE, except Catalina (INT), and all have Pre-AP Honors programs. Six high schools have a Dual Credit (HS-CC) program: Catalina (INT), Cholla (RC), Pueblo (RC), Rincon (INT), Santa Rita, and Tucson High (RC).[32] Three do not: Palo Verde (INT), Sabino, and Sahuaro. Pueblo High School (RC) offers a dual language program. Cholla High School (RC) offers the IB program. (Revised ALE USP RAC (Doc. 2092-1) at 20); *Id.* at 4.

The Mendoza Plaintiffs point out that Latino enrollment in AP classes dropped from 1633 in 2016-17 to 1494 in 2017-18, African-American enrollment in AP classes dropped from 192 in 2016-17 to 178 in 2017-18, and White enrollment in AP classes rose from 1182 in 2016-17 to 1190 in 2017-18. By the Mendoza Plaintiffs' calculations, Latino enrollment in AP courses declined by 8.5% while total Latino high school enrollment declined by only 1.3%, but White student enrollment in AP high school courses increased notwithstanding a drop of 3% in total white high school enrollment. (Mendoza Response (Doc. 2101) at 34) (citing 2016-17 SMAR (2096-5) at 9), *compare*

---

[32] The ALE Action Plan "require[ed] all District high schools to actively advertise and recruit for Duel-Credit courses." (ALE Action Plan (Doc. 1645-2) at 22.) Assumedly, all high schools should offer Duel Credit (HS-CC), *but see* (Revised ALE USP RAC) (Doc. 2092-1) at 20 (reflects no Dual Credit program at: Palo Verde (INT), Sabino, Sahuaro).

(R&R ALE, Addendum Table II (Doc. 2041-1) at 8); (Mendoza Response, Ex. 11 (2101-2) at 2.)

### a-4.   ALE Action Plan: Effectiveness of Planned Strategies.

The Court turns to the District's ALE Action Plan, which tracked three broad areas of concern addressed in the USP, as follows: 1) Student Identification and Recruitment, 2) Increase Student Enrollment, and 3) Student Support Strategies for Successful ALE Completion. (ALE Action Plan (Doc. 1645-2) at 11.) The ALE Action Plan and ALE Supplement Action Plan (Doc. 1788) identified strategies to address each of these areas of concern for GATE programs, AAC programs, and UHS. The Court finds significant duplication between recruitment strategies identified in the ALE Action Plan, Subsection III, Student Identification and Recruitment, and Subsection IV, Increase Student Enrollment. There is also conceptual overlap with USP § V.E, Student Engagement and Support, and USP § II.I, Outreach and Recruitment, which are not limited to ALEs but are aimed, generally, at increasing access, participation and student achievement for minority students in all USP programs. As it did in respect to the Magnet Plan provisions of the USP, the Court retains jurisdiction over USP § II.I to the extent relevant to the ALE Program. As the Special Master noted, "key elements" of the USP are now in place and "there is more coherence in the extent to which these elements reinforce one another." (Reply (Third) (2115) at 19.) The Court sees no reason to duplicate recommendations and correspondingly balloon the record for these cohesive USP provisions. As directed in the Magnet Program section of this Order, the District shall prepare a comprehensive Outreach and Recruitment Addendum covering both the Magnet Program and ALE Program.

Going forward the Court asks the parties and the Special Master to eliminate duplication as much as possible. Therefore, instead of following the format of the ALE Action Plan, the Court discusses strategies designed to increase African-American and Latino access and participation in ALEs as follows: 1) Student Identification: Access and

Availability; 2) Increase Student Enrollment: Recruitment, and 3) Student Support and Engagement.

Student identification strategies increase access and are aimed at increasing program availability by increasing the number and strategic placement of ALE programs and increasing the number of eligible African-American and Latino, including ELL, students, who are qualified to participate in ALEs. Strategies to increase student enrollment include recruitment strategies to increase actual participation in ALEs, such as recruitment through marketing, peer-to-peer and family outreach programs, teacher and school counselor outreach programs, and the creation of environments of academic excellence. Support strategies, include student engagement strategies set out in USP § V.E.1.b, promoting socially and culturally relevant curriculum and improving student achievement by providing academic and behavioral support necessary for African-American and Latino students who enroll in ALEs to successfully complete the courses, including passing requisite tests, and strategies aimed at retaining these students in ALE programs, in school, and until graduation.

The Mendoza Plaintiffs object to an award of unitary status because the District allegedly failed to implement several strategies set out in the ALE Action Plan, the ALE Supplement Action Plan, and Orders of this Court. The Special Master, thereafter, called for a response from the District, and reconsidered his Reply, First and Second, and filed a Third Reply relevant to the Plaintiffs' charges. The need for this additional briefing highlights the problem of navigating the record, which stretches over three years of voluminous annual reports. The problem is compounded by reliance on the Special Master's recommendations in lieu of the record. In other words, the record may well exist to support unitary status but it is buried like a truffle waiting to be rutted out by the Court. *See Dunkel*, 927 F.2d at 956 ("Judges are not like pigs, hunting for truffles buried in briefs.")

Based on the record presented to the Court, it is impossible to determine which strategies planned by the District to increase access and success in ALEs are effective and

which the District intends to maintain going forward with the ALE Program. The ALE Action Plan called for the District to "[c]reate [an] ALE Policy Manual outlining policies for student participation and retention in TUSD's ALEs." (ALE Action Plan (Doc. 1645-2) at 25.)[33] The Court adopts the ALE Policy Manual as the vehicle by which the District shall provide a record sufficient for determining unitary status. This Order shall guide the District in codifying effective strategies as ALE policy in the ALE Policy Manual.

### 1. Student Identification: Access and Availability

GATE Programs: Elementary Schools and K-8, grades 1-8

In 2013, when the District prepared the ALE Plan, it recommended an increase in GATE funding for K-8 schools. *Id.* at 14. There is no evidence of any direct ALE funding increases for either programs or staffing. In his SMAR, the Special Master recommends an ALE completion plan that includes: "Teachers shall be trained to offer GATE programs and, if necessary, the District shall provide appropriate incentives." (2096 at 35.) The Court has already issued this mandate: "The District should create an incentive program that will draw teachers to become GATE certified." (Order (2084) at 18.) The Court so ordered this in response to the District's assertion last year that it did not have a sufficient number of teachers who are GATE certified. Now, it is time for the District to appraise the effectiveness of the incentive program, revise it up or down and estimate, based on its cost, whether it is effective for addressing the need for certified GATE teachers.

The Mendoza Plaintiffs note that one of the main reasons given for not sending qualified students to Self-contained GATE programs is transportation. (Mendoza Response (Doc. 2101) at 30 (Revised ALE USP RAC) (Doc. 2092-1) at 92) (describing 2017 meeting between GATE and Transportation departments to discuss increasing alternative routes to reduce travel time, without success, due to budget constraints). The

---

[33] The Mendoza Plaintiffs question whether the District complied with the recommendation in the ALE Action Plan to create an ALE Policy Manual. The Special Master replies that it was created, is posted and will be distributed. (Reply (Third) (Doc. 2115) at 13.)  A copy has not been provided to the Court, but the Court assumes it will have to be amended to satisfy the directives of this Order.

Mendoza Plaintiffs are correct that there is no evidence this budget issue was resolved in 2017-18. According to the Revised ALE USP RAC, representatives of the TUSD GATE and Transportation departments met to discuss increasing alternative routes to reduce travel time to GATE sites but "[b]udget constraints prevented significant transportation changes." *Id.*

To the extent the transportation issue is, as asserted by the Special Master, aimed at the availability of certified teachers to teach particular high school courses, especially Algebra 1, the Court finds no objection from the Plaintiffs, and the Court has none, to the District's strategy of bussing middle school students to the nearest high school to take courses for dual (MS-HS) credit. (Reply (Third) (Doc. 2115) at 4.) The District reports it provides transportation for 8th grade students in K-8 schools to take Algebra 1 as follows: Pueblo Gardens (RC) to Utterback Middle School (RC); Dietz and Roberts-Naylor to Palo Verde High School (INT), and McCorkle (RC), Rose (RC) and Hollinger (RC) to Pueblo High School (RC). "There are approximately 40-50 participating students in SY 2016-2017." (Reply (Third) (Doc. 2015) at 3.) In the ALE Policy Manual, the District shall determine whether this is a practicable strategy for providing the Dual Credit program, especially Algebra 1, to African-American and Latino, including ELL, students. With robust marketing, will transportation costs constrain this strategy? Is there an ELL component available? What is the requisite annual cost required to implement this strategy?

To prove budgetary constraints, the District must demonstrate there is no practicable means to address budgetary issues, including transportation, in SY 2018-19 or going forward. (Mendoza Response (Doc. 2101) at 30-31.) The ALE Policy Manual shall account for budgetary constraints, including staffing and transportation, as a factor in determining the practicability of adopting a strategy as a policy.

The Mendoza Plaintiffs raise several challenges involving the expansion of GATE programs. Specifically, the Mendoza Plaintiffs question whether the District has explored the possibility of expanding existing Self-contained GATE programs and/or adding Self-

contained GATE programs on the east side of Tucson. (ALE Supplement Action Plan (Doc. 1788) at 20.) The Mendoza Plaintiffs question whether the District has studied the possibility of implementing kindergarten Push-In Itinerant Services to expand GATE services to provide all kindergarten students with thirty minute weekly lessons from a gifted endorsed teacher stressing critical thinking, creative thinking, and problem-solving skills. Has the District studied the possibility of implementing primary Push-In Itinerant Services to provide services to all students in first grade except those in self-contained GATE with a forty-five minute weekly lesson from a gifted endorsed teacher who is stressing critical thinking, creative thinking, and problem-solving skills? (ALE Action Plan (Doc. 1645-2) at 26.)

In 2013, there were five elementary Self-contained GATE programs. (ALE Action Plan (Doc. 1645-2) at 17.) Now, there are seven, with the addition of White Elementary School (RC) and Roberts-Naylor K-8. (Revised ALE USP RAC) (Doc. 2092-1) at 17-19.) There were, and there are now, three middle school Self-contained GATE programs, with only one being located in a Racially Concentrated school, Pistor (RC), which is the Dual Language ALE and, therefore, not available to non-Spanish speaking students. (ALE Action Plan (Doc. 1645-2) at 17; (Revised ALE USP RAC) (Doc. 2092-1) at 20.) In 2013, like now, the District offered the dual language Self-contained GATE programs at Hollinger K-8 School (RC) and Pistor Middle School (RC). (ALE Action Plan (Doc. 1645-2) at 17; (Revised ALE USP RAC) (Doc. 2092-1) at 86.) As it does now, it offered Itinerant Pull-out GATE programs in all elementary and K-8 schools for 1st through 5th grades. (ALE Action Plan (Doc. 1645-2) at 17; (Revised ALE USP RAC) (Doc. 2092-1) at 17-19).

In 2016-17, the District re-established a Self-contained GATE program at Tully Elementary School (INT) as an Open GATE program[34] and added a Self-contained GATE program at Wheeler Elementary School (INT). The District added Pre-GATE

---

[34] The Court understands the Tully (INT) program to be a modified Self-contained Open GATE program, meaning that the Self-contained GATE program at Tully in grades 1-3 is open to all students in these grades without testing.

kindergarten, and 1st through 3rd grade Self-contained GATE programs at both schools. (2016-17 SMAR, Ex. 5: V-A (Doc. 2096-5) at 19.) It added a pre-GATE kindergarten and a Self-contained 2nd grade GATE class at Roberts-Naylor K-8.[35] (Reply (Doc. 2115) at 10 (citing 2116-17 DAR)). Roberts Naylor K-8 is centrally located and Wheeler Elementary School (INT) is on the east side. (Reply (Doc. 2115) at 9.) The District has more recently expanded one class at Lineweaver Elementary School (INT), but due "to student or classroom capacity no other self-contained site could expand or was it necessary to expand services." *Id.* at 10 (quoting TUSD Response to Request for Information (RFI)).

The District reports that as a result of these 2016-17 additions, it was able to offer placement through a lottery system to students wait-listed for Self-contained GATE programs. *Id.* at 10. Prior to the Lineweaver (INT) addition, students on wait-lists for Self-contained GATE at Kellond (INT) and Lineweaver (INT) were offered placement at the newly added Roberts-Naylor or Wheeler (INT) Self-contained GATE programs. *Id.* at 8. It seems disingenuous to report that there is no need for further expansion of Self-contained GATE programs when students are wait-listed for the program.

In SY 2015-16, for the first time, the District offered whole-class itinerant GATE services for kindergarten and primary grades at targeted schools with high populations of underrepresented students: Holladay (INT), Carrillo, White, Hollinger (RC), Pueblo Gardens (RC), and Grijalva. *Id.* at 14 (citing 2015-16 DAR). In SY 2016-17, the District expanded the whole-class itinerant GATE program for kindergarten and primary grades at targeted schools, as follows: Roberts-Naylor and Maldonado (RC), Mission View (RC), and Wheeler (INT) elementary schools). (2016-17 DAR (2057-1) at 179), *but see* (Reply (Doc. 2115) at 14-15 (citing 2015-16 DAR, 2016-17 DAR)) (reporting itinerant teachers as providing such whole-class instruction at most elementary sites).

---

[35] The Pre-GATE kindergarten pilot program at Roberts-Naylor K-8 School resulted in 14 kindergarten students, including eight Latino students, attending and successfully completing it and being promoted to the Self-Contained GATE program at Roberts-Naylor. (2016-17 DAR (2057-1) at 178.)

An itinerant GATE teacher, assigned to a school, provides weekly 45-minute critical thinking and reasoning lessons using gifted strategies in the regular education kindergarten classroom to all the children, with the purpose being twofold: 1) to provide early exposure to gifted instructional strategies and 2) to potentially increase the number of students tested for GATE. *Id.*

In SY 2015-16, "push in (whole grade) lessons were provided in kindergarten and first grade classrooms at their assigned schools as schedules permitted. The number of lessons each classroom received increased in SY 2016-17 and as schedules permit the number will increase in SY 2016-17 and as schedules permit the number will increase in SY 2017-18 . . . ." (Reply (Doc. 2115) at 14 (citing TUSD Response to RFI)).

In 2016-17, the District reports implementing an ELL Whole Grade Push-In program at Mission View Elementary School (RC), as a pilot program to increase participation of ELL students in GATE programs, because this school has a large ELL population. Mission View was also assigned a GATE itinerant teacher to provide weekly 45-minute critical-thinking and reasoning lessons using gifted strategies in all regular education classrooms at Mission View (RC). (2016-17 DAR (2057-1) at 178-179.)

As part of the Mission View Elementary School pilot, the GATE department developed and implemented a classroom observation rubric, Differentiated Observation Classroom Screener, (DOCS48), for observational screeners to use to identify students who might benefit from receiving additional GATE services in a Pull-out or Self-contained GATE program. The goal was to develop an observational scale to identify underrepresented students who qualify for gifted services. The GATE DOCS identified eight additional Latino students, including four ELL students, and the department invited them to participate in the GATE Pull-out program at Mission View (RC). These students will be monitored throughout their participation in the GATE program. (2016-17 DAR (Doc. 2057-1) at 178-79.) The Mendoza Plaintiffs ask whether this pilot might be expanded to other schools. The answer is assumedly yes because the District also plans for a dual language pre-GATE kindergarten at Hollinger K-8 School (RC) in 2017-18,

with testing already identifying 59 students, including four African-American students and 35 Latino students. All four African-American students and 27 Latino students were offered placement for SY 2017-18. (2016-17 DAR (2057-1) at 178).[36]

Accordingly, the record reflects that since 2013, the District has increased access to GATE programs by adding Self-contained GATE programs at two new schools, White Elementary School and Roberts-Naylor K-8, and re-instating the Tully (INT) program as an Open Self-contained GATE. The District has made expansions to the Self-Contained GATE programs at Roberts-Naylor K-8, and Wheeler (INT), Tully (INT), and Lineweaver elementary schools (INT). This increased access has enabled the District to accommodate ALE eligible students who were previously on waiting lists. The District added a dual language Pre-GATE kindergarten at Hollinger K-8 (RC) in 2017-18. The Court does not know the extent of remaining wait-lists, if any, for Self-contained GATE programs, including the dual language Self-contained GATE programs.

The District reports recently adding "whole-class itinerant GATE services at Roberts-Naylor, Hollinger [(RC)], Maldonado [(RC)], Mission View [(RC)], and Wheeler elementary schools [(INT)] and the pilot ELL Whole Grade Push-In program at Mission View [(RC)] Elementary School." The Court assumes there is a distinction between whether the GATE experience is offered to one whole class or the whole grade at the school. The Court does not know, but assumes, these itinerant GATE services are in addition to the Pull-out GATE programs which already existed at "all the elementary schools." As noted, these programs were offered "as schedules permitted," which affords no basis for the Court to review the availability of this program beyond knowing of its

---

[36] It appears DOCS is the current multiple measure for determining GATE eligibility being considered by the District. The District has implemented as pilots and subsequently rejected as ineffective the following: the Discovery Intellectual Strengths and Capabilities While Observing Varied Ethnic Responses (Discover Pilot) and the Naglieri Non-Verbal Abilities Test (NNAT Pilot). (Reply (Doc. 2115) at 5-8.) The ALE Action Plan required the District to undertake these pilot studies. It is time for the District to determine whether or not to use, and if so to identify, multiple eligibility measures, including the use of nontraditional student qualifying criteria and/or non-cognitive measures, in addition to verbal and non-verbal cognitive assessments.

existence. The record does not reflect the significance of a "whole grade" versus "whole-class" program and sometimes refers to Push-in GATE programs. The Court assumes the whole-class itinerant GATE services are in fact the Push-in GATE programs being taught by itinerant GATE teachers, who are the teachers responsible for Pull-out GATE instruction. "As schedules permitted and will permit in the future" offers little insight into the extent of actual increased services provided by these programs.

The District did not expand the Cluster GATE programs to 14. Instead, the District has reduced the 12 Cluster GATE programs to nine, with 8 at its elementary schools and with its two K-8 Cluster GATE schools cut to one. (ALE Action Plan (Doc. 1645-2) at 18), *compare* (Revised ALE USP RAC (2092-1) at 17-19.)

The nine Cluster GATE programs, like the Tully Open GATE program and the five "whole-class/grade itinerant Push-in GATE services, are GATE programs that expand access by allowing participation without any eligibility limitation. Of these approximately 15 expanded access programs, about seven are located in Racially Concentrated schools. There are 23 Racially Concentrated elementary schools, including K-8 schools. The Court notes that schools are Racially Concentrated by Latino student populations, not African-American students. There is no evidence that targeting Racially Concentrated schools is an effective strategy for targeting African-American students, and the Court notes that African-American students are extremely underrepresented in ALEs, with almost all ALE programs red-flagged under the 15% Rule for African-American students.

AACs and Resource GATE: Middle Schools, K-8 (grades 6-8)

In 2013, when the District prepared the ALE Action Plan, it recommended that Resource GATE programs be at every middle and K-8 schools in grades 6-8, and high schools. (ALE Action Plan (Doc. 1645-2) at 26.) Resource GATE programs are at all middle schools, except for Magee Middle School, (Revised ALE USP RAC) (Doc. 2092-1) at 20), but only about half (seven out of fifteen) of the K-8 schools, grades 6-8, have Resource GATE programs. *Id.* at 19-20, *see also* (Mendoza Objection (First) to R&R,

Addendum (Doc. 2069-1) at 3 (citing (ALE Action Plan (Doc. 1645-2) (recommending an enrichment (resource) GATE class at every middle, especially K-8 schools)). Resource GATE programs are offered at all the high schools, except Catalina High School (INT). *Id.* at 20, *but see* (2016-17 SMAR (Doc. 2096) at 36) (reporting District intends to expand to all high schools a Resource GATE elective experience).

The Mendoza Plaintiffs assert that the District is not providing Resource GATE at every middle and K-8 school as recommended in the ALE Action Plan. The District reports that in 2015-16, it "assisted Safford Middle[37] School [(RC)] to establish a GATE resource class with current staff." (Reply (Doc. 2115) at 15 (citing 2015-16 DAR)). The Court notes however that the 2016-17 Revised ALE USP RAC reflects there is no Resource GATE offered at Safford (RC). The District reports that it provides a co-teaching Resource GATE at Roskruge Bilingual K-8 Magnet School and at McCorkle K-8 (RC). *Id.* at 15. As for the other K-8 schools, the District "provided pull-out services once a week with instruction by an itinerant GATE teacher," as follows: Morgan Maxwell (RC), Pueblo Gardens (RC), Borman, Rose (RC), Dietz, Drachman (INT), and Lawrence. *Id.* at 15-16 (citing 2015-16 DAR, 2016-17 DAR). In response to the Mendoza Plaintiffs' challenge, the District replies that in 2018-19, "several smaller K-8s will transition to resource rather than pull-out based on the availability of GATE-certified teachers and school scheduling." *Id.* Subsequently, the Court does not know how many K-8 schools will be without Resource GATE programs and whether the "one 90 minute class" per week "pull-out" GATE format, as understood by this Court in the context of GATE services for grades 1-5, compares to an effective Resource GATE program, for middle school, and ninth and tenth grade, students.

In 2013, when the District prepared the ALE Plan, it recommended increasing AACs offered at middle schools with few or no AACs, especially at K-8 schools grades 6-8, with Algebra 1 being added at all middle schools for dual high school credit, and eliminating entrance requirements for any Pre-AP and AP classes in middle schools or

---

[37] Safford (RC) is a K-8 School.

high schools. (ALE Action Plan (Doc. 1645-2) at 14, 20, 28-29.) The District recommended increasing the number of AAC offerings by opening all AAC classes to any interested student at both the middle and high schools, equalizing access to technology[38] at middle and high schools, increasing the number of teachers highly-qualified to teach math by providing incentives and recruitment, offering Advanced classes in language arts and math in all 6-8 grades, providing Algebra 1 for all qualified 8th graders, expanding the number of AP courses in its high schools level by focusing on those that are high-interest to African-American and Latino students, including ELL students.

Until challenged by the Mendoza Plaintiffs, neither the District nor the Special Master reported on the status of the above strategies planned three years ago to increase access to AACs at middle schools for African-American and Latino, including ELL, students. As noted above, only about five of the fifteen K-8 schools, grades 6-8, have what the Court considers robust AAC programs. Six of the K-8 schools only have one AAC program. Of the fifteen K-8 schools, grades 6-8, only nine offer Dual Credit (MS-HS) courses, with four of these same schools also having the Pre-AP Advanced AAC. (ALE Action Plan (Doc. 1645-2) at 28.)

The Special Master recommends that every middle school should have at least two pre-AP courses, Honors and Advanced, with at least one being available in SY 2018-19. (2016-17 SMAR (Doc. 2096) at 39). According to the middle school evidence reported by the District, all middle schools, except Dodge Middle School (INT), offer the two programs; Dodge Middle School (INT) only offers the Pre-AP Advanced program. (Revised ALE USP RAC) (Doc. 2092-1) at 19-20), *but see* (2016-17 SMAR (Doc. 2096) at 36) (reporting that four schools with middle grades do not offer either of the two pre-AP options). The Special Master's recommendation may be referring to the middle-school grades at the K-8 schools, which only offer both programs at four out of 15

---

[38] The parties and the Special Master present their concerns regarding equal access to technology under USP § IX. The Court does the same.

schools (Revised ALE USP RAC) (Doc. 2092-1) at 20.) The Court notes that the value of this access is limited unless the District ensures that these Pre-AP courses effectively function as pipelines for AP programs, including UHS.

Both Plaintiffs and the Special Master note problems with Pre-AP course effectiveness. The Special Master asserts there is no evidence that existing Pre-AP classes serve as a pipeline to enrollment and successful completion of AP and other rigorous high school classes and whether and to what extent the Pre-AP classes need to be redesigned to accomplish this stated goal. As the Fisher Plaintiffs articulately explain, it is not enough to just increase the number of Pre-AP courses. "For this to be effective, the criteria and curriculum for these classes need to be aligned with the College Board," and 8th grade and earlier grade standards must be aligned to ensure successful transitions from Pre-AP courses to AP courses. (Mendoza Response (Doc. 2100) at 4-5.) Both Plaintiffs ask the District to redesign these courses and/or offer additional student support, inclusive but not limited to tutoring, to ensure students successfully transition from Pre-AP to AP programs. The Mendoza Plaintiffs ask the District to compare the AP success rate for students taking Pre-AP courses versus those transitioning to AP courses from Self-contained GATE programs. (Mendoza Response (Doc. 2101) at 33) (identifying Magee Middle School as offering Pre-AP programs for comparison with Vail Middle School (INT) offering Self-contained GATE). Given the critical need for Pre-AP courses to be effective pipelines to AP courses, including the AP curriculum offered at UHS, the Court grants the Plaintiffs' request.

The Special Master recommends that the District increase participation of middle grade students in ALEs and ensure that all students have access to at least one dual credit (MS-HS) course. (2016-17 SMAR (Doc. 2096) at 38) (complaining that MS-HS is only offered in six middle schools and four of them only offer one such course; recommending all middle schools have at least one). A year ago, this Court adopted this recommendation and ordered the District to make the Dual Credit program universally available in all middle schools. (Order (Doc. 2084) at 18); (2016-17 SMAR (2096) at 39.) The Court will

not re-order that which it has already ordered to be done. The Court finds no fault with the District's strategy of offering the Dual Credit (MS-HS) program via transportation to District high schools for classes, especially for courses like the Algebra 1 course which the ALE Action Plan recommended providing for all qualified 8th graders. The District shall show good cause why a Dual Credit program (MS-HS) is not offered at: Borman, Dietz, Lawrence 3-8, McCorkle (RC), Morgan Maxwell (RC), Rose (RC), and Secrist. (Revised ALR USP RAC (Doc. 2092-1) at 19-20.)

The District has nine high schools, with only six having Dual Credit (HS-CC) courses. (Revised ALE USP RAC) (Doc. 2092-1) at 20.) All have AP Honors courses, but only seven have AP Advanced courses. *Id.* The Special Master reports that the District only offers 22 Dual Credit (HS-CC) courses, with 12 of them being offered at Santa Rita. He recommends expansion of this program, with priority being placed on schools servicing the largest populations of students eligible for free and reduced meals. The District agrees to so proceed. (2016-17 SMAR (Doc. 2096) at 44.)

In 2013, the ALE Plan recommended expanding AP courses at the high school level, "focusing on AP courses of high-interest to African-American and Latino students, including ELL students. Initially, all high schools will offer Spanish Lang & Culture, World History, English Language (first course), and Biology. Subsequently, all high schools will also offer Spanish Literature, English Literature (second course), Psychology, Human Geography, U.S. History and Studio Art." (ALE Action Plan (Doc. 1645-2) at 29.) Neither the District nor the Special Master provides the status of the expansion plan described above in the ALE Action Plan, but the Mendoza Plaintiffs complain that there are no Culturally Relevant Curriculum (CRC) AP courses. This subject is discussed in greater detail for UHS, where almost all core courses are AP. The Court's discussion there shall apply equally here.

The Special Master describes the major issue confronting the District as being the disparity in the proportion of African-American and Latino students enrolled in ALEs between high schools. So for example, Pueblo High (RC), with 90% African-American

and Latino students, and Tucson High (RC), with 78% minority students, have approximately 15% of their minority students enrolled in at least one AP course. He compares this to Sahuaro High and Sabino High, where minority students make up less than 50% of the student populations, but where 57% and 70%, respectively, of their minority students are enrolled in one or more AP courses. (2016-17 SMAR (Doc. 2096) at 41.) He describes African-American and Latino students' enrollment in AP classes as "particularly low" at Tucson High (RC), where it has declined each of the last three years. He also describes enrollment as "exceptionally low" at Catalina High (INT), where there are 741 students with only six AP classes available in 2016-17 and 2017-18. He compares Sabino High, with 196 more students, which has twice as many AP courses and five times as many sections. (2016-17 SMAR (Doc. 2096) at 42-43.)

The Special Master believes the greater availability of courses at Sabino may be why enrollment of African-American and Latino students there exceeds enrollment at Catalina (INT). He recognizes that Catalina (INT) also has more ELL students,[39] which affects both demand and opportunity with respect to AP courses, but that does not explain the disparity, "which at Catalina [(INT)] is unbelievable- with average class sizes being less than 10 in 2016-17" and "not a single AA or Latino at Catalina [(INT)] passed an AP exam." (2016-17 SMAR (Doc. 2096) at 42-43.)

The Special Master recommends that the District identify the reasons for low AP enrollment at Catalina (INT) and reasons why AP enrollment at Tucson High (RC) is on a steady decline and develop strategies to address these problems. (2016-17 SMAR (Doc. 2096) at 43.)

This is not the first time the Court has seen these examples of gross disparities. The Special Master included them, almost verbatim, in his R&R on the District's ALE Plan, filed with the Court on August 3, 2017. (R&R ALE (Doc. 2041) at 17, 19-20.) Then to address this issue, he recommended, as a high priority, the District should establish

---

[39] *See* (District Response (Doc. 2199) (identifying high ELL population as one reason why Catalina AP participation is low).

school cultures with "an ethos of achievement" or as the Court ordered, "the District should focus on developing school-wide cultures where academic excellence is valued and celebrated." (Order (Doc. 2084) at 18.) Then, he recommended that "[t]he situation at Catalina [(INT)] demanded immediate attention." (R&R ALE (Doc. 2041) at 25.) He noted that "Tucson High [(RC)], Rincon [(INT)], Pueblo [(RC)], and Palo Verde (INT) also stand out as schools with low AP participation." *Id.* He recommended, "[t]he District should develop plans to enhance enrollment in the five schools." *Id.*

On October 24, 2017, the Court adopted the Special Master's recommendations made then and ordered the District to immediately address the access problems at Catalina (INT), Santa Rita, and Cholla (RC) high schools. (Order (Doc. 2084) at 18.) Then, Catalina (INT) had six AP courses, Santa Rita had one, and Cholla (RC) had one, but it had the IB program. *Id.* at 13. The record reflects no action by the District to either add AP courses or to develop ethos of achievement at Catalina (INT) and Tucson High (RC). The access disparities between high schools, especially the conditions at Catalina High (INT) remain the same, and Tucson High (RC) continues to slide downward. There is no mention of Rincon (INT), Pueblo (RC), and Palo Verde (INT) high schools and no reason to assume any changed circumstances there. It remains for the District to develop plans to enhance enrollment at five high schools: Catalina (INT), Tucson High (RC), Rincon (INT), Pueblo (RC), and Palo Verde (INT).

From the 2016-17 SMAR, it appears that the Special Master now accepts Santa Rita's lack of an AP program in favor of a Dual Credit (HS-CC) program and Cholla's (RC) lack of an AP program in favor of the IB program. The Court accepts the latter but not the former change in the Special Master's position.

As noted by the Special Master last year in his R&R reviewing the ALE Plan, there is a "virtual absence of AP classes at Santa Rita," (R&R ALE (Doc. 2041) at 18), with only one studio art class offered and having a very low enrollment, . . . but in 2015-16, it offered nine AP classes." *Id.* at 19. Now, Santa Rita offers 12 Dual Credit courses. (2016-17 SMAR (Doc. 2096) at 44.) Dual credit courses guarantee credit at Arizona

colleges and universities including community colleges, with almost all students who take dual credit courses received passing grades in comparison to students taking AP or IB classes who must pass a more rigorous examination in order to receive college credit. Many TUSD students start their postsecondary education at community colleges. "The downside of these courses is that when students who have taken them seek admission at a college or university outside of the state of Arizona, they may be at a disadvantage as compared to students who take and succeed in traditional AP or IB courses;" therefore, Santa Rita students and families should be advised, accordingly. *Id.* The Court has already issued this directive: "the District should ensure that parents understand the difference between AP and dual-credit courses, especially the limited value of dual credit courses outside Arizona." (Order (Doc. 2084) at 18.) This advice does not remedy the lack of access to AP courses for students attending Santa Rita High School.

The Special Master reports that 9th and 10th grade students at Cholla High School (RC) have the opportunity to participate in the IB program. There is every reason to believe that the IB program, while it's per student costs are relatively high, is a successful initiative. Large proportions of Cholla (RC) students take at least one IB course, take the IB exam for that course and pass the exam at a level that will earn them college credit. (2016-17 SMAR (Doc. 2096) at 43.)

The IB experience has two strands: 1) a diploma program and 2) the opportunity to take IB courses that can result in college credit, similar to college credit that is received for AP courses. The diploma program is extremely rigorous and only a small number of students choose it, but over half of the 9th and 10th grade students at Cholla High School (RC) take an IB course. "It is generally thought that IB is more rigorous than AP. There is, however, a relatively high rate of success among Cholla [(RC)] students which may be, in part, because students are tutored by IB course teachers. This model might be explored for AP tutoring." (2016-17 SMAR (Doc. 2096) at 44.)

Over the last three years, the percentage of White and Latino students taking the IB courses increased by three percent; the percentage of African-American students

increased by seven percent. *Id.* at 43. Of students who took an IB course, 85% of 12th grade students also took an IB exam. *Id.* Of those who took the IB exam, 54% of students earned a score of four or higher while 84% earned a grade of three or higher and qualified for college credit at most four-year colleges. *Id*. According to the Special Master: "This is remarkable; during the spring 2017, 41% of non-UHS students earned a qualifying score of three or better (which is comparable to the score 3 on the IB exam)." *Id.* at 43-44.

In short, the IB program is very successful, with the downside being that Cholla High School (RC) only offers AP courses in four subjects not covered by IB courses. (R&R ALE (Doc. 2041) at 18.) However, students who take IB classes and receive a passing grade have at least as good a chance of receiving college credit as students who take an AP class. *Id.* at 20. There may be a further slight disadvantage to the IB program because, generally, there is a greater range of content in AP courses than exists in IB courses. *Id.* at 20. The Special Master recommends awarding unitary status for the IB program. The Court agrees that further judicial oversite of this successful program is unnecessary.

The Mendoza Plaintiffs agree, but "believe the District should be directed to further explore how effective marketing and public education of the successful IB program at Cholla (RC) might lead to greater enrollment of White students and a decrease in its level of racial concentration." (Mendoza Response (Doc. 2101) at 36.) The Court agrees, and so directs the District. If determined to be a practicable strategy for increasing integration, the District shall include it in the ALE provisions Outreach and Recruitment Addendum. Given the District's strong commitment to the IB Program, the Court's retention of jurisdiction over the Outreach and Recruitment provisions of the USP is sufficient to see this task through.

The Court recognizes that it is undisputed that the District has increased AP programs. It "received national recognition for the increase in the number of AP courses offered and students tested in 2013-14 and 2015-16, with the number of individual African-American and Latino students who enrolled in AP classes stabilizing at about

1700 students." (2016-17 SMAR (Doc. 2096) at 40.) "However, all of the increases in the number of classes offered are accounted for by increases in two high schools: UHS and Sahauro High School. In other schools, the aggregate number of courses actually declined." (R&R ALE (Doc. 2041) at 17.) UHS is a unique circumstance, but Sahauro High School offers the District a successful prototype AP program for developing ALE policies.

The District is not free to ignore an Order of the Court, and must show good cause and seek leave for non-compliance. The District has presented no such requests, but also has presented no evidence of compliance. The Court reaffirms its prior directives. The District shall show good cause why it has delayed addressing the access problems at Catalina (INT), Santa Rita, and Cholla (RC) high schools. The District shall identify reasons why these schools have disproportionately low participation in AP courses and why Tucson High School (RC) participation numbers continue to decline, and immediately develop strategies, including but not limited to adding AP programs and programs to create school-wide ethos of academic excellence, and implement these strategies at Catalina (INT), Santa Rita, Tucson High School (RC), Rincon (INT), and Pueblo (RC) high schools.

<u>University High School (UHS)</u>

"University High School is considered one of the best high schools in America. Admission to UHS is based primarily on performance on admission test (the CogAT) and grade point average above 3.0. It is also among the most racially and ethnically diverse 'exam schools,' especially if diversity is measured by the relative ratios of African American, Latino and White. In 2017-18, the racial composition of the UHS student body of 1122 students was: White-46%; African American-3.4%; Latino-35%; Native American-.20%; Asian Pacific Islander-10%; Multiracial 6%." (2016-17 SMAR (Doc. 2096) at 45.) "Another indication of diversity, is the fact that 56% of UHS enrollment in 2016-17 were eligible for free and reduced meals." *Id.* UHS is not, however, an Integrated high school, pursuant to the USP.

In comparison to UHS, Palo Verde High School (INT), which has almost the same number of students, 1139, has an AP enrollment of: White-23%; African American-19%, and Latino-48%. AP enrollment at Rincon High School (INT), with a total of 1054 students, has an AP enrollment of: White-20%; African American-14%, and Latino-59%. Both Palo Verde (INT) and Rincon (INT) high schools are Integrated schools. (Mendoza Response, Ex. 1 (Doc. 2101-1) at 4.)

Early on, in 2013-14, the Court ordered:

a change in admission criteria to allow students who fell slightly below the 50 point admission bar based on the test and grade point average to write short answer essays to demonstrate their qualifications. Between 2013-14 and 2016-17, Latino enrollment at UHS increased by 18% and African American enrollment by 20%." All of the gains for African American students (that resulted in a total enrollment of 37 students in all grades), occurred for African Americans in 2014-15. The number of Latino students has grown each year over the last four years, with the biggest annual growth having occurred in 2016-17.

(2016-17 SMAR (Doc. 2096) at 45.) "These increases in the number of African American and Latino students occurred while the total enrollment in UHS increased so the actual percentage of increase attributable to the change as compared to increased enrollment was .5% for African-American students and 3.8% for Latino students. (The proportion of white students at UHS declined slightly)." *Id.* at 45.

Most core academic courses at UHS are AP courses, with UHS enrolling 8.1% of TUSD's high school students and accounting for 25% of all the District's high school students enrolled in AP classes in 2017-18. *Id.* at 40. UHS students' AP scores are as follows: 94% of White students score 3 or higher on AP tests, and 85% of African American-students and 87% of Latino students score 3 or higher. The Mendoza Plaintiffs complain that there are no CRC AP courses at UHS, which is the strategy designed to address this type of achievement gap.

According to the Special Master, "UHS provides considerable academic support for all students who need it; a small percentage of students of all races withdraw from UHS for academic reasons." (2016-17 SMAR (2096) at 46.) "In general, African

American and Latino students are successful at UHS." *Id.*[40]  The Special Master reports that attrition rates for African American students went from 7% in 2013-14 to 3% in 2017-18. The attrition rates for Latino students increased from 4% to 7%. He reported a 4% retention rate for White students, which the Court assumes is the retention rate for 2017-18. Like other ALEs, The graduation rates for both African-American and Latino students at UHS are greater than the graduation rates for high school students district-wide. (2016-17 SMAR (2096) at 46.)

The Special Master recommends that the District inquire into "why the attrition rate for Latino students is twice the attrition rate for [W]hite and African American students." (2016-17 SMAR (Doc. 2096) at 48.) The Mendoza Plaintiffs ask that TUSD be required to develop and implement an action plan to increase Latino retention. (Mendoza Response (Doc. 2101) at 37.)  Given the findings below, the Court agrees that the District must inquire into why the attrition rate for Latino students is twice that of other students, develop, and implement strategies to decrease attrition and increase retention for Latino students, if practicable.

According to the Special Master, "*a significant number* of UHS students had not enrolled in the TUSD school before enrolling in UHS or live in communities outside the boundaries of TUSD. However, this does not affect the admission of African American or Latino students who have attended TUSD schools because all students who meet the admission requirements are accepted." (2016-17 SMAR (Doc. 2096) at 46) (emphasis added). According to the Special Master, "[t]he District has reviewed and revised the process and procedures used to select students for admission to UHS to ensure that multiple measures for admission are used and that all students have an equitable opportunity to enroll at University High School using all the criteria and input as directed by the Unitary Status Plan." *Id.*

---

[40] The Special Master has recommended that the District might use the very successful IB tutoring program, where tutoring is provided by IB course teachers, as a prototype to follow for the District. The Court assumes UHS has a similar tutoring program.

As described by the District, in 2014-15, it adjusted the distribution of admission points by increasing the number of points associated with qualifying test scores, reducing the value of the GPA so that fewer students had to participate in the short answer essay. (2016-17 SMAR, Ex. V-C (2096-9) at 1.) The District found the short-answer essay to be ineffective. *Id.* In 2014-15, the District began to phase out the short-answer essay and by 2015-16, it was replaced by "the ACT Engage," a non-cognitive measurement. *Id.,* Ex. V-C (2096-9) at 2. The Special Master recommends that a second essay answer[41] be used for borderline qualified students, with the Mendoza Plaintiffs asking that the essay answer only be applied to boost UHS in-District enrollment. (2016-17 SMAR (Doc. 2096) at 47.)

The District has considered cutoff score reductions but believes that the small number of African-American students this might benefit would be swallowed up by the additional number of White students. *Id.,* Ex. V-C (2096-9) at 2. The District also believes that lowering the GPA requirement from 3.0 to 2.9 or 2.8, would likely bring in students who would struggle with the rigorous and advanced UHS curriculum. The Court notes this assertion is contrary to the District's open enrollment philosophy adopted for all other ALE AP courses. Without knowing the number of White students being recruited from outside the District, the Court can only wonder whether the number of White students qualifying under any lower-cut score could be limited by applying it preferentially to only boost UHS's in-District enrollment. (2016-17 SMAR  (Doc. 2096) at 47.)

The Fisher Plaintiffs complain that in 2017-18, there were approximately 12 African-American students who passed the admissions test, but missed the GPA score by one-tenth of a percent and were not allowed to enroll while students from outside the District enrolled at UHS. (Fisher Response (Doc. 2100) at 5.) The Special Master replies that out-of-District students do not push out African-American students because "all TUSD students who qualify for UHS are offered placement." (Reply (Second) (Doc. 211)

---

[41] More accurately described as a reinstatement of the short-answer essay.

at 21.) But, the Fisher Plaintiffs describe UHS and Rincon (INT), where UHS students also take courses, as being over capacity with UHS out-of-District White students so as to potentially push in-District Rincon students out of their school. (Fisher Response (Doc. 2100) at 5.)

The Fisher Plaintiffs also complain that TUSD students must take the admissions test during their 7th grade year, while out of District students take it during their 8th grade year so their achievement level is one year advanced. (Fisher Response (Doc. 2100) at 5.) The Fisher Plaintiffs charge that TUSD students must enter UHS in their 9th grade year, but out of District students may enter at any grade level. *Id.* at 6. The Special Master replies that the Fisher Plaintiffs are referring to "a make-up test that is given in December for 8th grade students new to TUSD or non-TUSD students who did not live in the area[42] at the time of 7th grade testing." (Reply (Second) (Doc. 2111) at 21.) The Court recognizes that the USP § V.A.5.b requires the UHS admission test to be given to all students in the 7th grade, but just as there is no restriction from giving the make-up test to 8th graders, the District may offer in-District students with a 2.9 GPA a re-take test in the 8th grade or allow them to simply re-apply, if their GPA improves between 7th and 8th grade. In short, the UPS does not preclude this or any other preferential considerations for in-District students, especially if in-District enrollment would increase integration at UHS.

The Special Master reports on UHS targeted recruitment of African American students as follows: 1) it reached out to parents of African-American students with before-school coffee events aimed at soliciting their advice regarding strategies to recruit more African-American students for UHS; 2) it held an African-American family dinner attended by 70, 7th and 8th grade TUSD students and their parents, with current UHS African-American parents and students answering questions, dispelling myths, and encouraging student enrollment. UHS offers parental support from an African-American

---

[42] The Court assumes students living outside the area are students living outside of the Tucson metropolitan areas because any student may enroll in UHS without geographic limitation based on availability.

UHS alumni parent who also is a UHS staff member. (Reply (First) (Doc. 2096) at 46 (citing Ex. V-C (2096-9) at 2.)) There is no similar evidence referenced in the record regarding targeted recruitment for Latino students.

The Special Master makes no recommendations for increasing enrollment numbers, but the Mendoza Plaintiffs ask that the District be held accountable for ALE Action Plan goals of 7% enrollment for African-American students and 38.9% enrollment for Latino students. UHS enrollment is only 3.4% for African-American students and 35% for Latino students. (Mendoza Response (Doc. 2101) at 37.)

The Mendoza Plaintiffs ask that these goals be attained before unitary status is granted. The Court denies this request. The Court rejects the Mendoza Plaintiffs request to apply ALE enrollment goals to only in-District enrollment. African-American and/or Latino students recruited from out-side the District create the same diversity as in-District African-American and Latino students. Of concern to the Court is the number of White students recruited from outside the District, and here the record is silent. Given White student enrollment at UHS is double in-District norms, the Court suspects that "a significant number" of the UHS students being enrolled from outside TUSD may be White. If true, the Court finds that the District should consider the practicability of implementing in-District preferences for the more racially diverse in-District students, who are on the borderline of qualifying for enrollment at UHS.

The Mendoza Plaintiffs submit that before unitary status should be granted "UHS should be required to offer CRC courses (and/or work to develop a College Board approved AP course that fits within the USP definition of CRC." (Mendoza Response (Doc. 2101) at 2), *but see* (2016-2016 SMAR (Doc. 2096) at 46 (reporting there is currently one CRC AP course, AP World History, listed as leading toward 24 college majors including African American-Studies and Ethnic studies)). As a starting point, the ALE Policy Manual should accurately identify the status of CRC AP course development and/or implementation at UHS, and include a plan for a CRC AP program at UHS as a policy matter. They ask that the District determine there are no pipeline issues impeding

enrollment at UHS. The District's assessment regarding the effectiveness of the Pre-AP program to prepare students for the AP program may answer this question in part.

The Special Master focuses his concern on the "number of students who are eligible for admission to UHS, [who] chose not to enroll." *Id.* 47. He describes a "*sizable pool* of potential African American and Latino students whose enrollment in UHS would increase its diversity." *Id.* at 47 (emphasis added). He recommends that the District "[d]ocument that all students who do not accept an enrollment invitation have been contacted for additional recruitment purposes as well as to provide rationale for enrollment refusal." (2016-17 SMAR (Doc. 2096) at 48.) He believes "[o]ne reason for reluctance to do enrolling in UHS may be a concern on the part of families, if not the students themselves, that the rigor of the UHS curriculum would be too stressful," *id.,* at 47, which he refers to as: "a phenomenon called 'stereotype threat,'" *id.*n.22. He submits that "providing prospective eligible candidates an opportunity to experience what academic work at UHS involves and to learn that they will have support of UHS faculty and fellow students could encourage some students to enroll." *Id.* at 47. He recommends that the District "explore the usefulness of a summer program for seventh and eighth grade students who have qualified for admission to UHS that provides them with the opportunity to know what the level of academic demand is in UHS." *Id.* at 48.

Noting that the District has not attained the ALE goals it set for UHS, the Court grants the Mendoza request that it identify whether there are any pipeline issues impeding UHS enrollment, and if so address such issues in the ALE Policy Manual. The Court also orders the District to implement a CRC AP course at UHS and a summer program for seventh and eighth grade students who have qualified for admission to UHS or show good cause why these strategies are impracticable for addressing the phenomena of "stereotype threat." Likewise, the Court finds that the District must do more than document why each African-American and Latino student does not accept an enrollment invitation. The District shall develop a remedial strategy, if practicable, and likewise develop a remedial strategy for Latino attrition. The District shall identify recruitment

strategies for Latino students similar to those for African-American students, if it has determined these strategies are effective. The District shall develop in-District enrollment preferences, if determined to be practicable strategies for promoting integration at UHS. Recruitment strategies determined to be effective to increase enrollment shall be reflected in the ALE Policy Manual.

ELL students, Dual Language ALEs, not § V.C Dual Language Programs

The District reports "unique challenges" to its efforts to increase English Language Learners (ELL) student participation in ALE programs. First, there are "Arizona Department of Education (ADE) requirements for ELL students," which "at times [] has meant students are unable to participate in many ALE programs, including self-contained GATE (all-day program), GATE resource (during elective classes), and several AP or Honors ELA (sic) classes." (Revised ALE USP RAC (Doc. 2092-1) at 81 (citing 2016-17 DAR (2057-1) at 219-220)). "Another factor is that students classified as ELL lose that designation once they achieve English proficiency." *Id.* So, once an ELL student advances to ALE participation, he or she is no longer an ELL student. *Id.* Despite all these challenges, the District reports that from SY 2012-13 to 2016-17, ELL participation increased in three AACs, as follows: 1) Pre-AP Advanced programs (4 to 35), 2) Pre-AP Honors programs (10 to 115), and 3) AP programs (6 to 14) students. *Id.* at 81. ELL student participation in GATE programs increased from 2013-14 to 2016-17 in Self-contained GATE from 4 to 9, decreased in Pull-out GATE from 33 to 23, and increased in Resource GATE from 1 to 18. *Id.* at 88.

In addition to increasing ELL participation in ALEs, USP § V.A.3-4, the USP, § V.C, calls for the District to build and expand its Dual Language Program. Such programs "are positive and academically rigorous programs designed to contribute significantly to the academic achievement of all students who participate in them and which provide learning experiences comparable to the advanced learning experiences described above." *Id.*

Under the USP, there are two different dual language obligations. First, the District must offer dual language ALE programs to increase access to and participation in ALEs. Second, the District must expand the Dual Language programs, which offer dual language courses in K-12 grades to teach coursework in both Spanish and English to increase the number of academically bilingual students, thereby preparing them to compete in a global economy. (Revised ALE USP RAC (Doc. 2092-1) at 65), (2016-17 DAR (2057-1) at 195). The Court previously treated the two the same, (Order (Doc. 1771) at 4 (identifying the Dual Language Program as an ALE), but stands corrected. The two USP requirements are not the same but fit together, with the dual language ALE programs providing ALE opportunities to ELL students and students participating in the Dual Language programs.

The Court understands the former to be a gifted program, requiring cognitive testing, taught by certified gifted teachers for Spanish-speaking students, assumedly ELL students, students with an ELL history, or students enrolled in Dual Language programs. Whereas, the Dual Language programs require language proficiency and the courses are not taught by certified gifted teachers. *See* (Mendoza Response (Doc. 2101) at 21, 38) (describing additional effort needed to recruit teachers from Spain and/or Puerto Rico and proposing GYOP to address shortage of dual language teachers by focusing on bilingual paraprofessionals currently working in dual language program).

The USP stopped short of categorizing the Dual Language program as an ALE, and so does the Court. It finds this distinction is important. There is no evidence before the Court that Dual Language programs, K-12 grades, teaching coursework in both Spanish and English to increase the number of academically bilingual students, include critical thinking and reasoning lessons using gifted strategies. There is no suggestion that certified gifted teachers teach them. These bilingual courses are designed to contribute significantly to the academic achievement of all students who participate in them, but participation is not limited by cognitive or academic standards.

Based on the record presented here, the Court finds that the only dual language ALEs are the Self-contained GATE programs at Hollinger K-8 school (RC), grades 6-8, and Pistor Middle School (RC), which served 68 and 91 students, respectively, in SY 2014-15, and 74 and 83 students, respectively, in SY 2016-17. (Revised ALE USP RAC (Doc. 2092-1) at 86.) The Court does not know whether the Self-contained GATE programs at Hollinger (RC) and Pistor (RC) enrollment numbers are inclusive or exclusive of the ELL student participation numbers reported by the District, above. *See* (Revised ALE USP RAC (Doc. 2092-1) at 88) (referencing ELLs in GATE programs), (Revised ALE USP RAC) (Doc. 2092-1) at 81) (referencing ELLs in AACs), *but see* (Revised ALE USP RAC (Doc. 2092-1) at 82 (citing 2016-17 DAR (Doc. 2057-1) at 219-20) (asserting ELL students cannot participate in GATE, especially Self-contained GATE programs).

Possibly misled by the Court, the Special Master and the parties reviewed all dual language programs as ALEs and failed to make any recommendations or objections specific to the dual language ALEs being offered in the District. The District shall include plans and effective strategies, if any, for increasing dual language ALEs in the ALE Policy Manual, including how to offset the impact of dual language ALEs on access to ALEs for non-Spanish speaking African-American and Latino students.

## 2. Increase Student Enrollment: Recruitment

First, the USP Outreach and Recruitment provision requires the District, after review and revision, to have marketing and recruitment strategies "to provide information to African-American and Latino families and community members throughout the District about the educational options available to the District." (USP (Doc. 1713) § II.E.) ALE programs are educational options. As noted in the context of the Magnet Program, the Court retains jurisdiction over this section of the USP. Likewise, the USP ALE Program includes recruitment provisions, (USP (Doc. 1713) § V.A.2.d), which were accordingly reflected in the ALE Action Plan, (ALE Action Plan (Doc. 1645-2) at 19, 20, 23 (respectively for GATE, AAC, and UHS) and in the ALE Supplement Action Plan.

In 2013, the District recommended specific recruitment strategies for the various ALE programs. For example, the ALE Action Plan provides a GATE recruitment strategy of sending a postcard to all students in TUSD inviting them to take the GATE test. (ALE Action Plan (Doc. 1645-2) at 19.) For AACs, the ALE Action Plan recommended that the District provide professional development for designated staff regarding how to identify AAC students including issues of equity, cultural relevance, and the value of AAC programs, (ALE Action Plan (Doc. 1645-2) at 21), and recommended open-enrollment in AACs for middle schools and high schools, (ALE Action Plan (Doc. 1645-2) at 21).

Over the duration of the USP, the District intended to move towards an open access philosophy, *id.* at 21, by providing professional development to designated staff regarding identification of students for AACs and discussing the open access philosophy with AAC teachers to "ensure" that all teachers support it, and "require" middle and high schools to promote TUSD's commitment to open access for AACs. (ALE Action Plan (Doc. 1645-2) at 21-22.)

In 2017, in response to the ALE R&R, the Mendoza Plaintiffs reviewed the ALE Action Plan and questioned the status of various strategies contained in the ALE Action Plan, including the implementation of the open access policy. They reurge, now, this same status question. (Mendoza Response (Doc. 2101) at 35.)

The District reports "it meets with principals to inform them about the relevant provisions of the USP and the ALE plans." (Reply (Third) (Doc. 2015) at 12.) It also appears that the Director of ALE also meets with school counselors. *Id.* The Special Master believes that it is necessary to depend on the District's assertions that professional training for AAC teachers is, accordingly, being conducted at the schools.

The Court does not agree. At a minimum, the Director of ALE shall report the status of the open enrollment policy at the individual schools and report the specifics of any eligibility requirements, if any remain, except for content prerequisites. The Court cannot imagine that there are no tracking procedures in place in the District for mandatory training requirements for its teachers. The professional training at issue here

goes to the heart of overcoming bias and stereotypes by teachers. The District has direct responsibility for the professional development of its teachers. The Court agrees with the Mendoza Plaintiffs that the record does not reflect whether this professional development is being provided to AAC teachers. More importantly, the Court asks the District to report on whether the open enrollment philosophy has been implemented in all middle and high schools or if there remain some of the various identification requirements, such as a GPA standard or teacher recommendation, which existed at the inception of the USP. If the open access philosophy has not yet been fully embraced by middle and high schools, including principals, counselors, and teachers, the District shall identify an effective strategy for immediately implementing this essential USP goal to the greatest extent practicable in these schools.

Prior Orders of this Court have directed the District to implement family peer-to-peer recruitment strategies aimed to address the "known unknown" factor that leads to qualified students and their parents declining to participate in ALEs. (Order (Doc. 2084) at 6-7) (calling for peer-to-peer recruitment and developing school-wide cultures celebrating academic excellence, and directing District to address misconceptions perpetrated by school counselors and teachers). Here, the Court has ordered that the District compare AP enrollment at schools like Sabino and Sahuaro high schools with schools that have declining AP participation and develop strategies for turning the latter around. The ALE Policy Manual shall identify the strategies the District finds effective to comply with these directives.

Not yet addressed is the Mendoza Plaintiffs' argument that the District must develop programs that focus on creating school-wide cultures of excellence and that this strategy be "broadened" to expressly include the District's on-going USP undertakings relating to the development and implementation of multicultural curriculum and culturally responsive pedagogy creating a synergistic intertwinement between the ALE provisions of § V.A and the general student engagement and support provisions of the USP in § V.E. (Mendoza Response (2101) at 25, n.16). The Court understands the

Mendoza Plaintiffs to be asking for the application of this strategy, generally, to improve student achievement for all minority students and for the requisite corresponding professional development and training for administrators and certificated staff regarding strategies to create this ethos of excellence, similar to the training given for the CRC Program.

First, the Court notes that the Special Master described creating ethos of academic excellence at individual schools as a recruitment strategy to redress "stereotype threat" syndrome which causes minority students to decline participation in ALEs because they lack confidence in their own academic competence. On the other hand, culturally relevant pedagogy (CRP), multi-cultural or culturally relevant curriculum (CRC), are engagement and support strategies to increase academic success for African-American and Latino, including ELL, students across the board, including ALEs. To be clear, the Court ordered the District to develop ethos of academic excellence in the context of a recruitment strategy for ALEs, not to address the District's broader responsibility to develop and implement engagement and support strategies, including CRCs, aimed at improving academic achievement, generally, for minority students. The Court rejects the argument that unitary status in respect to the latter depends on a synergistic creation of environments of excellence.

The Court does acknowledge that creating ethos of excellence to increase participation in ALE programs will likewise improve student achievement, generally. Therefore, these efforts in respect to the ALE programs necessarily satisfy the District's more general obligation to develop and implement transformative engagement and support strategies that are "designed to change the educational expectations of and for African American and Latino students." (USP (Doc. 1713) § V.E.1.a.) The Court finds that effective strategies for creating environments of excellence to increase participation in ALEs shall be deemed effective strategies for improving academic achievement and educational outcomes, generally, for all African-American and Latino, including ELL, students.

The Court's retention of jurisdiction over USP §§ II.I and V.A.2.c-d, Outreach and Recruitment, is for the purpose of reconsidering unitary status upon the filing by the District of the 3-Year PIP: CMP and the ALE Policy Manual. The District shall prepare the Outreach and Recruitment Addendum reflecting effective strategies applicable universally to both the Magnet program and the ALE program, and unique to each. The 3-Year PIP: CMP and ALE Policy Manual shall refer, accordingly, to the Outreach and Recruitment Addendum where appropriate rather than duplicating information.

### 3. Student Support and Engagement

The Court begins by noting the importance of successful participation in ALE programs by African-American and Hispanic, including ELL, students. *See e.g.*, In addition to the clear benefit which comes from advanced academic achievement, the District reports overall graduation rates between ALE Seniors and all Seniors, respectively, as follows: Catalina 86%/71%; Cholla 96%/88%; Palo Verde 84%/78%; Pueblo 92%/87%; Rincon 96%/88%; Sabino 98%/95%; Sahuaro 99%/95%; Santa Rita 97%/82%, and Tucson High 94%/91%. (Revised ALE USP RAC (Doc. 2092-1) at 30.) Between African-American ALE Seniors and all Seniors, the graduation rate is, respectively, as follows: Catalina 100%/100%; Cholla 100%/94%; Palo Verde 91%/84%; Pueblo 100%/80%; Rincon 94%/91%; Sabino 86%/86%; Sahuaro 100%/94%; Santa Rita 100%/80%, and Tucson High 84%/86%. *Id.* Between Hispanic ALE Seniors and all Seniors, the graduation rate is, respectively, as follows: Catalina 86%/71%; Cholla 96%/88%; Palo Verde 84%/78%; Pueblo 92%/87%; Rincon 96%/88%; Sabino 98%/95%; Sahuaro 99%/95%; Santa Rita 97%/82%, and Tucson High 94%/91%. *Id.*

The USP ALE provisions, generally couched in terms of access issues, also require the ALE Action Plan to include strategies "to support African American and Latino students, including ELL students, in successfully completing ALEs," (USP (Doc. 1713) § A.2.c), and "to provide assistance for African American and Latino students, including ELL students, to stay in and to be successful at UHS, *id.* § V.A.5.d.

More broadly, the USP requires the District to improve academic achievement and

educational outcomes to close the achievement gap and eliminate racial and ethnic disparities, including access to ALEs, using transformative strategies that are designed to change the educational expectations of African-American and Latino students, improve student engagement in the academic curriculum, adopt culturally responsive teaching methods, and encourage and strengthen participation and success of African-American and Latino students, and provide necessary student support services that allow them to improve their educational outcomes. (USP (Doc. 1713) § V.E.) Culturally relevant teaching methods and curriculum are relevant to the extent they promote student engagement to improve student participation and success in ALEs.

The Mendoza Plaintiffs charge that the District has failed to use the student engagement CRC strategy in its AP program and at UHS. The Court agrees. The ALE Policy Manual shall include strategies for the ALE programs to use culturally relevant curriculum to promote student engagement to improve the academic success of African-American and Latino students enrolled in ALEs. Further discussion of the District's efforts to improve student engagement in the academic curriculum by adopting culturally responsive teaching methods, such as CRC, multi-cultural courses, is discussed later outside the context of the ALE program.

In the context of a recruitment strategy, the Court ordered the District to use the transformative strategy of creating ethos of excellence to change the educational expectations of African-American and Latino students to increase enrollment in ALEs. Synergistically, creating ethos of excellence is also an ALE engagement and support strategy. The same applies to family engagement strategies for recruitment, like peer-to-peer efforts to dispel the stereotype threat syndrome. There is a porous line between recruitment and support. For example, the District pays exam fees for low-income students as a support strategy under USP A.2.d.v., but this subsidy also serves to help the District recruit students who would otherwise be unable to participate in the program. The Court nevertheless rejects the Mendoza Plaintiffs' arguments of synergy to preclude a partial award of unitary status. As explained earlier in this Order, the interconnectivity

between the USP programs makes it awkward to grant unitary status in part, but not impossible. The problem is more a difficulty in structuring review than an impossibility to attain unitary status in one program and not in another.

The Special Master recommends that the District assess the effectiveness of the various engagement and support strategies being used and identify those that are most effective in order to cull out those that are less or not at all effective. The Court adopts this recommendation.

The Court has expressly directed the District to compare successful tutoring programs where course-teachers tutor students, which is the model being used in the IB program and at UHS, with what is being done or not done at other schools. The Special Master notes that tutoring is only being provided for AP, IB and UHS programs. (2016-17 SMAR (Doc. 2096) at 37.) Given the Court's directive that the District develop a GYOP for ALE students, the District shall consider the practicability of effective tutoring for elementary grade ALEs, and in relationship to the District's need to develop an effective pipeline for Pre-AP to AP programs. Above, the Court directed the District to compare high schools with high AP enrollment to schools with low enrollment to determine if different recruitment strategies make a difference. To the extent the answer is not recruitment, the District shall identify engagement and support strategies aimed at increasing AP participation at Cholla, Rincon, Palo Verde, Pueblo, and Tucson High School. The District shall include the effective strategies for engagement and support in the ALE Policy Manual.

To ensure equal access to ALEs, the District is expressly required "to increase access to academic preparation programs such as AVID." (USP (Doc. 1713) §V.A.2.d.v), *see also* § V.E.8 (requiring District to fund and sustain support services for Latino Student Achievement including AVID).

In 2013, when the District drafted the ALE Action Plan, the "highly-regarded college preparatory support program was in place at three high schools, Cholla, Pueblo, and Palo Verde, with feeder middle schools being Valencia, Secrist, and Booth-Fickett.

1  (ALE Action Plan (1645-2) at 31.) The ALE Action Plan recommended the District

2  create a plan that outlines how this expansion could take place over a multi-year period,

3  *id.* at 32.

4       The Special Master reports that the District has an incremental plan to increase

5  AVID programs, and notes that AVID is a costly program which requires buy-in from

6  teachers and administrators to be successful. (2016-17 SMAR (Doc. 2096) at 31.) The

7  District will add AVID at Wright Elementary School (RC) next year at a cost of $40,000

8  plus the costs for teacher training. He reports that Catalina (RC) already has an AVID

9  program within the school, which the District plans to expand school-wide with the goal

10 of having AVID strategies embedded at each grade level and in all content areas. The

11 anticipated cost of the Catalina AVID program is $185,000. (*Id*. at 32.) The Special

12 Master reports that the District's ultimate goal is to have the District be an AVID District.

13 (Reply (Second) (Doc. 2111) at 21.) The Special Master did not prepare a completion

14 plan for AVID and the Mendoza Plaintiffs did not object.[43]

15      The Special Master's Reply (Third) reflects recent conversations with the District

16 that reveal "the District has undertaken a strategy for building achievement oriented

17 school cultures that seek to enhance student interest as well as confidence in achieving at

18 high levels," including becoming an AVID District, "the development among students

19 and teachers of achievement mindsets, building student's persistence or 'grit,' culturally

20 responsive pedagogy, dealing with 'stereotype threat,' and expanding CRC." (Reply

21 (Second) (Doc. 2111) at 29.) According to the Special Master, the District agrees to

22 prepare a description of this work.

23

24 _____

25      [43] The Mendoza Plaintiffs reurged that the District and Special Master
   failed to "review[] the District's implementation of the Specified ALE access
26 support strategies set forth in the ALE Action Plan, the Supplement, and other
   plans or strategies proposed or agreed to by the District or ordered by the Court,"
27 as set out in the Addendum to their Objection to the ALE R&R. (Mendoza
   Response (Doc. 2101) at 25.) The Court has reviewed the Addendum, (Mendoza
28 Objection (First), Addendum (Doc. 2069-1) at 1-4) and finds no reference to
   AVID.

This work may or may not be satisfactory to show good cause for the District's failure to develop and/or implement strategies, like AVID, to address the low AP program participation at Catalina (INT), Santa Rita, Tucson High (RC), Rincon (INT), and Pueblo (RC) high schools or to develop and implement strategies to deal with "stereotype threat" syndrome, including creating ethos of excellence. It may assist in determining the practicability of implementing a summer program for seventh and eighth grade students who have qualified for admission to UHS to address the phenomena of "stereotype threat" and increase UHS enrollment. Likewise, this work may assist the District in identifying remedial strategies for the known unknown phenomena where qualified African-American and Latino students do not accept an enrollment invitation to UHS. The District plans for expanding CRC in its ALE program shall be included in the ALE Policy Manual.

**a-5.    Summary: ALE Policy Manual**

The ALE Policy Manual shall be based on the District's assessments of the effectiveness of the various ALE strategies contained in the ALE Plan, the ALE Supplement Action Plan, and strategies ordered by this Court. The ALE Policy Manual affords the District the opportunity to answer unanswered questions noted by the Court in this Order, such as: whether the Pre-AP program is an effective pipeline versus Self-contained GATE programs for AP programs; whether tutoring would improve the effectiveness of this pipeline; whether Dual Credit (MS-HS) programs are effective substitutes for middle school ACCs, including Pre-AP courses; whether Dual Credit (HS-CC) programs may entirely replace AP programs in a high school, and whether the most effective tutoring programs are teacher-based like the IB and UHS programs. For example, it should identify a practicable policy for strategically placing Self-contained GATE programs to serve the greatest number of African-American and Latino students, especially targeting African-American students for ALE services, and apply that policy to identify where and when this expansion will occur.

The Court does not intend the examples given in this summary section to be the

exclusive content in the ALE Policy Manual. The entirety of this ALE Order shall guide the District in drafting the ALE Policy Manual. The District should focus on strategies and policies that will create a cohesive ALE program, providing a structure for a GYOP for ALE students beginning in the elementary GATE programs, retaining them through middle school in GATE and Pre-AP programs and into high school AP programs, including UHS. The ALE Policy Manual should guide the District's ongoing operation of the ALE Program pursuant to chosen effective strategies. The District has identified various ALE strategies for access, recruitment, and support, and now it must determine whether these strategies were sufficiently effective and are fiscally sustainable to warrant permanency, including a determination that the District can meet staffing and transportation requirements. In short, the Policy Manual shall make programmatic and strategic choices addressing in sufficient detail the issues identified by the Court in this Order to guide the District in the future.

Last and importantly, the District should note that, for reasons explained later in this Order, it shall be held accountable for ensuring that the Evidence-Based Accountability System (EBAS) data shall be used to assess program effectiveness.

The ALE Policy Manual shall be filed with the Court and guide the District's future decisions related to ALE programs, including the Outreach and Recruitment Addendum. Filing of the ALE Policy Manual shall trigger this Court's reconsideration of the question of unitary status for the USP § § A and E, to the extent subsection E applies to ALEs, and retains jurisdiction over § III, Transportation, to the extent transportation is a necessary component of the ALE Program.

**b.      § V.C: Dual Language Programs**

The Court sees no evidence that the Dual Language programs at Bloom, Davis (INT), Grijalva (RC), Howell (INT), Hudlow (INT), Mission View (RC)) and White (RC) elementary schools Dual Language programs are ALEs. The Court finds the same for the Dual Language programs at K-8 schools, 6-8 grades, offered at McCorkle (RC), Pueblo Gardens (RC), and Roskruge and for the Dual Language program at Pueblo High

School (RC).[44] The District does not provide participation data for these programs.

Further supporting this Court's determination that the District's Dual Language program is not an ALE, the Special Master reports that the District has struggled between its obligations to increase the number of programs and the need to improve programs already in place, with current efforts focusing on Bloom and McCorkle (RC) schools. According to the Special Master, a nationally prominent consultant hired by the District in 2016-17 advised the District to start over. (2016-17 SMAR (Doc. 2096) at 58.)

The Special Master echoes the Mendoza Plaintiff's conclusion that the major obstacle to the Dual Language program is the lack of qualified dual language teachers. He reports that the District recently doubled the incentive stipend it was offering to teachers to become certified in addition to offering to pay for the expense of becoming certified, with about 50 teachers showing up for the information session but only three moving forward to become certified dual language teachers. (2016-17 SMAR (Doc. 2096) at 58; (Mendoza Response (Doc. 2101) at 38.) The Mendoza Plaintiffs recommend the District develop a GYOP program focused on bilingual paraprofessionals currently working for the District, who may already be involved with the dual language program, and recruit teachers from Spain and/or Puerto Rico. (Mendoza Response (Doc. 2101) at 38.) The Court notes that neither the Special Master nor the Mendoza Plaintiffs address any need for these teachers to be certified as gifted teachers.

The Special Master recommends that by the end of this school year, the District should do the following: 1) continue to advocate with the State to provide legislative alternatives that will allow ELL students to participate in dual language courses,[45] 2)

---

[44] The Court is aware that the dual language Self-contained GATE programs at Hollinger K-8 (RC) and Pistor MS (RC) feed into the dual language program at Pueblo High School (RC), but this does not establish that the high school or any dual language course offered there is an ALE.

[45] In 2000, Arizona adopted its English-only law stopping bilingual education programs in favor of 4hr-per-day English immersion programs. Currently, two bills are being considered by the Arizona State legislature to cut the immersion time in about half and allow ELL students to attend bilingual classes,

develop a comprehensive plan for expanding the Dual Language program laying out the obstacles and the costs for developing additional sites by the end of the current school year, 3) assess evaluations by principals at TWDL schools regarding the effectiveness of the TWDL program, and 4) assess the possibility of establishing a full K-8, no boundary dual language magnet program at Roskruge. (2016-17 SMAR (Doc. 2096) at 59.)

The Court adopts these recommendations and includes the Mendoza Plaintiffs' recommendation that the District assess the sufficiency of the incentive stipend to recruit certified dual language teachers, develop a GYOP focused on bilingual paraprofessionals develop, and determine whether it is a practicable strategy to recruit dual language teachers from Spain and/or Puerto Rico.

In summary, the Court concludes that the Dual Language programs, developed pursuant to USP § V.C, are not ALE programs but their expansion is, nevertheless, mandated by the USP. The Court will not ignore that these dual language courses do not promote integration. (2016-17 SMAR (Doc. 2096) at 32.) Especially, the Two Way Dual Language (TWDL) model, which was chosen by the District because research shows it to be the best for developing fluency in English and a second language, here Spanish, does not promote integration because students must speak reasonably good Spanish by the beginning of the third grade or have trouble catching up. *Id*. n. 15. Given the model, TWDL is "premised on successful and significant recruitment for first grade (and even at the kindergarten and pre-kindergarten levels)." (Mendoza Response (Doc. 2101) at 38.)

The Mendoza Plaintiffs take issue with the Special Master's portrayal of the Dual Language program as segregative because "they believe that just as the District has focused on promoting increased integration for its magnet schools at the entry level grades, the same approach can be adopted for dual language." (Mendoza Response (Doc. 2101) at 38.) The Mendoza Plaintiffs are correct that nothing prevents the District from creating a Dual Language magnet program to promote integration, which the Court notes

which is a more effective model for addressing achievement gap issues between English and non-English speaking students.

would necessarily ensure the academic integrity of such a program. And, as noted by the Mendoza Plaintiffs, African-American student enrollment grew in elementary (K-5) dual language programs from 1.80% in 2012-13 to 3.35% in 2016-17. (Revised ALE USP RAC (Doc. 2092-1) at 66.) Still, the 15% Rule would red-flag the Dual Language program for African-American students as segregative. While TWDL might have an integrative impact as a magnet program, as an ALE it is especially disconcerting in the context of limited ALE programs such as the Self-contained GATE. The Fisher Plaintiffs are correct that these dual language ALEs decrease the number of available ALE programs for them and other non-Spanish speaking students. The Court will review the District's plans for dual language ALE programs when it reviews the ALE Policy Manual.

The Court has no choice but to agree with the Special Master's recommendation to retain jurisdiction over USP § V.C, the Dual Language Programs. The Court has no information that would enable it to determine whether this program has been expanded since the inception of the USP. It has no information for: 1) how many students Dual Language programs serve; 2) how many ELL students there are in TUSD, 3) how many TUSD students there are where English is not spoken at home, or 4) how many TUSD students qualify for extra language services. There is no information regarding the projected need for this program that the District should strive to meet. In short, there is no information offered to the Court upon which it might assess unitary status.

The Court adopts the Special Master's recommendations for Dual Language programs, including that prior to receiving unitary status the District shall "[d]evelop a comprehensive plan for expanding dual language laying out the obstacles and the costs for developing additional sites. The Dual Language Action Plan shall be submitted to the plaintiffs and the Special Master by the end of the current school year." (2016-17 SMAR (Doc. 2096) at 59.) The Court orders it simultaneously filed with the Court, which shall trigger reconsideration of unitary status.

**c.     § V.D: Exceptional Education**

To guard against minority students being disproportionately assigned to Special/Exceptional Education (ExEd) programs, the USP required the District "to develop appropriate criteria for data gathering and reporting to enable it to conduct meaningful review of its referral, evaluation and placement policies and practices on an annual basis to ensure that African American and Latino students, including ELL students, are not being inappropriately referred, evaluated or placed in exceptional (special) education classes or programs." (USP (Doc. 1713) § V.D.)

The Special Master, after reviewing the data gathered by the District from 2016-18 and the process implemented by the District to safeguard against disproportionate and possibly discriminatory placement of minority students in the ExEP program, recommends granting unitary status, here. The Mendoza Plaintiffs object because: "the [Special Master's] discussion fails to address the referral, evaluation, and placement of ELL students." (Mendoza Response (Doc. 2101) at 45) (citing 2016-17 SMAR (Doc. 2096) at 53-54.) The Court disagrees. The District's referral, evaluation, and placement procedures for ExEd students apply equally to ELL students.

As summarized by the Special Master, the District has adopted a systematic process for reviewing referrals to special education, with referrals being examined by psychologists who determine whether the alleged symptoms of need warrant special education placement. Then there is further oversight because professional staff from the District's Central Office conduct a review for potential misplacements, and students are tracked to establish that they make progress in light of services being provided. Senior District staff conducts quarterly reviews of the placements, trends and relevancy of service being provided to each student. (2016-17 SMAR (Doc. 2096) at 54.) The Special Master reviewed the data gathered by the District from 2016 to 2018 for 16 categories of disability, paying particular attention to categories which studies have flagged as possible venues for discrimination, including emotional disability, mild intellectual disability and language impairment. He found nothing amiss. According to the Special Master, "[t]he assignment to these different categories of disability roughly mirror the proportion of

white, African American and Latino students in the larger school population." *Id.*

The Court has reviewed the 2015-16 DAR (Doc. 2057-1) at 238-242) and the 2016-17 DAR (Doc. 2075-5) at 30-36, and for the sake of brevity, incorporates the information contained therein, here. These reports clearly reflect the District's referral, evaluation and placement procedures that apply to all ExEd students, including ELL students. The Plaintiffs have had access to these reports and data which included ELL students, and the power of discovery. With all of this, the Mendoza Plaintiffs fail to point to any evidence to support the charge that ELL students may not be protected by the District's ExEd program. The Mendoza Plaintiffs' objection is disingenuous.

Early on the District began gathering and reviewing data so that by 2014-15, it was applying uniform reporting criteria and by 2015-16, it implemented a four-part plan: the Multi-Tiered Standards Support (MTSS). The District applies MTSS across the board to all students. The MTSS, designed to more accurately identify ExEd students, has the dual benefit of identifying non-ExEd behavioral issues. The District adopted an alternative to discipline for the general education population using a positive behavioral modification model. The District provides training and professional development not only to ExEd program staff, but to general-ed teachers with the goal of ensuring ExEd referrals and evaluations occur only when all other interventions have been unsuccessful.

In short, the District has exhibited a strong commitment to an ExEd program that safeguards against disproportionate and possibly discriminatory placement of minority students, including ELL students. There is no reason to believe the District will abandon this strong commitment for the ExEd program, which it designed to ensure African-American and Latino students, including ELL students, are not being inappropriately referred, evaluated or placed in exceptional (special) education classes or programs. The Court finds the District has attained unitary status for the USP § V.D.

**d.  § V.E: Student Engagement and Support**

The USP requires the District to implement strategies to improve academic achievement and educational outcomes to close the achievement gap and eliminate racial

and ethnic disparities for African-American and Latino students, including ELL students, as follows: 1) in academic achievement, 2) dropout and retention rates, 3) discipline, 4) access to ALEs and 5) any and all other areas where disparities and potential improvement may be identified. The District is required to use transformative strategies designed to change educational expectations of and for African-American and Latino students, to adopt culturally responsive teaching methods to improve African-American and Latino student engagement in the academic curriculum, thereby encouraging participation and improving the academic success of African-American and Latino students, and to provide African-American and Latino students with the necessary student support services that will allow them to improve their educational outcomes. (USP (Doc. 1713) at § V.E.a.)

To carry out these objectives the USP expressly requires the District to implement the following strategies: "(i) student support services that focus on academic intervention and dropout prevention; (ii) socially and culturally relevant curriculum, including courses of instruction centered on the experiences and perspectives of African-American and Latino communities; (iii) professional development and training for administrators and certificated staff to teach socially and culturally relevant curriculum and engage African-American and Latino students; (iv) establishment of support services for African-American and Latino students including college mentoring programs; and (v) support for parent and community participation to improve the educational outcomes of African American and Latino students." *Id.* § V.E.b.)

### d-1. Academic Intervention and Dropout Prevention

The Special Master and the Mendoza Plaintiffs agree that unitary status has been attained for graduation, dropout, retention and absenteeism for all students except ELL's, but the Mendoza Plaintiffs object to awarding unitary status in part.

The Special Master reports that the District's graduation rates are relatively high and would be envied by any other District serving such a diverse student body. "Dropout rates, and retention rates are exceptionally low. Absenteeism rates are reasonable."

(2016-17 SMAR (Doc. 2096) at 52.)

For example, the most recent available data indicates a national dropout rate of 6.5% and a dropout rate in Arizona of 4%, with a 2016-17 dropout rate for TUSD of 2.5%. Graduation rates in the District for all students is exemplary and rates of retention and absenteeism are low, with the District making modest and consistent progress since 2012-13 on each of these metrics. The one exception, graduation rates for African-American students improved in the last two years and now exceed state and national averages. "In 2016-17, African American students graduated at rates the same or higher than Whites students at UHS, Sahuaro, Rincon, Cholla, Palo Verde and Catalina high schools. In 2016-17, African-American graduation rates were higher or the same as graduation rates for Latino students at Sabino, Sahuaro, Cholla, Rincon, Pueblo and Catalina. Graduation rates for Latino students were the same or higher than White students at UHS, Sabino, Sahuaro, Cholla and Pueblo and Catalina. The overall graduation rates are the highest they have been since 2012-13. Between 2015-16 and 2016-17, the African American graduation rate increased by 7.5% and the Latino graduation rate increased by 4%." *Id.* at 52-53.

The Special Master reports that the parties have already met to identify a practicable graduation rate for ELL students. Both seek an Action Plan from the District for ELL students. The Court agrees that given the success achieved by the District in preventing dropouts and grade-retentions and in increasing graduation rates, unitary status hinges on the Action Plan developed for ELL students. The Court retains jurisdiction over USP § V.E.1.b.i. to the extent necessary to consider ELL students. The District shall file the Dropout, Retention and Absenteeism ELL Action Plan, which shall trigger the Court's reconsideration of unitary status for USP § V.E.1.b.i.

### d-2. Culturally Relevant Curriculum (CRC) and Professional Development and Training for CRC

The Court has already called for the District to include in the ALE Policy Manual the effective strategies it intends to use to implement CRC in the ALE program. The Court discusses the remainder of the CRC provisions, here. This includes the District's

implementation of culturally relevant pedagogy (CRP) and professional development and training. CRP requires teachers to be culturally responsive to students. The teacher creates cross-cultural or multicultural learning environments by interacting with students in a way that enables a student to personally relate course content to the student's own cultural context. In other words, the goal of the pedagogy is to make learning culturally relevant.

The Special Master initially recommended the Court grant unitary status for CRC, but subsequent to the Mendoza Plaintiffs' Response, he withdrew his recommendation and devised a Completion Plan requiring the District to establish two CR courses at Santa Rita High School, where now there are none, including one with an African American perspective even though the course enrollment will be lower than the minimum for elective courses. (Reply (Third) (Doc. 2111) at 25.) He "proposes an 'interim completion plan' be endorsed by the Court directing the parties to reevaluate the provisions of the Stipulation before its provisions are implemented." *Id.* at 26. The Court rejects this recommendation.

The Special Master refers to the Stipulation Re: Implementation of USP Section V.E.6.a.ii (Culturally Relevant (CR) Courses) (the Stipulated Action Plan).

By way of background, the USP provides:

> The District shall continue to develop and implement a multicultural curriculum for District courses which integrates racially and ethnically diverse perspectives and experiences. The multicultural curriculum shall provide students with a range of opportunities to conduct research and improve critical thinking and learning skills, create a positive and inclusive climate in classes and schools that builds respect and understanding among students from different racial and ethnic backgrounds, and promote and develop a sense of civic responsibility among all students. All courses shall be developed using the District's curricular review process and shall meet District and state standards for academic rigor. The courses shall be offered commencing in the 2013-2014 school year.

*Id.* at (6)(i).

> By the beginning of the 2013-2014 school year, the District shall develop and implement culturally relevant courses of instruction designed to reflect the history, experiences, and culture of African American and Mexican American communities. Such courses of instruction for core English and Social Studies credit shall be developed and offered at all feasible grade levels in all high schools across the District, subject to the District's

minimum enrollment guidelines. All courses shall be developed using the District's curricular review process and shall meet District and state standards for academic rigor. The core curriculum described in this section shall be offered commencing in the fall term of the 2013-2014 school year. The District shall pilot the expansion of courses designed to reflect the history, experiences, and culture of African American and Mexican American communities to sixth through eighth graders in the 2014-2015 school year, and shall explore similar expansions throughout the K-12 curriculum in the 2015-2016 school year.

*Id.* at (6)(ii).

As the Court understands these USP provisions, CRC modules are integrated into standard academic courses whereas CR courses are stand-alone core courses like English or Social Studies, with the subject instruction reflecting the history, experiences and culture of either African-American or Mexican-American communities. The purpose of having a multicultural curriculum is to create a positive and inclusive climate in classes and schools, build respect and understanding among students from different racial and ethnic backgrounds, and provide a range of opportunities to improve critical thinking and learning. The purpose of CR courses is to improve academic achievement; "'[t]his curriculum is critically important to provide opportunities that enhance student learning.'" (Stip. Action Plan (Doc. 1761) at 18 (citing Cabrera Report)).

The USP mandated CR courses to be developed and offered at all feasible grade levels in all high schools. The USP mandated a pilot program for expanding CR courses in the middle schools, 6-8[th] grades, and required the District to explore "similar expansions" throughout K-12 curriculum.

Subsequent to challenges of noncompliance from the Mendoza Plaintiffs to the District's CRC Action Plan, the two negotiated the Stipulated Action Plan, which was first an intervention "to ensure that by the start of the 2015 spring semester [SY 2014-15] at least one Culturally Relevant (CR) course" was being taught at five of the Districts high schools were no CR courses were available: Catalina, Palo Verde, Rincon, Sahuaro, and Santa Rita highs schools. (Stip. Action Plan (Doc. 1761) at 7, 17.) From there, it provided a very specific "short term solution," the 2015 Intervention Plan (SY 2015-16 Intervention Plan), *id.,* at 7, 17-38, "pending completion of a comprehensive curriculum

framework [to] include additional expansion of CR classes in high school and middle school, as well as the piloting of CR units at the elementary school level," *id.* at 7. The Stipulated Action Plan requires a comprehensive evaluation at the conclusion of SY 2015-16 to determine future development and modification to the plan. *Id.* at 23. The 2015-16 Comprehensive Plan is described as "a systemic approach to ensuring the implementation of CR courses as prescribed in the USP." *Id.* at 7. It is this last step that is in question.

As stipulated, the SY 2015-16 Intervention Plan, included in the Stipulated Action Plan, clearly identifies the CRC curriculum for TUSD's high schools as follows: 11-12th grades, English Language Arts (ELA) courses for African-American and Mexican-American Literature, 11th grade History courses from African-American and Mexican-American Viewpoints, and 12th grade Government from African-American and Mexican-American Perspectives. *Id.* at 24.

The middle school pilot program includes implementing in 2015-16, in all ten traditional middle schools, the following: 8th grade ELA with 1st semester for Mexican-American literature and 2nd semester for African-American literature, with three Social Studies classes infused with a minimum of one designated section for historical perspectives of African Americans and Mexican Americans. For 2016-17, the pilot for 6-8 grades continues to be implemented for all 11 K-8 schools, as follows: 8th grade ELA with 1st semester for Mexican-American literature and 2nd semester for African-American literature, with six Social Studies classes infused with a minimum of one designated section for historical perspectives of African Americans and Mexican Americans. *Id.* at 24-26. Annual expansion continues in 2017-18, whether or not unitary status is attained, with continued growth and expansion being ongoing. *Id.* at 26.

The District's elementary school pilot program commenced in 2015-16, with infusion modules reflecting experiences of Mexican Americans and African Americans for 5th grade ELA and Social Studies. *Id.* at 26-28. Annual expansion continues in 2017-18, whether or not unitary status is attained, with continued growth and expansion being

ongoing. *Id.*at 27.

The Special Master and the Mendoza Plaintiffs both criticize the District for its absolute and complete failure to implement, as planned, CR courses at Santa Rita High School. (Stip. Action Plan (Doc. 1761) at 23-24.) According to the Special Master, the Director of Culturally Relevant Pedagogy and Instruction (CRPI) met with Santa Rita staff and reported little interest in CRC. "The Director is working with the principal to identify capable CRC teachers at Santa Rita, which the Special Master believes 'should result in greater student interest.'" (2016-17 SMAR (Doc. 2096) at 59.) The Court finds that the Special Master's better response is found in his recommendation: "[t]he District should establish two CR courses at Santa Rita High School during the 2018-19 school year," including offering a course with an African-American perspective even though the course enrollment is lower than the minimum established for offering elective courses. (Reply (Doc. 2111) (Second) at 25.) The Court adopts this recommendation.

As for the lack of CR courses at UHS, the Special Master acknowledged the District is working with the College Board to develop at least one CRC AP course. *Id.* at 24. This issue is being addressed in the UHS section of the ALE Policy Manual.

To the extent the Mendoza Plaintiffs are complaining that the District has developed a number of courses, like "CR global issues" or "CR economics," that do not fit the definition of CR courses provided for in the USP, the Special Master reports that he did not consider them in reporting that substantial progress has been made towards implementing the USP CRC provisions. The Court understands the Special Master's attestation to be that he has only considered courses such as those identified in the 2015 Intervention Plan to the Stipulated Action Plan.

The Fisher Plaintiffs argue that African-American CR courses should be eliminated, with the curriculum instead integrated into multicultural classes. (Fisher Response (Doc. 2100) at 7.) Fisher Plaintiffs assert the pilot infusion modules foster inclusion and integration. *Id.* Generally, the Fisher Plaintiffs complain that the Court lacks an interest in the African-American focused curriculum compared to having great

concern for Latino focused CRCs. The Fisher Plaintiffs, however, do not now nor have they previously sought redress for any such disparity and instead recommend abandoning CR courses entirely.

The Court finds confusion exists between integrated "multicultural curriculum" courses and CR courses, which has been compounded by the stipulated CR "infusion" pilot programs for middle school Social Studies courses and the elementary school programs. The Court is not using these terms loosely. As noted, USP § V.6.a.i. requires the District to integrate racially and ethnically diverse perspectives and experiences in academic courses, thereby, creating multicultural curriculum aimed at creating inclusive class environments while providing "a range of opportunities to improve critical thinking and learning skills." Subsection ii requires CR courses of instruction reflecting either African-American or Mexican-American history, experiences, and culture to improve academic achievement and reduce the achievement gap. (Stip. Action Plan (Doc. 1761) at 24-27.)

Perhaps in part due to this confusion, the Mendoza Plaintiffs challenge the District for implementing multicultural CRCs instead of CR courses, and the Special Master deferred recommending unitary status for multicultural curriculum CRCs. He prepared a Completion Plan requiring the District to report by August 2018 on the following: (1) the progress made in "infusing" multicultural content throughout the curriculum; (2) the process for review, curriculum modification and relevant professional development that ensures books and other hard copy or electronic materials are purchased for school-level libraries or as resource materials for LIRC,[46] and ensures those materials are selected with multicultural perspectives taken into consideration as a component of the selection process; (3) a schedule for "infusing" multicultural content to curriculum domains not yet revised, including reviewing the science curriculum during the current school year, and (4) the frequency with which review of curriculum is recurrently undertaken to determine

---

[46] The Court guesses this acronym is: Learning and Information Resource Center (LIRC).

whether further infusion of multicultural content is warranted.

The Court adds that the District shall clarify whether infusion CRCs differ in any substantive way from integrated multicultural curriculum courses. If different in name only, the District shall determine whether any CR course options exist for middle school Social Studies and elementary school students or adopt multicultural curriculum as the best practicable strategy for delivering these CRCs.

The District shall issue this report by revising the Comprehensive Plan[47] to expressly include all CRCs, USP § V.E.6.i.-ii.: the CRC Comprehensive Plan.

When the Special Master withdrew his recommendation for unitary status he suggested the Court endorse an interim completion plan directing the parties to reevaluate provisions of the Stipulated Action Plan in hopes of ending further dispute over the original provisions. (Reply (Doc. 2111) (Second) at 26.) The Court does not endorse revising the Stipulated Action Plan. Instead, the Court resolves the issues raised by the Mendoza Plaintiffs,[48] which in one way or another challenge the District's development and ongoing vetting of CRC courses.

The Mendoza Plaintiffs do not dispute that the number of CRC high school courses and CRC modules in other grades has grown steadily over the last three years. The number of students enrolled in high school courses is understated because many

---

[47] The Court assumes the District prepared the Comprehensive Plan at the end of SY 2015-16. (Stipulated Action Plan (Doc. 1761) at 23.) In the event the District failed to prepare the Comprehensive Plan, the District shall immediately comply and prepare it in full accordance with this Order and the Stipulated Action Plan provisions, including measuring the effectiveness of CRC courses. *Id.* at 32.

[48] As a third issue, the Mendoza Plaintiffs complain that the District fails to present any evidence of progress for a Grow-Your-Own Program (GYOP) involving TUSD graduates at the University of Arizona (UofA). According to the Mendoza Plaintiffs, the National Panel recommended the District consider using this GYOP as a strategy for recruiting CRC teachers. This Court has already ordered the District to prepare a study, including review of the UofA GYOP for recruiting teachers. To be clear, the District shall report therein on whether it's work with the UofA has included developing a CRC path through university work and teacher preparation for TUSD's CRC graduates to return to the District as classroom CRC teachers. The study's efficacy assessments should include the UofA GYOP effectiveness to recruit CRC teachers. This issue shall be revisited in the context of the question of unitary status for USP § IV, Administrators and Certified Staff and appropriately cross-referenced.

students take more than one CR course, but the District only counts student enrollment once. The Special Master estimates that "the total enrollment in high school CRC has been about 2000 students over the last two years," without counting multicultural courses or multiethnic[49] courses. He reports the number of students enrolled in middle school, 5-8 grades, CRC infused modules doubled over the last two years. (2016-17 SMAR (Doc. 2096) at 50.)

The Mendoza Plaintiffs do not challenge these successes. Instead, they accuse the District of failing to establish the annual review, modification, and further development of CR courses, (Mendoza Response (Doc. 2101) at 40 (citing Stip. Action Plan (Doc. 1761) at 31-32), and that there is no record reflecting that the panel of national experts (National Panel), commissioned by the District pursuant to the Stipulated Action Plan, "develop[ed] and vet[ted] curriculum materials on an on-going basis," *id.* (citing (Stip. Action Plan (Doc. 1761) at 15). To the extent the Mendoza Plaintiffs are suggesting that the National Panel is responsible for "developing and vetting curriculum on an ongoing basis" in the context of "the relevant evaluation on <u>an annual basis</u> . . . to guide decision making for the continued expansion and potential modification to curriculum and program design," the Court rejects this outright.

The Court sees no support for the assertion that the National Panel is responsible for developing and vetting CRC annually and/or for making decision for continued expansion and potential modification to CRCs and program design. It has always been the understanding of this Court, the Special Master, and the Parties, including the Mendoza Plaintiffs when previously arguing CRC noncompliance, that curriculum development, including CRC lessons, is a function of Itinerant Teachers with the primary burden for curriculum development belonging to Itinerant teachers. *See* (Mendoza Objection CRC R&R (Doc 1932) at 6) (describing multiple duties of Itinerent Teachers, including non-instructional duties to develop curriculum units for CR and non-CR courses throughout the year).

_____

[49] This term is undefined and not found in the USP.

The Stipulated Action Plan, section for "Curriculum Development and Articulation" provides:

> a cadre of experienced CR teachers and district staff will work on curricular and programmatic alignment. Identified district teachers with experience in CR instruction shall collaborate with CRPI staff to develop necessary curriculum for CR expansion for the following upcoming school year…[t]hey will be tasked with revision of the curriculum maps, development of CR lessons, ensuring vertical articulation of curriculum across grade levels, and general preparation for full implementation of this plan in the 2015-2016 SY.

(Stip. Action Plan (Doc 1761) at 22.) Further, "Mentor/Itinerant Teachers will develop extensive curricular units for courses at the middle school and high school level," *id.,* and "continue to develop research-based, culturally relevant curriculum lessons throughout the year," *id.* at 23. In the past, the concern has been the shortage of CR teachers, especially Itinerant Teachers, to effectively perform non-teaching CRC responsibilities so as to not dilute the planned intensity of the Itinerant Teacher model for implementing the CRC program. (Order (Doc. 1982) at 3 (taking a "wait and see" approach to District's hiring 6 of the 12 CRC teachers recommended in Stipulated Action Plan).

Conversely to the Mendoza Plaintiffs' argument, the "National Panel on Culturally Responsive Curriculum & Instruction 2016-2017," attached to the 2016-17 DAR, provides that the National Panel is a group of renowned scholars, with diverse perspectives, working collaboratively with the District and the Special Master to provide guidance to the Department of Culturally Relevant Pedagogy and Instruction (CRPI) "in the development of culturally responsive and relevant curriculum and pedagogy." The National Panel is commissioned to work three days' time throughout the year, with its purpose being "to provide consultative guidance on the theoretical and practical application of culturally relevant & responsive, critical and multicultural education. . . . The expectation is that panel members will review general materials and be vocal advocates on a national level for the ongoing work being done within the District." (DAR 2016-17, Appendix IV-77 (Doc 2060-5) at 57).

1    The Court finds that the National Panel serves as a resource to the District and
2    develops and vets curriculum materials on an on-going basis, accordingly. Nothing in the
3    Stipulated Action Plan changes the USP which mandates CRC to "be developed using the
4    District's curricular review process." (USP (Doc. 1713) § V.E.6.i, ii.)  The Court notes
5    that the Mendoza Plaintiffs' interpretation undermines the USP requirement that the
6    District hire a Director of CRPI to "supervise the implementation of courses of
7    instruction that focus on the cultural and historical experiences and perspectives of
8    African American and Latino communities,". . . who "shall have experience developing
9    and teaching" CRC. *Id.* § E.4.c.

10   The Court rejects the Mendoza Plaintiffs' request that the District be ordered to
11   "promptly take action to expand membership on the National Panel to include
12   practitioner experts who have taught ethnic studies courses at the high school level."
13   (Mendoza Response (Doc. 2101) at 41.) The Court will not order the District to "submit
14   all CRC curriculum that has not been vetted by the National Panel . . . to that Panel for its
15   review/vetting." *Id.*

16   The Mendoza Plaintiffs also argue that "[i]n light of the recent federal court ruling
17   that the State of Arizona may not enforce A.R.S. Section 15-112,[50] the District, assisted
18   by members of the National Panel and/or other experts recommended by the Panel,
19   should review the curriculum for all CRC courses to ensure that the existence of A.R.S. §
20   15-112 and the potential threat of State enforcement thereof did not have a chilling effect
21   on what has been included in that curriculum and shall revise the curriculum to the extent
22   warranted." (Mendoza Response (Doc. 2101) at 41.) The Court reminds the Mendoza
23   Plaintiffs of its ruling February 6, 2013, when it denied the State of Arizona's request to
24   intervene in this action to enforce A.R.S. §  15-112. Then and now, "the MAS courses,

---

[50] A school district is prohibited from including in its program of instruction any
courses or classes that: 1) promote the overthrow of the United States government, 2)
promote resentment toward a race or class of people, 3) are designed primarily for pupils
of a particular ethnic group, or 4) advocate ethnic solidarity.

which were terminated subsequent to the administrative decision issued by the State that they violated A.R.S. § 15-112, are not at issue in this case." (Order (Doc. 1436) at 14.)

The Court does, however, take judicial notice of *Acosta et al. v. Huppenthal et al.,* CV 10-623 TUC AWT, wherein the District challenged the constitutionality of the State's preclusion of Mexican-American Studies (MAS) courses. The Court does so, not so much because the District ultimately prevailed, but because the District's advocacy for these courses was unstoppable. TUSD was unflagging in its efforts to implement MAS courses, even in the face of serious opposition from the State Department of Education, and only terminated MAS courses when the Department threatened to cut the District's funding. Beginning the case in 2010, the District appealed a preliminary decision that was only partially favorable, and ultimately prevailed at trial in 2017, obtaining a permanent injunction against the State from enforcing A.R.S. § 15-112 against TUSD.

The District created the MAS program in 1998 to further the objectives of the 1978 Settlement Agreement entered in this case "'to remedy existing effects of past discriminatory acts or policies.'" (Order (Doc. 468) (CV 10-623 AWT TUC) at 2 (quoting *Fisher v. TUSD,* 652 F.3d 1131, 1137 (9th Cir. 2011)). "The [MAS] program included art, government, history, and literature courses at the kindergarten through 12[th] grade levels, with each course focusing on historic and contemporary Mexican-American contributions. The concept of the program was to engage Mexican-American students by helping them see 'themselves or their family or their community' in their studies, and its purpose was to close the historic gap in academic achievement between Mexican-American and white students in Tucson." *Id.* (trial testimony citations omitted). "At the high school level, the MAS courses were research-based, designed as college preparatory courses, and 'used texts that are regarded as canonical in the fields of Ethnic studies and Mexican American Studies.'" *Id.* To the extent MAS courses differed from CRC courses,[51] the District has won the right to reinstate them.

---

[51] An issue not litigated here or in CV 10-623 AWT TUC.

- 115 -

In CV 10-623 TUC AWT, the District presented evidence that in 2010-11, when the State banned the MAS courses, TUSD had 53,000 students, with 60% of TUSD students being Latino. Twenty-one MAS classes were offered that year at eight high schools and middle schools, with a total of 1,300 students enrolled and almost ninety percent of the MAS students were Latino. TUSD tracked certain measures of MAS student success, such as graduation rates, state standardized test passage rates, discipline rates and attendance rates. *Id.* at 3-4.

TUSD presented testimony:

> that students in the program surpass[ed] and outperform[ed] similarly situated peers. TUSD presented evidence of a significant and positive relationship between taking MAS classes and increased academic achievement-- measured by increased high school graduation rates and increased AIMs-test passing rates for all students who took the courses, and in particular for Mexican-American students at TUSD. The more MAS classes a student took the greater the positive relationship, with the results being especially impressive because students electing to take MAS classes generally had extremely low academic performance prior to taking the courses.

*Id.*

The take-away for this Court is the clear record reflecting that the District has been a vanguard in implementing culturally relevant courses to close the achievement gap between minority students and White students, especially for Latino students. It has staunchly advocated for courses containing culturally relevant curriculum. It has demonstrated to the students and the TUSD community its commitment to this program. The Court finds that there is a long history of good-faith efforts to implement culturally relevant curriculum in TUSD, first with the MAS program and then through the CRC program adopted in the USP. The Court finds that judicial oversight is not necessary to ensure further development and growth of the CR courses.

Nevertheless, the Court does not award unitary status in part. The two CRC strategies, CR courses and multicultural curriculum, may be more fluid than suggested by USP § V.E.6.i-ii. The Stipulated Action Plan, including infusion CR courses, the Mendoza Plaintiffs' objections related to multicultural curriculum courses, and the Special Master's proposed Completion Plan lead the Court to clarify that there is one

strategy, which is CRC. Under the USP, CRC may be delivered through CR courses or multicultural courses. The Court rejects the Fisher Plaintiffs' objection to CR courses because they jeopardize "racial harmony." (Fisher Response (Doc. 2100) at 6) (complaining ethnic-based classes are counterproductive and against concept of inclusion and integration). This Court takes judicial notice of Judge Tashima's conclusion that there is "no legitimate basis for believing that the MAS Program was promoting racism." (Order (Doc. 468) (CV 10-623 AWT TUC) at 41.) The Court finds that CR courses do not jeopardize racial harmony. The Court finds that both strategies for implementing CRC shall be included in the CRC Comprehensive Plan, which shall make it clear when and why one strategy is used versus another. There shall be a priority for CR courses because of their track record to improve academic achievement and reduce the achievement gap. The CRC Comprehensive Plan shall include both subsections i and ii of § V.E.6.a, and the Completion Plan report recommended by the Special Master for subsection ii, multicultural curriculum, with the additions ordered by this Court.

Likewise, the Court finds that the Special Master's Completion Plan recommendations for CRP shall be included in the CRC Comprehensive Plan. The Court rejects the Mendoza Plaintiffs' request for a broad sweeping pedagogy plan for "all administrators and certified staff [and paraprofessionals] …with training on how to create supportive and inclusive learning environments for African American and Latino students with an emphasis on curriculum, pedagogy, and cultural responsiveness." (Mendoza Objections (Doc. 2101) at 39.) Pedagogy means the method of teaching, and the Special Master has appropriately aimed his Completion Plan at teachers. The CRC Comprehensive Plan shall reflect the District's development of: (1) the teacher evaluation instrument used by TUSD, amended, to include culturally responsive pedagogy as an element of teacher proficiency; (2) training for administrators who evaluate teachers to be trained to evaluate teacher proficiency in culturally responsive pedagogy, including procedures for validating the capabilities of administrators to undertake such evaluation, and (3) teacher training which employs culturally responsive pedagogy as an integral part

of their training to implement the curriculum (e.g., teaching students to read through culturally responsive instruction).

For reasons explained later in this Order, the Court shall consider whether the District has implemented a Professional Learning Plan for CRP. The CRC Comprehensive Plan shall include a Professional Learning Plan to ensure implementation of CRP district-wide.

The CRC Comprehensive Plan shall be filed by the end of SY 2018-19 and trigger reconsideration of unitary status for the CRC program.

### d-3.   Support Services for African-American and Latino students and Support for Parent and Community Participation

The Court begins by noting the difference in the approach between the USP provision for academic and behavioral support for at-risk students, including African-American and Latino students, including ELL students, (USP (Doc. 1713) § V.E.2),  and support services for African-American and Latino students, *id.* §§ V.E.7 and 8. Support services for at-risk students is overseen by a coordinator, the ABSC, who is responsible for implementing a plan to equitably provide academic and behavioral support programs and dropout prevention services, focusing on individualized assistance and mentoring to students, concentrating on school sites and in areas where student and school data indicate there is the greatest need to reduce the dropout rate and increase graduation rates. Within this context, strategies identifying African-American and Latino students, including ELL students, exist aimed at providing resources to accelerate and advance their learning such as: lowering grade retentions in grades 3 and 8, providing literacy programs, engaging language-appropriate social workers, health clinics, school staff, volunteers, etc., as necessary to assist in providing support for these students. (USP (Doc. 1713) § V.E.2.)

In comparison, the USP § E.4.a-b provides for a Director for African-American Support Services (AASS) and a Director for Latino Student Support Services (MASS). The retention of the MASS acronym and the existence of two separate departments,

AASSD and MASSD, are holdovers from the original Mexican-American Studies and African-America Studies programs, which had their origins in the 1978 Settlement Agreement. Importantly, the Court notes that the USP does not require AASS or MASS departments. The Court assumed that with unitary status the structure for delivering support services to African-American and Latino students would look more like that being used to deliver support services for at-risk African-American and Latino students.

The USP § V.E.7 expressly requires support services aimed at promoting academic achievement for African-American students. The USP § V.E.8 provides the same for Latino students. Noticeably, there is duplication here in comparison to strategies being implemented by the ABSC coordinator in the context of support services for at-risk African-American and Latino students. *Compare* (USP (Doc. 1713) § V.E.2.b.i.III and V.E.7.b.-c, V.E.8.b.-c.) Noticeably, § 7, AASS, differs from § 8, MASS, by including a provision for a Task Force to be created in 2013, to consult with experts, to develop a research-based strategy for enhancing educational outcomes, including potential to reduce the achievement gap and improve academic educational outcomes, for African-American students. *Id.* § V.E.7.g-i. In comparison, § 8, MASS, provides for the implementation of specific strategies aimed at improving Latino student educational outcomes and to close the achievement gap, such as Arizona Department of Education Office of English Language Acquisition Services (OELAS), *id.* § V.B, and Advancement Via Individual Determination (AVID), *id.* § V.E.8. And, there is the CRC USP requirement for CR courses. *See* (Reply (Doc. 2111) at 25) (recommending one of two CR courses at Santa Rita High School be an African-American perspective "even though the course enrollment is lower than the minimum established for offering elective courses").

The Special Master does not recommend unitary status for African-American or Latino student support services. Instead he reports these two departments, AASSD and MASSD, cost approximately 1.5 million dollars a year without any concrete showing of benefit to either African-American or Latino students. Nevertheless, he reports an

unflagging adherence by the Plaintiffs to maintaining these departments in spite of the past, present, and anticipated future disagreement between the parties over the function of these departments. It has been clear to this Court since the inception of the USP that these two departments were as symbolic as they were substantive, especially given the duplication of efforts between each of the departments and between other District departments and other District operations. Like the Special Master, this Court would be remiss if it did not consider ending these departments as the natural consequences of attaining unitary status. (2016-17 SMAR (Doc. 2096) at 56.)

The Special Master reports:

> In January 2018, the District and the Fisher and Mendoza plaintiffs developed a completion plan for how these departments would function going forward. These plans provide very little information about how the departments will actually function. The plans basically retain the current staffing but appear to give some of the people different titles. The staff of the proposed departments have multiple and poorly defined functions in direct contradiction to recommendations made by the District in its evaluation of the efficacy of these departments.

*Id.* at 55-56.

The Mendoza Plaintiffs object to the Special Master's report of an agreement: "They are aware of no such plan," and they remain actively engaged with the District to develop a new plan for MASSD. (Mendoza Response (Doc. 2101) at 48.) The Fisher Plaintiffs are silent. In addition to his objection to the apparently nonexistent agreement, the Special Master recommends that the parties continue to meet to: identify activities to be performed by staff of the two departments and demonstrate how these activities are integral to the core functions of the District; specify the qualifications that members of the department staffs should have to perform specific functions and describe how staff with these qualifications can be recruited, trained and retained (e.g., current salary levels will not do it); convene a small panel of experts (no more than four people) to advise the District on effective practices for providing support services to African-American and Latino students, and no later than May 1, 2018, to submit a revised plan for AASSD and MASSD or an alternative. (2016-17 SMAR (Doc. 2096) at 57.)

**The** Special Master recommends continued negotiation between the parties even though "[i]t would not be difficult to identify effective strategies for enhancing the achievement and social-emotional development of African-American and Latino students," and even though the "District is already implementing some of the strategies." *Id.* Further negotiations are needed according to the Special Master because of the contentious history between the parties over how to define and support effective ways to enhance the quality of education for African-American and Latino students. The Court disagrees. Party contentiousness is not a reason to implement or not implement a strategy. The USP calls for the District to determine whether effective support strategies exist, and if so to implement them and to operate the District to the extent practicable pursuant to effective strategies. The Special Master's SMAR suggests that the District has evaluated the efficacy of the MASSD and AASSD and recommended changes. Such recommendations are appropriate, here, where the District has operated the student support services, pursuant to § § 7 and 8, for several years.

The District shall recommend an organizational and substantive plan for the post-unitary status delivery of student support services to African-American and Latino students, including ELL students, which shall: identify activities to be performed by staff of the two departments and demonstrate how these activities are integral to the core functions of the District, and specify the qualifications that members of the department staffs should have to perform including specific functions and describe how staff with these qualifications can be recruited, trained and retained (e.g., current salary levels will not do it). The District shall develop a Post-unitary Status Plan for AASS and MASS, and may convene a small panel of experts (no more than four people) to advise it regarding effective practices for providing support services to African-American and Latino students. The Court notes that student support services are an area where the District, for reasons explained later in this Order, will be held accountable for the effective use of the Evidence-Based Accountability System (EBAS). The Post-unitary Status Plan for AASS and MASS shall ensure the effective use of EBAS.

The District shall file the Post-unitary Status Plan for AASS and MASS, which shall trigger reconsideration of unitary status in respect to student support services for African-American and Latino students.

**e.    Maintaining Inclusive School Environments: USP § V.F**

The USP § V.F prohibits the District from assigning students to classrooms and services in a manner that impedes desegregation. "The District shall review its referral, evaluation and placement policies and practices, as well as relevant disaggregated enrollment data, and shall take appropriate action to remedy any classroom assignment or placement of students that results in the racial or ethnic segregation of students." (USP (Doc. 1713) § V.F.1.) The Mendoza Plaintiffs call for the District to demonstrate that it has reviewed "'its referral, evaluation and placement policies and practices, as well as relevant disaggregated enrollment data, and shall take appropriate action to remedy any classroom assignment or placement of students that results in the racial or ethnic segregation of students.'" (Mendoza Response (Doc. 2101) at 46 (quoting USP (Doc. 1713) § V.F.a.) The District's student assignment policies have been under scrutiny for the past three years, with DARs and SMARs filed every year. This year, the District filed the USP compliance report for every USP provision. The Mendoza Plaintiffs have access to disaggregated enrollment data and the power of discovery. Yet their objection leaves the Court guessing: is there a problem, and what is the problem? ELL programs segregate students; Dual Language programs segregate students. GATE programs, requiring cognitive testing, segregate students and sometimes create a racial composition in a GATE class that differs dramatically from the racial composition of the school, but still the racial composition of the GATE classroom is more integrated now than before the USP. Without more, the Court cannot identify a problem related to the District's compliance with the USP and this USP provision.

The USP also requires the District to develop and maintain inclusive school environments as follows: 1) adopt inclusive, non-discriminatory policies for all District activities and disseminate them throughout the District; 2) pilot and implement strategies

to develop intercultural proficiency, and 3) amend policies, including JICFB, and practices to protect all members of the school communities from discriminatory harassment and bullying. The District shall require each school principal to develop strategies to highlight the historic and ongoing contributions of diverse ethnic, racial, and linguistic groups in a manner that is evident throughout each school, including public displays, classroom environments and libraries. (USP (Doc. 1713) § V.F.2.)

Many of these strategies have been discussed in the context of ALEs and CRCs because multicultural curriculums and creating environments of excellence serve the dual purpose of being strategies which highlight positive contributions from diversity. There is no assertion that principals have failed to publicly display positive portrayals of diversity in classrooms and school libraries. The Special Master proposes a Completion Plan requiring the District to compile a report of existing data from annual student and teacher surveys, which he believes should reflect whether students feel accepted by students of other races and by teachers or experience bullying or harassment. In the event the data reflects that levels of inclusiveness that need to be improved and/or that perceptions vary by race, the District shall identify remedial strategies and implement them during SY 2018-19. The Special Master's Completion Plan enables the District to address issues on a school by school basis.

The Mendoza Plaintiffs call for more. They want the Special Master to review claims and investigations of alleged discriminatory harassment and/or bullying at school sites. They want him to review the Governing Board Policy JICK to ensure that staff persons responsible for investigating and responding to complaints have and are perceived by parents, students, and staff as having sufficient independence to effectively and fully perform this responsibility. Governing Board policies are public and available to the Mendoza Plaintiffs for them to review. Again, without more, the Court cannot identify any problem related to the District's compliance with this USP provision.

The Special Master's Completion Plan complies with the USP. He requires the District to provide the 3-year survey data by May 2018 and identify the strategies the

District has utilized to improve inclusive school environments, which shall be studied by the District in collaboration with the Special Master before the beginning of SY 2018-19, to determine the effectiveness of such strategies overall and/or by race, and to identify any additional strategies to improve inclusiveness. Depending on this analysis, the District shall report and implement in SY 2018-19 the planned strategies for maintaining and/or improving inclusiveness. For reasons explained later in this Order, the Court shall consider whether the District has implemented a Professional Learning Plan for these strategies aimed at creating cultures of civility.

The District shall file a Notice and Report of Compliance with the Completion Plan, including a Professional Learning Plan, which shall trigger reconsideration of unitary status.

### 5.      Discipline: USP § VI

From its inception, this case challenged the District's disciplinary policies and practices as having a disparate effect on minority students, especially African-American students. It was addressed as a *Green* factor and expressly included in the 1978 Settlement Agreement and again in the USP. "Disproportionality does not, in itself, demonstrate discrimination," (2016-17 SMAR (2096) at 60n.24), but it is a red-flag for when discrimination may exist. In 1978 and now, African-American students are disproportionately subject to disciplinary actions. Latino and White student suspension is not disproportionate to their respective percentage representations in the total student body. Latino students are 61% of the student population. White students are 20%. African-American students make up only 9% of TUSD's students. There is no explanation offered for why 10% of the total student population accounts for almost the same number of suspensions compared to White students, who make up approximately 20% of the student population. In other words, African-American students are twice as likely to be suspended as White students. "Although, compared to national averages in other school districts, African-American students receive less disciplinary measures in TUSD." (TUSD Response (Doc. 2099) at 39.)

To be exact, in 2016-17: White students made up 21% of TUSD students, African-American students were 10%, and Latino students were 61% of TUSD students. White students made up 17% of in-school suspensions, African-American students were 18%, and Latino students were 55% of the students who were suspended in-school. White students were 17% of out-of-school long-term suspensions, African-American students were 19% and Latino students were 52% of out-of-school long-term suspensions. (2016-17 SMAR, Revised Discipline Report 11/14/2017 (Doc. 2096-10) at 4.)

The Court has no evidence that the level of disproportionality has decreased during or from the USP. According to the Special Master, "[t]he District is still finding its way in developing and implementing coherent policies and practices related to discipline." (2016-17 SMAR (Doc. 2096) at 62.) The Court finds this is an understatement. There has actually been a retreat from initial steps forward. The number of in-school suspensions grew by about 28% between 2015-16 and 2016-17, but was obscured by the District changing the definition for exclusionary discipline. The Special Master could not rely on the District's data reported in the 2016-17 DAR because it failed to use the definitions of disciplinary action in place in 2013-14, and he had to obtain relevant data by Requests for Information.

November 9, 2017, the Court issued an Order resolving this data reporting issue, which at that time the parties reported had been in dispute for over a year. First, the Court repeated its prior admonition that in the context of data gathering, the parties should and the Court would defer to the Special Master's data gathering directives related to his data needs for monitoring the District's progress under the USP. (Order (Doc 2087) at 4.) More to the point, the Court adopted the definition for exclusionary discipline as: "being removed from a regular classroom." The Court rejected the District's reclassification of in-school disciplinary interventions (ISI) as "not exclusionary." *Id.* 4-5.

The Court issued its Order in response to the Special Master's complaint that the District's reclassification jeopardized compliance with the USP because it was difficult to correctly calculate the extent of declines in the amount of serious student misbehavior. *Id.*

at 5. He questioned a dramatic drop in the overall amount of disciplinary actions between 2014-15 and 2015-16, with a big change for in-school suspensions which dropped by 78% and long-term suspensions which dropped over 50%. He attributed the drops in part to the District's change in the Guidelines for Student Rights and Responsibilities (GSRR) that allowed the introduction in 2015 of the in-school District Alternative Educational Program (DAEP) for disciplinary offenses that previously would have required out-of-school suspension. The Court commended the District on DAEP, but held that the District went too far in its quest to reduce out-of-school suspensions when it classified long-term placement of a student in DAEP as a school transfer and not as an exclusionary removal of a student from classroom instruction. *Id.* at 6. The difficulty now in assessing the effectiveness of the disciplinary strategies rests on the District's definitional-programmatic change in 2015 and stubborn adherence to it, even in the face of the Special Master's directive and this Court's Order to discontinue it.

In the USP, "the Parties acknowledge that the administration of student discipline can result in unlawful discrimination when students are disproportionately impacted or treated differently by virtue of their race or ethnicity" and "acknowledge that the punitive use of serious disciplinary sanctions for low-level offenses creates the potential for negative educational and long-term outcomes for affected students." (USP (Doc. 1713) § VI.A.1.) To redress these realities, the USP requires the District to consider its student behavior policies and discipline practices in the context of its overall goal of creating inclusive and supportive school environments. *Id.* § VI.A.2. The USP requires the District to "commit to ensuring that students remain as often as practicable in the classroom settings where learning happens" by devising a variety of graduated positive behavior techniques to be used based on the student behavior at issue with the goal being "to prevent students from being excluded for any amount of time from the classroom or school." *Id.* "The District shall reduce racial and ethnic disparities in the administration of school discipline." *Id.*

The USP provides for two comprehensive, school-wide approaches to classroom

management and student behavior: Restorative Practices and Positive Behavior Intervention and Supports (PBIS). Correspondingly, the USP required the District to evaluate and revise its Guidelines for Student Rights and Responsibilities (GSRR) to:

> (i) limit exclusionary consequences to instances in which student misbehavior is ongoing and escalating, and the District has first attempted and documented the types of intervention(s) used in PBIS and/or Restorative Practices, as appropriate; (ii) require the administration of consequences that are non-discriminatory, fair, age-appropriate, and correspond to the severity of the student's misbehavior; (iii) require that consequences are paired with meaningful instruction and supportive guidance (e.g., constructive feedback and reteaching) to offer students an opportunity to learn from their behavior and continue to participate in the school community; and (iv) require that law enforcement officers, including School Resource Officers, School Safety Officers, and other law enforcement and security personnel who interact with students, are not involved in low-level student discipline.

*Id.* § VI.2.a. Likewise, the USP requires the District to monitor disciplinary data, analyze it, and develop corrective action plans "to ensure that exclusionary discipline consequences are not meted out in a manner that impermissibly targets or has a disparate effect on students of a particular race or ethnicity." *Id.* § VI.F.2.

The Court finds that the USP is designed to create a disciplinary program that if implemented and staunchly adhered to will reduce exclusionary discipline, thereby reducing disproportionality. And disproportionality, if discovered, will trigger corrective action plans whenever possible. The Court asks: What are the corrective action plans, if any exist, for African-American students who are disproportionately affected by exclusionary discipline? *See* USP § VI.B.2.a.(iii) (requiring consequences be paired with meaningful instruction and supportive guidance so students learn from their behavior and continue to participate in the school community).

The Special Master does not recommend unitary status because: there has been a "reversal of progress with respect to in-school suspensions during the 16-17 school year;" the fact that the District has made only modest improvement in out-of-school suspensions, and the persistence of disproportionality in suspensions between White and African-American students. (2016-17 SMAR (Doc. 2096) at 63.)

The Special Master reports specific road blocks to unitary status, as follows:

In its Annual Report, the District describes processes for problem solving and communication, but staff interviews and reports from the Special Master's Implementation Committee, who tour the schools, indicate that the processes described in the DAR are not being reliably implemented throughout the District.

There is no way to identify what issues confront which schools or what has been done to address identified problems and to ascertain whether different strategies are more effective than others.

There is no way to ensure that the different offices involved in discipline are working collaboratively and systematically, and with the exception of the Coordinator of Discipline, all of the key central office personnel who are involved in addressing important disciplinary problems have other important roles so that the allocation of their time to discipline issues is potentially problematic.

Implementation of Positive Behavior Intervention and Supports (PBIS) is fundamental to reducing discipline issues and creating positive learning environments free from disciplinary disruption, but the District did not provide principals with a protocol for evaluating progress made at the school level with PBIS until the end of SY 2015-16.

The District couples PBIS with "Restorative Practice" as two strategies, but Restorative Practice is a strategy to be used with PBIS, not a separate strategy.

Principals are accountable for implementing PBIS, and report on the effectiveness of PBIS at their schools, but there is no regularly scheduled process for monitoring the accuracy of these reports, and there is evidence that effective implementation varies noticeably from school to school.

Training for principals, who are responsible for implementing PBIS, is woefully insufficient, dealing mainly with administrative matters such as data resources and data gathering, and some bias-training which does little to address how to deal with students who violate school disciplinary policies. Instead, principals need training to enable them to confront the challenges involved in bringing about changes in the school culture or how to manage difficult disciplinary situations that threaten school safety. An effective PBIS program depends on substantial professional development for principals but the District's Annual Report does not indicate any training for individual principals.

The District uses "walk-throughs" by District personnel who have responsibility for oversight of PBIS implementation at multiple schools, but there is no on-going analysis of reports on these walk-throughs.

If TUSD central office review of data from individual schools sets off alarms that there are problems with respect to the administration of disciplinary policies and practices, the schools involved are asked to prepare Corrective Action Plans (CAPs), but there is no continuity in these reports and some are nothing more than assertions to do better.

Responses to student and teacher surveys indicate that discipline problems persist in many schools, staff at several schools indicated that staff and

students do not feel safe at school, bullying and harassment are not uncommon, and report principals are not fair or consistent.

IC interactions with teachers indicate a frequent lack of understanding regarding disciplinary practices, the GSRR, PBIS and Restorative Practices.

The TUSD Superintendent has reported to the Governing Board that training for PBIS and Restorative Practices is inadequate and requires additional investment.

Administrators receive "Fred Jones" training which contradicts the premises of PBIS and Restorative Practices.

In SY 2016-17, the District's handling of fighting as an immediate suspension violated the GSRR, which it has suspended but now there is evidence that in some schools routine fights are being mischaracterized as assaults to justify suspension under the GSRR.

In short, the USP includes extensive professional development provisions to ensure that the disciplinary procedures and the positive behavioral models are being used by administrators and teachers in its schools. (USP (Doc. 1713) § E.) The Special Master reports that "there is insufficient evidence to be confident that the District has put in place processes and developed the capabilities of key actors that will enable the District to make progress in the future to reduce levels of discipline, especially that which involves suspensions, and further reduce the disproportionality in disciplinary actions involving African-American students." (2016-17 SMAR (Doc. 2069) at 63.) In other words, the evidence reflects that on a school-by-school basis there is a varied degree of effective implementation of the disciplinary strategies developed pursuant to the USP.

The Mendoza Plaintiffs object to the Special Master's failure to point out that in-school suspensions are underrepresented because the District counts the number of students suspended, not the number of suspensions. In other words, the District counts one in-house suspension for a student that may receive multiple in-house suspensions.[52] The Special Master agrees this compounded the difficultly he had correctly calculating

---

[52] The Fisher Plaintiffs are confusingly silent on the subject of discipline. They offer this: "Forty years of futility on deseg efforts and after billions of dollars of deseg funds were spent, African-American children are still last, not closing the achievement gap, and disproportionately suspended from classes." (Fisher Response (Doc. 2100) at 8.)

whether the number of suspensions had increased or decreased. He amends his Completion Plan recommendations, accordingly.

The breadth of the Special Master's Completion Plan is telling in respect to the progress or lack thereof made under the USP, § VI: Discipline. The amended Completion Plan is as follows:

By the beginning of SY 2018-19, the District shall take the following steps:

A.      Data on student offenses and responses to them shall use measures that were in place in 2013-14 to ensure that trends can be accurately assessed and distinctions between types / actions that respond to student misbehavior are clear.[53] The District shall report such discipline data both by number of each type of disciplinary consequence imposed and by number of students receiving each type of disciplinary consequence. Data should include students with multiple infractions to avoid any miscount of the degree of discipline difficulties.

B.      Teachers, principals and others shall have easy access to information about how best to deal with particular offenses as defined by the GSRR. Such information shall be available in real time (e.g., online), and be based on research in other districts and effective practices identified within TUSD. Such information could include name of individual teachers and other professional personnel who have demonstrated relevant expertise and be willing to provide peer support.

C.      The District shall hire or designate an individual "Director of Discipline" whose sole focus is the implementation of discipline-related desegregation efforts. (The Office of the Director of Discipline shall be staffed with full-time personnel sufficient to:

1. Analyze school level data, including all data the District is required to collect and analyze under USP Section VI.F.2, and bring any issues warranting investigation or remediation to the attention of the chief academic officer of the District.

2. Review schools' use of exclusionary discipline to ensure that it is fair and equitable and complies with the GSRR, including ensuring that exclusionary discipline is not inappropriately used for low-level incidents involving physical aggression (including "fights" that do not lead to significant injury) and that catch-all offenses such as "disorderly conduct" and "other aggression" are not used to improperly impose exclusionary discipline.

3. Provide technical assistance to school level personnel.

---

[53] The Court has no intention of issuing this directive a 3rd time, without there being consequences for the failure to comply with it. *See* (Order (Doc. 2087) at 7.)

4. Contribute to the design of professional development that focuses on handling potential disciplinary problems at the classroom level and that recognizes that disciplinary problems are often related to the need for improved instruction.

5. Assist schools in developing corrective action plans ("CAPs"), review CAPs for consistency and efficacy, monitor the implementation of CAPs monthly, suggest modification or support as needed, and track any improvements resulting from the implementation of CAPs.

6. Conduct and monitor site-level walkthroughs of PBIS implementation and conduct follow-up in an effort to make PBIS implementation across schools consistent and effective.

D.      The Coordinator of Discipline shall report to the chief academic officer for the District.

E.      The process for dealing with hotspots and high visibility problems shall be streamlined. It shall not be necessary to regularly convene meetings of central office staff who have other responsibilities than discipline in order to determine how best to address challenges.

F.      For any student offered a DAEP placement, the District will include any days suspended prior to the DAEP placement in calculating the length of the DAEP placement offered the student will not exceed the number of days issued for the suspension.

The Court adopts this Completion Plan in full, including its deadline. The Court adds that the District shall comply with §§ VI.B.2a.(iii), F.2 and develop corrective action plans either on a case by case basis or district-wide to address the consequences of exclusionary discipline which is disproportionately experienced by African-American students, and ensure implementation of these action plans.

The Court adopts the Completion Plan provisions recommended by the Mendoza Plaintiffs, as follows:

1.      The District shall institute a process to regularly assess that teachers have an understanding of District disciplinary practices, the GSRR, PBIS, and restorative practices.

2.      The District shall regularly review and assess the accuracy of reports by principals relating to the use of PBIS and to ensure that they are using the District's protocol for evaluating progress with PBIS at the school level.

The Court adds that the District shall develop practices and procedures to ensure that the disciplinary program designed by the USP is implemented, and buy-in is being promoted, now and in the future, by the District in its schools, by its principals and teachers. For reasons explained later in this Order, the District shall be held accountable for the effective use by principals and teachers of the Evidence-Based Accountability System (EBAS) data related to discipline. Likewise, for reasons explained later in this Order, the Court shall consider whether the District has implemented a Professional Learning Plan for USP § VI strategies to ensure the discipline strategies are uniformly used by teachers and principals district-wide.

The Court notes that the Special Master's Completion Plan, the Mendoza Plaintiffs' recommendations, and this Court's concerns are the same: the effective use of EBAS and the USP disciplinary strategies designed to reduce the negative effects of discipline to address the issue of disproportionality, especially for African-American students.

The District shall make attaining unitary status in discipline, pursuant to USP § VI, a top priority. The District shall file a Notice and Report of Compliance at the end of SY 2018-19, including a detailed progress report specifically addressing each provision of the Completion Plan and a Professional Learning Plan. The Notice of Compliance shall trigger reconsideration of unitary status for USP § VI, Discipline.

### 6. Family and Community Engagement: USP § VII

A major component of the USP is § VII, Family and Community Engagement, which stretches across the USP, especially the outreach provisions for § II, Student Assignment; § V, Quality of Education, and § VI, Discipline. In short, Family and Community Engagement is a multi-provision, multi-departmental program. The breadth of the program is both its strength and weakness.

The USP requires the District to adopt strategies to increase family and community engagement in schools, including developing and implementing an outreach plan to families, providing information to families about available services, programs and

courses of instruction, learning from families how best to meet the needs of their children, and collaborating with local colleges and universities and community groups to provide information and guidance designed to improve the educational outcomes of African-American and Latino students, including ELL students, and providing relevant information to their families. (USP (Doc. 1713) § VII.A.1.)

The USP requires the District to develop and implement the Family and Community Engagement Services, District Family Center Plan. (USP § VII.C.1.) The USP calls for the District to hire or designate a District Office employee to be the Family Engagement coordinator (FEC), located at a Family Center, and to be responsible for reviewing and assessing the District's existing family and engagement and support programs, resources, and practices, focusing on African-American and Latino students, including ELL students, and families, particularly students struggling, disengaged, and/or at risk of dropping out, to participate in the development and implementation of the outreach and recruitment plan. *Id.* § VII.B.1. When the USP was drafted, the District operated two Family Centers and the AASD and MASSD. The USP called for a Family and Engagement Plan to reorganize family engagement resources for an effective delivery system by increasing Family Center services to ensure equitable access to these programs and to concentrate the programs at school sites as indicated based on need. *Id.* § VII.C.d.

All parties agree staff assignments were made, the program assessments were made, and these efforts resulted in the Revised Family and Community Engagement Plan, (FACE Action Plan), dated September 26, 2014, including: the Plan to Reorganize and/or Increase Family Engagement Resources and the Plan to Expand and Develop New Student Service and Partnership Centers. The first plan focuses on school-site programs, resources and practices, and the latter focuses on programs, resources and practices at the Family Centers. It is undisputed that the District opened two more Family Centers, which provide computer access for family engagement, distribute comprehensive information on all the USP student service programs, and provide translation and interpretation

services. (TUSD Response (Doc. 2099) (citing 2016-17 DAR (Doc. 2075-7) at 4-4-6, 11-21, 27-48).

The question of unitary status hinges on the implementation and effectiveness of the FACE Action Plan, which includes both school-site and Family Center programs, resources and practices to create learning-centric family engagement and support opportunities. First, the Special Master considers "learning-centric" an ill-defined term. (2016-17 SMAR (Doc. 2069) at 67.) The Court does not agree. Under the FACE Action Plan, family engagement is not simply parental involvement, but must be a learning-centric engagement strategy informing parents about student learning and the parent's role in their student's success. (FACE Action Plan (Doc. 2101-2) at 101.) In other words, it is not a school social event or any school activity attended by parents, like a student concert or play.[54] As noted in the FACE Action Plan, often student engagement at District schools is limited to parental involvement activities, not strategies to support learning. *Id.*

The FACE Action Plan identified as a problem the District's heavy reliance on Title 1 and Student Support Services provided by AASD and MASSD to provide parent education opportunities, without any district-wide coordination or comprehensive strategy. *Id.* at 101-102. The FACE Action Plan prioritized a need for the District to have a district-wide family engagement vision, and recognized that to effectively promote it the District would have to create a cross-departmental infrastructure with some kind of cohesive staffing plan to ensure coordination of efforts, continuous quality improvement, and effective service delivery. The FACE Action Plan administrative scheme includes the Assistant Superintendent for Equity, supervising the Director of Family and Community Engagement, supervising the FEC, with the Director and FEC working closely with the Directors of AASD and MASSD, Title 1 and other departments.

---

[54] To be clear, data reporting for family and community engagement shall not include family involvement; family engagement must facilitate student learning or be training of family leaders for schools.

The Court has opened the door for the District to reassess its reliance on AASD and MASSD, and consequently there may need to be a revision of the District's reliance on AASD and MASSD as direct providers of family and community engagement services. Effective coordination of services shall be addressed in the context of any proposed changes from the District in the roles and responsibilities for AASS and MASS under USP § V.E.7 and 8.

The FACE Action Plan makes the Director of Family and Community Engagement responsible for the district-wide coordination of family engagement activities. (FACE Action Plan at 102.)   However, the SMAR makes it clear that the effectiveness of the FACE Action Plan at school sites is the responsibility of school principals, but the FEC "is not in a position to hold school leaders accountable or to direct them to engage in improvements." (2016-17 SMAR (Doc. 2096) at 69.) The Special Master recommends that the District make it clear that "responsibility for overseeing  implementation of school-level strategies for family engagement rests primarily with the principal, and oversight of principals' efforts in implementing family engagement strategies is the responsibility of District supervisors-- assumedly the Director of Family and Community Engagement or the Assistant Superintendent for Equity. If not, the District shall propose an administrative structure that can effectively ensure buy-in from principals[55] and teachers to implement the FACE Action Plan.

In the SMAR, the Special Master finds that the District has complied with the FACE Action Plan for Family Centers but not for school sites. *See* (2016-17 DAR RAC (Doc. 2075-7) at 1-56.) Following objections from the Mendoza Plaintiffs,[56] the Special Master agrees that the District's data tracking for family engagement has been

---

[55] The data review for family and community engagement efforts at schools reflects "a significant number of school principals did not even file the requisite reports for on-site family and community engagement activities. *See* (Mendoza Response, Ex. 21 (reflecting 23 reports complete out of 77 schools, with remainder needing updates or missing.)

[56] The Court is not persuaded that missing survey data would preclude unitary status; substantive research-based strategies shall inform District priorities. (Reply (Doc. 2111) at 37.)

insufficient for both school-site and Family Center activities. He reports that in SY 2018-19, the District initiated a more robust approach to gathering data on family engagement, and the District has engaged a national expert at Johns Hopkins University to provide services to schools for the development of effective family engagement strategies.[57] (Reply (Doc. 2111) at 37-38.) These two actions by the District address both reasons for not granting unitary status for § VII, Family and Community Engagement.

The Special Master points out that the most effective strategies for addressing education-related issues "occur at the school-level where families have a greater incentive to be involved in the pursuit of strategies to enhance the learning opportunities and outcomes of their own children." *Id.* at 38. The Court finds that the District shall task the expert with developing district-wide guidelines for fostering family engagement at the school level, including strategies which enable teachers to learn from families how best to meet the needs of their students and strategies which enable parents to participate meaningfully in school plans and activities. The District shall provide professional development for principals, assistant principals, and teachers to implement these strategies. District supervisors, who are responsible for overseeing principals' performance, shall oversee implementation by principals of the strategies developed as a result of the expert's work with the District.

The Court finds that the only remaining question relevant to awarding unitary status for VII, Family and Community Engagement, is the implementation of a district-wide strategy for family and community engagement services at school-sites and an effective data gathering and tracking program. Subsequent to the conclusion of the expert's work, the District shall file an update to the FACE Action Plan, reflecting the directives contained in this Order and cross-referencing as appropriate the District's Post-

---

[57] The Court directs that the expert consider the Special Master's concern that the Academic Parent-Teacher Teams (APTT) is not a two-way family-teacher information sharing strategy and that Supportive and Inclusive Learning (SAIL) is an effective strategy for schools, not Family Centers. (2016-17 SMAR (Doc. 2096) at 68.)

unitary Status AASS or MASS Plan as relevant. The filing of the Updated FACE Action Plan will trigger reconsideration of unitary status for the USP VII.

### 7. Extracurricular Activities: USP § VIII

The Special Master recommends deferring the unitary status analysis for extra-curricular activities until additional information is gathered and analyzed. He reports that he is unable to make school-level participation comparisons, particularly between Racially Concentrated and Integrated schools, which are necessary to determine parity, or a lack thereof. The District changed the data components to develop a more comprehensive approach to assessing participation, but this created difficulty in comparing year-to-year data. Two years of like-participation data is needed to determine whether the District has effectively addressed parity. In short, the current data is for one year and it is not possible to determine whether the District has met its responsibilities with respect to extracurricular activities until adequate data is available. He proposes a Completion Plan to attain unitary status, including the development of procedures and formats for data gathering, its analysis, and if necessary, development of remedial strategies. The Mendoza Plaintiffs agree that the Completion Plan will result in unitary status for USP § VIII.

The Completion Plan is as follows:

1.      The District shall revise its reporting on extracurricular activities to include all such activities clearly delineating which are funded by parents, the community, the District, or other sources outside the District including the 21 Century or similar grants.

2.      Data shall be reported by grade structure and race of student participants in extracurricular activities.

3.      By September 2018, the District shall conduct the study of participation in its schools with particular attention to racially concentrated schools and those schools at which Anglo student enrollment exceeds 25%. If disparities exist, the District should explain the reasons for these and identify strategies for eliminating them, if practicable.

4.      By August 30, 2018, the District shall have put in place and implemented a process by which principals are responsible for reviewing the extent to which extracurricular activities at their schools are providing opportunities for interracial contact and positive settings of shared interest as mandated by the USP. The District shall analyze the array of extracurricular activities occurring in the schools and identify those that

- 137 -

provide opportunities for interracial contact and positive settings of shared interest, and if necessary develop remedial strategies to ensure such opportunities are occurring in each school.

5.     By January SY 2018-19, the District shall implement any strategies identified for eliminating disparities in extracurricular activities between schools and/or for extracurricular activities to afford opportunities for interracial contact and positive settings of shared interests.

At the end of SY 2018-19, the District shall file a Notice and Report of Compliance for USP § VIII.

### 8.     Facilities and Technology: USP § IX

The District developed two indexes: 1) the Facilities Conditions Index (FCI), which includes an Educational Suitability Score (ESS), and 2) the Technology Conditions Index (TCI). The District conducts a biannual review of both and uses these measures as decision-making tools, respectively, for capital expenditures pursuant to the Multi-Year Facilities Plan and Multi-Year Technology Plan, respectively.

The FCI tracks such things as classroom capacity and utilization, portable classrooms, heating and cooling systems, playgrounds libraries, textbooks, special facilities like laboratories and gymnasiums, capacity and use of cafeteria, fire and safety conditions, and asbestos abatement. The multi-year plan for facility repairs and improvements, places a priority on facility conditions that impact health and safety, and then Racially Concentrated Schools that score below 2.5. (USP (Doc. 1713) § IX.A.1.)

The TCI tracks student access to computers and other learning devices like smart boards, availability of wireless and broadband internet in a school, research-based educational software and courseware, and teacher proficiency in facilitating student learning with technology.  *Id.* § IX.B1.

### a.     Facilities

The Special Master reports that the Indexes were completed and filed with the Court on February 27, 2015, and that same school year, the District without notice or input from the Parties or Special Master changed the FCI Index. As noted by the Mendoza Plaintiffs, on November 9, 2017, this Court ordered the District to return to the

original FCI formula so that the Special Master's unitary status assessment would be made pursuant to the original FCI. (Order (Doc. 2087) at 8.) This did not happen.

According to the "altered" FCI and ESS measures, the Special Master finds no evidence that Racially Concentrated schools have lower scores than non-racially concentrated schools. He reports that the Implementation Committee, all experienced educators, visited sample District schools to rate the facilities and their rating closely aligned with the District's altered FCI scores. The Special Master recommends that upon recalculating the FCI scores using the originally agreed to criteria, and assuming those scores demonstrate that Racially Concentrated schools do not have lower FCI scores than those of non-racially concentrated schools, the District shall have attained unitary status. The Mendoza Plaintiffs agree, but ask that prior to awarding unitary status, the Court require the recalculation to be based on the most recent FCI data. The Court agrees.

According to the Special Master's Completion Plan, by the beginning of SY 2018-19, the District will submit its revisions, including the most recent FCI data, for the Special Master's review. The Special Master shall file a Notice and Report of Compliance with the Court, triggering an award of unitary status for USP § IX.A.

**b.    Technology**

The Mendoza Plaintiffs, the District, and the Special Master agree that recent investments in technology with priority for Racially Concentrated schools increased demand for internet service, especially at these schools. The Court assumes the Parties have proceeded pursuant to the proposed expedited review and revision process suggested by the Mendoza Plaintiffs for revising the TCI to include internet access. Previously, it was not included in the TCI because all schools had the same level of connectivity. The District shall review the updated TCI, and to the extent inadequate internet speeds disproportionately affect Racially Concentrated schools, the District shall develop a plan for correcting the disproportionality by the end of SY 2018-19, and submit the plan for the Special Master's review and recommendation for unitary status.

The Special Master recommends that the Court retain jurisdiction for USP § IX.B.1.iv. and B.4 "teacher proficiency in facilitating student learning with technology." For reasons explained later in this Order, the Court retains jurisdiction here to ensure that the District has implemented a Professional Learning Plan to ensure teacher proficiency in using technology to facilitate student learning.

The Special Master shall file a Notice and Report of Compliance with the Court, triggering an award of unitary status for § IX.B, except for teacher proficiency in using technology to facilitate student learning. The District shall seek reconsideration of USP IX.B.1.iv and IX.B.4 by filing a Notice and Report of Compliance: Professional Learning Plan.

## 9. Accountability and Transparency: USP § X

### a. Evidence Based Accountability

According to the Special Master, "[a] core concept that is essential to the success of TUSD going forward is that decision-making will be driven by collaborative evidence-based problem solving." (2016-17 SMAR (Doc. 2096) at 76.) He refers to the USP § X, Accountability and Transparency, the express provision that the District create a system to be known as: the Evidence-Based Accountability System (EBAS). The USP requires the EBAS data system to be capable of tracking individual student demographics, academic and behavioral data pursuant to requirements set forth in an Appendix A to the USP, running reports for tracking personnel data and information, and automatically producing alerts, flags, and other programmed signals to indicate when students do not meet pre-determined goals or expectations for academic performance or behavioral concerns. (USP (Doc. 1713) § X.A.2.) The purpose of EBAS is to "review program effectiveness and ensure that, to the extent practicable, program changes address racial segregation and improving the academic performance and quality of education for African American and Latino students, including ELLs." *Id.* § X.1.

The District reports that in 2014, it purchased Synergy and added an application, Clarity, to support the USP requirement for automatic flagging of at-risk students and for

tracking interventions. Clarity involves two modules, the Early Warning Module (EWM) and the Intervention Module (IM). Clarity also provides current national research-based suggestions for administrators and facilitators of interventions to address high-risk areas of concern: academics, attendance, and behavior. The EWM ranks every student's risk level along a continuum of one to nine. The IM formalizes the intervention referral process by connecting the at-risk student with the right supports, and then allows for tracking the fidelity and frequency of support efforts to evaluate the effectiveness of specific supports to specific students. Clarity is supported by a company BrightBytes for customization to meet the needs of TUSD, including the USP, and for training. (USP RAC (Doc. 2075-10) at 6-8.) The EBAS includes user-friendly dashboards to enable users to interface with data either through Clarity's student specific dashboards or with Synergy through big-picture dashboards for Enrollment, Discipline, and Classroom capacity and scheduling. *Id.* at 9-10.

The District began rolling out Synergy and Clarity at the beginning of SY 2016-17, with feedback to BrightBytes to make corrections to improve effectiveness, and the final roll out for EBAS was scheduled for SY 2017-18. *Id.* at 9. According to the District, it has "worked hard to make sure that all staff--administrators, teachers and others--have appropriate training on the use of the system for the position they fill, and are evaluated on their ability to utilize the system." *Id.* at 14.

The Special Master describes EBAS as the corner-stone to effective evidence-based decision making, but believes that unitary status cannot be attained by its mere development or even implementation. He recommends this Court retain jurisdiction over EBAS until the District demonstrates capabilities and commitment with respect to what he describes as the five domains of an Organizational Learning System (OLS), with EBAS being one, and the other four elements of an effective system being: Professional Learning Communities (PLCs), MTSS, discipline monitoring, and program evaluation. He admits that over the last two years, "the District has done a very good job on the development of EBAS." (2016-17 SMAR (Doc. 2096) at 78.) The problem is that the

other four elements have with varying degrees of effectiveness been implemented from school to school. *Id.*

The Special Master is likely correct that the District needs a well-developed OLS, but that is not the question. What is relevant is how well the District has effectively implemented EBAS, and here the Special Master asks the right question: how well is the data utilized? The District will be well advised to consider the Completion Plans he offers to answer this question. For now, the record regarding EBAS is scant, especially related to its implementation and use in the context of the USP programs where unitary status is at issue. Now that EBAS is operational its use is relevant to the effective implementation of USP programs. For example, the Court has called for the District to review AASD and MASSD and make recommendations as to the most effective strategies for providing student support services for African American and Latino students, i.e., AASS and MASS. According to the District, EBAS plays a major role in the District's future plan for student interventions to improve student achievement for African-American and Latino students, including ELL students, and to address major issues like the disproportionality of discipline on African-American students. When the District seeks reconsideration of unitary status in the context of V.E.7-8, AASS and MASS, the District shall provide details on the use of EBAS for AASS and MASS.

In short, the District adopted a multi-tiered support system (MTSS) for student academic and behavioral interventions, emphasizing the most positive intervention possible at each tier. The first-level of support is to provide strong instruction for all students in the class room. Then support is tiered upwards to provide additional interventions for students who need additional small group or individual supports. MTSS, accordingly, spans all Student Support Services, including AASS, MASS, and at-risk students, for all services from tutoring to out-of-school suspensions. The focus of the Special Master's Completion Plan is to ensure district-wide school-site use of EBAS in the context of intervention programs and the use of EBAS to assess program effectiveness, especially USP initiatives, including the systematic analysis of EBAS data

to identify problem areas and/or schools that are positive and negative outliers with respect to success in implementing initiatives or achieving particular goals. He suggests positive results would create a resource library of effective practices and negative results would flag outliers for review.

The District objects because USP § X.A, EBAS, does not call for more than its development and implementation, but the USP requires the District to establish effective strategies, and EBAS is a major part of many USP strategies. Therefore, EBAS must be used effectively. So for example, the Court must consider how well the relevant EBAS data is used to provide student support services to African American and Latino students, including ELL students. Additionally, the express purpose of EBAS is to review program effectiveness. Therefore, the District must show that relevant EBAS data is being effectively used by the persons responsible for implementing the various USP program strategies. In this way on reconsideration, the District will address the only remaining impediment to unitary status for USP § X.A, EBAS, which is to establish that it is being used.

The Court will take an especially close look at how well EBAS data is used to implement effective strategies for: student support services, USP § V.E.6-7; reducing discipline, especially exclusionary discipline, USP § VI, and the evaluation of the effectiveness of new initiatives, such as those implemented pursuant to USP § V.A. The Special Master argues that if the EBAS is being effectively used in these three areas then the requisite degree of professional development related to the implementation and use of EBAS has occurred. The Court agrees, and will address this showing on reconsideration of these USP provisions, which correspondingly, will establish unitary status for EBAS. In other words, when unitary status is attained for these USP provisions, §§ V.A and E.6-7, and VI, unitary status is likewise attained for EBAS.

### a-1.    Professional Learning: Professional Development

The USP requires the District to provide training and professional development for implementing USP provisions across the board for administrators, certificated staff, and

any other staff involved as follows: § II.J, student assignment and/or enrollment process; § IV.I and J, the use of culturally responsive pedagogy and to improve teacher performance and for principals to foster professional learning communities (PLCs) so that effective teaching methods may be developed and shared; § V.E.5, for teachers and administrators to teach and promote socially and culturally relevant curriculum and pedagogy; § VI.E, to use positive behavior approaches to discipline and Guidelines for Student Rights and Responsibilities (GSRR); § IX, the use of technology (computers, smart boards, and educational software for the classroom) to promote student learning, and § X.A, the use the EBAS.

The Special Master reports that the District has undertaken new and more productive strategies for professional development that he describes as Professional Learning. The Special Master proposes that the District with his assistance develop a comprehensive research-based plan for how professional learning is provided to teachers and administrators, which shall be implemented especially in the context of seeking reconsideration for unitary status related to culturally responsive pedagogy, § V.E.6.a.i and ii; reducing student misbehavior, § VI; creating cultures of civility in schools, § V.F; enhancing teacher and administrator proficiency in using technology for student learning, X.A, and EBAS. The Special Master proposed that work on the Professional Learning Completion Plan would commence in SY 2018-19, and be completed by the end of the school year.

This brings the Court to the Special Master's criticism of the professional development and training provisions that are sprinkled across the various USP programs. He explains it means little to track the number of trainings offered here and there to determine whether professional development has actually occurred. The Court agrees. What is important is that the District has implemented an effective professional development program or as stated by the Special Master: whether the District has implemented a Professional Learning Plan with the ultimate measure of effectiveness

being whether or not teachers and administrators are using the USP strategy, such as EBAS, which is the subject of the Professional Learning Plan. The Court agrees.

The best way to look at professional development is to determine whether a USP program or strategy is in fact being used by teachers and administrators. Without effective professional development, the best plans, strategies, or programs, developed by the District, adopted by the Board, and approved by this Court, mean nothing. The teachers and administrators are the boots on the ground implementing the USP strategies. Of course, it is a massive undertaking to implement professional development programs at each school for each USP program and strategy, but this is where the rubber meets the road in the end. The Special Master proposes the following test for assessing whether the District has accomplished the requisite degree of professional development to ensure implementation of UPS strategies. He suggests measuring the effectiveness of professional development by considering whether the District has implemented an effective Professional Learning Plan in its schools in four USP programs: culturally relevant pedagogy, reducing student misbehavior, creating inclusive school environments, i.e., cultures of civility, and enhancing teacher and administrator proficiency in using technology for student learning. [58]

---

[58] The Court emphasizes that there must be evidence of district-wide, school-site implementation of the Professional Learning Plan. Therefore, the District should consider the Special Master's suggestion for a rubric to assess effectiveness, such as the effectiveness of MTSS facilitators and leads in performing their responsibilities to identify and provide student support services using EBAS. The Court notes that the Special Master's Completion Plans for both EBAS and Professional Learning include the recommendation that the District place program responsibility in one person at the top of the administrative chain, reporting directly to the Superintendent. He similarly suggested in the context of USP § VI, Discipline, that the District create a Director of Discipline to report directly to the Chief Academic Officer. For USP § VII, Family and Community Engagement (FACE), the Special Master recommended that District supervisors should oversee principals' implementation of FACE, not the Family Engagement Coordinator (FEC), who is responsible for Family Centers. This Court noted the FACE Action Plan's administrative scheme includes the Assistant Superintendent for Equity, supervising the Director of FEC, supervising the FEC, who works closely with the Directors of AASD and MASSD. The point being that the interconnectivity of the various USP programs is a strength that can become an administrative weakness because it lends itself to duplication, disorganization, confusion, and lack of accountability. Now is the time for the District to correct

The Court agrees, and will address this showing on reconsideration of unitary status for these USP programs, which correspondingly, will establish unitary status in respect to the District's obligations to provide professional development under the USP, §§ II.J, § IV.I and J, V.E.5, VI.E, IX, and § X.A. In other words, when unitary status is attained for USP §§ V.E.6.a.i-ii, V.F, VI, and X.A, unitary status is likewise attained for professional development.

**b.      Budget**

The District claims that it has complied fully with USP budget provisions, but again the Special Master reports non-compliance with agreed to guidelines for the budget- comment and review process. "Each year, modification of the budget processes is made in an effort to facilitate review by the plaintiffs and Special Master by giving the District the opportunity to reallocate funds throughout the school year." (2016-17 SMAR (Doc. 2096) at 85.) "But the guidelines could be better implemented." *Id.* The Court finds this is an understatement. "The Court is well aware that the budget development process has been a conflicted one." (Reply (Doc. 2111) (Second) at 44.) The Special Master reports that this fiscal year ending June 2017, the District made major changes involving millions of dollars in mid-year to the Budget without submitting these proposals to the agreed-upon reallocation process." *Id.* This is not ok. The budget provision is located in the USP § X, Accountability and Transparency, for a reason. The transparency and accountability of the budget process is as important as the actual budgetary allocations. Unitary status cannot be attained in respect to the District's good faith efforts to be transparent and accountable to TUSD students and the community in its allocation of millions of dollars if it cannot at a minimum comply with agreed to USP transparency and accountability requirements, i.e, the budget review and comment processes. The

---

any such weaknesses, especially if existing administrative or organizational structures are impeding effective program implementation or operations. The District is on the cusp of unitary status but implementation of many successful strategies varies from good to nil, school to school. The District must attain unitary status district-wide.

Court retains jurisdiction over USP § X.B. for another year. The District may seek unitary status again following the next budget cycle.

**C.**
**Conclusion**

The nature of this Order requires the Court to focus on the areas of the USP where the District has not attained unitary status. The Court would be remiss to not mention the innovative strategies and general progress resulting from the USP.

There are absolutely more students in TUSD attending more racially diverse schools than existed at the inception of this case. For example, the number of students attending Integrated schools in 2016-17 was 8,337 and in 2017-18 there were 11,522. This dramatic jump reflects the results of better community outreach and marketing of the academic programs offered in TUSD. It also reflects improvements in the Magnet Program and increased ALE programs.

TUSD has been the only recipient in Arizona of the Magnet Schools of America award that in the last three years went to Borton Elementary School, which received the Merit Award of Excellence (the highest MSA award), and Mansfeld and Dodge middle schools which received the Merit Award of Distinction.

In delivering gifted programs, the District has implemented whole grade testing to create access to ALE programs for all students, and has created innovative ALE programs like the Cluster GATE program and the Open GATE program at Tully Elementary School. In offering gifted endorsed curriculum to all students, the District has established that regardless of cognitive test scores students taking gifted classes excel academically by 10% higher than the district averages in ELA and Math benchmarks and have improved in AZMerit state standard test performance. The District is implementing a K-1 district-wide enrichment program of open-access gifted services through a whole-grade push-in program offering critical thinking lessons in all K-1 classrooms.

The District operates two exceptional college preparatory programs. The nationally recognized UHS, where minority enrollment increased between 2013-14 and

2016-17, for Latino students by 18% and for African American students by 20%. The International Baccalaureate (IB) program at Cholla High School (RC), is "remarkable," with 85% of 12th grade students who took an IB course also taking an IB exam, and 54% of those students earning a score of four or higher while 84% earned a grade of three or higher and qualified for college credit at four-year colleges.

While the Court does not award unitary status for CRC, it notes that the District is a vanguard in offering culturally relevant curriculum to students. The District has reduced its drop-out rate and achieved a graduation rate to be envied in and out of Arizona. The District dropout rate for African-American students is 2.5% as compared to Pima County at 4.9%, Arizona 4.0%, and the national average of 6.5%. The District dropout rate for Latino students is 2% as compared to Pima County at 4.9%, Arizona 4.08%, and the national average of 9.2%. The District's Latino student graduation rate is 80%, compared to Pima County at 71%, Arizona 72%, and the national average of 78%. The District's African-American student graduation rate is 82%, compared to Pima County at 74%, Arizona 74%, and the national average of 80%.

The Court notes that much, if not most, of the progress has occurred this past school year. In part, the Court attributes this to the time it took to develop strategies and action plans, but these recent dramatic changes also reflect the power of the strategies and the certitude with which the District has proceeded since approximately SY 2016-17. As to those parts of the USP where the Court awards unitary status, the Court finds that the District has acted in good faith to fully and satisfactorily comply with the USP program, eliminated the related vestiges of the prior *de jure* segregation to the extent practicable for that program, and demonstrated a good-faith commitment to the whole of the USP program where unitary status is awarded. To be clear, the Court awards unitary status in part only as to USP programs where the Court is confident judicial oversite is no longer necessary. In other words, the Court is confident that the District is committed to a future course of action as to these USP programs that will give full respect to the equal

protection guarantees of the Constitution and guarantee parents, students, and the public assurance against any further injuries or stigma.

The Court notes that in several parts of the USP where it does not award unitary status, there is minimal work remaining to attain full program compliance. In every instance where unitary status is denied, the Court has identified what remains to be done to comply with the USP, and the Court believes that unitary status may be attained within approximately one year. In issuing the orders below, the Court relies on the District's representation that even as it objected to recommendations by the Special Master, it nevertheless was moving forward to comply with the Completion Plans.

**Accordingly,**

**IT IS ORDERED** that, pursuant to 2016-17 SMAR (Doc. 2096), unitary status is GRANTED IN PART AND DENIED IN PART.

**IT IS FURTHER ORDERED** that unitary status has been attained for all provisions of the Unitary Status Plan, except those identified below.

1. GRANTED for USP § II, Student Assignment, except for the Magnet Program, with unitary status to be reconsidered as follows:

§ II.E: The District shall file the 3-Year Plus Integration Plan, including individual school non-magnet integration plans, if any are practicable, and the Outreach and Recruitment Addendum, by: September 1, 2019.

2. GRANTED for USP § III, Transportation, with the Court retaining jurisdiction for the purpose of considering unitary status for the Magnet Programs and Advanced Learning Experiences (ALE) Programs.

3. GRANTED for USP § IV, Administrative and Certificated Staff, except for §§ A, F.1, I.3, and E, with unitary status to be reconsidered as follows:

§ IV.A, F.1, I.3: The District shall file the 2018-19 Teacher Diversity Plan (TDP), including the attrition and Grow-Your-Own Program studies, by: 90 days of the filing date of this Order.

§ IV.E: The District shall file a Notice and Report of Compliance with the Court's directives related to centralizing the hiring process and certification for placing beginning teachers at Racially Concentrated or under-achieving schools by: 90 days of the filing date of this Order.

4.    GRANTED for USP § V, Quality of Education, including § D, Exceptional/Special Education, and excepting §§ A-C, E.1.b.a.i-ii, E.7-8, and F, with unitary status to be reconsidered as follows:

§ V.A: The District shall file the ALE Policy Manual by: September 1, 2019.

§ V.C: The District shall file the Dual Language Plan by: September 1, 2019.

§ V.E.1.b.i: The District shall file an ELL Action Plan for dropout prevention by: 90 days from the filing date of this Order.

§ V.E.6.a.i-ii: The District shall file the CRC Comprehensive Plan and CRP Professional Learning Plan by: September 1, 2018.

§ V.E.7-8: The District shall file the Post-unitary Status Plan for AASS and MASS, including ELL students, by: 90 days from the filing date of this Order.

§ V.F: The District shall file a Notice and Report of Compliance with the Completion Plan for Maintaining Inclusive School Environment and Professional Learning Plan by: 90 days from the filing date of this Order.

5.    DENIED for USP § VI, Discipline, with unitary status to be reconsidered as follows:

§ VI: The District shall file a Notice and Report of Compliance, including a detailed progress report specifically addressing each provision of the Discipline Completion Plan and Professional Learning Plan by: September 1, 2019.

6.    GRANTED for USP § VII, Family and Community Engagement, except for school-site services and to develop data tracking capabilities, with unitary status to be reconsidered as follows:

§ VII: Subsequent to the completion by the expert on effective family engagement strategies, the District shall file an update to the FACE Action Plan, reflecting the

directives contained in this Order and cross-referencing the District's Post-unitary Status AASS or MASS Plan as relevant by: 90 days from the filing date of this Order.

7.  GRANTED for USP § VIII, Extracurricular Activities, except for documenting that there are no disparities between Racially Concentrated and Integrated schools and extracurricular activities are being used to facilitate positive interracial interactions, with unitary status to be reconsidered as follows:

§ VIII: The District shall file a Notice and Report of Compliance with the Extracurricular Activities Completion Plan by: September 1, 2019.

9.  GRANTED for USP § IX, Facilities and Technology, except for the FCI and TCI, and for § IX.B.1.iv and B.4, for teacher proficiency in using technology to facilitate student learning, with unitary status to be reconsidered as follows:

§ IX.A: The Special Master shall file a Notice and Report of Compliance for recalculation of FCI scores.

§ IX.B: The Special Master shall file a Notice and Report of Compliance for the TCI update for internet access and correction of any disproportionality, by: September 1, 2019.

§ IX.B.1.iv and B.4: The District shall file a Notice and Report of Compliance: Professional Learning Plan for teacher proficiency in using technology to facilitate student learning by: 90 days from the filing date of this Order.

10. GRANTED for USP § X, Accountability and Transparency, for EBAS, § X.A, EBAS, except for professional development, and DENIED for Budget, § X.B, as follows:

§ X.A: Unitary status shall be deemed attained as to professional development for the effective use of EBAS when unitary status is granted for USP §§ V.E.6.a.i-ii, V.F, and VI.

§ X.B: The District may seek reconsideration following the next budget cycle.

**IT IS FURTHER ORDERED** that the above filings shall trigger reconsideration of unitary status. Within 14 days, the Plaintiffs may file Supplementary Responses.

Within 7 days, the District may file a Supplementary Reply. Within 14 days, the Special Master shall file an R&R after the Supplementary Reply. The Court shall thereafter, reconsider unitary status.

**IT IS FURTHER ORDERED** that the Court shall retain jurisdiction over all provisions of the Unitary Status Plan for the purpose of enforcement.

**IT IS FURTHER ORDERED** that for the purpose of reconsidering unitary status, the Court shall retain jurisdiction over USP § II.J, IV.I and J, V.e.5, VI.E, IX, and X.A for Professional Development; USP § III for Transportation related to the Magnet Program and the ALE Program, and USP §§ II.I and V.A, for Outreach and Recruitment related to the 3-Year PIP: CMP, the ALE Policy Manual, and the Outreach and Recruitment Addendum.

**IT IS FURTHER ORDERED** that the District shall continue to file the annual report, and the Parties may request the Special Master to file a Report and Recommendation in the event any compliance issues arise that are not being addressed by the filings above.

**IT IS FURTHER ORDERED** that the motions to strike (Docs. 2112 and 2114) are DENIED.

Dated this 5th day of September, 2018.

Honorable David C. Bury
United States District Judge