# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
|     Plaintiffs | |
| and | |
| United States of America, | |
|     Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
|     Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
|     Defendants-Intervenors, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
|     Plaintiffs, | |
| and | |
| United States of America, | |
|     Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
|     Defendants. | |

2019-20 910G USP Budget

On July 1, 2019, the District filed the 2019-20 Budget for 910G funding for implementation and operation of the District under the Unitary Status Plan (USP). Prior to filing the Budget with the Court, the parties went back and forth approximately three times addressing various concerns expressed by the Plaintiffs and the Special Master. The School Board adopted the budget on June 25, 2019.[1]

The Plaintiffs filed objections, and the District responded. The Special Master filed the Report and Recommendation (R&R) on July 30, 2019. The Mendoza Plaintiffs and the District filed objections to the R&R. The last brief was filed by the District on August 18, 2019. With over a month having passed since the Board adopted the budget and school having already commenced, the Court rules as expeditiously as possible and approves the budget. Without these time constraints, the Court would have called for further briefing on some issues. Instead, the Court will adopt the Special Master's recommendation for a $1,000,000 USP set aside, contingent on further briefing of issues raised challenging the budget which have substantive programmatic implications.

Simultaneously with the budget submission, the District also filed Notices of Compliance to directives issued by the Court in April 2019, when it found the District to be non-compliant with directives made by the Court in September 2018. The Court considers both the budget objections and the program issues because several are intertwined. Here, the Court addresses the USP budget issues.[2] The Court, simultaneously, issues a separate, second, Order to consider the Notices of Compliance and program issues.

---

[1] On June 25, 2019, the Special Master filed a Report and Recommendation (R&R) related to the 2019-20 910G Budget. (Doc. 2231.) On July 30, 2019, the Special Master substituted his Report and Recommendation related to the 2019-20 910G Budget for the Court's consideration. (Doc. 2246.) The District filed a Combined Response to the Mendoza Plaintiffs' Objection and to the July 30, 2019 R&R, and again objected to the July 30, 2019 R&R. The Court has considered the R&R filed on July 30, 2019 (Doc. 2246), not the previously filed R&R, but it has considered both of the District's responsive briefs.

[2] The Court notes that the Special Master included program related comments about the Teacher Diversity and Grow Your Own Programs (BYOP) in his budget R&R. The Court addresses Teacher Diversity and GYOP in its Order addressing the Notices of Compliance, not here.

- 2 -

The Court adopts the budget as explained herein. In some instances, the Court has painted broadly to provide the District, the Parties, and the Special Master with fiscal priorities as the Court understands them for USP programs. The Court's rulings are in keeping with the Special Master's recommendation that budget decisions be based on the following: 1) expenditures should be justified by research based projects or programs that improve integration or student achievement for minority students; 2) cost-effectiveness should be considered, especially when expenditures are not research based but instead have devolved over time due to local traditions and conditions; 3) 910G funds should disproportionately benefit African American and Latino students, and 4) 910G funds should not be used to supplant Maintenance and Operations (M&O) funds. (R&R (Doc. 2246) at 3.)

**Completion Plan Budgets**

The District's spending for various USP provisions, including the Completion Plans, is spread throughout the budget and cannot be readily identified as the budget for any specified USP program and/or Completion Plan. Therefore, the Plaintiffs and the Special Master report that it is difficult to determine whether there is sufficient funding being allocated for each of the Completion Plans. The problem of determining adequate program funding is compounded where the District is allocating Completion Plan responsibilities to be performed by existing full-time employees (FTEs), raising questions about whether the District intends to add to or change existing staff responsibilities. Obviously because existing staff are FTEs, the District must be doing the latter. The Special Master reports that the District has failed to identify how many people in what positions are needed for the various USP program Completion Plans. He asks the Court to order the District to submit budgets for the implementation of the Completion Plans that remain in play where tasks are to be performed by current FTEs, the District should identify those tasks that existing staff will no longer be performing.

The Special Master shall provide a list of the Completion Plan budgets that he needs to review and the employee information he seeks, such as identification of FTEs who are

in what positions, currently performing what responsibilities related to the Completion Plans and how those responsibilities change for 2019-20. In other words, the District shall provide the Special Master with the information he requests as being necessary for him to determine whether the District has conducted a needs-based determination of staffing levels for the Completion Plans as reflected in the 2019-20 USP Budget.

### Magnet School Budgets

The Special Master shall address the Mendoza Plaintiff's FTE concerns related to the Magnet School budgets.

The remainder of the Mendoza Plaintiff's objection to the budget will be treated like a substantive program challenge. The Mendoza Plaintiffs, like they did last year, challenge the District's perpetuation of the same Magnet School budgets year after year after year. For example, the Holladay Elementary School (ES) 2018-19 budget allocation was $609,332 and in 2019-20 it is $609,332.25. The Special Master describes this as particularly troubling because this year, the District changed its budget method to actual numbers where it had previously used average teacher salaries and estimated program costs. The Mendoza Plaintiffs submit this as evidence that the District fails to make the requisite needs-based assessment, based on program effectiveness, to improve student achievement. Both the Mendoza Plaintiffs and the Special Master ask for an explanation.

The District provides an explanation. According to the District, the Court need look no further than the Magnet Site Plans (MSPs) to see that the District is assessing the academic and integration progress at each school and, based on these program evaluations, is developing budgets based on program effectiveness and need. Each magnet school uses the Arizona Department of Education's Comprehensive Needs Assessment (CNA) process to identify school strengths and weaknesses across six School Improvement Action Plan (SIAP) Principles. Each MSP builds academic achievement strategies and efforts around three of the six CNA principles so in this way, each magnet school aligns its MSP with its SIAP, using the CNA to inform the funding needs for both.

Simultaneous with this CNA process, the magnet department engages magnet

schools in a parallel process to assess magnet staffing, programs, data, effectiveness, and needs based through the lens of the MSPs and magnet budgets.

These two processes result in the District developing magnet budgets based on multiple sources: "the CNA, monthly site visits, reviews of quarterly reports, observations, analyses of academic progress on benchmarks, program assessments, and meetings focused specifically on developing plans and funding based on identified need." (District Response (Doc. 2244) at 8.) "Through meetings with the magnet department, sites adjust how resources are used, but work to remain within their existing budget amounts. That budget amounts remain constant between years shows fiscal responsibility, not lack of assessment." *Id.* According to the District, the Mendoza Plaintiffs have conflated "budget" with "budget amount." Admittedly, budget amounts stay the same but the budgets change year to year because the programs change. *Id.* at 6.

The District refers to Holladay ES again, as an example:

> For example, the 2018-19 MSP for Holladay ES included instructional specialists (3 FTE), master teachers (3 FTE), and magnet teachers (3 FTE). Based on multiple need assessments, the District eliminated instructional specialists and master teachers, reduced magnet teachers from three to two, and added an instructional data intervention specialist (1 FTE), and teaching assistants (2.5 FTE). The 2018-19 USP budget allocation for Holladay was $609,332 (9.5 FTE); the 2019-20 USP budget allocation for Holladay was $609, 332.25 (10 FTE). The District conducted needs assessments, worked with Holladay on how best to utilize its resources to meet those needs, and did so within the existing budget amount.

*Id.* at 8. The Court finds that the District stops short on its explanation. How did the need for 3 FTE instructional specialists, 3 FTE master teachers, and 3 FTE magnet teachers get whittled down to: no instructional specialists, no master teachers, and 2 FTE magnet teachers, 1 FTE instructional data intervention specialist, and 2.5 FTE teaching assistants? The Court realizes that the MSP identified the need for 9 FTE and the 910G budget allocated 9.5 FTE at Holladay ES, but FTEs are not all equal. The Mendoza Plaintiffs and the Special Master are correct, the District does need to explain how this prioritization process, seemingly designed to crunch USP program needs into predetermined budgets, does not undermine the need-based assessments to an extent that jeopardizes the effectiveness of Magnet school programs. The Court agrees to start with the MSPs. The

- 5 -

District should provide the same comparison for each Magnet School that it provided here for Holladay ES. In addition, the Court will allow the Mendoza Plaintiffs to conduct limited discovery, through the Special Master, related to the question of whether disparities between MSPs and budget allocations for the past three years have compromised program integrity. In other words, are the Magnet School's MSP goals being realized. After discovery, the Mendoza Plaintiffs may reurge their Objection to the District's process for developing Magnet School budgets.

**Consultants, including Out-side Vendors for Tutoring Services**

The Special Master repeats his past criticism of the District's use of consultants to carry out tasks that in the future may fall to District employees because it would be a better use of 910G funds to build in-house expertise. He recommends that due to the uniqueness of TUSD operations under the USP, consultants should not be used to conduct professional training unless they have expertise in culturally responsive pedagogy and equity practices. He suggests that using multiple resources has led the District to have multiple instruments to assess professional proficiency, which could be confusing. He recommends professional training and instruments of measurement be aligned to ensure coherence and consistency. The Special Master should undertake an investigation to determine whether either of these problems exist, and if so reurge his recommendations.

<u>Tutors</u>

The Court, like the Special Master and the Plaintiffs, is disappointed that the District has been unable to expand the in-house model used at Cholla High School which has proved to be highly effective for affecting student success in International Baccalaureate courses. Instead, the District reports it has been forced to use private companies to provide tutoring services. Previously, the Court has considered use of tutors in the context of tutoring services being provided by AASSD and MASSD and has repeatedly held that student tutoring programs require certified teaching staff. In the event the private companies used to provide tutoring services do not use certified teaching staff, the District shall file a Motion for Leave to modify this requirement.

**Out-of-State Travel for Recruitment**

The Special Master agrees with the Fisher Plaintiffs that out of state travel to recruit minority professional staff, as required under the USP, is costly and unproductive. As recommended, the Court advises the District that out-of-state travel for such recruitment shall be discretionary. The District shall review the HR department's recruitment practices and procedures to ensure that it is using the most updated, research based, recruitment tools, including marketing models aimed at recruiting Black teachers and administrators. The District shall file a report with the Court identifying these recruitment tools and procedures: HR Procedures for Recruiting Black Professional Staff. The Plaintiffs and the Special Master shall be afforded an opportunity to object regarding the sufficiency of the procedures, including recruitment tools and marketing strategies. Thereafter, the Court shall approve them, with the understanding that all HR staff shall be, accordingly, trained with training funded by 910G funds as soon as possible, but no later than the 2020-21 budget.

**Mentors and Beginning Teachers**

The Court relies on the simultaneously issued Order addressing the District's failures to comply with the directives of the Court related to the certification procedures for placing beginning teachers in underperforming and racially concentrated schools. To be clear, the District shall not use Curriculum Service Providers (CSPs) in place of mentor teachers because the Court approved the District's plan for supporting beginning teachers based on the District's express teacher-mentoring ratios for first and second year teachers teaching in regular schools and teaching in underachieving and racially concentrated schools. The Court has, likewise, approved the number of hours per week of one-on-one mentoring required for teachers, including teachers teaching in underperforming and racially concentrated schools. All parties and the Special Master appear to agree on the formulas.[3]

---

[3] In the event there is misunderstanding regarding these formulas, a motion requesting clarification shall be immediately filed.

- 7 -

The sole problem appears to be the disparity in numbers of beginning teachers teaching in these schools. The District's last filing reasserts the 50-something number and reports it has employed 28 teacher-mentors where it only needs 19. If true, the District has more than satisfied the requirement for teacher-mentors. The District has doubled the teacher-mentors needed, which raises the question of whether this budget allocation is an effective use of teachers as teacher-mentors, who have no teaching responsibilities, when there is an admitted teacher shortage in the classroom and not enough teachers for an in-house tutoring program. The teacher-mentor budget question cannot be decided in a data vacuum.

The Court must know exactly how many beginning teachers are teaching now and how many beginning teachers the District anticipates coming on board during the year. The Court must also know how many teacher-mentor FTEs should funded from the 910G budget because not all teacher-mentors are mentoring teachers teaching at underperforming or racially concentrated schools. Subsequent to the District's filing the Beginning Teacher Inventory, the Plaintiffs and Special Master may reurge any budget objections.

**Reading Recovery**

The Special Master reports that the District's own research demonstrates the efficacy of the District's Reading Recovery program, which targets African American students better than most other academic interventions. He explains the difficulty in targeting academic achievement for African American students because they make up a small number of students in most schools and describes the Reading Recovery program as effective in reaching African American students. The Special Master recommended that the District add two additional Reading Recovery teachers to the program; the District agreed to add one.

The District responds that it has used the Reading Recovery program to target African American students. It currently has 13 schools in 2019-20 offering the Reading Recovery program. Three of the schools have near, at, or above, the District average for African American students (Borton ES (19%); Cavett ES (9%); and Marshall ES (11%))

and three of the schools have twice the District average for African American students (Erickson ES (22%), Myers-Ganoung ES (25%), and Wright ES (28%)). This leaves approximately half of the schools with Reading Recovery programs unaccounted for by the District as to the logic for these program's placements. The District does explain its hesitation to add more reading recovery teachers is because "RR is not cost-effective; it serves approximately 20 students per program on an average." (TUSD Response (Doc. 2256) at 7.) It is an expensive program, and in addition to the price tag, the District questions justification for hiring one teacher for 20 students when it is facing a teacher shortage. Each teacher hired for Reading Recovery is a teacher not hired to fill a teacher vacancy. *Id.* at 7-8. Nevertheless, it will add one reading recovery teacher, but notes that its previous agreement to expand Reading Recovery was contingent on it proving effective, not a future promise to do so regardless of cost or other factors. *Id.* at 7.

The District shall report on the current status of the reading recovery program, including a school by school breakdown of how many reading-recovery teachers are at each school reaching how many students, and the racial make-up for those students receiving services through the Reading Recovery program. The District shall propose an effective student-Reading Recovery teacher ratio. The District shall identify target schools for implementing and or retaining the Reading Recovery program, with a priority of reaching African American students and, secondarily, students attending underachieving schools. Unless the report reflects that the District's targets are satisfied by the current status of the program, the District shall, as recommended by the Special Master, add the two Reading Recovery teachers in the coming year. If it is the District's position that the Reading Recovery program is not cost effective and should, therefore, be discontinued, reduced, or modified, the District shall ensure that there are alternative programs, which must be best-practices programs, to promote reading. The District should have a comprehensive reading student-support program and explain how it will pick and choose which reading programs to implement in which schools. The District shall propose a time frame, based on budgetary constraints, for implementing these student support reading

programs in target schools.

**Integration and Transition Schools**

The Special Master complains that the District has freed up $2 million dollars formally committed to transition magnet schools without recommitting those moneys to integration efforts. The District responds: "The underlying purpose of removing magnet status from a school is to redeploy the magnet funds used by the school "*so that resources can be used more effectively in other schools or programs.*" (Response (Doc. 2244) at 10) (emphasis in original). According to the District, "[t]he understanding has been that the funds would stay with the demagnetized school for a brief transition period to provide some level of continuity and ability to transition to a new status." *Id.* at 10-11.

The District reads too much into the Court's directive to "complete transition plan implementation in SY 2017-2018," and "correspondingly, staff positions and expenditures to 'facilitate transition' shall be phased out no later than 2018-19." (Order (Doc. 1966) at 4-5) (approving transition plans). The District argues that the purpose of the transition plans was to transition the schools to their new non-magnet status without negatively impacting student performance at the former magnet schools. The District submits it has accomplished this transition, without any net loss of full-time employees (FTE) and an additional $953,000 has been added to the budgets of these schools in other categories, to ensure continued [support for students at these schools." (Response (Doc. 2244) at 11.) The Court understands this to be an admission by the District that it has redirected approximately $1,000,000, rather than $2,000,000, from these schools to other schools, albeit for integration efforts ($677,000 transportation) and/or other USP purposes.

The District misunderstood the purpose of the Transition Plans. They were not simply to transition magnet funding from these schools to others without negatively impacting the students attending the transition schools. As the Special Master reminds the District, this Court ordered it to look at strategies other than magnet schools for promoting integration, specifically this Court directed the District to improve student achievement in racially concentrated schools as a means of attracting racially diverse students to promote

integration. (Order (Doc. 1983) at 4-5 (discussing transition plans and need to focus on improving academic achievement as one effective means of promoting integration); *see also* (Order (Doc. 1870) at 4, 6-7 (same). Likewise, the Court reminds the District that it was directed to prepare transition plans for racially concentrated and underperforming schools to replace magnet programs and dollars with other exemplary programs and equal funding aimed at improving student achievement at the transition schools. (Order (Doc. 1870) at 7.)

In other words, the transition plans had a two-fold goal of: 1) removing magnet status to improve the integrity of the District's Comprehensive Magnet Plan and 2) improving academic achievement at underperforming schools where magnet status was being removed, especially in underperforming schools that were racially concentrated. The Court's expedited schedule for preparation and implementation of the Transition Plans was not to expedite a swing in funding away from these schools but was to ensure funding could be most effectively used by the District at these schools as soon as possible.

The Court approved Transition Plans for: Ochoa Elementary School; Robison Elementary School; Safford K-8 School; Utterback Middle School; Cholla High School, and Pueblo High School. (Order (Doc. 1996) at 2.) Each Transition Plan included strategies to improve student achievement, such as: Tier 1 (classroom) instruction; culturally relevant curricula, and family engagement. The Court noted that the District was lagging behind when it came to "the number one strategy for improving student achievement," which was ensuring quality teaching. *Id.* at 3. The Court noted its concern with the District's plan to facilitate the Transition Plans by hiring consultants because direct delivery of quality education is key to improving the achievement gap at TUSD, which in the end requires having boots on the ground; for example, the Court noted the delay in securing permanent principals at Ochoa Elementary School and Utterback Middle School. *Id.* at 3-4. Nevertheless, the Court approved the Transition Plans based on the District's agreement to follow the Special Master's recommendation to use

"research based" criteria for introducing new programs in the transitioning schools. *Id.* at 4.

It appears to the Court that the District's admitted approximately $1,000,000 redirection of funding from these schools may be premature, especially for the transition schools that are "among the schools performing below the District average-- Utterback and Safford for example." (R&R (Doc. 2246) at 8.) The Court adopts the Special Master's recommendation to "require the District to explain why some of the transition funds are no longer needed in former magnet schools, [especially schools] achieving below the District average." (R&R (Dioc. 2246) at 10.)

The Special Master asks that the District explain: "How will the continuing needs of students in the so-called transition schools be met without resources beyond those assured by formula?" The Court can answer that question in part. The District has been ordered to, and did prepare, Transition Plans that called for the development, adoption, and implementation of programs to improve student achievement in these schools. The District shall file a status report for each Transition Plan, especially focusing on the implementation and operation of any exemplary programs and programs intended to improve student achievement at schools achieving below the District average. The Special Master shall review the District's status reports and file an R&R regarding improved academic achievement, if any, and any recommendations related to implementing, operating, and/or modifying the transition plan programs to improve student achievement. The District is required to fund these programs at least equivalent to the previous magnet funding apportioned to these schools. Because the District asserts that "the SY2019-20 budget includes almost one million dollars ($953,000) in 910G funding to continue to support transition schools, the Court adopts the Special Master's recommendation for the District to set aside the remainder, $1,000,000, of previous transition plan funding as an integration contingency fund for these schools.[4] The Special

---

[4] The District submits that the 910G Budget is approximately $1,000,000 over the $63.7 million statutory cap on such 910G funds and was reconciled with the statutory cap by reducing the percentage of transportation costs attributable to USP activities, assuming

- 12 -

Master's R&R shall include budget recommendations for the $1,000,000. To be clear, the Court does not foreclose redirecting 910G funding from these schools, but only after student achievement needs are addressed, especially for students at schools achieving below the District average.

**General Student Services: Evidence Based Accountability System (EBAS), 7th Period, and Discipline (Professional Training)**

The Plaintiffs and the Special Master complain that the District is allocating too much of its 910G funding for general student services. They point specifically to a hundred percent 910G funding for EBAS, which is the student tracking system the District relies on to determine delivery of appropriate services to each and every student. Plaintiffs note that in past years, the 910G budget has funded only 50 percent of EBAS; the District asserts that 910G funds paid 100% for EBAS program, BrightBytes and SchoolCity, licensing fees.

The District responds, essentially, that removing the EBAS program costs from the 910G budget "solves nothing, because the principal budget is fully subscribed, and this would mean a cut to something else in the principal budget. With declining enrollment, the principal budget is declining." (TUSD Response (Doc. 2244) at 13.) Nevertheless, the District may not supplant general M&O funding with 910Gfunding. This hard and fast rule arose because of the District's historic misuse of desegregation funding to operate the District, generally, based on the assertion it was a majority minority district. It is not unreasonable for the Plaintiffs, the Special Master, and this Court to require the District to tie the use of 910G funding to USP programs, especially in areas of overlap where all students are benefitting from a program. If the District

---

as previously reported by the District that approximately 54% of all transportation costs in the District are attributable to transportation provided for USP programs. (TUSD Combined Response (Doc. 2244) at 11.) The Special Master responds that another $1,000,000 can be added over the 910G cap because the District will not come close to spending all the money budgeted due to unforeseen circumstances, including the inability to fill staff positions. In the past years, the District has had at least $4,000,000 per year in unspent funds. (R&R (Doc. 2246) at 10.)

wants to use 910G funds, it must prioritize the benefit to be first for the Plaintiffs and then for the remainder of students.

The Court does not hold that the District may not use 910G funding for EBAS. The Court refers the parties to its discussion of the importance of EBAS to the USP in the September 6, 2018, Order. (Order (Doc. 2123) at 140-143, 145.) The USP required the District to develop EBAS, a data system capable of tracking student demographics, academic and behavioral data for students and faculty, which can be used to assess individual student service needs and program effectiveness. The Special Master recommended, and the Court agreed, to retain jurisdiction over EBAS as one of five essential domains of an Organizational Learning System (OLS) under the USP, with the other four domains being: Professional Learning Communities (PLCs), MTSS, discipline monitoring, and program evaluation. *Id.* at 141. The Court rejected the District's assertion that the USP called only for the development of EBAS, which was completed. The Court found the District was responsible for showing that EBAS was being used effectively by staff for purposes of the USP. *Id.* at 143. The Court directed that it would take an especially close look at how well EBAS data is being used to implement effective strategies for: student support services, reducing discipline, especially exclusionary discipline, and the evaluation of the effectiveness of new USP initiatives. *Id.*

In conclusion, the District may not use 100 percent 910G funding for EBAS, but it may use 100 percent 910G funding for EBAS operations related to the delivery of student support services in minority racially concentrated schools and for underachieving minority students. It may use 100 percent 910G funding for EBAS directly related to reducing discipline, especially exclusionary discipline which has been shown to fall disproportionately on Black students. It may use 100 percent 910G funding for EBAS related to assessing the effectiveness of USP programs. The Special Master and the Plaintiffs do not object to using 50 percent 910G funding for all EBAS expenditures. Because the District intends to use more, the EBAS expenditures become an issue and the District must establish a link to the USP.

For example, the District allocates a hundred percent 910G funding for the cost of adding a 7th period at Gridly Elementary School because this period will be used by teachers for PLCs and to allow extra time for interventions for struggling students. The Plaintiffs object because Gridly Elementary School is 42% Anglo/white, with only 38 percent Hispanic/Latino and 11 percent African American students. "The District says it is ok because 'more than a majority of students in the school are African American and Latino.'" (R&R (Doc. 2246) at 17.) As explained above, this is the type of rationale that led to historical misuses of 910G funding. The Plaintiff's flip-side racial argument, does not, however, necessarily prevail but it is enough to question the 910G allocation for a 7th period at Gridly Elementary School. Is the 7th period program being used to benefit Plaintiffs. To answer this question, the District must identify the schools where it has placed other 7th period programs? For example, have all the racially concentrated schools been outfitted with 7th periods, justifying the District to move on to lower priority schools serving fewer minority students? The Court notes that PLCs, which allow time for professional learning, are especially necessary for the successful implementation of new discipline programs.[5] Are 7th periods being located at schools with the largest Black student populations? To the extent that 7th periods are used for the delivery of student support services, have they been placed at schools were students are performing below the District averages or at underperforming schools?

The District must identify priority criteria that justify placing these type of cross-over benefit programs for full funding in the 910G budget, including the transfer of $632,000 in 910G funding from transition school programs to magnet transportation and incentive transportation. The link being readily apparent for the former, magnet transportation, but not so for alleged incentive transportation, which may or may not be integrative. The Court refers to the Express Bus shuttles, and its prior criticism of the

---

[5] The District promises that the September 1, 2019, Discipline Professional Development Completion Plan, will reflect how the District links its existing systematic analysis of data on disciplinary actions with necessary professional development and it processes to regularly assess how well teachers understand and use their discipline training and existing resources.

Magee Drachman Express shuttle which moved five students from east to west without any readily apparent integrative improvement in either the sending or receiving schools. (Order (Doc. 2123) at 30.) The Magee Drachman Express Bus would be an example of a misallocation of 910G funding.

**Student Support Services: AAASD and MASSD**

The Special Master reports that both Plaintiffs object to the budgets for the African American Student Support Services Department (AASSD) and the Mexican American Student Support Services Department (MASSD), respectively. He declines to make any recommendation for either department because he believes these departments are not effective and efficient means for providing student support services. The Court understands that the District is between a hard spot and a rock, with the Special Master objecting to the existence of the two departments and the Plaintiffs insisting on them. On April 10, 2019, this Court ordered the District to look again at the Special Master's concerns because the Court agreed with them. Noting that "if the USP has been successful there should be less for AASSD and MASSD to do and their roles should have markedly changed." (Order (Doc. 2213) at 16.) "This does not mean that there is no role for AASSD and MASSD. It means, however, that the Departments' roles should have narrowed, especially in the areas of family engagement, Culturally Relevant Curriculum (CRC) and CRP, and individual on-site delivery of academic and behavioral student support." *Id.*

The Court ordered the District to revise and refile AASSD and MASSD Operating Plans by September 1, 2019. The Court has not approved the AASSD and MASSD Operating Plans.[6] The Court refers the parties and the Special Master to the April 10, 2019, Order, as follows:

---

[6] The Fisher Plaintiffs indignantly complain that the District "deliberately misled the Court" to believe the Fisher Plaintiffs had signed off on the revised AASSD plan, but Fisher Plaintiffs were still negotiating with the District and were not on board with the revised plan as submitted to the Court. *But see* (Order (Doc. 2213) at n.2 (recognizing Special Master's note to the Court that as of January 9, 2019, Fisher's counsel indicated Fisher Plaintiffs opposed the plan for AASSD and noting Fisher's counsel knowledgeable regarding rules of the court for filing responses and objections, including rule that failure

> It is the Court's responsibility to assess the District's commitment to operating effective programs under the USP to the maximum extent practicable. There is no room to unnecessarily duplicate and confuse delivery of services, especially when every USP program requires expensive administrative staff including at least one Director, Program Coordinator, and Administrative Assistant. These costs divert millions of dollars away from direct-student services and should not be incurred simply to perpetuate the status quo. To be clear, it is not enough to simply coordinate duplicative efforts.

*Id.* To be clear, in the event the parties have been unable to work with the Special Master and each other to agree on more limited roles for AASSD and MASSD, the Court is prepared to decide their fate. As of the September 1, 2019, filing by the District, the Court intends to approve or not, in total or piece by piece, the AASSD and MASSD Operating Plans based on an R&R from the Special Master and full briefing by the parties. There can be no further delay in setting a future course for these two historically significant departments, which absorb significant 910G funding.

**Family Engagement and Community Engagement (FACE)**

The Court's directive above that the District prepare Completion Plan budgets resolves the Special Master's concerns that the District's reallocation of existing staff responsibilities is need based and not just a guestimate. Without the Completion Plan budgets, including the one for FACE, the parties, the Special Master, and the Court must depend on the District's assertions that existing full time staff can take on new full time responsibilities, an assertion that is counterintuitive, or the District must hire staff that is more than sufficient, like the two new FACE coordinators, to make the Special Master happy. The FACE Completion Plan Budget should benefit all the parties and the Court.

**Accordingly,**

**IT IS ORDERED** that the Report and Recommendation (Doc. 2246/2231) is

---

to respond may be deemed consent). Fortunately for the Fisher Plaintiffs, resolution of the AASSD plan remains pending, with an opportunity for the Fisher Plaintiffs to be heard on the subject subsequent to the September 1, 2019, filing by the District of the revised AASSD.

adopted in part and denied in part as follows: the USP 910G Budget for SY 2019-20 is approved, with an integration-contingency set aside of $1,000,000.00.

**IT IS FURTHER ORDERED** that within 14 days of the filing date of this Order, the Special Master shall provide the District with a list of Completion Plans, where tasks are to be performed by current FTEs, and identify the employee information he seeks; the District shall have 14 days to provide the requested information to the Special Master. The Special Master shall have 14 days from the disclosure of the information to review it and reurge the Objection that the District failed to assess actual staffing needs for any Completion Plan.

**IT IS FURTHER ORDERED** that within 14 days of the filing date of this Order, the District shall file the Magnet School MSP Comparison Report; within 14 days of the report being filed, the Mendoza Plaintiffs, through the Special Master, may seek limited discovery related solely to the question of whether the Magnet School budgets are need based, based on program effectiveness; the District shall have 14 days to make disclosures, and the Mendoza Plaintiffs may have 14 days to reurge the Objection to the District's process for developing Magnet School budgets.

**IT IS FURTHER ORDERED** that the out-of-state recruitment of minority professional staff shall be discretionary.

**IT IS FURTHER ORDERED** that within 14 days of the filing date of this Order, the District shall file the HR Procedures for Recruiting Black Professional Staff; any Objections, including substantive challenges to the sufficiency of the procedures, shall be filed within 14 days.

**IT IS FURTHER ORDERED** that in the event there are no Objections or once the Court has finalized the HR Procedures for Recruiting Black Professional Staff, all HR staff shall be, accordingly, trained, and training shall be funded by 910G funds in SY 2019-20.

**IT IS FURTHER ORDERED** that within 14 days of the District filing the Beginning Teacher Inventory, pursuant to the directives of the simultaneous Order being issued related to the Supplemental Notices of Compliance, any budget related Objection

may be filed.

**IT IS FURTHER ORDERED** that within 14 days of the filing date of this Order, the District shall file the Reading Recovery/Reading Support Status Report; any Objections, including substantive challenges, may be filed within 14 days.

**IT IS FURTHER ORDERED** that the District shall add two RR teachers in the coming year unless the Reading Recovery Status Report reflects the District's targets are satisfied by the current status of the program.

**IT IS FURTHER ORDERED** that within 14 days of the filing date of this Order, the District shall file the Transition Plan Status Report; the Special Master shall have 14 days to file an R&R, including budget recommendations for the $1,000,000 set aside funds; any Objections may be filed within 14 days; there shall be no Replies, unless requested by the Court.

**IT IS FURTHER ORDERED** that the District shall identify District programs that are cross-over services benefitting the Plaintiff classes as well as the general student population, like EBAS, 7th Period PLCs, and transportation, etc. and either by stipulation of the parties determine how to apportion future funding between the 910G budget and M&O budgets or propose the appropriate ratio between the two pots of funding based on linkage and USP program priorities, taking into account the restriction that 910G funding may not supplant M&O funding.

**IT IS FURTHER ORDERED** that within 14 days of the filing date of this Order, the District shall file the Proposed 910G/M&O funding ratios for these cross-over benefit programs; within 14 days, any objections, including the EBAS objections, may be reurged.

**IT IS FURTHER ORDERED** that where Objections are filed, the District my

///

///

file a Reply within seven days and, thereafter, the Special Master may file an R&R within 7 days—the R&R being the final brief. In the event an Objection is filed by the Special Master, the District's Reply shall be the final brief.

Dated this 9th day of September, 2019.

Honorable David C. Bury
United States District Judge