# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
| Plaintiffs | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
| Defendants-Intervenors, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

December 1, 2018 Benchmarks: Supplemental Notices of Compliance

On September 6, 2018, the Court issued a comprehensive Order finding that TUSD had attained unitary status in part for some Unitary Status Plan (USP) programs but had not attained unitary status in other programs. The Court made express directives and set benchmark deadlines for compliance where it identified specific deficiencies in respect to attaining unitary status for specific programs. In April 2019, the Court considered substantive programmatic objections to Notices of Compliance filed by the District on December 1, 2018, as follows: 1) AASSD and MASSD Operating Plans; 2) FACE Update; 3) ELL Plan; 4) Middle School Courses for Highschool Credit; 5) Centralized Hiring Process and Certification for Placing Beginning Teachers at Underperforming and Racially Concentrated Schools; 6) Teacher Diversity, Grow-Your-Own Programs, and Attrition; 7) Inclusive School Environments and Cultures of Civility, and 8) Professional Learning for Technology. (Order (Doc. 2217), *see also* (Order (Doc. 2213)).

In April 2019, agreeing in part with objections made by the Plaintiffs and the Special Master to the December 1, 2018, Notices of Compliance filed by the District, the Court required the District to make immediate, but not longer than 30 days, revisions to bring the District into compliance with the September 6, 2018, Order. The Court ordered the District to show good cause for any further delays in compliance. (Order (Doc. 2217) at 15.) The Court also ordered the District to prepare an Executive Summary by December 1, 2019, to address the interconnectedness of the Unitary Status Plan (USP) programs before the Court reconsiders unitary status. (Order (Doc 2213) at 12-20.)

On May 22, 2019, the District filed Supplemental Notices of Compliance,[1] except on July 1, 2019, the District filed the Supplemental Notice of Compliance related to the Study of Strategies for Fostering Inclusiveness and Cultures of Civility. The Mendoza Plaintiffs have filed Supplemental Objections. There were no replies. The Special Master has filed a Report and Recommendation (R&R).

1. <u>AASSD and MASSD Operating Plans</u>

As noted in its Orders issued in April 2019, the Plaintiffs did not make substantive

---

[1] Supplemental to the December 1, 2018 Notices of Compliance.

objections to the AASSD and MASSD Operating Plans, but the Court nevertheless, based on recommendations from the Special Master, ordered revisions to be made by September 1, 2019, (Order (Doc. 2213)).

2. FACE Update

In addition to FACE Update revisions due on September 1, 2019, to reflect program interconnectivity (Order (Doc. 2213), the Court ordered the District to file a Notice of Compliance with this Court's directive that it immediately ensure, including updating the FACE Plan, that individual school websites are kept current regarding family engagement events, including but not limited to site council, PTO, SCPC, and Governing Board meetings. (Order (Doc. 2217) at 4.) The District filed the Supplemental Notice of Compliance (Doc. 2219) reflecting that the FACE Plan now requires school staff to keep websites updated and current regarding these events. Plaintiffs do not object to the update.

3. ELL Plan.

In addition to FACE Update revisions due on September 1, 2019, to reflect program interconnectivity (Order (Doc. 2213), the Court ordered the District to, during this year's annual review, determine whether the ELL dropout goal is sufficiently ambitious. The Court clarifies that this review and determination shall be set out in the 2018-19 District Annual Report (DAR), excerpted and simultaneously filed as a Supplemental Notice of Compliance which may contain additional supporting documentation and/or memorandum. (Order (Doc. 2217) at 5.)

4. Middle School Courses for Highschool Credit

In April, the Court found that no further action was necessary; such courses were being provided at all middle and K-8 schools. (Order (Doc. 2217) at 6.)

5. Centralized Hiring Process and Certification for Placing Beginning Teachers at Underperforming[2] and Racially Concentrated Schools

In it's April Order, this Court made several clarifications, beginning with its assurance to the parties that it was not confused by their respective arguments over whether

---

[2] Previously, the Court has described these schools as "underachieving" as defined

there were or were not too many first-time, inexperienced teachers, teaching at underperforming or racially concentrated schools. Ignoring discrepancies in the District's data as to the exact number of such teachers, the Court noted: "It is undisputedly 'clear that in developing the USP no one intended that the number of beginning teachers in what some call 'hard to teach schools' would be as great as it is.'" (Order (Doc. 2123) at 43 (citing (Special Master Reply (Doc. 2111) (Second Reply) at 14)). "The importance of limiting the number of beginning teachers in these schools cannot be overstated because good experienced teachers are the most important factor needed to improve student achievement." *Id. See also* (Order (Doc. 2217) at 6 (reiterating that there are too many beginning teachers teaching at underperforming or racially concentrated schools).

In response to the Supplemental Notice of Compliance, as it did to the original Notice of Compliance, the Mendoza Plaintiffs complain about inconsistency in TUSD's data and point out that Exhibit B2, First Year Teachers at Underperforming Schools Pre and Post Observational Rubric, reflects 92 teachers, which does not coincide with TUSD's previous representation of 54 first-year teachers for SY 2018-19. (Mendoza Objection (Doc. 2227) at 3.) The Court cannot ignore the inconsistency because accurate identification and tracking of beginning teachers is essential to an effective beginning teacher support program and to the District's 910G Budget for beginning teacher mentors. The first is relevant here. The second is relevant to the Order being issued simultaneously with this Order, approving the 2019-20 budget.

The Mendoza Plaintiffs challenge the District's strategies for support for beginning teachers teaching at underperforming and racially concentrated schools, Study of Strategies for Support of First Year Teachers (Supplemental Notice of Compliance (Supp. NC), Exhibit B (Doc. 2222-2) at 2-7), as lacking any follow-up second-year support strategies for teachers who are underperforming at the end of the first year. *Id.* at 5-7. The Mendoza Plaintiffs complain that the certification process reflected in the Certification Form

---

by USP IV.E.5: "schools in which students are achieving at or below the District average in scores on state tests or other relevant measures of academic performance." (Order (Doc. 2123) at 43 n. 20.) The Court considers the term underperforming to be the same as underachieving.

undercuts the Court approved Centralized Process for Hiring Teachers which requires "a written statement of those circumstances justifying hiring a beginning teacher for a position at a racially concentrated or underperforming school." (Centralized Process for Hiring Teachers (2155-1) ¶8.) According to the Mendoza Plaintiffs, they understood that a description of the efforts that were made to fill the position with a more qualified and/or more experienced candidate would be provided by the District, and the form fails to provide for such a statement. Instead, the form allows reasons for hiring beginning teachers in underperforming and racially concentrated schools that are not related to unavailability of more experienced teachers: "Promotes a diverse teaching staff" and "School has 3 years of above District average AZMerit scores in ELA and Math." The Mendoza Plaintiffs also complain that the checklist Certification Form omits creation of an "individualized mitigation plan for the placement" and "suggests" that the determination of whether to certify the assignment may be made prior to identifying individualized mitigating strategies for the placement. (Mendoza Objection (Doc. 2227) at 4-5.)

In April 2019, the Court ordered the District to show good cause why it had not conducted the planned study to establish criteria for making individualized case-by-case certifications for placing beginning teachers at under-performing and racially concentrated schools. The Court clarified that it had approved the District's centralized process for hiring teachers, except its omission of the beginning teacher certification criteria, including individualized mitigating strategies, to be applied when determining whether to allow a beginning teacher placement at an underperforming or racially concentrated school. The Court suggested a checklist type of certification process and broadly discussed certifying beginning teacher appointments to improve teacher diversity at racially concentrated schools and at racially concentrated schools with at least 3 years of above District average AZMerit scores in ELA and Math. (Order (Doc. 2217) at 7-8.)

The Court criticized the District for essentially offering support strategies to beginning teachers teaching in hard-to-teach underperforming schools that are nothing more than support strategies offered to all beginning teachers. The Court ordered: "The

District <u>shall</u> identify strategies aimed at supporting beginning teachers in these hard-to-teach schools, such as: reduced class size, reduction in the number of classes taught, limiting the number of beginning teachers at any given school, and having classes co-taught." (Order (Doc. 2217) at 7-8) (emphasis added).

The District's Supplemental Notice of Compliance includes: a proposed checklist form, Exhibit A: Certification Form, to be completed whenever the District finds it necessary to hire a first year teacher for a position at a racially concentrated or underperforming school, and Exhibit B, Study of Strategies for Support of First Year Teachers, which also identifies the District's currently employed strategies, the Beginning Teacher Performance Rubric, the Rubric Report for beginning of the year (BOY) and end of the year (EOY), and a synopsis of the various teacher-support studies reviewed by the District. As the Court understands the Supplemental Notice of Compliance, the District has, based on these best-practices studies, formalized the process for certifying assignment of a first-year teacher to an underperforming or racially concentrated school.

To off-set the negative impact of placing inexperienced teachers in these schools, the District proposed, and the Court approved, providing teacher-mentors to new teachers during their first two years of teaching: first-year teacher mentor ratios 1:10 at underperforming and racially concentrated schools, 1:15 (2 points) at all other schools; second-year teacher mentor ratios 1:15 (2 points) at underperforming and racially concentrated schools, 1:15 (1 point) at all other schools. (TUSD Objection to R&R (Doc. 2256) at 6) (citing (Order (Doc. 2086) at 5, 7-8.))[3] On September 6, 2018, the Court ordered the District to study support strategy alternatives to offset the negative impact of a beginning teacher to the extent practicable. The Court ordered that "either the Superintendent or his delegate shall <u>strategically</u> grant exceptions to the prohibition against placing beginning teachers in racially concentrated or under-achieving schools, including mitigating strategies. The Superintendent shall certify each exception and expressly

---

[3] In the event there is any misunderstanding or disagreement with the District's representation of these formulas, a motion requesting clarification shall be immediately filed.

identify the strategies being employed in the school to mitigate the negative impact of the beginning teacher appointment." *Id.* at 45 (emphasis added).

For the purpose of reducing the number of appointments of beginning teachers in lower achieving schools, where a beginning teacher appointment cannot be avoided, the Court ordered the District to, pursuant to the study, "identify mitigating strategies which must be in place at a school for such an appointment to be approved. These mitigating strategies <u>shall inform on a case by case basis</u> the Superintendent's certification of each exceptional placement, with the certification expressly identifying the mitigating strategy or strategies <u>being employed in the school where the beginning teacher is being appointed.</u>" (Order (Doc. 2123) at 45) (emphasis added).

In April 2019, the Court rejected the District's assertion that placing beginning teachers at underperforming and racially concentrated schools "'was not a major issue'" and "besides little can be done because in all instances of these placements there were no other more experienced teacher applicants." (Order (Doc. 2217) at 6.) For the Court's rationales, the parties may re-read the Court's prior orders, but in summary the Court meant to preclude carte blanch appointments of beginning teachers in underperforming or racially concentrated schools. The Court ordered the District to conduct the study and to comply with the directives contained in its September 6, 2018, Order.

The Court reiterates its discussion from the September 6, 2018, Order because as noted, therein, the *Green* factors cover things that readily identify a school as White or Black, such as the racial composition of staff or quality of school buildings and equipment, and in the context of educational resource allocations, those type of things include teacher assignments for teachers with advanced degrees or more experience, --then a prima facie case of violation of substantive constitutional rights under the Equal Protection Clause is shown. (Order (Doc. 2123) at 10 (citing (Order (Doc. 1119) at 16 (citing *Swann v. Charlotte-Mecklenburg Bd. Of Ed.*, 402 U.S. 1, 18 (1971); *Freeman v. Pitts*, 503 U.S. 467, 482-83 (1992)). The USP § IV.E.5 "requires that TUSD 'increase the number of experienced teachers and reduce the number of beginning teachers hired to teach in racially

concentrated schools or schools in which students are 'underachieving academically.'" (Order (Doc. 2123) at 42 (quoting (Order (Doc. 2086) at 5) (addressing for budget purposes staffing ratios for peer-mentoring of beginning teachers placed at these schools)). "This is an issue which affects student achievement because inexperienced teachers are less effective teachers. Attrition rates are higher for beginning teachers where students are lower performing than in above-average schools, which compounds the problem of securing the most effective teachers for the students who need effective teachers the most." (Order (Doc. 2123) at 42 (citing (2016-17 SMAR (Doc. 2096) at 18)).

To address *Green*, "the USP requires the District to place more experienced teachers where the need is greatest to improve student achievement." *Id.* Only because of the reality of teacher shortages, the Parties, the Special Master and this Court understood that there would have to be beginning teachers hired to teach at racially concentrated and academically underperforming schools. *Id.*

With this context, the Court considers the Supplemental Notice of Compliance made by the District on May 22, 2019. Again, the District's Support Strategies for Beginning Teachers are universal for all beginning teachers, with the sole exception being an enhanced, two to four hours, of one-on-one teacher-mentoring per week for teachers teaching at underperforming and racially concentrated schools compared to one to two hours of one-on-one teacher-mentoring provided for all other beginning teachers. With this one exception, there continues to be absolutely no recognition by the District that extra support is necessary for beginning teachers being placed in hard-to-teach environments.

The Court has read the best practices study summaries, (Exhibit B.3 (Doc. 2222-2) at 17-24), and finds that at a minimum, the District's <u>pre-start of the school year induction program should include a training unique to teaching in underperforming and racially concentrated schools</u>. The District's teacher-support strategies are devoid of sheltering strategies, the second strategy for supporting beginning teachers. The District's one-on-one mentoring strategy is a teacher-development strategy. As noted above, on April 22, 2019, this Court ordered the District to include both. (Order (Doc. 2217) at 7-8.)

After reviewing the best practices information provided by the District, the Court reaffirms the directive for sheltering strategies and notes that support at the school administrative level improves teacher performance and retention. *See e.g.,* "Beginning Teacher Induction: What the Data Tell Us," by Richard M. Ingersoll, May 16, 2012 (Summary (Doc. 2222-2) at 20-21) (questioning widely held assumption that insufficient production of new teachers causes teacher shortages; instead evidence reflects teacher shortages caused by revolving door, especially in first years on the job where there is inadequate support from school administrators). In short, the best practices information provided by the District reflects that a comprehensive support program, like the one previously approved by the Court, is better for teacher retention and overall performance. *Id.* The only study included in the District's report that actually addressed schools with "at-risk" students, "Growing Great Teachers" by David Rosenberg and Karen Hawley Miles, reflects that the most effective teacher-support models provide both shelter and developmental supports. *Id.* at 23-24. The Court reaffirms its prior directive to the District to include site-specific teacher support strategies, sheltering strategies, to mitigate the placement of a beginning teacher at an underperforming or racially concentrated school.

The Court, likewise, finds merit to the Mendoza Plaintiff's criticism of the Beginning Teacher Support strategies for not including follow-up second-year support strategies for teachers who are underperforming at the end of the first year. *See* USP § IV.I.1. The Special Master reports that the District offers teacher support programs for all teachers needing it. Consequently, the Court orders that the District track the End-of-the-Year (EOY) proficiency scores for beginning teachers to ensure beginning teachers attain at least a "Basic" proficiency score by then and if not, support will continue.

The Court also agrees with the Mendoza Plaintiffs that the Certification Form undercuts the centralized teacher-hiring process, (Mendoza Objection (Doc. 2227) (citing NC: Centralized Process for Hiring Teachers (Doc. 2155-1) at 2 ¶ 8), which the Court approved to offset the innate bias of every school Principal to hire the best candidate for his or her school, which results in more experienced teachers snapping up the easiest

teaching positions to the disadvantage of students attending underperforming schools where teaching is more difficult. The District undermines the benefits that flow from the centralized hiring process by impermissibly allowing certification of a beginning teacher, without identifying the site-based administrative supports, sheltering strategies, that need to be in place to mitigate the negative impact of a beginning teacher, especially for students attending underperforming schools. This makes the Certification Form inconsistent with USP § IV.E.5, which requires the District to "'increase the number of experienced teachers and reduce the number of beginning teachers hired to teach in racially concentrated schools or schools in which students are underachieving academically.'" (Order (Doc. 2123) at 42 (quoting Order (Doc. 2086) at 5)).

The Court finds that the written description of those circumstances justifying hiring the beginning teacher shall include a description of the efforts that were made to fill the position with a more qualified and/or more experienced candidate. Without this requirement, as the Certification Form reflects, the District's HR staff may gloss over its responsibility to review the general pool of applicants for other possibly more qualified applicants, (Centralized Process for Hiring Teachers (Doc. 2155-1) ¶ 6), and treat availability of other more qualified applicants as just one of several considerations to take into account in making a hiring decision, *id.* ¶ 7. The Court agrees with the Mendoza Plaintiffs that the requirement for the District to include a written statement of the efforts that were made to fill the position with a more qualified and/or more experienced candidate will keep the District focused on the USP goal in IV.E.5-6, which is to increase the number of experienced teachers hired in racially concentrated and underperforming schools. To be clear, certification of a beginning teacher to teach at an underperforming or racially concentrated school must at all times be due to unavailability of a more experienced teacher, except "[b]eginning teachers may be assigned to schools at which students are achieving above the District average[4] when such assignment will increase faculty

---

[4] The Court assumes this will be schools that have 3-years of above average AZMerit scores in ELA and Math.

diversity." (TUSD Teacher Diversity Plan for SY 18-19: Results, Analysis and Conclusions (Doc. 2159-1) at 3.).

Lastly, the Court considers what on the Certification Form appears to be an alternative reason for placing a beginning teacher in a racially concentrated school: "schools with 3-year above District average AZMerit performance." Previously, the Court denied the District's request for a blanket exclusion from the certification process for racially concentrated schools with 3 years of above District average performance. The Certification Form is contrary to that ruling. The Court has reviewed § USP IV.E.6. It calls for the pilot plan at issue here "to support first-year teachers serving in schools where student achievement is below the District average." The Court approves the District's prioritization to place the greatest benefit from its teacher support strategies on beginning teachers teaching at underperforming schools and racially concentrated schools not having 3-years of above District average AZMerit scores in ELA and Math. Essentially, the District expands the USP exception for placing beginning teachers to increase faculty diversity at schools with above average student performance to all racially concentrated schools, defining above average performance as: schools with 3-year above average AZMerit performance in ALE and Math.

As the Court understands the District's Supplemental Notice of Compliance, "…Strategies for Support …," the District does not suggest exempting these teachers from the teacher-mentoring support program but may avoid site-based administrative sheltering support strategies. The District shall revise the Certification Form to reflect the exception from sheltering strategies for beginning teachers at racially concentrated schools with 3-year above District average AZMerit performance. The District notes that "[t]hough unlikely, a school could become racially concentrated with an Anglo population over 70% (in 2012-13, Fruchthendler ES was 69% Anglo). If so, mandating additional support to all racially concentrated schools would force the District to provide additional resources to a school that might not need it and that enrolls very few African American and Hispanic students." (TUSD Objection to R&R (Doc. 2256) at 6) (emphasis added). The Court has

required a case by case certification assessment which affords the District enough flexibility to address any such unusual circumstances.

The District shall immediately comply with the prior directives of this Court, as follows:

a. Expand the strategies for support for beginning teachers to include First and Second Year Teachers, with beginning teachers receiving EOY evaluations at the end of the first year being retained in the District's teacher support programs until performing with "Basic" proficiency.

b. The District shall file a "2019-20 Beginning Teacher Inventory" of all schools, identifying each school as: Underperforming, Racially Concentrated, both, neither, or a racially concentrated school with 3-year above District average AZMerit performance for ELA and Math. For each school, the District shall report: the number of actual and anticipated teachers for SY 2019-20; the number and percentage of actual and anticipated beginning first-year teachers and second-year teachers; the number and percentage of actual and anticipated beginning teacher-mentors for first and second-year teachers; the corresponding the BOY proficiency scores for the first and second year teachers, and number of required mentors at each school. At the end of SY 2019-2020, the District shall refile the inventory, updated to reflect actual end of the year numbers and to add the EYO proficiency scores. The District shall include a summary report, reflecting the District-wide totals for the above individual school data.

c. The District shall correct and amend the Study of Strategies for Support of First Year Teachers, the Certification Form, and any other relevant plan documents to reflect the directives above and below, and file them with the Court.

• All certifications must be based on need due to unavailability of a more experienced teacher, including a written statement of the efforts that were

made to fill the position with a more qualified and/or more experienced candidate, with the exception of a racial diversity placement at a school having 3-years of above average AZMerit scores in ELA and Math.

- The District's Support Strategies <u>shall</u> include shelter strategies.
- For racially concentrated schools having 3 years of above District average AZMerit scores in ELA and Math, no site-based shelter strategies are required to mitigate the placement.
- Prior to Certification, the Superintendent shall identify the on-site Sheltering Support Strategies required for the placement. "None" is not an acceptable sheltering mitigation strategy.

6. <u>Teacher Diversity, Grow-Your-Own Programs (GYOP), and Attrition</u>

The District's Supplemental Notice of Compliance addresses the directive contained in the Court's April 22, 2019, Order, which adopted the Special Master's recommendation for a diversity leader to be hired by the District and charged with "identify[ing] promising candidates and work[ing] with them as individuals to find the right spots with the right package of incentives" for the active management of the District's Diversity Plan. (Order (Doc. 2217) at 12.) The Mendoza Plaintiffs object and correctly charge that the District has entirely ignored the remainder of the directives issued by the Court in its last Order. The Court, additionally, directed the District to improve administrative staff diversity by modifying its recruitment process by identifying a point person to provide central leadership and coordination to increase the number of nominees for administrative GYOPs, who are African American and Latino. *Id.* at 12. The Court ordered the District to ensure that its GYOPs were growing teachers and administrators of color, not just addressing overall staffing shortages. *Id.* at 13-14.

The Court has read the Plan for Recruitment of Teachers for Diversity and Grow Your Own Administrative Programs attached to the District's Supplemental Notice of Compliance and cannot begin to fathom why the District has limited one to teachers and the other to administrators because this Court has expressly required both programs to

apply to both teachers and administrators.  (Order (Doc. 2123) at 40 (directing TDP be extended to administrators); Order (2123) at 41 (finding no reason for GYOPs to be limited to teaching staff or site-based administrators). The Supplemental Notice of Compliance reflects a recruitment plan for teacher transfers to increase teacher diversity, Subsection A, and GYOPs to increase administrative diversity, including site-based administrators. Teacher recruitment for transfers is to be actively managed by the diversity leader, but the District's HR Director will continue to recruit qualified candidates for the Administrative GYOPs, using the same type of "wide dissemination" program criticized by the Court when it last visited this subject.  (Order (Doc. 2217) at 11.)   This is contrary to the recommendation of the Special Master that the District place more emphasis on recruiting minority administrators for its GYOP programs by having central leadership and coordination <u>through a proactive identification</u> of candidates.  (Order (Doc. 2217) at 12.)

The District lists its current GYOPs as the Leadership Prep Academy and a program to provide tuition assistance for those enrolled in a master's program that will lead to an administrator's certificate at the University of Arizona, with the intent to expand the tuition program to include Grand Canyon University and Northern Arizona University.  Because the GYOPs in the Supplemental Notice of Compliance are limited to administrators, the District ignored teacher GYOPs that it previously reported were being explored: 1) partnering with Pima College and the University of Arizona to offer increased financial support to graduating seniors who have shown an aptitude for teaching in exchange for commitments to study education and teach in the District for a minimum of three years, and 2) developing a culturally relevant curriculum (CRC) pathway for university students to become TUSD teachers.  (Order Doc. 2217 at 13.)  The District has seemingly reversed course on its strategies for moving forward, which it previously included in the TUSD Grow-Your-Own Programs (GYOPs): Review of Current Programs, Analysis, and Conclusion, which the Court reviewed and directed the District to revise on April 22, 2019.  (Order (Doc. 2217) at 14.)  The District has also failed to comply with the Court's directive that it "must identify how its GYOS's are TOCs or AOCs," and if not, the District "must

refashion them and/or implement others to serve the purposes of the USP." (Order (Doc. 2217) at 13-14.)

The Court can only assume that the District, rather than ignoring the Court's prior directives, intends for its recent filing, "Plan for Recruitment of Teachers for Diversity and Administrator Grow Your Own Programs, to somehow fit within the confines of its previously submitted diversity plan documents. (Docs. 2159-1-20159-3.) The District shall revise the "Plan for Recruitment of Teachers for Diversity and Grow Your Own Programs, to comply with the prior directives of the Court as follows:

   a. The central-staff, director-level employee, i.e., the diversity leader shall be responsible for the active management of all recruitment efforts for teachers and administrators of color to increase teacher and administrator diversity.

   b. Expand Subsection A, Teacher Diversity, to include Administrator Diversity and teacher transfers to include administrator transfers.

   c. Expand Subsection B, Grow Your Own Administrator Programs to include programs to grow teachers of color, and for each GYOP, the District must identify how it is a TOCs or AOC, not simply a GYOP.

The District shall identify applicable customized incentive strategies for the administrative transfer program. *See* (District Notice of Compliance (Doc. 2159-1) at 7, filed December 6, 2018) (reporting such incentives to be identified in SY 19-20); *see also* (R&R (Doc 2253) at 3 (describing various limitations to administrative transfer programs to avoid risk of impeding school improvement).[5] The District shall identify applicable GYOPs for teachers of color, including a status report regarding those previously reported as being explored by the District. *See* (R&R (Doc. 2253) at 5 (identifying other GYOPs for teachers of color: certifying uncertified paraprofessional TUSD staff; Teacher Cadet[6]

---

[5] The Court does not preclude the HR Director from, in addition to the customized recruitment programs, continuing the "wide dissemination" recruitment efforts for administrator GYOPs.

[6] Honor courses create student chapters at the high schools of students interested in teaching, who provide tutoring under the guidance and direction of teachers to stimulate an interest in teaching careers. This might also address the issue of District's need for

programs).

The Court is concerned that the stipend incentive program may create a revolving door, with diverse teachers coming and going every three-years. The R&R cautions that there is a downside to the TDP as planned by the District because "it could introduce excessive instability in staffing." (R&R (Doc 2253) at 4.) All parties agree that mandatory reassignment of teachers is not acceptable, and the District is unlikely to secure permanent and stable diversity in the District's schools using only an incentive program, which was why the Court approved the custom incentive, active management, program. (Order (Doc. 2217) at 12.) The "Plan for Recruitment of Teachers for Diversity . . .," however, includes only the stipend incentive program and does not reveal a strategy for addressing staff diversity long term.

The District shall consider the Special Master's recommendation that it offer different stipend amounts, including smaller stipends, $2500.00, to incentivize transfers to address the Special Master's report that cognitive dissonance studies suggest that the larger the incentive to undertake a task the larger the potential the task will end when the incentive ends. The Special Master also recommends that the TDP transfer plan should not be initiated every year but there should instead be a specific time period and criteria for activating the plan. *Id.* The Court understands the Special Master to be referring to the District's generation of TDP target schools. The Court agrees that the identification of TDP target schools should occur approximately every three to four years, instead of annually. In order to assess the effectiveness of the TDP, the Court intends to consider the target schools identified in SY 2016-17 and SY 2019-20.

The Court found reviewing the "Plan for Recruitment of Teachers for Diversity and Grow Your Own Programs, to be excruciatingly difficult because the District did not follow the Court's directive, issued April 22, 2019, to file a revised TUSD GYOP: Review of Current Programs, Analysis, and Conclusions. (Doc. 2159-3.) Instead, it left the Court to guess how the "Plan for Recruitment of Teachers for Diversity and Administrator Grow

tutors.

Your Own Programs, fits within the confines of the District's previously filed TDP or if it is intended as a replacement. To avoid future confusion, the revisions previously ordered and again required here shall be presented to the Court as follows:

a. The District shall file a Diversity Plan for Teachers and Administrators for Certified Staff transfer programs and GYOPs, which shall include previously reviewed and approved provisions (Docs 2159-1-2159-3; 2016-1) and revisions previously ordered by the Court (Docs. 2123 and 2217) and the directives ordered here.

b. The District shall update the TDP target school reports (Doc. 2159-1) as follows: SY 2018-19 to correct the numbers for Holladay, Howell, Kellond, Marshall, Tolson, Booth/Fickett and University High, and add the SY 2019-20 report reflecting final numbers for SY 2016-2017 target schools and the beginning numbers for the new 2019-20 target schools.

7. <u>Inclusive School Environments and Cultures of Civility</u>

The District, in collaboration with the Special Master, studied students' sense of inclusiveness at its schools. There are no objections to the study, its findings, or the conclusions drawn by the District based on the study. The objections relate to the District's failure to determine the effectiveness of the strategies it has used to improve inclusive school environments and identify these and other effective strategies it intends to use now and, in the future, to improve and retain the sense of inclusiveness at its schools. The District did not collaborate with the Special Master in this regard.

The District shall immediately comply with this Court's directive issued on September 6, 2018, to work in collaboration with the Special Master in assessing the effectiveness of existing strategies and identifying possible additional strategies. (Order (Doc. 2123) at 123-124.) The Court is confident that with this collaboration the District's plan for maintaining inclusive school environments will comply with the Court's substantive directives, also, issued September 6, 2018. (Order (Doc. 2123) at 143-45), *see also* (TUSD Objection to SM R&R (Doc. 2207) at 3 n.1 (admitting the Special Master's

recommendation to be "sound" and "District should [] adopt it.")

The District shall immediately comply with the Court's prior directives, as follows: 1) It shall NOT USE strategies that are not research based, including the Youth Uprising program; 2) It shall undertake a study of the effects of the pilot intervention program using restorative processes as instruction and identify positive and negative outliers among schools to determine whether there are common practices being implemented in either regard; these studies shall inform future strategy choices by the District for creating inclusive school environments and cultures of civility; 3) It shall collaborate with the Special Master to identify strategies to be used in the future at schools that need improvement; 4) It shall collaborate with the Special Master to develop a professional learning plan for preparing District staff to implement the District's program to create and maintain school environments of inclusiveness and civility.

The District shall file a Second Supplemental Notice of Compliance and Revised Professional Learning Plan: Inclusive School Environments and Cultures of Civility.

8.    Professional Learning for Technology

On April 22, 2019, the Court found the District had failed to comply with directives issued by the Court on September 6, 2018, and adopted the Special Master's recommendation that the District's Professional Learning Plan for Teacher Proficiency in Using Technology, aka Professional Learning Plan: Instructional Technology, be revised to reflect a focus on the use of technology to facilitate student learning. (Order (2217) at 15.)  The Court ordered the District to revise the Plan, accordingly. *Id.*

On May 22, 2019, the District filed a Supplemental Notice of Compliance, but did not file the revised Professional Learning Plan: Instructional Technology Plan.  To the extent it was not clear, when the Court orders a plan or document revised, compliance requires that the revised plan or document be filed with the Court along with the notice of compliance.  The Court agrees with the Mendoza Plaintiffs that without placing actual revised plans or documents into the record, it will be extremely difficult to access the District's plans without having to conduct what might well be a futile search through

voluminous case filings.[7]  The Court notes that without the revised plan, the Court must depend on the District's descriptions of the Professional Learning Plan: Instructional Technology Plan revisions as complying with the Court's prior directives.

The Court has reviewed the Supplemental Notice of Compliance and the Special Master's objection that it continues to lack sufficient focus on the use of technology to facilitate student learning. The Special Master shall work with the District to expand the Courses Addressing Use of Technology in the Classroom to include content pedagogy, meaning "courses about how to use technology in the subject matter that particular teachers teach (such as American government or biology, etc.)"  (R&R (Doc. 2252) at 3.)

Both the Special Master and the Mendoza Plaintiffs are concerned that Teacher Technology Liaisons (TTLs), full time teachers who are paid a stipend to provide assistance to fellow teachers at their schools, may not have sufficient expertise, training, and/or support to serve as school-site resource locators and clearinghouses for questions. The Special Master and the Mendoza Plaintiffs are, likewise, concerned that school administrators, Principals, do not have sufficient technological savvy to evaluate teachers with respect to their use of technology to facilitate student learning.

From the minimal information provided by the District in the Supplemental Notice of Compliance, it appears that personnel will be designated by the District to record observed teaching and learning with technology and provide qualitative notes where applicable, using an assessment form ranking teachers as "not effective," "somewhat effective," and "very effective" at using various instruments of technology, such as computer, database, digital camera, digital sensors, document camera, graphics, interactive whiteboard, podcast, tablets, etc.  There are five Educational Technology Integration Specialists (the Specialists), who the Court assumes to be the District's experts in using

_____

[7] The Court is tracking compliance with the directives issued on September 6, 2018, pursuant to the various notices of compliance, making these notices helpful in locating final plan documents.  The notices become less helpful as they are supplemented, especially when multiple supplemental notices are required.  The better approach is, therefore, a Court order for all plan and program documents required pursuant to USP provisions and Orders from this Court to be published on the District's website and kept updated.

educational technology. The Court assumes that these Specialists will be the "personnel" designated by the District to "record observed teaching and learning with technology in the classrooms" as being effective, somewhat effective, or not. The Court might, likewise, assume that these Specialists could prepare school administrators to make judgments about how teachers employ technology. The Court is not, however, inclined to make assumptions in the context of finding unitary status. The District shall revise the Professional Learning Plan: Instructional Technology Plan as previously directed and make it clear how the District will evaluate the effectiveness of TTLs and how administrators will attain the requisite training to evaluate teachers with respect to their use of technology to facilitate student learning.

Conclusion

The District shall immediately comply with the directives issued by the Court September 6, 2018, the April 2019, Orders issued subsequent to the December 1, 2018 Benchmark Notices of Compliance, and the directives contained herein, and the District shall file Second Supplemental Notices of Compliance Re: December 1, 2018 Benchmark Notices of Compliance.

**Accordingly,**

**IT IS ORDERED** adopting in part as described herein the Special Master's Report and Recommendations (Docs. 2251, 2252, 2253, 2254) for the May 2019 Supplemental Notices of Compliance.

**IT IS FURTHER ORDERED** that within 30 days of the filing date of this Order, the District shall make the revisions described herein and file Second Supplemental Notices of Compliance.

**IT IS FURTHER ORDERED** that the Plaintiffs shall have 14 days to file Objections, with the Special Master's R&R following within 14 days, and the District having seven days to file a Reply.

**IT IS FURTHER ORDERED** that all plan and program documents required pursuant to USP provisions and Orders from this Court shall be published by the District

on the TUSD website and kept updated.

The District's pre-start of the school year induction program should include a training unique to teaching in underperforming and racially concentrated schools.

Dated this 9th day of September, 2019.

Honorable David C. Bury
United States District Judge