# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., <br>     Plaintiffs <br> and <br> United States of America, <br>     Plaintiff-Intervenor, <br> v. <br> Tucson Unified School District, et al., <br>     Defendants, <br> and <br> Sidney L. Sutton, et al., <br>     Defendants-Intervenors, | No. CV-74-00090-TUC-DCB |
| Maria Mendoza, et al., <br>     Plaintiffs, <br> and <br> United States of America, <br>     Plaintiff-Intervenor, <br> v. <br> Tucson Unified School District, et al. <br>     Defendants. | No. CV-74-0204-TUC-DCB <br><br> **ORDER** |

<u>2019-20 910G Budget: Reading Recovery and 910G Budget Ratios</u>

On September 10, 2019, the Court approved the 910G Budget for SY 2019-20, with an integration-contingency set aside of $1,000,000.00. The Court also ordered the District to provide additional information regarding various objections,[1] with Plaintiffs subsequently being afforded an opportunity to reurge objections. Pursuant to the recommendation of the Special Master, the Court ordered the District to file a Transition Plan status report, with the Special Master to subsequently make any relevant recommendations, including budget recommendations for the $1,000,000.00 set aside. As to any Objection, the District was afforded an opportunity to Reply and, thereafter, the Special Master's Report and Recommendation was due.

On September 24, 2019, the District filed the HR Procedures for Recruiting Black Professional Staff (Doc. 2289-1); Reading Recovery/Reading Support Status Report (Doc. 2289-2), and Transition Plan Status Report (Doc. 2289-3). Objection was renewed to Reading Recovery. The deadline for the Special Master to file his Report and Recommendation regarding the District's Transition Plan Status Report (R&R) is being extended, and, therefore, is not addressed here.

On September 30, 2019, the District filed the Magnet School MSP Comparison Report (Doc. 2297-1) and 910G Funding Ratios (Doc. 2297-2). The Mendoza Plaintiffs object generally to 910G/M&O ratios proposed by the District, whereas previously their objection was aimed more specifically at 910G funding apportioned in the 2019-20 budget, such as 100% funding for EBAS. Any objection to the Magnet MSP and actual budget comparisons is not due yet, and, therefore, is not addressed here.

**1. Reading Recovery**

The Mendoza Plaintiffs object to the Reading Recovery/Reading Support Status Report. The Mendoza Plaintiffs challenge the inadequacy of the District's reading support program because it fails to meet assessed need: the District's assessment of its incoming

---

[1] The District shall provide: 1) USP Provision Completion Plans, as requested by the Special Master; 2) a Magnet School MSP Comparison Report; 3) HR Procedures for Recruiting Black Professional Staff; 4) Beginning Teacher Inventory; 5) Reading Recovery/Reading Support Status Report; 6) Transition Plan Status Report; 7) future 910G/M&O funding apportionments for crossover services.

first graders reflects that 209 (32.5%) of African American students and 728 (35%) of Latino students, or a total of 796 students, are in "need of support."[2] Comparatively, Reading Recovery direct services will reach 16% of African American and 5.5% of Latino students needing reading support services. (Mendoza Objection (Doc. 2311) at 3 (citing Reading Recovery Status Report (Status Report) at 4)).

The Court has reviewed the District's Reading Recovery Status Report, the Mendoza Objection, the District's Reply, and the Special Master's Report and Recommendation. The Court does not understand the distinction in the Status Report between direct services provided to individual students and indirect "individual" student services. (Status Report (Doc. 2289-2) at 7-8.) The Court assumes that the distinction between "Reading Recovery teachers" and "Reading Recovery itinerant teachers" is that the latter travel between schools rather than being stationed at a specific school.

The Court understands that the Status Report reflects 533 students out of the 796 students, who need reading support services, will receive at least indirect services from Reading Recovery teachers. In other words, the District's Reading Recovery program reaches approximately 67% of the students who need reading support. (Status Report (Doc. 2289-2) at 6.) Of these 533 students, approximately 52 students received direct one-on-one support services in the first semester of 2019-20 and 68 students will receive direct one-on-one support second semester. Students remain in the program until attaining a specified level of improvement, so the Court assumes that there is duplication between the 68 students receiving support services second semester and the 52 students who received services first semester, with 16 students being added as a result of this Court's directive that the District add two more Reading Recovery teachers. Approximately, 413 students receive indirect services, meaning reading support is provided by the Reading Recovery teacher to small (20 students or less) groups.

---

[2] Reading Recovery is for first graders and eligibility is based on DIBELS data collected by the District for all kindergarteners entering first grade, which identifies students as needing either Intensive or Strategic reading support.

The Special Master explains that Reading Recovery is a very effective reading support program, but it is also expensive. He recommended the program to the District because it may be operated in a fashion to readily target "African American students who are struggling readers but attend integrated schools throughout the district in relatively small numbers in each school." (R&R (Doc. 2339) at 2.) The Court assumes that the Special Master is referring to the itinerant Reading Recovery teachers, but the downside to itinerant teachers is that they do not provide small group indirect services.

The Status Report makes it clear that the Reading Recovery program is designed as a supplemental reading support program, which is especially useful to meet the needs of African American students. "Despite this prioritization significantly more Latino students than African American students participate in Reading Recovery (four times as many)." (R&R (Doc.2339) at 2 (citing District Reply (Doc. 2333) at 2-3 (citing Status Report (Doc. 2289-2) at 7)). The question asked by the Court when it called for the Status Report remains: what about the remaining 263 (33%[3]) of the students who need reading support? How is reading support provided to these students?

In its Reply, the District clarifies that it is "not discontinuing, reducing, or modifying Reading Recovery in a manner that requires replacing it with an alternative program." (Reply (Doc. 2333) at 6.) On the last page of the District's Reply, mirrored in the R&R, the District explains that there are other reading support programs, including the District's common curriculum which is designed to teach reading at all of its elementary schools and K-8 schools: Benchmark Advanced/Benchmark Adelante (Tier 1 Adoption); Cengage (Tier 1 Adoption); SuccessMaker (Tier 2 and 3 Adoption), and Scholastic Bookroom-Guided Reading (Tier 2 and 3 Adoption). The Court is being asked to find that the common curriculum addresses the 33% of first-grade students who, according to the DIBLES assessment, need either Intensive or Strategic reading support but are not in a Reading

---

[3] Depending on the level of duplication in students receiving support services over both semesters, this could be as large as 40%.

Recovery program. The District attaches five pages, reflecting two supplemental reading programs.

The SuccessMaker program is presented as a supplemental program for grades K-8, which "makes EVERY student more successful;" it is truly adaptive learning for intervention, differentiation, and personalization with every student's interaction adjusted in real time to real learning needs. It delivers tutorials, practice, challenge, and remediation and instantly adjusts pacing and sequencing, with continual assessment to report on student progress to help teachers improve student success over time. It keeps students on pace to master target skills and standards. Research reflects that SuccessMakers has a statistically significant and positive effect on student outcomes for K and First Grade in diverse student samples. (Reply Exhibit (Doc. 2333-1) at 3.)

The District also uses Scholastic Bookroom-Guided Reading for small-group reading instruction designed to provide differentiated teaching that supports students in developing reading proficiency. The teacher uses a tightly structured framework that allows for incorporation of several research-based approaches into a coordinated whole. The guided reading lesson means reading and talking (and sometimes writing) about an interesting and engaging variety of fiction and nonfiction texts. Students are assessed so they can be grouped for efficient reading instruction by the teacher from texts that are selected from a collection arranged along a gradient of difficulty aimed to teach 10 essential literacy practices that prekindergarten children should experience every day. *Id.* at 4-5.

There is evidence of a supplemental program, Big Brainz (Imagine Learning) being used at Ochoa Elementary School. (Reply (Doc. 2333) at 4.)

The research currently before the Court does not reflect the success of SuccessMaker to provide reading support for students such as those who need Intensive or Strategic reading supports, especially those needing Intensive reading support. The Scholastic Bookroom-Guided Reading for small-group reading instruction suggests a need for reading teachers or volunteers, but there is no evidence that the District has developed an appropriate staffing ratio for this program or determined staffing needs for this program.

The record is completely silent, except for the Ochoa reference, regarding the Imagine Learning program. Based on the limited information provided by the District at this time, the Court cannot conclude that the alternatives to the Reading Recovery program are best practices to meet the needs of students who have tested, pursuant to DIBELS, as needing Intensive or Strategic reading support.

Even if the Court were able to find that the District offers two best practices alternatives to Reading Recovery for students who have been identified as needing intensive and strategic reading support, this does not answer Court's question: how many Reading Recovery teachers are needed for the Reading Recovery program.

The Reading Recovery Status Report reflects that the "RRCNA" Standards and Guidelines of Reading Recovery recommend that fully implemented, there would be 100% coverage meaning there would be enough teaching slots for every child who needs the program, with Administrators estimating need at approximately 20-25% of the first-grade population,[4] with one teacher trained in Reading Recovery per two first-grade classrooms to work with at least four first-grade students, individually on a daily basis for 30 minutes each. (Status Report (Doc. 2289-2) at 7-8.) The District does not inform the Court as to how many first-grade classrooms exist in the District. The District does not suggest that the Court should find it needs one teacher for every four of the 796 students identified as needing reading support. The District only operates Reading Recovery at 17 of its approximately 63 elementary/K-8 schools so, clearly, the District does not intend to use the Reading Recovery program to meet the needs of all 796 students identified on the DIBELS assessment as requiring either Strategic or Intensive reading support.

The District has identified 17 target schools and teacher-student ratios of one-to-four for direct one-on-one instruction and one-to-twenty for group instruction. This is enough information to address the Court's budget concerns regarding the existing Reading Recovery program, but not enough to answer the question of how many Reading Recovery

---

[4] The District uses the DIBELS assessment of needing Intensive or Strategic reading support.

- 6 -

teachers are needed in the District, which is not a question of funding. In the context of the 2019-20 Budget, the Special Master recommends that the Court approve the District's proposed budget for Reading Recovery for the current school year. The Court shall adopt the recommendation.

The Court turns to the question: How many Reading Recovery teachers are needed for an effective Reading Recovery program, and in the event of fiscal constraints, how are services being provided to students who are not in the Reading Recovery program but need Intensive or Strategic reading support? The information provided by the District in the Status Report and Reply fails to answer this question.

The District must break down student need between direct Intensive and indirect Strategic reading support services.[5] What are the determining criteria for enrollment in Reading Recovery direct one-on-one services or indirect group reading support services? 2) How many students, district wide, meet the criteria for direct or indirect Reading Recovery programs? 3) How many students are enrolled in each type of Reading Recovery program? In other words, how many students remain without Reading Recovery services?

Reflecting the District's targets, African American students and Underachieving schools, the District shall provide a comparison chart to identify each of the 17 targeted schools by classification as either African American or Underachieving[6] or both; identify how many students, pursuant to DIBLES, need Intensive or Strategic reading support; identify how many Reading Recovery teachers are assigned to the school and whether the teacher is an itinerant teacher or not, and summarize how many students needing direct or

---

[5] The Court assumes that students who need Intensive reading support need to be in a one-on-one direct reading support program and that the indirect group program works for students who need Strategic reading support.

[6] For purposes of the USP, "Underachieving" is defined pursuant to the school's last issued AZMerit score. There is some confusion because the District used the 2017-18 AZMerit scores to prioritize underachieving schools to target for Reading Recovery, but complains that the Mendoza Plaintiffs' used the 2018-19 AZMerit score of F to discribe Ochoa Elementary School as underachieving because the District expects the Ochoa Elementary School 2019-20 AZMerit score to improve to at least a C. For the purpose of identifying reading support program needs, the Court considers a school to be "underachieving" until it isn't.

indirect services at the target school are obtaining services through Reading Recovery and how many are not.

This information informs the basis for the Court's second inquiry: what alternative supplemental reading support programs exist for students who have been assessed as needing Intensive or Strategic reading support, who do not have access to a Reading Recovery program? The District shall identify any other elementary or K-8 schools likewise qualifying for Reading and Recovery programs, but where the program is not offered, and compile the same comparison chart information. Once this information is compiled, the Court, the parties, and the Special Master can easily calculate the number of Reading and Recovery teachers the District needs based on the District's proffered ratios: one teacher to four students for one-on-one direct support, i.e., Intensive support, and one teacher to 20 students for indirect group support, i.e., Strategic support. This does not mean that the District must hire this number of Reading Recovery teachers. Instead, the Court assumes the District cannot afford such an expansive Reading Recovery program. The Court approves the District's prioritization of the Reading Recovery program to serve the greatest need. It remains, however, for the District to identify alternative, reading support programs which are supplemental, i.e., something more than the common curriculum which is designed to teach reading generally. The District may use alternative programs that are considered best practices for providing reading support to students who, respectively, need Intensive or Strategic reading support.

The District shall develop staffing ratios for these alternative supplemental reading support programs to be fully operational for a 100% coverage in all Underachieving schools where Reading Recovery is not available, including target schools where Reading Recovery does not reach all the students who have been assessed as needing either Intensive or Strategic reading support. This does not mean that the District must hire this staff, but it does mean that given the paramount importance in providing reading support to struggling students, especially those attending underachieving schools, the District must propose a plan for addressing this need to the maximum extent practicable.

The District shall file a Notice of Compliance with the above directives, including as attachments: 1) alternative program information reflecting best practices for reading support for students similarly situated to those who in TUSD have been identified as needing Intensive and Strategic reading support, and 2) comparison charts reflecting which programs are available in which schools to serve the number of students identified at each school as needing Intensive or Strategic reading support and reflecting the corresponding staffing needs at each school in comparison to existing staff. The reading support program at Ochoa Elementary School can be considered at the same time the Court reviews the Notice of Compliance. By then, the Special Master will have filed his R&R for the transition plans, including the transition plan for Ochoa Elementary School.

**2. 910G/M&O Ratios**

In response to the District's filing, the Mendoza Plaintiffs did not reurge the EBAS challenge nor question the budget for 7-period days. Instead the Mendoza Plaintiffs object, generally, because the District's 910G ratio report for crossover programs failed to establish sufficient linkage to the USP for the 910G ratios used in the 2018-19[7] budget and the proposed maximums. The Court has reviewed the District's report, which is a chart of proposed and actual ratios for approximately 48 programs or activities: student assignment programs, programs exclusively benefitting African American and Latino students, and crossover benefit programs. (Reply (Doc. 2334) at 3.) The District reports that it did not have time to consult with Plaintiffs and the Special Master regarding proposed 910G/M&O budget ratios and intends "to do so to reach agreement on some or all of these issues." (Doc. 2297) at 2.) The District reserved the right to object on the merits to any percentage limits on funding of a program that otherwise qualifies for funding under § 910G.

The Court recognizes that its Order may have suggested a broad review of the budget ratios being used by the District for programs having a crossover benefit to Plaintiffs and the student body at large, but the Court did not issue the supplant/supplement

---

[7] The current budget at issue is 2019-20; is the budget chart miscaptioned? The year is irrelevant to assessing ratios for all 910G crossover programs.

- 9 -

directive in a void.[8] This is a budget criterion previously negotiated by the parties and Special Master, which has been routinely applied in every USP budget. The Court asked the District to identify the USP programs with crossover benefit to all students, where the supplant and supplement criteria might be an issue and to identify 910G/M&O(non910G) funding ratios so that they could be reviewed for compliance issues and to afford the parties and the Special Master an opportunity to update or revise ratios for use in future budgets. It its Reply, the District requests that the Court allow the parties to use the report as a starting point to develop a stipulation to guide future 910G funding by the start of next budget development process in December. (Reply (Doc. 2334) at 6.) The Special Master recommends that he and a budget expert provide the District with basic principles to guide the parties in these discussions. (R&R (Doc. 2337)). The Court agrees.

The District shall proceed as planned to review and revise, if necessary, the 910G/non910G budget ratios for future budgets and to resolve by agreement any issues. The Court shall extend the time for the Plaintiffs to challenge any ratio, specifically, subsequent to the December 1, 2019, filing by the District of the budget guide for 910G funding. Thereafter, the Plaintiffs may file objections to any specific program ratio by explaining why the ratio proposed by the District does not ensure that 910G funding is not supplanting M&O funding.

**Accordingly,**

**IT IS ORDERED** that the Report and Recommendation (Doc.2339) is adopted; the Court approves the 2019-20 budget for Reading Recovery.

**IT IS FURTHER ORDERED** that within 30 days of the filing date of this Order, the District shall file the Notice of Compliance Re: Reading Recovery/Reading Support Status Report Supplement. Thereafter, the Plaintiffs may reurge Objections.

**IT IS FURTHER ORDERED** that the Report and Recommendation (Doc. 2337) is adopted; the parties and Special Master shall undertake discussions to resolve 910G

---

[8] The supplant/supplement distinction is designed to ensure that 910G funding is not supplanting M&O funding.

| | |
|---|---|
| 1 | budget ratio issues and by December 1, 2019, the District shall file a Notice of Compliance |
| 2 | Re: Guide for 910G Funding for Future Budgets. |
| 3 | **IT IS FURTHER ORDERED** that the briefing schedule for Notices of Compliance |
| 4 | shall apply.  (Amended Order (Doc. 2285) at 3.) Upon the above filings, Objections may |
| 5 | be filed within 14 days; the District shall have 7 days to file Replies, thereafter, the Special |
| 6 | Master shall have 14 days to file an R&R responsive to any Objection. There shall be nor |
| 7 | further briefing. |
| 8 | **IT IS FURTHER ORDERED** that the Special Master's Motion for Extension of |
| 9 | Time to submit his Report and Recommendation related to the District's Transition Plan |
| 10 | Schools (Doc. 2338) is GRANTED for 10 days or until November 4, 2019. |
| 11 | Dated this 28th day of October, 2019. |

_____
Honorable David C. Bury
United States District Judge