1
2
3
4
5          **IN THE UNITED STATES DISTRICT COURT**
6            **FOR THE DISTRICT OF ARIZONA**
7

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
| Plaintiffs | (Lead Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
| Defendants-Intervenors, | |

| | |
|---|---|
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | (Consolidated Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

ALE Policy Manual

The Court issues this Order on the heels of the Order (Doc. _____) addressing the 3-Year PIP, CMP, including the District's Transportation Plan and Outreach and Recruitment (ORR) Plan in that context. In this Order, the Court considers the Transportation and ORR plans in the context of the Advanced Learning Experience (ALE) programs. The Transportation Plan (Doc. 2270-4) shall be revised for clarifications in accordance with the revisions called for herein related to the ALE Policy Manual.

The Court incorporates its discussions from the Order of September 6, 2018, of the various ALEs, which are: Gifted and Talented Education (GATE), including self-contained, pull-out, resource, cluster and open GATE; all the Advanced Academic Courses (AACs), like Advanced Placement (AP), Honors, Advanced and Accelerated, Dual Credit for both middle and high schools (MS-HS and HS-CC), and International Baccalaureate (IB). The Court's 2018 assessment of ALE progress based on the 2013 ALE Action Plan for the Unitary Status Plan (USP), § V.A, was as follows: the District shall evaluate the various strategies it employs to  determine effectiveness and file the ALE Policy Manual to reflect these assessments and "to guide the District in the future." (Order (Doc. 2123) at 98.) The ALE Policy Manual does the former but not the latter.

In the September 6, 2018, Order, the Court also identified, specifically, certain ALEs that were deficient as red flagged by the "not less than" 15% Rule or the Special Master and ordered the District to act immediately to remedy these situations. The Court directed the District to address three areas for improvement:  1) Student Identification: Access and Availability; 2) Recruitment and 3) Support and Engagement.

The Court determined that progress was insufficient in some schools for some ALE programs and directed specific actions to be taken, as follows: increase cluster GATE to 2013-14 level of at least 14 programs; expand resource GATE for placement at all K-8 schools; expand pre-AP, Honors and Advanced courses for placement of at least two at every middle school; Dual Credit (MS-HS) courses at Borman, Dietz, Lawrence, McCorkle, Morgan Maxwell, Rose, and Secrist; placement of Dual Credit (HS-CC) at all high schools, and generate specific improvement plans for increasing the number of AP

courses, enrollment, and success rates for AP courses at high schools: Pueblo, Tucson High, Catalina, Rincon, and Palo Verde. The Court approved the IB alternative for AP courses at Cholla and rejected the Santa Rita plan to have only Dual Credit and no AP courses. For UHS, the Court asked the District to address the Latino attrition rate; targeted recruitment efforts, and whether any District-preference policies, such as extending testing-retake opportunities for the qualifying exam. There being no showing of impracticality, the Court noted the priority for attaining the 2013 Action Plan goal to develop and implement a CRC AP course to be offered first at UHS.

The Mendoza Plaintiffs charge that the District has completely failed to comply with the above directives. If true, this would be most egregious because several of these directives made in the September 6, 2018 Order were repeated from previous orders. The Court has, therefore, looked closely at the Mendoza Plaintiffs' challenge. The Court finds compliance. The problem is not a lack of compliance but is a lack of clarity. The District reports in triplicate, including some information in the ALE Policy Manual and some in the Progress Report §§ I-V.B, with further addition and/or repetition in § V.C. The ORR and Transportation Plan are also additional relevant planning documents. The Court had to combine the information scattered throughout these documents to assure itself that the District has complied with the express directives identified above issued by the Court on September 6, 2018.

In addition to the above specific directives, the Court asked the District to adopt broad policies necessary to ensure, to the extent practicable, that USP provisions are effective at increasing ALE access for African American and Latino students. The remainder of this Order addresses those issues which the Court intended the District to include in the ALE Policy Manual. The District needs to clarify some parts of the ALE Policy Manual because its presentation is either confusing or incomplete. The ALE Policy Manual especially needs to clarify how the District intends to apply ALE strategies and policies in the future. Just as the 3-Year PIP failed to identify future magnet projects, if any, that were immediate priorities for the District, the ALE Policy Manual fails to reflect

the District's future commitment, if any, to grow and/or improve ALE access for Latino and African American students. The brevity of this Order reflects that the need for clarification is limited and needs to be expedited for the District to apply the policies, as clarified, in the ALE Policy Manual in SY 2020-21.

### September 6, 2018, Unitary Status Order

**Self-contained GATE**: The Court ordered the District to assess self-contained GATE program limitations due to transportation distances and/or certified GATE teacher shortages, and strategically place self-contained GATE programs, especially to target the interests of African American students.

**Opt-out Enrollment:** The Court ordered the District to consider whether there were other ways besides blanket testing to increase access, including lowering cut scores or an opt-out enrollment policy, and any alternative evaluation instruments.

**Dual Language ALE:** The Court clarified that dual language programs, generally, are not ALEs, noted that the only dual language ALE was the TWDL GATE program at Hollinger ES serving as the pipeline to Pistor's middle-grade TWDL program. The Court ordered the District to identify effective strategies, if any, for increasing access to dual language ALEs and, relatedly, to improve ALE access for ELL students.

**ALE and AP Tutoring:** For improving student support and engagement, the Court ordered the District to explore implementing AP tutoring as done for the successful Cholla IB program, which is teacher-based by the teacher teaching the course.

**AVID:** Without any directive from the Court, the District volunteered that it intended to become an AVID District as "'a strategy for building achievement-oriented school cultures that seek to enhance student interest as well as confidence in achieving at high levels.'" (Order (Doc. 2123) at 96 (quoting Reply (Second (Doc. 2111) at 21)). At the time, the District had AVID programs at Cholla HS, Pueblo HS, and Palo Verde HS with feeder middle schools Valencia, Secrist and Booth Fickett, and planned to add AVID at Wright ES and Catalina HS.

**CRC ALE Course Development:** The Court noted that Culturally Relevant Curriculum (CRC) ALE courses serve the dual purposes of recruitment and engagement because it makes ALE more attractive to minority students. The Court ordered the District to move forward with developing CRC ALEs, including a CRC AP course to be implemented first at UHS.

**Santa Rita Dual Credit:** After noting that on October 27, 2017, the Court had directed the District to address the lack of AP courses at Santa Rita, the Court rejected the idea of Santa Rita HS having only Dual Credit courses and ordered the District to address this inequity.

**IB Cholla HS Integration Plan:** The Court ordered the District to determine the practicality of outreach and recruitment, in combination with free transportation, to incentivize students from north east-side demographically White-concentrated neighborhoods to attend Cholla High School for the IB program. The Mendoza Plaintiffs in their Response to the 3-Year PIP, CMP, raised ORR and transportation issues related to the IB program at Cholla High School, which are addressed here.

**University High School (UHS):** The Court noted the District had not attained target participation goals for African American and Latino students and that UHS is not integrated and has a larger White student population than other district schools. It asked the District whether strategies exist for increasing enrollment and success at UHS for African American and Latino students, especially for Latino students to counter their high attrition rate. It asked the District to consider whether in-district preferences could help offset what appears to be higher White student participation due to out-of-district enrollment.

**Pre-AP Mapping:** The Court ordered the District to ensure that pre-AP courses function as AP pipelines for high school AP AACs, including mapping and aligning them with College Board standards.

**Professional Development and Open Enrollment:** In respect to recruitment and increased student enrollment, the Court ordered the District to adopt a professional development policy to train staff to identify qualified students and to support its open

enrollment policies. The Court directed the District to ensure school-site implementation and by-in for open-access AACs and resource GATE at middle and high schools and to determine whether there remained any schools applying eligibility requirements contrary to the open-enrollment policy.

### ALE Policy Manual Revisions

The Court finds that the District included the strategies it determined to be the most effective in the ALE Policy Manual (Doc. 2267-1), but most of the remaining information discussing various policies being applied in the District was instead included in the ALE Progress Report (Doc. 2267-2). This makes it difficult to identify actual versus considered policies. The ALE Policy Manual fails to discuss strategies in enough detail to be a transparent guide for the future.  The need to look for information sprinkled in different places, including outside the ALE Policy Manual, makes it difficult for the Court, the parties, or the community to identify the post-unitary growth planned for ALE, if any. It is not clear whether a strategy being employed by the District today is a strategy the District intends to employ in the future. As recommended by the Special Master, all the policies should be in the ALE Policy Manual, and it shall be revised to include the following clarifications:

**Self-contained GATE:** The District reports that it has strategically located the five self-contained GATE programs at schools serving large numbers of minority students, but the Court notes that the five self-contained GATE schools identified now are the same that existed in 2018, which existed before then, and that growth in self-contained GATE has occurred from the addition of grade four at two of those schools, Roberts-Naylor K-8 and Wheeler ES. The District expanded the open-access self-contained GATE program at Tully ES[1] by adding an open GATE program at Roberts-Naylor for grades 7 and 8.

Self-contained GATE programs are one of the most advantageous GATEs because they are full day all day programs, but the limited number of these programs limits

---

[1] Because Tully ES is an open GATE, it is more like a cluster GATE. Neither requires an eligibility test.

availability. Students must also test into self-contained GATE. The District has offset these limitations by developing 14 cluster GATE programs,[2] which are essentially open (no entrance test) self-contained GATE schools. It is these schools which have been strategically located to increase ALE access for African American and Latino students. Three of the cluster GATEs are in schools having more than 20% African American students: Blenman ES, Myers-Ganoung ES and Wright ES. (ALE Progress Report (Doc. 2267-2) at 9); (Notice (Doc. 2470-1 at 2-5). A high percentage of African American students is not necessarily a litmus test for success in securing African American student participation in ALE. Howell ES, with only 16% African American students (41 out of 261) has enrolled 36, all but five, of its African American students in its cluster GATE program.  Compare, Blenman ES, 26% African American (74 out of 283), which has only enrolled 26 African American students in its cluster GATE.[3]

It is undisputed that GATE enrollment has dramatically increased overall over the life of the USP, but the Mendoza Plaintiffs charge that the District has simply increased access to ALE for all students and, therefore, has not improved academic achievement for African American and Latino students, pursuant to § V.A of the USP. While it is true that the goal reflected in § V of the USP is student achievement, the Court notes that in the context of ALE, the USP requires the District to "ensure African American and Latino students have equal access to [ALE]." (Order (Doc. 2123) at 45 (quoting USP (Doc 1713) § V.A.) Nevertheless, at the elementary level, self-contained GATE remains red-flagged by the "not less than" 15% Rule[4] for participation for both Latino and African American

---

[2] This was the number mandated by the Court in the September 6, 2018, Order based on the number of existing cluster GATE schools prior to the USP.

[3] The Court notes that the ALE Policy Manual provides procedures for assessing this disparity. The GATE Senior Program Coordinator shall review the GATE data relevant for Howell ES to determine whether there is a best-practices to be learned from the African American enrollment numbers there, and report accordingly to the ALE Director for a determination as to whether there is a take-away recruitment policy for African American students. (ALE Operating Plan (Doc. 2267-3) at 3-4.)

[4] The District proposed this proportional measure of success, as follows: African American and Latino Students should not make up less than 15% of the ALE program numbers, with 15% calculated by the percentage of African American and Latino students

students. Pull-out GATE, the other elementary school GATE option, is also red flagged for having less than 15% African American and Latino student participation.[5] Both require testing to qualify and affirmative action by parents to enroll qualified students into these ALE courses. Even for cluster and open self-contained GATES, parents are required to enroll qualified students into the ALE. This speaks to the importance of the various ORR strategies aimed at improving participation, i.e., persuading parents to enroll their qualified students in ALE, including GATE. Neither the Special Master nor the Plaintiffs have complained that ORR strategies are deficient nor suggested any new strategy, except for the Special Master's recommendation for an opt-out enrollment policy. Previously, the Special Master withheld this recommendation because of party objections, (Order (Doc.2123) at 59), but now having it made, the Court adopts it.

The ALE Policy Manual fails to identify any future plans for growing self-contained GATE (open or not) or for growing cluster GATE. This sidesteps the Court's directive that the District consider whether long travel times to the self-contained GATE schools depresses enrollment or if availability is limited by GATE-certified teacher shortages. Instead, the District submits that "budgetary issues do not constrain" transportation for qualified students to self-contained GATE programs. (ALE Progress Report (Doc. 2267-2) at 12.) "The District provides the necessary transportation to each student who has qualified for self-contained GATE . . . ." (ALE Progress Report (Doc. 2267-2) at 89.) Likewise, the District reports it has been successful in adding certified GATE teachers to meet program demands. (ALE Policy Manual (Doc.2267-1) at 12.) *But see* (ALE Policy Manual (Doc. 2267-1) at 13) (suggesting resource limitations in the context of student assessments by describing GATE placements as "continuing throughout the school year and summer until all seats are filled.")

---

enrolled districtwide in the grades where the ALE is offered multiplied by 75% to determine the percentage of students of each race that should be enrolled in an ALE. (Order (Doc. 2123) at 51.) The Special Master has promoted a 20% ratio. Either way, the Court uses the "not less than" 15 % Rule as a rule of thumb and not a standard for determining unitary status. The Plaintiffs proposed the Court look at actual numbers, which it does as well.

[5] 2018-19 DAR, Ex. V.G.1.c. ((Doc. 2302-1) at 17).

The District shall clarify in the ALE Policy Manual, expressly, that limited resources do not impede future growth in self-contained, including cluster, GATE programs based on prioritizing viable growth of this ALE program at specific schools, with Erickson ES or Magee K-8 being considered as top priorities because both are large schools with over 20% African American students. The Court understands that the District's submission that there are no resource limitations may change when the ALE Policy Manual is revised to include future plans for ALE growth based on demand for self-contained or cluster ALE schools. The revised ALE Policy Manual, like the Revised 3-Year PIP, shall prioritize viable ALE growth, if any, or clarify that there is no need for future expansion.[6] Resource questions and answers may change given the Special Master's recommendation to approve implementing an "opt-out' enrollment policy for self-contained GATE and this Court's expansion of that design for pull-out GATE.

**Opt-out Enrollment:** In addition to implementing open and cluster GATE to address the testing impediment for qualifying students for GATE, it appears that the District has implemented the Special Master's recommendation to lower cut scores for GATE eligibility. See (ALE Progress Report (Doc. 2267-2) at 16) (decreasing Raven cut score for self-contained GATE from 268 to 258 resulting in 75 more qualified students: 42 H; 9 AA, and 24 W). The Special Master now recommends, and the District agrees that it should introduce an enrollment opt-out policy as a trial measure in the self-contained GATE program for SY 2020-21. The Court directs that the opt-out policy shall also be introduced in pull-out GATE. Both the lowered cut score in-district preferences and opt-out policies shall be contained in the ALE Policy Manual.

The opt-out enrollment policy is one means for addressing the "stereotype threat" to ALE success under the USP. Stereotype threat occurs when qualified minority students choose to not participate because they, like society in general, believe they cannot excel in challenging academic programs. Like lower socio-economic markers translate into lower

---

[6] For planning purposes, the District may apply the same three-year+ time frame used for future planning purposes in the 3-Year PIP, CMP.

student achievement which cannot be effectively addressed by schools, the stereotype threat impedes minority student participation in ALE even when there is structural equal access. Like economic disparities are difficult for schools to address, there are exceedingly few remedies to stereotype threat. See (Order (Doc. 460) (explaining the phenomenon, difficulty, and schools' limited ability to address it).  Opt-out enrollment is one remedy, and it will allow the District to maximize the effectiveness of its other strategies for increasing participation by African American and Latino students in ALEs. The Court approves the opt-out policy because it complements the existing ORR strategies. Implemented for ALE in the elementary GATE programs, the opt-out policy takes advantage of the natural matriculation of students, who gain confidence and familiarity with ALE early on and, therefore, continue to enroll in middle and high-school ALEs. (R&R Re: Unitary Status (Doc. 2468) at 27.)

The Court recognizes that depending on the degree of success, the District realizes from the opt-out policy, it may overwhelm its resources, especially for GATE certified teachers. As noted above, the District's failure to address future growth and resource needs, especially stipends to increase the ranks of its certified GATE teachers, leaves this Court with only the District's blanket submittal that it has adequate resources to provide certified teachers and meet the transportation[7] needs for ALE. Gone is any reference to waiting lists, which the Court saw when it reviewed ALE in 2018. The District shall confirm that there are no waiting lists and students are not turned away[8] from GATE programs, especially self-contained and cluster GATE. The Court assumes there are no resource issues because the District has agreed to introduce the opt-out policy for self-contained GATE at the start of SY 2020-21. The District may address any resource issues caused by the Court's expansion of the policy to pull-out GATE by using waiting lists in SY 2020-21. The ALE

---

[7] While ALE, especially, self-contained GATE, including cluster GATE, may affect school choice and, therefore, integration, ALE is an access issue.

[8] The Court considers the need to stop ALE enrollment because seats are no longer available to be the same as turning students away.

1   Policy Manual shall clarify a phased in plan for implementing the opt-out policy in pull-
2   out GATE.

3       The Court finds that the opt-out policy should apply to pull-out GATE because self-
4   contained GATE only reaches students attending five schools and involves travel
5   requirements for students that discourage enrollment. Most students receive GATE
6   services through the pull-out programs which offer 90 minutes of GATE services per week
7   by itinerant GATE teachers. Pull-out GATE is offered in all elementary schools. If African
8   American and Latino students participate here, the District increases the potential for future
9   ALE growth if these students continue to enroll in ALE as they matriculate through
10  TUSD's middle and high schools. The degree of success for the opt-out policy in pull-out
11  GATE will assist the District in determining a more accurate picture of the policy's
12  potential impact to increase enrollment.

13      Additionally, the numbers of qualified students for pull-out GATE dropped for
14  African American and Latino students in SY 2017-18 and 2018-19. (ALE Progress Report
15  (Doc. 2267-2) at 12.) The number of participating students in pull-out GATE dropped for
16  both racial groups for the last two years too. *Id.* at 18. The Court recognizes that this drop
17  is mirrored in part by an increase in self-contained GATE, including cluster GATE, but the
18  numbers of African American and Latino students enrolled in all elementary level GATE
19  programs is still less than the 15%. The Court expects that ORR strategies will be more
20  difficult to deploy this year given the impediment that COVID 19 creates for schools to
21  hold on-site ORR activities and, therefore, the need for the opt-out policy is greater than
22  before.[9]

23      In the event, the District anticipates that there will be wait lists due to the Court's
24  application of the opt-out policy to pull-out GATE, the ALE Policy Manual shall clarify a
25  timeline for a phased in plan. The timeline shall be based on identified limitations,
26  including certified staffing needs for GATE itinerant teachers, with possible remedies, such

27
28      [9]The Court recognizes that COVID 19 was not addressed by the District or briefed
    by the parties, but the ALE Policy Manual was filed on August 30, 2019, long before the
    advent of the national COVID 19 emergency.

as teacher stipends, factored into the assessment equation to determine a viable phased in schedule for applying the opt-out policy to pull-out GATE beginning in SY 2020-21.

**Dual Language ALE:** One, Hollinger ES, out of the five self-contained GATE programs is dual language, meaning it is a TWDL GATE school. Students must test into it for both GATE and language fluency. TWDL is the District's dual language model for USP, § V.C. TWDL maximizes language proficiency pursuant to limiting criteria that require entry into the program ideally in the first grade for English-speaking participants, but entry no later than the third grade. In short, the exclusivity of TWDL, which is designed to provide the maximum benefit for Spanish-speaking students, is contrary to the integration goals of the USP. The model is also contrary to broad and expansive growth of dual language programs under the USP because TWDL requires a complex classroom mix of equally balanced English-speakers, Spanish-speakers, and bilingual students. This is, however, the dual language program choice under the USP made by the District and supported by the parties and the Special Master, which was approved by the Court.[10]

In 2017-18, the District restructured the TWDL GATE program to consolidate it at one school, Hollinger, by adding grades 7 and 8 there, because not enough of the Hollinger 6-graders were moving to Pistor, a middle school TWDL program. In 2017-18, only six students enrolled from Hollinger ES in the Pistor MS TWDL program. The Special Master reports the change in 2017-18 to move the entire operation to Hollinger resulted in enrolling 178 students in the TWDL GATE. The Court notes that the District continues to count all students in all dual language (TWDL) programs as participating in ALE programs. The District reports 2089 (nonELL) and 357 (ELL) students enrolled in 2018-19 in dual language ALE. (2018-19 DAR (Doc. 2302-1) at 7.) The Court has expressly disallowed this. (Order (Doc. 2123) at 98, 100.) This number may, however, be relevant to assessing demand for TWDL GATE.

---

[10] The Court rejects the District's suggestion that it creates robust access to TWDL GATE by inviting all students who qualify for self-contained GATE to attend either their feeder GATE self-contained school or the TWDL GATE at their grade level. This is a disingenuous invitation for any qualified student not fluent in Spanish or not in the first grade.

The ALE Policy Manual shall clarify, based on need, whether Hollinger TWDL GATE has enough capacity to meet future demand for TWDL GATE. The District shall assess the average travel time for accessing this TWDL GATE, and identify mitigating measures, if any, that can be undertaken to alleviate the transportation burden imposed on ELL students and other dual language qualified students for access to TWDL GATE. The District shall identify the number of ELL or dual language qualified students living beyond a reasonable travel distance[11] from Hollinger as: "not having access to a TWDL self-contained GATE."  The ALE Policy Manual shall confirm that there are no Transportation Plan remedies for any such lack of access.

Most ELL students receive ALE like their fellow students through pull-out GATE in elementary school, resource GATE in middle school, and alongside their peers in high school in AP, Duel Credit, and/or other like AAC ALEs. ELL students also benefit from open enrollment and cluster GATE policies.

The District has two policies intended to expand access to ALE for African American and Latino students, including ELL students: 1) universal testing to increase qualified minority students and 2) tutoring and other academic support services to improve academic performance. Both strategies are aimed specifically at improving access to ALE for minority students. The first, addresses "stereotype threat" and administrative bias and the second ensures that once enrolled, students have enough support, especially academic support, to succeed in an ALE program.

The ALE Policy Manual shall clarify that both these policies apply to ELL students: 1) ELL students, like all other students, are universally tested for GATE eligibility in grades one and five; 2) ELL students also benefit for the other universal testing policies

---

[11] The District shall confirm its use of the same travel distance parameters as applied to determine that existing self-contained GATE schools were available, i.e., reasonably accessible to all qualified students, which the Court assumes was a travel distance of approximating 20 to 30 minutes to a self-contained GATE school, including open and cluster programs. If this assumption is wrong, the District shall clarify the record as to what it considers a reasonable travel distance and identify the number of qualified self-contained GATE students living beyond that travel distance as "not having access to a self-contained GATE."  The ALE Policy Manual shall confirm that there are no Transportation Plan remedies for any such lack of access.

aimed at identifying and expanding qualified students for ALE, including pre-kindergarten emergent and kindergarten testing and high school PSAT. To be clear, the Court understands that tests may be different for ELL students, but the policy of universally testing all students to expand the pool of qualified students shall apply to ELL students. The ALE Policy Manual shall clarify the universal testing policies that apply to ELL students equal to those applying to all students.

The ALE Policy Manual shall clarify the District's policies for specifically and directly targeting ELL qualified students for recruitment into ALEs and recruiting ELL students for open enrollment and cluster GATE. Passive recruitment by flyers and emails is not enough, especially when direct contact recruitment is utilized for all other African American and Latino students. The District's ELL recruitment policy should reflect that ALE support service policies exist which address the unique impediment faced by ELL students because they are in the process of learning English. The Court has unsuccessfully scoured the ALE Policy Manual to determine whether existing tutoring and other student support services, especially academic supports, are equally available to ELL students in light of the language barriers that exist for ELL students, and whether there are any unique services targeted especially to the language needs of ELL students. The ALE Policy Manual shall clarify the support services available to ELL students, which are designed to address the fact that they are learning English.

The District provides special support services for ELL GATE, Spanish-speaking students through K-3 English development by tutoring provided by Language Acquisition Department (LAD) and in-class English Language Development (ELD). (ALE Progress Report (Doc. 2267-2) at 31.)  Otherwise, ELL students have access to the Interscholastic Tutoring Program, which allows all students, including those in ALE, to receive tutoring under the guidance of certified teachers at "several"[12] school sites. (ALE Progress Report (Doc. 2267-2) at 47)). Likewise, ELL students in ALE have access to the high school AP

---

[12] Are there some schools where students do not have access to Interscholastic tutors?

Mentoring and Tutoring program, with AP tutoring in Math and English Language Arts being provided on-site by AP teachers. (ALE Progress Report (Doc. 2267-2 at 57)). The District notes that the student support departments, including Mexican American Student Support Services Department (MASSD) also provide tutors for AP students. (ALE Progress Report (Doc. 2267-2) at 47.)  AVID provides tutors to all AVID students and is developing a curriculum with MASSD for tutor-training. (ALE Policy Manual (Doc. 2267-1) at 38.) Assuming the adequacy of the LAD English development program for ELL students in GATE programs K-3 and that MASD tutoring services includes bilingual tutors, the ALE Policy Manual shall clarify how the remainder of the academic support services available to ALE students accommodates the language needs of ELL students.

**ALE and AP Tutoring:** It appears that the District has determined the IB model for tutoring to be successful.  The unique quality of the IB tutoring model being used at Cholla HS is that the teacher teaching the IB course provides the tutoring.  The District replicated in part a critical element from this model in the ALE improvement plans for Catalina HS by imbedding a conference period in the school day and for Tucson High by adding an advisory/intervention period into the bell schedule. In this way, both allow AP students more access to their AP teachers, which facilitates the teacher's ability to assess when a student or students need extra help and to determine whether tutoring should be provided in small groups or individual settings.[13] This is of course in keeping with the teacher-based tutoring model this Court has approved at the recommendation of the Special

---

[13]At Cholla HS, the IB teachers provide approximately 3,979 hours of tutoring (an average of about 165 hours per teacher for 24 IB teachers) over 32 weeks; each IB teacher tutors a little over five hours per week. This costs approximately $99,489, which is paid with Title 1 funding. In comparison, AP teachers are paid for approximately four hours of tutoring per year. And, each HS has one math and one ELA AP teacher providing an additional two hours each of tutoring per week. "Thus, although the District cannot expand the IB tutoring model to all ALEs, all interested ALE students receive individual tutoring throughout the year under the guidance of certified teachers before, during, and after school in the District's formal tutoring program." (TUSD Response (Doc. 2315) at 14.) Clearly, five hours of tutoring available from each IB course teacher a week at Cholla HS cannot in any way be considered equally matched by four hours per year of tutoring by AP teachers, even with the addition of four more hours of tutoring per week at each school for math and ELA. If the IB tutoring program is demand driven, there is every reason to believe that the AP tutoring program falls short of meeting the academic support needs of AP students at the other high schools.

1    Master and the Plaintiffs that tutoring shall be provided by certified teachers. The Special

2    Master, now, reports he has rethought this well accepted professional opinion because of

3    the extreme national shortages in certified teachers. He recommends allowing the District

4    to use a team approach for tutoring made up of teacher candidates and others with college

5    degrees, who are supervised by a certified teacher. The Court adopts the recommendation

6    to expand tutoring to include non-certified staff, directly supervised by certified teachers.

7    The ALE Policy Manual shall clarify that the Court approves this team-approach for

8    tutoring, with the teachers teaching AP and ALE courses being available to their AP

9    students through the use of advisory/intervention or conference periods and playing a

10   pivotal role in facilitating the dissemination of tutoring services to their AP students.

11       **AVID:** AVID is not an ALE, it is a strategy the District employs which creates an

12   atmosphere of academic excellence in a school to offset stereotype threat and increase

13   participation in ALE. In 2018, the Court was looking at SY 2017-18 data, which reflected

14   AVID programs located at Cholla, Pueblo, and Palo Verde high schools with feeder middle

15   schools Valencia, Secrist and Booth Fickett. In 2018, the District reported a policy to grow

16   into an AVID District and to add AVID programs in 2018-19 at Wright ES and Catalina

17   HS. The District reports 15 AVID school programs, mainly elective courses, with Wright

18   ES being a school wide AVID program. The other schools having AVID courses are middle

19   schools Doolen, Magee, Pistor, Secrist, Valencia, Booth-Fickett, and Utterback and high

20   schools Palo Verde, Pueblo, Rincon, Sahuaro, Cholla, Catalina, and Tucson High. *But see*

21   (Progress Report (Doc. 22767-2) at 76, 77) (reporting increase from 12 to 13 AVID

22   programs). Since the Court last considered AVID, the District has expanded AVID courses

23   to three more middle schools and four more high schools. The ALE Policy Manual shall

24   confirm the policy to become an AVID District, and the ALE Policy Manual, Appendix A,

25   shall clarify the phased in plan (past and future) for growing AVID, at which schools and

26   when, to attain the goal of becoming an AVID District.

27       **CRC ALE Course Development:** The District has completed development of the

28   CRC AP course, and it is being offered for the first time at UHS as a junior-year Language

and Composition course, Culturally Relevant Mexican American and African American Perspective. (ALE Policy Manual (Doc. 2267-1) at 28.) The District reports that competition for students exists between CRC and AP courses, which can be avoided by offering CRC AP courses. This makes the District's plan for future offerings of CRC AP course at all schools even more important. The ALE Policy Manual shall clarify the phased-in timeline (plan) for offering at least one CRC AP course at every other high school and at least one CRC AAC at every middle school. The District reports a dual-purpose policy to create AP courses that are simultaneously Dual Credit courses to maximize resources and avoid conflict between AP and Dual Credit ALE. The ALE Policy Manual shall clarify that the dual-purpose, AP/Dual Credit, policy may apply to CRC AP courses as well.

The Court notes that the ALE Policy Manual includes a brief description of each ALE but fails to reflect policy issues as applied in the future. Access disparity between schools which concerned the Court when it reviewed the high school ALEs in 2018 were addressed in the Progress Report but not translated into policy in the ALE Policy Manual. The Progress Report reflects that the District has added AP and other AACs at the high schools, which the Court identified as needing immediate improvement. For example, AP courses increased at high schools, as follows: Catalina (6 to 9), Palo Verde (9 to 17), Pueblo (14 to 16), Rincon (12 to 14), Sabino (13 to 16), Sahuaro (12 to 13), and Tucson (18 to 20). (ALE Progress Report (Doc. 2267-2) at 51.) Dual Credit (HS-CC) and other AAC classes were, likewise, added at each high school; the K-8 middle schools added Dual Credit (MS-HS) by transporting middle students to high schools to take Algebra 1 because the middle schools are generally too small to offer MS-HS courses on site. These undertakings would have informed resource and demand assessments for ALE policies for future planning purposes, but the ALE Policy Manual stopped short of clarifying ALE policies for future growth. Are 6 AP courses for 655 students at Catalina a minimum or are 17 for 791 students at Palo Verde optimal AP offerings, or is the number of AP courses needed at a high school based on other factors such as how many students qualify for AP courses at a school? These questions are not for the Court to answer, and the ALE Policy Manual fails to reflect the

1   demand analysis used by the District for determining the number of AP courses at each
2   high school based on needed access. Instead of offering a target number for planning
3   purposes, the District submits "it will continue to strive to provide appropriate AP
4   opportunities." (Notice of Compliance (NC) (Doc. 2424) at 4) (describing commitment to
5   add AP courses at Santa Rita). This is like striving to provide appropriate instruction to
6   improve state Math and ELA test scores, without aligning the curriculum to the state
7   standards.

8        The ALE Policy Manual shall clarify what "the appropriate ALE opportunities"
9   means for future planning purposes, especially for AP and Dual Credit courses. The ALE
10  Policy Manual shall determine the optimal number for ALE courses by type and set target
11  numbers for each school. The ALE Policy Manual shall clarify the phased in schedule for,
12  accordingly, growing the HS-CC Dual Credit program at all high schools, except Santa
13  Rita HS. The ALE Policy Manual shall clarify a phased in schedule for, accordingly,
14  growing the AP program at all high schools, with a priority placed on growing AP courses
15  at Santa Rita and Catalina high schools.

16       **Santa Rita Dual Credit:** The ALE Policy Manual shall clarify the appropriate AP
17  opportunities, i.e., a viable target number for providing equal access to the extent
18  practicable for African American and Latino students to this ALE at Santa Rita HS. The
19  Court adopts the Special Master's recommendation that the number of AP courses at Santa
20  Rita be expanded, beginning this year, SY 2020-21.  (R&R Re: Unitary Status (2468) at
21  24.) The ALE Policy Manual shall clarify the timeline for phasing in AP courses at Santa
22  Rita HS to attain the target number of AP courses. The District has made no showing that
23  allowing Santa Rita students to travel to other schools to take AP courses creates equity.
24  The Court finds that the strategy of transporting students from smaller K-8 schools to
25  neighboring high schools for access to MS-HS Dual Credit Algebra 1 courses is not
26  apparently applicable as a strategy for providing equal access to AP courses for students at
27  Santa Rita.

28

In the event the District would like to make such a showing, it may seek reconsideration of the Court's prior directive. The District should be prepared to present evidence of estimated demand, burdensomeness related to travel distances, and an impact analysis. The Court wants estimates of participation to be based on other school's demands for AP courses, not just the alleged lack of demand at Santa Rita HS. Singing the praises of the HS-CC Dual Credit program, alone, has not persuaded the Court that they should replace AP courses, but it has convinced this Court to adopt the Special Master's recommendation that Dual Credit (HS-CC) courses need to be expanded beyond existing levels of "one or more." (ALE Progress Report (Doc. 2267-2) at 58.) As directed above, the ALE Policy Manual shall clarify a viable target number for Dual Credit courses for future planned growth of ALE, if any.

**IB Cholla HS Integration Plan:** The ALE Policy Manual shall reevaluate the Integration Potential rating "Low" provided in the 3-Year PIP, CMP, Non-Magnet Integration and Academic Plans (Doc. 2270-3) at 4) for Cholla HS to expressly determine the integrative potential of the IB program. The District shall prepare a Non-Magnet School Integration Action Plan (Action Plan)[14] for Cholla HS, including targeted outreach and recruitment and incentive transportation aimed at enrolling students from east-side demographic White neighborhoods in the IB program at Cholla HS to promote integration at this Racially Concentrated school. The Action Plan shall reflect the cost benefit of this integration plan and determine whether it is viable and if yes, identify it as a year one, two, three, or plus priority project.

**University High School (UHS):** The ALE Policy Manual makes it clear that the District automatically tests all TUSD 7th graders and automatically qualifies those who have a CogAT score of 7, if they have 3.0 GPA in core classes. There is an alternative, non-cognitive, social and emotional learning assessment for student success for students having within range test scores, ACT Tessera. The Progress Report notes that 7th graders

---

[14] The Court's 3-Year PIP, CMP, Order directed the District to prepare a Non-Magnet School Student Achievement Action Plan for Santa Rita HS.

who miss the test or have a borderline test score (6) can retest in 8th grade. The District offers CogAT test preparation sessions taught by UHS teachers.

The ALE Policy Manual shall clarify that the revised norming rubric, retesting option for borderline test scores, and the CogAT test preparation sessions are UHS policies, not pilot strategies.

Like all the ALE programs, UHS focuses on getting qualified students to enroll.[15] In addition to the normal ORR strategies, UHS hosts, BLAST, a ten-day summer session for 7th and 8th graders, and their parents, to meet alumni from their middle schools who are now attending UHS. It offers a summer bridge program for incoming freshman, BOOST, and a sophomore summer math and science program, BOUNCE. Student recruitment includes student to student and family to family efforts aimed at providing social support for students and parents considering, and then, enrolling in UHS, such as Zip Code parties and Penguin 2 Penguin. There is no distinction in the ALE Policy Manual between African American and Latino recruitment strategies.

The Court finds that to the extent resources limit the District's ability to provide BLAST, BOOST, BOUNCE to all comers, these programs may be limited to in-District students; in-District preferences that benefit African American and Latino students are approved by the Court.

The ALE Policy Manual shall clarify policies, if any may exist, to address racial imbalances due to out-of-district enrollment, such as prioritizing or incentivizing out-of-district enrollment that improves the diversity of UHS. The enrollment at UHS continues to fall below the ALE Action Plan enrollment goals of 7% African American and 38.9 % Latino students.[16]  The ALE Policy Manual fails to clarify whether any policies may exist to address the extent, if any, that out-of-district enrollment contributes to there being higher White student enrollment at UHS compared to other high schools in TUSD. According to

---

[15]The court assumes that free incentive transportation is provided for UHS. This needs to be clarified in the Transportation Plan.

[16] 40th Day 2019-20 enrollment at UHS: 519 W (45%); 47 AA (4%), and 395 (34% Hisp).

1   the Fisher Plaintiffs, UHS students take courses at Rincon HS and out-of-district students

2   create an imbalance there. Rincon is Integrated, and the Court finds no over-flow issue[17]

3   in the context of integration at Rincon.

4         The ALE Policy Manual shall clarify the student support services available at UHS

5   aimed at improving African American and Latino student's academic performance in and

6   successful completion of UHS AP courses. UHS offers a Math Center, Writing Center, and

7   Science Center as courses targeting interventions aimed at specific skill gaps in reading,

8   writing, science, and math to improve student performance in core academic classes.  (ALE

9   Policy Manual (Doc. 2267-1) at 31.) In SY 2018-19, 48 students took one of these classes.

10  (2018-19 DAR (Doc. 2298-1) at 75.) The ALE Policy Manual shall clarify policies, if any,

11  to increase utilization of these Centers by African American and Latino students.

12        Not included as a policy, the Progress Report reflects "[t]utoring services continued

13  in SY 18-19, with additional math and science tutors and writing support for senior students

14  applying to college." (ALE Progress Report (2267-2) at 73.) The Court assumes the

15  Progress Report refers to a volunteer African American and Hispanic UHS alumni tutoring

16  program mentioned in the 2018-19 DAR. (Doc. 2298-1) at 75.)

17        The ALE Policy Manual shall clarify that the above tutoring programs are the only

18  academic support services available to African American and Latino students enrolled at

19  UHS and show that this level of academic support meets the academic student support

20  needs of African American and Latino students at UHS. If not, the ALE Policy Manual

21  shall clarify a phased-in plan for the future development of academic support services at

22  UHS to meet that demand to the extent practicable.

23        **Pre-AP Mapping:** The District shall confirm, expressly, that it has mapped the pre-

24  AP courses to align with the College Board standards for AP courses to ensure to the extent

25  practicable that Pre-AP courses are a successful means for increasing student success in

26

27  ────────────────────

28      [17] The Court does not address the question of whether Rincon is overcapacity, generally, or specifically due to UHS enrollment because there is no evidentiary showing made to support such an assertion.

AP courses. If this has not been done, it shall be done as soon as possible and no later than the end of SY 2020-21.

**Professional Development and Open Enrollment:** The District has affirmed that there is a professional development policy to train staff to identify qualified students and to support open enrollment policies for AACs and resource GATE at middle and high schools. The ALE Policy Manual shall clarify, expressly, that there are no middle or high schools contrarily applying eligibility requirements instead of the District's open enrollment policy for ALEs.

### Transportation Plan

Considering the clarifications to be made in the ALE Policy Manual, the District shall revise the Transportation Plan, accordingly.

Informed by the work of the Comprehensive Integration Plan (CIP) for assessments of travel distances, locations of targeted populations, costs, and other factors, the Transportation Plan shall clarify the use of transportation as a criterion for selecting and prioritizing future ALE programs, including self-contained, open and cluster, and TWDL GATE. For it to be comprehensive, the Transportation Plan shall clarify all, not just magnet, free transportation programs including GATE, UHS, TWDL,[18] and transportation from K-8 schools to high schools for Dual Credit (MS-HS) Algebra 1 and transportation from Santa Rita[19] to another high school for AP access.

Free transportation serves as an incentive for students to attend schools outside their neighborhoods. Free transportation is provided as follows: TUSD Yellow Busses; Public

---

[18] The Court only addresses the merits of the TWDL GATE program at Hollinger and does not address the Transportation Plan in the context of the dual language TWDL program, generally. The Court retains jurisdiction to consider transportation issues if any arise in the pending Dual Language Plan: TWDL. Likewise, the Court retains jurisdiction to consider transportation issues, if there are any in the context of the ELL Action Plan revisions related to dropout rates or FACE and MASSD currently pending before the Court. Nevertheless, the District needs to address TWDL generally in the Transportation Plan to clarify that free transportation is available to all TWDL schools regardless of whether or not the student's enrollment improves integration at the receiving TWDL school.

[19] This is contingent on the District continuing to press this option for providing AP access to students at Santa Rita.

Transportation; Contracted Services, and Express Shuttles. The Transportation Plan shall clarify that these are the four modes of free transportation available in TUSD.

Program Specific: There are some programs, which entitle a student to free transportation, *per se*, to attend a school offering the following: Magnet Schools, Self-contained GATE schools, including cluster and open GATE, Dual Credit (MS-HS) at a neighborhood high school for K-8 middle schools or AP courses for Santa Rita[20] students, UHS, and all dual language TWDL schools. "Students are eligible for free magnet transportation if they live within the TUSD general boundary, but outside of the walk-zone of the magnet school." (Transportation Plan (Doc. 2270-4) at 2.) The Transportation Plan shall clarify that the Court's understanding is correct and expand the eligibility definition of "outside the walk-zone of the magnet school," accordingly.

Incentive Transportation: Free transportation for "students living within the boundary of a racially concentrated school, whose enrollment improves the integration of the receiving school." (Transportation Plan (Doc. 2270-4) at 3.) The District proposes, and the Court approves, the addition of incentive transportation for "students living within 'an identified incentive zone," *id.,* whose enrollment improves the integration of the receiving school. The Transportation Plan shall clarify that an incentive zone is a zone that has been identified by the District as having enough targeted students to have a potentially integrative impact on a specified receiving school. *Id.*

As the Court understands it, free incentive transportation is available for AACs, like Honors and AP courses. Transportation to pull-out gate and Resource GATE is not an issue because these GATE ALEs are offered at all elementary and middle schools, respectively. In short, free incentive transportation is available to any school for any reason, for students living within racially concentrated school boundaries or incentive zones when the student's enrollment improves the integration of the receiving school. The Transportation Plan shall clarify that the Court's understanding is correct.

---

[20] *See* n. 18.

1    The Express Shuttles shall be limited to routes that take no more than 30 minutes.

2    The Transportation Plan shall clarify that modes of free transportation include the express

3    shuttles and clarify, by ridership data by route, broken down by race, for SY 2019-20, that

4    the shuttles are transporting students from either racially concentrated school

5    neighborhoods or incentive zones to schools where the student's enrollment is improving

6    integration at the receiving school. Alternatively, free express shuttles may transport

7    students, living beyond school attendance boundaries, to schools hosting qualifying

8    programs.  The existing express shuttle routes are as follows: Sabino HS, Santa Rita HS,

9    and Roskuge K-8 TWDL Magnet School.

10    The Transportation Plan shall clarify, as understood by the Court, that free incentive

11    transportation is available to Sabino HS for students whose enrollment would improve

12    integration. Sabino HS is neither Integrated nor Racially Concentrated and is located on

13    the far northeast corner of the District with 54% White students so the southside/westside

14    northbound route makes sense for moving African American and Latino students,

15    assumedly living in racially concentrated school boundaries, north and east to improve

16    integration at Sabino HS. The Court is confused by the express shuttle route from the

17    southside to Santa Rita HS, which is Integrated and located on the southeast side of the

18    District. The Transportation Plan shall clarify the justification for this shuttle express route

19    by providing ridership data which reflects students using this shuttle are living within

20    racially concentrated school boundaries or incentive zones and their enrollment improves

21    integration at Santa Rita HS. The shuttle express route from the eastside to centrally located

22    Roskruge K-8 is based on its dual language magnet status, which also explains its racial

23    concentration of 81% Latino students. (Notice Enrollment Data (Doc. 2470-1 at 2-5)). The

24    Transportation Plan shall clarify that the express shuttle to Roskruge K-8 is based on its

25    magnet or TWDL status, or both.

26    The Transportation Plan shall clarify, based on projected ridership data, the potential

27    for an express shuttle route from the northeast parts of the District to Cholla HS, which

28    located far west in the District and a Racially Concentrated school.

The Transportation Plan shall clarify transportation as a criterion for selecting future candidates for Self-contained GATE schools, including open and cluster GATE, and TWDL GATE, and non-ALE dual language TWDL schools. The Court recognizes that TWDL dual language schools are not the subject of this Order because they are not considered ALE. The Court will review TWDL and ELL program issues next.

<u>**Conclusion**</u>

Pursuant to the clarifications to be made to the ALE Policy Manual, the Court finds that the District has complied with the directives set out on September 6, 2018, relevant to the question of unitary status for USP § V.A., ALE, including those relevant to the Transportation Plan.

**Accordingly,**

**IT IS ORDERED** that the Report and Recommendation (Doc. 2376) is adopted in part as described herein.

**IT IS FURTHER ORDERED** that the ALE Policy Manual shall be revised for clarification as directed herein and shall be refiled within 21 days of the filing date of this Order.

**IT IS FURTHER ORDERED** that the Motion to Strike the Notice of Compliance with the R&R (Doc. 2432) is DENIED, but alternatively the request for consideration of objections is GRANTED, with such consideration to be made in the context of the Court's determination of unitary status.

Dated this 12th day of June, 2020.

Honorable David C. Bury
United States District Judge