1

2

3

4

5 **IN THE UNITED STATES DISTRICT COURT**

6 **FOR THE DISTRICT OF ARIZONA**

7

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
| Plaintiffs | (Lead Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
| Defendants-Intervenors, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | (Consolidated Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

December 1, 2018 USP Benchmarks: Second Supplemental Notices of Compliance

**Procedural Posture**

On September 6, 2018, after full briefing on the question of unitary status, the Court adopted recommendations by the Special Master for completion of Action Plans, which were adopted pursuant to various Unitary Status Program (USP) provisions and gave express directives for actions the Court found were necessary under the USP, including planning for future post unitary status operation of the District under the USP. (Order (Doc. 2123)). "The Court made express directives and set benchmark deadlines for compliance where it identified specific deficiencies in respect to attaining unitary status for specific programs." (Order (Doc. 2273) at 2 (citing Order (Doc. 2123)). Since then, the Court has issued several Orders tracking the District's progress related to the benchmark date, December 1, 2018, and the District's corresponding, Notices of Compliance, as follows: 1) AASSD and MASSD Operating Plans; 2) FACE Update; 3) ELL Plan; 4) Middle School Courses for Highschool Credit; 5) Centralized Hiring Process and Certification for Placing Beginning Teachers at Underperforming and Racially Concentrated Schools; 6) Teacher Diversity, Grow-Your-Own Programs, and Attrition; 7) Inclusive School Environments and Cultures of Civility, and 8) Professional Learning for Technology.

In April 2019, after briefing by the Plaintiffs and the Special Master, the Court considered the December 1, 2018, Notices of Compliance and required the District to make immediate, but not longer than 30 days, revisions to bring the District into compliance with directives from the September 6, 2018, Order. (Order (Doc. 2217) at 15.)

The Court called for Supplemental Notices of Compliance as follows: 1) Centralized Hiring Process and Certification for Placing Beginning Teachers at Underperforming and Racially Concentrated Schools (requiring the District to revise certification criteria and identify strategies aimed at placing beginning teachers in hard-to-teach schools); 2) Teacher Diversity, Grow-Your-Own-Programs, and Attrition (requiring District to ensure its GYOPs are growing teachers of color and administrators of color); 3) Inclusive School Environments (reaffirming directive for District to work with Special Master to assess effectiveness of strategies), and 4) Professional Learning for Technology (District agreeing

to revise professional learning to focus on use of technology to facilitate student learning). (Order (Doc. 2217) at 6-15.)

Subsequent to the District's filing the first Supplemental Notices of Compliance, after full briefing, and review,[1] on September 10, 2019, the Court again called for supplementation, Second Supplemental Notices of Compliance, as follows: 1) Centralized Hiring Process and Certification for Placing Beginning Teachers at Underperforming and Racially Concentrated Schools (directing District to revise beginning teacher certification procedure and teacher assessment form and to file Beginning Teacher Inventory); 2) Teacher Diversity, Grow-Your-Own-Programs, and Attrition (reaffirming directive to file comprehensive plan addressing all directives from April 22, 2019, Order); 3) Inclusive School Environments (reaffirming directive for District to work with Special Master to assess effectiveness of strategies), and 4) Professional Learning for Technology (ordering District to work with the Special Master to, as it had agreed, revise professional learning plan to focus on use of technology to facilitate student learning, including explaining how to evaluate effectiveness of Teacher Technology Liaisons (TTLs) and to file the plan with the Court.) (Order (Doc. 2273)).

These Second Supplemental Notices of Compliance are the subject of this Order, which issues after full review and comment from the Parties and the Special Master.

Likewise, in April 2019, when it addressed the compliance issues above, the Court found the inter-connectedness of USP provisions for Student Support Services (AASSD and MASSD) and Family and Community Outreach Engagement (FACE), including the crossover role played by these departments in serving English Language Learner (ELL)[2] students, required a more wholistic approach to the Court's review of these efforts under the USP. The Court called for first Supplemental Notices of Compliance to be filed by September 1, 2019 for the AASSD and MASSD Operating Plans, the FACE Update, and

---

[1] Review was limited to the District's efforts relevant to the September 6, 2018, directives, as narrowed by Objections, R&Rs, and the April 2019 Orders issued by the Court. The Court takes the same approach here.

[2] Now: English Learners (EL).

the ELL Plan reflecting this interconnection and ensuring that AASSD and MASSD do not duplicate services being provided by other departments or by school staff on-site at the schools. (Order (Doc. 2213)). The Court ordered the District to prepare an Executive Summary[3] by December 1, 2019, to address the interconnectedness of the Unitary Status Plan (USP) programs before the Court reconsiders unitary status. (Order (Doc 2213) at 12-20.)

Subsequent to the District filing the AASSD and MASSD plans, the Plaintiffs' objections and the Special Master's reassertion of duplication and waste of resources, the Court ordered the Special Master to develop the AASSD and MASSD Plans. (Order (Doc. 2359)). The Court will address Student Support Services, AASSD and MASSD Plans, the FACE Update and ELL Plan in a separate Order.

**December 1, 2018 USP Benchmarks: Second Supplemental Notices of Compliance**

1) <u>Centralized Hiring Process and Certification for Placing Beginning Teachers at Underperforming and Racially Concentrated Schools.</u>

On September 10, 2019, the Court ordered the District to revise its beginning teacher certification procedure, including the certification form.[4] The Court ordered the District to file a Beginning Teacher Inventory. The first directive was responsive to the Mendoza Plaintiffs' complaint that District procedures were undermining its commitment to not hire beginning teachers at underperforming and racially concentrated schools. The second directive addressed the District's chronic inability to provide accurate data related to its hiring and placement of beginning teachers, which is essential to the integrity of its beginning teacher programs. This data issue is both a budget and substantive program concern. *See* (Order (Doc. 2273) at 3-13 (full discussion of rationales supporting these directives).

---

[3] Executive Summary (Doc. 2384) filed 12/1/19.

[4] Certification of necessity is required before a beginning teacher is placed at an underperforming or racially concentrated school.

On October 10, 2019, the District filed the Second Supplemental Notice of Compliance: Certification & Support for Beginning Teachers (NC: Beginning Teachers) (Doc. 2327). The District has revised the certification procedures, including the certification form to address the Court's concerns. It is now clear that there are only two legitimate exceptions justifying placement of a beginning teacher at an under-performing or racially concentrated school: 1) "The school is racially concentrated or underperforming, and a qualified, more experienced applicant was not available or [2]] The school is racially concentrated, has three years of above District average scores in ELA and Math, and the first year teacher promotes a diverse teaching staff." (2nd Supp. NC: Beginning Teachers, Ex. E: Certification Form (Doc. 2327-5) at 2.) It is also clear that during the certification process specific sheltering/mitigating strategies, above and beyond the support strategies afforded all beginning teachers, have been identified and agreed to by school leadership. *Id.* (omitting option "none"); *see also* (TUSD Response (Doc. 2423-2) (reflecting which sheltering/mitigation strategies are being used at which schools).[5]

Second, the Court directed the District to prepare a Beginning Teacher Inventory. This directive was not an attempt to micro-manage District operations but was instead responsive to the chronic inability of the District to report accurate data for beginning teachers. (Order (Doc. 2273) at 4.) In fact, this inability continued through the filing of the Second Supplemental Notice of Compliance, 2019-20 Beginning Teachers Inventory (10/10/19). (2nd Supp. NC: Beginning Teachers, Ex. B (Doc. 2327-2) at 2-5.) In spite of the District's assertion that it had "discovered issues regarding data fields used to enter teacher experience, which [had] been carefully corrected and checked," (2nd Supp. NC:

---

[5] The Court notes that the Sheltering/Mitigation Strategies report reflects 36 schools as compared to the First and Second Yr. Teachers SY 19-20 by Site (11/5/19) Inventory, reports 48 underperforming and racially concentrated schools. In other words, 12 schools may be missing sheltering/mitigation strategies. The November 5, 2019, Inventory removed the classification RC3+, which this Court asked to be included in the report to reflect those schools that would not need sheltering/mitigation strategies. Perhaps the schools missing sheltering/mitigation strategies are high performing racially concentrated schools, i.e., RC3+ schools, but the Court's review of the original First and Second Yr. Teacher SY 19-20 (10/10/20) Inventory, which did include the RC3+ classification, only showed five such schools. The District shall resolve this data discrepancy and ensure that sheltering/mitigation strategies are being used at all underperforming schools.

Beginning Teachers, Ex. C: Summary 2019-20 Beginning Teachers Inventory (Doc. 2327-2) at 2), and its confidence "that these numbers are accurate as of the date of filing," *id.*, this was not true. The District self-corrected by filing the First and Second [Yr] Teachers SY 2019-20 by Site 11/5/19 (Doc. 2423-1) Inventory in response to the Special Master's Report and Recommendation (R&R) asking again for the data, which this Court had directed should be included in the Inventory. (R&R (Doc. 2346)); *see also* (Mendoza Objection (Doc. 2340) at 4) (pointing out Tucson High is a large school but the Inventory reflected only seven actual teachers, and small schools like Tolson, Henry, and Dunham had Inventory numbers of actual teachers near and over 100)). The filing made by the District on January 31, 2020, reflecting First and Second [Yr] Teachers by Site 11/5/19 appears to be an accurate report, and, therefore, complies with the directives of this Court but for the omission of "RC3+" classification for racially concentrated schools that are high-performing.[6] The Court is confident that the Beginning Teachers Inventory (Doc. 2423-1) is accurate and can be relied on for planning and budget purposes.

To the extent that the need for an accurate data-based tracking system for beginning teachers is not obvious, the Court's approval is conditioned on it for the Plan for First-Year Teachers at Racially Concentrated and Underperforming Schools and Second Year Teachers Who Receive Unsatisfactory End of First Year Evaluation (Plan for Beginning Teachers at RC and UP Schools) (Doc. 2327-1 at 2-6). The District has designed support strategies for beginning teachers, who are teaching in hard-to-teach schools, which includes an intense Beginning Teacher-Teacher Mentor program. The support strategies are directly linked to need, which is assessed by a pre-and post-observational rubric which assesses teacher proficiency to ensure that support exists for these teachers through their second year of teaching, if necessary, to attain proficiency. The District provided the Pre and Post Observational Rubric reflecting that the necessary assessments are being performed, and that there is improvement between the Beginning of the Year (BOY) and End of the Year

---

[6] Meaning, the school is racially concentrated, with three years of above District average scores in ELA and Math.

(EOY) scores for these teachers. (2nd Supp. NC: Beginning Teachers, Ex. D: Strategies (Rubric Scores) (Doc. 2327-4) at 15-18.)

The main component of the District's Support Plan for Beginning Teachers at Racially Concentrated and Underperforming Schools is the Beginning Teacher-Teacher Mentor program, which assigns mentors by a ratio of 1:10 for beginning teachers at underperforming and racially concentrated schools. (2nd Supp NC: Beginning Teachers, Ex. A: Support Plan for Beginning Teachers at RC and UP Schools (Doc. 2327-1) at 2.)[7] Every budget cycle, it has been an issue whether the District is providing sufficient funding for this mentoring program. The Court notes that SY 2020-21 has commenced, and the SY 2020-21 USP Budget has been filed with the Court for review and comment. The District shall run the First and Second [Yr] Teachers Inventory as filed for SY 2019-20 (11/5/19), (Doc. 2423-1), for SY 2020-21 and provide it to the Plaintiffs and the Special Master.

2) Teacher Diversity, Grow-Your-Own (GYO) Programs, and Attrition[8]

The revisions called for by the Court in its September 10, 2019, Order were in large part required to resolve confusion created because development of the Teacher Diversity

---

[7] Different ratios apply for mentors for beginning teachers at other schools and for second-year teachers. (2nd Supp NC: Beginning Teachers, Ex. A: Support Plan for Beginning Teachers at RC and UP Schools (Doc 2327-1) at 2.)

[8] In the September 6, 2018, Order, the Court considered attrition in the context of the USP goal to retain a diverse teaching staff. Based on the Special Master's examination of District records, the Court rejected Plaintiffs' allegation that the District had improperly blacklisted former employees from being rehired. Without objection from the Plaintiffs, the Court adopted the Special Master's recommendation that the District conduct a study to identify ways to improve working conditions and leadership behavior, to in-turn reduce teacher turnover and the number of new teachers to improve both teacher performance and, correspondingly, student performance. (Order (Doc. 2123) at 40 (citing (2016-17 SMAR (Doc. 2096) at 17)). The Court ordered the District to include strategies determined to be effective in the study to reduce attrition in the 2018-19 Teacher Diversity Plan (TDP). *Id.* Subsequently, the Special Master reported that the rate of attrition in TUSD among teachers is lower than the national average and lower than the state average, with especially low numbers in new teachers in 2018-19, which he attributed to declining attrition. He reported studies of teachers' attitudes towards their jobs indicated there is no substantial difference among White, African American and Latino teachers in their levels of job satisfaction or intent to leave the District. The Special Master recommended: "The District should be granted partial unitary status with respect to attrition." (R&R (Doc. 2203/2204) at 5), *see also* SY 2018-19 TDP (Doc. 2159-1). There were no objections. Accordingly, the Court's last Order on the TDP did not address attrition. (Order (Doc. 2217) at 8-14.) For this same reason, this Order does not address attrition.

Plan was spread out over several years and between multiple documents. The Court asked the District to bring them altogether in one Diversity Plan document, with the District making it clear which strategies discussed in the various documents are actually being used in the District, including the GYO programs. Substantively, the Court required the District to make it clear that its proactive recruitment plan, including the soon to be hired Director of Talent Acquisition, would address both diversity in teaching staff and diversity in school administrators. The Court required the plan to make it equally clear how each GYO program would grow teachers and administrators of color (TOC and AOC), not just grow teachers and administrators, generally, to address national teacher shortages. (Order (Doc. 2273) at 13-17); *see also* (Order (Doc. 2217) at 13).

On October 10, 2019, the District filed the Second Supplemental Notice of Compliance: Diversity Plan for Teachers and Administrators (Diversity Plan) (Doc. 2329-1). The Court finds it addresses all but one of the Court's concerns, which the Special Master has addressed by R&R previously, asking the Court to require the District to have a proactive recruitment plan that includes a pathway to administrative positions, especially for African American teachers.  In 2018, when the Court reviewed the District's diversity efforts, it ordered the District to conduct a study to determine whether it could develop a viable proactive recruitment program, including the types of programs "adopted by the military which seek out and groom individuals with leadership potential from entry level positions through assigned career paths leading to the District's top administrative positions."  (Order (Doc. 2123) at 42 (citing SMAR (Doc. 2096) at 17)).

In the R&R to the Second Supplemental Notice of Compliance: Diversity Plan, the Special Master reports this omission, (R&R (Doc. 2372/2392)[9] at 5), and recommends it be added to the proactive recruitment plan for teachers and administrators of color through GYO programs, *id.* at 6. The District seems to agree to implement this recommendation. (*See* NC with Special Master's R&R (Doc. 2425) at 3-5 (describing how the proactive recruitment plan as revised in the Diversity Plan is seeing successes in recruiting African

---

[9] Identical documents.

American and Hispanic[10] applicants for the GYO Leadership Prep Academy (LPA)), *see also* (TUSD Report (Doc. 2352) (describing same success). The Court directs the District's attention to the Diversity Plan: Plan for Improved Diversity Through Grow Your Own Programs (Doc. 2329-1 at 45-53). Admittedly, the District has designed generalized GYO strategies to serve as TOCs and AOCs through a personalized targeted recruitment strategy, spearheaded by the newly hired Director of Talent Acquisition. There is nothing wrong with this, but this does not really address the Special Master's recommendation that the District design pathway-recruitment programs.

The District reports that this year minority enrollment in LPA far surpassed prior years, with 25 (45%) African American, 14 (25%) Hispanic, and 17 (30%) White applicants, from which, based on screening criteria, the District selected the 30 strongest applicants: 13 (43%) African American, 9 (30%) Hispanic, and 8 (27%) White participants. The Special Master's recommendation would reach these screening criteria and other similar impediments. He recommends the District develop a proactive program aimed at strengthening the qualifications of African American and Hispanic teachers over the years they serve as teachers in the District so that when an administrative position opens, there is a pool of well qualified African American and Hispanic teachers available to apply for that position. The Special Master's recommendation reaches the competitive application process to attend GYO programs like LPA. The District's proactive recruitment program should extend to the type of selection criteria used for LPA, thereby, creating professional pathways for Africa American and Hispanic teachers to become the strongest applicants for GYO programs leading to administrative positions. For example, the screening criteria include leadership roles, such as: Principal designee, Dean of Students, MTSS Facilitator or Lead, or Curriculum Service Providers. The District, including the Director of Talent Acquisition, shall extend proactive recruitment efforts to these types of positions. This was

---

[10] Hispanic, meaning native speakers of Spanish, is used interchangeably with Latino, meaning of Latin American origin. Both replace the previous use of Mexican American.

1   what the Special Master was recommending and what the District's proactive recruitment
2   program does not do.

3       The Special Master's recommendation makes a generalized GYO, like the LPA, an
4   AOC.  This is not a quota affirmative action strategy, but it is a proactive recruitment
5   program that reaches systemic types of impediments to the advancement of African
6   American and Hispanic teachers to become administrators. The Director of Talent
7   Acquisition responsibilities shall be expanded to include developing this pathway approach
8   extending recruitment to these building block positions, which addresses the need to make
9   the generalized GYO programs TOCs and AOCs.

10      The Mendoza Plaintiffs submit that there remains some confusion as to what's in
11  and what's out of the Diversity Plan because the District included as Exhibit 1-6, Plan for
12  Recruitment of Teachers for Diversity and GYO Programs (Doc. 2221-1), which the Court
13  ordered revised in September 2019. (Order (Doc. 2273) at13-17.) The District explains it
14  had no choice but to include it because the Court said to: "file a Diversity Plan . . ., which
15  shall include previously reviewed and approved provisions." (Reply (Doc. 2353) at 2
16  (quoting Order (Doc. 2273) at 1). Since the Court did not approve the Plan for Recruitment
17  of Teachers for Diversity and GYO Programs (Doc. 2222-1), the District cannot entirely
18  clear up the confusion with the directions on the first page of the Diversity Plan, which
19  explain that the Plan has two major parts: 1) the Diversity Transfer Plan (Diversity Transfer
20  Plan), including Exhibit 1-6, the original recruitment plan (Doc. 2221-1) and 2) the Plan
21  for Improved Diversity Through GYO Programs (GYO Diversity Plan). Further
22  clarification is required to address the last paragraph of the Diversity Transfer Plan ((Doc.
23  2329-1) at 13), which says that the recruiting plan "originally filed as 2221-1, is now
24  incorporated into the Diversity Transfer Plan." More accurately, this paragraph should
25  describe 2221-1 as being superseded by incorporation in the Diversity Plan.

26      In addition to the above recommendation regarding the scope of the proactive
27  recruitment plan, the Special Master made several other recommendations in response to
28  the Second Supplemental Notice of Compliance: Diversity Plan. (R&R Doc. 2372/2392).

The District filed a Notice of Compliance suggesting its agreement with the recommendations. (NC with R&R Re: Diversity Plan (Doc. 2425)). The Mendoza Plaintiffs filed a Motion to Strike or Alternatively, a Response. (Doc. 2423.) Alternatively, the Court considers the Mendoza's Response (Doc. 2423).[11]

The Mendoza Plaintiffs challenge the veracity of the District's Notice of Compliance with the Special Master's R&R that the Diversity Transfer Plan "keep[s] open the broad range of incentives available in the original TDP." (R&R (Doc. 2372/2392) at 4 (referring to 2016 TDP (Doc. 2329-1) at 34)). The District says it does, but the clear express incentive provisions for Teachers, § III.E, and for Administrators, § IV.E, of the Diversity Transfer Plan ((Doc. 2329-1) at 9) reflect it does not. The Diversity Transfer Plan shall expressly memorialize that it retains this range of options by reference to and incorporation of the 2016 Teacher Diversity Plan ¶ 2, Teacher Incentives: Requested Transfers ((Doc. 2329-1) at 34).

The Special Master suggests various alternative measures of success for assessing improved diversity over the course of the USP. The District submits it "will continue to report, as it has done, the number of teachers of all races/ethnicities at every school in the District. Thus, any party may compute [and the Court] may compute integration and diversity by whatever measure they choose." (NC with R&R Re: Diversity Plan (Doc. 2425) at 2.) The Court approves the District's approach to report the numbers as it has been doing, specifically as reflected in the 2019-20 TDP report, which includes application of the +-15% standard for White teachers.[12]

The Court reserves discussion regarding the merits of the various measures of success for when it considers unitary status, but in the context of this review of the

---

[11] The Court denies the Motion to Strike (Doc. 2423).

[12] The District measures effectiveness by applying the +-15% standard to Hispanic teachers only; the Court has agreed with the Plaintiffs and Special Master that the +- 15% standard be measured for White teachers too. The Special Master offers new measurements such as widening the +- standard by two points, adding all minority teachers together at a school, or looking at the total number of teachers of color at a school or looking for an approximate 50/50 balance between White and Hispanic teachers at a school.

District's compliance with the USP and related Orders of the Court, the Court makes several observations. First, by any proposed measure, about 40% of the 26 original 2016 targeted schools remain targeted in SY 2019-20. *Compare* (2016-17 Teacher Transfer Target Schools (Doc. 2329-1) at 34); 2019-20 Diversity Transfer Plan (Doc. 2329-1) at 15 (reflecting 11 of the *original* targeted schools remaining). The Court notes that without attaining the +-15% standard for Hispanic teachers and without explanation, the District appears to abandon further diversity efforts at Dunham ES, Gale ES, Holladay Magnet ES, Howell ES, Hudlow ES, Hughes ES, Kellond ES, Marshall ES, Miller ES, Myers/Ganoung ES, Soleng Tom ES, Roberts/Naylor K-8, and Safford K-8. (2019-20 Diversity Transfer Plan (Doc. 2329-1) at 15.)

It is even harder to apply the +-15% standard to measure administrative diversity by school because of the small number of administrators at each school, including many schools with only one administrator, the Principal. (SY 2019-20 Administrator Diversity Report (Doc. 2329-1) at 20.)

In summary, the reports provided by the District reflect that the impediment to attaining diversity under the +-15% standard is too many White teachers, and African American administrators trailing far behind Hispanic administrators. In addition to the +-15% standard, the Court intends to look for improved diversity in professional staff over the course of the USP. The Special Master recommended that the District not adopt a new list of target schools in 2019-20 but retain the original targets until 2020-21. The District agrees. The Court adopts this recommendation but notes that the 26 target schools were selected by the Special Master in spring of 2016 for a period of two years, with the District planning to meet the +-15% standard in 2016 and SY 2017-18. The plan to attain professional staff diversity at these schools was extended for a third year (SY 2018-19), with the District proposing a new target list for SY 2019-20. (2nd Supp. NC: Diversity Plan (Doc. 2329) at 4-5); (2019-20 Diversity Transfer Plan Target Schools (Doc. 2329-1) at 15.) This makes SY 2019-20 an especially appropriate time for the District to review the effectiveness of its diversity efforts since 2016 and consider improvements for future

strategies. The District has done this by adopting the Proactive Transfer Plan and hiring the Director of Talent Acquisition.

As for future strategies, the District shall file the SY 2020-21 Diversity Transfer Plan Target Schools, including a status update identifying any of the original target schools which are not within one or two teachers of meeting the +-15% standard, *see* (Status Report (Doc. 2352) at 5) and evaluate the effectiveness of the diversity efforts which were undertaken there. The status update shall prioritize these schools for further diversity efforts or explain why there are no further diversity efforts warranted at this time.

Based on what the Court has before it, there is no proposal for how the Court should assess the success or failure of the District's Diversity Plan for administrators, except for the +-15% standard, which all appear to agree is not a legitimate diversity standard to apply to administrators. The District shall provide a 2016 comparison report for the 2019-20 School Site Administrators Report ((Doc. 2329-1) at 20). The District shall file a status report identifying the school site diversity priorities for administrators in SY 2020-21, especially any efforts which may improve African American administrator diversity.

   3.  <u>Inclusive School Environments/Cultures of Civility</u>

In its last Order addressing USP § V.F, Maintaining Inclusive School Environments, the Court reaffirmed the directive that the District work with the Special Master to assess the effectiveness of strategies being used now and potentially to be used in the future to create and maintain inclusive school environments. The Court issued the following express directives: 1) "The District shall NOT USE strategies that are not research based"; 2) it "shall undertake a study of the effects of a pilot intervention program using restorative processes and identify positive and negative outlier schools to determine whether there are common practices being implemented in either regard; these studies shall inform future strategy choices by the District for creating inclusive school environments and cultures of civility"; 3) it shall collaborate with the Special Master to identify  strategies to be used in the future at schools needing improvement, and 4) it shall collaborate with the Special Master to develop a professional learning plan for preparing District staff to implement a

program to create and maintain school environments of inclusiveness and civility. (Order (Doc.2273) at 18.)

On October 10, 2019, the District filed the Second Supplemental Notice of Compliance: Inclusive School Environments and Cultures of Civility (Doc. 2328). The Mendoza Plaintiffs accuse the District of once again failing to collaborate with the Special Master to assess the effectiveness of existing strategies and identify possible additional strategies, and that, most likely, the District also failed to collaborate on the development of the Professional Learning Plan. The Court addresses the District's compliance with the Court's express directives for collaboration with the Special Master. Subsequently in an Order to follow, the Court will address the merits of the collaborative efforts in the context of the District's Notice of Compliance: Discipline Progress Report and Combined Discipline/Inclusivity Professional Learning Plan (Doc. 2266). "[I]n reality the discipline plan completely overlaps the inclusivity/civility plan: all of the training to create and maintain inclusive school environments [are] included within, and a subset of, the training the District provides to reduce the incidence of discipline by preventive means." (2nd Supp. NC: Inclusive School Environments/Cultures of Civility (Doc. 2328) at 5.)

Regarding the question of collaboration, the District asserts that every step of the way it has collaborated with the Special Master, who on the other hand has filed R&Rs calling for further collaboration. The Court required the District to work with the Special Master to develop a professional learning plan linked to the practices the District found to be effective. (Order (Doc. 2273) at 17 (issuing identical directive as issued April 22, 2019 (Order 2217) at 14)). "While the District did work with the Special Master to design the study that shows that the District is doing well with respect to the set of goals implicit in the relevant section of the USP, the District and the Special Maser did not collaborate in the development of the professional learning plan." (R&R (Doc. 2254) at 4.) In the R&R, dated August 9, 2019, the Special Master asked the Court to "remind the District that it had been directed to work with the Special Mater to develop the professional learning plan for fostering inclusiveness and cultures of civility." *Id.* at 5.

- 14 -

In contrast, subsequent to the Second Supplemental Notice of Compliance: Inclusive School Environments/Cultures of Civility (2328), the Special Master explains that he was consulted regarding the various study approaches. He advised the District that a study of the relative effectiveness of its major strategies was not possible "because all of the tools that were being used to promote the outcomes desired by the Court and the parties were being implemented simultaneously and it would not be possible, without an elaborate experimental design that would likely be resisted by families, to separate the effects of these different strategies not only because they overlapped but because they were employed at different times for different purposes in each school in the District." (R&R (Doc 2377) at 2-3.)

According to the Special Master, the District is limited to the type of research-based effectiveness analysis which it has conducted. *Id.* at 3. The only other avenue of assessment is the outlier study approach, which he recommended in his last R&R on this subject. *Id.* at 3. In conjunction with the pilot study regarding Restorative Practices Training, which the Special Master also recommended be performed by the District, the District performed the outlier study. It compared the five schools targeted in the pilot study, which were selected as negative outlier schools with higher rates of disciplinary infractions and exclusionary discipline or suspensions, (2nd Supp. NC: Ex. A, Pilot Study (Doc. 2328-1) at 2), with five positive outlier K-8 or middle schools with high rates of inclusivity and low rates of discipline, *id.* at 13.

This outlier study led to three conclusions: 1) differences were not due to different programs or strategies between the schools; 2) the positive outlier schools were committed to implementing the programs with a high degree of fidelity, and 3) the positive outlier schools had foundational structures and systems in place to support the successful implementation of district programs and practices. (2nd Supp. NC: Ex. A, Pilot Study (2328-1) at 13-14.) In comparison, the negative outlier schools from the pilot study saw little to no improvement, except perhaps to some extent in program readiness, and the District was generally dissatisfied with the vendor it hired to roll-out the Restorative

Practices program in the five pilot schools. *Id.* at 12. The District decided to not renew the vendor contract and to instead adopt a "train the trainer" model in SY 2019-20 "to develop internal capacity within the district for the five existing pilot schools as well as five new schools." *Id.* at 13. This in-house model should generate more buy-in at the school-site level, which was one of the distinguishing factors in the Restorative Practices study between the five pilot schools' scores of: 1, Not Yet Implemented, 2, Needs Work in the Implementation, and 3, Yes, it is Implemented. *See* (2nd Supp. NC: Ex. A, Pilot Study (Doc. 2328-1) at 6, 9 (common feed-back theme was need for continued staff development and skills building for long-term sustainability; different readiness levels resulted from degree of staff buy-in and whether infrastructure exists to implement restorative practices).

The District resubmitted the Study of the Effectiveness of Strategies Employed at TUSD to Promote a Sense of Inclusiveness or Belonging and a Culture of Civility (2nd Supp. NC: Ex. B, Study of Effectiveness) (Doc. 2328-2), which it submitted with the first Notice of Compliance (Doc. 2232-1). The Mendoza Plaintiffs logically argue that if it was deficient the first time around, and it remains so. The Court recognizes that the Special Master originally reported that the study failed to "identify an additional strategy *which it might employ* [] should monitoring disclose the need for an additional approach." (R&R (Doc. 2254) at 4) (emphasis in original). And, the Special Master recommended further collaboration related to "any new strategies" . . . "it may decide to use in schools that need to develop more positive school cultures." *Id.*

The Court has reread the Study of Effectiveness, specifically Part B: Other Strategies, and finds that it identifies the additional social-emotional learning (SEL) strategy of "SEL curriculum," which "TUSD has not yet attempted." (2nd Supp. NC: Ex. B, Study of Effectiveness (Doc. 2328-2) at 21.) Now, the Special Master endorses this broad expansion of SEL should it become necessary, (R&R (Doc. 2377) at 4-5), especially given the District's recent decision to move forward by building a cadre of teachers and administrators who are capable of implementing the existing strategies, *id.* at 5, which are "based on the principles of (SEL)," (2nd Supp. NC: Ex. B, Study of Effectiveness (Doc.

2328-2) at 21). Rather than contracting outside vendors to provide SEL skill sets, the Special Master finds no "downside" to the District "undertaking small steps forward that could be implemented more broadly [later] because SEL [curriculum] will enhance the effectiveness of the other [SEL] strategies the District is [currently] employing." (R&R (Doc. 2377) at 6.)

The Special Master reports that the two empirical studies, the student survey and the pilot Restorative Practices Study, both reflect that the District has created a strong foundation of schools which are generally perceived as being inclusive school environments, upon which it can build cultures of civility pursuant to the Combined Professional Learning Plan (PLP) for Discipline and Inclusivity. As noted above the Court will consider the merits of this PLP in an Order to follow. The Court finds that the District has undertaken the studies, as directed by this Court, to determine the effectiveness of its efforts under the USP to create and maintain inclusive school environments.

4) Professional Learning Plan (PLP) for Using Technology

On September 6, 2018, the Court considered the District's assertion that it had attained unitary status for USP § IX, Facilities and Technology, by its development of two required indexes, the Facilities Conditions Index (FCI) and the Technology Conditions Index (TCI). The District uses the two indexes to determine capital expenditures to be made under the Multi-Year Facilities Plan and Multi-Year Technology Plan. The Court ordered the District to, and it did, recalculate FCI scores using the original FCI formula (Order (Doc. 2123) at 139), which reflected that racially concentrated schools do not have lower FCI scores than non-racially concentrated schools, (Order (Doc. 2362) at 2-3 (finding compliance with Completion Plan for attaining unitary status related to Facilities Plan).

The Court rejected the District's argument that the TCI did not need to reflect each school's internet access because upgrades gave all schools equal wireless internet access. (Order (Doc. 2362) at 3-4.) The District revised the TCI, which as expected reflects there is no disparity in access, even though the school's internet footprints differ. (Supplemental

NC Re: Internet Access (Doc. 2381). There were no objections to the Supplemental Notice of Compliance.

The Court turns to the remaining USP § IX provision, over which it retained jurisdiction in 2018 "to ensure that the District has implemented a Professional Learning Plan focused on the use of technology to facilitate student learning." (Order (Doc. 2123) at 140.) In its April 22, 2019, Order, the Court noted that, without waiving its objections, the District had commenced efforts to comply with recommendations from the Special Master to revise the PLP for Teacher Proficiency in Using Technology (PLP: Teacher Proficiency in Technology) and report further on these efforts. (Order (Doc. 2217) at 15.)

Subsequently, on May 22, 2019, the District filed a Supplemental Notice of Compliance: PLP for Teacher Proficiency in Technology (Doc. 2220), which garnered objections from the Mendoza Plaintiffs and the Special Master. The Court adopted two recommendations from the Special Master for revisions. First, the Court directed the Special Master "'to work with the District to expand the 'Courses Addressing Use of Technology in the Classroom' to include content pedagogy, meaning 'courses about how to use technology in the subject matter that particular teachers teach (such as American government or biology, etc.).'" (Order (Doc. 2273) at 19 (quoting (R&R (Doc. 2252) at 3 (recommending revision of Ex. B, Courses Addressing Use of Technology in the Classroom (Doc. 2220-2)). Second, the Court addressed the plan's lack of clarity regarding the District's procedures for training teachers and assessing their proficiency in using classroom technology. *Id.* at 19-20. On October 10, 2019, the District filed the Second Supplemental NC: PLP for Teacher Proficiency in Using Technology (Doc. 2330).

The Mendoza Plaintiffs object, complaining that the PLP remains deficient in both regards. (Response (Doc. 2342)). The Special Master reports that as to the first recommendation adopted by the Court in its September 10, 2019, Order: "Fortunately, there is an abundance of lesson plans keyed to national standards available online that teachers could use if the District made the search costs low for locating such resources and indexed these resources to the TUSD curriculum. Such materials are available by googling

PBS[13] teacher lesson plans and there are lesson plans on the ISTE[14] website, among other sources." (R&R (Doc. 2375) at 2.)

The Court has reviewed the PLP for Teacher Proficiency in Using Technology (Doc. 2330-1). It explains the procedures for training teachers to use instructional technology. The Instructional Technology Department is responsible for teacher proficiency in the use of instructional technology. There is a director and five Educational Technology Integration Specialists (ETI Specialist), one for each of the five TUSD regions, who are responsible for coordinating and conducting teacher training within his or her region. Further school-site support is provided by Teacher Technology Liaisons (TTLs), who provide technology instruction and peer coaching. TTLs are teachers, who have expertise in the use of classroom technology and who receive special training and a stipend for their services. The District follows the methodology of the International Society for Technology in Education (ISTE) and applies ISTE standards to "identify and internalize ways in which they can adapt the technology tools and platforms to content-specific pedagogy." (PLP for Teacher Proficiency in Using Technology (Doc. 2330-1) at 4.)

The Court finds the revised PLP for Teacher Proficiency in Using Technology (Doc. 2330-1) clarifies the structure and procedures for delivery of training services to teachers regarding the use of classroom technology. *Id.* at 2-5. The Court believes that the PLP suggests that courses addressing use of technology include content pedagogy, meaning courses about how to use technology in the subject matter that a teacher teaches. *Id.* at 67, 25-26 (Academy: Office 365 (targeted online professional development; iPad/TOTS (integrating device use into specific content areas); Independent Learning with Math Tools in OneNote (math)). The Court approves the PLP, contingent upon the District filing the resource index available to teachers reflecting access to courses addressing use of technology by content pedagogy.

---

[13] Public Broadcasting System.

[14] International Society for Technology in Education.

After reviewing the 2nd Supp. NC: PLP for Teacher Proficiency in Using Technology, the Special Master recommended the Technology Integration Observation Tool, being used to assess teacher proficiency with classroom technology, should be aligned with instructional strategies and learning goals for students so it can be used to guide professional development. (R&R (Doc. 2375) at 3-4.) The Special Master recommended the District's responsibilities under § IX of the USP would be completed once the District made this revision, upon his approval of the Technology Integration Observation Tool. *Id.* On January 31, 2020, the District filed a Notice of Compliance (Doc. 2426) and attached a revised Technology Integration Observation Tool (Doc. 2426-1).

The Mendoza Plaintiffs object to the Court's acceptance of the revised evaluation tool because this would "leapfrog" over the Court and circumvent their opportunity for review and response. (Motion to Strike or Alternative Response (Doc. 2433) at 2.) The Mendoza Plaintiffs ask the Court to strike it. *Id.*  Upon closer scrutiny, the record reflects the Special Master qualified his approval of the revised evaluation tool. He approved it, only, to be used in SY 2019-20, with further revisions to be made for SY 2020-21. (TUSD Response to Mendoza Motion to Strike: Hawley email to TUSD (Doc. 2442-2) at 2.)

Therefore, the Court denies the Motion to Strike but directs the Special Master to consider the Mendoza Plaintiffs' objections in the context of his review of the revised SY 2020-21 evaluation tool, which should be the final Technology Integration Observation Tool. The Special Master shall file the final Technology Integration Observation Tool with the Court, including a summary of explanation for any objections remaining by any party to the final evaluation tool he approves.

**Accordingly**,

**IT IS ORDERED** that the Second Supplemental Notices of Compliance Re: the December 1, 2018 USP Benchmarks set by this Court in the September 9, 2018 Order are approved, except as specified below.

**IT IS FURTHER ORDERED** that the Report and Recommendation Re: Support for Beginning Teachers (Doc. 2346) is moot because the District subsequently filed the 1st & 2nd [Yr] Teachers [Inventory] by site 11/5/19 (Doc. 2423-1).

**IT IS FURTHER ORDERED** that the Second Supplemental Notice of Compliance:  Beginning Teachers at Underperforming and Racially Concentrated Schools (Doc. 2327) is approved, except:

1. All future Beginning Teacher Inventories shall be the same format as the 1st & 2nd [Yr] Teachers Inventory by site 11/5/19 (Doc. 2423-1), including the "RC3+" classification.

2. The District shall run the Beginning Teacher Inventory for SY 2020-21 and provide it to the Plaintiffs and the Special Master.

**IT IS FURTHER ORDERED** that the Report and Recommendation Re: Teacher Diversity Plan, Retention, and GYO Programs (2372/2392) is adopted in all parts, except the Court declines to formally adopt alternative standards for measuring staff diversity.

**IT IS FURTHER ORDERED** that the Second Supplemental Notice of Compliance: Diversity Plan and GYO Programs (Doc. 2329) is approved, except:

1. Proactive recruitment efforts shall reach pathway positions necessary to create a pool of well qualified African American and Hispanic candidates for administration positions by ensuring its generalized GYO administrator programs s are AOCs.

2. The Plan for Recruitment of Teachers for Diversity and GYO Programs (Doc. 2221) is superseded as incorporated expressly in the Diversity Plan, approved herein.

3. The full range of incentives included in the original 2016 Teacher Diversity Plan remain in the Diversity Plan, approved herein.

4. The District shall retain the 2016-17 target transfer schools for attaining teacher diversity through SY 2019-20 and identify new target transfer schools for SY 2020-21, to be filed with an updated status report for the original target

schools that were not one or two teachers away from the +-15% teacher diversity standard in SY2019-20, and priority given to any such school or an explanation for why no further diversity efforts are being undertaken in SY 2020-21.

5. The District shall file a 2016 comparison report for the 2019-20 School Site Administrators Report, with a status report identifying the school site diversity priorities for administrators beginning SY 2020-21, especially efforts to increase African American administrator diversity.

6. The Motion to Strike (2423) is DENIED.

**IT IS FURTHER ORDERED** that the Report and Recommendation Re: Inclusive School Environments and Civility (Doc. 2377) is adopted, except the Court does not reach the merits of whether unitary status should be granted.

**IT IS FURTHER ORDERED** that the Second Supplemental Notice of Compliance: Inclusive School Environments/Cultures of Civility (Doc. 2328) is approved.

**IT IS FURTHER ORDERED** that the Report and Recommendation Re: Professional Learning for Technology (Doc. 2375) is adopted by the Court.

**IT IS FURTHER ORDERED** that the Second Supplemental Notice of Compliance: Professional Learning Plan for Teacher Proficiency Using Technology (Doc. 2330) is approved, contingent on the following:

1. District filing the Resource Index including content pedagogy.

2. The Special Master filing the SY 2020-21 Technology Integration Tool, with a summary of explanation for any objections remaining by any party to the evaluation tool he approves.

3. The Motion to Strike (Doc. 2433) is DENIED.

/////

/////

/////

/////

**IT IS FURTHER ORDERED** that all filings necessary to comply with the directives of this Order shall be made within 30 days of the filing date of this Order.

Dated this 15th day of July, 2020.

Honorable David C. Bury
United States District Judge