1

2

3

4

## IN THE UNITED STATES DISTRICT COURT

5

### FOR THE DISTRICT OF ARIZONA

6

7

Roy and Josie Fisher, et al.,

No. CV-74-00090-TUC-DCB
(Lead Case)

8

Plaintiffs

9

and

10

United States of America,

11

Plaintiff-Intervenor,

12

v.

13

Tucson Unified School District, et al.,

14

Defendants,

15

and

16

Sidney L. Sutton, et al.,

17

Defendants-Intervenors,

18

Maria Mendoza, et al.,

No. CV-74-0204-TUC-DCB
(Consolidated Case)

19

Plaintiffs,

20

and

21

United States of America,

22

Plaintiff-Intervenor,

23

v.

**ORDER**

24

Tucson Unified School District, et al.

25

Defendants.

26

27

NC: Discipline Progress Report; Combined Professional Learning Plan (PLP) for
Discipline/Inclusivity

28

**Overview**

At the risk of redundancy, the Court repeats the following from the September 6, 2018 Order as follows:

> From its inception, this case challenged the District's disciplinary policies and practices as having a disparate effect on minority students, especially African-American students. It was addressed as a *Green* factor and expressly included in the 1978 Settlement Agreement and again in the USP. "Disproportionality does not, in itself, demonstrate discrimination," (2016-17 SMAR (2096) at 60n.24), but it is a red-flag for when discrimination may exist. In 1978 and now, African-American students are disproportionately subject to disciplinary actions. Latino and White student suspension is not disproportionate to their respective percentage representations in the total student body. Latino students are 61% of the student population. White students are 20%. African-American students make up only 9% of TUSD's students. There is no explanation offered for why 10% of the total student population accounts for almost the same number of suspensions compared to White students, who make up approximately 20% of the student population. In other words, African-American students are twice as likely to be suspended as White students. "Although, compared to national averages in other school districts, African-American students receive less disciplinary measures in TUSD."

(Order (Doc. 2123) at 124 (quoting (TUSD Response (Doc. 2099) at 39)).

It remains true now that Latino and White[1] student suspension is not disproportionate to their respective percentage representations in the total student body. Latino students are 61% of the student population. White students are 20%. (2018-19 DAR (Doc. 2305-4) at 38.) Latino students are 56% of in-school suspensions and 51% of long-term out-of-school suspensions; White students are 20% of in-school suspensions and 17% of long-term out-of-school suspensions. *Id.* It is undisputed that across the board for all disciplinary strategies, these ethnic groups are not disproportionality represented.

In 2018-19, African American students make up 10% of TUSD's students and remain red-flagged for discrimination across every discipline category ranging from a low of 14% for in-school suspensions to a high of 20% for long-term out-of-school suspensions.

According to the District, "[i]n SY2014-15, African American students were 3.2 times more likely to have a short-term suspension than White students. By SY2018-

---

[1]White is used synonymously with Anglo, to mean non-Hispanic and/or not Latino.

19, the likelihood ratio had dropped to 1.7 for African American students to receive a long-term out-of-school suspension. Hispanic students are less likely than White students to receive short-term out0of0school suspensions. In SY2014-15, African American students were 3.5 times more likely to have a long-term suspension than White students. By SY2018-19, the likelihood ratio had dropped to 2.1, with Hispanic students being just as likely as White students to receive a long-term suspension.  (2018-19 DAR (Doc. 2305-3) at 49-52.)

Because disproportionality serves as a red flag for when discrimination may exist, the Court focuses on this data. Proportionality measures the percentage of African American students in the total student population compared to the percentage of African American students in the disciplined population. The two should be the same. This calculation is different from determining the percentage of African American students in TUSD, who are disciplined, which is the calculation made by the District to arrive at a risk factor for disciplinary inequity based on ethnicity. That risk has decreased. It also remains true that "compared to national averages in other school districts, African American students receive less disciplinary measures in TUSD." (Order (Doc. 2123) at 124); (R&R (Doc. 2380) at 2).

Because there is no disproportionality in discipline for Latino students, the Court's focus is on the District's efforts addressing discipline disproportionality for African American students.

Under the USP, discipline is an issue "'when students are disproportionately impacted or treated differently by virtue of their race or ethnicity' and because 'the punitive use of serious disciplinary sanctions for low-level offenses creates the potential for negative educational and long-term outcomes for affected students.'" (Order (Doc. 2123) at 126 (quoting USP (Doc. 1713) § VI.A.1)). The first USP goal is aimed at reducing racial and ethnic disparities in the administration of school discipline. The second goal requires the District to consider its student behavior policies and discipline practices in the context of creating inclusive and supportive school environments. Both

USP goals require the District to "'commit to ensuring that students remain as often as practicable in the classroom settings where learning happens'" by devising a variety of graduated positive behavior techniques to be used based on the student behavior at issue with the goal being "'to prevent students from being excluded for any amount of time from the classroom or school.'" (Order (2123) at 126) (quoting USP (Doc. 1713) § VI.A.1).

"The USP provides for two comprehensive, school-wide approaches to classroom management and student behavior: Restorative Practices and Positive Behavior Intervention and Supports (PBIS)." *Id.*

Over the course of the USP, the District has developed multiple degrees of discipline, with each graduating in severity. In-school Discipline does not result in removing a student from his or her classroom. Exclusionary discipline includes: In-school Suspension; In-school Intervention (ISI); Out-of-school Short-term Suspension; Out-of-school Long-term Suspension, and the District Alternative Education Program (DAEP) which may be meted out alone or with an out-of-school suspension. (Order (Doc. 2123) at 125.)

Both ISI and DAEP were implemented in 2015 in the District. They are disciplinary options that reduce out-of-school suspensions and/or the length of such suspensions. To be clear, neither is a non-exclusionary strategy because both remove students from their regular classrooms. *See* (Order (Doc. 2123) at 125 (citing Order (Doc. 2087) at 4 (rejecting District's treatment of ISI as an in-school disciplinary intervention)). It is undisputed, however, that both ISI and DAEP include a classroom component and are far better than out-of-school exclusionary disciplines. The Court accepts there is an important distinction between in and out-of-school suspensions, with the advantages of in-school ISI and DAEP being to keep students from falling behind academically and to address the behavioral aspects of the suspension. The merits of these exclusionary discipline programs are undisputed by the Plaintiffs.

ISI has been implemented at all middle schools, high schools and large K-8 schools. (2018-19 DAR (2298-1) at 151), Appendix VI-16 (Doc. 2305-2) at 29: In-school Intervention Evaluation for 22 Target Schools 2018-19). Three DAEP facilities are strategically located in the District. DAEP is available to students in 6-12 grades, who are removed from their school as well as the normal classroom and attend DAEP as an alternative to long-term out-of-school suspension or to shorten the out-of-school period of suspension. *Id.* at 54.

Under the USP, the Guidelines for Student Rights and Responsibilities (GSRR; Code of Conduct) was the starting point, with the District being required to evaluate and revise the GSRR to limit exclusionary consequences to instances when student misbehavior is ongoing and escalating, ensure that administration of discipline is non-discriminatory, fair, age-appropriate and paired with meaningful instruction and supportive guidance, and exclude law enforcement from being involved in low-level student discipline (Order (Doc. 2123) at 127 (citing USP § VI.2.a)).

In 2013, the District, with the aid of outside consultants and the Special Master, made substantial revisions to the GSRR and by 2016, the District was in the process of dissemination and professional training related to the GSSR components. *Id.* at 338.  In fall of 2015, the District began an effort to develop a more modern code of conduct to replace the GSRR, (2016-17 DAR (Doc. 2057-1) at 340-342) which would not see fruition until 2018-19, (2018-19 DAR (Doc. 2298) at 133).  In 2018-19, after review of routine misuse of "Other Aggression" violations, corresponding improper use of exclusionary discipline for low-level behavior, the District revised the GSRR to eliminate the "Disorderly Conduct" violation altogether because the District determined this violation and its consequences were difficult to evenly apply across dozens of school sites. (2018-19 DAR (Doc. 2298) at 135.)

In SY 2018-19, the District introduced Positive Intervention Centers (PICs), designed to prevent exclusionary discipline or escalation of behaviors leading to exclusionary discipline by providing a "time-out" space for students who are feeling

angry or overwhelmed. (NC: Discipline Progress Report (Doc. 2266-1) at 8.) "PICs are key to providing students with an opportunity [to] de-escalate before their behavior leads to classroom disruption or exclusionary discipline, but without the need to invoke disciplinary consequences." *Id.* PICs provide a student a short time (no more than 30 minutes for grades K-5 or no more than the remainder of one class period for grades 6-12) and a positive and supportive environment to de-escalate their feelings. A PIC can be an ISI room (MS and HS), a buddy teacher's classroom (K5 and K8), or a counselor's or social worker's office space. Various protocols are utilized to de-escalate the situation and assist in helping to restore the student back into the classroom or classroom setting. (NC: Discipline Progress Report (2266-1) at 4 n. 4, 8.)

The District also uses Abeyance Contracts, where a student agrees to comply with the GSRR in the future in exchange for being allowed to stay in class or being given a shorter period of out-of-school detention. (2016-17 DAR (2057-1) at 317, 344.)

In 2018-19, the District revised the GSRR to include a new section devoted to PICs and to address five violations that lead to the most incidents of exclusionary discipline, particularly for African American students: fighting, drug possession, drug use, alcohol possession, and alcohol use. Whereas these were once mandatory suspensions of several days (11 minimum), the District now offers an alternative one-day suspension and diversion to prevention and rehabilitation programs, such as substance abuse workshops. *Id.*

### Discipline Progress Report and Combined Professional Learning Plan (PLP) for Discipline and Inclusivity

On August 30, 2019, the District complied with the directive of the Court, issued on September 6, 2018, by filing the Discipline Progress Report (Doc. 2266-1) and the Combined PLP for Discipline and Inclusivity (Doc. 2266-2). On October 1, 2019, the District filed the 2018-19 annual report (2018-19 DAR (Doc. 2298-1), Appendixes VI-1 to VI-35 (Doc. 2305)).

The Mendoza and Fisher Plaintiffs' Responses (Doc. 2280); (Doc. 2276), were filed on September 20, 2019, without the advantage of the 2018-19 DAR. They raised the following concerns: Data Reporting; Best Practices Website; Support Action Plans (SAPs), and called for corresponding Professional Learning Plan revisions. (Mendoza Response (Doc. 2280). To some extent, the Special Master's Report and Recommendation (R&R) (Doc. 2380) mirrored these concerns, and he requested explanations from the District, which it provided, (Response to Special Master (Doc. 2427.) The Mendoza Plaintiffs objected to the supplementation of the Notice of Compliance, (Motion to Strike (Doc. 2431), but alternatively replied. The Court denies the Motion to Strike and considers the Reply arguments.

1.  Discipline Data: Continuity and Consistency of Reported Data as Required by USP § VI.F.2 and G.1.

The Court finds that with the clarifications made herein, the District is in compliance with USP § VI.F.2 and G.1, requirements for the District to "collect, review, and analyze discipline data from each school on at least a quarterly basis. The data shall include the number of students receiving any exclusionary discipline consequence (i.e., detention, in-school suspensions, out-of-school suspensions, referrals to alternative placement, referrals for expulsion, and referrals to law enforcement), disaggregated by grade, teacher, school, ELL status, gender and race and ethnicity, (USP § V.F.2), . . ., substantially in the form of Appendix I . . . for every year after the 2011-12 year, *id.* at § VI.G.b.

Appendix I requires data for: In-school Discipline; In-school Suspension; Short-term Out-of-School Suspension; Long-term Out-of-School Suspension. These four categories make sense given the programs in place in 2013, when the USP was adopted by the Court. (USP, Appendix I (Doc. 1450-1) at 24.) Post 2015, with the advent of ISI and DAEP, the Court ordered the District to begin reporting those numbers which led to the continuity issue raised by the Mendoza Plaintiffs. The Court reaffirms this directive because strict adherence to the outdated Appendix I

format would be adherence for adherence sake and would deprive the Court of easy access to relevant and important ISI and DAEP data.  The Court understands the data being reported by the District as explained below.

In-School Discipline is non-exclusionary discipline such as PIC referrals, Restorative Practices and PBIS interventions. Inclusion of this category on the Appendix I form seems to fly in the face of the data reporting requirement which is expressly limited to exclusionary disciplines.[2] Nevertheless, the District has consistently reported this data; it has also reported in-school suspensions, short-term out-of-school suspensions, and long-term out-of-school suspensions. In 2016-2017, the District added ISI and DAEP data. It retained the original Appendix I form and added a breakdown below for In-School Suspensions reflecting those that remained under the District's original in-school suspension (ISS) program and those involving the graduated positive behavior strategy ISI. *See e.g.,* (NC: Discipline Progress Report, Attach. 1: SY 2016-17 (Doc. 2266-1) at 21 (reporting 108 White In-School Suspensions (ISS) and 302 ISI for a total of 410 in-school suspensions). It is important to know ISI numbers because this is the preferred in-school type of suspension.

It is equally important to know the role DAEP is playing in eliminating, or reducing the length of, out-of-school long-term suspensions. This brings the Court to the DAEP data, which the District suggests can be understood by simply adding or subtracting. (TUSD Response (Doc. 2325) at 6.) While this is true for ISI, it is not clear for DAEP how the District has not done the math. The Court reads the DAEP data as described below.

The Court took the total Long-term Out-of-School Suspensions (LTS) and subtracted those suspensions which were without a DAEP component (LTS w/o DAEP) and calculated the number of long-term suspensions with a DAEP component

---

[2] The Court admits confusion regarding the three different reports included in Appendix I, which all purport to report the same data for SY 2011-12 but each reflects entirely different numbers. (USP, Appendix I (Doc. 1450-1) at 24.)

(LTS w/DAEP). The Court took the Short-term Out-of-School Suspensions (STS) and did the same.[3] The Court added the LTS w/ DAEP to the STS w/DAEP and subtracted this number from the total DAEP to arrive at the total for DAEP only suspensions.

If the Court properly understands the mathematical machinations required, it finds that for White students in SY 2017-18 there were 40 LTS; 32 LTS without DAEP and 8 LTS with DAEP.   There were 340 STS; 312 STS without DAEP and 28 STS with DAEP. There were, accordingly, 36 out-of-school suspensions with DAEP components and 10 DAEP only suspensions.  (NC: Disciplinary Progress Report, Attach. 1: SY 2017-18 (Doc. 2266-1) at 22.)

For White students in SY 2018-19, there were 22 LTS; 21 LTS without DAEP and 1 LTS with DAEP. There were 424 STS; 417 without DAEP and 7 STS with DAEP. There were, accordingly, 8 out-of-school suspensions with a DAEP component and 16 DAEP only actions.  (2018-19 DAR (Doc. 2305-4) at 38.)

This is important data because out-of-school suspensions, especially long-term, are the most damaging form of discipline, which DAEP is designed to address. The District shall correct the Court if its understanding of DAEP calculations is incorrect.  In the future, the District shall do the math in the Appendix I, USP § IV.G.a-b, data report. To be clear, all the discipline strategies reported on the Appendix I form, except for In-school Discipline, are exclusionary, but this does not negate the in-school distinction which makes ISI and DAEP suspensions preferable disciplinary strategies over out-of-school suspensions.

Substantively, the Court considers the out-of-school, especially long-term, suspension data for African American students.  Beginning in 2012-13, African American students made up 8% of the population and 12% (53) of the LTS, without the benefit of DAEP. In 2013-14, African American students were 16% (55) of LTS. In 2014-15, African Americans were 6% of the total student population and 16%

---

[3] The Court admits confusion, here, since the DAEP serves to shorten or eliminate long-term suspensions, not short-term out-of-school suspensions.

(48) of LTS. In 2015-16, African American students were 9% of the total student population and 19% (28) of LTS discipline. African American students were, accordingly, disproportionately represented in long-term suspensions.

DAEP was implemented in 2015 and was reported in SY 2016-17. African American students were 10% of the total student population and 17% (29) of LTS and 18% (63) of DAEPs. (NC: Disciplinary Progress Report, Attach. 1: SY 2016-17 (Doc. 2266-1) at 21.) African American students were disproportionately represented in DAEP and long-term out-of-school suspensions.

In 2017-18, African American students were 9% of the total student population but were 40 (20%) of LTS: 31 LTS were without DAEP and 9 LTS were with DAEP. African American students were 278 (16%) of STS: 261 without DAEP and 17 STS with DAEP. There were, accordingly, 26 out-of-school suspensions (both long and short-term, with a DAEP component, and 14 DAEP only suspensions. (NC: Disciplinary Progress Report, Attach. 1: SY 2017-18 (Doc. 2266-1) at 22.)

In 2018-19, African American students were 10 % of the total student population but were 25 (20%) of LTS: 22 without DAEP and 3 with DAEP. African American students were 367 (15%) of STS: 358 without DAEP and 9 with DAEP. There were, accordingly 12 out-of-school suspensions, with a DAEP component, and 17 DAEP only suspensions.  (2018-19 (Doc. 2305-4) at 38.)

The data reflects the disproportionality for African American students being suspended out-of-school, with and without DAEP. The preference is with DAEP because it mitigates the impact of out-of-school suspensions by shortening the number of days out of school. DAEP is offered in a classroom setting with certified teachers and counselors to keep students academically engaged and to address the foundational issues that caused the suspension, and transitions students back to their regular classrooms. In 2017-18 and 2018-19, African American students remained disproportionately represented in suspensions, but DAEP reduced that impact. The total long-term out-of-school suspensions in 2013-14 for African

American students was 55 (16%). In 2018-19, there were 25 long-term suspensions (20%), with 3 having a DAEP component. If the Court has correctly calculated the DAEP only suspensions, there were 29 DAEPs in 2018-19. The Court assumes a similar disproportionality for African American students in DAEP. Still, even adding DAEP and long-term out-of-school suspensions together in 2018-19, there were 54 long-term related suspensions, which is only one more than the total out-of-school long-term suspensions meted out in 2013-14. DAEP mitigated the impact in a little over half of the long-term suspensions for African American students in 2018-19.[4]

The singular disproportionality for African American students exists across the board for all discipline strategies, including short-term out-of-school and in-school suspensions (SSI and ISI). Instances of short-term out-of-school suspensions have not decreased over the life of the USP or with the advent of ISI: SY 2015-16 (1,863); SY 2016-17 (2,494); SY 2017-18 (2,034), and SY 2018-19 (2,940). (2018-19 DAR, Appendix VI-16 (Doc. 2305-2) at 33.)

ISI is designed for level 1 through 3 infractions, and some level 4 infractions. A 1-day ISI assignment also assists to transition a DAEP or out-of-school suspended student back into their normal classroom.  (2018-19 DAR, Appendix VI-16 (Doc. 2305-2) at 29.) "The ISI program is intended to reduce out-of-school suspensions by providing an in-school alternative for Level 3 violations." *Id.* at 31. ISI may be used in conjunction with an out-of-school level 4 or 5 suspension, DAEP, or abeyance contract *Id.* Students are assigned to ISI on a temporary short term, two to 5 days,[5] basis, with the ISI class being taught by a certified teacher who helps the student academically and uses Positive Behavioral Intervention Strategies (PBIS) and

---

[4] This rough comparison is credible because the number of African American students in TUSD has been constant over the years: 2013-14 (4626) and 2018-19 (4832).

[5] Going back to SY 2015-16, suspension rates have been fairly uniform across the 22 ISI schools, with the average number of suspended days being about four for K-8 schools, six for middle schools and seven for high schools. In 2018-19, the trend shifted for all schools with ISI to be about 3 days. (2018-19 DAR, Appendix VI-16 (Doc. 2305-2) at 38.)

Restorative Practices to address the behavior issue that resulted in the disciplinary action. (2018-19 DAR, Appendix VI-16 (Doc. 2305-2) at 29.)

The District reports as follows:

Of the original 19 schools, participation in ISI increased from 1,523 students in 2015-16 to 2,096 students in 2016-17, an increase of 38%. In 2017-18, participation at the original 19 schools decreased to 1,397 and then again in 2018-19 to 865, the lowest participation in the last four years. Also, the average percent of the school population who participated in ISI increased from 8% overall in 2015-16 to 11% in 2016-17. In 2017-18, the average percent of the school population that participated in the program dropped back to 8%. In 2018-19, it dropped even more to 5%. It appears that 2016-17 was a peak year for the ISI program and since then, it has been gradually serving fewer students each year.

*Id.* at 30 (emphasis added).

The District admits that ISI utilization has been "uneven" over the last five years of implementation. *Id.* at 30.  Both the Plaintiffs and th**e** Special Master point out a SY 2018-19 spike in short-term out-of-school suspensions.

While it would be nice if yearly comparisons over time could be easily made based on comparable data, this is not the case because the USP called for a graduated system, with an emphasis on in-school, in-classroom, non-exclusionary strategies. As these strategies have devolved, they do not simply replace one or the other disciplinary strategy from the past. The disciplinary strategies are inextricably linked in a graduated system, with non-exclusionary strategies preferred first, followed by in-school (ISI) suspensions replacing short-term out-of-school suspensions when possible, and short-term instead of long-term out-of-school suspensions preferred.

The District believes that the SY 2018-19 (2,940) spike in short-term out-of-school suspensions corresponded to the 2018-19 changes to the GSRR, which were designed "to reduce exclusionary discipline for all students, but particularly for African American students." (NC: Discipline Progress Report (Doc. 2266-1) at 8-9.) The District revised the approach for violations that lead to the most incidents of exclusionary discipline, particularly for African American students: fighting and

1    drug possession. *Id.*  The GSRR now provides that these Level 4 violations which

2    mandate long term (11 to 30-day) suspensions may be reduced to a 1-day

3    suspension where students participate in mediation for a first offense fighting or in

4    a substance abuse workshop for a first offense for drugs or alcohol. *Id.* at 9. This

5    policy-change to reduce long-term out-of-school suspensions dramatically increased

6    short-term out-of-school suspensions. Drug offenses include tobacco use and TUSD,

7    like the rest of the country, experienced a dramatic increase in 2018-19 in vaping.

8    For example, for tobacco violations: "In 2016-17, there were 22 tobacco violations

9    and 6 drug violations involving vaping, compared to 113 tobacco violations and 252

10   drug violations involving vaping in 2018-19." (TUSD Response (Doc. 2427-1) at 3.)

11       The 2018-19 policy change for fighting resulted from the District's review of

12   discipline data with the Department of Justice and identification of improper use of

13   exclusionary discipline for low-level behavior violations of "other aggression." (NC:

14   Discipline Progress Report (Doc. 2266-1) at 5.) The District eliminated the violation

15   "disorderly conduct," "altogether after extensive data review [found] . . .it was difficult to

16   apply this violation (and its consequences) evenly across dozens of sites, and it had been

17   used as a precursor to exclusionary discipline. *Id.* at 9; (TUSD Response to R&R (Doc.

18   2325) at 3, 5.)

19       The Disciplinary Progress Report (Doc. 2266) makes it very clear that the

20   District has devised a disciplinary plan, "that is part of the District's overall goal of

21   creating an inclusive and supportive environment in District schools." USP § VI.A.1.

22   The disciplinary strategies adopted by the District reflect its commitment to ensure

23   "that students remain as often as practicable in classroom settings where learning

24   happens," USP § VI A.2, including the creation of PICs, which allow students a short

25   time-out and keep students in their normal classroom environments, and ISI and

26   DAEP, which are exclusionary but at least keep students in an alternative classroom

27   environment and at school in supportive environments.  (Discipline Progress Report

28   (Doc. 2266-1) at 2-15.)

The District has revised the GSRR to reflect these strategies. USP § VI.B.2. The District is also gathering the requisite data necessary to determine whether these practices are being effective to address any discriminatory impact, which may result from its disciplinary policies. USP § VI.F and G. (DAR 2018-19, Appendix VI-16, 17 (2305-2), Appendix VI-22 (2305-3)). The District gathers and reviews extensive disciplinary data, especially related to the exclusionary strategies of short and long-term out-of-school suspensions and ISI and DAEP. (2018-19 DAR, Appendix VI-16 and 17, (Doc. 2305-2)). There is a need for data related to PIC, the non-exclusionary in-school strategy introduced by the District in 2018-19. In short, the District needs to flesh out the "In-school Discipline" category on the Appendix I, USP § VI.G.a-b, form for reporting data.[6]

The Court accepts the District's explanation for why the 2018-19 spike in out-of-school short-term suspensions is not, necessarily, contrary to a finding of progress, but the District's own finding regarding uneven ISI utilization needs to be addressed. It is undisputed that discipline continues to disproportionately impact African American students across all sectors of discipline, and this is enough to warrant the redress initiated by the District in 2018-19 described above and the efforts described below.

The merits of ISI and DAEP are not disputed by the Plaintiffs or the Special Master. *See also* (R&R (Doc. 2380) at 2 (describing evidence as showing positive trends for short and long-term out-of-school suspension with respect to both disproportionality[7] and total number of discipline actions lessening considerably). Accordingly, the Court turns its attention to the question of whether the disciplinary

---

[6] As is evident from the Court's discussion of the DAEP numbers, this report should clearly identify what disciplinary strategies make up which reporting categories and how those numbers are derived so that in fact parties can manipulate the numbers in various but comparable ways so that any such compilations does not destroy the integrity of the data.

[7] Special Master describes African American disproportionality as being halved since SY 2014-15 and 2018-19. The Court does not focus on the degree of disproportionality because any disproportionality is a red flag for when discrimination may exist, which is enough to trigger further investigation and redress, if warranted.

provisions called for under the USP are being used in TUSD's schools. Specifically, the Court considers the District's  professional development plan, the Combined PLP for Discipline and Inclusivity, designed to advance both the non-exclusionary and exclusionary strategies to address behavioral issues, including discipline, without impeding academic performance.

2. The Combined Professional Learning Plan (PLP) for Discipline and Inclusivity

The Court's assessment begins with the Mendoza Plaintiffs' quote of the Court's September 6, 2018, Order: "'[T]here is insufficient evidence to be confident that the District has put in place processes . . . that will enable the District to make progress in the future to reduce levels of discipline, especially that which involves suspensions, and further reduce the disproportionality in disciplinary actions involving African-American students.'" (Mendoza Plaintiffs' Response (Doc. 2280) at 13) (quoting Order (Doc 2123) at 129.) As the discussions above regarding the District's advancements in 2018-19 with GSRR, PIC, ISI and DAEP reflect, this is no longer true.

The remaining issue, addressed here, is the District's implementation of the changes in disciplinary strategies in TUSD's schools. The Court references the information contained in the Disciplinary Status Report which highlights the undertakings by the District since the Court's September 6, 2018, Order. The Court addresses the Plaintiffs and the Special Master's challenges to the sufficiency of these efforts to secure buy-in and professional proficiency necessary to implement USP § VI, Discipline, in TUSD's schools.

First, the District has created the Student Relations Department and hired a Director. The Student Relations Department, created in SY 2018-19, focuses exclusively on implementing the District's "discipline-related equity efforts." (Discipline Progress Report (Doc. 2266-1) at 4.) Student Relations staff is responsible for: "improving student behavior, reducing disciplinary and

exclusionary consequences, creating systemwide handbooks and manuals to ensure consistent practice across schools, organizing and leading professional development, auditing schools for best practices and deficient practices, and regularly reviewing discipline data for trends, policy violations and hotspots." (Discipline Progress Report (Doc. 2266-1) at 5-6.)

The Plaintiffs are correct that the District must do more than promise to do these things, (Fisher Response (Doc. 2478) at 32 (citing *Fisher v. TUSD*, 653 F.3d 1131, 1140 (9th Cir. 2011)), and must go beyond "bare assertions," (Mendoza Response (Doc. 2280) at 12). The District is doing this.

In addition to hiring the Director, the District has staffed the department with a Discipline Coordinator, an Equity Compliance Liaison, and administrative support. The Director of Student Relations reports to the District's Chief Academic Officer, and the Assistant Superintendent of Curriculum and Instruction. Department staff work directly and closely with the five regional assistant superintendents, who are directly responsible for overseeing the schools within their assigned regions of the District, to ensure effective implementation and accountability for the discipline related policies of the District. (Discipline Progress Report (Doc. 2266-1) at 4.) This structure addresses the disconnect between policy and program development at the central office level and implementation at the school-site level.

In 2018-19, the Student Relations Department began conducting regular discipline data reviews, including analysis of school-level data on a bi-weekly, monthly, and quarterly basis. Using this data, it works closely with principals, assistant principals, and regional superintendents to bring any issues warranting investigation or remediation to the attention of the Chief Academic Officer of the District. Student Relations Department staff conducted site-based audits and walk-throughs to observe and assess practices at the schools and to provide job-embedded support, including real-time observation of school-based PBIS practices, restorative practices, positive alternatives to suspension, and the creation of

inclusive school environments. The department has developed surveys and assessments to analyze and improve behavioral and disciplinary practices at the school-site level, specifically for each school. (Discipline Progress Report (Doc. 2266-1) at 4-5)

The Student Relations Department's review and analysis responsibilities enable it to assess behavior and discipline strategies and to evaluate coherence in strategy implementation across TUSD and make recommendations for improvements at the school-site level, as well as district-wide. (Discipline Progress Report (Doc. 2266-1) at 4-5.)

It is undisputed that the District developed and administered the school-site surveys and assessments, including walk-throughs, and analyzed on an ongoing basis the discipline data for every TUSD school. "Based on data review and local observation, Student Relations assisted schools in developing Support Action Plans ("SAPs")(formerly known as "corrective action plans"), reviewed them for consistency and efficacy, monitored their implementation, suggested modification or support, and tracked improvements resulting from SAP implementation." (Discipline Progress Report (Doc. 2266-1) at 5.)

The Student Relations Department reportedly reviews in real-time "all suspensions to assist sites in calibrating consequences across schools and gives ongoing advice and feedback to administrators related to violations, interventions, and consequences for lower-level behaviors. . . . Student Relations actively review[s] schools' use of exclusionary discipline to ensure compliance with the Student Code of Conduct, and to ensure schools were disciplining students in a fair and appropriate manner." (Discipline Progress Report (Doc. 2266-1) at 5.) The Court understands this review and real-time input applies to in-school suspensions as well as out-of-school suspensions. This process addresses the overuse or improper use of aggression offenses and the disproportional use of exclusionary disciplines for violations, especially any involving African American students.  It is also a work-

around to right-of-privacy interests that limit access for Student Resource staff to individual student disciplinary records.

There is another work-around needed, which is addressed by both the Special Master and the Plaintiffs which pertains to the Student Relations Department's ability to identify individual teachers, who may be using disciplinary strategies in excess, disproportionately based on race or ethnicity, or any other improper manner. Identifying such teachers is essential to the District's ability to provide professional development where needed to attain individual teacher proficiency with the USP mandated disciplinary strategies.

The Mendoza Plaintiffs point out that there is conflicting evidence to the District's assertion "[t]hat the District reviews '[t]eachers who have disproportionate numbers of discipline' and '[t]eachers who have disproportionate numbers of ISI referrals,' and that these teachers then are provided extra training or mentoring." (Mendoza Response (Doc. 2431) at 7 (quoting Discipline Progress Report (Doc. 2266-1) at 3.) In response to the Mendoza Plaintiffs' inquiry as to how many of those teachers had been identified, the District admitted that its review of site reports only identifies the schools "'where the most referrals come from... But, the reporting form does not ask for specific teacher names or counts.'" (Mendoza Response at 7; Exhibit A: RFI #2581[8] (Doc. 2431-1)). The Special Master accepts the District's rationale that individual teacher improvement must be handled at the school-site level because the teacher's peers, who make up the school's discipline oversite committee, will be hesitant to identify to the central office fellow teachers

_____

[8] The Court notes that the Fisher Plaintiffs' Response is a series of requests for information: 1) request for data on number of students arrested in 2018-19; 2) request for data on number of students placed in DAEP; 3) request list of schools with SAPs, with reason for the SAP and the discipline data following implementation of SAP; 4) request copy of monthly and quarterly reports including quantitative data analysis, assessment and written reports on direct observations including trends and hotspots, and 5) request to know how District determines programs are being implemented with fidelity. (Fisher Response (Doc. 2276 (Doc. 2276) at 9.) The District has a form and format for making direct requests for information. *See e.g.,* (Mendoza Response at 7; Exhibit A: RFI #2581 (Doc. 2431-1)). The Fisher Plaintiffs do not explain their failure to timely seek discovery which would have enabled them to respond on the merits of these issues.

as needing improvement. (R&R (Doc. 2468)). The Special Master recommends, and the District agrees, to "develop a procedure for reporting the number of teachers that school-level discipline committees believe require support to improve their administration of discipline," which would not include the names of the teachers, but identifies the problems, the nature of the intervention, and assessment of its successes. *Id.* This information will enable the District to not only address individual teacher and administrator development but will also enable the District to develop common interventions that could be adapted for each school based on need. (R&R (Doc. 2468) at 47-48.)

District-wide, Student Relations staff serve as leading members of the Comprehensive Behavior and Discipline Committee (CBDC) and contribute heavily to the design and presentation of professional development focused on improving classroom instruction, relationships with students, and inclusive school environments.

On-site, Student Relations staff work through three sets of teams at the school level: Multi-Tiered System of Supports (MTSS) teams, site discipline teams, and Positive Behavioral Interventions and Supports (PBIS) teams.[9]

Student Relations staff, in coordination with other relevant staff, have developed manuals to be used by school staff across schools to ensure consistent compliance for the following programs or functions: ISI and PIC rooms; School Deans; Restorative Practices. (Discipline Progress Report, Attach. 5: In-School Intervention/Positive Intervention Centers Handbook (Doc. 2266-1) at 37.) The Student Relations Department is currently in the process of developing a DAEP manual. *Id.* (Discipline Progress Report (Doc. 2266-1) at 5.)

---

[9] Some large schools have all three teams; smaller schools combine team functions into one or two teams. In 2018-19, the District required most schools to have separate MTSS teams and site discipline teams.

The record reflects a site-based monthly reporting system, *e.g.,* (Site-based Disciplinary Monthly Report: Robins K-8 (2018-19 DAR (Doc. 2305-3) at 2), which reinforces the Student Relations Department's ability to identify hotspots at a school. "Through the Student Relations Department, the District streamlined the process for dealing with hotspots and high visibility problems," including joint real-time review of suspensions by the department, the regional assistant superintendent, and the school.  Through these channels of communication, hotspots are identified and Student Relations staff and site-based leadership "agree on supportive actions and work collaboratively to implement solutions."  (Discipline Progress Report (Doc. 2266-1) at 6.)

The District provides the Supportive Action Plan (SAP) form, which the Court understands may be initiated by Student Relations staff based on its review and analyzation of discipline data, (Disciplinary Status Report (2266-1) at 33), or a school's Site-based Disciplinary Monthly Report, *supra.* The District submits the SAP predecessor, Corrective Action Plans (CAPs) (2018-19 DAR, Appendix 30 (Doc. 2305-4)) for the eight schools having corrective action plans in 2018-19, which were: Booth-Fickett K-8, Doolen MS, Roberts-Naylor K-8, Pistor MS, Safford K-8, Secrist MS, and Utterback MS. *Id.* at 40-63.

The SAP form identifies the concern and "Action Step" needed to address the concern, and asks for a "Justification Statement," described as "root causes for patterns and hotspots." It includes a "Begin date" and a "Review date" for the "Action Step." It asks for "Out-Come of Product," to be completed "[a]fter the review of the action step as occurred, describe the results." Lastly, it identifies the "Next Step." The form also asks for a target goal to be described as "what data results would be indicative of success." (Discipline Progress Report, Attach. 4: SAP (Doc. 2266-1) at 33.) The Court finds nothing wrong with the form if it is properly completed. The problem is that none of the eight CAPs in SY 2018-19 were completely filled out and, therefore, could not be fully utilized by the school or the Student Relations

Department. Especially damaging, the CAPs all failed to include "Outcome of Product" information or, instead, included hoped for outcomes rather than actual results. The Court finds that the Student Relations Department shall be directly responsible for completing the SAPS, every single line.[10] By doing so, the SAP data the Plaintiffs seek will be available in the future.

The District shall also prepare an annual SAP for each school for SY 2020-21 because the Court's review of the data, (Disciplinary Status Report (Doc. 2266-1) at 115-150), reflects schools in various stages of readiness for full operations under the USP § VI, Discipline, but none which are currently operational without room for improvement.  The annual SAP shall sweep more broadly to focus on structural or foundational stages of readiness and is not meant to replace SAPs addressing hotspots.

The District also provides what appears to be a compilation by school of the data gathered pursuant to the various surveys and rubrics, etc., devised to assess the status of implementation of the USP § VI, Discipline, positive behavior techniques and graduated disciplinary strategies at each school. (Disciplinary Status Report, Attachment 12 (Doc. 2266-1) at 115-150.)

First, the Court notes the data is incomplete for many of the schools. The Court cannot tell whether the absence of data is because something has not been done at a school or if staff just didn't complete the data entry. The Court finds merit in Plaintiffs' challenging the District's ability to track the efforts being undertaken at each school to show: 1) it is identifying and addressing hotspots; 2) positive behavior techniques and disciplinary strategies are being implemented, and 3) there is professional proficiency in using these discipline and civility strategies.

In the 2019-20 DAR, the District shall report the data for the structural and foundational prerequisites for Restorative Practices, PBIS, and the GSRR graduated

---

[10] Student Relations staff does not necessarily need to fill in every data line but is responsible for ensuring that the form is 100% complete.

system of discipline, including non-exclusionary strategies like PIC and the in-school and out-of-school exclusionary strategies ISI and DAEP.  The District should identify the building block "top priority" prerequisites needed initially, like a PIC and ISI room; a certified ISI teacher; MTSS team or discipline team, or both; data entry into Synergy within 24-48 hours; etc., without which Restorative Practices, PBIS, or the graduated behavioral or disciplinary strategies cannot operate effectively at a school. The District shall identify as "secondary priorities" any structural or foundational prerequisites that must follow upon the heels of the top priority prerequisites. These structural or foundational prerequisites shall be identified as existing "yes" or "no" and inventoried, accordingly. There shall be no missing data. The data shall be reported as an inventory organized so that the Court, the Special Master, and the Parties may see in a glance the progress being made at each school. The annual SAP shall follow the inventory and include recommendations for professional development, accordingly.

The District has prepared a Combined PLP for Discipline and Inclusivity, which includes a detailed description of the various professional learning opportunities available to teachers to become more proficient in Restorative Practices, PBIS, GSRR, how to use culturally relevant courses (CRC) to better engage their students, and to use culturally relevant pedagogy (CRP) to be culturally responsive to students to improve student-teacher communications. (Combined PLP Discipline/Inclusivity, Attachment 1 (Doc. 2266-2) at 2.)

In 2018-19, the department prepared and offered professional development opportunities focusing on civility and discipline. (Combined PLP Discipline /Inclusivity, Attach. 1: PL Chart (Doc. 2266-2) at 8-15.) The department also prepared professional development for SY 2019-20. (Combined PLP Discipline/Inclusivity, Attach. 2: PL Chart (Doc. 2266-2) at 16-23.) The PLP reflects that professional learning opportunities are more than "merely 'information sharing' (monitoring mode)." (Combined PLP Discipline/Inclusivity (Doc. 2266-2) at 3.)

1   Professional Learning (PL) developers and providers are learning from participants how

2   they can improve the effectiveness of the PL for future participants, while

3   simultaneously, the participants are becoming professionally proficient in using the USP

4   § VI behavioral and discipline strategies. (Combined PLP Discipline/Inclusivity (Doc.

5   2266-2) at 3.)

6          Depending on the type of professional learning (one-time, multi-session, job-

7   embedded, etc.), PL staff observes participants and reviews data to gauge the

8   effectiveness of learned strategies. Generally, the department responsible for developing

9   and providing the PL is also responsible for conducting observational walkthroughs at

10  schools and in classrooms or using other tools, such as questionnaires, interviews, etc.

11  Assessments include: (a) participants' initial satisfaction with the PL experience, and (b)

12  participants' learning and understanding content and strategies being taught during the

13  PL. (Combined PLP Discipline/Inclusivity (Doc. 2266-2) at 3-4.)

14         After analyzing the feasibility of developing and using a single, multi-use

15  observational rubric, the District decided that certain trainings were distinct enough to

16  warrant qualified persons in each field, including staff with expertise in Restorative

17  Practices, PBIS, SEL, Cultural Relevant Pedagogy, Multi-cultural Curriculum and

18  Culturally Relevant Curriculum, to do observations using specific rubrics to provide

19  coaching and job-embedded support while observing, and to assess implementation of

20  strategies to strengthen the PL opportunity where needed. (Combined PLP

21  Discipline/Inclusivity (Doc. 2266-2) at 4.)

22         The Mendoza Plaintiffs question the District's ability to assess the level of

23  understanding being attained by teachers and administrators pursuant to the PLP;

24  they challenge the District's plan to give teacher's professional development credit,

25  if teacher's score over 80% on a post-training skills test. (Mendoza (Doc. 2280) at

26  14.) The Court finds that a score of 80% strongly suggests proficiency.

27

28

1          The Court finds that the District's commitment to build in-house resources for

2   professional development addresses the concerns of the Special Master, which the

3   Court previously referenced, as follows:

4          The Special Master repeats his past criticism of the District's use of
           consultants to carry out tasks that in the future may fall to District
5          employees because it would be a better use of 910G funds to build in-
           house expertise. He recommends that due to the uniqueness of TUSD
6          operations under the USP, consultants should not be used to conduct
           professional training unless they have expertise in culturally
7          responsive pedagogy and equity practices. He suggests that using
           multiple resources has led the District to have multiple instruments to
8          assess professional proficiency, which could be confusing. He
           recommends professional training and instruments of measurement be
9          aligned to ensure coherence and consistency. The Special Master
           should undertake an investigation to determine whether either of
10         these problems exist, and if so reurge his recommendations.

11   (Order (Doc. 2272) at 6); *see also* (Mendoza Plaintiffs' Response (Doc. 2280) at 6).

12   Since then, the District performed a pilot PLP for Restorative Practices at five schools,

13   which caused it to "decide[] to not renew the vendor contract and to instead adopt a 'train

14   the trainer' model in SY 2019-20 'to develop internal capacity within the district for the

15   five existing pilot schools as well as five new schools.'" (Order (Doc. 2497) at 13)

16   (citation omitted). "This in-house model should generate more buy-in at the school-site

17   level," which was one of the distinguishing factors in the Restorative Practices pilot study

18   for determining whether a school had "implemented" or "not yet implemented"

19   Restorative Practices. *Id.* Buy-in is, similarly, being addressed by the District in the

20   Combined PLP for Discipline and Inclusivity.

21          The PLP reflects that the department staff provides training and technical

22   assistance to school leadership and staff related to the GSSR and discipline data

23   entry and the processes and systems for discipline matters, including improvements

24   to PBIS and Restorative Practices, including Positive Intervention Centers (PICs), In-

25   School Intervention (ISI) rooms, and the District Alternative Education Program

26   (DAEP).  (Discipline Progress Report (Doc. 2266-1) at 4-5.) The Special Master has

27   not reurged any concern related to multiple instruments being used to assess

28   professional proficiency for using behavioral and discipline strategies.

- 24 -

Finally, the Court considers the Mendoza Plaintiffs' criticism that the District's on-line professional resource page, What Works, does not appear to be a best-practices resource. They complain that they are unable to access it to review it because it is not a public resource. The Special Master responds that he recommended creating the "What Works" webpage, but "such files are uncommon." (R&R (Doc. 2468) at 45.) "The idea is to provide all staff with a readily accessible source of information about how best to handle particular actions that teachers and principals believe warrant disciplinary action" *Id.* He reports having experience building such online learning environments, and therefore, volunteers to assist the District at no charge, with what he describes as a work in progress. In the face of limited research-based evidence supporting this online in-house resource, the Court recommends the District take direction from the Special Master to improve "What Works."  (R&R (Doc. 2380 at 3, n.1.)

The Court is keenly aware of COVID 19 and anticipates that the pandemic will impact the Combined PLP for Discipline and Inclusivity and the District's ability to maintain continuity of data, especially for SY 2020-21 if students do not go back to their brick and mortar schools. Nevertheless, the District shall continue to undertake measures, pursuant to the Completion Plan and directives of this Court, (Order (Doc. 2123) at 124-132), to secure buy-in and develop expertise at the school-site level for the effective use of the graduated disciplinary strategies adopted pursuant to the USP § VI, Discipline. The Court does not believe the directives in this Order are precluded by the pandemic, except for the obvious impact on the continuity of numbers of students reported in the DARs for USP § VI, Discipline, during the duration of school closures.

**Accordingly,**

**IT IS ORDERED** that the R&R (Doc. 2380) is adopted by the Court in part as described in this Order.

**IT IS FURTHER ORDERED** that the Motion to Strike (Doc. 2431) is DENIED.

1       **IT IS FURTHER ORDERED** that all future compilations and filings of data,

2   pursuant to Appendix I, USP § VI.G.a-b, shall be as described in this Order, including

3   In-school Discipline being broken down to reflect PIC data.

4       **IT IS FURTHER ORDERED** that the Student Relations Department shall be

5   responsible for obtaining complete data as described in this Order, including all data

6   and information necessary to complete every SAP, without there being any missing

7   data or information, and prepare annual SAPs for each school for SY 2020-21.

8   Before the end of the first quarter, the District shall disclose the 2020-21 Annual

9   SAPs to the Plaintiffs and the Special Master.

10      **IT IS FURTHER ORDERED** that the District shall provide a status report for

11  SAPs in all future DARs.

12      **IT IS FURTHER ORDERED** that the 2019-20 DAR shall include the Inventory

13  for Structural and Foundational Prerequisites for USP § VI, Discipline.  The Student

14  Relations Department shall be responsible for obtaining complete data as described

15  in this Order, including all data and information necessary to complete the

16  Inventory, without there being any missing data or information,

17      Dated this 30th day of July, 2020.

18

19

20

21  David C. Bury
United States District Judge

22

23

24

25

26

27

28