# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
| Plaintiffs | (Lead Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| and | |
| Sidney L. Sutton, et al., | |
| Defendants-Intervenors, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | (Consolidated Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

Revised AASSD and MASSD Plans; CRC Plans.

<u>Introduction</u>

It seems fitting that this Order addresses what might be considered the foundational origins of the Unitary Status Plan (USP): The Student Support Services Departments (SSSDs), AASSD and MASSD, and Culturally Relevant Curriculum (CRC).  This case, originally filed in 1974, resolved by a post-Judgment Settlement Agreement entered in 1978, remained pending in this Court for 30 years until 2008, when this Court issued an Order of unitary status which was subsequently reversed by the Ninth Circuit Court of Appeals. When remanded, the Parties entered into the 2013 Consent Decree: The Unitary Status Plan (USP). Since then, the Court has tracked the District's endeavors to implement the programs and strategies adopted in the USP.

Recently, the Court has issued a series of Orders reviewing the District's compliance with directives issued on September 6, 2019, for attaining unitary status under the USP. This is the last Order in that series, with the Court's attention turned to the USP § V.E, Student Engagement and Support, specifically the engagement strategy of using socially and culturally relevant curriculum (CRC), USP § V.E.1a-b(ii), and the requirement that the District "continue to fund and sustain Support Services for African American Students Achievement, USP § V.E.7, and Support Services for Latino Students Achievement, *id.* § 8. Both the CRC and the SSSD provisions in the USP harken back to the approximately 30-years of TUSD operations under the 1978 Settlement Agreement.

### 1.    Student Support Services Departments: AASSD and MASSD

During those 30 years, several SSSDs were established in TUSD, including the African American Student Services Department (AASSD), Native American Student Services (NASS), and Asian Pacific Student Services (APASS). The student support services for Mexican American students was best known as MAS, the Mexican American Studies program. The MAS minority-studies curriculum became so controversial that it was banned by A.R.S. § 15-112, which was eventually struck down in relevant part as unconstitutional in *Acosta v. Huppenthal,* 2013 WL 871892 (Ariz. March 8, 2013).[1] The

---

[1] Affirmed in relevant part by *Arce v. Douglas*, 793 F.3d 968, 986 (9th Cir. 2015).

Parties' commitment to both minority-student support departments and minority studies are reflected in the USP provisions now being reviewed by the Court.

This history is important because the Special Master recommends that, post-unitary status, AASSD and MASSD, if not eliminated, should be structured very differently than the Defendant, the TUSD School District (the District), proposes. The Court directed the Special Master to draft operating plans for AASSD and MASSD after his repeated objections and assertions that these departments are duplicative of services which are being more effectively provided by other departments and on-site at schools. The Court called for further briefing of the roles and responsibilities for these departments given the substantial changes made in TUSD under the USP. (Order (Doc. 2359)).

While this Court may be inclined to agree with many of the Special Master's recommendations, it agrees with the District that its "commitment to providing extra support and enrichments for students of certain racial and ethnic groups is beyond question." (TUSD Response to R&R (Doc. 2411) at 2.) The Court defers to the District's experience, including its report that the fears expressed by the Special Master are not supported by its past experience. The District further believes, as follows:

> . . . that valuable, important and worthwhile direct services can be provided to students, families and teachers by these departments, focusing on those who need it most, as provided in the District's post-unitary operating plans. The District believes that the ability to deliver those direct support services in a culturally responsive way as done by these departments is important, and that the value of the direct services provided by these departments is not limited to those circumstances where schools cannot provide the same services. The staff of these departments have not experienced issues with teachers or other professionals in the District not taking "advice" from them, as theorized by the Special Master. These departments are well respected within the District for professional, culturally relevant skill sets and connections to the communities they serve.

(TUSD Response to R&R (Doc. 2411) at 2-3.) According to the District, most services provided by the departments are not even of the same type provided elsewhere in the District; some services may be of the same type but replace services provided by other departments, in a more culturally responsive way for African American and Latino students. *Id.*

The Court also agrees with the District that post unitary status, "the particular support services provided, the manner in which they are provided, and the structure of the departments providing them, are all matters which, by definition in a post-unitary status [world], are committed to the sound judgment of District's educators and its elected Governing Board." *Id.* This review is not, however, being made post-unitary status. The Court is considering the District's proposed post-unitary status plans for AASSD and MASSD operations in the context of determining whether they exhibit a commitment by the District to maintain, post-unitary status, the integrity of the USP. Accordingly, the Court turns to the merits of the District's arguments against the Special Master's recommendations for the SSSDs. The District believes that elimination of functions and services from the AASSD and the MASSD in the Special Master's recommendations will not necessarily have the effect of "saving" money as contended by the Special Master because the interconnectedness of USP operations means responsibilities are sprinkled between school-sites and departments, including AASSD and MASSD, depending on the District's determination on the most effective point of delivery, so  if the Court were to order a function removed from the student support departments, the District would likely need to move the function and personnel to another department. (TUSD Response to R&R (Doc. 2411) at 3.)

The District has designed the SSSDs' operating plans for both AASSD and MASSD to "have parent and community outreach program specialists as an actual field position (conducting outreach and empowerment for African American and Hispanic families), not merely doing research on best practices and advising other departments." *Id.* Under the Special Master's design, the discipline/behavioral support program specialists, "who provide direct services in each department would likely need to be moved to the Student Relations Department . . .[;] the academic intervention specialists would likely need to be moved to the Curriculum and Instruction Department." *Id.* at 4.

In summary, the District asserts there is no cost savings with the Special Master's changes to AASSD and MASSD. It will continue to pay for student support services but

get less bang for their buck because direct services will be provided by departments without the expertise and/or ability to perform culturally relevant outreach or to be culturally responsive in delivering academic and behavioral student support services.

Admittedly, all TUSD professional staff are trained in culturally relevant pedagogy. The Special Master reports that "[v]irtually all of the functions of the PS [Program Specialists] are the responsibility of other staff members throughout the District." (R&R (Doc. 2347) at 4.) He asks: Would it not be more productive to devote resources to enhancing the capability of the people already responsible for meeting the needs of the students with whom the PS would work?" *Id.* at 4-5. He describes it as "particularly nonsensical" to believe "that there is a need for another staff person to enhance culturally relevant course teaching and curriculum. The CRPI[2] department, which is responsible for ensuring the integrity and quality of culturally relevant courses, is extraordinarily well staffed (better than any other District's support for curriculum development and implementation) and can provide support for numerous teachers throughout the District." *Id.* at 5.

The Special Master recommends that if the AASSD and MASSD are to provide the requisite level of professional expertise capable of advising teachers and administrators, their qualifications must increase to at least eight master-level or higher new equity specialists. As noted by the District, this would drive up AASSD and MASSD program costs and not be a cost savings at all. The Court adopts the District's position that AASSD and MASSD professional staff, who provide direct student services need only be equally qualified to their professional counterparts providing these same student support services at school-sites and other departments.  To be clear, AASSD and MASSD staff providing direct academic student support services shall be certified teachers and those providing behavioral counseling shall be certified as well. Career counselors should be equally qualified regardless of whether they work on-site or at AASSD or MASSD, and so on.

---

[2] Culturally Relevant Pedagogy and Instruction Department.

AASSD and MASSD professional staff are also required to have culturally relevant skill sets and connections to the communities they serve.

The Special Master is correct that the District's other department and school-sites, especially the CRPI department, has expertise in delivering culturally relevant student support services, especially direct academic support. The District's behavioral and disciplinary strategies are equally supported by experts in the Student Relations Department. Program expertise tracks across the USP, including as examples the following: Advanced Learning Experiences (ALE) Department; Assessment and Evaluation Department; Dropout Prevention and Graduation (DPG) Department; Language Acquisition Department (LAD); Magnet Department; Multi-cultural Department; Multi-tier System of Supports (MTSS) Program, and Student Relations Department, and the SSSDs (AASSD and MASSD). (Executive Summary (Doc. 2384) at 3-4.)

The Court concludes that the District has the ability in-house, through these various departments, to train AASSD and MASSD professional staff in the same way they conduct professional development district-wide for all professional staff in the delivery of USP strategies.  There is no reason why AASSD and MASSD staff, just like on-site teachers, counselors, and administrators, cannot look to other TUSD departments for program specific training in CRPI, CRC, MTSS, PBIS, Restorative Practices, discipline and dropout prevention strategies, etc.  *See e.g.,* (MASSD Plan (Doc. 2151-2 at 15 (including District Department trainings from ALE, CTE, FACE, LAD, GATE, CRPI)); (AASSD Plan (Doc. 2151-1) at 9 (same)). In other words, AASSD and MASSD staff shall be equally qualified to their on-site or other departmental peers, including being equally trained in the expert delivery of the USP strategies relevant to their areas of specialty. What AASSD and MASSD bring to the table is equally qualified professionals, **who have culturally relevant skill sets and connections to the communities they serve.**

The Court has reviewed the various responses from the District, the original AASSD and MASSD operating plans, and the revised plans, which this Court finds are not

replacement plans but serve to explain the interconnectedness of the AASSD and MASSD services with other department services and school-site student support services.  The Court finds that the revised operating plans address the Court's inquiry as to whether there was duplication of services, and the District did not intend any substantive differences between the two. The Court explains this conclusion in respect to each operating plan below. The Court adopts the original AASSD Operating Plan (AASSD Plan) (Doc. 2151-1) and MASSD Operating Plan (MASSD Plan) (Doc. 2151-2) at 1), as clarified by the revised operating plans (Doc. 2265), supported by the MASSD 2018-19 Reorganization Plan ((Doc. 2151-2) at 20) and AASSD 2018-19 Restructuring Plan ((Doc. 2276) at 27.)

As explained in the MASSD 2018-19 Reorganization Plan, the department is shifting away from the current deficit-based ideology of identifying student deficiencies (i.e. low achievement in reading and math test scores, low attendance, behavior issues, etc.) which justify outcome inequalities like standardized test-scores or disproportionate discipline and use academic or behavioral strategies to address these deficiencies. Instead, MASSD Program Specialists should maximize the access and use by Latino students of the research-based practices that exist in the District, which are aimed at increasing student success in school and enhancing academic achievement. (MASSD Reorganization Plan ((Doc. 2151-2) at 22-23.) This is mirrored in the AASSD 2018-19 Restructuring Plan, drafted by Trayben and Associates, "[AASSD should] "shift[] direction from 100% direct services to a balance between direct services to students and direct support for departments and schools by building instructional capacity of teachers and other support staff. Some direct services will continue at targeted schools, using asset-based approaches designed to meet students where they are through culturally responsive practices." (Fisher Objection, AASSD Restructuring Plan (Doc. 2276) at 27.)

Trayben and Associates, the District's expert hired pursuant to the suggestion and recommendation of the Fisher Plaintiffs,[3] explained: "AASSD supplement[s] educational

---

[3] The District conducted the comprehensive review of the AASSD structure during 2018, "using a consultant suggested and approved by counsel for the Fisher Plaintiffs." (TUSD Response (Doc. 2314) at 3.)

services that should be provided by the District, not supplant them." (Fisher Objection, AASSD Restructuring Plan (Doc. 2276) at 38.) "However, because of the "lack of African American teachers, counselors, [and] principals . . . in the District" . . . "compared to the majority of the AASSD staff [being] African American, the AASSD affords African American "students an opportunity to learn from individuals of the same ethnicity which can have a significant impact on student learning through supplemental services." (Fisher Objection, AASSD Restructuring Plan (Doc. 2276) at 38.) *"Current research finds support for the positive impact African American teachers have on African American student achievement." Id.*

The AASSD and MASSD operating plans strike a balance between the deficit-based direct-services approach, which limits the reach of the Student Support Departments, with an asset-based approach, which extends it. For example, in 2017-18 "MASSD's 7 Student Success Specialists committed to serving as many of the 29,949 students as possible with a 4,007 to 1 ratio."[4] (MASSD Reorganization Plan ((Doc. 2151-2) at 22-23.) Whereas, there were only approximately 4,869 African American students enrolled in TUSD. (NC: Discipline Disaggregated by Race for 2017-18  (Doc. 2266-3) at 22.) These comparisons and the difference in demographics between Latino students being a minority-majority and African America students being only about 10 % of the total student population, with even less representation as teachers and administrators,  explain why the MASSD and AASSD operating plans strike the balance differently. These differences do not, however, carryover to other MASSD and AASSD operating plan components, which the Court directs the District to make uniform, as follow.

Both operating plans shall include the progress monitoring provisions from the MASSD Plan, § III Data Driven Progress Monitoring, ((2151-2) at 17); (2265-2 at 14), as expressly described in the MASSD 2018-19 Reorganization Plan ((2151-2) at 25), including the designation of a Research Project Manager from the District Assessment &

---

[4] An exaggeration exists because not all Latino or Africa American students need student support services.

Evaluation Department, with monitoring and assessment of effectiveness of positions and alignment with job responsibilities based on data by school and individual students served. *See* (Fisher Objection, AASSD Restructuring Plan (Doc. 2276) at 8 (requesting evaluation data for 2018-19 to show what services were provided at what schools and the number of students served; requesting information on how the effectiveness of AASSD was measured)).

Like it did for MASSD, the District shall form the AASSD Reorganization Planning Committee (the Committee), including a Fisher Plaintiff representative, a member of the Special Master's Implementation Committee, and District leadership involved in AASSD operations. (TUSD Response (Doc. 2322) at 5 (describing formation of Committee and its development of the MASSD 2018-19 Reorganization Plan, with input from a panel of experts).

The lines of communication described for the Director of AASSD shall be the same for the Director of MASSD: "The department director reports directly to the Assistant Superintendent for Curriculum and Instruction, who in turn reports to the District Superintendent." (AASSD Plan (Doc. 2265-1) at 2), *cf.,* (R&R (Doc. 2403) at 5 (recommending Director report to Senior Director for Equity who, in turn , would report to the Assistant Superintendent for Curriculum and Instruction). Both Directors shall "[p]rovide regular updates to the superintendent, governing board and community."[5] (AASSD Plan (Doc. 2151-1) at 4.)

Both departments shall follow the annual monitoring and assessment provisions, pursuant to the MASSD Operating Plan, Section III, Data Driven Progress Monitoring. This year the departments shall each prepare a status report reviewing the 2018-19 Strategic Plan to identify any modifications and adjustments in operations made in SY 2018-19 or SY 2019-20 and include a 2020-21 Strategic Plan.  The status report shall be finalized to reflect the [o]ngoing monitoring and assessment to determine the effectiveness" of the 2020-21 operations and include a draft updated operating plan which reflects the directives

---

[5] This shall include posting on the District's website

made by this Court in this Order and any other operational changes deriving from the annual review process. These materials shall be provided to the AASSD and MASSD Reorganization Planning Committees, respectively, for further review and comment regarding revisions. Subsequently, the District shall update the MASSD and AASSD Operating Plans, with the Directors presenting the updated operating plans in his/her regular update to the superintendent, governing board and community, depending on whether this year's review is in late winter of early spring.

SSSDs' staff, who are providing direct student support services, actually or on paper, shall have professional qualifications equal to their professional counterparts providing these same student support services at school-sites and other departments, including requisite certifications, and shall be equally trained with these peers regarding the delivery of services pursuant to USP strategies relevant in their areas of specialty. This latter requirement shall apply to all AASSD and MASSD staff, even those not providing direct student support services. This training shall be a top priority. This directive overrides any "related field" or "alternative experience" provisions which are to the contrary. For example, both operating plans provide: Behavioral Specialists "must hold a Bachelors degree in education, counseling, African American [Mexican American]studies, or a related field. (AASSD Plan (Doc. 2151-1) at 7); (MASSD Plan (Doc. 2151-2) at 6). Pursuant to the directives in this Order, only a licensed counselor would have the qualifications to address Tier 2 and 3 behavioral issues for at-risk students.

The Court finds that it is unnecessary for the District to immediately file revised operating plans. The District shall consider the directives in this Order as binding during this year's operations and for purposes of the annual review (winter or early spring) of the 2020-21 MASSD and AASSD operations, including preparing the Status Reports, 2020-21 Strategic Plans, and updating the AASSD and MASSD Operating Plans, as described below more fully for each department.

1        A. MASSD

2        The Mendoza Plaintiffs had no substantive objections to the District's originally

3  filed MASSD Plan (Doc. 2151-2) but filed an objection to the Revised MASSD Plan.

4  (Mendoza Response (Doc. 2168)). The Plaintiffs complain that "'[t]he revised plans reflect

5  some evolution since the original filing, based on experience in the interim.''' (Mendoza

6  Response (Doc. 2287) at 4 (quoting (R-MASSD Plan (Doc. 2265-1) at 2).  The Plaintiffs

7  believe that the District made material changes to the organization and work of the MASSD

8  and fails to explain how those changes relate to MASSD's efforts to implement the 2018-

9  19 Strategic Plan or whether it made these substantive changes pursuant to the monitoring

10  and assessment provisions required by both the original and revised MASSD plan.

11  (Mendoza Response (Doc. 2287) at 4-5.)

12        The Plaintiffs compare the Revised MASSD Plan, which reflects that each of the

13  eight Program Specialists are assigned to provide direct student support services, to the

14  original MASSD Plan, which called for only two of the eight Program Specialists to be

15  providing direct services: the two Academic Empowerment & Engagement Program

16  Specialists being certified teachers qualified to "actually instruct" and the Social-

17  Emotional & Behavioral Support Program Specialist being a licensed Social Worker.

18  (Mendoza Response (Doc. 2287) at 6) (relying on original MASSD Plan (Doc. 2151-2) at

19  12)). The Plaintiffs complain that in the Revised MASSD Plan the District ignores the

20  differences in qualifications between the eight Program Specialists and has them delivering

21  both direct academic and behavioral services while carrying out other responsibilities.

22  (Mendoza Response (Doc. 2287) at 6.) If true, this is contrary to MTSS, which recognizes

23  separate and distinguishable needs between academic and behavioral interventions.

24  (Mendoza Response (Doc. 2287) at 6-7.)  Plaintiffs complain that the Revised MASSD

25  Plan in comparison to the original MASSD Plan is vague in respect to development and

26  implementation of individual student plans and completely omits the roles of the

27  Department Director and Program Coordinator. (Mendoza Response (Doc. 2287) at 7-10.)

28  The Plaintiffs charge that the District has stepped back from its commitment, memorialized

1   in detail in the MASSD 2018-19 Strategic Plan for reorganization, pursuant to the MASSD

2   2018-19 Reorganization Plan, from being a "deficit-based" model to taking an "asset-

3   based" approach to student support services. (MASSD Reorganization Plan (Doc. 2151-2)

4   at 21); (MASSD Plan (Doc. 2265-2) at 17).

5       Both the Plaintiffs and the District explain that the Court misunderstood the status

6   of MASSD as being stagnate and stuck in the past. Instead, the District formed the

7   Reorganization Planning Committee (the Committee), including a Mendoza Plaintiff

8   representative, a member of the Special Master's Implementation Committee, and District

9   leadership involved in SY 2017-18 operations. (TUSD Response (Doc. 2322) at 5.) This

10  Committee developed the MASSD 2018-19 Reorganization Plan, with input from a panel

11  of experts. *Id.*

12      In a nutshell, as the Court understands it, the Committee advised that a more

13  comprehensive and integrated outcome-based service model will best support students,

14  which can provide targeted areas of support – reflected by the Program Specialist positions.

15  The Committee intends for MASSD to shift away from the current deficit-based ideology

16  of identifying student deficiencies and addressing those deficiencies through Student

17  Success Specialists and, instead, MASSD will focus on an asset-based approach by

18  Program Specialists to increase access for Latino students to the research-based practices

19  that exist in the District, which are aimed at improving student success in school and

20  enhancing academic achievement.

21      The District responds to the Mendoza Plaintiffs' concerns by reemphasizing its

22  strong support of this new trajectory for MASSD and expressly commits to adhering to the

23  MASSD 2018-19 Reorganization Plan, and the expressly referenced SY 2018-19 Strategic

24  Plan. (TUSD Response (Doc. 2322 at 2, n.1) (explaining the Strategic Plan can be found

25  attached to the Mendoza Objections (Doc. 2287-1) and was simply a filing decision to not

26  attach it to the MASSD Reorganization Plan).

27      MASSD's new goals, include implementing strategies as follows: 1) asset-based

28  support services integrated with culturally responsive strategies to improve student

achievement and educational outcomes; 2) a systemic approach of support for administrators and teachers to incorporate asset-based and culturally responsive strategies within all facets of Mexican American/Latino students' educational experiences; 3) represent the interests of Mexican American/Latino students and parents in District decision-making; 4) expand extensive, integrated, collaborative partnerships at the local, state and national level to support MASSD goals; 5) foster Mexican American/Latino students and parents engagement in collaboration with FACE, site administrators, the CRPID, and District Leadership; 6) monitor academic success indicators district-wide to recommend interventions as needed; 7) target CRC classrooms to utilize AVID strategies to build positive, trusting relationships for students' academic and social support; 8) utilize EBAS to regularly review the effectiveness of MASSD organization, positions, plan, and operations to determine effectiveness and potential revisions to services and plans for individual students and the overall operation of MASSD. (MASSD Plan (2151-2) at 16.)

The District explains that the Revised MASSD Plan was responsive to the Court's directive to revise the operating plans to make it clear that there were no duplications of services occurring between MASSD and other departments and because the Revised MASSD Operating Plan reflected actual "day-to-day" 2018-19 MASSD operations. (TUSD Response (Doc. 2322) at 3 (admitting revised operating plan reflects existing "MASSD functions, employee duties, relationships with other departments; intended expression of long-term strategy for MASSD remains the province of the 2018-19 Strategic Plan)). The District reports it was harder than anticipated to shift away from direct services because of the community's long history of reliance on MASSD for these services. "The MASS Department expects a gradual release of direct student interventions through the MTSS model by all Program Specialists to be fully implemented either by the end of SY 2019-20, or early 2020-21." (TUSD Response (Doc. 2322) at 5) (emphasis added).

The Court finds that the Revised MASSD Operating Plan addressed the Court's inquiry as to whether there was duplication of services. Both the original and revised MASSD plans reflect an operational structure that ensures direct-services remain the

primary responsibility of the District's schools and departments, with MASSD taking a targeted approach in providing support services and, whenever possible, taking an asset-based approach to maximize the efficacy for Latino students of the research-based practices that exist in the District. The Court finds the District did not intend any substantive difference between the revised and original MASSD operating plans. The Court attributes differences to the stylistic limitations of the bullet-point format used in the original plan and the more explanatory nature of prose, which was used in the presentation of the revision.

Accordingly, the Court adopts the MASSD Operating Plan as originally filed on December 6, 2018 ((Doc. 2151-2) at 3), as clarified by the Revised MASSD Operating Plan ((Doc. 2265-2) at 2), and adopts the 2018-19 Reorganization Plan ((2251-2 at 20); (2265-2 at 16)), referencing the 2018-19 Strategic Plan (2287-1).

To clear up any confusion which may have been caused by the Court's delay in adopting the District's MASSD Operating Plan, the 2018-19 Reorganization Plan, and referenced 2018-19 Strategic Plan, especially in relation to the annual monitoring and assessment provisions, pursuant to the MASSD Operating Plan, Section III, Data Driven Progress Monitoring, the District shall prepare a status report for the 2018-19 Strategic Plan to reflect the [o]ngoing monitoring and assessment to determine the effectiveness" of the 2018-19 MASSD operations and also the SY 2019-2020 operations, and identify any modifications and adjustments in operations made in SY 2019-20.  The District shall prepare a 2020-21 Strategic Plan.

The MASSD Operating Plan calls for an annual (late winter or early spring) MASSD staff meeting, with the Assistant Superintendent of Curriculum and Instruction, to assess the support services, outcomes, and areas for improvement, and to consider operational changes for the following year.  (MASSD Plan (Doc. 2151-2) at 18.) This year's meeting shall be memorialized in the Status Report and a draft updated MASSD Plan, reflecting the directives made by this Court herein and any operational changes deriving from the annual review process. These materials shall be provided to the

- 14 -

1    Reorganization Planning Committee for further review and comment regarding revisions.

2    Subsequently, the District shall update the MASSD Operating Plan. The Director of

3    MASSD shall present the updated MASSD Operating Plan in his "regular update to the

4    superintendent, governing board and community" either at the end of SY 2020-21 or the

5    beginning of SY 2021-22, whichever deadline coincides with this year's annual (winter or

6    spring) review. (AASSD Plan (Doc. 2151-1) at 4.)

7         Prior to issuance of the updated MASSD Operating Plan, the directives in this Order

8    are binding, including MASSD' staff, who are providing direct student support services,

9    actually or on paper, shall have professional qualifications equal to their professional

10   counterparts providing these same student support services at school-sites and other

11   departments, including requisite certifications, and shall be fully trained to be experts in

12   the delivery of services for USP strategies relevant in their areas of specialty.

13        B.  AASSD

14        Like the Mendoza Plaintiffs, the Fisher Plaintiffs did not object to the District's

15   originally filed AASSD Plan (Doc. 2151-1), and but for the concerns of the Special Master,

16   the AASSD Plan would likely have been adopted by the Court. Like the Mendoza

17   Plaintiffs, the Fisher Plaintiffs filed an objection to the Revised AASSD (Doc. 2265-1).

18   Whereas the Mendoza Plaintiffs complained of diversions between the revised and the

19   original plans, the Fisher Plaintiffs charged that AASSD operations for at least five years

20   have failed to produce any evidence that its operations serve to improve the achievement

21   gap between White and African American Students. (Fisher Objection, AASSD

22   Restructuring Plan (Doc. 2276) at 6.) The Fisher Plaintiffs complain that Defendants fail

23   to present any data indicating what assessment results were used to design the AASSD

24   reorganization, and there is no information on how the effectiveness of the department's

25   programs and services will be measured. *Id.* at 7.

26        The Fisher Plaintiffs complain that they have repeatedly asked the District to

27   develop an academic achievement plan for African American students, but instead of

28   creating such a plan, the District continues to operate the AASSD without any specific

strategies to narrow the achievement gap or reduce discipline disparities. *Id.*

The Fisher Plaintiffs ignore USP § V.E, Student Engagement and Support, and its strategies including using culturally relevant curriculum and pedagogy to engage minority students, USP § V.E.1, and to continue to support AASSD to provide culturally relevant student support services, *id.* § V.E.2-7**.** The Fisher Plaintiffs ignore the ALE provisions, USP § V.A, and the Family Engagement and Community Outreach (FACE), USP § VII**.** The Fisher Plaintiffs ignore USP § VI, Discipline, provisions which call for a graduated system of student behavior policies and discipline practices with the overall goal of creating inclusive and supportive environments in District schools aimed at keeping students in school and learning. In short, the Fisher Plaintiffs ignore that USP, which includes the academic achievement plan and disciplinary revisions they claim the District has failed to provide. As this Order, and the other recently issued Orders tracking the District's endeavors pursuant to the USP, reflect, the District has developed and implemented plans pursuant to the USP provisions aimed at improving academic achievement for African American students. It has completely redesigned its disciplinary strategies. (Order (Doc. 2502)). Accordingly, the Court rejects this objection.

As directed above, the data and monitoring provisions contained in the MASSD, which clearly provide the type of assessments regarding the effectiveness of the SSSDs that the Fisher Plaintiffs seek for AASSD, shall so apply.

This leaves the Fisher Plaintiffs' invocation of expert, Dr. Gwen Benson of Trayben and Associates, an organization the District utilized as an expert to "examine the district's systems, services, and processes to close the achievement gap between Anglo and African American Students." (Fisher Objection, Attach. 2: Trayben and Associates' Report (Doc. 2276) at 21.) Especially relevant here, Trayben and Associates prepared a 2018-19 AASSD Restructuring Plan (Doc. 2276) at 27). The Court treats this like the MASSD 2018-19 Reorganization Plan and gives it the same weight and authority. In comparing the Trayben AASSD 2018-19 Restructuring Plan with the District's AASSD Plan (2151-1), the two are substantively identical and almost verbatim identical in the tasks and responsibilities of the

recommended AASSD staff positions. *Compare*:   (Fisher Objection, AASSD Restructuring Plan (Doc. 2276) at 27); (AASSD Plan (2151-1)). The Court finds that the Revised AASSD Plan addressed the Court's inquiry as to whether there was duplication of services. Both the original and revised AASSD plans reflect an operational structure that ensures direct-services remain the primary responsibility of the District's schools and departments, with AASSD taking a targeted approach in providing support services and, whenever possible, taking an asset-based approach to maximize access and use of the research-based practices that exist in the District for African American students. The Court finds that there was no substantive difference between the revised and original AASSD plans. Accordingly, the Court adopts the original AASSD Plan, filed on December 6, 2018, (2151-1) as clarified by the Revised AASSD Plan (2165-1), and adopts the AASSD 2018-19 Restructuring Plan ((Doc. 2276) at 28).

Like the MASSD 2018-19 Reorganization Plan, the AASSD Restructuring Plan includes a 2018-19 Strategic Plan of sorts in Table 1: Measurement Plan including Tasks, Responsibilities and Timelines by Task (Fisher Objection, AASSD Restructuring Plan (Doc. 2276) at 28-29) and an Implementation Chart, *id.* at 37-38, which are sufficient for the District to prepare a Status Report and 2020-21 Strategic Plan, as described above for MASSD. As the monitoring and review provisions provided for MASSD operations have been deemed herein to apply to AASSD, so too shall this Court's directives for this year's annual review of MASSD apply to AASSD. The District shall form an AASSD Restructuring Planning Committee identical to the MASSD Reorganization Planning Committee, including a Fisher Plaintiff representative, a member of the Special Master's Implementation Committee, and District leadership involved in AASSD operations.[6]

This year's meeting shall be memorialized in the Status Report, a 2020-21 Strategic Plan, and draft updated AASSD Plan, reflecting the directives made by this Court herein

---

[6] The Court does not repeat every directive given for MASSD here to avoid the risk of leaving something out or creating confusion with differing language. The Court intends that procedural provisions, especially those relating to program development, review, monitoring, and revisions shall be the same for MASSD and AASSD.

and any operational changes deriving from the annual review process. These materials shall be provided to the AASSD Reorganization Committee for further review and comment regarding revisions. Subsequently, the District shall update the AASSD Plan. The Director of AASSD shall present the updated AASSD Plan in his "regular update to the superintendent, governing board and community" either at the end of SY 2020-21 or the beginning of SY 2021-22, whichever deadline coincides with this year's annual (winter or spring) review. (AASSD Plan (Doc. 2151-1) at 4.)

Prior to issuance of the Updated AASSD Operating Plan, the directives in this Order are binding, including AASSD staff, who are providing direct student support services, actually or on paper, shall have professional qualifications equal to their professional counterparts providing the same student support services at school-sites and other departments, including requisite certifications, and shall be fully trained experts in the delivery of services, pursuant to the USP strategies, relevant to their areas of specialty.

C. English Language Learners (ELL)[7] students and Family and Community Engagement (FACE) Department.

Lastly, the Mendoza Plaintiffs' object to " the failure of the AASSD and MASSD Operating Plans to adequately address targeted support of ELL students and engagement of their families." This objection should have been raised in respect to the original filings because if anything, the record is clearer now than it was then as to the roles and responsibilities for these departments, especially for the SSSDs' role in relation to ELL students. Since then, the Court called for a Revised Family and Community Engagement (FACE) Plan to clarify the interrelationships between it and other departments, especially MASSD and AASSD. (Order (Doc. 2386)). The District filed the Revised FACE (Doc. 2391) on December 3, 2019. The Court also called for similar revisions to be made to the ELL Action Plan for dropout prevention, which was filed on August 30, 2019. (ELL Plan: Graduation and Dropout Prevention (Doc. 2261)). The District filed the Executive

---

[7] Now English Learner (EL) students

Summary (Doc. 2384) on December 1, 2019. All these subsequent filings help to clear up the confusion created by omissions in the SSSDs' operating plans.

What becomes clear from reviewing all these documents together is that the SSSDs play supplemental roles but have two primary responsibilities. First, they provide direct student support services, both academic and behavioral, targeted to at-risk African American and Latino students, including ELL students, and conduct outreach to the families of such students related to these direct student support services. Second, these departments provide culturally responsive outreach to maximize the efficacy[8] for African American and Latino students, including ELL students, of District programs designed to improve academic achievement, including other non-AASSD/MASSD student support services.

The Revised FACE Plan relied on the revised MASSD and AASSD Plans, which as described by the District, reflected the 2019 operations, not the operations represented in the 2018-19 Reorganization and Restructuring Plans. Admittedly, as noted above, the revised plans represented the historical use of SSSD staff to provide direct services, not the asset-based new roles reflected in the original plans which were aligned with the Reorganization and Restructuring Plans. As also noted above, the District "expects a gradual release of direct student interventions through the MTSS model by all Program Specialists to be fully implemented either by the end of SY 2019-20 or early 2020-21." (TUSD Response (Doc. 2322) at 5.) The FACE reliance on the Revised MASSD and AASSD Plans perpetuates the old direct-service provider approach. Fortunately, however, the interrelationship between FACE and the SSSDs is limited to their outreach roles and responsibilities and does not involve direct, academic or behavioral, student support services. The FACE Plan must track the directives in this Order and MASSD and AASSD plan updates.

---

[8] The Court uses the term "efficacy" to mean "to increase access, participation and success" for African American or Latino, including ELL students, in an opportunity or service afforded all students in TUSD. (Executive Summary (Doc 2384-1) at 24.)

The FACE for the ELL Action Plan Graduation and Dropout Prevention (Doc. 2391) at 131), the ELL Action Plan: Graduation and Dropout Prevention Plan (Doc. 2261-1) make it clear that roles and responsibilities being performed by MASSD and AASSD are considered interrelated to and supplemental to those departments' operations. This is certainly true in the context of providing asset-based student support services, which by definition means that AASSD or MASSD look to another department or school-site staff to provide the requisite, academic or behavioral, direct student support service.

The Multi-Tiered System of Supports (MTSS) "is an umbrella framework that uses positive interventions and supports responsive to student needs. Every student receives core classroom instruction (Tier 1). Some students need supplemental instruction (Tier 2), most often in small groups. A fewer number of students need more intensive interventions and supports (Tier 3)." (Executive Summary (Doc. 2384-1) at 23.) The District requires all schools to have MTSS teams. These teams are responsible for developing support plans for high-risk students, with AASSD and MASSD "provid[ing' supplemental, supportive, and additional services in this area." (Executive Summary (Doc. 2384-1) at 23.)

The Language Acquisition Department has primary responsibility for ELL student support strategies, and the Refugee Services Department provides supplemental in-class support for ELL students in sheltered classes and at elementary schools with high refugee populations. (Executive Summary (Doc. 2384-1) at 23.)

AASSD and MASSD "currently provide direct student services, providing supplemental academic and behavioral interventions "in coordination" with the MTSS and behavioral teams at schools." (Executive Summary (Doc. 2384-1) at 23.) The Program Specialists devote time to more asset-based tasks, as follows: 1) to increase access, participation and success in ALE opportunities; to ensure college and career readiness, and 3) to engage and reach out to the larger community, including outreach support work for programs and events sponsored by other departments. (Executive Summary (Doc. 2384-1) at 24.)

While the Court was able to discern AASSD and MASSD's asset-based responsibilities from the operating plans, the important gatekeeping role played by MTSS was omitted. In the MASSD, MTSS was mentioned three times. The Behavioral Specialist was described as working with the school behavioral team in connection with Tier 2 and Tier 3 behavioral intervention and "coordinating" with the MTSS team. (R-MASSD (Doc. 2265-2) at 10.) The Academic Empowerment & Engagement Specialist "conduct[s] individual academic mentoring for students, consult[s] targeted MTSS teams in academic interventions using asset-based strategies and facilitate[s] academic goals." (R-MASSD (Doc. 2265-2) at 8.) The Certified Academic Tutors are described as tutors for grades 3-8 for math and English Language Arts (ELA).  (R-MASSD (2265-2) at 11.)

In the AASSD Plan, MTSS is more frequently mentioned but similarly the gatekeeper role of MTSS is obfuscated.  The Behavioral Specialist, who delivers Tier 2 and 3 behavioral interventions "coordinates with MTSS team to ensure any ongoing academic interventions are consistent with the behavior plan." (R-AASSD (Doc. 2265-1) at 4.) The Response to Intervention Specialists (RtI Program Specialists), certified teachers, "who frequently provide  interventions themselves," coordinate with the MTSS team or lead, but AASSD develops the academic intervention plan for African American students not scoring proficient in math or ELA, and the RtI Program Specialist coordinates with MTSS to schedule the academic student support intervention. (R-AASSD Plan (Doc. 2265-1) at 5-6); *but see* (Executive Summary (Doc. 2384-1) at 23) (describing MTSS as responsible for developing support plans for high-risk students, and turning to AASSD and MASSD, social workers, and the Dropout Prevention Department to assist in implementing the individual support plans). Likewise, AASSD Program Specialists work with schools' MTSS and guidance resources to develop a high school graduation plan for 9th graders who performed below grade level on AZMerit and/or did not pass all core subjects in the 8th grade. (R-AASSD (Doc. 2265-1) at 6.) "The success coach serves as an interconnected resource in MTSS academic and PBIS behavioral interventions for African American students." (R-AASSD (2265-1) at 9.)

For ELL students, the FACE Section of the Dropout Prevention and Graduation Plan (FACE: DPG Plan (Doc. 2391-1) at 127) and the FACE section of the ELL Action Plan: Graduation and Dropout Prevention (ELL DPG Plan: FACE (Doc. 2391-1) at 131), reflect that FACE is primarily responsible for outreach, but generally passes this primary responsibility over to the SSSDs, which are responsible for conducting this targeted outreach to families with struggling Latino and African America students, including ELL students. *See*: (FACE: DPG Plan (Doc. 2391-1) at 128 (describing Type 2 Family Engagement as being responsibility of AASSD and MASSD "in conjunction with site administrators, FACE and others); ELL DPG Plan: FACE (Doc. 2391-1) at 132 ("[w]hen the MTSS team (including language acquisition teachers for ELL students) determines that interventions or family engagement may be of benefit, one of the student services department may already be involved in family outreach. If not, the language acquisition department may either engage in its own direct outreach, or request the appropriate student services become involved, connecting the family to the educational team.") Both FACE sections of the DPG Plan and the ELL Action Plan: DPG reflect a coordination of support services for at-risk students on-site by the MTSS team. *See*: (FACE: DPG Plan (Doc. 2391-1) at 128 (apply MTSS mode of operations and using the Student Equity and Intervention Request for Service form); ELL DPG Plan: FACE (Doc. 2391-1) at 132) (MTSS team identification of at-risk ELL student triggers involvement by language acquisition department, if student services department not already involved).

Summarizing the above, the Executive Summary describes the primary responsibility for direct academic student support services for ELL students as falling to the Language Acquisition Department, with AASSD and MASSD playing a supporting role to provide culturally relevant outreach to engage ELL families, generally, and to specifically provide family outreach for families with at-risk ELL students.

In contrast to this patchwork of clarity, the MASSD Plan provides for the Parent Outreach and Empowerment Program Specialist to conduct and coordinate outreach for other departments to Mexican America/Latino families "either to promote attendance at

events sponsored by those departments, or for direct targeted outreach to families (such as families of ELL students)." (R-MASSD (Doc. 2265-2) at 5.) The Academic Empowerment and Engagement Program Specialists "assist sites with ELLs in integrating supports to ensure an asset-based approach in classrooms." *Id.* at 8. For African American ELL students, the AASSD Plan provides for the Program Specialist to conduct direct outreach "in response to particular requests from other departments, such as the Language Acquisition Department, regarding ELL matters (both struggling students and ELL targeted events)." (R-AASSD (Doc. 2265-1) at 7.)

In summary, other department plans reflect, where MASSD and AASSD plans do not, the gatekeeper role played by MTSS for direct student support services and the targeted leadership role played by MASSD and AASSD in family engagement and outreach to families with at-risk Latino and African America students, including ELL students.

There is no reason why the Court or anyone else should have to ferret out the gatekeeping role of the MTSS team in relationship to AASSD and MASSD's direct student support responsibilities or the role the SSSDs play in family outreach and engagement for at risk students, including ELL students. These relationships reflected in the FACE Plan and ELL Plans should be mirrored in the MASSD and AASSD operating plans. The Court understands the advantage of retaining flexibility to secure the best student support services for each student, but the downside to unfettered flexibility is the risk of a lack of accountability stemming from a lack of clarity in roles and responsibilities. The Court finds that MTSS gatekeeping responsibilities ensure the respective departments work effectively and efficiently together and reduces the potential for run-around and lack of accountability. Within the parameters of AASSD and MASSD operations, the MTSS gatekeeping role shall be recognized.

Clarity in roles and responsibilities is especially important for the roles and responsibilities of the Program Specialists. As of now, the SSSDs operating plans fail to even identify which Program Specialists are responsible for working with at-risk ELL students and their families.  It is not enough that "[a]ll Program Specialists are able to

support students and parents in both English and Spanish." (TUSD Response (Doc. 2322) at 9.)[9] It seems like it should go without saying that it takes more to meet the needs of ELL students than providing USP strategies in Spanish. While ELL students are unable to communicate fluently or learn effectively in English and, therefore, require specialized or modified instruction in the English language, it cannot be ignored that their language acquisition issues arise because they come from non-English-speaking homes and backgrounds, i.e., immigrant heritages. In other words, the culturally relevant skill sets and connections to communities differ for ELL students from those applicable to Mexican American, Hispanic America, Latino American, or African American students because they are affiliated with foreign cultures. The USP approach of sprinkling ELL across the USP by applying strategies to African American and Latino students, "including ELL students," creates a propensity to ignore their cultural uniqueness. The Court finds that the AASSD and MASSD Operating Plans shall include an ELL Plan addendum to address program distinctions necessary to support culturally relevant family outreach and engagement and any student support services being provided to at-risk ELL students.

For this year's annual review, the Court calls the District's attention to the FACE provisions for at-risk students, including ELLs. (Dropout Prevention and Graduation Plan: FACE Strategies (Doc. 2391) at 127); ELL Action Plan: Dropout Prevention and Graduation Plan, FACE Strategies ELL Plan: FACE (Doc. 2391) at 131; (Doc. 2261-1 at 7), and the Executive Summary (Doc. 2384). The 2020-21 Strategic Plans shall include preparation of the ELL Student Addendums, which shall become part of the updates to the MASSD and AASSD Operating Plans.

<u>Conclusion</u>

Rather than requiring the District to immediately revise the SSSD operating plans, the Court directs the District to consider the directives in this Order as binding during this year's operations and for purposes of the 2020-21 annual review (winter or early spring)

---

[9] The District's Response fails to address the language needs of Black ELL students, which the Court assumes is the primary responsibility of the Language Acquisition Department.

of the SSSD operations, including preparing the Status Reports for AASSD and MASSD and the respective 2020-21 Strategic Plans, until the updated AASSD and MASSD plans are finalized.

2.      Plans for Culturally Relevant Curriculum (CRC); CR Professional Learning and Multicultural Curriculum

As mentioned at the beginning of this Order, the District has been a vanguard in offering minority-study courses going back some 30 years. Pursuant to USP § V.E, the District was charged to develop and use strategies designed to change the educational expectations for African American and Latino students by adopting a culturally responsive teaching method, Culturally Relevant Pedagogy and Instruction (CRPI),  to encourage and strengthen participation and success of African American and Latino students.  USP § V.E.1.a. This section mandated that the District use several strategies, including courses of instruction centered on the experiences and perspectives of African American and Latino communities, Culturally Relevant Curriculum (CRC). USP § V.E.1.b.

The District presents the CRC Status Report ((Doc. 2259-1) at 9-13), including "The Way Forward: 5-Year Plan" ((Doc. 2259-1) at 15-18); the CR Professional Learning Plan ((Doc. 2259-2)at 2-8), including CRPI  Framework for Student Academic Achievement ((Doc. 2259-2) at 9-16), and the Multicultural Curriculum (Doc. 2259-3). The Status Report reflects the growth of CRC as follows: SY 2015-16 (1243 students); SY 2016-7 (2424 students); SY 2017-18 (4126 students), and SY 2018-10 (6184 students). (CRC Status Report (Doc. 2259-1) at 9.) The purpose of culturally relevant education is to increase student engagement to improve academic performance and create inclusive school environments to reduce disciplinary and other behavioral sidetracks from education.

CRC courses use specialized curriculum designed with a particular cultural perspective, African American or Mexican American, such as courses that teach literature through Hispanic authors or courses that teach U.S. history though the African American experience. CRC courses are offered as alternatives to standard core courses that students may elect to take instead of the standard course. In this way, the CRC literature class

1   replaces the general 11th grade literature class or CRC history replaces the general U.S.

2   history class. CRC courses are different from efforts to infuse the general curriculum with

3   multicultural elements. At the elementary school level, CRC teachers infuse culturally

4   relevant elements into the general curriculum in their classes, but at the middle and high

5   school levels CRC is designed specifically for the course and focuses on a single cultural

6   viewpoint. (CRC Status Report: Overview (Doc 2259-1) at 2 n. 1.)

7         CRC courses are one part of TUSD's overall culturally relevant educational

8   approach, CRPI, which under the USP is a comprehensive across-department and school-

9   site broad range of culturally responsive practices for teachers, counselors, administrators,

10  etc. In short, CRPI is a culturally responsive pedagogy for all professional staff dealing

11  with all students in respect to all issues.

12        For reasons explained below, the Court agrees with the Plaintiffs' objections to the

13  CRC Plans. *See*: (Mendoza Response (Doc. 2286), (Fisher Response (Doc. 2276) at 4-5),

14  (R&R (Doc. 2374) at 5) (recommending that the District "present evidence . . . that the

15  training of administrators to evaluate the CRP competencies of teachers is effective).

16        A.  CRC Plan: Status Report

17        The District failed to include the current status of the CRC courses, i.e., "a list of

18  CR courses in schools at this particular moment in time." (TUSD Response (Doc. 2324) at

19  4.) This has been remedied to some extent with the Response, Exhibit A (2324-1), which

20  reflects one CR course for ELA and one for Social Studies per middle school grade at each

21  middle and K-8 school, except for Hollinger K-8 which has three humanities courses, one

22  for each grade 6-8. The status report does not reflect whether these middle school CRC

23  courses are from an African American or Mexican American perspective. Without

24  explanation, there are no CRC courses at Bormann K-8, Safford K-8, or Wakefield MS and

25  none at Meredith K-12.

26        In addition to there being no CRC courses at Meredith K-12 in the high school

27  grades, there is no reflection of any CRC courses at University High School. The Court

28  knows that there is one AP CRC course at University High School. The Court assumes this

AP CRC is the only CRC course offered there. The other high schools, generally, offer CRC courses in American History, Government, and English. The English CRC courses are offered in the 11 and 12 grades. The Court assumes the History and Government CRC courses are offered in the 9 and 10 grades. It looks like there is one CRC course offered at each school per grade per semester. In response to the Fisher Plaintiffs' inquiry regarding a pilot CRC, African American perspective, at Cholla High School, it is an English CRC for grade 11. There appears to be approximately 10 more CRC offerings from the Mexican American perspective than African American, but all high schools, except Rincon High School, have African American perspective CRC courses.

The attachment to the District's Response is the status of the current CRC program from which the District shall measure growth going forward. The District shall revise it to address the omissions and assumptions referenced here.

B.  The Way Forward: CRC and Instruction Over the Next Five Years (CRC: 5-Year Plan)

The District believes that rapid growth and enrollment in CRC courses is past, and "[f]urther expansion of staff and resources will depend on increased need determined by student demand and enrollment in CR courses. " (Status Report (2259-1) at 15.) It is "committed" to supporting those courses currently being offered at the current staff levels and with instructional resources necessary for their success. *Id.* "The district hopes to expand into content areas, grade levels and viewpoints when feasible based on student interest." As the Court understands the District's Status Report, it intends to maintain CRC courses at the current level. There is no objection, except for the general objection discussed below that the District is failing to make data-based programmatic decisions.

The Court's Order (Doc. 2474) directing revision to the ALE Policy Manual, however, creates an exception to the District's minimalistic approach to growth because the Court ordered expansion of AP CRCs. The District has been ordered to clarify a phased-in timeline (plan) for offering at least one CRC AP course at every high school and at least one CRC AAC at every middle school." (Order (Doc. 2474) at 17.) The District has also

been instructed to determine whether the dual-purpose, AP/Dual Credit, course design might apply to CRC AP courses as well. The CRC 5-Year Plan shall be revised, pursuant to the directives issued by the Court for revision of the ALE Policy Manual.

The District shall also revise the CRC 5-Year Plan to reflect the status of offered CRC courses at UHS. The District shall revise the CRC 5-Year Plan to reflect the status of offering CRC courses at Meredith K-12, Borman K-8, Safford K-8, and Wakefield Middle School.

The Mendoza Plaintiffs assert that the CRC materials fail to reflect the interconnectedness between the CRPI Department and other departments, especially MASSD and AASSD. The Court finds that pursuant to the directives above in the SSSD section of this Order, professional learning for CRPI ((Doc. 2259-2) at 2) shall be provided to the MASSD and AASSD Program Specialists and Behavioral Specialists to ensure their expertise in CRPI, including CRC instruction, as relevant to their areas of specialty. The Revised 5-Year Plan shall reflect this new role for the CRPI Department.

It is clear to this Court that the CRPI Department plays the leadership role and has primary responsibilities for all CRPI related areas, including CRC courses. All other departmental interconnectedness is covered by the reference in the CRC, Overview: "The CRPI Department (a) develops new CR course content (working with outside experts and internal District experts), (b) works with school administrators and teachers to offer new courses at schools and expand the number of sections of existing schools, and (c) works with the student services departments, the Family and Community Engagement Departments, the Language Acquisition Department and Communications in outreach to students and to families, to promote the benefits of culturally relevant courses." (Status Report (Doc. 2259-1) at 3.)

There were no objections to the roles and responsibilities performed by the CRPI Department, except for the Special Master's recommendation that the District be required to present evidence that the training of administrators to evaluate the CRP competencies of

teachers is effective. (R&R (Doc. 2374) at 5.) The District shall tender such evidence to the Special Master, which he shall review and, subsequently, approve.

The Special Master also recommends that the District present evidence to support its claims that non-academic benefits flow from CRC, especially CRPI. (R&R (Doc. 2374) at 5.) The request for evidence is expanded on by the Fisher Plaintiffs, who seek data reflecting reduced discipline incidents and improved academic achievement, including data evincing higher attendance, GPAs, test scores, and graduation rates and decreased discipline. (Fisher Response (Doc. 2276) at 4-5.) The District responds that "[t]here is no dispute that the District's program for culturally relevant curriculum and instruction is extraordinarily successful. It is likely the strongest such program in the entire country, and regularly held up as a model for other districts." (TUSD Response (Doc. 2324) at 2.) Additionally, the District relies on comments from the Special Master that "'TUSD may be the only school district to make CRP integral to its conception of effective teaching regardless of the subject being taught.'" (TUSD Response (Doc. 2324) at 2 n.1 (quoting ECF 2096 at 48)). "The Special Maser reported that the CRPI Department's culturally relevant course program 'has been shown to make a significant difference in academic performance.'" *Id.* (quoting Order (Doc. 2213) at 5.)[10]

The Status Report reflects that the District has commissioned a standing National Panel of Experts in Culturally Responsive Education for advice on the latest cutting-edge CRPI research, and the District consults with additional experts when necessary. In short, the District works with "premier scholars and practitioners in the fields of critical multiculturalism, culturally relevant and responsive education." (Status Report (Doc 2259-1) at 10.)

---

[10]The Court actually referenced the Special Master's objection to the costs for the SSSDs as being too much, especially because the "only research-based program that has been shown to make a significant difference in academic performance being carried out by the Culturally Responsive Pedagogy and Instruction (CRPI) Department." (Order (Doc. 2213) at 5.)

The CRPI Department, itself, is becoming a leader in the field and for the last four years has held an Annual Summer Institute for Culturally Responsive Education (SICRE), hosted at the University of Arizona and drawing renowned scholars to present keynote lectures over the three-day conference. Nearly 300 District certified staff members, including administrators, attended in 2019 and took advantage of the workshop sessions. (Status Report (Doc. 2259-1) at 13.) CRPI staff also attends, and has presented at, the American Educational Research Association Annual Conference in New York City. *Id.* In short, as the Court noted in the section above addressing AASSD and MASSD, the CRPI Department has extensive in-house expertise.

This brings the Court to the Status Report, the 5-Year Plan, Section E, Continued Improvement in Data Collection and Analysis, and the assertion which is in contention here, as follows:

> While there are numerous qualitative measures to assess the effectiveness of the CR initiative, the long-term impact of culturally responsive practices emerge (sic) in the quantitative data. The data points that often reflect the impact of CR include but are not limited to; higher attendance rate, increased GPA, higher graduation rates, increased college-going rates, reduced incidents of student discipline, and increased scores on standardized and benchmark tests.

(Status Report, 5-Year Plan (Doc. 2259-1) at 17.)

The District explains that the limitation in assessing the "CR initiative" lies in the difficulty in disaggregating the various elements comprising this approach. (Status Report: 5-Year Plan (Doc. 2259-1 at 17-18.) The Court has experienced firsthand the difficulty in addressing the far reaching and interconnected USP strategies, one of which is CRPI, including CRC, and the various behavioral strategies like restorative practices, FACE, MASSD and AASSD, etc.—all strategies intended to lead to improved performance. The District explains: "While isolating the cause and effect connection with specific aspects of this approach is difficult, research shows that these approaches are effective in increasing student achievement and significantly reducing the 'achievement gap.'" (Status Report: 5-Year Plan 2259-1 at 18.)

First and importantly, CRC and CRPI are different strategies, with CRPI interconnected and related to CRC in the same way that CRPI is related to other USP strategies and programs. In other words, CRPI is an umbrella covering all pedagogy, including CRC. Given the admitted lack of data-based evidence regarding program efficacy, the Court must rely on the Special Master's statement: "A rigorous study of the academic benefits of CRC courses was undertaken by established scholars and published in the leading education journal. There have [been] other studies that attest to the academic benefits of culturally responsive pedagogy." (R&R (Doc. 2374) at 5.) The Court accepts that the CRC and CRPI provisions in the USP are research-based strategies for improving academic achievement, but that does not mean that the District can bypass data driven analysis regarding the effectiveness of both. Like its mandated implementation of CRPI and CRC, the USP also mandated that both programs be monitored for effectiveness, USP § V.G, Reporting, and USP § X.A, Evidence Based Accountability System (EBAS.)

Difficulty analyzing the effectiveness of CRPI is not an excuse for not assessing the effectiveness and impact of the CRC courses. Without this analysis, the decision to not continue the aggressive expansion of CRC courses is not data-based, but rather is an arbitrary determination based on how many students may want to take CRC courses. It is important to know how many students need to take these courses based on the effectiveness of CRC courses to improve academic achievement. CRC data shall be analyzed now for program effectiveness.[11] The CRC data and report shall be included in the District's 2020-21 Annual Report (2020-21 DAR). The 5-Year Plan, Section E, shall be revised accordingly, to reflect this review and analysis to be conducted and reported this year.

---

[11] The District Status Report included Section 5, Assessment of Program Effectiveness, which assessed program effectiveness in a number of ways: feedback from CRC teachers indicating areas of strength and weaknesses; teacher and student surveys reflecting program satisfaction with content, and Master Teacher observations of CRC teachers' use of culturally relevant pedagogy. (Status Report (Doc. 2259-1) at 11.) This is not the data-driven analysis needed to provide an evidentiary basis to support the effectiveness of CRPI and/or CRC to improve academic achievement, such as: "higher attendance rates, increased GPA, higher graduation rates, increased college-going, reduced incidents of discipline, and increased scores on standardized and benchmark tests." (Status Report: 5-year Plan (Doc. 2259-1) at 17.)

The District has now been operating CRPI for several years under the USP, and has a very experienced and expert CRPI Department, which should be able to develop an appropriate study to mirror the other allegedly existing research-based study of the effectiveness of CRPI, at least in the context of improving academic achievement. If the CRPI Department needs additional expertise, there is the standing National Panel of Experts in Culturally Responsive Education, or any other experts.[12] The District needs to act immediately to develop a data-driven research-based methodology for assessing the effectiveness of TUSD's CRPI, including CRC. The 5-Year Plan, Section E, shall reflect a schedule for conducting this analysis, including review of the existing data being gathered to ensure it satisfies study parameters and the anticipatory "long-term" time for operations, prior to final analysis, with final analysis occurring within the next five years.

**Accordingly,**

**IT IS ORDERED** that the recommendations in the Report and Recommendations Re: AASSD and MASSD (Doc. 2347, 2404) are not adopted by the Court.

**IT IS FURTHER ORDERED** that the Court adopts the MASSD Operating Plan as originally filed on December 6, 2018 (MASSD Plan (Doc. 2151-2) at 3), as clarified by the Revised MASSD Operating Plan (Doc. 2265-2 at 2), and adopts the 2018-19 Reorganization Plan ((Doc. 2251-2 at 20); (Doc. 2265-2 at 16)), referencing the 2018-19 Strategic Plan (2287-1).

**IT IS FURTHER ORDERED** that the Court adopts the AASSD Operating Plan, filed on December 6, 2018, (Doc. 2151-1), as clarified by the Revised AASSD Plan (Doc. 2165-1), and adopts the AASSD 2018-19 Restructuring Plan ((Doc. 2276) at 28).

**IT IS FURTHER ORDERED** that the District shall consider the directives in this Order as binding during this year's operations and for purposes of the annual review (winter or early spring) of the 2020-21 MASSD and AASSD operations, including

---

[12] *See* Cabrera, N., Milem, J., Jaquette, O., Mar, R. (2014). Missing the (Student Achievement) Forest for All the (Political) Trees: Empiricism and the Mexican American Studies Controversy in Tucson. *American Educational Research Journal,* 1035. (Status Report, Framework for Student Academic Achievement (Doc. 2259-2) at 15.)

preparing the Status Reports for AASSD and MASSD, the respective 2020-21 Strategic Plans, and binding until the updated AASSD and MASSD Operating Plans are finalized, which shall be no later than SY 2021-22, depending on whether this year's annual review is in the winter or spring.

**IT IS FURTHER ORDERED** that AASSD and MASSD operate within the parameters of MTSS, with MTSS having a gatekeeping role for the delivery of direct student support services for at-risk African American and Latina students, including ELL students.

**IT IS FURTHER ORDERED** that the 2020-21 Strategic Plans for AASSD and MASSD shall include ELL Addendum provisions.

**IT IS FURTHER ORDERED** that the Special Master's Report and Recommendation Re: CRC Plans (Doc. 2370, 2374) is adopted: the District shall provide to the Special Master evidence that the training of administrators to evaluate the CRP competencies of teachers is effective, which training he shall approve, and subsequently, the District shall file a Notice of Compliance no later than the end of SY 2020-21.

**IT IS FURTHER ORDERED** that within 30 days of the filing date of this Order, the District shall revise the CRC: 5-Year Plan ((Doc. 2259-1) as described herein for the following:

    a.  To include the status "listing of CR courses in schools at this particular moment in time," revised to address omissions and assumptions.

    b.  To comply with the directives issued by the Court for the ALE Policy Manual for a plan and timeframe for offering at least one CRC AP course at every high school and one CRC AAC at every middle school.

/////

/////

/////

/////

/////

c.  To revise Section E, Continued Improvement in Data Collection and Analysis, for a CRC efficacy report this year to be included in the 2020-21 DAR and for a CRPI efficacy study within the next five years.

Dated this 14th day of August, 2020.

David C. Bury
United States District Judge