1
2
3
4
5

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB |
|---|---|
| Plaintiffs | (Lead Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB |
| Plaintiffs, | (Consolidated Case) |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | **ORDER** |
| Tucson Unified School District, et al. | |
| Defendants. | |

Supplemental Petition for Unitary Status: GRANTED IN PART and reserved in part pending compliance for USP § V.A as previously ordered and for § X, as ordered herein.

**PROCEDURAL HISTORY**

On September 6, 2018, this Court granted unitary status in part and adopted recommendations by the Special Master for Completion Plans, which were designed to bring the District into full compliance with the Unitary Status Plan (USP). The Court made specific findings, identified specific deficiencies in respect to attaining unitary status for specific programs, and issued express directives and set benchmark deadlines for completing the work required under the USP.

In adopting the Special Master's recommendations, the Court called for the District to file Notices of Compliance related to the Completion Plans and other directives of the Court, and held that such notices would trigger supplemental briefing by the parties and the Court's reconsideration of unitary status.[1] The Court set two Completion Plan benchmarks: December 1, 2018 and September 1, 2019. Compliance was only partially attained by these dates, and the District was required to file supplemental Notices of Compliance. For every Notice of Compliance, including supplemental ones, the parties and Special Master provided review and comment, and the Court addressed all assertions of noncompliance and ineffectiveness until finally, compliance was attained, except for a few limited tasks which remain as noted herein. The Court turns to the District's Supplemental Petition for Unitary Status filed on December 31, 2019. (Supp. Petition (Doc. 2461))

The Supplemental Petition has been fully briefed by the parties, and the Special Master recommends that the Court grant unitary status, except for a few specific objections which have been addressed by the Court over the course of the past year and are now moot.

---

[1] In 2017, the District filed a Motion for Unitary Status. (Doc. 2005.) The Court denied it as moot and directed that the District's 2016-17 Annual Report (DAR) include a detailed analysis regarding compliance with each USP provision and that the Special Master's 2016-17 Annual Report (SMAR) (Doc. 2096) include a like status report regarding progress made under the USP. The District filed an Analysis of Compliance (USP RAC (Doc. 2075)) simply asserting that evidence reflected there was no basis to conclude it would revert to segregated schools and its efforts since the inception of the USP reflected its good faith. The District stopped short of renewing the Motion for Unitary Status, however, it objected to the Special Master's recommendation for partial unitary status by arguing that he should have recommended immediate and complete termination of supervision because the District had attained unitary status. (TUSD Response (Doc. 2099)).

The Court adopts the recommendation of the Special Master after being fully advised by Plaintiffs' Objections. The Court finds in favor of the Defendant, and hereby makes the following special Findings of Fact and Conclusions of Law pursuant to the Federal Rules of Civil Procedure, Rule 52(a) and (c) which constitutes the decision of the Court that the Tucson Unified School District has attained unitary status, except where the Court has found compliance contingent on outstanding filings from the District as specified herein.

## FINDINGS OF FACT

To the extent these Findings of Fact are also deemed to be Conclusions of Law, they are hereby incorporated into the Conclusions of Law that follow:

**1.** The District has moved forward with deliberate speed over the past approximately six years. In 2013, it agreed to participate in drafting and adopting the USP as a consent decree. It developed action and implementation plans for all USP provisions and made adjustments to improve program effectiveness as ordered by the Court. By SY 2016-17, when the Court last reviewed unitary status, the District was implementing those plans. Since then, the District has monitored and tracked data relevant for assessing program effectiveness and complied with all operational directives from this Court, issued in response to challenges asserted by the Plaintiffs and Special Master. As of now, all USP programs have been designed to meet best practices standards and to be the most effective programs for each USP provision based on research. There has been full implementation of USP strategies, and the District is being operated, accordingly, under the USP, now and into the future. These operations over six years, from 2013 through now, have eliminated the vestiges of segregation to the extent practicable over this period of time.

**2.** The District has acted in good faith to comply with the USP over the past six years, which is a reasonable period of time to establish a lasting commitment to the USP and the Constitution, rather than merely being a temporary constitutional ritual by the District's board.

**3.**     For over six years, the District has demonstrated its good-faith commitment to the whole of the USP and to those provisions of the law and the Constitution that predicated judicial intervention, and where contingencies for compliance remain, they do not call into question the District's commitment to the whole of the USP or to the Constitution.

**4.**     The District has the commitment, the relevant data, technology, and the expertise to make program decisions, now and in the future, based on the effectiveness of strategies and programs to integrate its schools and afford equal access to educational opportunities and improve academic achievement for African America and Latino, including English Learner (EL),[2] students.

**5.**     The District's course of action reflects more than a mere promise. The District has now done the things previously found lacking, *see supra* ¶¶ 14-15, that once precluded a finding of good faith.

**6.**     It is time for the District to be released from judicial oversight and held accountable by the community.

**7.**     It remains, pursuant to the USP § X, for the Special Master to oversee the District's development of a Post Unitary Status Plan (Post-USP) to restore accountability, through transparency, in the governmental systems that are designed to oversee the District's operations.

**8.**     On December 31, 2019, the District filed the Supplemental Petition for Unitary Status. (Doc. 2461.) The Special Master filed a Report and Recommendation (R&R) (Doc. 2468) recommending that the Court find unitary status has been attained and grant the Petition. The Court adopts the recommendation of the Special Master based on the Findings of Fact and Conclusions of law as stated herein.

History

**9.**     "In 1974, two class action lawsuits were filed alleging segregation in TUSD between White students and African-American students (Fisher Plaintiffs), CV 74-90 TUC DCB, and Mexican-American students (Mendoza Plaintiffs), CV 74-204 TUC

---

[2] English Language Learners (ELL). (USP § II.E.3 (Doc. 1713) at 11.)

DCB. The cases were consolidated in 1975 and went to trial in 1977." (Order (Doc. 2123) at 4.) [3]

**10.**    "In 1978, the Court found that *de jure* discriminatory segregation existed in TUSD. Regardless of the fact that only Black students were statutorily prohibited from attending White schools, Judge Frey found that even as the District dismantled the 'dual Black and White school system and, thereafter, there existed some intentional segregation of minority students (Black and Mexican-American) from Anglo-students.'" (Order (Doc. 2123) at 4 (quoting Order (Doc. 1119) at 15 n.9), *see also Fisher v. TUSD*,[4] 652 F.3d 1131, 9781 n.9 (9th Cir. 2011) (citing finding of *de jure* discrimination without criticism)). Judgment was entered for Plaintiffs.

**11.**    Instead of proceeding on appeal, "the parties entered into a Settlement Agreement to resolve the consolidated case. 'It appears likely that the Settlement Agreement resolved the appellate issues raised by the class Plaintiffs because Judge Frey approved it without ruling on the pending motions and ordered that the Stipulation would be the controlling Order of the Court.'" (Order (Doc. 2123) at 4-5 (quoting Order (Doc. 1119) at 4-5 (citing *Fisher,* 652 F.3d at 1137 n.10 (quoting Settlement Agreement: "the rights and obligations of the parties to be determined solely by its terms and the terms of any subsequent stipulations or orders entered herein pursuant to it.")).

**12.**    "The 1978 Settlement Agreement provided for TUSD to implement 'its proposed desegregation plans in a number of specified schools, cooperate with parents to develop and examine future student assignment policies at several additional schools, and eliminate discrimination in faculty assignments, employee training, and in polices on

---

    [3] "More detailed discussions of the history of this case have been given by this Court in prior Orders. (Docs. 1119, 1270), *see also Fisher v. Tucson USD*, 652 F.3d 1131, 9781 n.9 (9th Cir. 2011) (citing *Mendoza v. [TUSD],* 623 F.2d 1338, 1341 (9th Cir. 1980) (describing early case history))." (Order (Doc. 2123) at 4 n.1.)

    [4] *Fisher v. TUSD,* 549 F. Supp. 2d 1132 (Ariz. 2008) (granting unitary status), rev'd 652 F.3d 1131 (9th Cir. 2011).

bilingual education, testing, and discipline.'" (Order (Doc. 2123) at 5 (quoting *Fisher*, 652 F.3d at 1137 (citing *Mendoza v. TUSD,* 623 F.2d 1338, 1342 (9ᵗʰ Cir. 1980)). The Settlement Agreement prohibited TUSD from "engaging 'in any acts or polices which deprive any student of equal protection of the law' based on race or ethnicity.'" *Id.*

**13.**     "The District was supposed to operate for five years under the terms of the Settlement Agreement before TUSD could file a motion to dissolve it. Around the end of this period, in 1983, the Arizona State Legislature enacted a funding provision, A.R.S. § 15-910G, to allow school districts operating under court orders to generate additional tax revenues above and beyond educational spending limitations to pay for desegregation activities. By and large the express provisions of the Settlement Agreement had been implemented within the five-year period, but the case did not end." (Order (Doc. 2123) at 5 (citing Order (Doc. 1119) at 8, 10, 18, 23)). "Instead, TUSD spent millions of dollars, *id.,* over the course of approximately twenty years before the Court called for TUSD to show good cause why unitary status had not been attained." *Id.* (citing Order (Doc. 1052)). "The question was briefed by the parties, and on April 24, 2008, this Court found unitary status had been attained, but not without finding some fault with the District's failure to consider the effectiveness of the programs financed by desegregation dollars over this extended period of time." *Id.* (citing Order (Doc. 1270)). "This Court's decision was reversed by the Ninth Circuit Court of Appeals on August 10, 2011." *Id.*

**14.**     In the 20-plus years of operation under the 1978 Settlement Agreement, "the School District 'failed to act in good faith in its ongoing operation ... under the Settlement Agreement.' . . . [specifically,] the School District had failed to make 'the most basic inquiries necessary to assess the ongoing effectiveness of its student assignment plans;' had 'exacerbated the inequities' of racial imbalances through its 'failure to assess program effectiveness;' had 'failed to respond' to 'legitimate and important' concerns about staff cuts at minority schools; had 'failed to comply' with the Settlement Agreement's requirement that it regularly review recruitment, hiring, and promotion in order to 'guard against discrimination or inequities;' had never 'undertaken a

comprehensive analysis of suspension and expulsion data by ethnicity and race;' had not given 'time and attention' to how the African American Studies Department could aid the quality education of minority students; and had failed to review program effectiveness in order to ensure quality education for minority students." *Fisher v. Tucson Unified Sch. Dist.,* 652 F.3d 1131, 1142 (9th Cir. 2011) (quoting this Court's findings without citation).

**15.**    The appellate court held the above findings cannot be "reconciled with Supreme Court precedent." "[A] plan that merely promises future improvements is [not enough;] [t]o the contrary, it is only '[a] history of good-faith compliance" that "enables the district court to accept [a school district's] representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future.'" *Fisher v. Tucson Unified Sch. Dist.,* 652 F.3d 1131, 1142 (9th Cir. 2011) (quoting *Freeman*, 503 U.S. at 498).

**16.**    "The case was remanded to this Court 'to maintain jurisdiction until it is satisfied that the School District has met its burden by demonstrating – not merely promising—its good-faith compliance . . . with the [Settlement Agreement] over a reasonable period of time.'" (Order (Doc. 2123) at 6 (quoting  *Fisher v. TUSD*, 652 F.3d at 1143-44 (quoting *Freeman v. Pitts*, 503 U.S. 467, 498 (1992)). "'The court must also be convinced that the District has eliminated 'the vestiges of past discrimination . . . to the extent practicable' with regard to all of the *Green* factors.'" *Id.* (quoting *Fisher,* 652 F.3d at 1144 (quoting *Freeman*, 503 U.S. at 492 (citing  *Green v. County School Board of New Kent County VA,* 391 U.S. 430 (1968)). Here, desegregation efforts have been defined broadly and not limited to the *de jure* segregation found by Judge Frey to exist in 1977 at certain specific schools, which was the impetus for the relief he granted in 1978.

**17.**    "Upon returning the case to its active docket, the Court appointed a Special Master to develop a plan by which the District would attain unitary status. Given the history of the case, this Court directed the plan to be specifically designed to address the *Green* factors relevant to attaining unitary status in this case and for a plan of action that

would avoid a repeat performance of the District operating under court jurisdiction in perpetuity. The parties entered into a stipulated plan, i.e., a consent decree: the USP. The Court adopted the USP in 2013." (Order (Doc. 2123) at 6); (Order (Doc. 1436) (adopting the USP); (USP (Doc. 1415); (Doc. 1713) (revised to correct typographical errors).[5]

---

[5] The District rewrites history by asserting that "[t]he Court entered the Unitary Status Plan ("USP") as an order, over the District's objections, . . .." (Supp. Petition (Doc. 2461) at 11.) In fact, on remand TUSD asked the Court to refer the case to a mediator, either a Magistrate Judge or the 9th Circuit Mediation program, for a settlement conference. Using this forum, the District proposed it would draft a plan, having as its goal, "the elimination of all vestiges of a segregated system and the attainment of unitary status within a reasonable time period." (Order (Doc. 1320) at 2.) The Plaintiffs objected to the District taking the lead on this endeavor, and after full briefing, the Court decided to appoint a Special Master, pursuant to Fed. R. Civ. P. 53(a), to oversee the undertaking. *Id.* at 3.

After initially being at odds regarding the nominee for Special Master, on December 6, 2011, the District reported that it agreed to the appointment of Dr. Willis Hawley, the preferred candidate by the Fisher Plaintiffs, who would employ the Plaintiffs' experts to assist him, especially in the area of student assignment. (Order (Doc. 1345)). The District prepared the draft Order, (Doc. 1345-1), for appointment of the Special Master, which clearly reflects that the parties intended the USP to be prepared as a consent decree, approved by the Court, to lead to unitary status. (Order (Doc. 1350) at 3, 4-6, 9). *See also*, (Order (Doc. 1377) at 2 (extending deadline for submitting the USP to the Court, pursuant to the parties' stipulation to work "collaboratively" to resolve any objections to the initial USP proposed by the Special Master prior to presenting it to the Court; granting nine additional weeks to develop "greater consensus among the Parties, greater specificity where desired, greater coherence, and a more solid legal basis for the USP.")

The Court extended the time for filing the USP, because the parties represented they agreed there were "substantial areas of agreement regarding the Unitary Status Plan which [could] be addressed by Consent Decree" and needed an extension "to draft the Consent Decree–Unitary Status Plan and to prepare a single document identifying any remaining areas of disagreement including the Parties' positions and/or objections with respect to those areas." (Order (Doc. 1398) at 2.) The parties, likewise, agreed "to make a good faith effort to reach agreement on as many areas of the USP as possible." *Id.* The parties reported they had "engaged in intense negotiations, resulting in a proposed Consent Decree [reflecting] the agreement of all Parties to numerous *Green* and ancillary factors, with only a few areas of disagreement or objections anticipated." (Order (Doc. 1405) at 2.) Due to hurricane Sandy, one last extension of time was necessary, but instead of the Special Master filing the USP, the parties agreed to prepare the Consent Decree, present it to the Court and simultaneously identify all areas of objection, and where appropriate include alternate language or provisions. *Id.* The parties did precisely this. *See* (Stipulation (Doc. 1411)). To the extent the District made objections those can be found in the USP, Exhibit A. *Id.* The Court ruled on each objection and adopted the USP, as so revised. (Order (Doc. 1436)). The USP was filed as adopted by the Court on February 20, 2013 (USP (Doc. 1415)), and revised to correct typographical errors on November 6, 2014 (Doc. 1713)). The USP expressly states that it is a "Consent Order." (Doc. 1713) at 5.)

<u>The Unitary Status Plan (USP)  (Doc. 1713)</u>

**18.**    "The USP is an ambitious and comprehensive plan developed to remedy the past vestiges of discrimination and segregation that existed in TUSD." (USP (Doc. 1713) at 5 (citing Order (Doc. 2123) at 7 (relying on 2016-17 SMAR (Doc. 2096) at 3-4)). "[T]he Parties expressly entered "into this Consent Order ("Order") to resolve the longstanding desegregation case against the District." (USP (Doc. 1713) at 5.)

**19.**    The USP, adopted on February 20, 2013 (Doc. 1415), amended to correct typographical errors (Doc. 1713), replaced the 1978 Settlement Agreement as the operative consent decree, which will guide this Court's determination of unitary status.

**20.**    "In addition to strategies to promote and sustain integration, the USP includes provisions to provide students with transportation, increase the diversity and effectiveness of teachers and school administrators; strengthen and enrich the curriculum and increase access to advanced learning experiences; develop safe, productive, inclusive and supportive school environments; provide services to students with special needs; meaningfully engage families; ensure equity in facilities and technology-facilitated learning resources; provide students with extracurricular activities; and create information systems and budgetary processes that facilitate accountability, strategic resource allocation and effective management." (Order (Doc. 2123) at 7[6] (citing 2016-17 SMAR (Doc. 2096) at 3-4)).

**21.**    The USP provisions are contained within interconnected or interrelated sections, as follows: 1) Student Assignment; 2) Transportation; 3) Administrators and Certificated Staff; 4) Quality of Education; 5) Discipline; 6) Family and Community Engagement; 7) Extracurricular Activities; 8) Facilities and Technology, and 9) Accountability and

---

[6] "The 1978 Settlement Agreement's approach to eliminating discrimination was focused on testing, whereas the USP student achievement provisions are exceedingly broader. But even under the 1978 Settlement Agreement, this Court rejected a narrow scope of factors for assessing unitary status and held that TUSD had spent millions of desegregation dollars over the course of this case to close the student achievement gap, therefore, student achievement was at least one measure of program effectiveness." (Order (Doc. 2123) at 11-12 n. 4 (citing Order (Doc. 1119) at 15 n.7, 22-23.))

Transparency." (Order (Doc. 2123) at 8 (citing USP (Doc. 1713)). *Cf.,* (Executive Summary (Doc. 2384); Orders (Docs. 2213 and 2217) (requiring Executive Summary to reflect interrelationships between USP provisions and assist the Court's determination of unitary status).

**22.**     "The USP called for the development of specific action plans for each of its provisions, implementation of the action plans, and operations pursuant to the action plans for a time period sufficient for the District to determine the effectiveness of the various plans and make modifications accordingly, and an end date 'not prior to the end of the 2016-2017 school year.'")" (Order (Doc. 2123) at 6 (quoting USP (Doc. 1713) § XI.A.2)).

**23.**     "Annually, the District files a report of activities undertaken pursuant to the USP: the District's Annual Report (DAR). The Special Master follows with his annual report: the SMAR. The parties may make objections," (Order (Doc. 2123) at 7), and the Court resolves any issues raised in the objections.[7]

**24.**     The Special Master filed the first annual report, SY 2014-15 SMAR, on July 31, 2014. (Doc. (1641). He reported the development of a set of plans, 28 Action Plans and 107 Implementation Plans, with Action Plans for the most significant elements of the USP and Implementation Plans either describing the steps to implement the Action Plans or to implement other less significant elements of the USP. The District drafted the proposed plans, with review and comment by the Plaintiffs and the Special Master, and the Court resolved objections based on a R&R from the Special Master and full briefing by the parties. Nineteen of the 28 Action Plans were finalized, but objections were pending. The Action Plans were behind schedule due to time spent developing the USP as a consent decree, but the Special Master reported the District was moving forward even while waiting for the Court

---

[7] The parties have had access to the Court to present any issue at any time by first presenting it to the Special Master for resolution, and if not resolved by him, thereafter to be submitted to the Court by R&R for resolution after full briefing by the parties.

to resolve Plaintiffs' Action Plan challenges. (SY 2014-15 SMAR (Doc. 1641) at 3.)

**25.**    The USP provides for "an end date 'not prior to the end of the 2016-2017 school year.'" *See supra ¶ 22.* "'The Court [has affirmed] the January 6, 2012, Order, paragraph 7, directive that annual extensions of judicial oversight beyond three years will be based on reasons of unattained compliance by the District with the USP. Three years out, the Court [took] an inventory of the District's progress towards unitary status.'" (Order (Doc. 2123) at 14 (quoting Order (Doc. 2086) at 2).

<u>SY 2016-17 Status of USP Compliance (Order (Doc. 123)</u>

**26.**    The Court's comprehensive review of unitary status in 2018 "marked the three-year presumptive end-date, SY 2016-17, for the USP. Therefore, the Court required both the DAR and SMAR to include a comprehensive analysis of the District's progress under the USP and a status report to the Court on whether or not unitary status has been attained in whole or in part." (Order (Doc. 2123) at 7.)

**27.**    Subsequent to the 2016-17 DAR, (Docs. 2057-2068), the Analysis of Compliance with USP (USP RAC) (Doc. 2075), and the Revised ALE USP RAC (Doc. 2092), "the Special Master identifie[d] specific non-compliance issues, [made] specific recommendations for activities necessary for compliance, and provide[d] specific deadlines for the District to complete such activities. The Plaintiffs, who [] had full and ongoing discovery rights including the ability to make requests for disclosures and answers, [] filed Responses and made objections, . . .. [The] Court [] reviewed thousands of pages, including [] referenced briefs and any referenced supporting evidence." (Order (Doc. 2123) at 14 (relying on 2016-17 SMAR (Order (Doc. 2086) at 3) (citations omitted)).

**28.**    The Special Master developed, and the Court adopted, Completion Plans to eliminate discrimination to the extent practicable as proposed in USP Action and Implementation Plans, which were based on data and research, and best practices. (Order (Doc. 2123) at 12.)

29.     While the Defendants objected to the Special Master's recommendations that the Court adopt Completion Plans, "[t]he District began its compliance effort upon receipt of preliminary drafts of the SMAR from the Special Master in December, 2017 and January, 2018, and [began working] with the Special Master to refine many of the completion steps set out in the SMAR. (Order (Doc. 2123) at 12 (citing TUSD Response (Doc. 2099) at 4)). The District acted to implement recommendations by the Special Master even while it asserted that it was not required to act accordingly, *id.,* and acted to comply with the Court's adoption of those recommendations even though it appealed them, (Order (Doc. 2213) at 2); *see e.g.,* (Order (Doc. 2555) at 6) (noting District's express intent to continue pursuant to oversight directives pending appeal of Orders issued in 2020).

30.     By three-years out, SY 2016-17, "the Court detected a change in attitude. From its previous reticence, the District [appeared] committed to bringing this case to a conclusion by implementing Completion Plans for USP provisions where unitary status ha[d] not yet been attained." (Order (Doc. 2123) at 13.)

31.     On September 6, 2018, after full briefing by all parties and the Special Master on whether the District had attained unitary status, the Court granted unitary status in part, retained judicial oversight beyond three years based on findings that identified specific USP programs and provisions where the District had not yet attained compliance with the USP, adopted recommendations made by the Special Master and the Plaintiffs compliance with each USP section, and correspondingly issued express directives, including requiring the District to plan for future post unitary status operations. (Order (Doc. 2123) at 14.) The Court did not "grant unitary status in full because it found that the School District [had] not demonstrated to the public, including African-American and Hispanic[8] parents and students, its good-faith commitment to the whole of the USP and to those provisions of the law and the Constitution that predicated judicial intervention." (Order (Doc. 2123) at 15.)

---

[8] Mendoza Plaintiffs were referred to as Hispanic in the 1978 Settlement Agreement and Latino in the USP. The terms are used interchangeably.

**32.** On September 6, 2018, the Court adopted the Completion Plans and other recommendations by the Special Maser and Plaintiffs and set two benchmark deadlines for reviewing compliance: December 1, 2018 and September 1, 2019. Neither deadline saw full compliance, but eventually full compliance was attained as identified below, except for a final revision of the ALE Policy Manual and corresponding revision of the Transportation Plan are due April 26, 2021, and development of a Post-USP, as directed herein.

**33.** The first benchmark, December 1, 2018, included the following USP provisions:

    a. § IV, §§ A, F.1, I.3, Administrative and Certificated Staff Diversity: The Court ordered the District to file the 2018-19 Teacher Diversity Plan (TDP), including attrition and Grow-Your-Own (GYO) Program studies. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs. 2217, 2273, 2497, 2564), including the Order finding compliance issued on February 9, 2021 (Doc. 2564), and the African American Diversity Plan Addendum for Black Certificated Staff (Doc. 2568) filed 3/9/2021).

    b. § IV.E, Assignment of Certificated Staff, Beginning Teachers: The Court ordered the District to comply with directives related to centralizing the hiring process and certification for placing beginning teachers at Racially Concentrated or under-achieving schools. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs. 2217, 2272, 2273, 2497, 2564), including the Order finding compliance issued on February 9, 2021. (Doc. 2564.)

    c. § V.E.1.b.i, Student Engagement and Support: The Court ordered the District to clarify the interrelationships between African American Student Services Department (AASSD), Mexican American Student Services Department (MASSD), including EL Action Plan, and Family and Community Engagement (FACE) and file an EL Action Plan for dropout prevention and graduation (DPG). The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs 2213, 2217, 2273, 2363, 2386), including the Order finding compliance related to establishing the EL DPG issued on November 18, 2019 (Order (Doc. 2363), and the Order finding the District has addressed the interrelationships between FACE performed by AASSD and MASSD, including ELs issued on December 3, 2019 (Doc. 2386).

    d. § V.E.1-8, Student Engagement and Support, Post-unitary Status Plan for AASSD and MASSD: The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs. 2213, 2359, 2363, 2386, 2508), including the Order issued on August 14, 2020 (Doc. 2508), adopting AASSD and MASSD Plans, as revised.

- 13 -

e. § V.F, Student Engagement and Support, Inclusive School Environment and Professional Learning Plan: The Court ordered the District to comply with the Completion Plan for maintaining inclusive school environments and related professional learning. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs. 2217, 2273, 2497, 2502), including the Orders finding compliance issued on December 13, 2019 (Doc. 2497) and on July 31, 2020 (Doc. 2502).

f. § VII, Family and Community Engagement (FACE): The Court ordered the District to address school-site services and develop data tracking capabilities, using expert advice on effective family engagement strategies, to update the FACE Action Plan. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Doc. 2213, 2217, 2273, 2363, 2386), including the findings of compliance related to school websites (Order (Doc. 2273) issued on September 10, 2019, integration into AASSD and MASSD Plans (Order (Doc. 2363) issued on November 18, 2019, and the final Order (Doc. 2386) issued on December 3, 2019.

g. § IX.B.1.iv and B.4, Facilities and Technology: The Court ordered the District to comply with the Professional Learning Plan for teacher proficiency in using technology to facilitate student learning. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Doc. 2217, 2273, 2492, 2497, 2502, including the findings of compliance related to the Resource Index (Order (Doc. 2497),[9] hiring consultants (Order Doc. 2492), and the final Order (Doc. 2502) issued on July 31, 2020 approving the Professional Learning Plan for Inclusive Environments and Discipline.

**34.** The second benchmark, September 1, 2019, included the following USP programs:

a. § II, Student Assignment, § E, Magnet Program: The Court ordered the District to file a 3-Year Plus Integration Plan, prioritizing magnet program expansion and priority non-magnet school integration plans, if any are practicable, and an Outreach and Recruitment (ORR) Addendum combined for both magnet schools and ALE programs. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs. 2205, 2471, as amended by 2486, 2485, 2557), including the Order finding compliance for USP § II, Student Assignment, § E, Magnet Program, and § I, Outreach and Recruitment issued on December 23, 2020. (Order (Doc. 2557)).

b. § V.A, ALE Policy Manual: The Court ordered the District to file the ALE Policy Manual. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs. 2474, 2512, 2561), including the Order finding

---

[9] *See* (R&R Re: Professional Use of Technology to Teach: Technology Integration Observation Tool (TIOT): NC (Doc. 2477) Approved) (Doc. 2510.)

compliance issued on January 26, 2021, (Order (Doc. 2561), contingent on the District filing the Revised Final ALE Policy Manual and Appendices, Full Time GATE and AACs-AP Alignment Map and Schedule, and the Revised Final Transportation Plan due: April 26, 2021.

c. § III, Transportation: The Court retained jurisdiction over transportation as relevant to determining unitary status for the Magnet Programs and Advanced Learning Experiences (ALE) Programs. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders for the Magnet Program (Docs. 2205, 2471, 2485, 2486, 2557) and for ALE (Docs 2474, 2512, 2561), contingent on the District filing the Final ALE Policy Manual with corresponding revisions to the Transportation Plan, due: April 26, 2021. (Order (Doc. 2561.)

d. § V.C, Dual Language (TWDL) Plan: The Court ordered the District to file the Dual Language, Two-Way Dual Language (TWDL) Plan. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (2295, 2483), including the Order finding compliance issued on June 19, 2020 (Doc. 2483.)

e. § V.E.6.a.i-ii, Student Engagement and Support, Culturally Relevant Curriculum (CRC) Comprehensive Plan and Culturally Relevant Pedagogy (CRP) Professional Learning Plan: The Court ordered the District to file the CRC Comprehensive Plan and CRP Professional Learning Plan. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders (Docs. 2508, 2561 (CRC AACs and AP course), with the Special Master to approve the District's training of administrators to evaluate the CRP competencies of teachers as being effective, due: May 2021. (Order (Doc. 2508) at 28-29, 33.)

f. § VI, Discipline: The Court ordered the District to file a detailed progress report specifically addressing each provision of the Discipline Completion Plan and Professional Learning Plan. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders, including those related to compliance and directing the District to continue reporting Discipline data and program information in the 2019-20 DAR as made in its Order (Doc. 2502) issued on July 31, 2020.

g. § VIII, Extracurricular Activities: The Court ordered the District to document that there are no disparities between Racially Concentrated and Integrated schools and that extracurricular activities that are used to facilitate positive interracial interactions. The Court adopts the findings of compliance made in the September 6, 2018 Order (Doc. 2123) and all subsequent relevant Orders, including those related to compliance, made in its Order (Doc. 2364) issued on November 18, 2019. *See* (Supp. NC (2387) (no objections, thereafter).

h. § IX.A and B, Facilities and Technology, FCI and TCI: The Court ordered the Special Master to recalculate the FCI scores and the District to update the TCI internet access and correct any disproportionality. The Court adopts the findings of compliance made in the September 6, 2018

Order (Doc. 2123) and all subsequent relevant Orders, including those related to compliance, made in its Order (Doc. 2362) issued on November 18, 2019.

**35.**    The USP, § X.A.1, Accountability and Transparency, Evidence-based Accountability System (EBAS): EBAS is a data system capable of tracking individual student demographics, academic and behavioral data, and running reports that flag when students do not meet pre-determined goals or expectations for academic performance or behavioral concerns. In this way EBAS assesses program effectiveness for each student and *in masse* for each USP program.  (Order (Doc. 2123) at 140.)

**36.**    The USP requires the District to ensure that EBAS data is used to assess program effectiveness, especially for § V.A, increasing participation and performance in ALEs, § V.E, the Post-unitary Status Plans for AASSD and MASSD, and § VI, reducing discipline, especially exclusionary discipline. (Order (Doc. 2123) at 98, 121, 132.) "[I]f the EBAS is being effectively used in these three areas then the requisite degree of professional development related to the implementation and use of EBAS has occurred." *Id.* at 143.)

**37.**    The Court rejects the District's assertion that "USP § X.A, EBAS, does not call for more than its development and implementation . . .[because] the USP requires the District to establish effective strategies, and EBAS is a major part of many USP strategies. Therefore, EBAS must be used effectively." (Order (Doc. 2123) at 143.)

**38.**    The Court rejects the Mendoza Plaintiffs' argument that the District must demonstrate it has fully implemented EBAS, plus show it is effectively using EBAS data. *See* (Mendoza Objection (Doc. 2463) at 33 (arguing against unitary status for family engagement because District fails to demonstrate effective site-use of FACE data tracking system); *see also* (Mendoza Supp. Resp. to NC: ELL DPG (Doc. 2332) at 5 (quoting (Order (Doc. 2123) at 143) (challenging lack of evidence that "'relevant EBAS data is being effectively used by the persons responsible for implementing the …USP program strategies'" for DPG); (Mendoza Supp. Resp. to NC: AASSD and MASSD plans (Doc. 2168) at 3 (having no substantive objections to plans, but objecting to unitary

status in part because no showing that student service departments are effectively using EBAS).

**39.** EBAS is designed to gather data necessary to assess program effectiveness, therefore, the question is simply whether EBAS is being used. The Plaintiffs were afforded opportunities to raise program specific challenges as to whether EBAS is tracking requisite data for the USP programs, such as FACE, DPG, AASSD and MASSD, relevant to assessing program effectiveness. Plaintiffs were silent.

**40.** The 2018-19 DAR included detailed information regarding the progress being made with EBAS. (2018-19 DAR § X, Accountability and Transparency (Doc. 2298) at 184-187 (Reporting: continued building of EBAS as a federation of multiple software applications to collectively work together to inform decisions and strategies for effective instruction and administration; developing capability to pull data from multiple systems to conduct studies and assessments across the systems, with A&E, Curriculum and Instruction, Desegregation, Student Relations, and Technology Services departments; monthly collaboration with the AASSD, MASSD, and other departments to ensure the EBAS was aligned and enhanced to support the instruction and development of students; enhancements ranging from incorporating additional data, additional reporting, replacing Clarity with Synergy, implementing district-wide capabilities in support of Multi-Tiered System of Supports (MTSS), and in-house design and implementation of electronic tracking system for FACE); *see also* 2018-19 DAR § V.D, Dropout Prevention (2298-1) at 87-88 (moving from professional development to professional learning related to MTSS and FACE); § V.F, Targeted Interventions and Supports, AASSD (2298-1) at 98, 104); MASSD (2298-1) at 105, 116; § VI, Discipline (2298-1) at 132, 139, 141-143, 153, 155, 160-161 (implementing coordinated effort to ensure the effective use of data related to discipline by principals, teachers, and other relevant staff using various components of EBAS, including site discipline audits, interviews with principals regarding the site's use of discipline data, and guidance to principals and certified staff through training to facilitate replication of best practices, identify patterns and hot spots; developed strategies

to address areas in need of improvement, with site teams assessing effectiveness of interventions and strategies to determine if they contributed to positive outcomes and to share strategies). The Plaintiffs were silent subsequent to the District's filing the 2018-19 DAR.

**41.**     The 2019-20 DAR included detailed information regarding progress being made with EBAS. (2019-20 DAR § X.C, EBAS (Doc. 2531-1) at 181 (reporting targeted advancements primarily aimed at transferring from Clarity to Edupoint Synergy MTSS, addressing long held desire of teachers to consolidate everything in one place: gradebooks, attendance, and MTSS); 2019-20 DAR (2531-1) at 9, 102, 114, 133, 144-146 (reflecting ongoing training for use of EBAS data by teachers and principals). The Plaintiffs were silent subsequent to the District's filing the 2019-20 DAR.

**42.**     The Special Master did not file SMARs after 2017-18 because he shifted his focus to tracking and reporting compliance with Completion Plans and Court directives. (Order (Doc. 2164); (SM Request for discretionary filings (Doc. 2150). He has not raised any issues related to EBAS.

**43.**     The sole challenge presented to the Court to resolve related to EBAS was that the District allocated too much (100%) of 910G funding for EBAS because EBAS benefits all students; the District may not supplant general M&O funding with 910G funding. The Court noted the importance of EBAS to the USP and the breadth of the District's responsibility to not just develop EBAS, but to implement it, including professional training in its operation and use, and to ensure USP operations are using EBAS. The Court held the District could use 100 percent 910G funding for EBAS operations related to: the delivery of student support services in minority Racially Concentrated schools and underperforming schools; reducing discipline, especially exclusionary discipline which has been shown to fall disproportionately on African American students, and assessing the effectiveness of USP programs. Ruling in part for the Plaintiffs, the Court held the District must link other EBAS expenditures to the USP). (Order (Doc. 2272) at 13-14.)

**44.**      The District has shown EBAS is being effectively used because there were no challenges to the District's representations as made in the DARs and the Completion Plan developed by the Special Master was designed "to ensure district-wide school-site use of EBAS in the context of intervention programs and the use of EBAS to assess program effectiveness, especially USP initiatives, including the systematic analysis of EBAS data to identify problem areas and/or schools that are positive and negative outliers with respect to success in implementing initiatives or achieving particular goals."(Order (Doc. 2123) at 142-143.) The Court affirms, its prior finding that when unitary status is attained for the USP provisions, especially §§ V.A and E.6-7, and VI, unitary status is likewise attained for EBAS. (Order (Doc. 2123) at 143.)

**45.**      The USP, § X, Transparency requirements shall be addressed by the District, with the assistance of the Special Master, in a post unitary status plan. (Order (Doc. 1350) at 3, 9.) The Post-Unitary Status Plan (Post-USP) shall identify any benchmark events related to any plan, program or study that has been scheduled to occur beyond the date of this Order; retain the practice of publicly posting such information on the District's website to facilitate public transparency and accountability, and address the recent "comparative data" challenge raised by Mendoza Plaintiffs on March 23, 2021 that the District adopted new academic achievement measures for SY 2020-21. (Mendoza Supp. Opposition (Doc. 2570)). Pre or post unitary status, comparable data is critical to making data-based decisions related to USP program effectiveness and to having effective transparency and accountability strategies for oversight of District operations. The District shall continue to prepare and post the DAR and 910G budget details on its website for a reasonable period of time to facilitate public accountability and transition oversight of the District from this Court to the community.

**46.**      On September 6, 2018, the Court retained "jurisdiction over all provisions of the Unitary Status Plan for the purpose of enforcement." (Order (Doc. 2123) at 152.) Since then, the Court, upon full briefing by the parties and R&R from the Special Master,  has resolved each and every objection until finally finding that the District has fully complied

with September 6, 2018 directives, the Completion Plans, and the USP. *See supra* ¶¶ 34-35. The Court adopts the findings made in the September 6, 2018 Order (Doc. 2123) and the subsequently issued Orders, referred to above in ¶¶ 34-35.

<u>*Green v. County School Board of New Kent County VA,*</u> 391 U.S. 430 (1968)

**47.**     Under *Green,* the Court considers whether racial disparities remain in: student assignment; faculty and staff, including teacher assignments for beginning teachers; transportation; extracurricular activities, and facilities. The Court also considers whether racial imbalances exist in the context of educational resource allocations, including ALEs.

**48.**     <u>Student Assignment</u>: The Court assumes it is true, as alleged by the Mendoza Plaintiffs, that the District has failed to: integrate ten percent of its nonmagnet schools (8 out of 69) where it has determined there is a high potential for integration; reduce the number of Racially Concentrated schools to below the number of Integrated schools (students in Racially Concentrated schools account for more than one-third of the total enrollment), and failed to improve racial concentrations at six (6) transition schools, which had magnet status terminated (four are more racially concentrated than they were in 2016-17, one has the same degree of racial concentration, one is slightly reduced, and one is Integrated). (Mendoza Objection (Doc. 2463) at 14-16.)

**49.**     In 2018 when the Court reviewed the data for SY 2016-17, it found that "from 2014-15 the number of Racially Concentrated schools had gone from 35 to 30; the number of Integrated schools went from 17 to 25. This resulted in 2,154 more students being in Integrated schools and 2,542 students not being in Racially Concentrated schools. The Special Master provided this data and reported that if he used a "highly diverse" definition for integration, there was even greater improvement. (Order (Doc. 2123) at 16 (citing SM Resp., USP Integrated School (Doc. 2111-1) at 1)). The TUSD 40th Day Enrollment for SY 2019-20 reflects there are currently 27 Racially Concentrated schools and 27 Integrated schools. There are approximately 81 schools, with the remainder being neither Racially Concentrated nor Integrated. (2019-20 DAR, II.k.1.a

Enrollment-40[th] Day (Doc. 2532-3) at 111.) The Court assumes the same would be true now as it was in 2018, several of these other schools are highly diverse. The Court has not rutted through the record further to find this number or to tickle out how many more students are now in Integrated or highly diverse school environments because the numbers are not dispositive. It is enough that the data reflects progress at this time under the USP to integrate the District's schools to the extent practicable.

**50.** Based on the District's demographics of being a minority majority district, "[a] racially concentrated school is any school in which any racial or ethnic group exceeds 70% of the school's total enrollment." (USP (Doc. 1713) § II.B.1.) "An integrated school is any school in which no racial or ethnic group varies from the district average for that grade level (Elementary School, Middle School, K-8, High School) by more than +/- 15 percentage points, and in which no single racial or ethnic group exceeds 70% of the school's enrollment." (USP (Doc. 1713) § II.B.2.)

**51.** Directives to identify integration priorities for nonmagnet schools were issued by the Court in the context of the 3-Year Priority Integration Plan (3-Year PIP). *See* (Order (Doc. 2485) at 5-6 (3-Year PIP to include nonmagnet school integration priorities; requiring Action Plans for every nonmagnet school because the District cannot abandon USP goals for a school when magnet status is withdrawn or because it is not a magnet school; USP calls for district-wide integration to the extent practicable, with magnet schools being one integration strategy); (Amended Order (Doc. 2486) at 6 (requiring Integration Improvement Action Plans (IIAPs) for nine "high potential" nonmagnet schools)). The Court affirmed using a future definition for integration rather than the USP definition in the 3-Year Nonmagnet Priority Integration Plan.[10] (Order (Doc. 2557) at 14.) In its December 23, 2020 Order, the Court recapped its directives, which required the District to review of noncompliant magnet schools using new definitions, improvement plans for all noncompliant magnet schools, Integration Improvement Plans for the top nine "priority" nonmagnet schools, and Academic Improvement Action Plans for 19

---

[10] *See supra* ¶ 66. _____

nonmagnet schools with AZMerit grades D or F. The Court noted that all this work was done and filed with the Court without any objections from the Plaintiffs. (Order (Doc. 2557) at 11.)

**52.** The Mendoza Plaintiffs recently, March 23, 2021, allege the District opened two new schools in 2021, Wakefield Middle School (MS) and Innovation Technology High School (HS), which are both Racially Concentrated, 89% and 77% Hispanic, respectively. (Mendoza Supp. Opposition (Doc. 2570) at 3-7.) This does not raise questions involving the ongoing and future integration plans for nonmagnet schools, except for Wakefield MS and Innovation Tech. HS

**53.** Opening both these schools was approved by the Court pursuant to Notice and Request for Approval (NARA) provisions, USP § X.C, which included a Desegregation Impact Analysis (DIA), full review and comment from the parties and the Special Master. *See* Wakefield MS NARA (Doc. 2373), Mendoza Objection (Doc. 2390); Fisher Objection (Doc. 2400); TUSD Reply (Doc. 2409); R&R (Doc. 2394); Supp. R&R: Utterback Alternative (Doc. 2418); Order (Doc. 2428). *See also* Bridges HS (Innovation Tech. HS) NARA (Doc. 2336); Mendoza Objection (Doc. 2361); (U.S. Intev. Resp. (Doc. 2356); R&R (Doc. 2389); Order (Doc. 2395). In the face of this Court's approval for opening these schools, Plaintiffs nevertheless argue that opening two Racially Concentrated schools this past year proves "[the District,] has not yet developed the capacity to move toward integration absent Court oversight." (Mendoza Supp. Opposition (Doc. 2570) at 2.)

**54.** Wakefield MS, closed in 2013, was reopened as an "an open-access, high-achieving, no-boundary, Integrated, south-central middle school[, . . . , featuring a lab school in partnership with the University of Arizona, after-school programming in partnership with non-profit Higher Ground, and an express bus and a modified lottery to improve integration and access for traditionally underserved students seeking preparation for high school ALE programs like University High School, the IB program at Cholla,

and the AP program at Pueblo, and all AP and Honors courses at all high schools."

(Notice and Request for Approval (Wakefield NARA) (Doc. 2373) at 2.)

**55.** "The [Wakefield MS] proposal ha[d] three key objectives: 1) create an Integrated middle school in a racially concentrated area of the District; 2) develop new teachers through a "lab school" model in partnership with the University of Arizona, and 3) strengthen the ALE pipeline at the middle school level." (Wakefield NARA (Doc. 2373) at 3 (citing Exhibit 1, Revised DIA)).

**56.** As described by the Special Master, Innovation Tech. HS, then called Bridges High School, was proposed in collaboration with the Pima County Joint Technical Education District (JTED) to be "a new career and technical high school[, affording] . . . TUSD students an extraordinary opportunity to develop knowledge and skills that are likely to provide them with exceptional employment prospects. Students will be provided with core academic courses and sophisticated career and technical skills that are in high demand (e.g., robotics). Students will have the opportunity to earn industry certificates and credentials, participate in internships and externships, and engage in clinical experiences in dual college credit in many classes. The District would be unable to provide these learning opportunities without partnering with JTED." (R&R (Doc. 2389) at 2.)

**57.** The Court considered the Plaintiffs' objections that these two schools would be Racially Concentrated and the Special Master's recommendations to, nevertheless, approve both with strategies for integration, and approved the NARAs to place these "specialized"[11] schools in highly concentrated neighborhoods to improve the academic opportunities and student achievement, for African American and Latino, including EL,

---

[11] Early on this Court recognized that there were ways beyond magnet status to promote integration and academic achievement. *See* (Order (Doc. 1753) at 15 (encouraging use of alternative resources to improve schools unencumbered by the burdens of trying to become a magnet school); (Order (Doc. 2123) at 31 (asking District to consider nonmagnet strategies to increase integration district-wide).

students, contingent on proposed strategies to integrate these schools to the extent practicable.

**58.**     For Wakefield MS, the Court heard fully from the parties, ordered the Special Master to conduct further investigation of an alternative site for the school at Utterback Middle School, and pursuant to the recommendation of the Special Master approved the NARA for Wakefield MS, contingent on most if not all of the Plaintiffs' recommended directives addressing integration concerns, including a number of strategies such as express incentive bussing tied to targeted marketing for the school and provisions to ensure that master teachers for Wakefield MS would not be recruited from underperforming schools, etc. (Order (Doc.2428)). The Court did the same for Innovation Tech. HS. (Order (Doc. 2395)).

**59.**     The Mendoza Plaintiffs' recent supplemental argument opposing unitary status is that Wakefield MS and Innovation Tech are Racially Concentrated schools. Essentially, the Mendoza Plaintiffs argue "we told you so," with the only other challenges being: 1) questions related to whether express bus service is being used as proposed in the NARAs for both these schools and 2) for Innovation Tech. HS, whether Dr. Gary Orfield is being consulted related to marketing and recruitment. The Court would normally assume that these and other strategies to promote integration, included in the NARAs and adopted by the Court, were implemented by the District. There is no showing of noncompliance. The Plaintiffs instead note the District's responses to RFIs about what is being done to reduce racial concentration at these schools does not include express bussing. The Court calls for a Response from the District, specifically, addressing whether the strategies outlined in the NARAs to promote integration at these schools have been implemented, and if not why?

**60.**     The District's ability to eliminate racial concentration in its schools is limited because Arizona law requires open enrollment and allows charter schools (Order (Doc. 2123) at 15), leaving the District with the primary[12] strategy of magnet schools to

---

[12] Other integration strategies are: student assignment through attendance

voluntarily integrate the District which is almost 80% minority (60% Hispanic, primarily Mexican American, students).[13] Pursuant to § II.E of the USP, the magnet school program, Comprehensive Magnet Plan (CMP) and 3-Year Priority Magnet Plan (3-Year PIP), has been developed, implemented, and is fully operational now and into the future. *See supra ¶ 35.a (citations omitted.)*

**61.** The CMP strategically places magnet programs centrally in the District, with identifiable demographic target neighborhoods and targeted marketing plans for each magnet school. While the primary goal of the CMP is integration, to accomplish this goal it is imperative that magnet schools be academically attractive: schools with AZMerit grades A or B, or if a C school, it has a TUSD MagnetMerit grade of B. The District has developed and is using clear standards and procedures for improving or removing magnet status from noncompliant programs. The 3-Year PIP includes priorities for future magnet schools and priorities for improving integration at nonmagnet schools that have a high potential to be Integrated. *See supra ¶ 35(a) (citations omitted.)* Free, incentive transportation promotes magnet school programs and priority nonmagnet school integration efforts. The 3-Year PIP has been informed by transportation costs. *See supra ¶ 35(b);* (Doc. 2471) at 14 (priority candidate magnet school and nonmagnet schools to include specific transportation plans required for those programs); (Doc. 2557) at 24-25 (reserving review of Transportation Plan to be joined with review of Revised ALE Policy Manual because Mendoza Plaintiffs raised transportation issues related to ALE)).

**62.** The CMP was prepared in 2015-16 and identified 19 magnet schools/programs (Cragin Elementary School was eliminated as a magnet program in SY 2015-16.) Of the 19 magnet schools, only two met magnet criteria of being Integrated and A or B schools: Dodge Middle School and Palo Verde High School. (CMP (Doc. 1898) at 10.) Four magnet schools (Borton Elementary School, Booth Fickett K-8, Dodge Middle School,

---

boundaries, open enrollment policies, and lotteries. (Amended Order (Doc. 2486) at 7 n.5.)

[13] African American students are 9-10% of the total student population; Hispanic students are approximately 61%, and White students make up about 20-21%, with other students completing student demographics. (Supp. Petition (Doc.2461) at 39-40.)

1  and Palo Verde), met the integration criteria. Subsequent to Court ordered magnet status

2  terminations, 13 magnet schools remained.

3  **63.**  "In 2016-17, five magnet schools were Integrated: Borton, Holladay, and Tully

4  elementary schools, Dodge Middle School, and Palo Verde High School." (Order (Doc.

5  2123) at 22) (relying on CMP (Doc. 1898) at 10; 2016- 17 DAR (Doc. 2057-1) at 53). By

6  September 28, 2017, the District's 40th Day enrollment report reflected the addition of

7  four more Integrated magnet schools: Bonillas and Davis elementary schools, Drachman

8  K-8, and Mansfield Middle School. In short, nine magnet schools were Integrated, with

9  2017-18 AZMerit grades as follows: Bonillas (INT) B; Borton (INT) C; Carillo (RC) B;

10  Davis (INT) B; Holladay (INT) C; Tully (INT) C; Drachman (INT) F; Booth-Fickett D;

11  Roskruge D; Dodge (INT) B; Mansfeld (INT) B; Palo Verde (INT) D, and Tucson High

12  (RC) C. Based on 2017-18 data, there were nine non-compliant magnet schools: one

13  Racially Concentrated school, one F school, three D schools, and four C schools. (Order

14  (Doc. 2123) at 22-24.)

15  **64.**  Based on 2018-19 enrollment data, only Roskruge K-8, a dual language

16  program,[14] was a Racially Concentrated school. Booth-Fickett and Holladay were no

17  longer Integrated as defined for the USP, but qualified as magnet schools, pursuant to the

18  future definition of integration adopted by the District: "an integrated school is any

19  school in which no racial or ethnic group varies from the district average for that grade

20  level (Elementary School, Middle School, K-8, High School) by more than +/- 25

21  percentage points, and in which no single racial or ethnic group exceeds 70% of the

22  school's enrollment." (NC (Doc. 2501) at 3.) Subsequent to the adoption of a TUSD

23  MagnetMerit B grade for AZMerit C schools, there were three schools that did not meet

24

25  _____

[14] "This is important because the dual language [] programs place 'a practical limit
26  on African American and Anglo student enrollment because success in these programs in
grades three and beyond is affected by the student's ability to speak Spanish.'" (Order
27  (Doc. 2123) at 56 (quoting (2016-17 SMAR (Doc. 2096) at 32)). It is not surprising
Roskruge K-8 is Racially Concentrated, but Davis Bilingual (Dual Language) Elementary
28  Magnet School is Integrated. (2018-19 DAR, Appendix II-12, Integration (Doc. 2299-2) at
4.)

the academic criteria to be a magnet school. (NC (Doc. 2501) at 2.)[15] Accordingly, there were four noncompliant magnet schools. (Order (Doc. 2557) at 11.)

**65.** The Court approved a post-USP definition for Integrated because it was considering the merits of continuing magnet status for these schools into the future. (Order (Doc. 2557) at 2-3 (citing Amended Order (Doc. 2486) at 8 (adopting Special Master's recommendation for more common definition of Integration to capture "highly diverse" environments for future use post unitary status, including the 3-Year PIP)).

**66.** Pursuant to CMP protocols, the District developed Targeted Academic Improvement Plans (TAIPs) for Tully Elementary Magnet School (C) , Booth-Fickett Math/Science Magnet School (F), and Palo Verde Magnet High School (C), and a Targeted Integration Improvement Plan (TIIP) for Roskruge K-8. These improvement plans will either move these schools into magnet compliance or transition them to nonmagnet status by the end of SY 2021-22. (Order (Doc. 2486) at 18 (transition plan implementation to begin SY 2022-23)).

**67.** The 3-Year PIP future definition for Integration and the TUSD MagnetMerit B grade are important, not because they reduce the number of noncompliant magnet schools from nine to four, but because they provide clear standards, combined with protocols adopted in the Revised CMP,[16] which provide a finite period of time, end of SY 21-22, for making substantial progress (also clearly defined) towards meeting the requisite academic and integration standards or trigger automatic development of Transition Plans and mandatory implementation at the beginning of SY 22-23. (Amended Order (Doc. 2486) at 18); *see* (Revised CMP, § C, Eliminating Magnet Programs (Doc. 2517) at 15-16 (describing 3-Year protocols for meeting eligibility standards or transitioning to nonmagnet school operations). Accordingly, the District has designed, implemented, and

---

[15] Tully Elementary Magnet School (C), Booth-Fickett Math/Science Magnet School (F), and Palo Verde Magnet High School (C); AZMerit grades were the same as in 2018-19 because AZMerit testing did not occur in 2019-20 due to the COVID-19 pandemic.

[16] The Final CMP is the one posted on the District's website after the Court's Order issued on December 27, 2020 (Doc. 2557).

1   is operating a comprehensive magnet plan that, according to research and best practices,

2   will promote integration, and the 3-Year PIP ensures the integrity of the magnet program

3   now and into the future.

4   **68.**   In its Supplemental Opposition ((Doc. 2571) at 13-14), the Fisher Plaintiffs charge

5   that the District is in violation of the Court's order issued December 23, 2020, that

6   pursuant to the CMP, § B.3, Magnet School Plans (MSP), the "Academic Performance

7   (African American and Latino Students) criteria be used in the MSPs by the Magnet

8   Review Committee for the 2020-21 MSPs. *See* (Order (Doc. 2557) at 6-7 (explaining

9   basis for and providing directives for including these criteria in MSPs). The Court

10  assumes compliance with its Orders or a showing of cause from Defendants for

11  noncompliance, the District shall accordingly respond this challenge.

12  **69.**   Faculty and Staff (Administrators and Teacher) Diversity: The Court assumes it is

13  true, as alleged by the Mendoza Plaintiffs, that the District has diversified only 10 of the

14  26 schools targeted for teacher diversity, which was 13 in SY 2016-17. The District has

15  placed approximately 75% of its first-year teachers at Racially Concentrated and

16  underperforming schools, which schools comprise approximately 58.8% of all TUSD

17  schools. (Mendoza Objection (Doc. 2463) at 16-20.)

18  **70.**   "[T]here is no assertion of discriminatory hiring practices in TUSD." (Order (Doc.

19  2123) at 38.) The USP goal of increasing certificated staff diversity is because: "teachers

20  [and administrators] of color tend to expect more from minority students, and those

21  higher expectations can lead to increased academic achievement; 2) positive exposure to

22  a variety of races and ethnic groups can help reduce stereotypes, and 3) children who see

23  people like themselves as role models are more likely to follow in their footsteps." (Order

24  (Doc. 2564) at 7 (relying on Order (Doc. 2123) at 38; 2016-17 DAR, Appendix IV-29

25  (Doc. 2060-2) at 2).

26  **71.**   The severe national teacher shortage is a fundamental problem facing TUSD in its

27  efforts to recruit diverse teaching staff. "'Moreover, Arizona ranks at the bottom among

28  the states as attractive places for teachers to start their careers.'" (Order (Doc. 2123) at 39

(quoting 2016-17 DAR, Appendix IV-29 (Doc. 2060-2) at 15)). "Arizona teacher salaries are 17% lower than jobs that require similar levels of experience and education; 'Arizona teachers who head families of four are eligible for seven need-tested federal aid programs—more than teachers in any other state.'" *Id.*

**72.**     Problems related to teacher shortages, generally, are further compounded for African American certificated staff because in Arizona, the African American population is only about five percent, and only about 4 percent of the teachers in the entire District are African American.

**73.**     The national teacher shortages limit avenues available to the District to improve teacher diversity, especially the ability to hire new diverse staff, therefore, the District focuses on in-house retention, GYO programs, and incentive transfers. Teacher diversity and administrator diversity are linked because as teachers' careers progress, they tend to move to administrative positions. (Order (Doc. 2123) at 38-42.) The District has developed and implemented diversity plans for both teachers and administrators, and hired a Diversity Recruitment Director, who is responsible for identifying specific site-based needed diversity for both teachers and administrators; identifying and recruiting in-house transfers to meet that need, using incentives including monetary stipends, and does the same for GYO programs, including recruiting African American and Latino staff for pathway positions which are building-block positions necessary to become eligible for GYO administrative programs. *See supra* ¶ 34.a (citations omitted).

**74.**     The strategies available to increase Latino teacher and administrator diversity do not necessarily address African American certificated staff diversity. The data reflects that the District cannot attain this diversity unless new African American certified staff can be recruited. (Order (Doc. 2564) at 9-10.) Given the small African American populations in Arizona and Tucson, new recruits must come from out-of-state, however, the Fisher Plaintiffs have objected to this strategy as not productive. *Id.* at 8. The HR Procedures for Recruiting African American Staff have been reviewed, without objection. *Id.* at 9. The District has complied with the Court's Order to file the African American

1   Diversity Plan Addendum to answer on March 11, 2021 identifying the practicable

2   strategies being used for recruiting and hiring new African American teachers and

3   administrators, with an emphasis on teachers. (Doc. 2568.) Again, there is no objection.[17]

4   **75.**     The African American Diversity Plan Addendum strategies include HR

5   Procedures for Recruiting African American Professional Staff, and the District has

6   identified a program at John Hopkins University which is not an HBCU, but may afford

7   the District an opportunity to recruit African American teachers from John Hopkins. The

8   Fisher Plaintiffs have challenged the efficacy of partnering with HBCU because of the

9   travel expense and lack of success. The cost effectiveness of the John Hopkins program is

10  for the District to determine; they intend to maintain recruiting efforts with HBCUs. The

11  Addendum reflects the active role by the Diversity Recruitment Director to spear head

12  the Diversity Plan, including increasing African American certificated staff diversity.

13  (African American Diversity Plan Addendum (Doc. 2568-1) at 4.)

14  **76.**     TUSD demographics are: African American students are 9-10%; Hispanic

15  students are approximately 61%, and White students make up about 20-21%, with other

16  students completing student demographics. (Supp. Petition (Doc. 2461) at 39-40.) Tucson

17  is 37% Hispanic and 4% African American. (African American Diversity Plan

18  Addendum (Doc. 2568-1) at 21.)

19  **77.**     The Addendum reflects that TUSD employed African American teachers above

20  the state average of 2.8%, as follows: 2016-17 (3.0%); 2017-18 (2.9%); 2018-19 (3.4%,

21  and 2019-20 (3.4%). (African American Diversity Plan Addendum (Doc. 2568-1) at 2.)

22  In 2015-16 (4%) of new classroom-teacher hires were African American and by 2018-19

23  and 2019-20 that increased to (5%). *Id.* at 3.

24  **78.**     The District has increased the number of new African American administrators

25  hired from 2015-16 (8%) to 2018-19 and 2019-20 (14%), with site-administrator new-

26

27      [17] The assertion by the Fisher Plaintiffs in the Supplemental Opposition filed April
28  6, 2021, that "[t]he District's present hiring methodologies for African American
    Administrators do not met the diversity requirements of the Unitary Status Plan (USP)," is
    too little too late.

hires going from 13% in 2015-16 and 2016-17 to 14% and 15% in 2017-18 and 2018-19, but dropping to 9% in SY 2019-20. (African American Diversity Plan Addendum (Doc. 2568-1) at 3.)

**79.**     The Addendum answers the Fisher Plaintiffs' questions of how many African American new-hires the District recruited using USP strategies. (Order (Doc. 2564) 8 (citing Fisher Obj. 2019-20 Budget (Doc. 2239) at 4—5)). The answers are: Recruitment Incentives for Critical Needs (Hard-to-Fill) new-hire incentives (7 in 2016-17, 6 in 2017-18, 7 in 2018-19, and 7 in 2019-20); Make the Move financial assistance to current employees for pathways to teacher certification (2 in 2016-17, 5 in 2017-18, 5 in 2018-19, and 4 in 2019-20); Relocation $10,000 Reimbursement for new out-of-state hires (2 in 2018-19 and 1 in 2019-20). (African American Diversity Plan Addendum (Doc. 2568-1) at 6-7.)

**80.**     The national teacher shortage increased the need to hire beginning teachers beyond the expectations of any party and "no one intended that the number of beginning teachers in what some call 'hard to teach schools' would be as great as it is.'" (Order (Doc. 2273) at 4 (quoting Order (Doc. 2123) at 43 (citations omitted)). "'The importance of limiting the number of beginning teachers in these schools cannot be overstated because good experienced teachers are the most important factor needed to improve student achievement.'" *Id.* (citing Order (Doc. 2217) at 6).

**81.**     The only thing worse than placing beginning teachers at these schools was teacher vacancies, which in SY 2016-17 in August when the most vacancies occurred, there were 158. *Cf.,* (Order (Doc. 1865) at 6-9 (stipulation by parties, subsequent to the Court's first review of CMP, calling for improvement plans, agreeing improvement plans would include among other things, dates certain by which the District would fill approximately 25 teacher vacancies, including long-term substitutes, at approximately eight of the 13 magnet schools). By SY 2019-20, the number of teacher vacancies dropped to 62. (Supp. Petition (Doc. 2461) at 22-23.)

**82.**     The District offset the negative impact of placing beginning, less experienced teachers at Racially Concentrated and underperforming schools by adopting a centralized hiring structure and certification for each beginning teacher placement identifying site-specific mitigation strategies and that there was no more experienced applicant available or that the school has above average ELA and Math scores and the first-year teacher promotes diversity. (Order (Doc. 2497) at 5.) Mitigation strategies are site-specific but all include a 1:10 ratio teacher mentor program, which tracks the beginning teacher's proficiency into year two to ensure supports, including the teacher-mentor, are available until the teacher becomes proficient. *Id.* at 7. *See supra* ¶ 34.b.

**83.**     The percentage of teacher diversity by race has improved as follows: SY 2016-17 65.4% White; 28.1% Hispanic, and 3% African American compared to SY 2019-20 61.9% White; 30% Hispanic, and 3.4% African American. TUSD racial diversity compares to national averages of White 81.9%; 7.8% Hispanic, and 6.8% African American and state averages of 80.1% White; 13.1% Hispanic, and 2.8% African American. (Supp. Petition (Doc. 2461) at 21.)

**84.**     Administrative diversity exceeds national and state averages, with the state average being 5.9%, and the District average in 2018-19 being 11.6%. (Supp. Petition (Doc. 2461) at 22). The state average for Hispanic administrators was 31.4%, and the District average was 38.7% in 2018-19. *Id.* The record reflects steady improvement over the life of the USP, as follows: African American 6.2% in 2013-14 to 10.7% in 2019-20; Hispanic 38.8% to 42%, and White 53.5% down to 44.3%. (2nd NC Diversity (Doc. 2329-1) at 91.)

**85.**     To the extent that racial imbalances remain in certificated staff and administrators, they have been eliminated to the extent practicable and are not the result of past *de jure* segregation or current discrimination.

**86.**     <u>Transportation</u>: Compliance with USP § III, Transportation, is contingent on the District filing the Revised Transportation Plan to correspond with the ALE Policy Manual revisions for AP student support services and the Self-contained GATE and

AAC-AP Alignment Appendixes. *See supra ¶* 35.b-c. There is no allegation of discrimination. There is no racial disparity resulting from past *de jure* segregation in transportation services. The burden of transportation necessary to integrate the District falls most heavily on students living in racially concentrated neighborhoods, African American and Latino, including EL, students but is reasonable because commute times are limited to approximately 20 minutes. *See supra ¶* 96.

**87.**    Extracurricular Activities: On September 6, 2018, the Court ordered the District to document that there are no disparities between Racially Concentrated and Integrated schools and that extracurricular activities are being used to facilitate positive interracial interactions. (Order (Doc. 2123) at 137-38.) Students from lower socioeconomic families participate in extracurricular activities at lower levels, therefore, the District developed and implemented strategies to reduce and/or eliminate fees associated with participation, increase transportation support for extracurricular activities, and designed activities to target increased participation for this group of students. (Order (Doc. 2364) at 2-3.) On November 18, 2019, the Court concluded the only thing missing for full compliance with USP § VIII, Extracurricular Activities, was for the District to ensure it is monitoring the effectiveness of these strategies at Racially Concentrated schools and schools with high percentages of students qualifying for free and reduced lunches. *Id.* at 3. Subsequent to the base line report, the Court ordered the District to include the data in the DAR, and directed it to use a form recommended by the Special Master which was designed to assist school principals in identifying extracurricular activities conducive to promoting positive interracial interaction. *Id.* at 4. This work was completed. (Supp. NC (Doc. 2387)). There are no objections to the entry of unitary status for extracurricular activities. *See supra ¶* 35.g (citations omitted).To the extent that racial imbalances remain, they have been eliminated to the extent practicable and are not the result of past *de jure* segregation or current discrimination.

**88.**    Facilities: The Facilities Conditions Index (FCI) report reflects that the District, using the original FCI formula, demonstrates equity; there is no evidence that Racially

Concentrated schools have lower FCI scores than non-racially concentrated schools. (Order (Doc. 2362) at 1-3.) "'Every school has the same type of wireless access points, installed to the same minimum density standards.'" *Id.* at 4. "Each school has equipment of the same type and with the same capacity connecting the school to the main District internet connection," with no disparity in the availability of internet access anywhere in the District. *Id.* There are no objections to the entry of unitary status for facilities. *See supra ¶* 35.h. There are no racial imbalances in facilities, including technology infrastructure.

**89.**    Advanced Learning Experiences (ALEs): Disparate allocation of educational resources may violate the constitutional right of equal access to educational opportunities. *See* (Order (Doc. 2512) at 5-8 (discussing *Green* factors)). ALE is an educational resource, "which if disproportionately available to White students can easily be identified as segregated and, highly likely to be due to discriminatory intent." (Order (Doc. 2561) at 4 n.3 (citing Order (Doc. 1119) at 15-16)).

**90.**    Parity is not a reasonable goal for ALEs because voluntary participation in ALEs is "influenced by perceptions of a likely attainment of the putative benefits of participating in a given ALE," which are influenced by family and student perceptions of whether students will benefit from ALEs and creates a "stereotype threat" to equal access over which the District has no control. (Order (Doc. 2123) at 46.)

**91.**    A meaningful standard for participation by African American and Latino students in ALE is "not less than 15%" of the percentage of African American and Latino students enrolled district-wide in the grades where the ALE is offered, multiplied by 75% to determine the percentage of students of each race that need to be enrolled in the ALE to reflect equal access exists for an ALE. Enrollment, red-flagged under the "not less than 15%" rule, makes a *prima faice* case of discrimination. (Order (Doc. 2123) at 10.)

**92.**    A *prima facie* case of discrimination exists for a substantial number of ALE programs in SY 2019-20. *See* (Order (Doc. 2561) at 7 (identifying SY 2019-20 "less than" 15% red-flagged ALEs), (Mendoza Objection (Doc.2463) at 20-25 (noting the

discrepancy, but either 15 of 28 or 13 of 32 ALEs red-flagged for discrimination, complaining that District strategies raised all boats instead of targeting African American and Latino students), (Mendoza Objection to SM R&R (Doc. 2476) at 33-34 (same)).

93.     Student enrollment has increased across the board, including increased participation by African American and Latino students in ALEs, (SM R&R Re: Unitary Status (Doc. 2468) at 26-27), (Order (Doc. 2561) at 25 (3,853 ALE students in 2014-15 increased to 6,283 in 2019-20; Latino 1,973 in 2014-15 to 3,314 in 2019-20; African American 200 in 2014-15 to 615 in 2019-20.) White student enrollment grew from 1,338 to 1,772. (Order (Doc. 2561) at 26.) This 63% increase in ALE students from 2014-15 to 2019-20, was apportioned as follows: 68% increase for Latino students, 33% increase for White students, and 207% increase for African American students.[18] Nevertheless, "numbers of African American and Latino students enrolled in all elementary level GATE programs is still less than 15%." (Order (Doc. 2474) at 11.)

94.     ALEs include: Gifted and Talented Education (GATE) and Advanced Academic Courses (AACs). Access to ALEs includes "the number of ALE programs available to minority students, including EL students, and opportunities for participation, defining participation as the number of students enrolled in ALE courses through completion by passing ALE courses or taking and passing requisite certification tests necessary for African American and Latino students to secure the benefit of participating in ALE programs.'" (Order (Doc. 2123 at 5 (quoting Order (Doc. 2084) at 17)).

95.     "The District has implemented every [] suggested strategy for increasing access, [meaning availability,] to GATE. It universally administers the GATE qualifying exams to all students. It has lowered the cut scores. It has Pull-out GATE programs at every elementary school for grades 1-5. For grades 6-10, it offers Resource GATE, which is GATE instruction provided in enrichment or content area classes, and offers one or more

---

[18] The Court miscalculated these percentages in its Order (Doc. 2561) at 26), but the miscalculation was not determinative because African American and Latino students, generally, participate in ALE below the 15% red-flag threshold for equal participation, especially in the entry-level elementary grades.

Resource class(es) at every school for these grades. It has promoted an open GATE policy which fills GATE classes with students without requiring a qualifying entrance test at Tully ES grades 1-5 and at Roberts-Naylor in the Open GATE strand for grades 6-8. It has 14 Cluster GATE schools as an open enrollment alternative to Pull-out GATE, and Resource GATE is open to all students without any qualifying cognitive testing or other qualification. The District identifies all students who qualify for GATE and has implemented direct outreach programs by school staff to these students and their parents, and also by either the African American Student Support Department (AASSD) or the Mexican American Student Support Department (MASSD)." (Order (Doc. 2561) at 12.) *See supra ¶* 35.b (citations omitted).

**96.**     The only GATE program where there is limited program availability is in Self-contained GATE, defined as: "full time, five days per week" (Revised ALE Policy Manual (Doc. 2500-1) at 9), and "GATE instruction in all core academic subjects" (ALE Action Plan (Doc. 1645-2) at 43)." (Order (Doc. 2561) at 13.) It is also established that a program should not be further than a 20-minute commute, (Order (Doc. 2123) at 27 (explaining parents will not send their children where travel time exceeds approximately 20 minutes); (Order (Doc. 2512) at 11 n.8) (same); (Order (Doc. 2561) at 14 (requiring Transportation Plan revision to reflect same).

**97.**     It remains for the District to prepare an Appendix to the ALE Status Report to reflect an equitable plan ensuring equal availability for African American and Latino students to a full-time GATE experience, including revising the Final ALE Policy Manual, Status Report, and Transportation Plan. (Order (Doc. 2561) at 13-15.)

**98.**     The District has developed and implemented "a comprehensive and evenly distributed AAC plan, which in summary includes Honors, Advanced, and Accelerated courses for grades 6-10 and AP, IB and Dual Credit programs for grades 11 and 12." (Order (Doc. 2561) at 17) (explaining Plaintiffs do not challenge AAC plan, except for omission of new schools Wakefield MS and Innovation Tech. HS) *See supra* ¶ 35.b

(citations omitted). *See also* (Order (Doc. 2217) at 6 (middle school for high school credit courses now equally exist at every middle and K-8 school)).

**99.**    UHS student diversity target numbers were not reached, but the District is doing everything practicable to recruit and support African American and Latino students to and at UHS. Personally, every eligible student is contacted. Free transportation is provided to and from UHS, and for student academic support programs. "'African American and Latino students participate in and pass AP courses at the same rate as White students at UHS," (Order (Doc. 2561) at 29), and UHS academic support programs are the gold-standard applied by the Court in assessing practicability and effectiveness. *Id.* at 26-34. It remains for the District to file a report regarding the practicability of running an express UHS shuttle from the south or west sides of the District to UHS. *Id.* at 36.

**100.**    In 2018, the Court found, without objection, that further oversite of the IB program at Cholla High School was not necessary. (Order (Doc. 2561) at 30 (citing Order (Doc. 2123) at 79)). The question remained as to whether integration of the 82% majority Latino student body at Cholla High School might be promoted by an incentive transportation route from targeted northeastern White neighborhoods to south-side Cholla High School. This question was answered in the negative. *Id.* at 36-37. The IB Program is the other student-support litmus test for practicability and effectiveness. *Id.* at 28-34.

**101.**    Student support strategies are necessary to secure full access to ALEs for African American and Latino, including EL, students, because access is defined as successfully completing ALE GATE and AAC courses, and passing requisite AP and IB qualifying exams. (Order (Doc. 2561) at 26-36.)

**102.**    The District has developed support strategies, pursuant to the USP, aimed at increasing enrollment and participation in ALE programs, including strategies to improve the academic performance for African American and Latino students in ALE, (Order (Doc. 2123) at 50 (quoting Order (Doc. 2084) at 17), as follows: CRC AAC and AP courses, student support services provided on-site, especially those provided for ALE students at UHS and for IB students at Cholla High School, and/or by AASSD or

MASSD, transportation, and family engagement. (Order (Doc. 2561) at 15-40.) It remains for the District to implement student support services equal to those offered at UHS and Cholla High School for IB students for all ALE AP students. *Id.* at 40. *See supra* ¶ 35.b (citations omitted).

**103.**    The District failed to comply with past directives to promote academic achievement in ALEs by aligning Honors, Accelerated, and Advanced courses with its AP courses, including alignment for AACs at Wakefield MS and Innovation Tech. HS (Order (Doc. 2561) at 17-18), and for CRC ACCs to align with CRC AP courses, *id.* at 23, 40. It remains for the District to prepare and file the AACs to AP Courses Alignment Map and Schedule for Compliance. *See supra* ¶ 35.b (citations omitted).

**104.**    The USP, § V.E, Student Engagement and Support, programs are all designed to increase academic achievement using strategies targeting African American and Latino, including EL, students, as follows: CRC and CRP to maximize academic engagement and performance; student support service departments, including AASSD, MASSD, and the Linguistic Acquisition Department, to ensure behavioral and academic support services are delivered effectively in a culturally relevant manner, including addressing language barriers and outreach to prevent dropouts and encourage graduation; community engagement programs, including family centers, to address culturally relevant outreach issues. *See also* (SM R&R Re: Unitary Status, Efforts to Improve Academic Performance (Doc. 2468-1) at 5-10 (same, adding on-site AVID and MTSS program to identify academic and behavioral needs, DPG, Reading Recovery, Seven Period Days, etc.)

**105.**    In short, most of the USP strategies being implemented by the District target African American and Latino students and are designed to improve academic achievement, such as: professional development programs, including teacher-mentor programs to improve teacher performance, especially for beginning teachers at Racially Concentrated and underperforming schools; GYO programs and incentive transfer programs to increase school-site diversity in teacher and administrative staff to provide culturally relevant role models and mentors for students; dual language (TWDL) program

to ensure the dual language educational program is academically challenging; inclusive school environments and a discipline plan designed to mitigate the negative impact of discipline which falls most heavily on African America students, and extracurricular activities designed to increase participation and inter-racial interaction. Free incentive transportation glues it altogether.

**106.** That many of these strategies improve academic achievement across the board in TUSD is not surprising because the District is an 80% minority-majority district, with approximately 60% Hispanic students, and "best practices" in teaching strategies necessarily improves student achievement for all the students in a classroom. This phenomenon is not contrary to the Court's prior findings that the USP, its programs and 910G funding, are for the exclusive benefit of African American and Latino, including EL, students.

**107.** Student achievement is one measure of program effectiveness. The 2018-19 DAR reflects that from 2015 to 2019, the number of African American students taking AP exams has increased from 138 to 144, but the number passing with a qualifying AP score fell from 42 to 37. (Mendoza Objection (Doc. 2463) at 22.) The 2019-20 DAR did not include AZMerit data because AZMerit testing was cancelled due to COVID-19. (2019-20 DAR (Doc. 2531-1) at 26.) The District does not present data or argument that reflects any notable improvement in academic achievement as measured by AZMerit testing or alternatively by the District, but the Special Master reports, generally, AZMerit scores for African American and Latino students increased substantially over the last three years to "proficient."[19] (SM R&R Re: Unitary Status (Reply) (Doc. 2494) at 5.)

**108.** According to the Special Master, socioeconomic factors account for approximately 60% of the student achievement gap between White students and their minority counterparts. When race is adjusted for lower socioeconomic factors, reflected by a study group of 2000 students, grades 4 to 8, receiving free and reduced lunches (FRL), the student achievement gap or "poverty gap" is narrower between White students receiving

---

[19] The Court finds no supporting evidence for this assertion.

FRL and their minority counterparts, and there has been a slight reduction in the gap this past year. (SM R&R Re: Unitary Status, Appendix A (Doc. 2468-1) at 2.)

**109.** There is no data to date reflecting USP strategies have narrowed the student achievement gap between White and African American and Latino students. (SM R&R Re: Unitary Status, Addendum A, Examining the Achievement GAP in TUSD (Doc. 2468-1) at 2-3.)

**110.** To the extent racial imbalances remain in ALE, they will be eliminated to the extent practicable upon completing the pending revisions of the ALE Policy Manual, Appendixes, and correspondingly the Transportation Plan. *See Supra* ¶¶ 35.b, 92, 93.

**111.** Discipline is an ancillary factor, which was included in both the original 1978 Settlement Agreement and the USP because the punitive use of disciplinary sanctions, especially serious sanctions for low-level offenses, creates the potential for negative educational and long-term outcomes for affected students. (Order (Doc. 2502) at 3 (citing Order (Doc. 2123) at 126; USP (Doc 1713) § VI.A.1)).

**112.** In 1978, 2013, 2018, and now, disciplinary policies have a disparate effect on African American students across the board for all levels of discipline, including long-term out-of-school suspensions which is the most damaging for a student and his or her academic performance. (Order (Doc. 2502) at 3 (citing 2018-19 DAR (Doc. 2305-3) at 49-52)). "'Disproportionality does not, in itself, demonstrate discrimination, [] but it is a red-flag[20] for when discrimination may exist." *Id.* (quoting Order (Doc. 2123) at 124) (citations omitted). There is no disproportionately between Latino and White students. *Id.* at 2 (citing Order (Doc. 2123) at 124)).

**113.** "In 2018-19, African American students ma[d]e up 10% of TUSD's students and remain[ed] red-flagged for discrimination across every discipline category ranging from a low of 14% for in-school suspensions to a high of 20% for long-term out-of-school suspensions." (Order (Doc. 2502) at 2.) "There is no explanation offered for why 10% of

---

[20] In this context, red-flagged means disproportionality and is NOT associated with the ALE "not less than 15%" rule of thumb red-flag for discrimination. (Order (Doc. 2502) at 3.)

the total student population accounts for almost the same number of suspensions compared to White students, who make up approximately 20% of the student population [and 20% of suspensions]." *Id.* (quoting Order (Doc. 2123) at 124.)

**114.**   Under the USP, there are two goals related to discipline: 1) reduce racial and ethnic disparities in the administration of school discipline and 2) consider student behavior policies and discipline practices to create inclusive and supportive school environments that ensure students remain as often as practicable in the classroom settings where learning happens by devising a variety of graduated positive behavior techniques to be used based on the student behavior at issue with the goal being "to prevent students from being excluded for any amount of time from the classroom or school." (Order (Doc. 2502) at 3-4 (citing Order (Doc. 2123) at 126; USP (Doc. 1713) § VI.A.1)).

**115.**   The District has complied with USP provisions calling for the adoption of two comprehensive, school-wide approaches to classroom management and behavior: Restorative Practices and Positive Behavior Intervention and Supports (PBIS). Over the course of the USP, the District has developed multiple degrees of discipline, with each graduating in severity." (Order (Doc. 2502) at 4.) The District added a classroom component to reduce the impact of suspension when a student is removed from his or her regular classroom: In-school Intervention (ISI), Out-of-school Short-term Suspension, and District Alternative Education Program (DAEP), which also reduces the length of out-of-school suspensions. *Id.* Substantively, it is undisputed that ISI and DAEP are far superior to out-of-school exclusionary discipline. *Id.*

**116.**   African American students make up approximately 10% of the total student population, in 2018-19, African American students made up 15% of the total disciplinary incidents and White students, who make up approximately 20% of the students, made up 18% of the incidents. (2018-19 DAR (Doc. 2305-3) at 34.)

**117.**   "While there are slight fluctuations from year to year, the overall trend is a reduction in the differences in discipline rates between African American and White

students."[21] The difference between White and African American students that existed in 2013-14 was nine percentage points (White 11.56% and AA 20.47%) and by 2018-19, the difference dropped to approximately four and a half percent (White 6.33 % and African American 10.93%). (2018-19 DAR (Doc. 2305-3) at 49.)

**118.**   An AP-Index of "1" reflects students in a group are suspended in the same proportion as their share of the total student population. The P-Index for African American students for long term suspensions in 2014-15 was 2.67 and in 2018-19 was 1.80. Put another way, in 2014-15, African American students made up 6% of the student population and 16% of the long-term suspensions; in 2018-19, African American students made up 10% of the student population and 18% of the long-term suspensions. (2018-19 DAR (Doc. 2305-3) at 51.)

**119.**   Looking at risk factors, in 2014-15, African American students were 3.5 times more likely than White students to be disciplined with a long-term suspension; in 2018-19, the risk factor was 2.1. (2018-19 DAR (Doc. 2305-3) at 52.)

**120.**   It is undisputed that "'compared to national averages in other school districts, African American students receive less disciplinary measures in TUSD.'" (Order Doc 2502) at 3 (quoting Order (Doc. 2123) at 124) (other citations omitted).

**121.**   The Guidelines for Student Rights and Responsibilities (GSRR); Code of Conduct) has been revised to reflect Restorative Practices and PBIS and graduated degrees of discipline from the least disciplinary measure, such as Positive Intervention Centers (PICs) or time-out rooms to long-term out-of-school suspension. (Order (Doc. 2502) at 4-6.) The Revised GSRR eliminates the "Disorderly Conduct" violation, which was routinely misapplied and allows for Abeyance Contracts and diversion and prevention programs which enable students

---

[21] This is true even though discipline rates for SY2018-19 across all groups increased slightly because the Revised GSRR allowed incidents of exclusionary discipline for fighting and drug possession, to be reduced from an 11 to 30-day suspension to a 1-day suspension for first offenders. Also, tobacco use, including vaping, is considered a drug offense, and these violations increased from about 22 in 2016-17 to around 347 in 2018-19 due to vaping. (Order (Doc. 2502) at 13.)

1   to stay in class or on-site suspensions with a classroom component or have shorter

2   periods of out-of-school suspensions. *Id.* at 5-6.

3   **122.**   The District is currently collecting, reviewing, and reporting now and in all

4   future DARS the discipline data as required under the USP to monitor and track the

5   effectiveness of PBIS and the GSRR policies and procedures. (Order (Doc. 2502) at 7-

6   15.)

7   **123.**   The District has put in place processes that will enable it to continue to

8   progress in the future to reduce levels of discipline, especially out-of-school

9   suspensions, and further reduce the disproportionality in disciplinary actions

10  involving African American students. (Order (Doc. 2502) at 15.) At each school, the

11  Student Relations Department is working with site administrators and staff,

12  including MTSS staff, to provide job-embedded support to improve behavioral and

13  disciplinary practices at the school sites and to create site specific Support Action

14  Plans (SAPs). *Id.* 16-17. The Student Relations Department, Director, reports directly

15  to appropriate central administration to bring any issues warranting investigation

16  or remediation to the District's attention. *Id.* at 16.

17  **124.**   Professional Learning is provided in-house by qualified persons in each field,

18  such as GSRR, PBIS or CRP, using specific rubrics to provide coaching and job-

19  embedded support, with this in-house model promoting buy-in from site staff.

20  (Order (Doc. 2502) at 23.)

21  **125.**   The Court ordered the District to include in the 2019-20 DAR, the following:

22  data for the structural and foundational prerequisites for Restorative Practices,

23  PBIS, and GSRR system of discipline, school-site SAPs to address hotspots and an

24  Annual SAP, to be disclosed the first quarter, to address school-site structural or

25  foundational readiness. (Order (Doc. 2502) at 15-26 (purpose to flush out the status

26  of implementation of the USP, § VI, Discipline, positive behavior techniques and

27  graduated disciplinary strategies at each school). The 2019-20 DAR was filed on

28  October 1, 2020. There were no objections from the Plaintiffs or the Special Master.

1    **126.**    To the extent that racial imbalances exist for disciplinary actions involving

2    African American students, they have been eliminated to the extent practicable and are

3    not the result of past *de jure* segregation or current discrimination.

4                                            Unitary Status

5    **127.**    The Court rejects the Plaintiffs' argument that unitary status cannot be granted

6    until the District attains some predetermined measure of equitable effectiveness,[22] such as

7    increasing faculty diversity at its schools +/-15%, increasing access to ALEs, measured

8    by increasing passing scores on qualifying exams or so that no ALE has minority

9    participation less than 15% . . .,  or narrowing the student achievement gap between

10   White and African American and Latino students**.** In the USP Action Plans, the Court

11   required the District to set goals or standards for anticipated improvement. As discussed

12   above some were met; many have not been met. These standards served to guide the

13   District's efforts under the USP during the course of this litigation to measure program

14   effectiveness. They remain equally relevant post unitary status.

15   **128.**    When these measures are met, a program has effectively attained the program

16   goal. However, the reverse is not true. If these standards are not met, it does not mean

17   that a USP strategy is ineffective. The showings of ineffectiveness mean the Court must

18   instead look to the District's good faith compliance with the USP provisions and

19   strategies that were research based and designed based on best practices to be effective in

20   attaining the USP goals of integration, closing the student achievement gap, etc.

21   **129.**    Except for the USP § V.A, ALE Policy Manual revisions and, corresponding, §

22   III, Transportation Plan revisions and the § X Post-USP work that remains, the District

23   has demonstrated compliance with every section of the USP, including the USP

24   provisions that were designed to address the *Green* factors. There are no racial

25   _____

26        [22] The Mendoza Plaintiffs do not contend the District must fully eliminate the
     achievement gap or assert parity as the standard for attaining unitary status, but "contend
27   that the tests this Court has articulated must be met." (Mendoza Objection (Doc. 2463) at
     22.)
28

1   imbalances in transportation, extracurricular activities and facilities. To the extent that

2   racial imbalances exist in student body assignment, certificated faculty and staff, ALE,

3   and discipline, they have been eliminated to the extent practicable because the District

4   has fully and satisfactorily complied with the USP and its strategies, which were designed

5   to eliminate the vestiges of the prior *de* jure segregation that once existed in TUSD. The

6   District's compliance with the USP and related directives of this Court demonstrates its

7   good faith commitment to the whole of the USP and of the law and the Constitution.

8   **CONCLUSIONS OF LAW**

9   To the extent any of the Findings of Fact contain or include any Conclusions of

10  Law, said Findings of Fact are incorporated herein by reference.

11  **1.**     "'[This case] falls squarely within the confines of [] *de jure* [segregation] [] for

12  purposes of determining whether or not TUSD has attained unitary status regardless of the

13  fact that only Black students were statutorily prohibited from attending White

14  schools.'" (Order (Doc. 2123) at 11 (quoting Order (Doc. 1119) at 15 n. 9, *see also*

15  *Fisher v. TUSD,* 652 F.3d 1131, 1137 n. 9 (9th Cir. 2011) (referencing this finding

16  without criticism)).

17  **2.**     "'Like the 1978 Settlement Agreement, the parties entered into the USP 'to

18  resolve the longstanding desegregation case against the District.'" (Order (Doc. 2123) 8

19  (quoting USP (Doc. 1713)] § I.A). "It was a plan designed with 'specific substantive

20  programs and provisions to be implemented to address all outstanding *Green* factors and

21  all other ancillary factors.'" *Id.* (citing *Green v. School Bd. of New Kent County*, 391 U.S.

22  430, 435-36 (1968)). "In addressing whether or not the District has attained unitary status

23  this Court considers that '[t]he duty and responsibility of a school district once segregated

24  by law is to take all steps necessary to eliminate the vestiges of the unconstitutional *de*

25  *jure* system.'" *Id.* (citing USP (1713) )] § I.C.1 (quoting *Freeman v. Pitts*, 503 U.S. 467,

26  485 (1992)).

27  **3.**     "'A school district under a desegregation order, [such as the USP,] is obligated to:

28  (1) fully and satisfactorily comply with the court's desegregation decree(s) for a

reasonable period of time; (2) eliminate the vestiges of the prior *de jure* segregation to the extent practicable; and (3) demonstrate a good-faith commitment to the whole of the court's decrees and to the applicable provisions of the law and the Constitution.'" (Order (Doc. 2123) at 8 (quoting USP (Doc. 1713) § I.A (citing *Freeman,* 503 U.S. at 491-92; *Board of Educ. Oklahoma City Public Sch. v. Dowell*, 498 U.S. 237, 248-50 (1991)).

**4.** "'The test used to determine when unitary status has been achieved and, accordingly, when federal court oversight may end, is well-established: 'The ultimate inquiry is whether the constitutional violator has complied in good faith with the desegregation decree since it was entered, and whether the vestiges of past discrimination have been eliminated to the extent practicable.'" (Order (Doc. 2123) at 8 (quoting *Fisher,* 652 F.3d at 1134-35 (citations omitted)).

**5.**     The Supreme Court has instructed that courts should "give particular attention" to the school system's record of compliance because in this regard a school district is better positioned to demonstrate good faith by committing to a predetermined constitutional course of action and undertakings that form a consistent pattern of lawful conduct directed to eliminate earlier violations. *Fisher,* 652 F.3d at 1135 (citing *Freeman,* 503 U.S. at 491)). Good faith compliance since the inception of a desegregation decree through the entirety of the desegregation plan demonstrates a school district's commitment to a course of action that gives full respect to the equal protection guarantees of the Constitution and guarantees "that parents, students, and the public have assurance against further injuries or stigma . . .." *Id.* at 1141 n.25.

**6.**     "'A history of good-faith compliance is evidence that any current racial imbalance is not the product of a new *de jure* violation, and enables the district court to accept the school board's representation that it has accepted the principle of racial equality and [the school system] will not suffer intentional discrimination in the future.'" (Order (Doc. 2123) at 9 (quoting *Freeman*, 503 U.S. at 498–99). "In other words, good faith compliance over time 'reduces the possibility that a school system's compliance is but a temporary constitutional ritual.'" *Id.* (quoting *Morgan v. Nucci,* 831 F.2d 313, 321 (1st

Cir. 1987)). "Therefore, good faith compliance by the District with the USP over a reasonable period of time 'is a factor to be considered in deciding whether or not jurisdiction [should] be relinquished.'" *Id.* (quoting *Fisher,* 652 F.3d at 1141 n. 25 (citing *Dowell*, 498 U.S. at 249-50)).

**7.**     "In 1968, the Supreme Court established that a school district, like TUSD, that at one time operated a statutorily mandated dual school system had an affirmative duty to eliminate all vestiges of the state-imposed segregation." (Order Doc. 2123) at 9 (citing *Green*, 391 U.S. at 435-36)). "The Court in *Green* explained that a school system can make a *prima facie* case for unitary status by showing that racial imbalances no longer exist in student body assignment, faculty, staff, transportation extracurricular activities and facilities. The *Green* factors cover things that readily identify a school as White or Black, such as the racial composition of staff, [teachers and administrators,] or quality of school buildings and equipment, [or the organization of sports activities,] or in the context of educational resource allocations, such as teacher assignments for teachers with advanced degrees or more experience, then a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." *Id.* at 9-10 (citing Order (Doc. 1119) at 16 (citing *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 18 (1971); *Freeman*, 503 U.S. at 482-83)).

**8.**     *Green* creates "a presumption of discriminatory intent which also attaches to factors that reflect resource disparities because both types of disparities are unlikely to have nondiscriminatory explanations. (Order (Doc. 2123) at 10 (citing Order (Doc. 1119) at 16 (citing *Coalition to Save Our Children*, 90 F.3d 752, 776-77 (3rd Cir. 1996) (placing the burden of proof on Defendants in respect to *Green* presumptive factors, but requiring Plaintiffs to prove disparities in student achievement were vestiges of *de jure* segregation)).

**9.**     "The burden is on the school district to prove it has attained unitary status." (Order (Doc. 2123) at 10 (citing *Fisher*, 652 F.3d at 1135)). "Disparities in *Green* factors are presumptively vestiges of *de jure* segregation, but Plaintiffs have the burden to link

1    disparities that fall beyond *Green,* such as performance disparities in student

2    achievement, to vestiges of *de jure* discrimination." *Id.* (citing *Save Our Children*, 90

3    F.3d at 776).

4    **10.**    "'A school board has no obligation to remedy racial imbalances caused by external

5    factors, such as demographic shifts, which are not the result of segregation and are

6    beyond the board's control.'" (Order (Doc. 2123) at 8 (quoting *Fisher,* 652 F.3d at n.4

7    (quoting *Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.,* 244 F.3d 927,

8    941 (11th Cir. 2001)).

9    **11.**    The District misstates, over simplifies, and conflates the law by asserting the Court

10   must find unitary status because 1) there are no vestiges of the prior dual segregated

11   school system and 2) good faith exists if the Court is confident that there is no risk the

12   District will return to a dual segregated school system if it terminates supervision. (Supp.

13   Petition (Doc. 2461)).

14   **12.**    The Plaintiffs equally misstate, overly simplify, and conflate the law by asserting

15   that the Court cannot find unitary status until the District attains the USP goals to some

16   predeterminate standard: increasing Integrated schools and reducing Racially

17   Concentrated schools, increasing student and faculty diversity, increasing graduation

18   rates and reducing dropout rates; increasing access to ALEs, measured by obtaining

19   passing scores on qualifying exams, and improving student achievement for African

20   American and Latino, including EL, students that narrows and/or eliminates the student

21   achievement gap between these students and White students.

22   **13.**    The law is more nuanced than either party asserts, and both parties do this Court

23   and the community a disservice by not recognizing the advancements which have been

24   made under the USP. Instead, the Plaintiffs highlight the minimal or lack of data

25   reflecting progress in attaining integration or closing the student achievement gap to

26   argue ineffectiveness, bad faith, and failure. The District ignores the record relied on by

27   the Plaintiffs because any disparity is "not the result of *de jure* segregation that existed in

28   1978." The District's failure to cite to contrary evidence of successes left the Court to rut

- 48 -

through the voluminous record and rely on its own recall of successes and its prior Orders addressing compliance with the various USP provisions. *Fisher v. TUSD*, 2007 WL 2410351 *7 (Ariz. Aug. 21, 2007) (citing *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.")).

**14.**     "The District has the burden to show that any current imbalance is not traceable, in a proximate way, to the prior violation, but 'as the *de jure* violation becomes more remote in time and demographic changes intervene, it becomes less likely that a current racial imbalance is a vestige of the prior *de jure* system.'" (Order (Doc. 2123) at 10 (citing *Fisher,* 652 F.3d at 1144 n. 30 (quoting *Freeman,* 503 U.S at 496)). "Still, good faith remains paramount: 'The causal link between current conditions and the prior violation being even more attenuated if the school district has demonstrated its good faith.'" *Id.*

**15.**     A finding of unitary status is informed by the following: "'whether there has been full and satisfactory compliance with the [Consent Decree] in those aspects of the system where supervision is to be withdrawn; whether retention of judicial control is necessary or practicable to achieve compliance with the [USP] in other facets of the school system; and whether the school district has demonstrated, to the public and to the parents and students of the once disfavored race[s] and ethnicities], its good-faith commitment to the whole of the [USP] and to those provisions of the law and the Constitution that were the predicate for judicial intervention in the first instance.'" (Order (Doc. 2123) at 11 (quoting *Fisher,* 652 F.3d at 1144 (quoting *Freeman,* 503 U.S. at 491)).

**16.**     A finding of unitary status is informed by the fact that the District failed to establish good faith in its 20-year operations under the 1978 Settlement Agreement. A failure to demonstrate past good faith cannot be cured by promises of future improvements. "To the contrary, it is only '[a] history of good-faith compliance' that 'enables the district court to accept [a school district's] representation that it has accepted the principle of racial equality and will not suffer intentional discrimination in the future.'" *Fisher*, 652 F.3d at 1142 (quoting *Freeman*, 503 U.S. at 498). Consequently, the

District's record of good faith compliance since remand is a paramount consideration in determining unitary status.

**17.**     "The District is [] incorrect in arguing . . . that '[a]s a matter of law, good faith in the context of this case is *not* whether the District has done all it can to comply with the decree or even all it can to promote integration.'" (U.S. Intervenor Resp. (Doc. 2475) at 5) (emphasis added). "To the contrary, the District's good faith compliance with the requirements of the USP is a critical basis on which its Supplemental Petition for unitary status must be assessed." *Id.* (citing *Missouri v. Jenkins,* 515 U.S. 70, 87-89 (1995); *Freeman,* 503 U.S. at 491-92; *Dowell* 498 U.S. at 248-50)).

**18.**     This Court has a "responsibility [] to retain jurisdiction until [the District] has demonstrated good faith and eliminated the vestiges of past discrimination to the extent practicable." *Fisher,* 652 F.3d at 1143.

**19.**     Practicability "'implies a reasonable limit on the duration of that federal supervision. Indeed, to extend federal court supervision indefinitely is neither practicable, desirable, nor proper.'" (Supp. Petition (Doc. 2461) at 13-14 (quoting *Save Our Children*, 90 F.3d at 760), *accord Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 318 (4th Cir. 2001); *Manning ex rel. Manning*, 244 F.3d at 943 n. 29.

**20.**     "A desegregation decree, like the USP, is not intended to operate in perpetuity." (Order (Doc. 2123) at 6 (citing *Fisher*, 652 F.3d at 1143 (citing *Board of Educ. Oklahoma City Public Sch. v. Dowell*, 498 U.S. 237, 247-48 (1991)). "Given 'local autonomy of school districts is a vital national tradition,' the Court adopted the three-year minimum operational [benchmark] in the USP in order to return TUSD to the control of local authorities at the earliest practicable date to restore true accountability to the government." *Id.*at 7 (quoting *Freeman*, 503 U.S. at 491).

**21.**     Only after the District has "'shown that [it] has attained the requisite degree of compliance" may [the Court] craft "an orderly means for withdrawing from control.'" *Fisher*, 652 F.3d at 1143 (quoting *Freeman,* 503 U.S. at 490). "'[T]he court's end purpose must be to remedy the violation and, in addition, to restore state and local authorities to

1   the control of a school system that is operating in compliance with the Constitution.'" *Id.*
2   (quoting *Freeman,* 503 U.S. 489).

3   **22.**    When the Court finds the District has attained unitary status on all provisions of
4   the USP, federal court oversight ends in its entirety. (U.S. Intervenor (Doc. 2475) at 6-7
5   (citing *DeKalb Cnty. Sch. Dist. v. Schrenko,* 109 F.3d 680, 692 (11th Cir. 1997) (once
6   district achieved unitary status, role of the district court ends); *Pasadena City Board of*
7   *Education v. Spangler,* 427 U.S. 424, 436-37 (1976) (reiterating force of principle set out
8   in *Swann,* 402 U.S. at 31-32); *Lee v. Talladega County Bd. of Education,* 963 F.2d 1426,
9   1430 (11th Cir. 1992) (unitary status means the school board has remedied their
10  constitutional violations and transition to racially non-discriminatory school system is
11  complete and judicial remedial authority ends); *United States v. Overton,* 834 F.2d 1171,
12  1177 (5th Cir. 1987) (once declared unitary, district is released from judicial oversight,
13  and the district is on the same footing as all other state actors)).

14  **23.**    The USP, § XI, Final Termination, of the USP, requires good faith compliance
15  with all obligations under the USP and all Orders of the Court, including the January 6,
16  2012, Order, appointing the Special Master "to formulate a post unitary status plan to
17  guide the District in maintaining constitutional compliance after the release of court
18  supervision." (Order (Doc. 1350) at 3.)

19  **24.**    The subsequent drafting of the Post-USP, like the other identified noncompliant
20  contingencies, does not preclude a finding of unitary status. The Court "'possesses ample
21  discretion to fashion equitable relief [in this case], to tailor that relief as progress is made,
22  and to cede full control to local authorities at the earliest appropriate time.'" (Order (Doc.
23  2123) at 13 (quoting *Freeman,* 503 U.S. at 486-92)).

24  **25.**    The Special Master shall oversee the District's development of a Post-USP
25  addressing accountability and transparency necessary to guide community oversight
26  pursuant to normal governmental systems.

27
28

**CONCLUSION**

The USP is more than a paper-plan. After its adoption, the plan provisions were developed as best practices, research based, and data driven strategies. The USP strategies have been fully implemented, except for the contingencies noted herein which primarily involve planning for future post unitary status operations. The Court retains jurisdiction to resolve any issues relevant to determine final compliance for these contingencies. This does not preclude the Court's finding that the District has demonstrated its good-faith commitment to the whole of the USP.

The District has operated, pursuant to implemented USP strategies, for approximately three years for most of the plan provisions, with some programs not being fully operational until this past year. These operations, whether three years or more or less, have been long enough for review, evaluation, and adjustments to ensure the USP strategies and programs are effective to the extent practicable over this time period, and fully vetted over this time period to weed out ineffective strategies. The USP programs permeate all levels of District operations from individual schools to the administration, including training, performance evaluations, and operational structures from policies to practices necessary for performance and use of the USP strategies. Has the USP been effective in increasing and improving access to educational opportunities or student achievement for African American and Latino, including EL, students? Some say "yes." Some say "no." Some say, the District has not operated under the USP long enough to know this answer, and the Court must retain jurisdiction over this case until there are actual increases and improvements evincing the District has attained the USP goals, including narrowing or closing the student achievement gap with White students for African American and Latino, including EL, students. The Court agrees that longer operation of the District will lead to improved equity and parity between the races but does not agree that the Court must retain jurisdiction until the USP goals are actually attained. Based on its findings of good faith above for compliance with every provision of the USP, the Court is confident that the District will continue USP operations, especially those that are already moving the needle

in the right direction. There is no reason to believe that the District will walk away now from this massive six-year undertaking. To deny unitary status would not only be contrary to the law, it would be counterproductive. The District must be free to respond to the needs of TUSD's students, including African American and Latino students, outside the cumbersome confines of litigation. The COVID-19 pandemic has made this fact abundantly clear.

For example, without any assertions of disparate resource allocation or even impropriety on the part of TUSD, the Fisher Plaintiffs question how the District can in good conscience, actually petition for unitary status when evidence suggests African American and Latino students have received substantially more failing grades than their White peers. In other words, "it is obvious that the achievement gap . . . has definitely widened during the pandemic due to profound disparities in the virtual classroom experienced by minority students." (Fisher Supp. Objection (Doc. 2571) at 2, 4.) By ignoring whether any evidence exists linking District conduct during the pandemic to this new academic disparity, the Plaintiffs fail to consider whether the USP, its strategies, the District's operations pursuant to these strategies, or even any other conduct of the District, failed these students during the COVID-19 pandemic. All parties, not just the Defendants, must consider the effectiveness of USP programs and strategies to address disparities. Otherwise, valuable time and resources are wasted focusing on school programs to address inequities that actually cannot be corrected by any school program, not even one designed under the USP.

The recent Supplemental Objections to unitary status reinforce the Court's conclusion to award unitary status now. The Plaintiffs do not challenge any USP strategy contained in the Wakefield MS and Innovation HS NARAs, which like all the USP strategies were research based and best practices, adopted by the Court with review and input from the Plaintiffs and the Special Master. The Plaintiffs would have this Court deny unitary status because these schools are Racially Concentrated, yet it was anticipated that student enrollment pulled from within a three-mile radius of these school might be 85%

and 84% Hispanic, respectively for Wakefield MS and Innovation Tech. HS (Wakefield MS NARA (Doc. 2373-2) at 5); (Bridges (Innovation Tech. (HS) NARA (Doc. 2336-1) at 2).

In the context of Wakefield MS and Innovation Tech HS, the District opened two specialized schools in minority concentrated neighborhoods, aimed at improving academic opportunities and student achievement for African American and Latino students, with proposed strategies to increase integration, including open enrollment, lottery, targeted marketing, incentive bussing, etc., The recent objections reflect the tension that can exist between integration and improving student achievement for African American and Latino students because TUSD is demographically majority-minority and geographically racially segregated. Sometimes, the District must strike a delicate balance between the two priorities. The teeter cannot totter back and forth depending on the argument of the day. The District must plan for the best result, which is what it did in the NARAs, and stay the course long enough to secure results. That is all that is practicable.

The Court is confident that the District is committed to staying the course and grants unitary status because the District is best positioned to balance these interests and chart the course forward to the end, using the building blocks set down these past six years under the USP.

**Accordingly,**

**IT IS ORDERED** the Special Master's Reports and Recommendations (Docs. 2468, 2469, 2494 (Reply R&R) and recommendation that the Court award unitary status is adopted based on the Findings of Fact and Conclusions of Law made by this Court.

**IT IS FURTHER ORDERED** that the Supplemental Petition for Unitary Status (Doc. 2461) is GRANTED for all USP provisions, except for those provisions reserved for noncompliance as follows:

1.  USP § V.A, ALE: Revised Policy Manual, Appendixes Fulltime GATEs and AAC-AP Alignment, and correspondingly § III, Revised Transportation Plan, *see also supra ¶¶* 89, 92;

2. USP § X, Transparency, Post-USP to: identify benchmark events scheduled to occur beyond the date of this Order; continue DARs for a reasonable period of time to facilitate the transition of oversight of USP operations, including addressing the recent "comparative data" challenge that the District adopted new academic achievement measures for SY 2020-21, which was raised by Mendoza Plaintiff's March 23, 2021 (Mendoza Supp. Opposition (Doc. 2570)); retain the practice of transparency, including the District's website, to facilitate transition from judicial to public accountability.

**IT IS FURTHER ORDERED** that the Court retains jurisdiction for the limited purpose of determining compliance with these remaining contingencies.

**IT IS FURTHER ORDERED** that the Special Master's approval of the District's training of administrators to evaluate CRP competency (Order (Doc. 2508) at 28-29, 33), USP § V.E.6.a.i-ii, shall be filed with the Court by May 31, 2021, and the District shall file the UHS express shuttle-bus report by this same date.

**IT IS FUTHER ORDERED** that the District shall respond to the Plaintiffs' Supplemental Opposition to the Petition for Unitary Status challenging that Wakefield Middle School and Innovation Tech. High School are Racially Concentrated by addressing whether the strategies outlined in the NARAs to promote integration at these schools have been implemented, and if not why.

**IT IS FURTHER ORDERED** that the District shall respond to the In its Supplemental Opposition ((Doc. 2571) at 13-14), the Fisher Plaintiffs charge that it is in violation of the Court's Order (Doc. 2557) by failing to include the "Academic Performance (African American and Latino Students) criteria in the 2020-21 MSPs.

**IT IS FURTHER ORDERED** that pending issues of compliance shall be addressed by the Court pursuant to current briefing schedules, and the District's Responses to the Plaintiffs' Supplemental Opposition to the Petition (Doc. 2570) shall be filed within 14 days of the filing date of this Order. The Plaintiffs shall file Replies within 7 days. If

1    the Court finds it would be helpful, it will call for an R&R from the Special Master and

2    afford the parties an opportunity to file responses.

3        **IT IS FURTHER ORDERED** that the Special Master shall consult the Plaintiffs

4    and oversee the District's development of the Post-Unitary Status Plan, which shall be filed

5    with the Court within 30 days of the filing date of this Order. The Special Master shall have

6    14 days to file a R&R explaining any objections he has to the Post-USP. The Plaintiffs may

7    file Objections within 30 days of the Special Master's R&R, and the District may file a

8    Reply within 14 days.

9        Dated this 19th day of April, 2021.

10

11

12

13    _____

14                    Honorable David C. Bury
                     United States District Judge
15

16

17

18

19

20

21

22

23

24

25

26

27

28