# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al., | No. CV-74-00090-TUC-DCB (Lead Case) |
| Plaintiffs | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | |
| v. | |
| Tucson Unified School District, et al., | |
| Defendants, | |
| Maria Mendoza, et al., | No. CV-74-0204-TUC-DCB (Consolidated Case) |
| Plaintiffs, | |
| and | |
| United States of America, | |
| Plaintiff-Intervenor, | **ORDER** |
| v. | |
| Tucson Unified School District, et al. | |
| Defendants. | |

USP (910G) Budget for SY 2021-22: Approved; PUSRP to be revised; Order to Show Cause Re: DAEP Termination

1

2

3   The Court approves the 910G[1] Budget for SY 2021-22. Going forward hereafter,

4   910G funding for the Equity, Diversity and Inclusion Director's salary and department

5   initiatives are limited as described herein. The District agrees to remove the Tucson Korean

6   Ambassador Program from the 910G Budget. The District shall show good cause why it

7   should not be estopped from ending DAEP in SY 2022-23. The District shall revise the

8   Post Unitary Status Reporting Plan (PUSRP) as discussed in this Order.

9   910G Budget for SY 2021-23

10   It appears the Desegregation Department, which in the past has been fully funded

11   from 910G allocations, has become the Equity, Diversity and Inclusion Department (EDI

12   Department), which the District included for 100% 910G funding in the SY 2021-22 USP

13   Budget. The Desegregation Director position, which was a senior director position is gone.

14   Instead, the District created a new position and "its leader [was] elevated from a senior

15   director to an assistant superintendent, reflecting part of the institutional commitment to

16   the principles underlying the Unitary Status Plan (USP)."[2] (D Reply (Doc. 2605) at 6.) The

17   District explains that "[c]ertain other departments were brought under the supervision of

18   the EDI Department, to improve the coordination of services addressed by the Court in

19   prior orders: the AASSD, the MASSD, Family and Community Engagement (FACE)

20   Magnet Department, and Student Relations Department. All of these department were

---

[1] "The governing board may budget for expenses of <u>complying with or continuing to implement activities that were required or permitted by a court order of desegregation</u> or administrative agreement with the United States department of education office for civil rights directed toward remediating alleged or proven racial discrimination that are specifically exempt in whole or in part from the revenue control limit and district additional assistance. This exemption applies only to <u>expenses incurred for activities that are begun before the termination of the court order</u> or administrative agreement. . . .." A.R.S. § 15-910(G)) (emphasis added).

[2] The Court assumes the Desegregation Director has become the EDI Assistant Superintendent. *But see* (Notice of Withdrawal as Counsel for Defendant by Samuel Brown (Doc. 2587), filed July 1, 2021. To the best of the Court's knowledge Mr. Brown has been the Desegregation Director since the adoption of the USP. His withdrawal as counsel causes the Court to question whether he remains with the District or if he withdrew as counsel due to his new duties as Assistant Superintendent.

largely created and funded under the USP in past years." *Id*. The District admits that it also brought other departments and their programs, not funded by 910G, into the EDI Department because it made organizational sense. *Id*. n. 6. This is fine, but then the EDI Department, including the Director, can no longer be a fully funded 910G program and the Director is no longer performing 100% desegregation related activities.

As a rationale for funding EDI at 100% in the 910G Budget, the District relies on USP Section V(F), Maintaining Inclusive School Environments, which requires the District to take steps to build and sustain supportive and inclusive school environments. "Over the years this has involved numerous initiatives in different departments without an overall coordinating department or leader." *Id.* at 7. And at the direction of this Court, it has studied and developed ways to provide the organizational structure to coordinated equity activities, leading the District to create "a position to supervise and coordinate its inclusivity initiatives undertaken under USP's enjoiner to build and sustain supportive and inclusive school environments." *Id.* According to the District, "[t]his is clearly precisely within the mandate of the USP and A.R.S. Section 15-910G, and though the position is new, the initiative and programs are (a) well established and (b) funded in past years under A.R.S. 15-910G." *Id.*

The District has done more than simply create a position to coordinate and supervise its inclusivity initiatives. It has shifted the focus from the robust USP sections related to desegregation and discrimination to one subsection, USP § V.F, of such a section, USP § V. The fish cannot swallow the whale. The USP § V.F requires the District to be committed to building and sustaining supportive and inclusive school environments and discouraging discrimination, harassment, and bullying. *Compare with* USP § V.A (expanding the reach of ALEs for African American and Latino, including EL students); § V.B (OELAS extension); § V.C (expanding Dual Language Programs); § V.D (addressing issues unique to Latino and African American students, including EL students, regarding placement in Exceptional/Special Education); § V.E (requires the District to create the student support departments (MASSD and AASSD) for the benefit of Latino and African American

- 3 -

students). Like the other substantive sections of the USP, § V expressly targets issues unique to African American and Latino, including EL, students. The Court, therefore, construes the purpose of § V.F, Maintaining Inclusive School Environments, similarly. The District's switcheroo, especially since it involves the elimination of the Desegregation Department, its 100% USP activities and 910G funding, calls into question the integrity of the District's application of the supplement and supplant distinctions in the 910G budgets.

Like this year, past disputes involving allegedly questionable 910G allocations have been resolved by the District agreeing to remove these activities from the 910G Budget. This year, the District agrees to remove the 910G allocation of $85,000 for the Tucson Korean Ambassador Program. It asks the Court to overrule the objection to 100% 910G funding for the EDI Director. The Court finds nothing new about split funding for a USP program. For example, USP § V.A, ALE, and § C, Dual Language, activities are what this Court has referred to in the past as crossover programs that are funded from multiple sources, including 910G allocations. The District has been funding these programs pursuant to some understood agreed split between O&M and 910G funding, which this Court has not been privy too. It shall do the same for the EDI Department, including the Director's position. When the District chose to eliminate the Desegregation Department, including the Desegregation Director position, and merge those program activities with other non-USP related program activities, it should have anticipated the need for split funding. The District, with input from the Special Master and Budget expert, shall recommend an appropriate split for EDI, which shall be applied to the 910G Budget going forward, including SY 2022-23, until or unless changed pursuant to process and procedures adopted in the PUSRP.

The SY 2021-22 910G Budget reflects the systemic problem of misunderstanding the difference between an allowed 910G supplemental allocation and the prohibition that 910G funding cannot supplant Operation and Management (O&M) funding. Confusion and misunderstanding will only increase as oversight of the District shifts from the Court, which now has the assistance of counsel every budget cycle, to members of the general

public, who will lack not only assistance of counsel but will also not know the history relevant to evaluating this distinction in 910G budgets.

This Court has repeatedly, without success, asked the parties for clarification of the supplement versus supplant distinctions, especially for crossover programs where budget allocations must be routinely split between O&M and 910G funding. The Court ordered the Special Master and Budget expert to clarify criteria to guide the District's application of the supplement and supplant allocations. (Order (Doc. 2349)). Still there was no agreement for a clear path forward. *Compare* (SM R&R Re: 2021-22 910G Budget (Doc. 2595) at 3 **(**"Supplanting means expending 910G funds for purposes that should be within the M&O budget. Supplementing is providing funding (910G in this case) beyond those within the M&O budget.") *with* (D's Notice of Compliance (NC) Re: Guideline for 910G Funding) (Doc. 2402) at 3 ("'[S]upplanting,' as that term is used in a budgeting context, does not relate to, or depend on, which students receive the benefit of a program, but rather is based on whether one funding source is used to replace another funding source previously used for the same purpose and at the same level.")

"Nonetheless," the District was willing to work within the outlines of the Special Master's proposed guidelines for its budget for the next budget year (SY2020-21), subject to and without waiving its objections," (NC (Doc. 2402) at 3), and believed that as a "practical matter," . . . "only a very few programs" in budget year SY2020-21 were likely to be an issue under the Special Master's guidelines and for those instances, the District proposed resolution "by specific negotiations based on the individual circumstances of the programs involved." *Id.* at 3. "The District thus suggest[ed] that the parties attempt to resolve issues related to items in the proposed SY2020-21 budget once that specific budget is proposed and avoid what may be a largely theoretical dispute leading only to an advisory decision." *Id.* at 3-4.

While this approach, and the District's voluntary removal of the Tucson Korean Ambassador Program from the 910G Budget, was enough to moot that issue for the purpose of approving the 2021-22 910G Budget, it is not enough to resolve the question of 100%

910G funding for EDI. The change in SY 2021-22 in 100% 910G funding from the Desegregation Department, its elimination, and replacement by 100% 910G funding for the EDI Department requires resolution of the supplement versus supplant issue, not an advisory opinion. The Court finds the change in 910G funding did not comply with USP § X, Transparency and Accountability, because the District did not apply the Budget Principles for Cross Program Funding. *See also* (PUSRP (Doc. 2583) (omitting any mention of supplement versus supplant 910G guidelines)). There is also no evidence that the District complied with USP § X.A.1, which requires evidence-based accountability for program changes that may impact the effectiveness of the District's programs that address racial segregation and improving academic performance and quality of education for African American and Latino students, including ELs.

The Court has seriously considered the Objections from the Plaintiffs and ruled accordingly in approving the 910G Budget for SY 2021-22. Subsequent 910G budgets, including SY 2022-23, shall split funding for the EDI Department, including the Director's salary, between O&M and 910G funding. The District shall make this split only after complying with USP § X.A.1 by determining whether the program change of eliminating the Desegregation Department and replacing it with the EDI Department may impact the effectiveness of the District's USP programs and address any such negative impact to the extent practicable. The District has removed the Tucson Korean Ambassador Program from the USP budget. The Court addresses the remainder of the issues raised in the budget briefs below in conjunction with the Plaintiffs and Special Master's objections to the Notice of Compliance (NC) Re: PSURP.

Post Unitary Status Reporting Plan (PUSRP)

Given the ongoing confusion that has persisted regarding the transparency and accountability provisions of the USP § X, apparent again in the SY 2021-22 910G Budget, the Court finds that the PUSRP must be revised for clarity, especially regarding 910G budget process and program changes, including termination. Otherwise, the Court cannot hand oversight off to the general public because it will be entirely in the dark when it comes

to understanding and reviewing both. This clarity is important in the PUSRP because state funding under 910G may continue long after the District is declared unitary for expenditures that are "a result of compliance with or continuing to implement activities that were required or permitted by a court order." A.R.S. § 15-910(G) and (J). *See* (D's Reply Re: PUSRP (Doc. 2604) at 8 n.1 (Phoenix Union High School still receiving 910G funds 12 years after desegregation case closed in 2009). "Contrary to the Mendoza Plaintiffs assertion, there is no question a school district may continue to levy funds pursuant to A.R.S. § 15-910(G) after court supervision has ended." *Id.*

According to the District, post unitary status, under the express statutory provisions of A.R.S. § 15-910(G), it is likely to continue receiving 910G funding under the auspices of the USP. This is precisely what the USP substantive 3-year program plans, like those for ALE and the Magnet schools, reflect. The PUSRP must reflect the same, which it does. *See* (PUSRP (Doc. 2583-1) § II, Transparency, ¶ A (filing Annual Reports for 3-years) ¶ B (continue to use USP 910G budget process and reporting forms for 3 years).[3]

The Plaintiffs argue that because of the direct link between 910G funding and activities complying with or continuing USP programs, the USP 910G budget process and reporting should continue as long as the District receives 910G funding. The Court believes this is a reasonable and logical request which is better answered by the Governing Board after 3-years of fully operational USP programs, including those adopted pursuant to § X as set out in the PUSRP. The program provisions in the PUSRP, as revised, will be subject like all USP programs to complying with § X, including § A.1, which as noted above requires evidence-based accountability for program changes that may impact the effectiveness of the District's programs that address racial segregation and improving

---

[3] The USP, adopted in SY 2013-14, provided a tentative "end date" of not prior to SY 2016-2017, which was continued because an inventory in that year reflected that many plans were not yet developed or developed but not yet implemented. The Court approved completion plans for each USP provision, which included 3-year operational plans to comply with the USP goal of actual operations rather than a paper plan. USP § XI.A.2: Final Termination, *see also* (Order (Doc. 2572) ¶ 25 (citing (Order (Doc. 2123) at 14 (quoting Order (Doc. 2086) at 2)).

academic performance and quality of education for African American and Latino students, including ELs.

In other words, the PUSRP, once revised, shall reflect the process and standards to apply when the District makes substantive USP program changes, including changing or ending the USP 910G budget process and reporting provisions contained in the PUSRP, unless the state 910G funding ends. In short, the 3-year plans do not operate as sunset clauses to the USP. For reasons explained below, the PUSRP, as revised, shall contain notice and hearing provisions which will apply if the District changes or terminates the PUSRP 910G budget process and reporting provisions. At end, the District is free to continue or discontinue USP programs, including those set out in the PUSRP, but must do so in conformance with the USP § X, Accountability and Transparency, provisions. Subsequent to the District attaining unitary status and this Court's termination of its jurisdiction, the Governing Board is responsible for addressing the Mendoza Plaintiffs request to continue PUSRP provisions pertaining to 910G Budget process and reporting for as long as the District receives 910G funding from the state.

In respect to transparency and accountability relevant to the 910G budget process, the PUSRP provides for continued use of the existing 910G budget process and forms developed under the USP. This is a good starting point for transparency but falls short as a means to facilitate public accountability. The Court notes that the PUSRP fails to even mention "accountability" and instead addresses only transparency. *See* (PUSRP (Doc. 2583-1) § II.A: Transparency.) The purpose of transparency is to facilitate public accountability. The PUSRP needs to be revised to reflect compliance with USP § X, Transparency and Accountability.

The Mendoza Plaintiffs note the general lack of accountability to the USP is even evident in the tenor of the District's website. They accurately describe what seems to have been an intentional omission of the USP and its legislative history and do a fast-forward to its new mission of: "Commitment to Equity, Diversity and Inclusiveness." The District

justifies the omission of "essential case history"[4] because "the purpose of the Post Unitary Status Reporting Plan is to provide transparency and accountability on a going forward basis. The District's website does that. The opening page lists and links to the key ongoing equity initiatives, as embodied in the various policies and plans the District has adopted." (D Reply Re: PUSRP (Doc 2604) at 8.)

In response to the request that the USP be more prominently featured, the District asserts the Mendoza Plaintiffs "misunderstand[] that the Reporting Plan is designed for a post-USP status. The USP by its terms applies during Court supervision of the District. After the Court terminates supervision, the goals and obligations underlying the USP live on in the plans adopted by the District, and the operative documents are those plans, which are the centerpiece of the website supporting the Post Unitary Status Reporting Plan." *Id.* at 9.

"The District has no objection to including the USP, and other filings from earlier in the case, on the Desegregation Case page. The District will always consider reasonable specific suggestions to make the website more accessible, but not as an element of, or precondition for, a Post Unitary Status Reporting Plan. But the Court should reject the Mendoza Plaintiffs' effort to design the District's website the way they would like it; that is not the purpose of the Post Unitary Status Reporting Plan." *Id.*

The District misunderstands the Mendoza Plaintiffs concerns regarding the website. They do not seek to redesign the website. They use it as an example of a shift by the District away from the UPS focus on African American and Latino students. Clearly, the District is free, post unitary status, to shift the District in whatever direction it chooses but the Court reminds the District, the Court has not found unitary status exists for the USP § X. The Court's findings of good faith and unitary status for the other USP provisions were based on 3-year operational plans. The USP § X, Transparency and Accountability, provisions

---

[4] The Court does not address the Mendoza Plaintiffs' other objection which might be accurately described as a rewriting of history that excludes the important role of the District's African American and Latino students in securing the adoption of the USP, its development and implementation, and all the subsequent progress seen in the District under the USP.

must correspond to these substantive programs. As discussed above, the PUSRP reflects a 3-year plan for transparency but ignores accountability. This blind spot resulted in a PUSRP that fails to recognize that accountability cannot occur in a void. Under § X A.1, accountability pertains to "program effectiveness" relative to the USP programs. The plans and programs adopted pursuant to the USP cannot stand alone, especially for the purpose of complying with § X of the USP.

It is not the Mendoza Plaintiffs who misunderstand the PUSRP. It is the District that misunderstands the PUSRP.

To be clear, the purpose of the PUSRP is to reflect compliance with the provisions contained in the USP § X, Accountability and Transparency, which requires that the District use its "evidence-based accountability system . . . to review program effectiveness and ensure that, to the extent practicable, program changes address racial segregation and improving the academic performance and quality of education for African American and Latino students, including ELLs." USP § X.A.1 (Doc. 1713)). The Court's unitary status determination for § X will be based on the same findings of fact and conclusions of law the Court applied to the other substantive provisions of the USP. A walk-away from the USP, without a showing of impracticability, is inconsistent with the approach taken by the District to establish good faith and unitary status. Again, to be clear, the accountability and transparency provisions in the USP § X, like all the provisions in the USP, are for the advantage of Latino and African American students. This requires the District to go beyond satisfying the general interest of the general public to know generally where its tax dollars are going.

It is not enough, as the District suggests, to simply comply with State law regarding 910G budgets, which it references in relevant part as follows:

A.R.S. § 15-910(J) requires a governing board using A.R.S. §15-910(G) to do the following:

> A governing board using 910G funding must: "prepare and employ a separate maintenance and operation desegregation budget and capital outlay desegregation budget on a form prescribed by the superintendent of public instruction in conjunction with the auditor general. The budget format shall

- 10 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> be designed to allow a school district to plan and provide in detail for expenditures to be incurred solely as a result of compliance with or continuing to implement activities that were required or permitted by a court order of desegregation or administrative agreement with the United States department of education office for civil rights directed toward remediating alleged or proven racial discrimination.

The Court notes that Arizona law requires a *desegregation* budget designed to identify expenditures incurred solely as a result of compliance with or continuing implementation activities required or permitted by a court order of desegregation directed toward remediating alleged or proven racial discrimination. Desegregation is not the same as Inclusivity, and the desegregation goals of the USP are not necessarily synonymous with the District's post USP goals of "Equity, Diversity and Inclusiveness."  In fact, the two can sometimes be at odds. The District admits as much by describing inclusivity as "a quality or characteristic that by definition is not and cannot be limited to the two plaintiff classes" because if it was, "it would not be a truly 'inclusive' environment." (D Reply Re: Budget (Doc. 2605) at 8.)

It is not this Court's concern how the State defines or monitors 910G funding for activities required or permitted in the name of a desegregation order. It is, however, this Court's concern whether the District's proposed PUSRP complies with the USP § X, Accountability and Transparency, provisions which like all the provisions in the USP were designed for the benefit of the Plaintiffs. The Court finds that compliance with the USP § X requires more than simple compliance with the state laws governing the use of 910G funding.

The Court must make the same finding of good faith and apply the same law it applied for all the other provisions in the USP in its April 29, 2021, Order (Doc. 2572) for USP § X, before it can enter judgment and close this case. As of now, the issue of unitary status for USP § X, Accountability and Transparency, remains pending. The Court agrees with the Government-Intervenor, that it must correct the misstatement of the status of the case in the Special Master's Report and Recommendation (R&R (Doc. 2586). "The Court did not find in the April Order that the District has achieved full unitary status and, therefore, has not yet terminated judicial supervision. This distinction is important because,

as the Court further held in its April Order, once the District has achieved full unitary status, judicial supervision must end, and the Court must cede full control to local authorities through the traditional political process." (Int. Resp. Re: PUSRP (Doc. 2591) at 3-4 (citing Order (Doc. 2572) at 51). As noted by the Government, this Court has already "confirmed that the District has not yet satisfied all of its desegregation obligations and that the Court continues to exercise jurisdiction," and will do so "until the District is declared fully unitary and oversight is transitioned to the community through the PUSRP." *Id.* at 4 (citing Order (Doc. 2572) at 51) (referring to USP § X).[5]

Because this Court will have no jurisdiction after it approves the PUSRP and finds the District has attained unitary status in full, it is of paramount importance that the PUSRP reflects provisions in full compliance with the USP § X requirements for transparency and accountability. The PUSRP will be the prototype of proper operations pursuant to § X to guide the District going forward until changed or terminated by the District. Post unitary status, the PUSRP reflects how the Plaintiffs, as members of the public, can use normal governmental systems to be heard, especially on 910G funding for USP activities. Promises[6] to do this are not sufficient to establish good faith. The PUSRP must provide the process and procedures for District budget operations to be transparent and for the District to be accountable to the public, including the Plaintiffs.

---

[5] *See also* (Int. Resp. Re: PUSRP (Doc. 2591) at 3-4 (citing Order (Doc. 2572) at 51) (referencing (Order, Conclusions of Law ¶24 (Doc. 2572) (explaining that until the District is declared unitary, [t]he Court "'possesses ample discretion to fashion equitable relief [in this case], to tailor that relief as progress is made, and to cede full control to local authorities at the earliest appropriate time.'" (Order (Doc. 2123) at 13 (quoting *Freeman*, 503 U.S. at 486-92).")

[6] *See also* (Order, Findings of Fact ¶¶ 15-16  (Doc. 2572) (reminding the parties that on appeal, the Ninth Circuit Court held "[A] plan that merely promises future improvements is [not enough]". . . and that this case was remanded with instruction "to maintain jurisdiction until it is satisfied that the School District has met its burden by demonstrating – not merely promising—its good-faith compliance . . . with the [Settlement Agreement] over a reasonable period of time." . . . "The court must also be convinced that the District has eliminated 'the vestiges of past discrimination . . . to the extent practicable' with regard to all of the *Green* factors." (internal quotations omitted). On remand, the Settlement Agreement was replaced by the USP.

1    Without citing to the record, the Court reflects that the budget process has been

2    problematic[7] through the duration of this Court's oversight, with resolution of budget issues

3    complicated because of the time pressures involved in approving the annual budgets. Again

4    this year, disclosures from the District were not forthcoming or came too late. For example,

5    the Mendoza Plaintiffs complained that the Magnet school plans reflected inconsistent and

6    illogical 910G allocations for tutoring, and the Special Master complained that the District

7    had failed to develop the individual school improvement plans in accordance with the Court

8    approved Smylie process. The District replied to both by asserting it appeared they were

9    unaware of the ongoing process the District is engaged in with Dr. Smylie to develop and

10   improve Magnet Site Plans because both relied on early-stage draft school plans.[8] The

11   District proceeded to tell the Court the "full story" which "illuminates the continued

12   commitment of the District to the Smylie Protocol as the basis for school improvement

13   planning, including magnet schools."  (D Reply Re: Budget (Doc. 2605) at 2-3.) The

14   District intends to have the final revised plans done by September 10, 2021. *Id.* at 4. This

15   complies with the Special Master's recommendation that school plans, consistent with the

16   approved Smylie Protocol, be submitted by November 1, 2021, and subject to his review

17   and comment. (R&R (Doc. 2595) at 4.) The Court adopts this recommendation, but more

18   importantly asks: Why the District did not provide the full story to the Plaintiffs and the

19   Special Master? This failure resulted in a waste of time for the Plaintiffs, the Special

20   Master, and this Court, but more relevant to the unitary status inquiry, transparency cannot

21   depend on judicial oversight or it will end when judicial oversight ends.

22      According to the District, the Mendoza Plaintiffs are confused by the multiple

23   funding sources for tutoring, with 910G funding be only a portion of it. The Court is not

24   positioned to address the tutoring issue because the budget forms 1A-C, which reflect all

25   the funding sources, do not contain any information related to tutoring. It appears the 910G

26

27      [7] *See* (Order (Doc. 2123) (describing development of budget process as conflicted).

28      [8] It appears the Plaintiffs relied on the Draft Magnet School Site Plans attached to
the District's First Draft, 910G Budget for SY 2021-22 (Doc. 2569), filed March 23, 2021.

funding for tutoring was broken out on the individual school plans and, therefore, like the Smylie Protocol representations, was out of date. The Budget expert and the Special Master shall review the individual school plans, including Magnet School site plans, and recommend any changes in format needed so that the supplement/supplant determinations being made for site specific activities track with the activities reported on the budget forms 1A-C. A parent, including parents of the Plaintiffs, should be able to see their tax dollars at work for their child's school in a meaningful way that includes the site-based activities that flow from the USP and are either fully funded by or being supplemented with 910G funding.

Of even greater concern, on September 13, 2021, the Special Master filed an R&R related to the 910G Budget for next year, SY 2022-23, which he asserts reflects that the District proposes to eliminate the District Alternative Education Program (DAEP), its alternative for out-of-school suspensions. DAEP is one of the backbone strategies developed by the District to comply with USP § VI, Discipline, designed to address the disproportionate impact of punitive discipline on Latino and African American, especially African American, students. *See* (Order (Doc. 2502) (discussing significance of DAEP, tracking its adoption in SY 2016-17, amendment to Guidelines to Student Rights and Responsibilities (GSRR) in 2018-19, and implementation of school-site training and monitoring implementation of GSRR strategies, including DAEP).

These examples reflect transparency and accountability issues which will only become more difficult when Plaintiffs are replaced by members of the public, who will have less understanding of USP programs and the history of their development. Yet, the District objects to the Fisher Plaintiffs' suggestion for at least an annual public meeting. The District argues it is unnecessary because the public can "just ask if there are questions" or "feedback, suggestions and critique need not await a meeting at all but may be presented in writing to the District at any time." (D's Reply Re: PUSRP (Doc. 2604) at 9.) Even with its open-door policy, it is not enough that the District has regular public meetings every month, along with numerous other meetings and gatherings that are open to the public." *Id.*

Given this is the District's position regarding community engagement, it is not surprising that the PUSRP does not provide a structure for addressing USP related questions or concerns. There is nothing in the PUSRP like the 1978 Consent Decree provision to form an Independent Citizens Council (ICC) to promote continuity post unitary status and field inquiries from the public regarding the Consent Decree. By citing this example, the Court does not mean to suggest that USP § X requires an ICC but there is the same need to promote continuity post unitary status and field inquiries from the public regarding the USP.

The Court assumes that the annual budgets are approved at publicly held board meetings but whether there is a separate agenda item for the 910G budget or ample time to allow public hearing to ensure public accountability is less clear. Unlike the budget, there is no designated time for the community to come before the Governing Board to address substantive USP program disclosures that may be reflected in the Annual Report, including any funding issues raised by the end-of-the year independent examination.[9] Just allowing questions at a general call to the public would not be sufficient for the community to address the Governing Board regarding substantive program changes, including program terminations like the elimination of the Desegregation Department or alleged termination of DAEP. The PUSRP must be revised to include notice and public hearing provisions for the annual 910G budget review and substantive program changes that may be reflected in the annual reports. Both are necessary to comply with § X, transparency and accountability, subsequent to unitary status when this Court's oversight authority ends and oversight moves to the Governing Board.

---

[9] See (USP § X.B.7 (Doc. 1713) (requiring end of the year fiscal report prepared by independent examiners referred to as an audit report). The Fisher Plaintiffs complain that the end-of-year examinations being performed are not audits. The District explains that "it is not possible to obtain a report that a certified public accountant is permitted under professional rules to call an 'audit' given the conditions and circumstances of the examination." To require an "audit" is to require an impossibility." (D Reply (Doc. 2605) at 10.) The Court agrees that the end-of-the year fiscal examinations being conducted by independent accountants, which the District includes in the annual reports, meet the purposes of the USP.

1    The discovery of the District's termination of DAEP during the 910G 2022-23
2    Budget process is especially troubling because there is no evidence that the District
3    reviewed this change for program effectiveness to ensure that, "to the extent practicable,"
4    the change addressed "racial segregation and improving the academic performance and
5    quality of education for African American and Latino students, including ELLs." USP §
6    X.A.1, Evidence-Based Accountability (Doc. 1713)).

7    In the same way the District designed a Desegregation Impact Analysis (DIA) to
8    address the impacts of student assignment decisions, USP X.C, Notice and Request for
9    Approval, the District needs an impact analysis for academic performance, including
10   quality of education for African American and Latino students, (Performance Impact
11   Analysis (PIA)). Like it developed and uses the DIA, the District shall similarly develop
12   and adopt a PIA to reflect substantive USP program changes are made based on "review
13   of program effectiveness to ensure that, "to the extent practicable, program changes address
14   racial segregation and improving the academic performance and quality of education for
15   African American and Latino students, including ELLs." USP § X.A.1. The Court has
16   found the DIAs especially helpful in assessing the impact of student assignment decisions
17   and finds that the continued use of DIAs, post unitary status, will likewise help the public
18   and Governing Board with these reviews. Developing and using PIAs will likewise reflect
19   compliance with USP § X.A.1, for USP program changes, including terminations. PUSRP
20   shall reflect the use of DIAs and PIAs, with disclosures being made to the public and the
21   Governing Board once this Court's jurisdiction ends.

22   The District shall complete a PIA to assess the impact of the proposed termination
23   of DAEP. Prior to completing the PIA, the District shall show good cause why the Court
24   should not stay the termination of DAEP pending this review. Likewise, a PIA shall be
25   used to assess the impact of this year's elimination of the Desegregation Department and,
26   if necessary, the PIA shall address for the purpose of including in the 910G Budget for SY
27   2022-23 for the EDI Department, including the Assistant Superintendent, activities to
28   ameliorate or mitigate negative performance impacts, if any.

In short, the PUSRP makes no accommodations in transparency for the transfer of accountability to the less informed general public and if anything, offers the general public fewer tools to use in securing public accountability post unitary status.

The District shall revise the PUSRP to include the above described notice and public comment provisions, and the use of DIAs and PIAs for making evidence based substantive program changes, including terminations. Disclosures to the public and the Governing Board, will provide the necessary transparency for the public to understand the District's "compliance with or continued implementation of activities that were required or permitted by this Court, pursuant to the USP, and is required under § X's accountability provisions including § X.A.1, Evidence Based Accountability and B, Budget.

As for transparency and accountability related to the 910G Budget, the PUSRP provides for continued use of the existing 910G budget process and forms but neither details the former nor attaches the latter. A good starting point, this statement is not enough given the complexity of the 910G budget process and forms. More is needed, especially, because the District, while conceding to use the current USP related budget process and forms, which have evolved over the course of this case, has refused to expressly agree to them or their underpinnings. Additionally, both the process and forms have been developed beyond the record in this case, which is extensive for all the USP sections, except § X. Therefore, the transition of budgetary oversight from this Court to the public does not have the advantage of a Court approved and adopted completion plan. Instead, implementation of § X provisions has been addressed largely by non-binding compromise, without Court involvement, and outside the record. Without a well-developed judicial record for USP § X, to assist the public or the Governing Board in exercising post unitary status oversight responsibilities related to 910G Budget reviews, public accountability is entirely dependent on the PUSRP.

The District shall revise the PUSRP to reflect the heretofore unreported budget process and relevant budget forms, including 1A-C and the Budget Criteria and Attestation

1   Form.[10] While the significance of the information presented in these forms may be obvious

2   to the parties, it is less obvious to others, including this Court. These materials shall be

3   revised to include meaningful explanations to guide those less experienced than the District

4   and legal professionals, who currently rely on them to understand the 910G budgets.

5            As noted above, this Court has, to no avail, repeatedly asked for clarification of the

6   supplement versus supplant distinctions, including agreed to guideline "split" formulas for

7   the several USP programs routinely using cross funding from O&M, 910G allocations, and

8   other funding sources. In response to the Court's last directive, Order (Doc. 2349), which

9   adopted the Special Master's recommendation that he undertake discussions to resolve

10  910G budget funding issues,[11] the District filed a NC Re: Guide for 910G funding (Doc.

11  2402). As noted above, the District objected to the Special Master's recommendations,

12  even to the definitions for the supplement/supplant distinctions and walked-back previous

13  agreements related to the appropriate 910G split funding for cross funded programs.

14  Nevertheless, the District agreed to follow the Guidelines in developing the SY 2021-22

15  910G Budget. *See* (NC, Ex. A: Budgeting Principles for 910G Cross Program Funding

16  12/6/2019: Driving Principles Listed Below Will Serve as a Budgeting Guide for USP

17  Activities (Doc. 2402-1)); *see e.g.*, (SY 2021-22 910G Budget (First Draft), Ex. 4:

18  Inclusivity Training: Budget Criteria Form and Attestation (Doc. 2569-4)). The Court relies

19

20          [10] Even this Court is in the dark as to which relevant budget forms the District

21  intends to continue using post unitary status.

22          [11] In the R&R, filed on October 23, 2019, the Special Master reported that "[t]hus

23  far, the parties have managed to agree on the share of the costs of implementing the
    provisions of the USP. However, the rationale for these decisions has not been formalized
    which could present difficulties in future budgeting when the District has been granted

24  unitary status." (R&R (Doc. 2337) at 2.) Referencing a prior Court Order for "the District
    to develop a formula for determining the ratio of 910G to other funds that could be applied

25  for all budgeting decisions going forward that related to the USP," the Special Master
    objected because "using the District's proposal would alter funding arrangements now in

26  place about which the parties have previously agreed thus setting up conditions for
    renegotiating prior agreements." (R&R (Doc. 2337) at 2 (referencing District's Reply (Doc
    2334)). The Special Master's recommendation, adopted by the Court, directed him and the

27  budget expert to "identify a set of principles based on the agreements that have been
    worked out by the parties to the extent possible." *Id.* These principles were submitted to

28  the parties for review and comment, and are the principles attached to the District's NC
    (Doc. 2402)).

on the concession this year, similar to the 910G budget concessions which have been made every year, to conclude that the principles applied by the Special Master in the Budgeting Principles for 910G Cross Program Funding reflect in fact the underpinnings of the USP budget process.

The Court has reviewed the Budget Criteria Form and Attestation, supported by the Budgeting Principles for 910G Cross Program Funding 12/6/2019 (the Guidelines) and finds that Principle 4, which relies on resolution of budget disputes by negotiation and agreement of the parties, must be revised for use in the PUSRP. The Court recognizes that whether 910G funding is appropriate will be debatable in many cases, (R&R (Doc. 2595) at 2), because "[t]he activities that the District is implementing to respond to the provisions of the USP, by design, affect almost all of the District's students in most cases. Many activities build on programs that existed before the USP was adopted. These two realities require arguable decisions about whether the funding for the activities should come from 910G funds or Management and Organization (M&O) funds or another source, such as Title One." (R&R (Doc. 2337) at 2.) The Court finds the omission of guideline splits for cross program funding from the PUSRP is not due to an inability to develop a split ratio but is the result of an unwillingness to do so. Clear guidance in the PUSRP, based on the Special Master and Parties' experiences over the duration of this case, is the best way for the Court to "return TUSD to the control of local authorities at the earliest practicable date to restore true accountability to the government." *See* (Order, Conclusions of Law ¶ 20 (Doc. 2572) at 50.)

The Court finds that the Special Master's Guidelines, Principles 1 through 4, address the District's concern that "supplanting," as that term is used in a budgeting context should not depend on which students receive the benefit of a program. (NC (Doc. 2402) at 2.) Principle 5 shall be revised to address the District's proposal that "'supplanting,' as that term is used in a budgeting context, . . . is based on whether one funding source is used to replace another funding source previously used for the same purpose and at the same level." Accompanying Principle 5, as revised, the Guidelines shall include an inventory of the

current funding sources and amounts for each 910G Budget Activity, *see* 910G Forms 1A-C, the standard guideline funding ratios for each 910G Budget Activity, and the actual ratio splits between their funding sources. The Court assumes the current split funding in the 910G SY 2021-22 for cross-programs, like ALE, the Magnet schools, or Dual Language (DL), are based on projected ratios that are being used by agreement of the parties, whether expressly or by concession. The District ignored making a split for EDI because it's Principle 5 only looks at whether one funding source is replaced by another funding source, without considering the activities being funded. This approach will be corrected if the Guideline Principles 1-5 are not exclusive of each other but are alternative principles which when applied suggest whether 910G funding is supplementing or supplanting other funding. Establishing guideline ratios for cross funding splits will serve as a double check on whether 910G funding is supplementing or supplanting other funding.

The Budgeting Principles for 910G Cross Program Funding: Driving Principles and Budget Criteria Form need to be revised to meet the accountability and transparency requirements for the PUSRP. Applying the revised 910G Budget Guidelines and Budget Criteria, the District shall develop a split ratio for cross funding the EDI Department, including funding for its Assistant Superintendent. The Special Master, with input from the Budget Expert and Plaintiffs, shall file a Notice of Approval with the Court. The development and approval of the split ratio for EDI shall be done within sufficient time to be used for the SY 2022-23 910 Budget.

Once the ratio split has been established for EDI, the Court finds no reason to expect any program changes[12] for it or any other cross-funded USP programs that would affect these ratios, and they shall be the standard guideline ratios applied in the PUSRP 910G budget process and reflected on the 910G budget forms, as revised accordingly.

The notice and public comment provisions for the 910G Budget process shall provide for full disclosure of the Budgeting Principles for 910G Cross Program Funding

---

[12] The Court draws this conclusion because the USP programs have been operational and funded since at latest 2020, and the final approved plans for the USP programs reflect no significant changes over the next 3 years.

1  and Budget Criteria Form, reflecting the application of those principles for each 910G

2  Budget Activity.

3  Conclusion

4      The Court finds that the District's good faith compliance with USP § X must be

5  assessed by whether the PUSRP reflects transparency that enables the public to "follow the

6  money," specifically 910G funding. The Court reminds the District that in 2008, this Court

7  could not find good faith in the District's operations under the Consent Decree because it

8  had spent millions of desegregation dollars, 910G funding, in the name of desegregation

9  without tracking the effectiveness of its programs to improve access to educational

10  opportunities and/or student achievement for African American and Latino students. The

11  Ninth Circuit reversed and remanded the case because the Court's failure to find good faith

12  was inconsistent with a finding of unitary status—even though the Court had concluded

13  that the District had fully complied with the express provisions of the 1978 Settlement

14  Agreement.

15      USP § X, Transparency and Accountability, addresses the lack of accountability that

16  was fatal to this Court's finding of unitary status in 2008.[13] Furthermore, the District

17  submits that post unitary status, it will continue to comply with and continue to implement

18  activities adopted pursuant to the USP to the extent practicable. The PUSRP must be

19  revised to comply with USP § X and this assertion of good faith.

20      In the process of revising the PUSRP, the District shall necessarily resolve the

21  requisite split in 910G funding for the EDI Department, including the EDI Assistant

22  Superintendent, determine the impact of this change, if any, compared to the USP activities

23  previously afforded Latino and African American students through the Desegregation

---

24

25      [13] *See* (Order Appointing Special Master (Doc. 1350) at 3-5 (directing that, at a minimum, USP must include: "2. Measurable standards of compliance, goals, timelines, interim benchmarks of progress, and structures for accountability and transparency; 3. A financial plan that provides for financial integrity and public accountability through specific provisions for transparency which identify all funding sources, federal, state and local, and the amounts flowing to the USP's specific components; 4. Recommendations for budgetary oversight and reporting formats including a review schedule to ensure parents and students can see these dollars at work and identify USP limitations that result from budgetary restraints).").

26

27

28

Department, and assess the effect of terminating DAEP on academic performance and quality of education for African American and Latino students, especially African American students.

**Accordingly**,

**IT IS ORDERED** that the 910G Budget for SY 21-22 is adopted by the Court.

**IT IS FURTHER ORDERED** that the District shall revise the Post Unitary Status Reporting Plan (PUSRP) in accordance with the directives and discussions presented in this Order.

**IT IS FURTHER ORDERED** that the Special Master's Reports and Recommendations (Docs. 2595 and 2586) are adopted in part as follows: 1) the Special Master shall review the individual school plans, including Magnet School Site Plans, and 2) clarify the supplement and supplant guidelines for the PUSRP.

**IT IS FURTHER ORDERED** that within 30 days of the filing date of this Order, the Special Master, with the assistance of the Budget expert, shall revise the Budgeting Principles for 910G Cross Program Funding (Guidelines) and Budget Criteria Form. The revisions shall ensure that the 910G Guidelines and Criteria Form shall serve as a meaningful public accountability tool to red flag possible improper supplanting of O&M funding with 910G funding. The revised Guidelines and Form shall be included in the revised PUSRP.

**IT IS FURTHER ORDERED** that the District shall develop a Performance Impact Analysis (PIA) to assess program effectiveness to ensure that to the extent practicable, program changes address racial segregation and improve the academic performance and quality of education for African American and Latino students, including ELs. The PUSRP shall be revised to reflect the use of PIAs and DIAs in compliance with USP § X.A.1.

**IT IS FURTHER ORDERED** that the District shall establish the ratio for split funding for EDI to be included in the PUSRP and used in the Budget Forms 1A-C. For all other Budget Activities, the guideline standard ratios for funding splits shall be those used in past 910G Budgets by agreement or concession.

**IT IS FURTHER ORDERED** that for the 910G Budget for SY 2022-23, the District shall comply with the revised PUSRP Budget Process provisions and revised forms, including the revised Budgeting Principles for 910G Cross Program Funding (Guidelines) and Budget Criteria Form, and include in the SY 2022-23 910G Budget any activities necessary to mitigate or ameliorate to the extent practicable negative effects, if any, on academic performance for African American and Latino students, including Els, resulting from the termination of the Desegregation Department and transition to an EDI Department, with an EDI Assistant Superintendent.

**IT IS FURTHER ORDERED** that within 7 days of the filing date of this Order the District shall show good cause for why the Court should not preclude it from terminating and/or terminating 910G funding for DAEP in SY 2022-23 until and unless it prepares a PIA.

**IT IS FURTHER ORDERED** that the District shall file the Revised PUSRP by January 10, 2022. The Special Master shall file an R&R within 14 days, and the Parties shall have 14 days, thereafter, to respond to the Revised PUSRP and related R&R.

Dated this 6th day of October, 2021.

Honorable David C. Bury
United States District Judge

- 23 -