# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Roy and Josie Fisher, et al.,<br>　　　　　Plaintiffs<br>and<br>United States of America,<br>　　　　　Plaintiff-Intervenor,<br>v.<br>Tucson Unified School District, et al.,<br>　　　　　Defendants, | No. CV-74-00090-TUC-DCB<br>(Lead Case) |
| Maria Mendoza, et al.,<br>　　　　　Plaintiffs,<br>and<br>United States of America,<br>　　　　　Plaintiff-Intervenor,<br>v.<br>Tucson Unified School District, et al.<br>　　　　　Defendants. | No. CV-74-0204-TUC-DCB<br>(Consolidated Case)<br><br>**ORDER** |

<u>OSC: Return DAEP to pre-pandemic program and prepare PIA</u>

1  The District is ordered to operate the District Alternative Education Program (DAEP) in SY 2022-23 and in the future as it was implemented and operated pre-pandemic, pursuant to the Unitary Status Plan (USP), until it prepares a Performance Impact Analysis (PIA) for DAEP changes, including retaining separate junior high and high school DAEP classrooms and is precluded from locating DAEP programs so that these two groups of at-risk students have contact with each other in the same classrooms and/or facilities.

## Background

On October 6, 2021, the Court issued an Order approving the USP (910G) budget for SY 2021-22, ordered the Post Unitary Status Reporting Plan (PUSRP) be revised, and required the District to show cause why the Court should not order it to stop the alleged termination of DAEP services and return DAEP to pre-pandemic operations. (Order (Doc. 2610).)

The Court took the opportunity then to clarify the unitary status of the District. Summarized, the Court retains jurisdiction and judicial supervision over the case until it transitions oversight to the community, pursuant to the USP § X, the provisions for transparency and accountability, which remain pending approval as submitted in the PUSRP. In other words, the Court has considered unitary status for each substantive section of the USP through a series of Orders, *see ex.,* (Order (Doc. 2572) (citing Order (Doc. 2123); Findings of Facts 33a-g; 34a-h), but unitary status remains pending until the Court approves the PUSRP, (Order (Doc. 2610) at 11-12).

The PUSRP has now been revised and submitted to the Court for review and approval. In this context as well as on the merits, the Court considers the District's response to the OSC issued by the Court regarding the alleged termination of DAEP. Section VI, Discipline, is one of the most important USP substantive provisions, therefore, the DAEP OSC serves as a prototype post-USP change that the PUSRP transparency and accountability provisions are designed to address.

The Court considers the merits of the parties' arguments related to DAEP program changes in the context of an OSC issued in response to a Report and Recommendation (R&R) (Doc. 2606) from the Special Master that his review of "the coming year" 910G budget[1] reflected elimination of DAEP. This and briefs filed by the Plaintiffs (Docs. 2607, 2608) prompted the Court to issue the OSC. The OSC did not issue, as charged by the District, due to any improper ex parte communications in violation of Canon 3(A)(4), Code of Judicial Conduct. The District complains there is an appearance of impropriety because on October 27, 2021, the Court forwarded emails sent to the Court's law clerk, one dated October 4, 2021, "two days before the Court issued an order to show cause regarding matters addressed in the email." (Dist. Amend. Resp. to OSC (Dist. Amend. Resp.) (Doc. 2624) at 15 n. 4.) The alleged impropriety is that the Court improperly considered the ex parte communications "which at the time the District had not been informed about, much less given an opportunity to respond." *Id.*

Obviously, the Court has no control over the timing of emails and/or other communications which are sent directly to it, and notes that direct communications from members of the community at large has periodically occurred over the course of this class-action lawsuit and tends to occur during times when the Court is considering issues of special importance to the TUSD-community, especially the Plaintiff class-members. It has always been the practice of this Court to forward such communications to the parties to inform them about such communications and enable them to decide on an appropriate course of action, if any, related to any such communications. As to the District's opportunity to respond, this is precisely the opportunity given to the District by the OSC, which directed the District to respond by showing cause why the Court should not act on the Special Master and Plaintiffs' assertions that the District was terminating the DAEP program. The District asserts, without citation, that an OSC is an extraordinary and rare sanction, which may be true in certain instances, but the OSC issued here most certainly

---

[1] The R&R was filed on September 13, 2021. The budget review process commences around January, with the proposed budgets filed with the Court in March for the next school year.

did not impose any sanction on the District. Finally, it is important to clarify that the October 2021 emails were NOT considered by the Court and were NOT made part of the record; the burden is on any party to keep copies in the event they desire them for any appeal.[2]

The Court is also in receipt of two new ex parte communications related to DAEP, which include another email and a letter. The Court expressly states that it is not considering them in its ruling here and is again going to forward both to the parties and to the Implementation Committee (IC) member Kelly Langford for future use, if any and at their discretion. As the Court understands the District's "open-door" policy, it will want to respond to the communications now and may want to consider them, pursuant to procedures which the Court ordered it to memorialize in the PUSRP for responding to USP related communications from the public, and in the PIA.

### DAEP: Changes in SY 2021-22

The Court finds that there is no evidence that DAEP is being terminated. The evidence[3] does reflect a change in DAEP operations occurred in SY 2020-21 and 2021-22,

---

[2] *See* (Dist. Amend. Resp. (Doc. 2624) at 16 n.4) (suggesting the Court take several actions whenever it receives an ex parte communication including that it disclaims any consideration of it). To the District's point that the Court should not read these communications, the Court like the parties shall exercise its discretion to determine an appropriate action, if any, to take regarding a communication.

[3] The Court relies on the DAEP Report (Doc. 2620-3) from IC member Langford, who acting in consort with other IC members, did precisely what this Court asked him to do to assist the Court due to the death of the Special Master, which was to review and investigate the District's representations regarding DAEP. He visited the DAEP sites and interviewed DAEP staff. The Court does not rely on hearsay evidence because the various factual assertions made in his report, which were based on the challenged DAEP staff interviews, are admitted and explained by the District. The Court relies on the District's admissions. *See examples* (Dist. Amend. Resp. (Doc. 2624) at 4, 8, 10, 11, 12, 13, 14 (admitting and explaining: lunch is not provided on Wednesday because DAEP ends early at 2pm instead of 3pm; during time DAEP was being moved to new site locations there were some issues with supplies and equipment; locating one DAEP classroom at each FRC site affords better access; during pandemic significant increases in teacher absences lead to a small number of occasions when substitute DAEP teachers could not be found and in one instance one DAEP student had to be told to stay home and do DAEP virtually; because of lack of substitutes, Exceptional Education DAEP teacher was assigned to serve as substitute DAEP teacher; same reason, orientation/transition coordinator was assigned to serve as DAEP teacher at Menlo and, therefore, had to do orientation/transition interviews after school hours; planned to conduct DAEP virtually in SY 2021-22 but instead retained DAEP as an in-person program when Governing Board refused to approve virtual program;

which in part are attributable to the COVID-19 pandemic and in part are not- and are being continued into SY 2022-23 and going forward. These program changes may impact program effectiveness of a substantive USP provision and, therefore, require the District to conduct a Performance Impact Analysis (PIA) to determine that to the extent practicable the changes address racial segregation and improve academic performance and quality of education for Latino and African American students, including EL students. The Court relies on earlier findings that Discipline, especially out-of-school suspensions has had a disparate impact on African American students, and DAEP is an important component in the District's Discipline Plan adopted to address this disparity pursuant to the USP § VI.[4]

DAEP enrollment related to long-term suspensions pre-pandemic was as follows: 266 students in SY 2016-17; 233 students in SY 2017-18; 286 students in SY 2018-19, and 226 students in SY 2019-20. (Dist. Amend. Resp. (Doc. 2624) at 5.)

Equally important, Abeyance Contracts, which place students back in their regular classrooms, pursuant to agreements for improved behavior, are an alternative to an out-of-school suspension and were used as follows: 108 students in SY 2016-17; 73 students in SY 2017-18; 25 students in SY 2018-19, and 70 students in SY 2019-20. *Id.*

During the COVID-19 pandemic, long-term suspensions dropped from 200-300 students to 12 students. For SY 2020-21, Abeyance Contracts were used 9 times with only 3 DAEP placements. *Id.* For SY 2021-22, DAEP enrollment is 21 students. *Id.* at 9. The District is silent on this school year's use of Abeyance Contracts. Based on this limited data, it appears that pre-pandemic Abeyance Contracts were proportionally used less often than DAEP as an alternative to an out-of-school long-term suspension.

There is an important distinction between Abeyance Contracts and DAEP because the former moves the student back to his or her classroom, while DAEP removes the

---

there was one DAEP teacher in a wheelchair who may or may not have had access issues, but the wheelchair was temporary due to a leg injury; only able to fill one out of four BIM positions; there was only one DAEP student who was accidentally assigned to DAEP at the student's home school.)

[4] *See* (Order (Doc. 2572) at 40-41 (Findings of Fact ## 113-114 (citing (Order (Doc. 2502) at 2-3 (citing 2018-19 DAR (Doc. 2305-3) at 49-52)); (Order (Doc. 2123) at 124).

- 5 -

student from his or her regular classroom into DAEP, where classwork is continued during the suspension period, with the addition of intensive behavioral supports to transition the student back into the regular classroom. The distinction is especially important because both alternatives to suspension apply to students who are subject to suspension for level 4 and 5 violations, which occur "when a student commits an action that puts other students or staff in potential harm or worse." (Fisher Objection, DAR 2018-19, Appendix VI-17: DAEP Program Evaluation over Three Years, 2015-16 to 2017-18 (Doc. 2609) at 5). Some examples of level 4 violations are: assault, causing any physical injury or apprehension of imminent physical injury; alcohol, tobacco, and other drug violations (possession or use); arson of a structure; fire alarm misuse; sexual offenses including harassment with contact, indecency; theft (burglary, robbery, or extortion), and weapons possession, such as billy club, brass knuckles, knives, etc. Level 5 violations are: aggravated assault, causing serious physical injury; alcohol, tobacco, and other drug violations (sale or sharing); arson to an occupied structure; school threats (bomb, chemical, etc.); theft (armed robbery, burglary with weapon), and firearm possession of handgun, pistol, revolver, rifle, etc. *Id.*

Now, with all students returning to TUSD's school campuses, there is no reason to expect that the need for DAEP services will be substantially different from those reflected in SY 2019-20. The District promotes its use of Abeyance Contracts, as "an even less exclusionary alternative to a long-term suspension," in combination with the flip-flop in referrals between DAEP and Abeyance Contracts in the past two years, reflects a program change that may impact performance, especially if extended into the future when students return to school classrooms. Then, out-of-school suspensions will likely rise back to pre-pandemic numbers which were between 200 and 300 students as compared to 12 students in SY 2020-21.

The lack of any program performance analysis between DAEP and Abeyance Contracts in combination with the lack of relevant data is reason enough for the Court to order the PIA. The Court attempted to review the DAEP numbers in the SY 2019-20 and 2020-21 District Annual Reports (DARs) but found that the District did not consistently

report the data in these two reports and the data in the DARs did not match the data in the District's Response to the OSC. *Compare* 2019-20 DAR, § VI.G.1b (Doc. 2536-1) at 122 and DAR 2020-21 (Doc. 2616-4) at 130-131. The Court will address these reporting inconsistencies in a subsequent Order to be issued regarding the PUSRP, but for the purpose of the DAEP PIA the data shall cover the years going back to SY 2016-17 to the most current data available and identify which numbers reflect when students were attending in-person versus virtual classrooms. The data reported by the District in its Response to the OSC is particularly helpful because it reflects data for Abeyance Contracts and shall be provided in the PIA, with the addition of data for short term suspensions with and without DAEP. The Court assumes the District's reference to Traditional Suspensions in its Response means actual long-term out of school suspensions without DAEP.

For a baseline, the Court looks to SY 2019-20 DAEP operations, which were the subject of extensive professional staff training pursuant to USP provisions designed to ensure implementation and integrity of operations. (2019-20 DAR (Doc. 2531-1) at 144: § VI.H, Discipline-Professional Learning; DAR Appendices (Doc. 2531)). Since then, the District has moved the DAEP sites, reduced DAEP staff, and begun using the "even-less exclusionary alternative to a long-term suspension: the abeyance contract." (Dist. Amend. Resp. (Doc. 2624) at 5.) Together, not considering other more minor changes that have occurred,[5] this Court finds that DAEP has been changed so that program effectiveness may be impacted. For the reasons explained below, the District shall be required to conduct a PIA, which shall address best practices for DAEP.

As noted above, the two alternatives, DAEP and Abeyance Contracts, to out-of-school suspension are not the same. They are not interchangeable. A PIA is necessary to consider performance factors, if any, resulting from returning students, who are subject to classroom suspension for level 4 and 5 violations, to their regular classrooms without

---

[5] By not discussing other changes, the Court does not mean they should be excluded from the PIA if they may, singularly or in combination, impact performance of DAEP, meaning its delivery to DAEP students as an effective program to reduce out-of-school suspensions and improve academic performance for at-risk students.

- 7 -

1  providing the type of supports offered through DAEP. A PIA will assess the performance
2  factors relevant to funneling these at-risk students one way or the other. Also, the District
3  shall consider the safety risks and risk of academic disruption for other students and faculty,
4  if students who are subject to an out-of-school suspension are returned to their regular
5  classrooms.

The District's Discipline Plan,[6] including the DAEP and Abeyance Contract components, were developed and adopted pursuant to the USP, and like all the USP programs are research based best practices. The PIA shall include this foundational component for assessing changes it proposes to DAEP.

The District has moved the locations of the DAEP programs. Pre-pandemic, DAEP was located at three sites: at the Southwest Educational Center, which is not a school site but is where the District has other programs and offices; on campus at Project MORE high school,[7] and at Magee Middle School. Now, it operates DAEP at four sites: the Southwest Educational Center; Palo Verde and Catalina High Schools, and Menlo School, which is like the Southwest Educational Center and no longer a school.

In short, the District relocated DAEP to its four Family Resources Centers (FRCs), which are a central component of TUSD's Family and Community Outreach program, adopted pursuant to the USP § VII. The four FRCs are strategically located for district-wide ease of access. The District reports this change makes DAEP more accessible. (Reply

---

[6] DAEP is part of a multi-faceted, comprehensive Discipline plan adopted pursuant to the USP § VI: Restorative Practices and Positive Behavior Intervention and Supports (PBIS). "'The District has developed multiple degrees of discipline, with each graduating in severity.'" (Order: Findings of Fact #115 (Doc. 2572) at 41 (quoting Order (Doc. 2502) at 4.) "The District added a classroom component to reduce the impact of suspension when a student is removed from his or her regular classroom: In-school Intervention (ISI), Out-of-school Short-term Suspension, and District Alternative Education Program (DAEP), which also reduces the length of out-of-school suspensions. *Id.* Substantively, it is undisputed that ISI and DAEP are far superior to out-of-school exclusionary discipline." *Id.* (citations omitted). The Court notes that the Abeyance Contract is not mentioned here; it does not remove the student from his or her regular classroom but instead affords the student one last chance to remain in the classroom.

[7] Project MORE, an alternative high school, offers a comprehensive alternative for students who face outside challenges in getting a diploma at a traditional high school. Teachers work with students at an accelerated pace to fill learning gaps and complete high school, and prepare students for college and careers.

- 8 -

(Doc.2631) at 4 (new locations expand access). The District ignores that, pursuant to its own reported DAEP numbers, DAEP is only providing services to a very few DAEP students at any one time. At most there may be a student-teacher ratio of 1:10 and usually it is far less. (Dist. Amend. Resp. (Doc 2624) at 9-10 (As of January 24, 2022, in SY 22-23, no DAEP teacher had more than 9 students at any one time and typically less than 7). Under these circumstances, district-wide access to DAEP locations, which is needed by only a few students, does not compare to the district-wide need for community access to FRCs. Ease-of-access is, therefore, not a strop performance factor for DAEP, and there are downsides to moving DAEP to the FRC locations.

The Mendoza Plaintiff's complain that the District has not explained why it believes FRCs are appropriate locations for the DAEP program, "or what family and community engagement services, events, or programs might be affected by the DAEP site relocations." (Mendoza Objection (Doc. 2629) at 11.) For example, the Mendoza Plaintiffs point out that the Palo Verde DAEP site is located in the computer lab at the school's FRC. The Mendoza Plaintiffs report that bathrooms must also be shared, and there have been complaints from FRC staff that DAEP students leave the bathrooms untidy or damaged. *Id.* at 10. In addition to sharing the FRC's printer, fax, and other equipment, this makes the FRC computer lab unavailable when DAEP is in session 9am to 3pm, seven days a week. One of the primary purposes of the FRC is to make technology, specifically computers, available to families and students, who do not have such access at home. U.S.P. § VII.C.b,d,f. The Court agrees with the Mendoza Plaintiffs that locating DAEP at the FRC sites may not be a good fit. These centers are central to the Districts' ability to reach out to and provide services to families and students, who are at risk of dropping out or struggling academically due to a lack of resources. This design model does not seem a good fit for DAEP, which provides services to students at risk of being suspended from school for level 4 and 5 violations. *See* (Mendoza Objection (Doc. 2629) at 16 n.8 (noting certain measures, like searching a student for drugs or weapons, cannot be performed by DAEP staff and can only be undertaken by a school administrator).

The greatest impact from the site changes has been the District's decision to combine middle school and high school DAEP. Previously, only the Southwest Educational Center served both middle and high school DAEP by partitioning the classroom in half. Now, DAEP is offered in one-room at each site, with one DAEP Team: a certified teacher and Behavioral Intervention Monitor (BIM). (Dist. Amend. Resp. (Doc. 2624) at 9.) The District has admittedly had difficulty filling teaching positions, generally-district-wide and specifically for DAEP. It has only been able to fill one of the four BIM staff positions. (Dist. Amend. Resp. (Doc 2624) at 14.)

The primary benefit from combining middle and high school DAEP students in one classroom is obvious: staffing. The District explains that at the beginning of the pandemic, it had 10 DAEP certified teachers and less than five DAEP students. It desperately needed these teachers elsewhere. After the Governing Board, due to strong community opposition, refused to approve a plan to make DAEP virtual, the site changes enabled the District to move all but four of the DAEP certified teachers elsewhere.

As noted by the Mendoza Plaintiffs, it should come as no surprise to the District that this Court would find it problematic to combine middle school and high school students in the same classroom. Previously this Court rejected grade reconfigurations that would have brought 7th and 8th graders to Sabino High School because the District's proposal failed to discuss and consider "'how the special developmental needs of 7th and 8th graders will be addressed in a high school environment. After all, it was the unique character of 7th and 8th graders that drove the creation of middle schools in the first place… For example, there appears to be no separate administration or disciplinary program planned for these middle school students.'" (Mendoza Obj. (Doc. 2629) at 12 n. 6 (quoting (Order (Doc. 1909) at 8)). The Court notes that the trend in combining 7th and 8th graders with other grades is not to move them up but to expand K-8 schools. Again, the District fails to consider the unique characteristics of middle school and high school students, especially between junior high and high school at-risk students who are at disciplinary tiers 4 and 5 and subject to exclusionary consequences.

The District admits to some instances of inappropriate middle school and high school contacts but notes that they all occurred outside the classroom. This does not surprise the Court because the DAEP classroom is monitored. It also supports the Court's conclusion that junior high and high school DAEP students should be separated so that the students do not have contact with each other at the DAEP facility. The District shall not proceed with its plan to open another DAEP classroom across the hall from the current DAEP classroom at Catalina High School to "allow greater physical separation of middle school students from high school students using a large room-divider partition, as has been used in the DAEP site at the Southwest Educational Center since the beginning of the program." (Reply (Doc. 2631) at 7.) The District shall not expand the Southwest Educational Center's physical accommodations for DAEP classes until it completes the PIA, which shall expressly address the issue of middle school and high school student contact in DAEP based on best practices.

Until the impact of this change on performance is assessed in a PIA, the District shall retain its pre-pandemic DAEP operations and shall not combine DAEP operations for middle and high school students in the same classroom or at the same facilities, unless the two groups of DAEP students can be physically separated both in and outside the DAEP classroom. This injunction applies equally to DAEP at the Southwest Education Center.[8]

The parties agree that DAEP classrooms shall be staffed with two person teams, including a certified teacher and BIM. Securing DAEP staffing for SY 2022-23 shall be a top priority for the District. The Court notes that BIM staff not only monitor student behavior, but they are also trained to build relationships with the students and provide

---

[8] While the District reports that DAEP has always been combined at the Southwest Educational Center, this is the first time it has been brought to the attention of the Court that middle and high school students are being brought in close proximity to each other there. It is undisputed that staff shortages, especially DAEP and BIM staff shortages, increased during the pandemic. The shortage in staffing BIM positions has precluded them from monitoring DAEP students when they use bathroom facilities, go to lunch, or to their transportation pick-up sites. (Mendoza Objection (Doc. 2629), Kapuscinski Decl. (Doc. 2629-1) at ¶ 17.) If true, the staff levels pre-pandemic, including adequate BIM staff at each site to monitor students in and outside the DAEP classroom, may explain the District's ability to operate DAEP at the Southwest Education Center without incident.

emotional support. (Mendoza Objection (Doc. 2629) at 17-19.) BIM staff is an important component to DAEP and retaining BIM staff once they are trained is not a new problem because they leave the District for higher salaries elsewhere. (Fisher Objection, DAR 2018-19, Appendix VI-17: DAEP Program Evaluation over Three Years, 2015-16 to 2017-18 (Doc. 2609) at 6.) To remedy this problem, the 2018-19 DAR, Three-Year DAEP Evaluation, recommended: "Similar to other high-profile programs in TUSD such as magnet programs or other 'hard to fill' positions in TUSD's at-risk schools, DAEP should receive hiring priorities and/or hiring incentives to recruit and retain teachers." *Id.* at 36. The Court does not understand the District's assertion that funding staffing levels are more than adequate for the DAEP mission, (Reply (Doc. 2631) at 8), without an explanation as to why the District's BIM salaries are not competitive with higher salaries being offered elsewhere that are resulting in BIM staff leaving the District once they are trained. As noted earlier, the USP's Discipline § VII, especially DAEP, is a key component for addressing the disparate impact on Black students from out-of-school suspensions, making 910G funding readily available for DAEP.

The Court does not enjoin the District from making changes to save money or better utilize resources. The Court recognizes the need to reassess DAEP staffing levels is especially acute in light of resource scarcity issues, especially during times when DAEP student numbers are very low. To be clear, the Court is not suggesting that 10 DAEP teams must stand by, ever ready, twiddling their thumbs waiting for DAP students to appear. If DAEP numbers are too low to warrant 10 DAEP teams[9] after the District returns to referring students to DAEP instead of routing them back to regular classrooms though Abeyance Contracts, then the District may reduce the number of DAEP teachers, BIMs, or classrooms. For example, if there are only a few DAEP students at any one time, it may make sense to have only one DAEP junior high and one DAEP high school. This would not be unheard of as there is only one Project MORE and one University High. The Court

---

[9] The Court assumes that the pre-pandemic staffing plan for 10 DAEP teams was research based and set for some reason related to best practices, and not just pulled out of a hat.

- 12 -

realizes that it has in the past measured access by a 20 or 30-minute bus ride, but exceptions do exist and may be warranted for DAEP, which is not a permanent classroom or school assignment for students. Generally, students stay in DAEP 15-30 days. (Dist. Amend. Resp. (Doc. 2624) at 4.) The point is that the District, through a PIA, must make these program decisions based on research and best practices to provide the most effective DAEP services to the extent practicable for these at-risk students, given the District's resources. The purpose of the PIA is to expedite sound program performance assessments so that program changes can be responsive to changing resource needs without undermining USP program effectiveness to the extent practicable. Preparing a PIA should not be a burdensome undertaking.

The Court issues this Order directing the District to prepare a PIA, recognizing that review and approval of the District's PIA format remains pending as part of the PUSRP. The Court, therefore, may have to amend directives issued herein, if necessary, to comply with findings issued after its review and approval of the PUSRP, including the PIA provisions. Likewise, the District may find it necessary to amend or supplement the PIA provision(s) submitted with the PUSRP to comply with these DAEP directives because DAEP will serve as a prototype to test the effectiveness of the PIA to assist decision makers in assessing changes to USP programs that may impact those student services.

The Court issues this Order prior to completing the review and approval of the PUSRP and PIA because the District needs time to change DAEP site locations and add DAEP staff, especially to address the past inability to hire BIMs, for SY 2022-23. Even if the current DAEP operations satisfy a best practices standard, the District will not be able to complete the PIA for DAEP changes until the Court completes its review of the PIA format and related policies and procedures for its use, which remains pending approval of the PUSRP. The Court does not suggest that the District is precluded from making changes to DAEP for SY 2022-23, including site locations and/or staff level changes, but it is enjoined from making the changes discussed here or any other changes that may impact the effective performance of DAEP until performance factors can be assessed pursuant to

a PIA and presented to the Governing Board for approval. This is the type of post-unitary status transparency and accountability required under the USP § X, which the Court expects to see in the PUSRP.

**Accordingly,**

**IT IS ORDERED** that the Court adopts the recommendation in the Report and Recommendation (Doc. 2606) filed by the Special Master in part, as follows: The District shall undertake a study of the effectiveness of DAEP, pursuant to a PIA and the directives contained herein.

**IT IS FURTHER ORDERED** that until the impact of changes that may impact DAEP performance are assessed in a PIA, the District shall return to and retain pre-pandemic DAEP operations and SHALL NOT:

1. Combine DAEP operations for middle and high school students in the same classroom or at the same facilities, unless the two groups of DAEP students can be physically separated both in and outside the DAEP classroom;
2. Use Abeyance Contracts in place of DAEP assignments, and
3. Reduce DAEP staffing below having classroom teams of two, one certified DAEP teacher and one BIM, with separate staffing for the Exceptional Education DAEP teacher and Orientation/Transition DAEP Coordinator.

**IT IS FURTHER ORDERED** that the District shall provide a copy of this Order to every member of the Governing Board and every member of the IC.

Dated this 24th day of March, 2022.

Honorable David C. Bury
United States District Judge